**FIGURE 63**



Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 64**



Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 65**



**3 Month EuroYen Deposit Rate Ask Price and**
**JP Morgan Chase 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 66**



**3 Month EuroYen Deposit Rate Ask Price and**
**Lloyds Banking Group 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 67**



3 Month EuroYen Deposit Rate Ask Price and
Bank of America 3 Month Yen LIBOR Quote Spread
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

### C.  During the Class Period, Euroyen TIBOR and Yen-LIBOR Diverged Dramatically From their Historical Relationship with Each Other

889.     Figures 68 and 69 below shows the relationship between Euroyen TIBOR and Yen-LIBOR beginning in January 2003 and ending in June 2012.  As demonstrated therein, historically before the start of the Class Period, between January 2003 and December 2005, Euroyen TIBOR and Yen-LIBOR moved closely together with Euroyen TIBOR remaining slightly higher than Yen-LIBOR, causing the Euroyen TIBOR/Yen-LIBOR spread to be slightly positive.  In particular, during the 36-month period of January 2003 through December 2005, the average spread of Euroyen TIBOR with respect Yen-LIBOR was a positive 0.024.

890.     By the start of the Class Period, this historical relationship began to diverge, as Yen-LIBOR increases at a faster rate than Euroyen TIBOR thereby causing a collapse and eventual inversion of the spread between Euroyen TIBOR and Yen-LIBOR (*i.e.*, the spread turns negative as Euroyen TIBOR becomes higher than Yen-LIBOR).  During the period of January 1,

2006 through January 15, 2009, the average spread between Euroyen TIBOR and Yen-LIBOR was -0.043.  Following January 15, 2009, and continuing through to the end of the Class Period, the relationship between Euroyen TIBOR and Yen-LIBOR remained delinked from its pre-Class Period historical relationship.  For example, from January 16, 2009 through the end of the Class Period, the average spread was positive 0.137, far from its historical pre-Class Period average of 0.024 by more than 470%.  Further, on November 26, 2009, the Euroyen TIBOR/Yen-LIBOR spread reached as high as 0.216, and on January 27, 2010, it reached as high as 0.200.

891.    As explained above, important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors facing the Defendant banks should (absent manipulation) be reflected similarly in Euroyen TIBOR and Yen-LIBOR, and therefore not cause the historical relationship between these rates to diverge. Significant de-linkages in the historical relationship between Euroyen TIBOR and Yen-LIBOR during the Class Period strongly indicate that Euroyen TIBOR and Yen-LIBOR rates were artificial.

**FIGURE 68**



**3 Month EuroYen TIBOR and Yen LIBOR Rate Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: Spread is calculated as 3 Month EuroYen TIBOR minus Yen LIBOR. All figures are in percent.

**FIGURE 69**



**3 Month EuroYen TIBOR and 3 Month Yen LIBOR**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The EuroYen Deposit Rate is provided by Bloomberg and computed as an average of bid and ask prices. All figures are in percent.

**D.  The Defendant Banks That Served on Both Panels Submitted Lower Individual Euroyen TIBOR Quotes than Yen-LIBOR**

892.    As explained in ¶¶ 889-891, and Figures 68 and 69 above, the historical pre-Class Period relationship between Euroyen TIBOR and Yen-LIBOR was such that Euroyen TIBOR was slightly higher than Yen-LIBOR.

893.    As detailed in Figures 70 and 71, the Defendant panel banks that served on both the Euroyen TIBOR and Yen-LIBOR panels repeatedly submitted a lower Euroyen TIBOR quote than Yen-LIBOR quote during the Class Period, which is contrary to the historical pre-Class Period relationship between Euroyen TIBOR and Yen-LIBOR, and the overlapping banks' pre-Class Period conduct.  The foregoing further supports that Euroyen TIBOR was artificial during the Class Period.



**FIGURE 70**

388

894.    As demonstrated in Figure 71 below, Defendants Bank of Tokyo-Mitsubishi, Mitsui Sumitomo Banking Corp., Mizuho Corporate Bank, Norinchukin Bank and JPMorgan Chase, submitted a lower Euroyen TIBOR quote than their Yen-LIBOR quote almost 40% of the time during the Class Period.

## FIGURE 71

## Comparison of Banks' 3 Month EuroYen TIBOR Quotes against Contributing Banks' 3 Month EuroYen LIBOR Quotes

|  | 1/1/2003 --<br>12/31/2005 | | 1/1/2006 --<br>6/30/2011 | |
|---|---|---|---|---|
|  | TIBOR quote <<br>LIBOR quote | | TIBOR quote <<br>LIBOR quote | |
| Bank of Tokyo-Mitsubishi | 0 | -- | 549 | (42%) |
| Citibank | 0 | -- | 0 | (0%) |
| Deutsche Bank | 0 | -- | 156 | (20%) |
| JP Morgan Chase | 99 | (14%) | 514 | (39%) |
| Mizuho Corporate Bank | 15 | (2%) | 529 | (40%) |
| Norinchukin Bank | 1 | (0%) | 532 | (41%) |
| Royal Bank of Scotland | 0 | -- | 0 | (0%) |
| Sumitomo Mitsui Banking Corp | 1 | (0%) | 541 | (41%) |
| UBS AG | 2 | (0%) | 348 | (27%) |

Data Source: Bloomberg.
Notes: Banks overlap across LIBOR & TIBOR panels.

895.    Figure 72 below performs a similar analysis, but does not limit its sample to just overlapping Euroyen TIBOR and Yen-LIBOR banks.  Instead, Figures 72 and 73 measure all individual Euroyen TIBOR quotes for all reporting Euroyen TIBOR panel banks and compares it to the actual Yen-LIBOR fix.

896.    In Figure 72, the height of each bar displays, on any given day, the number of banks that either submitted (1) Euroyen TIBOR quotes that were greater than the Yen-LIBOR fix (green); (2) Euroyen TIBOR quotes that were equal to the Yen-LIBOR fix (yellow); or (3) Euroyen TIBOR quotes that were less than the Yen-LIBOR fix (red).

897.    Figure 72 demonstrates that during the Class Period, from approximately January 2007 through January 2009, on average, 93% of Euroyen TIBOR quotes submitted by Defendant panel banks on the Euroyen TIBOR panel were lower than the actual daily Yen-LIBOR fix. In fact, from September 2007 through January 2009, virtually all of the Euroyen TIBOR Contributor Panel Banks submitted an individual Euroyen TIBOR quote which was lower than the actual Yen-LIBOR fix, day in and day out.



**FIGURE 72**
Number of Contributing 3 Month EuroYen TIBOR Quotes Greater-Than, Equal-To, and Less-Than 3 Month Yen LIBOR

Data Source: Bloomberg.
Notes: The height of each bar displays, on any given day, the number of banks that either submitted (1) TIBOR quotes that were greater than the LIBOR, (2) TIBOR quotes that were equal to the LIBOR, or (3) TIBOR quotes that were less than the LIBOR.

**FIGURE 73**

# Comparison of Banks' 3 Month EuroYen TIBOR quotes against Actual 3 Month Yen LIBOR

| | 1/1/2003 -- 12/31/2005 | | 1/1/2006 -- 6/30/2011 | |
|---|---|---|---|---|
| | TIBOR < Actual LIBOR | | TIBOR < Actual LIBOR | |
| **Bank of Tokyo-Mitsubishi** | 0 | -- | 609 | (46%) |
| **Bank of Yokohama** | 0 | -- | 190 | (25%) |
| **Chuo Mitsui Trust** | 0 | -- | 418 | (58%) |
| **Citibank** | 0 | -- | 0 | (0%) |
| **Deutsche Bank** | 0 | -- | 190 | (25%) |
| **JP Morgan Chase** | 625 | (88%) | 633 | (48%) |
| **Mitsubishi UFJ Trust** | 0 | -- | 540 | (41%) |
| **Mizuho Bank** | 0 | -- | 593 | (45%) |
| **Mizuho Corporate Bank** | 0 | -- | 543 | (41%) |
| **Mizuho Trust & Banking** | 0 | -- | 578 | (44%) |
| **Norinchukin Bank** | 0 | -- | 580 | (44%) |
| **Resona Bank** | 0 | -- | 545 | (42%) |
| **Royal Bank of Scotland** | 0 | -- | 0 | (0%) |
| **Shinkin Central Bank** | 0 | -- | 523 | (40%) |
| **Shoko Chukin Bank** | 0 | -- | 546 | (42%) |
| **Sumitomo Mitsui Banking Corp** | 1 | (0%) | 544 | (41%) |
| **Sumitomo Trust & Banking** | 0 | -- | 543 | (41%) |
| **UBS AG** | 66 | (12%) | 496 | (38%) |

Data Source: Bloomberg; CMA

Notes: Underlined banks overlap across LIBOR & TIBOR panels.  The 3 Month EuroYen Deposit Rate is provided by Bloomberg.

Percentages are computed with respect to each respective bank's total number of TIBOR quotes in each given period.

**E.  The Difference Between Defendants' Reported Yen-LIBOR Quotes and their CDS Spreads Strongly Supports Yen-LIBOR Artificiality**

898.     Another economic indicator that Yen-LIBOR was artificial during the Class Period is the difference between the Yen-LIBOR Defendant panel banks' reported daily Yen-LIBOR quotes and the contemporaneous cost of buying default insurance, known as the "spread," on credit-default swaps ("CDS") that Yen-LIBOR Defendant panel banks issued during the Class Period.

899.     A CDS is a contract which transfers credit risk from a credit protection buyer to a credit protection seller.  This agreement occurs when one party, the protection buyer, seeks financial protection in event of a default on an underlying credit instrument, such as a bond or a loan.  Generally, a CDS buyer makes a series of payments (known as the CDS "fee" or "spread") to the CDS seller in exchange for a payment if the underlying credit instrument experiences an adverse credit event.

900.     The spread serves as a measure of the perceived risk of default by the entity issuing the underlying bond or receiving the loan.  Typically, the greater the risk of default the underlying bond or loan bears, the higher the CDS spread.  In the case of a CDS for which the underlying instrument consists of an interbank loan where a Yen-LIBOR panel bank is the borrower, the greater the perceived risk the panel bank will default on the loan, the higher the applicable CDS spread, as this higher spread represents the cost of insuring against the increased risk of a default on the underlying loan.

901.     It is expected that an individual Yen-LIBOR bank's daily quote and its CDS spreads should move in relative lockstep, meaning that when an individual bank has a CDS spread that is one of the lowest when compared to all other banks in the group, it should also have one of the lowest LIBOR quotes in the group.  Plaintiffs' economic analyses indicate that

this was not the case during the Class Period, and in particular from September 12, 2008 through January 19, 2009, when banks with the highest CDS spreads in the Yen-LIBOR panel very often (nearly 100% of the time) submitted the lowest Yen-LIBOR quotes.

902.    Plaintiffs analyzed available CDS spread data for select Yen-LIBOR panel banks.

903.    In Figures 74 and 75, below, Plaintiffs conducted an intraday rank ordering whereby on each given day, Yen-LIBOR quotes submitted by Yen-LIBOR panel bank Defendants were ranked (ordered) from highest to lowest.  The quotes were then classified into two groups: above or equal, and below the median Yen-LIBOR quote for that day, among the same group of banks.  Similar rank ordering was performed for CDS spreads for the same group of banks, and the CDS spreads were classified into two groups:, above or equal, and below the median CDS spread on that day, within the same group of banks.  For each bank, results were organized into the three following groups: (i) Yen-LIBOR Quote Below Median & CDS Above or Equal Median (Black); (ii) Yen-LIBOR Quote Above or Equal Median & CDS Above or Equal Median together with Yen-LIBOR Quote Below Median & CDS Below Median (Dotted); and (iii) Yen-LIBOR Quote Above or Equal Median & CDS Below Median (Gray).

904.    Among other findings, Figure 74 shows that from September 12, 2008 through January 19, 2009, Defendant UBS' Yen-LIBOR quotes were below its CDS spread almost 100% of the time, and that the Yen-LIBOR quotes submitted by Defendants Deutsche Bank, Mizuho Corporate Bank, and Rabobank were below their respective CDS spreads 50% (or nearly 50%) of the time.

## **FIGURE 74**





**Intraday Rank Ordering:  3 Month Yen LIBOR Quotes and Credit Default Swaps**
9/12/2008 – 1/19/2009

Data Source: LIBOR data from Bloomberg; Credit Default Swap (CDS) data from CMA, starting on 9/12/2008.
Notes: Intraday ordering of 3 Month Yen LIBOR quotes and respective CDS Spreads. On each given day, banks LIBOR quotes are ordered from highest to lowest, and classified into two groups: above or equal, and below the median LIBOR quote for that day, among the same group of banks.  Similar ordering is performed for the available CDS spreads for the same group of banks conditional on data availability, classifying them into above or equal and below the median CDS spread on that day, within the same group.  For each bank, results are organized in three groups: LIBOR Quote Below Median & CDS Above or Equal Median (black), LIBOR Quote Above or Equal  Median & CDS Above or Equal Median together with LIBOR Quote Below Median & CDS Below Median (dotted), and LIBOR Quote Above or  Median & CDS Below Median (gray). The CDS data used are for the banks' one year senior debt CDS contracts in USD.

905.     Figure 75 below illustrates additional examples of when Yen-LIBOR Defendant banks submitted Yen-LIBOR quotes well below their then-prevailing CDS spreads.  For example, on October 15, 2008, Deutsche Bank submitted the lowest Yen-LIBOR quote, yet its CDS spread was the 9th lowest amongst 12 CDS spreads for that day.  This means that Deutsche Bank had one of the highest CDS spreads among the Yen-LIBOR panel banks on that day, while having the lowest Yen-LIBOR quote.  UBS is one of the banks with the largest difference between its CDS spreads and Yen-LIBOR quotes.   For example, on September 16, 25, 26 and 29 of 2008, UBS submitted the lowest Yen-LIBOR quote yet it had the highest CDS spread among 12 CDS spreads for that day.

394

## FIGURE 75

### Intraday Rank Ordering of LIBOR Quotes and Credit Default Swaps

| | 10/15/2008 | | 10/22/2008 | | 10/23/2008 | | 10/24/2008 | |
|---|---|---|---|---|---|---|---|---|
| | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank |
| Deutsche Bank | 1 | 9 | 2 | 11 | 2 | 11 | 2 | 11 |

| | 10/8/2008 | | 10/15/2008 | | 10/28/2008 | | 11/4/2008 | |
|---|---|---|---|---|---|---|---|---|
| | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank |
| Mizuho Corporate Bank | 3 | 10 | 5 | 11 | 1 | 8 | 4 | 10 |

| | 10/10/2008 | | 10/13/2008 | | 10/14/2008 | | 12/16/2008 | |
|---|---|---|---|---|---|---|---|---|
| | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank |
| Rabobank | 1 | 8 | 1 | 9 | 1 | 9 | 2 | 10 |

| | 9/16/2008 | | 9/25/2008 | | 9/26/2008 | | 9/29/2008 | |
|---|---|---|---|---|---|---|---|---|
| | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank |
| UBS AG | 1 | 12 | 1 | 12 | 1 | 12 | 1 | 12 |

Data Source: Bloomberg; CDS data from CMA.

Note: The rank is from lowest to highest, *i.e.*, a rank of 1 for LIBOR means that the bank had the lowest quote submitted that day. Similarly, a rank of 9 for CDS means that the bank had the ninth lowest CDS submitted that day. On each given day there were an average of 12 to 13 banks contributing to the LIBOR panel for which CDS data were available.

## IX.   During the Class Period, Plaintiffs Transacted in Euroyen-Based Derivatives at Artificial Prices Proximately Resulting From Defendants' Manipulation and False Reporting of Euroyen TIBOR and Yen-LIBOR

### A.  Plaintiff Sonterra

906.    Plaintiff Sonterra entered into U.S.-based transactions for Euroyen-based derivatives during the Class Period, including Yen foreign exchange forwards, at artificial prices proximately caused by Defendants' manipulative conduct and suffered legal injury.  For example, on May 20, 2010, Sonterra entered into a Yen foreign exchange forward, agreeing to buy $2,111,434.86 for ¥190,000,000.00 on May 28, 2010.

907.    Communications released as part of RBS' settlement with the CFTC demonstrates that Defendants were involved in manipulating six-month Yen-LIBOR on May 20, 2010:

**May 20, 2010**:

RBS [Tan]:  [Danziger/Yen Trader 6] can ask [Paul White] to bump up 6m JPY libor by 1bp

395

> RBS [Danziger]: sure
>
> RBS [Tan]: tx
>
> [RBS] Yen Trader 6: yes[365]

908.    As explained in ¶ 200, *supra*, the CFTC has found in its settlements with both RBS[366] and Rabobank[367] that Yen foreign exchange forwards are one of several Euroyen-based derivatives priced based on Yen-LIBOR and therefore were affected by Defendants' manipulation of Yen-LIBOR and Euroyen TIBOR during the Class Period.

909.    Defendants' upward manipulation of Yen-LIBOR on May 20, 2010, artificially increased the cost for Sonterra to purchase Yen foreign exchange forwards on that date.  As a result, Sonterra was injured when it entered into a Yen foreign exchange forward at an artificially higher price on May 20, 2010.

### B.  Plaintiff Hayman

910.    Plaintiff Hayman entered into U.S.-based transactions from Dallas, Texas for Euroyen-based derivatives during the Class Period, including Yen-LIBOR-based interest rate swaps and Yen-LIBOR-based swaptions, directly with Defendants Barclays, Merrill Lynch, JPMorgan, and Deutsche Bank at artificial prices directly and proximately caused by Defendants' manipulative conduct.  For example, on July 15, 2009, Hayman entered into a Yen-LIBOR-based interest rate swap with Merrill Lynch, agreeing to pay 1.515% interest on ¥2,500,000,000, in exchange for receiving floating rate payments based on Yen-LIBOR, starting on August 15, 2009.

---

[365] Ex. B-4 at 9.

[366] *Id.* at 6 (explaining Yen foreign exchange forwards are "priced based on" Yen-LIBOR).

[367] Ex. D-2 at 6 (explaining Yen foreign exchange forwards are "priced off of" Yen-LIBOR).

911.    Communications released as part of Defendant UBS' settlements with the CFTC and FCA demonstrate Hayman engaged in this transaction during Operation 6M (*see* ¶¶ 679-690, *supra*) specifically on a date where Defendants were engaged in a coordinated manipulation of one-month, three-month, and six-month Yen-LIBOR:

> **July 15, 2009**:
>
> Tullett Prebon [Cryan]: ha ha ok mate i can see you as captain chaos cash still looking a touch easier but nothing much going on arbi are starting to produce bids so hopefully the offers may go back
>
> UBS [Hayes]:  ok i only need 6m high this month then you MUST get it lower a lot lower pls keep 3m and 1m unch.
>
> Tullett Prebon [Cryan]: ok[368]

912.    As a result, Hayman suffered legal injury when it agreed to enter into a Yen-LIBOR-based interest rate swap with Merrill Lynch on July 15, 2009, at an artificial price directly and proximately caused by Defendants' manipulation of Yen-LIBOR.

913.    Similarly, on September 7, 2009, Hayman entered into two Yen-LIBOR-based interest rate swaps, one with Defendant JPMorgan agreeing to pay 1.60875% on ¥4,400,000,000 and another with Defendant Merrill Lynch, agreeing to pay 1.59875% on ¥4,400,000,000, in exchange for receiving floating rate payments based on Yen-LIBOR, starting on September 7, 2010.

914.    Communications released as part of Defendant Deutsche Bank's settlement with the DOJ, Defendant UBS' settlement with the CFTC, and Broker Defendant ICAP's settlement with the CFTC demonstrate that these transactions occurred while Defendants were engaged in a concerted effort to manipulate three-month and six-month Yen-LIBOR lower during August and

---

[368] Ex. A-2 at 34.

September 2009.  In the following communication, Deutsche Bank's Adolph tells Trader K-2 at Firm K that 6m Yen-LIBOR would go lower in September 2009:

**August 11, 2009**:

Deutsche Bank [Adolph]: between u and me 6m libor is going to go very low in sep

Deutsche Bank [Adolph]: [Hayes] will drop and teh others when back from holiday[369]

**September 10, 2009**:

ICAP [Read]: Happy friday mate … libors still heading in the right direction.

UBS [Alykulov]:      good mng Monday is the d-day

ICAP [Read]: big fix?

UBS [Alykulov]: Yeah both 3s and 6s

ICAP [Read]: low in both?

UBS [Alykulov]: ye

ICAP [Read]: ok will call [Cash Broker 1 [Colin Goodman]] on the train into work   [Mirhat Alykulov], you realise that you have the ability to influence the 3m fix, you are currently sitting at the upper end of the range. The 6m will have to come down to others as you are already v low.

UBS Yen Trader 1:   yep

ICAP [Read]: ill remind you to chase your cash boys as well:-)

UBS Yen Trader 1:   cool:-) on monday

ICAP [Read]: yes[370]

---

[369] Ex. I-1 at 57.

[370] Ex. C-1 at 34.

915.    As a result, Hayman suffered legal injury when it agreed to enter into Yen-LIBOR based interest rate swaps with Merrill Lynch and JPMorgan on September 7, 2009, at artificial prices directly and proximately caused by Defendants' manipulation of Yen-LIBOR.

916.    Defendants' manipulation of Yen-LIBOR and Euroyen TIBOR also directly impacted Hayman's Yen-LIBOR based swaption transactions.  For example, on March 3, 2010, Hayman sold four Yen-LIBOR based payer swaptions: (1) giving JPMorgan the right to enter into an interest rate swap where Hayman would pay 2.32% interest on ¥1,000,000,000 in exchange for receiving floating rate payments based on Yen-LIBOR; (2) giving JPMorgan the right to enter into an interest rate swap where Hayman would pay 2.415% interest on ¥1,000,000,000 in exchange for receiving floating rate payments based on Yen-LIBOR; (3) giving Merrill Lynch the right to enter into an interest rate swap where Hayman would pay 1.59875% interest on ¥4,400,000,000 in exchange for receiving floating rate payments based on Yen-LIBOR; and (4) giving JPMorgan the right to enter into an interest rate swap where Hayman would pay 1.60875% interest on ¥4,400,000,000 in exchange for receiving floating rate payments based on Yen-LIBOR.

917.    As described earlier, communications released as part of Defendant RBS' settlements with the DOJ, CFTC, and FSA, in addition to Broker Defendant ICAP's settlement with the CFTC demonstrate that Defendants were engaged in a concerted effort to, and in fact successfully did manipulate three month Yen-LIBOR lower on March 3, 2010.  *See* ¶¶ 560-61 *supra*.  As a result, Hayman suffered legal injury when it sold Yen-LIBOR-based swaptions to Merrill Lynch and JPMorgan on March 3, 2010, at artificial prices directly and proximately caused by Defendants' manipulation of Yen-LIBOR.

### C.  **Plaintiff CalSTRS**

918.    Plaintiff CalSTRS engaged in U.S.-based transactions for Euroyen-based derivatives during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was damaged and suffered legal injury when it was overcharged and/or underpaid in those transactions.  CalSTRS purchased and sold tens of thousands of Euroyen-based derivatives within the United States during the Class Period, including directly from/to the Contributor Bank Defendants.  For example, CalSTRS engaged in transactions for hundreds of Yen foreign exchange forwards with Defendant UBS between March 27, 2006 and June 24, 2011; hundreds of Yen foreign exchange forwards with Defendant Citibank between February 14, 2006 and June 29, 2011; hundreds of Yen foreign exchange forwards with Defendant Deutsche Bank between January 11, 2006 and June 30, 2011; hundreds of Yen foreign exchange forwards with Defendant RBS between January 14, 2006 and May 20, 2011; hundreds of foreign exchange forwards with Bank of America between January 13, 2006 and June 21, 2011; dozens of Yen foreign exchange forwards with Defendant HSBC Bank between February 22, 2006 and June 23, 2011; hundreds of Yen foreign exchange forwards with Defendant JPMorgan between January 20, 2006 and June 30, 2011; dozens of Yen foreign exchange forwards with Defendant Société Générale between March 2, 2006 and February 18, 2011; and dozens of Yen foreign exchange forwards with Defendant Barclays between January 11, 2006 and June 27, 2011.

919.    Yen foreign exchange forwards are Euroyen-based derivatives that are priced based on Yen-LIBOR.  *See* ¶¶ 199-201, *supra*.  As a result, Defendants' manipulation of Yen-LIBOR and Euroyen TIBOR, caused the prices of Yen foreign exchange forwards to be artificial during the Class Period.  CalSTRS was injured as a direct and proximate result of Defendants'

manipulative conduct when it paid more for, or received less than it otherwise should have in its transactions with the Contributor Bank Defendants.

920.    For example, on December 2, 2010, CalSTRS entered into a Yen foreign exchange forward with Defendant Barclays, agreeing to purchase ¥806,103,420.00 from Barclays on December 14, 2010, for $9,649,888.31.  CalSTRS also entered into two Yen foreign exchange forwards with Defendant Deutsche on December 2, 2010, agreeing to purchase ¥4,324,477.00 from Deutsche on December 16, 2010, for $51,274.33 and ¥5,242,826.00 from Deutsche on December 17, 2010, for $62,248.53.

921.    Communications released as part of ICAP and Rabobank's settlements with the CFTC demonstrate that Defendants planned to manipulate three-month Yen-LIBOR artificially lower to 0.18 on December 2, 2010:

**December 1, 2010**:

Rabobank [Yagami]: hope this will push libors down

ICAP [Goodman]: ok we need lower libors tomorrow yes?

Rabobank [Yagami]: Yeah…

ICAP [Goodman]: ok ill work some magic for tomorrow :-)

Rabobank [Yagami]: I want 3. And 6m libor a lot lower…? How?

ICAP [Goodman]: we wait and see, tomorrow lower Friday a bit more but ill do my best

Rabobank [Yagami]: Yeah…I think yen libors shud be lower but ppl tend to keep them higher whereas usd libors ppl look like manipulately put them higher

ICAP [Goodman]: ill work some magic tomorrow hopefully, 3m 19, 6m 35

Rabobank [Yagami]: Mate… 3mth is already below 19

> ICAP [Goodman]: **mistype 18**
>
> Rabobank [Yagami]: **That will be nice**
>
> ICAP [Goodman]: **ok i am on the case for u**
>
> Rabobank [Yagami]: Thank u mate[371]

922.    As Rabobank discussed with ICAP broker Colin Goodman, Defendants manipulated three-month Yen-LIBOR artificially lower to 0.18 on December 2, 2010.  This downward manipulation of Yen-LIBOR artificially increased the cost for CalSTRS to purchase Yen foreign exchange forwards from Barclays on December 14, 2010, and Deutsche on December 16 and 17, 2010.  As a result, CalSTRS was injured when it was overcharged by Barclays and Deutsche Bank for these Yen foreign exchange forwards.

923.    On March 12, 2008, CalSTRS entered into two foreign exchange forwards with Defendant JPMorgan agreeing to sell a total of ¥1,711,844,943.00 to JPMorgan on June 4, 2008, for $16,296,301.04.  Two days later, on March 14, 2008, CalSTRS entered into an additional Yen currency forward agreement with JPMorgan agreeing to sell ¥915,479,120.00 to JPMorgan on June 4, 2008 for $8,715,113.71.

924.    Communications released as part of UBS' non-prosecution agreement with the DOJ reveal that between March 12, 2008 and March 17, 2008, Defendants were engaged in manipulating three-month Yen-LIBOR artificially higher to benefit their Euroyen-based derivatives positions in advance of the March 17, 2008, IMM date.  *See* ¶ 297, *supra*.

925.    Defendants' upward manipulation of Yen-LIBOR between March 12 and March 17, 2008, artificially decreased the amount that CalSTRS received from JPMorgan when it sold

---

[371] *Id.* at 37.

Yen foreign exchange forwards on March 12 and March 14, 2008.  As a result, CalSTRS was injured when it was underpaid by JPMorgan for these Yen foreign exchange forwards.

926.    On May 12, 2010, CalSTRS entered into a Yen foreign exchange forward with Defendant RBS agreeing to purchase ¥198,000,000.00 from RBS for $2,127,644.15 on June 9, 2010.

927.    Communications released as part of the DOJ criminal complaint against ICAP brokers Darrell Read, Daniel Wilkinson, and Colin Goodman show that on May 12, 2010, RBS agreed to lower its three-month Yen-LIBOR quote to 0.23 to assist with Defendants' downward manipulation of Yen-LIBOR.

### May 12, 2010

UBS [Hayes]: You know my mate [Brent Davies], he used to work on the cash desk at RBS?

ICAP [Read]: Yeah, yeah, yeah.

UBS [Hayes]: Well, RBS is going to move its 3-month Yen LIBOR down to 23 today

ICAP [Read]: Ah perfect. Perfect. . . . Okay, well Colin's sending his out as well so that might help. He might get one or two. [Unintelligible] [H]andy man to know, this [Davies][372]

928.    On May 12, 2010, RBS did in fact lower its three-month Yen-LIBOR quote to 0.23, manipulating Yen-LIBOR artificially lower.

929.    Defendants' downward manipulation of Yen-LIBOR on May 12, 2010, artificially increased the cost for CalSTRS to purchase Yen foreign exchange forwards from RBS on June 9, 2010.  As a result, CalSTRS was injured by Defendants' manipulative conduct when it was overcharged by RBS for this Yen foreign exchange forward.

---

[372] Ex. C-3 at 26-27.

930.    On March 3, 2010, CalSTRS entered into a Yen foreign exchange forward with Defendant UBS agreeing to purchase ¥997,066,480.00 from UBS for $11,263,360.71 on March 19, 2010.

931.    Communications released as part of RBS and ICAP's settlements with the CFTC show that beginning on at least March 3, 2010, Defendants Citibank (who by then employed Tom Hayes), RBS and ICAP engaged in a coordinated downward manipulation of Yen-LIBOR to financially benefit their Euroyen-based derivatives positions heading into the March 15, 2010, IMM date.  *See* ¶¶ 560-61, *supra*.

932.    Defendants' suppression of Yen-LIBOR between March 3, 2010 and March 15, 2010, artificially increased the cost for CalSTRS to purchase Yen foreign exchange forwards from UBS on March 15, 2010.  As a result, CalSTRS was injured by Defendants' manipulative conduct when it was overcharged by UBS for this Yen foreign exchange forward.

### D.  Plaintiffs CalSTRS, Hayman & Sonterra

933.    In addition to transacting at artificial prices on the limited number of days for which Defendants' communications have been released to the public, Plaintiffs also were damaged and suffered legal injury on their Euroyen-based derivatives positions because Defendants' manipulative conduct rendered Yen LIBOR, Euroyen TIBOR and the prices of Yen LIBOR-based derivatives artificial throughout the entire Class Period.

934.    The persistent nature of Defendants' manipulative conduct is well documented in their settlements with government regulators.  This is confirmed directly by Hayes, who explained in his SFO interviews that he and his co-conspirators manipulated Yen-LIBOR to artificial levels on a daily basis and to keep the rate artificial over long periods of time by staying consistent in their efforts:

For a particular length of time that LIBORs would be, you know, particularly skewed. And I think you know that it's a semi sensible way to do it. Because I think I had in the FSA report I had seven campaigns . . . They weren't random, they were very consistent. I mean, in fact the plan was all about consistency.

You know it was all about doing the same thing on a daily basis…

935.   Defendants' relentless efforts to manipulate Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives, rendered the prices of Euroyen-based derivatives artificial throughout the entire Class Period.  As a result, Plaintiffs were damaged and suffered legal injury when they engaged in transactions for Euroyen-based derivatives at artificial prices proximately caused by Defendants' manipulative conduct.

## X.   Defendants Engaged in a Conspiracy in Restraint of Trade by Collusively Fixing the Price of Euroyen-Based Derivatives.

### A.   Direct Evidence Reveals and Factual Admissions Confirm That Defendants, Including UBS, RBS, Rabobank, Deutsche, JPMorgan, Lloyds, Citigroup, ICAP and R.P. Martin Conspired To Fix the Price of Euroyen-Based Derivatives.

936.   The instant messages and other communications collected by the DOJ Antitrust Division, the CFTC, and the FSA, and set forth in the Appendix to this Complaint vividly reveal pervasive collusion by UBS, RBS, Rabobank, Lloyds, Deutsche Bank and other Contributor Bank Defendants.  Notwithstanding the fact that hundreds of instant messages have been made publicly available, these messages represent but a very small sampling of the total record of all collusive messages.

937.   On December 4, 2013, the EC issued a press release announcing a €670 million ($870 million) fine against Defendants UBS, RBS, Deutsche, JPMorgan, Citigroup and R.P. Martin all in connection with each Defendants involvement in one or more "cartels in Yen Interest Rate Derivatives."

405

938.   The EC uncovered seven (7) distinct bilateral infringements lasting between 1 and 10 months in the period from 2007 to 2010.  The collusion included discussions between traders of the participating banks on certain Yen-LIBOR submissions.

939.   The traders involved also exchanged, on occasions, commercially sensitive information relating either to trading positions or to future Yen-LIBOR and Euroyen TIBOR submissions.

940.   UBS received full immunity for revealing the existence of the cartels.  As a result, UBS avoided a fine of around €2.5 billion ($3.25 billion) for its participation in five of the seven infringements.  Citigroup also received full immunity for one of the infringements in which it participated, thereby avoiding a fine of around €55 million ($71.5 million).

941.   For their cooperation with the investigation, the EC granted fine reductions to Citigroup, Deutsche Bank, RBS and R.P. Martin.

942.   The fines imposed by the EC for the Yen Interest Rate Derivatives Cartels are as follows:

| Participant | Infringements | Duration of Participation Per Infringement(s) | Reduction Under the Leniency Notice (%) | Fine (€) |
|---|---|---|---|---|
| UBS | 5 | 1 month, 8 months, 5 months, 10 months, 1 month | 100% for all infringements | 0 |
| RBS | 3 | 8 months, 5 months, 3 months | 25 % for one infringement | 260,056,000 |
| Deutsche Bank | 2 | 1 month | 35% , 30% | 79,897,000 |
| JPMorgan | 1 | 1 month | | 79,897,000 |
| Citigroup | 3 | 1 month, 2 months, 3 months | 35%, 100%, 40% | 70,020,000 |
| R.P. Martin | 1 | 1 month | 25% | 247,000 |

943.    In the context of the same investigation, the EC also opened proceedings against Broker Defendant ICAP.  The EC sent a Statement of Objections to Broker Defendant ICAP on June 10, 2014 outlining ICAP's participation in the Yen interest rate derivatives cartels.

944.    ICAP chose not to settle the proceedings.  On February 4, 2015, the EC fined ICAP €14.96 million (approximately $17 million).  The EC found that ICAP facilitated six of the seven Yen interest rate derivatives cartel agreements through various anticompetitive actions, including disseminating misleading information to certain Yen-LIBOR panel banks in the form of "predictions" or "expectations" of the daily Yen-LIBOR fix in 2007-2010; contacting non-cartel Yen-LIBOR panel members to influence their Yen-LIBOR submissions, and serving as a communication channel between Citigroup and RBS traders.

## B.  The Conspiracy to Fix The Prices of Euroyen-Based Derivatives Constituted an Agreement in Restraint of Trade

945.    The abundant evidence of collusive price fixing of Euroyen-based derivatives uncovered by the regulators and cited herein restrained trade across a variety of channels of competition.  Just like a traditional "brick and mortar" price fixing conspiracy, where manufacturers collude to set a pricing formula for their goods, the Contributor Bank Defendants colluded to fix the prices of their Euroyen-based derivatives through various means, including sharing price and volume information with competitors for the purpose of coordinating prices and agreeing to set Yen-LIBOR and Euroyen TIBOR prices either lower or higher, depending upon their mutual financial interests.  This price-fixing resulted in no less of a restraint of trade than a traditional agreement to fix the wholesale prices of, for example, washing machines.  The market for Euroyen-based derivatives was unlawfully restrained by price fixing because collusion, rather than the forces of supply and demand, set artificially supracompetitive and, at times, infracompetitive prices for these derivatives.

407

C.  **The Conspirators Were Horizontal Competitors In Euroyen-Based Derivatives.**

946.    Each of the Contributor Bank Defendants were competitors with one another for attracting transactions in Euroyen-based derivatives.  Indeed, it was by virtue of their position as competitor banks in this market that these Defendants secured their position as a Yen-LIBOR and Euroyen TIBOR contributor banks.  These banks competed for financial positions in this derivatives market in the position of horizontal competitors not only insofar as they occupied the same level of distribution in the marketplace, but because they competed with one another to attract customers for Euroyen-based derivatives transactions and/or to purchase and sell Euroyen-based derivatives contracts and/or to profit or lose on their activities in the foregoing.

D.  **The Collusive Conduct Fixed Prices and Restrained Trade or Changed Output.**

947.    The collusion alleged herein fixed the prices of Euroyen-based derivatives prices when the cartel members agreed to share pricing information and coordinate prices for their derivatives.  Moreover, the collusion had the effect of restraining or changing output in the derivatives market because market participants naturally responded to the changed prices.  The volume of derivatives transactions was therefore restrained and output changed.

948.    An example from the many instant messages that reveal collusion among Defendants is instructive.  On July 29, 2009, a broker was communicating with a trader at UBS.  The broker referenced recent "small reductions" in UBS' Yen-LIBOR rate submissions.  The broker mentioned that "External Trader E" at a competing panel bank (Contributor Bank Defendant) was "building positions" in the hopes that the rate would increase.  The broker stated that "External Trader E" ". . . could be in for a shock going into august . . . the three muscateers [sic] could do him a fair bit of damage."  When referencing "three muscateers [sic]," the broker was referring to UBS and two other panel banks (not employing External Trader E).

949. This instant message shows how the Contributor Bank Defendants *competed* when they set Yen-LIBOR and colluded in an effort to enhance their competitive positions. The "three muscateer [sic]" Contributor Bank Defendants, including UBS, had an agreement to try to set Yen-LIBOR lower during the period when External Trader E was "building positions" on the hope that the rate would go higher. Contributor Bank Defendants had competing financial interests in where the rates came out, so they competed in setting the rates. To enhance their competitive rate-setting positions, the Contributor Bank Defendants entered into agreements in restraint of trade to influence the JBA and BBA setting of Euroyen TIBOR and Yen-LIBOR in violation of Section 1 of the Sherman Act.

950. The alleged rate-setting collusion harmed competition among sellers and buyers of Euroyen-based derivatives. Contributor Bank Defendants' Yen-LIBOR and Euroyen TIBOR submissions are supposed to be a proxy for the competitive borrowing rate of each bank. The counterparties to financial instruments that use Yen-LIBOR and/or Euroyen TIBOR do so for the reason that they know that these rates reflect competitive supply and demand influences on the Yen interbank lending market. It is because these rates reflect such competitive prices that they are so commonly used in Euroyen-based derivative contracts to set pricing. When, as here, banks and others colluded and altered Yen-LIBOR and Euroyen TIBOR from competitively set prices to collusively fixed prices, competition in the Euroyen-based derivatives *a fortiori* was affected at the very instant and in the very same manner that the rate itself was collusively set. The price of Euroyen-based derivative contracts—set by collusion—became inherently anticompetitive in the same manner as Yen-LIBOR and Euroyen TIBOR itself became anticompetitive.

### E.   The Government Settlements to Date Reveal a High Number of Inter-Firm Communications

951.    The UBS, RBS, Rabobank, ICAP, Deutsche Bank, Lloyds, and R.P. Martin Settlement documents reveal a high number of inter-firm communication between their traders and brokers and unidentified traders and brokers at other Contributor Bank and Broker Defendants.  In all, there are at least hundreds of recorded communications that evidence explicit and implicit agreement among traders, submitters and/or brokers at UBS, RBS, Rabobank, ICAP, R.P. Martin, Deutsche Bank, Lloyds, and other Contributor Bank and Broker Defendants to fix the prices of Euroyen-based derivatives.  For example, the FSA determined that former UBS Senior Yen Trader Hayes made thirty-nine (39) manipulative requests in July 2009 alone to an unnamed broker, identified as "Broker F of Broker Firm C."  Public reports later revealed that Broker Firm C is Broker Defendant Tullett Prebon.

### F.   Specifically Citing Antitrust Concerns, the JBA Euroyen TIBOR Publication Rules Explicitly Proscribe Advance Information Exchange and Coordination Among Rate-Setting Banks.

952.    The Japanese Bankers Association published rules, governing TIBOR publication. These rules, entitled "JBA TIBOR Publication Rules" governed both Euroyen TIBOR and Japanese Yen TIBOR.  The Euroyen TIBOR part of these rules apply to rates that "reflect[] prevailing conditions in the Japan Offshore Market."

953.    The JBA Rules specifically warn the reference banks against behavior that would violate the Japanese Antimonopoly Law.  Specifically, the JBA Rules stated that "[r]eference banks and market participants must exercise caution when utilizing the JBA TIBOR to prevent engagement in activities that would constitute a violation of the Antimonopoly Law."  The JBA Rules included an addenda entitled "Reference: Notes of Publication of the JBA Japanese Yen TIBOR" ("JBA Rules Addendum").

954.    The JBA Rules Addendum noted that certain actions of reference banks may violate the Japanese Antimonopoly Law, including "advance exchange of information and coordination among reference banks on quoted rate levels to be furnished to [the JBA's] service providers," the precise conduct alleged to be illegal in this lawsuit.

955.    In promulgating rules designed to address antitrust concerns over advance exchange of information and coordinating rate submissions, the JBA recognized that the very conduct disclosed in the many regulatory investigations had significant anticompetitive effects.

## CLASS ACTION ALLEGATIONS

956.    Plaintiffs brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the following Class:[373]

> All persons or entities that engaged in a U.S. based transaction of a financial instrument priced, benchmarked, settled to or otherwise affected by Yen-LIBOR or Euroyen TIBOR during the period of at least January 1, 2006 through at least June 30, 2011 (the "Class Period"). A U.S. based transaction means a transaction by a U.S. Person, or by a Person from or through a location within the U.S. Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

957.    The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically dispersed Class members transacted in Euroyen-based derivatives worth billions of dollars during the Class Period.

958.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common

---

[373] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

959.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are adequate representatives of the Class and have no interests which are adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in class action litigation, including commodity manipulation and antitrust class action litigation.

960.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  These common questions of law and facts include, without limitation:

(a)    Whether Defendants unlawful acts violate Section 1 of the Sherman Act;

(b)    Whether Defendants unlawful acts violate RICO;

(c)    Whether Defendants engaged in wire fraud;

(d)    Whether Defendants engaged in a pattern of racketeering activity;

(e)     Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiffs and the Class;

(f)    Whether Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class;

(g)    The operative time period and extent of Defendants' foregoing violations; and

(h)    Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

961.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class

412

action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

962.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## TOLLING AND FRAUDULENT CONCEALMENT

963.    The statute of limitations relating to the claims for relief alleged herein (*see* ¶¶ 994-1078) were tolled because of fraudulent concealment, including: (1) Defendants' active acts of concealment that were independent of the acts that constituted the underlying conduct giving rise to their liability; and (2) the inherently self-concealing nature of Defendants' misconduct. Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by the exercise of due diligence until July 26, 2011 as to Defendant UBS only and until February 2012 as to several other Contributor Panel Banks and Broker Defendants.

964.    Plaintiffs and the Class' investigation of their claims required time and resources to identify additional Defendant wrongdoers through, among other things, economic analysis of public submission data and "reverse engineering" to identify unnamed co-conspirator Contributor Panel Banks and brokers.  At least one Defendant, Lloyds Bank, represented to Plaintiffs and the Class' counsel that its internal investigation revealed no instances of

413

wrongdoing, inducing them to voluntarily dismiss the action and entering into a tolling agreement.  It was not until later disclosures by other co-conspirators revealed to counsel, through additional "reverse engineering" efforts, and Lloyds own LIBOR settlement, that the public information revealed Lloyds' culpability that Plaintiffs and the Class determined that Lloyds misrepresented the facts.  With each succeeding indictment and government investigation disclosure, more and more information is revealed and additional Defendants and the scope of Defendants' wrongdoing becomes clearer.

965.    UBS' July 26, 2011 disclosure is the earliest Plaintiffs could have suspected UBS' role in the manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives.  Plaintiffs could not have suspected, much less known, of the other Contributor Bank or Broker Defendants involvement in the manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives until much later.  Plaintiffs thus assert the tolling of the applicable statute of limitations affecting the rights of the claims of relief asserted by Plaintiffs.  Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

**A.  <u>Dates of Initial Public Disclosures</u>**

966.    On March 15, 2011, UBS disclosed in its 2010 annual report (at page 318 of 430) that it had received subpoenas from the Commodity Futures Trading Commission, U.S. Department of Justice, and other U.S. government agencies, as well as an information request from the Japanese Financial Supervisory Agency, as follows:

> UBS has received subpoenas from the SEC, the US Commodity Futures Trading Commission and the US Department of Justice in connection with investigations regarding submissions to the British Bankers' Association, which sets LIBOR rates. UBS understands that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times. In addition, UBS has

414

> received an order to provide information to the Japan Financial
> Supervisory Agency concerning similar matters. UBS is
> conducting an internal review and is cooperating with the
> investigations.

967.   UBS failed to mention in its 2010 annual report whether the foregoing

investigations related to submissions for Yen-LIBOR or Euroyen TIBOR (or other rates).

968.   It was not until UBS filed a Form 6-K with the SEC on July 26, 2011 that UBS

disclosed for the first time that it had received conditional leniency from the Antitrust Division

of the U.S. Department of Justice in connection with potential antitrust or competition law

violations related to submissions of Yen-LIBOR and Euroyen TIBOR.  The July 26, 2011 Form

6-K was the first public disclosure by UBS of allegations of false reporting by it with respect to

Yen-LIBOR or Euroyen-TIBOR.

969.   UBS' July 26, 2011 disclosure is the earliest Plaintiffs could have suspected UBS'

role in the manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based

derivatives.  Plaintiffs could not have suspected, much less known, of the other Contributor Bank

or Broker Defendants involvement in the manipulation until much later.

970.   For example, on February 13, 2012, the Wall Street Journal reported that the

Canadian Competition Commission ("CCB") joined U.S., European and Japanese regulators in

investigations into reference banks collusion and resulting manipulation of Euroyen TIBOR and

Yen-LIBOR.  Later, on February 17, 2012, The Wall Street Journal reported that "lawyers

acting for the cooperating bank had told [the CCB] that traders at six banks on the yen Libor

panel—Citigroup Inc., Deutsche Bank AG, HSBC Holdings plc, J.P. Morgan Chase & Co.,

Royal Bank of Scotland Group PLC and UBS—'entered into agreements to submit artificially

high or artificially low' quotes . . . ."  The same report also confirmed that the CCB was

investigating whether the traders also "conspired" with individuals at individual inter-dealer

415

broker firms, including Broker Defendants ICAP and R.P. Martin, "to use their influence with yen Libor submitters to affect what rates were submitted by other yen Libor panel banks." The foregoing reports in February 2012 are the first public disclosures of Broker Defendants ICAP and R.P. Martin involvement in the manipulation of Yen-LIBOR or Euroyen-TIBOR.

971.    Additional public disclosures of other Contributor Bank and Broker Defendants' involvement in the manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives came even later than February 2012. For example, the first public disclosure of the involvement of Broker Defendants ICAP Europe Limited and Martin Brokers (UK) Ltd. in the manipulation of Yen-LIBOR did not occur until ICAP Europe Limited settled civil charges with the CFTC and FCA on September 25, 2013 and Martin Brokers (UK) Ltd. settled same with the CFTC and FCA on May 15, 2014. Similarly, the first public disclosure of Broker Defendant Tullett Prebon's involvement in the manipulation of Yen-LIBOR did not occur until February 2013 when news reports speculated that Tullett Prebon conspired with former UBS and Citibank Senior Yen Trader Tom Hayes. In response to the public reports, a Tullett Prebon spokesperson commented that "Tullett Prebon has never been informed by the FSA [Financial Services Authority] or any other regulatory authority that Tullett Prebon or any of its brokers are under investigation in relation to LIBOR." Thus, it was not until June 20, 2013 when the U.K. SFO identified Tullett Prebon as an alleged co-conspirator of former UBS and Citibank Senior Yen Trader Tom Hayes in the manipulation of Yen-LIBOR and other interbank offered rates that Plaintiffs had knowledge of Tullett Prebon's involvement in the alleged conspiracy and manipulation.

### B. Plaintiffs' Due Diligence Efforts

972.    Plaintiffs actively monitor their investments to ensure that there is no evidence of fraud or irregularities in their trading positions and did so in connection with their Euroyen-based

derivatives during the Class Period.  This monitoring included having investment professionals analyzing market trends and economic data associated with their investments and public information concerning the markets in which they were investing.  Prior to the times identified above when public disclosures were made, Plaintiffs, much like their similarly situated class members, had no suspicion of, nor reason to know, that Defendants were engaged in widespread collusion and manipulation of Yen-LIBOR and Euroyen TIBOR.  Hence, despite Plaintiffs' due diligence, they were unable to discover the fraud alleged herein until public disclosures raised their suspicions as to UBS and then they investigated the culpability of others through their lawyers' investigatory work.

973.    **The Structure of the Yen-LIBOR and Euroyen TIBOR Submission Process Gave Plaintiffs No Reason To Suspect Defendants Were Engaged in Wrongdoing.**

974.    In order to ensure that Yen-LIBOR constituted the average competitive market interest rate, the Defendants, through their trade organization known as the British Bankers Association ("BBA"), promulgated certain Instructions.  By promulgating these Instructions through their BBA trade organization and then making daily Yen-LIBOR submissions purportedly pursuant to these Instructions, each Defendant impliedly but repeatedly represented that its submissions complied with the Instructions.  By such conduct, each Defendant represented that its submissions transmitted to the markets reflected that Defendant's competitive market borrowing rate.

975.    Specifically, each Defendant's conduct was undertaken pursuant to and impliedly represented that it complied with, among others, the following Instructions promulgated by the BBA:

417

A. **An individual** BBA LIBOR Contributor Panel Bank will contribute **the rate at which it** could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable **market** size just prior to 1100.

B. Rates shall be contributed for currencies, maturities and fixing dates and according to agreed quotation conventions.

C. **Contributor Banks shall input their rate without reference to rates contributed by other Contributor Banks.**

D. Rates shall be for deposits:

- made in the London **market** in **reasonable market** size;

- that are simple and unsecured….

G. …. The Designated Distributor will endeavor to identify and arrange for the correction of manifest errors in rates input by individual Contributor Banks prior to 1130.

**The Designated Distributor will publish the average rate and individual Contributor Banks' rates at or around 1130hrs London time.**

Remaining manifest errors may be corrected over the next 30 minutes. The Designated Distributor then will make any necessary adjustments to the average rate and publish it as the BBA LIBOR Fixing at 1200hrs."[374]

976.    The foregoing Instructions ensured in at least three ways that Yen-LIBOR submissions constituted a competitive market rate and that the Yen-LIBOR average was

---

[374]https://web.archive.org/web/20080930203457/http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=225&a=1413&artpage=all (last viewed July 23, 2015) (emphasis added).

publishing a competitive average market rate.  First, each individual bank was to make its own submission relating to the competitive market rate at which it could borrow funds.  *See* Instruction "A" above.  This borrowing rate was expressly limited to that for loans of "reasonable market size."  The "reasonable market size" requirement for each bank's estimate of borrowing costs, most closely captured the competitive market borrowing rate.

977.    Second, each panel bank was prohibited from referring to, or coordinating with other panel banks in the submissions that such panel bank made.  See Instruction "C" above.  This prohibition of information sharing was reinforced and further ensured by the Instruction "G" above.  Specifically, Instruction "G" mandated that there would be only a simultaneous release of all banks' rates.  Such simultaneous release prevented any coordination among the banks after receipt from the BBA of another bank's rate.  This forced each bank individually to submit its own competitive rate for borrowing.

978.    Third, the Yen-LIBOR rate was that applicable to deposits made in the "market" and, even then, only those which were of "reasonable market size."  See Instruction "D" above. These requirements further ensured that Yen-LIBOR reflected a competitive "market" rate. Instruction "D" prohibited the use, for example, as the basis for each bank's submission of any non-market borrowing rates.  It even prohibited market rates for irregular sizes.  Once again, these requirements most closely captured the competitive market rate.

979.    Taken together, the foregoing Instructions, if followed, rendered Yen-LIBOR the average competitive market borrowing rate.  Such Instructions prohibited each bank's Yen-LIBOR submission from reflecting any collusion, coordination, advance notice among the competing banks, or sharing (directly or through brokers) of their intended rate submissions.

419

980.    Similarly, the Instructions, taken together, prohibited each individual bank from using its self-interest in profits on its derivatives positions as a substitute for its competitive borrowing rate in determining the rate submission the bank would make.

981.    On the contrary, the sole basis for the submission by each bank was limited to "the rate at which it could borrow funds…in reasonable market size just prior to 1100."  See Instruction "A" above.  Defendants, through the BBA, made this requirement even more explicit during 2008 when they stated that the

> basis for a … bank's submissions …was to be the rate at which members of the bank's staff primarily responsible for management of the bank's cash, rather than the bank's derivatives trading book, believed that the bank could borrow unsecured inter-bank funds in the London money market. Further, according to the BBA, a Contributor Panel bank should not have contributed a rate based on the pricing of any derivative financial instrument. In other words, a Contributor Panel bank's LIBOR submissions should not have been influenced by its motive to maximize profit or minimize losses in derivatives transactions tied to LIBOR.[375]

982.    By continuing to make their Yen LIBOR submissions, each Defendant impliedly represented that it was submitting its competitive market borrowing rate and was not submitting a non-competitive rate that served its interests in manipulating the markets.  Defendants continued to make these representations long after their re-affirmance in 2008 (quoted above) that their submissions were to reflect their competitive market borrowing rate rather than their self-interest in manipulating prices.

983.    However, these representations were false and fraudulent.  For example, Defendant UBS continued to make false and manipulative submissions from 2005 through 2010.  Accordingly, UBS and other Defendants intentionally and carefully limited their communications to secret communications that were either outside of business channels or in

---

[375] *See* Ex. I-1.

private chatrooms, emails, and through traders' personal cellphones.  Thereby, Defendants

intentionally, affirmatively and fraudulently concealed the facts that they were conspiring among

themselves to make, on virtually a daily basis, manipulated submissions of non-competitive rates

that benefited their Euroyen-based derivatives positions.

984.   **The Manipulative and Collusive Conduct Was Inherently Self-Concealing**.

The conduct that gives rise to the violations of law set forth herein are inherently self-concealing.

*See, e.g.*, *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004)

("[a]mong the principal allegations against Defendants are assertions that they reported false

trade data to entities that collect that information for public dissemination, and that they engaged

in fraudulent wash trades…Such activities are inherently self-concealing."); *In re Issuer Plaintiff*

*Initial Pub. Offering Antitrust Litig.*, 00 CIV. 7804 (LMM), 2004 WL 487222, at *4 (S.D.N.Y.

Mar. 12, 2004) (recognizing that bid-rigging and price-fixing conspiracies are inherently self-

concealing) (citing *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir. 1988)).

Further, as certain of defendants' traders recognized, the manipulation of Euroyen TIBOR and

Yen-LIBOR required that it remain concealed from the BBA, regulators and the public in order

to ensure its success over an extended period of time.  *See, e.g.*, ¶¶ 709-730.

985.   **Extraordinary Acts of Concealment Independent of the Conduct Underlying**

**their Violations of Law**.  In addition to and separate from the inherently self-concealing

manipulative and acts alleged herein as to Defendants' Yen LIBOR and Euroyen TIBOR

manipulation and collusion, many Defendants engaged in extraordinary measures to hide their

wrongdoing from government investigators and their victims, including Plaintiffs.  These acts

included:

> (1) avoiding discussing the manipulation of Yen-LIBOR and Euroyen TIBOR in
> public forums (*see,* App. *passim*);

(2) directing their Euroyen-based derivatives traders and Yen-LIBOR and Euroyen TIBOR submitters to limit their internal written communications discussing the  manipulation of Yen-LIBOR and Euroyen TIBOR;

(3) agreeing to stagger the submission of false reports over successive trading days and over extended periods of time (*e.g.*, agree that an artificially low rate would be submitted by co-conspirator A today, by co-conspirator B tomorrow and co-conspirator C the next day, etc.) in order to exert a greater and longer-lasting manipulative impact on Euroyen-based derivative prices and to mask their false reporting from other market players;

(4) concocting false stories they could give in the event someone (*e.g.*, the BBA, JBA, regulators, or other market participants) questioned their false Yen-LIBOR or Euroyen TIBOR submissions;

(5) lying to their own attorneys during internal investigations of rate manipulation, including falsely claiming that their Yen trading desks did not have any derivative positions with exposure to Euroyen rates and the interest rate submission process did not take into account trading positions;

(6) having the Broker Defendants disseminate false run-thrus or "Suggested LIBORs" daily to signal false directional trends of future Euroyen rates;

(7) having Broker Defendants post and disseminate false or "spoof" bids and offers regarding prevailing Euroyen rates;

(8) engaging in wash trades and other illicit sham transactions to surreptitiously pay the Broker Defendants for their assistance in manipulating Yen-LIBOR and Euroyen TIBOR;

(9) paying bribes and kickbacks to Broker Defendants for their LIBOR "fixing services" to maintain the Broker Defendants cooperation and continue the successful manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives;

(10) spoliating evidence of their wrongdoing by destroying LIBOR-related phone recordings and other documents after being put on notice of government investigations;

(11) lying to regulators and concealing the findings of LIBOR manipulation by one regulator from another regulator;

(12) using electronic chat rooms open only to a select group of traders and brokers (*see,* App. *passim*);

(13) using code words to avoid detection like "arbi" to signal a manipulative request or "curry" to indicate a bribe for advancing the manipulation was coming;

(14) intentionally taking manipulative communications "offline" to continue the manipulative conversations in-person or on personal cellphones or through text messaging to avoid detection;

(15) reorganizing trading desks to facilitate verbal communication, and eliminate written communication, between their Euroyen traders and submitters;

(16) having compliance officers falsely attest to the BBA that they audited their LIBOR submission processes;

(17) refusing to conduct internal audits of  Yen-LIBOR and Euroyen TIBOR submissions processes referring to the audits as nothing more than "an arse-covering exercise [by the BBA]";

(18) maintaining no LIBOR-specific systems and controls that could detect LIBOR-related "buzz words" indicative of manipulation; and

(19) putting in place lax compliance standards they knew would not detect wrongdoing.

986.    **Additional Evidence of Extraordinary Efforts to Conceal Wrongdoing Have Been Revealed to Plaintiffs Within the Last Month Through Testimony Adduced at Former UBS and Citibank Trader Thomas Hayes' United Kingdom Criminal Trial**.  For example, Hayes explained to ICAP broker Darrell Read in a March 2010 telephone conversation that Citi's Yen-LIBOR submitters were generally not receptive to manipulative requests unless the requests were made "offline."  Hayes stated to Read in words or substance, "You know because they were like pretty reluctant to do anything on the libors but if you talk to them like you now on a non recorded line. Blah blah blah…."

C. **Government Proceeding Antitrust Tolling**

987.    Plaintiffs' claims are also tolled by operation of 15 U.S.C. §16(i).

988.    Section 16(i) provides, in relevant part:

Suspension of limitations. Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws,…, the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding

423

shall be suspended during the pendency thereof and for one year
thereafter…

989.    As alleged herein, the United States has filed criminal proceedings, including

criminal antitrust indictments against former traders and brokers of the Contributor Bank and

Broker Defendants.  This private action seeks antitrust damages arising under the Sherman Act

and is based in large part on the matters complained of in the United States' criminal

proceedings.  As a result, under Section 16(i) of the Sherman Act, Plaintiffs' claims are currently

tolled and have been tolled since the date these criminal proceedings were instituted.

990.    For example, on December 19, 2012, the Criminal Division (Fraud Section) and

the Antitrust Division of the U.S. Department of Justice unsealed a criminal complaint

previously filed on December 12, 2012 in this District against former UBS and Citibank Trader

Tom Alexander William Hayes and former UBS trader and Yen-LIBOR submitter Roger Darin.

*See* Ex. A-6, Complaint filed in *United States of America v. Tom Alexander William Hayes, and*

*Roger Darin*, 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012) (the "Hayes/Darin Criminal Complaint").

The Hayes/Darin Criminal Complaint identifies at least four additional, unidentified Yen-LIBOR

panel banks as Banks A, B, C and D.  The Hayes/Darin Criminal Complaint also identifies at

least two unidentified Brokerage Firms as Brokerage Firm A and Brokerage Firm B.  Both Hayes

and Darin were charged with conspiracy to commit wire fraud. Hayes was also charged with a

violation of Section 1 of the Sherman Act due to alleged anticompetitive conduct in relation to

Yen-LIBOR from at least September 2006 through September 2009.

991.    On April 23, 2015, the Department of Justice charged Defendant Deutsche Bank

AG with a criminal violation of Section 1 of the Sherman Act, by filing a Criminal Information

in the U.S. District Court for the District of Connecticut.  (Docket No. 3:15-cr-61 (ENC)).   The

price-fixing count of Deutsche Bank's Criminal Information provides:

>From at least as early as 2008 through at least 2010, the defendant, Deutsche Bank AG, through its employees, and its co-conspirators, engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign commerce.  The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among the Defendants and its co-conspirators, the substantial terms of which were to fix the price of Yen LIBOR-based derivative products by fixing Yen-LIBOR, a key component of the price thereof, on certain occasions.

In violation of Title 15, United States Code, Section 1.[376]

992.    This action remains pending subject to Deutsche Bank's fulfillment of detailed requirements set forth in a Deferred Prosecution Agreement with the United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division on April 23, 2015.

993.    Plaintiffs' claims are in large part based on the same facts and circumstances that underlie the United States criminal complaint against former UBS traders Tom Alexander William Hayes and Roger Darin as well as Deutsche Bank's Criminal Information.  Plaintiffs expressly rely on the United States' criminal complaint against former UBS traders Tom Alexander William Hayes and the Deutsche Bank criminal indictment and Roger Darin in pleading their claims.  *See e.g.*, Ex. A-6, Ex I-7.  The United States' actions against both former UBS traders Tom Alexander William Hayes and Roger Darin remains pending and, as a result, the statutes of limitations on Plaintiffs' claims are currently suspended by operation of 15 U.S.C. §16(i).

---

[376] Ex. I-7.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act**

**Coordinated Submission of False Yen-LIBOR and Euroyen TIBOR Submissions to the BBA and JBA**

**Against all Defendants**

994.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

995.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

996.    During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives, by conspiring to, *inter alia*, make false submissions to the BBA and JBA designed to artificially suppress, inflate, maintain, or otherwise alter Yen-LIBOR and Euroyen TIBOR.

997.    This conspiracy to manipulate and fix the prices of Yen-LIBOR and Euroyen TIBOR caused injury to both Plaintiff and members of the Class because they were deprived of the benefit of a legitimate and accurate Yen-LIBOR and Euroyen TIBOR that reflected actual market conditions.  Plaintiffs and members of the Class also were deprived of the ability to accurately price Euroyen-based derivatives entered into during the Class Period and to accurately determine the settlement value of Yen-LIBOR interest rate swaps, Yen foreign exchange forwards and other Euroyen-based derivatives by reference to an accurate Yen-LIBOR and/or Euroyen TIBOR.  Plaintiffs and members of the Class thus received, during the term of their

426

transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts taken in furtherance thereof.

998.    The conspiracy is a *per se* violation of § 1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the over-the-counter and exchange traded Euroyen-based derivatives market.  There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof.  Any ostensible pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

999.    As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

1000.   Plaintiffs and members of the Class seek treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

1001.   Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### For Price Fixing In Violation of § 1 of the Sherman Act

### Non-Rate-Setting Collusion

### Making False Bids and Offers, Engaging in Sham Transactions, Wash Trading, and Coordinating Manipulative Trading of Euroyen-Based Derivatives

### Against All Defendants

1002.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

427

1003.   Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

1004.   During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives, by conspiring to, *inter alia*: (a) make false bids and offers for Yen money market instruments; (b) arrange for sham transactions between co-conspirators; and (c) coordinating manipulative trading of Euroyen-based derivatives, designed to artificially suppress, inflate, maintain, or otherwise alter Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives.

1005.   This conspiracy to manipulate and fix the prices of Euroyen-based derivatives caused injury to both Plaintiffs and members of the Class who received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts taken in furtherance thereof.

1006.   The conspiracy is a *per se* violation of § 1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the over-the-counter Euroyen-based derivatives market.  There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof.  Any ostensible pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

1007.   As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

1008.   Plaintiffs and members of the Class seek treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

1009.   Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

<u>**THIRD CLAIM FOR RELIEF**</u>

**For Violation of Section 1 of the Sherman Act**

**Bid-Ask Spread Conspiracy for Euroyen-based Derivatives Products**

**15 U.S.C. § 1, *et seq.***

**Against All Defendants**

1010.   Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

1011.   Defendants competed among themselves and others in the market for Euroyen-based derivatives.  However, during the Class Period, the Defendants replaced the competitive prices determined by normal forces of supply and demand with an agreement, combination and conspiracy to fix the prices of Euroyen-based derivatives.  Defendants agreed among themselves to fix prices of Euroyen-based derivative counterparties by agreeing keep the spread between bids (offers to buy) and asks (offers to sell) supracompetitively wide.

1012.   During the Class Period, Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade to fix the prices of Euroyen-based derivatives in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

1013.   Such contracts, combination and conspiracy included a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained or made artificial the prices of Euroyen-based

derivatives.  Defendants' price-fixing conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

1014.   Defendants' conspiracy and resulting impact on the prices of Euroyen-based derivatives occurred in and had direct, substantial and reasonably foreseeable effects on U.S. interstate commerce.  Defendants' conspiracy overcharged U.S.-based counterparties on each Euroyen-based derivative transaction they entered into with these counterparties at the moment these transactions were consummated.  No third party or other intervening circumstance stood between Defendants' collusion and the resulting impact on Euroyen-based derivative counterparties' overcharge resulting therefrom.

1015.   The Defendant Euroyen-based derivative dealers were supposed to be horizontal competitors in the market for Euroyen-based derivative offerings.  Instead of competing with one another for counterparty business by offering competitive spreads, Defendants supplanted competition with collusion by agreeing not to compete with one another beyond a certain "bid-ask" spread.  The collusion directly interfered with the salutary and price-reducing effects of the marketplace.

1016.   This price fixing scheme was complete at the moment of agreement to quote wide spreads; the offense was committed in the Euroyen-based derivatives market and was not dependent upon these same Defendants' additional scheme to make false Yen-LIBOR and Euroyen TIBOR submissions.  In essence, the "bid-ask" collusion was designed to, and did, rob counterparties of money upon entering into a Euroyen-based derivatives transaction while the collusive false submissions outlined in Count I, herein, was designed to, and did, rob these same counterparties of money when the Euroyen-based derivatives they purchased were priced, benchmarked, and/or settled based on Yen-LIBOR and/or Euroyen TIBOR.  Both schemes

430

related to the same overarching conspiracy to charge supracompetitive prices to Euroyen-based derivatives counterparties.

1017.   As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property.  Without limiting the generality of the foregoing, Plaintiffs and members of the Class paid artificial and non-competitive prices for Euroyen-based derivatives as a proximate result of Defendants' anticompetitive conduct. Plaintiffs and the other members of the Class were also deprived of the benefits of free and open competition in transacting in Euroyen-based derivatives.

1018.   Plaintiffs and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## FOURTH CLAIM FOR RELIEF

### (For Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)) 18 U.S.C. §§ 1961 *et seq.*
### Against All Defendants

1019.   Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

### Defendants Engaged In Conduct Actionable Under RICO

1020.   18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

1021.   18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

431

1022.   Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

1023.   18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

1024.   18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

1025.   18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

1026.   At all relevant times, an association-in-fact consisting of Defendants, Defendants' employees and agents, who conducted Defendants' affairs through illegal acts including the transmission of false Yen-LIBOR and Euroyen TIBOR submissions or directing other employees and agents to intentionally manipulate Yen-LIBOR and Euroyen TIBOR rates by wire communications, and the BBA were an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

1027.   At all relevant times, Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

## Defendants Conducted the Affairs of A RICO Enterprise

1028.   Defendants' association-in-fact, through their frequent and routine communications with each other, their organization of a hub-and-spoke conspiracy through inter-dealer brokers, association with the BBA and JBA, and participation together as members in the Yen-LIBOR and Euroyen TIBOR panels, constitutes a RICO enterprise.  Defendants conducted the affairs of the enterprise through a pattern of racketeering activity by transmitting or causing to be transmitted by use of wires false and artificial Yen-LIBOR and Euroyen TIBOR submissions throughout the Class Period.  Within the United States, Defendants would on a regular basis communicate through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce.  Further, on a daily basis, Defendants caused the enterprise to transmit an electronic spreadsheet to Thomson Reuters.  Through their collusive activities in reporting Yen-LIBOR and Euroyen TIBOR submissions and the daily transmission by use of wires of an electronic spreadsheet setting forth those submissions, Defendants conducted the affairs of the enterprise through a pattern of racketeering activity, knowingly transmitting or causing to be transmitted false Yen-LIBOR and Euroyen TIBOR submissions.

1029.   As part of its global settlement with regulators for its manipulation of financial benchmarks, Defendant Rabobank agreed to waive indictment to a one-count criminal information filed in the District of Connecticut by the Criminal Division (Fraud Section) and Antitrust Division of the DOJ charging Rabobank with wire fraud, in violation of 18 U.S.C. §

1343, in connection with, *inter alia*, Rabobank's false reporting of Yen-LIBOR.  The one-count criminal information provides that "[b]etween approximately 2005 and at least 2010, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., the defendant, through its employees, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant, through its employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about April 17, 2008, the defendant transmitted or caused the transmission of electronic communications - specifically, (1) an electronic chat between a derivatives trader and a money market trader, (2) a subsequent Yen LIBOR submission from the defendant to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate through international and interstate wires."  The Rabobank Criminal Information is attached as Ex. D-4.

1030.   As part of its global settlement with regulators for its manipulation of financial benchmarks, Defendant RBS Japan pled guilty and agreed to waive indictment to a one-count criminal information filed in the District of Connecticut by the Criminal Division (Fraud Section) and Antitrust Division of the DOJ charging RBS Japan with felony wire fraud, in violation of 18 U.S.C. § 1343, in connection with, *inter alia*, RBS Japan's false reporting of Yen-LIBOR.  The one-count criminal information provides that "[b]etween approximately 2006 and at least 2010, in the District of Connecticut and elsewhere, RBS SECURITIES JAPAN

LIMITED, the defendant, through its employees, unlawfully, willfully, and knowingly, having

devised and intending to devise a scheme and artifice to defraud and for obtaining money and

property by means of false and fraudulent pretenses, representations, and promises, did transmit

and cause to be transmitted by means of wire, radio, and television communication in interstate

and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing

such scheme and artifice, to wit, the defendant, through its employees, engaged in a scheme to

defraud counterparties to interest rate derivatives trades executed on its behalf by secretly

manipulating benchmark interest rates to which the profitability of those trades was tied, and in

furtherance of that scheme, on or about October 5, 2009, the defendant transmitted or caused the

transmission of electronic communications -- specifically, (1) an electronic chat between a

derivatives trader employed by the defendant and a derivatives trader employed by the

defendant's parent company, (2) a subsequent Yen LIBOR submission from a bank to Thomson

Reuters, and (3) a subsequent publication of a Yen-LIBOR rate—through international and

interstate wires, at least one of which passed through, among other locations and facilities,

servers located in Stamford, Connecticut."  The RBS Criminal Information is attached as Ex. B-

3.

        1031.   As part of its global settlement with regulators for its manipulation of financial

benchmarks, Defendant UBS Japan pled guilty and agreed to waive indictment to a one-count

criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section

and Antitrust Division of the DOJ charging UBS with felony wire fraud, in violation of 18

U.S.C. §§ 1342-3, in connection with, *inter alia*, UBS' false reporting of Yen-LIBOR and

Euroyen-TIBOR.  The one-count criminal information provides that "[b]etween approximately

2006 and at least 2009, in the District of Connecticut and elsewhere, UBS SECURITIES JAPAN

CO., LTD., the defendant, unlawfully, willfully, and knowingly, having devised and intending to

devise a scheme and artifice to defraud and for obtaining money and property by means of false

and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted

by means of wire, radio, and television communication in interstate and foreign commerce,

writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and

artifice, to wit, the defendant devised and engaged in a scheme to defraud counterparties to

interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest

rates to which the profitability manipulating benchmark interest rates to which the profitability of

those trades was tied, and in furtherance of that scheme, on or about February 25, 2009, the

defendant transmitted or caused the transmission of electronic communications—specifically, (1)

an electronic chat between a derivatives trader employed by the defendant and a broker

employed at an inter-dealer brokerage firm, (2) a subsequent Yen LIBOR submission from a

bank to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate through

international and interstate wires, at least one of which passed through, among other locations

and facilities, servers located in Stamford, Connecticut."  *See* Ex. A-4.

1032.   As part of its global settlement with regulators for its manipulation of financial

benchmarks, Defendant UBS AG pled guilty and agreed to waive indictment to a one-count

criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section

and Antitrust Division of the DOJ charging UBS with felony wire fraud, in violation of 18

U.S.C. §§ 1343 & 2, in connection with, *inter alia*, UBS' false reporting of Yen-LIBOR and

Euroyen-TIBOR.  The one-count criminal information provides that "Between approximately

2001 and in or about 2010, in the District of Connecticut and elsewhere, the defendant, UBS AG,

unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and

artifice to defraud and for obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, did transmit and cause to be transmitted by means of
wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and
sounds for the purpose of executing such scheme and artifice, which violation affected a
financial institution, to wit: the defendant, UBS AG, devised and engaged in a scheme to defraud
counterparties to interest rate derivatives transactions by secretly manipulating benchmark
interest rates to which the profitability of those transactions was tied, and in furtherance of that
scheme, on or about June 29, 2009, the defendant, UBS AG, transmitted or caused the
transmission of electronic communications in interstate and foreign commerce, specifically: (1)
an electronic chat between a senior derivatives trader employed by a subsidiary of the defendant,
UBS AG ("Trader-1"), and a London-based inter-dealer derivatives broker ("Broker-1"), in
which Trader-1 requested assistance from the broker in requesting that other banks sitting on the
London Interbank Offered Rate ("LIBOR") Yen panel submit an increased Yen LIBOR rate
favorable to Trader-1's trading positions; (2) a telephone call placed by Broker-1 at Trader-1's
request to a Yen LIBOR submitter at another Yen panel bank, in which Broker-l requested that
the submitter increase the panel bank's Yen LIBOR submission that day; (3) an electronic chat
between Trader-l and a junior derivatives trader employed by the defendant, UBS AG, who also
served as a Yen LIBOR submitter for the defendant ("UBS Submitter"), in which Trader-l
requested that the UBS Submitter increase UBS AG's Yen LIBOR submission to a rate favorable
to Trader-1's trading positions; (4) a subsequent Yen LIBOR submission from the defendant,
UBS AG, to Thomson Reuters reflecting an accommodation of Trader-1's request to the UBS
Submitter; and (5) a subsequent publication of a Yen LIBOR rate -through international and

interstate wires, at least one of which passed through, among other locations and facilities, servers located in Stamford, Connecticut."

1033.   Defendants completed all elements of wire fraud within the United States or while crossing United States borders.  Defendants did so by conducting the affairs of the enterprise through a pattern of racketeering activity, including by: (i) transmitting or causing to be transmitted false and artificial Yen-LIBOR and Euroyen TIBOR quotes in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (ii) transmitting or causing to be transmitted false and artificial Yen-LIBOR and Euroyen TIBOR quotes that were relied on by Thomson Reuters and the BBA and JBA in collecting, calculating, publishing and/or disseminating the daily Yen-LIBOR and Euroyen TIBOR submissions of each Defendant and the daily Yen-LIBOR and Euroyen TIBOR fix that were transmitted, published and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; (iii) coordinating their daily Yen-LIBOR and Euroyen TIBOR submissions and their Euroyen-based derivatives trading positions in electronic chats routed through electronic servers located in the United States; (iv) sending trade confirmations based on manipulated Yen-LIBOR and Euroyen TIBOR rates to counterparties in the United States; and (v) executing sham transactions, including wash trades, through inter-dealer brokers.  In total, this conduct constituted thousands of predicate acts of wire fraud.

1034.   It is clear that even though the BBA may be a foreign entity, the elements of the wire fraud were completed in the United States. This is evidenced by many phone conversations, electronic chats, electronic mail made from the Defendants in the United States and false wire submissions to Thomson Reuters in New York.  In addition to phone conversations, Defendants would routinely communicate using Bloomberg chat terminals and in internal electronic

messaging systems to discuss and receive preferential Yen-LIBOR and Euroyen TIBOR requests and their Euroyen-based derivatives trading positions.  Defendants also used electronic Bloomberg chats to communicate information regarding their trading positions and to coordinate their false Yen-LIBOR and Euroyen TIBOR submissions during the Class Period.

1035.   For example, at least some of the electronic chats between Defendants' traders and brokers below were transmitted through servers located in the United States.  As part of its factual basis for its Plea Agreement with the DOJ, Defendant UBS Japan admitted as "true and accurate" that "on or about February 25, 2009, a derivatives trader employed by UBSSJ [UBS Japan] (referred to as 'Trader-1') engaged in an electronic chat with an employee of an inter-dealer broker (referred to as 'Broker-B').  During the chat, Trader-1 asked Broker-B to help influence Yen-LIBOR submitters at other banks to contribute submissions that would benefit Trader-1's trading positions.  In response, Broker-B indicated that he would do so.  The chat was transmitted through, among other locations and facilities, a UBS server located in Stamford, Connecticut.  Following the chat, Broker-B spoke by telephone with a Yen-LIBOR submitter at a bank other than UBS (referred to as Submitter-F at Bank-F).  During that call, Broker-B asked Submitter-F to alter the submitter's contribution for Yen-LIBOR for a particular maturity (or "tenor") in a manner that was consistent with Trader-1's request to Broker-B.  Submitter-F acceded to Broker-B's request by changing the Yen-LIBOR contribution from Bank-F in that tenor.  Bank-F's LIBOR submissions were then transmitted to Thomson Reuters, which calculated and published the daily LIBOR rates and transmitted those rates electronically to locations around the world.  As a result of the change in Bank F's submission that occurred because of these events, a published Yen LIBOR was affected."

439

1036.   Further, the Defendants, through the BBA, made agreements with the Chicago

Mercantile Exchange, in the United States, which helped them to further their illegal acts.  To

increase interest in Yen futures contracts, the Chicago-based CME proposed that the BBA allow

them to use the BBA's LIBOR calculation as the basis for the Futures contracts amounts.  Since

2005, New York-based Thomson Reuters has been the BBA's agent for determining and

distributing LIBOR.  This change was approved by the CFTC and trading, both in the

exchange's Chicago trading pits and through the CME's Globex electronic exchange,[377]

encouraged the exponential global growth of trading in Yen futures contracts.

1037.   For example, the CME's agreement with the BBA permitted the Exchange to use

BBA LIBOR as the basis for settling Yen futures contracts and to refer to BBA LIBOR in

connection with creating, marketing, trading, clearing, settling and promoting Yen futures

contracts.[378]

1038.   Defendants, who were part of the BBA Yen-LIBOR panel, knew that the BBA

benefited financially from this relationship with the CME.  This contract between the BBA and

CME for LIBOR rates, a contract in interstate commerce, underscores the strength of the causal

connection between the pricing of LIBOR and the pricing of Yen futures, the largest futures

contract in the world, and shows that Defendants knew that their manipulation of LIBOR rates

would manipulate Yen futures in turn.

---

[377] CME RULEBOOK, Chapters 254 and 254(a) (Chicago Mercantile Exchange, Inc.), available at
http://www.cmegroup.com/rulebook/CME/III/250/254/254.pdf.

[378] *CME* 2012 *Annual Report*, at 8 ("We currently have a licensing and membership agreement with BBA
Enterprises Limited and the British Bankers' Association (collectively, BBA) for the use of LIBOR to settle several
of our interest rate products, including our Eurodollar contract. For the license, we paid an upfront fee and pay an
annual fee. Based on the ongoing review of LIBOR, we expect LIBOR to be reformed rather than replaced and to
continue as a regulated benchmark. Depending upon the outcome of the reform efforts, we may need to enter into a
new license agreement with BBA or the organization appointed to administer the benchmark").

1039.   The licensing of LIBOR by the BBA to the CME also constitutes a contract for LIBOR in interstate commerce.

1040.   By transmitting or causing false and artificial Yen-LIBOR submissions to be transmitted electronically to Thomson Reuters and the BBA, and by exchanging Euroyen-based derivative positions and prices, Defendants conducted the affairs of an enterprise through a pattern of racketeering activity which artificially fixed and affected the prices of Euroyen-based derivatives, directly resulting in Defendants reaping hundreds of millions, if not billions, in illicit trading profits on their Euroyen-based derivative positions.  Defendants conducted the affairs of the enterprise through a pattern of racketeering activity, including the use of electronic communication to affect the values of futures contracts, such as the Yen Futures Contracts traded in Chicago, for the purpose of defrauding innocent counterparties with whom Defendants traded.

1041.   The common purpose of the enterprise was simple: profiteering.  By engaging in the predicate acts alleged including, but not limited to, transmitting or causing false and artificial Euroyen TIBOR and Yen-LIBOR submissions to be transmitted to Thomson Reuters as agent for the BBA, and the JBA and by exchanging Euroyen-based derivative positions and prices, Defendants affected the prices of Euroyen-based derivatives, rendering them artificial.  This directly resulted in Defendants reaping hundreds of millions, if not billions, in illicit trading profits on their Euroyen-based derivative positions.

1042.   Defendants acknowledged the profitability of this scheme on multiple occasions. For example, in an electronic chat on August 20, 2007, an RBS Senior Yen Trader commented "its just amazing how libor fixing can make you that much money."  Moreover, while traders benefited through increased commissions, Broker Defendants were paid handsomely in the form of bribes and other illicit and illegitimate compensation by UBS traders which sometimes

included regular bonuses and bigger salary packages.  In one exchange on September 18, 2008, a UBS Trader wrote to a broker employed by Broker Defendant R.P. Martin that "if you keep 6s [six-month Yen-LIBOR] unchanged today. . . .**I will f\*\*\*ing do one humungous deal with you….Like a 50,000 buck deal, whatever….I need you to keep it as low as possible….if you do that….I'll pay you, you know, 50,000 dollars, 100,000 dollars….whatever you want. All right."**

### Defendants Have Conducted the Affairs of an Enterprise Through a Pattern of Racketeering Activity

1043.  Defendants each committed far more than two predicate acts of wire fraud.  As alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

1. The transmission of false Yen-LIBOR Rates to Thomson Reuters in the United States, for further dissemination;

2. Causing the transmission and dissemination in the United States of false Yen-LIBOR "Fix" by Thomson Reuters as agent for the BBA;

3. Causing the transmission and dissemination in the United States of false Yen-LIBOR Individual Bank Quotes by Thomson Reuters;

4. The transmission of false Euroyen TIBOR Rates from the United States to the JBA;

5. Causing the transmission and dissemination in the United States of false Euroyen-TIBOR "Fix" by Thomson Reuters as agent for the JBA;

6. Causing the transmission and dissemination in the United States of false Euroyen TIBOR Individual Bank Quotes by Thomson Reuters as agent for the JBA;

7. Electronic communications and instant messages that emanated from within the United States or were routed through United States electronic servers with manipulative requests, broker false run thrus and suggested LIBORs; and

8. Sending trade confirmations (e-mail, message, telephonic, facsimile) based on manipulated and false Yen-LIBOR and/or Euroyen TIBOR rates to counterparties in the United States.

442

1044.   The conduct of every party involved in the scheme is not an isolated occurrence. The pattern of racketeering activity herein alleged involved not isolated occurrences but constituted related acts which amounted to a threat of continued criminal activity throughout the Class Period.  Each Defendant shared a common purpose in increasing their profits from trading financial instruments priced, benchmarked, settled to or otherwise affected by Yen-LIBOR or Euroyen TIBOR, and also had a common method of conducting the affairs of the enterprise through a pattern of racketeering activity through use of the wires in transmitting false Yen-LIBOR and Euroyen TIBOR reports and placing trades in conformity therewith.

1045.   Defendants acted in a uniform way to conduct the affairs of the enterprise through daily submission and electronic communication of their collusive and artificial Yen-LIBOR and Euroyen TIBOR submissions to the BBA, JBA and Thomson Reuters following uniform procedures used in virtually an identical way every day. As alleged herein, the predicate acts had a closed-ended continuity involving a closed period of repeated conduct in colluding to set Yen-LIBOR and Euroyen TIBOR, reporting false Yen-LIBOR and Euroyen TIBOR, and trading to benefit therefrom, throughout the Class Period.

## The Pattern of Racketeering Activity Was Directed to, and Did Affect, Interstate Commerce

1046.   Through the racketeering scheme described above, Defendants conducted the affairs of the enterprise through a pattern of activity to illegally increase their profits to the detriment of investors in Euroyen-based derivatives residing throughout the United States, and/or transacting in Euroyen-based derivatives within the United States.

1047.   Plaintiffs' allegations herein arise out of, and are based on, Defendants' use of the Internet and/or the wires across state lines as well as agreements between entities in different states to manipulate Yen-LIBOR, Euroyen TIBOR, and the price of Euroyen-based derivatives.

443

Using those interstate channels to coordinate the scheme and transmit fraudulent statements to Plaintiffs across state lines satisfies RICO's requirement of an effect on interstate commerce. Defendants' racketeering acts had a direct effect on interstate commerce.

1048.   The predicate acts affected and made artificial the price of futures contracts which were traded on the CME.  These contracts are traded in an open outcry form in Chicago and also electronically on the CME's GLOBEX platform.

1049.   The primary purpose of Defendants' racketeering activity was to benefit the Defendants' derivative trading positions, including the positions in their United States entities.

1050.   In addition, as part of its Plea Agreement, UBS Japan admitted as "true and accurate" that it "entered into interest rate derivatives transactions tied to LIBOR and Euroyen TIBOR - such as derivatives, forward rate agreements, and futures - with counterparties to those transactions.  Many of those counterparties were located in the United States.  Those United States counterparties included, among others, asset management corporations, mortgage and loan corporations, and insurance companies.  Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States."

1051.   During the Class Period, numerous instant message chats and emails between UBS Senior Yen Trader Hayes and the Broker Defendants wherein Hayes requested the Broker help influence Yen-LIBOR Submitters to benefit the Trader's trading positions were transmitted through servers located in Stamford, Connecticut or New York, New York.[379]

1052.   Therefore, Plaintiffs' allegations satisfy RICO's "interstate commerce" element because the racketeering claims alleged herein arise out of, and are based on, Defendants' use of the internet or the wires across state lines as well as agreements between entities in different

---

[379] *See, e.g.*, Ex. A-4.

states to manipulate Euroyen TIBOR, Yen-LIBOR and the prices of Euroyen-based derivatives.

Using those interstate channels to coordinate the scheme and transmit fraudulent statements to

Plaintiffs across state lines satisfies RICO's requirement of an effect on interstate commerce.

**Plaintiffs Suffered Injury Proximately Caused By the Pattern of Racketeering Activity**

1053.   As alleged herein, Plaintiffs and members of the Class are direct victims of

Defendants' wrongful and unlawful conduct.  Plaintiffs and the Class' injuries were direct,

proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed depriving

Plaintiffs and the Class of their money relative to their Euroyen-based derivatives contracts was

the very purpose of the Defendants' scheme.

1054.   Plaintiffs and members of the Class are entitled to recover treble damages of the

injuries they have sustained, according to proof, as well as restitution and costs of suit and

reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

1055.   As a direct and proximate result of the subject racketeering activities, Plaintiffs

and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a),

enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

**FIFTH CLAIM FOR RELIEF**

**For Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)**

**18 U.S.C. §§ 1961 *et seq.***

**Against All Defendants**

1056.   Plaintiffs incorporate by reference and re-allege the preceding allegations as

though fully set forth herein.

1057.   In addition to conducting the affairs of the enterprise through a pattern of

racketeering activity, Defendants conspired to violate RICO in violation of 18 U.S.C. § 1962(d).

1058.   Defendants organized and implemented the scheme alleged herein, which required their agreement to report their borrowing rates falsely and to benefit their trading positions, and ensured that it continued uninterrupted, by concealing their violations and the prices of Euroyen-based derivatives from Plaintiffs and the Class.

1059.   Defendants knew and intended that their racketeering acts would injure participants in the Euroyen-based derivatives market, yet each Defendant remained a participant despite the racketeering nature of their conduct.  At any point while the scheme had been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence.  Rather than stopping the scheme, however, the Defendant chose to continue it, to the direct detriment of Euroyen-based derivatives market participants such as Plaintiffs and members of the Class.

1060.   As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct.  Plaintiffs' and the Class' injuries to their property were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, such effects were precisely the reason why the scheme was concocted.

1061.   Plaintiffs and members of the Class are entitled to recover treble the damages they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

1062.   As a direct and proximate result of the racketeering activities alleged herein, Plaintiffs and members of the Class are entitled to an Order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SIXTH CLAIM FOR RELIEF

### For Unjust Enrichment

### Against Contributor Bank Defendants

1063.   Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

1064.   To the extent required, this claim is pled in the alternative to Plaintiffs' Seventh Claim for Relief under FED. R. CIV. P. 8(d).

1065.   The Contributor Bank Defendants, individually, and/or through their subsidiaries or affiliates traded Euroyen-based derivatives at a time the Contributor Bank Defendants were actively and systematically manipulating Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives to artificial and anticompetitive levels for their own illicit financial benefit to the detriment of Plaintiffs and Class Members.

1066.   The Contributor Bank Defendants also individually, and/or through their subsidiaries or affiliates are future commission merchants, dealers in the Euroyen derivatives market in the U.S.,[380] clearing firms, and/or trading members of futures exchanges involved in profit-based trading, clearing and/or brokering of Euroyen-based derivatives contracts traded by Plaintiffs and the members of the Class.

1067.   The Contributor Bank Defendants, and/or one or more their subsidiaries and/or affiliates, financially benefited from the unlawful manipulation.  As alleged herein, Contributor Bank Defendants, among other things, intentionally and systematically manipulated Euroyen TIBOR and Yen-LIBOR to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) in ill-gotten trading profits on Euroyen-based derivative contracts held

---

[380] The Contributor Bank Defendants that engaged in Euroyen-based derivatives dealing in the U.S. include at least: (i) Bank of Tokyo-Mitsubishi; (ii) Barclays; (iii) Citigroup; (iv) Deutsche; (v) HSBC; (vi) JPMorgan; (vii) Mizuho; (viii) RBS; (ix) Société Générale; (x) Sumitomo Mitsui Banking Corp; (xi) Bank of America; and (xii) UBS.

by them and other colluding banks, the prices of which (and thus illicit profits) were benchmarked, traded and price settled to such Euroyen rates.  In this regard, for example, Euroyen TIBOR and Yen-LIBOR submitters at the Contributor Bank Defendants, among other things, regularly and improperly coordinated and changed their Euroyen TIBOR and Yen-LIBOR submissions with one another at the request of Contributor Bank Defendants' interest rate derivatives traders employed by them or their subsidiaries or affiliates.   These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact in Euroyen-based derivatives at artificial and manipulated prices.

1068.   Plaintiff Hayman Capital transacted Euroyen-based derivatives during the Class Period directly with Contributor Bank Defendants, including Defendants Barclays, Deutsche, JPMorgan, and Merrill Lynch.  *See* Part IX.B, *supra*.

1069.   Plaintiff CalSTRS transacted Euroyen-based derivatives with Defendants UBS, RBS, Barclays, Citibank, Deutsche Bank, Bank of America, JPMorgan, HSBC, and Société Générale.  *See* Part IX.C, *supra*.

1070.   It is unjust and inequitable for Contributor Bank Defendants (and/or their subsidiaries or affiliates) to have enriched themselves in this manner at the expense of Plaintiffs Hayman Capital, CalSTRS and similarly situated members of the Class, and the circumstances are such that equity and good conscience require the Contributor Bank Defendants to make restitution.

1071.   Each Contributor Bank Defendant should pay restitution or its own unjust enrichment to Plaintiffs Hayman Capital, CalSTRS, and similarly situated members of the Class.

<u>SEVENTH CLAIM FOR RELIEF</u>

**For Breach of The Implied Covenant of Good Faith and Fair Dealing**

**Against Defendants Barclays, Deutsche, JPMorgan, Merrill Lynch
Bank of America, UBS, RBS, Citibank, HSBC, and Société Générale**

1072.   Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

1073.   To the extent required, this claim is pled in the alternative to Plaintiffs' Sixth Claim for Relief under FED. R. CIV. P. 8(d).

1074.   Plaintiff Hayman Capital entered into binding and enforceable contracts with Defendants Barclays, Deutsche, JPMorgan and Merrill Lynch in connection with Euroyen-based derivatives, for example, Yen-LIBOR-based interest rate swaps and options.  *See* Part IX.B, *supra*.

1075.   Plaintiff CalSTRS entered into binding and enforceable contracts with Defendants UBS, RBS, Barclays, Citibank, Deutsche Bank, Bank of America, JPMorgan, HSBC, and Société Générale, for example, Yen foreign exchange forwards.  *See* Part IX.C, *supra*.

1076.   Each of the contracts includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

1077.   Defendants Barclays, Deutsche, JPMorgan, Merrill Lynch, Bank of America, UBS, RBS, Citibank, HSBC, and Société Générale breached this duty and, without reasonable basis and with improper motive, acted in bad faith by, among other things, (i) intentionally submitting false and artificial Yen-LIBOR and/or Euroyen TIBOR submissions to the BBA and/or JBA for the express purpose of obtaining ill-gotten profits from their Euroyen-based

449

derivatives positions; (ii) using the Broker Defendants (among others) to disseminate false market information; and/or (iii) colluding directly with employees at other Contributor Panel Banks, either directly or through brokers, in order to manipulate Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives.

1078.   As a direct and proximate cause of these breaches of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purposes of these contracts, Plaintiffs Hayman, CalSTRS, and similarly situated members of the Class, have been damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs demand relief as follows:

A.      For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives, and their counsel be appointed as Class counsel;

B.      For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

C.      For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful enterprise in violation of RICO;

D.      For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, to be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

E.      For a judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the federal antitrust laws and RICO, in an amount to be trebled in accordance with such laws;

F.      For a judgment awarding Plaintiffs and the Class restitution of any and all sums

received by the Contributor Bank Defendants' unjust enrichment;

G.      For an award to Plaintiffs and the Class of their costs of suit, including reasonable

attorneys' and experts' fees and expenses; and

H.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully

demand a trial by jury of all issues so triable.

Dated: December 18, 2015
White Plains, New York

LOWEY DANNENBERG COHEN
& HART, P.C.

By:_____

Vincent Briganti
Geoffrey M. Horn
Peter D. St. Phillip
Raymond Girnys
Christian Levis
One North Broadway, 5th Floor
White Plains, New York 10601
Telephone: (914) 997-0500
vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com
rgirnys@lowey.com
clevis@lowey.com

*Counsel for Plaintiffs*

Joseph J. Tabacco, Jr. (JT-1994)
Todd A. Seaver
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6282
jtabacco@bermandevalerio.com
tseaver@bermandevalerio.com

451

Patrick T. Egan (PE-6812)
Daryl DeValerio Andrews
**BERMAN DEVALERIO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
pegan@bermandevalerio.com
dandrews@bermandevalerio.com

*Additional Counsel for Plaintiffs*