IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SONTERRA CAPITAL MASTER FUND, LTD., HAYMAN CAPITAL MANAGEMENT, L.P., and CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>UBS AG, UBS SECURITIES JAPAN CO. LTD., MIZUHO BANK, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE SUMITOMO TRUST AND BANKING CO., LTD., THE NORINCHUKIN BANK, MITSUBISHI UFJ TRUST AND BANKING CORPORATION, SUMITOMO MITSUI BANKING CORPORATION, RESONA BANK, LTD., J.P. MORGAN CHASE & CO., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, J.P. MORGAN SECURITIES PLC, MIZUHO CORPORATE BANK, LTD., DEUTSCHE BANK AG, DB GROUP SERVICES UK LIMITED, MIZUHO TRUST AND BANKING CO., LTD., THE SHOKO CHUKIN BANK, LTD., SHINKIN CENTRAL BANK, THE BANK OF YOKOHAMA, LTD., SOCIÉTÉ GÉNÉRALE SA, THE ROYAL BANK OF SCOTLAND GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, RBS SECURITIES JAPAN LIMITED, RBS SECURITIES INC., BARCLAYS BANK PLC, BARCLAYS PLC, BARCLAYS CAPITAL INC., CITIBANK, NA, CITIGROUP, INC., CITIBANK, JAPAN LTD., CITIGROUP GLOBAL MARKETS JAPAN, INC., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., HSBC HOLDINGS PLC, HSBC BANK PLC, LLOYDS BANKING GROUP PLC, LLOYDS BANK PLC, ICAP PLC, ICAP EUROPE LIMITED,  R.P. MARTIN HOLDINGS LIMITED, MARTIN BROKERS (UK) LTD., TULLETT PREBON PLC, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., MERRILL LYNCH INTERNATIONAL, AND JOHN DOE NOS. 1-50,<br><br>Defendants. | Docket No. 15-cv-5844 (GBD) (HBP) |

**DECLARATION OF VINCENT BRIGANTI**

I, Vincent Briganti, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a shareholder with the law firm Lowey Dannenberg Cohen & Hart, P.C. ("Lowey"). I submit this Declaration in connection with the pending Motion for Preliminary Approval of the settlements reached with R.P. Martin and Citi.

2. A true and correct copy of the Stipulation and Agreement of Settlement dated December 3, 2014 (the "R.P. Martin Settlement"), among Plaintiffs and Defendants R.P. Martin Holdings Limited and Martin Brokers (UK) Ltd., and their subsidiaries and affiliates (collectively "R.P. Martin") is attached as Exhibit 1.

3. A true and correct copy of the Stipulation and Agreement of Settlement dated August 11, 2015 (the "Citi Settlement"), among Plaintiffs and Defendants Citigroup Inc., Citibank, N.A., Citibank Japan Ltd., Citigroup Global Markets Japan Inc., and their subsidiaries and affiliates (collectively "Citi") is attached as Exhibit 2.[1]

4. A true and correct copy of the U.S. Commodity Futures Trading Commission's Order Instituting Proceedings Pursuant to Section 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against R.P. Martin is attached as Exhibit 3.

5. A true and correct copy of the U.K. Financial Conduct Authority's Final Notice to Martin Brokers (UK) Ltd. is attached as Exhibit 4.

6. **Experience**.  At the time the proposed R.P. Martin and Citi Settlements (collectively, "Settlements") were being negotiated, my firm and I were experienced in prosecuting claims under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*, and Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*

7. I have nearly twenty years of experience in successfully developing and leading the

---

[1] Capitalized terms used herein that are not otherwise defined in this Declaration have the same meaning as in the Citi Settlement.

prosecution of commodity manipulation, antitrust, and federal securities litigation matters. This experience includes cases in which my firm and I have successfully prosecuted, as court-appointed lead or co-lead counsel or individual plaintiff's counsel, what were at the time the first, second, third, and fourth largest class action recoveries under the Commodity Exchange Act: *In re Sumitomo Copper Litigation*, Master File No. 96 CV 4854 (S.D.N.Y.) (Pollack, J.) ($149 million settlement); *Hershey v. Pacific Investment Management Corp.*, Case No. 05-C-4681 (RAG) (N.D. Ill.) ($118.75 million settlement); *In re Natural Gas Commodity Litigation*, Master File No. 03 CV 6186 (S.D.N.Y.) (Marrero, J.) ($101 million settlement); and *In re Amaranth Natural Gas Commodities Litigation*, Master File No. 07 Civ. 6377 (S.D.N.Y) (Scheindlin, J.) ($77.1 million settlement). Currently, my firm and I are prosecuting, as court-appointed class counsel, cases alleging anticompetitive conduct and manipulation of the world's most important financial benchmarks, including the London Interbank Offered Rate ("LIBOR") for the Swiss Franc (*Sonterra Capital Master Find Ltd. et al. v. Credit Suisse Group AG et al.*, Case No. 15-cv-871 (SHS) (S.D.N.Y.)), the Euro Interbank Offered Rate ("Euribor") (*Sullivan et al. v. Barclays PLC et al.*, Case No. 13-cv-2811 (PKC) (S.D.N.Y.)), the WM/Reuters FX benchmark ("FX")(*In re Foreign Exchange Benchmark Rate Antitrust Litig.*, Case No. 13-cv-7789 (LGS) (S.D.N.Y.)), and the London Silver Fixing (*In re: London Silver Fixing Ltd., Antitrust Litigation*, Case No. 14-md-2573 (VEC) (S.D.N.Y.). In the *Euribor* litigation, Judge Castel preliminarily approved a $94 million settlement with Barclays plc and related Barclays' entities on December 15, 2015. As part of the December 15 Order, Judge Castel appointed my firm and I as Co-Class Counsel to the Settlement Class. *See Sullivan v. Barclays plc*, No. 13-cv-2811 (PKC), Order Preliminarily Approving Class Action Settlement and Conditionally Certifying a Settlement Class (ECF No. 234).

8. Lowey's Firm Resume is attached hereto as Exhibit 5.

9. **Well-Informed**. Before reaching the Settlements, Plaintiffs' counsel was well-

informed regarding the strengths and weaknesses of Plaintiffs' claims. My firm and I extensively reviewed and analyzed the following documents and information: (i) government settlements, including plea, non-prosecution and deferred prosecution agreements; (ii) publicly available information relating to the conduct alleged in Plaintiffs' complaints; (iii) expert and industry research regarding Yen-LIBOR, Euroyen TIBOR and Euroyen-Based Derivatives futures and over-the-counter markets; and (iv) prior decisions of this Court and others deciding similar issues. In addition, my firm and I: (a) conducted an extensive investigation into the facts and legal issues in this action; (b) engaged in extensive negotiations with Citi and R.P. Martin; and (c) took many other steps to research and analyze the strengths and weaknesses of the claims, including ongoing consultations with a leading commodity manipulation consulting expert.

10. **Procedural History**. On April 30, 2012, Plaintiff Jeffrey Laydon ("Laydon") filed a class action complaint against Citibank, N.A. and Citibank Japan Ltd. and other Defendants.[2] ECF No. 1. Thereafter, on December 3, 2012, Laydon filed a corrected first amended class action complaint adding certain bank defendants, including Citigroup Inc. and Citigroup Global Markets Japan Inc. ECF No. 124. Laydon filed a second amended class action complaint on April 15, 2013 adding other defendants, including R.P. Martin. ECF No. 150. Defendants filed their motion to dismiss and thirteen separate memoranda of law on June 14, 2013. ECF Nos. 204, 205-06, 208-14, 217-18, 220-21. Laydon filed his opposition to Defendants' motions to dismiss on August 13, 2013. ECF No. 226. Defendants filed reply memoranda on September 27, 2013. ECF No. 232-243. Laydon filed a sur-reply memorandum on October 9, 2013. ECF No. 245.

11. On March 5, 2014, the Court held an all-day oral argument on Defendants' motion to dismiss. On March 28, 2014, the Court granted in part and denied in part Defendants' motion to dismiss Laydon's second amended complaint. ECF No. 270. Defendants moved for

---

[2] Unless otherwise noted, all docket citations are to *Laydon v. Mizuho Bank, Ltd. et al.*, 12-cv-3419 (GBD) (S.D.N.Y.).

3

reconsideration of their motions to dismiss on April 11, 2014.  ECF Nos. 275, 277, 278, 282.  Laydon opposed the reconsideration motions on May 9, 2014. ECF No. 290. Defendants filed reply memoranda on May 30, 2014. ECF Nos. 292, 293, 295, 296. The Court denied the motions for reconsideration on October 20, 2014. ECF No. 398.

12.     On April 21, 2014, the Court granted Laydon leave to file a motion to amend the second amended complaint and file a proposed third amended complaint. ECF No. 286. Laydon filed his motion to amend on June 17, 2014. ECF No. 301.  The proposed third amended complaint added Oklahoma Police Pension & Retirement System ("OPPRS"), and Stephen P. Sullivan ("Sullivan") as proposed plaintiffs and added claims under RICO and for breach of good faith and fair dealing against certain Defendants.  The proposed third amended complaint also sought to cure certain pleading deficiencies identified by the Court in its March 28, 2014 Order.  On August 15, 2014, Defendants filed a joint opposition to the motion to amend. ECF No. 361.  Laydon filed his reply memorandum on September 22, 2014. ECF Nos. 387-388. As part of his reply, Laydon also sought to add the California State Teachers' Retirement System ("CalSTRS") as a named plaintiff.  The Court granted in part and denied in part Laydon's motion to amend on March 31, 2015. ECF No. 448.  In the March 31 Order, the Court denied CalSTRS' application to intervene without prejudice and ordered CalSTRS to renew its application within 30 days.  CalSTRS filed its letter motion to intervene on April 29, 2015.  ECF No. 460.  Defendants filed their opposition on May 13, 2015.  ECF No. 471.  CalSTRS filed its reply on May 26, 2015.  ECF No. 475.  The Court denied CalSTRS' motion to intervene on October 8, 2015.  ECF No. 525.  CalSTRS timely filed a notice of appeal on November 9, 2015.  ECF No. 535.

13.     While the parties briefed arguments addressing Plaintiff Laydon's motion for leave to amend, fourteen Defendants filed motions to dismiss for lack of personal jurisdiction and a stay of discovery on August 10, 2014.  ECF Nos. 310, 315, 323, 331, 334, 337, 341, 344.  Laydon opposed

these motions to dismiss on August 29, 2014. ECF Nos. 366-370.  Fourteen Defendants filed their reply memoranda on September 15, 2014. ECF Nos. 375-379, 381-384. On September 30, 2014, the Court held oral argument on the fourteen Defendants' motions to dismiss for lack of personal jurisdiction.  On March 31, 2015, the Court granted the four Stipulating Defendants' motions to dismiss and denied the ten Non-Stipulating Defendants' motions to dismiss. ECF Nos. 446-447.  Defendants' motion for reconsideration was filed on April 14, 2015. ECF No. 452. The Court denied the motion for reconsideration on July 24, 2015. ECF No. 490.  The ten Non-Stipulating Defendants filed a petition for writ of mandamus on September 25, 2015.  *See In re: Mizuho Corporate Bank*, 15-3014 (2d Cir.).  The Second Circuit denied the mandamus petition on January 20, 2016.  *Id.*

14. On April 28, 2015, Laydon moved for an order entering final judgment under Fed. R. Civ. P. 54(b) as to the dismissal of the four Stipulating Defendants on personal jurisdiction grounds. ECF No. 457.  On April 30, 2015, Laydon, with proposed plaintiffs OPPRS and Sullivan, sought leave to file an interlocutory appeal under 28 U.S.C. § 1292(b) for immediate review of the Court's order denying Laydon leave to further amend the complaint to add the RICO claims and proposed plaintiffs OPPRS and Sullivan. ECF No. 461.  The Court denied both motions on July 24, 2015. ECF Nos. 489, 491.

15. Plaintiff served his First Request for the Production of Documents on Defendants on June 17, 2014.  While the parties were briefing Plaintiff Laydon's motion for leave to amend and fourteen Defendants' motions to dismiss for lack of personal jurisdiction, the U.S. Department of Justice also filed a motion to intervene and for a stay of discovery on September 15, 2014. ECF No. 380.  The Court granted the U.S. Department of Justice's motion to intervene and ordered a stay of discovery until May 15, 2015. ECF No. 451.  Defendants served their responses and objections to Plaintiff's First Request for the Production of Documents on December 19, 2014.

16. Following the lifting of the stay of discovery on May 15, 2015, Magistrate Judge

5

Pitman held a discovery conference on June 25, 2015.  Judge Pitman set a schedule by which Defendants were to brief and Plaintiff was to oppose Defendants' discovery objections based on the foreign data privacy laws of, among others, Japan.  ECF No. 483.

17.     Certain Defendants then moved on August 6, 2015 for an order sustaining their discovery objections under the foreign data privacy or bank secrecy laws of the United Kingdom and Japan.  ECF Nos. 495, 501.  On September 11, 2015, Plaintiff Laydon filed his opposition, including an expert declaration, to certain Defendants' motion to sustain their discovery objections under the laws of the United Kingdom.  ECF Nos. 512-513.  On September 11, 2015, Plaintiff Laydon and certain other Defendants also notified Magistrate Judge Pitman that they had reached an agreement to table Defendants' motion under the foreign data privacy laws of Japan.  ECF No. 511.

18.     On July 24, 2015, Sonterra Capital Master Fund, Ltd. and Hayman Capital Management, L.P. filed their initial complaint against Defendants. *Sonterra Capital Master Fund Ltd. et al. v. UBS AG et al.*, 15-cv-5844 (S.D.N.Y.) ("*Sonterra* Action") ECF No. 1. The *Sonterra* Action was assigned to this Court on August 5, 2015 as related to the *Laydon* action.  On October 8, 2015, the Court denied, without prejudice, Plaintiffs' request to consolidate the *Sonterra* and *Laydon* Actions.  ECF No. 524.

19.     On December 18, 2015, Plaintiff Laydon filed his Third Amended Class Action ("TAC") complaint.  ECF No. 547.  On January 8, 2016, the Court granted Defendants' request to strike the TAC and directed Plaintiff to submit a letter request with a new proposed complaint TAC by January 28, 2016.  ECF No. 558.  Plaintiff filed a letter request with a new proposed TAC on January 28, 2016.  ECF No. 564.

20.     On December 18, 2015, Sonterra Capital Master Fund, Ltd. and Hayman Capital Management, L.P. and CalSTRS filed their amended class action complaint. *Sonterra* Action, ECF No. 121.

6

21. **Arm's-Length**. Negotiations leading to the Settlements were entirely non-collusive and strictly arm's-length. During the course of negotiations, Plaintiffs had the benefit of developing information from various sources, including government settlements and orders, other public accounts of manipulation involving Yen-LIBOR and Euroyen TIBOR, counsel's investigation into Plaintiffs' claims, industry and expert analysis, and information shared by Settling Defendants during the negotiations. *See* ¶ 9. I was involved in all aspects of the settlement negotiations on behalf of Plaintiffs.

22. **R.P. Martin Settlement Negotiations**. The negotiations with R.P. Martin took place over four months starting approximately in September 2014 and continuing until the R.P. Martin Settlement was executed in December 2014.

23. Settlement discussions began in September 2014 after Lowey learned that R.P. Martin was facing insolvency, which would potentially impact, among other things, access to relevant documents and information.

24. R.P. Martin and Plaintiffs engaged in a number of phone calls and email exchanges to discuss the scope and terms of any settlement agreement during September and October 2014.

25. On November 5, 2014, my partner Geoffrey Horn and I traveled to London, England to meet in person with representatives of R.P. Martin, including R.P. Martin's Chairman and CEO Stephen Welch. During this meeting, R.P. Martin described the results of its investigation into its role in manipulating Yen-LIBOR, Euroyen-TIBOR and Euroyen-Based Derivatives, and discussed white papers it had prepared for government investigators describing its findings. R.P. Martin detailed their role in brokering various yen products including cash products, interest rate swaps, forward exchange and forward rate agreements in the voice broker market. It also provided information about its brokers' relationships with and manipulative activities (including wash trades) on behalf of Defendants such as UBS, RBS, and JPMorgan. R.P. Martin showed us audiotapes

containing conversations between R.P. Martin brokers and Defendants; the same recordings provided much of the information released by the various governments investigating the manipulation.

26. Following the November 5, 2014 meeting, R.P. Martin and Plaintiffs exchanged drafts of a proposed settlement agreement. After several rounds of revisions, R.P. Martin and Plaintiffs agreed on the final language and executed the R.P. Martin Settlement on December 3, 2014.

27. On December 4, 2014, Lowey had a conference call with R.P. Martin to specifically discuss the financial information and cooperation to be provided pursuant to the R.P. Martin Settlement. R.P. Martin agreed to produce, among other items, corporate declarations from R.P. Martin's C.E.O. describing, *inter alia*, R.P. Martin's involvement in manipulation; drafts of year-end audited financials; emails; voice recordings; electronic chat room data; transaction data; R.P. Martin's internal investigation files; and details of a plan to sell some assets of R.P. Martin and enter into insolvency proceedings.

28. Plaintiffs informed the Court and Defendants of the R.P. Settlement on December 9, 2014.

29. On December 15, 2014, Lowey had a conference call with R.P. Martin CEO and Chairman Stephen Welch to discuss the acquisition of certain R.P. Martin assets by BGC Partners, Inc. and the placement of the remaining assets under the supervision of a court-appointed administrator pursuant to British administration (insolvency) law.

30. On December 17, 2014, Lowey received some of the required information from R.P. Martin. Pursuant to the existing stay of discovery and an agreement with the U.S. Department of Justice, R.P. Martin's cooperation materials, other than information relating to R.P. Martin's financial condition, asset sale and insolvency, were embargoed and were not viewed until the Court-

8

ordered stay of discovery was lifted on May 15, 2015.

31.     Over the next several months, Lowey continued to work with R.P. Martin's agents to obtain all of the required documents. Lowey also confirmed R.P. Martin's representations that it was unable to pay any monetary settlement.

32.     R.P. Martin's settlement cooperation has provided a wealth of information previously unavailable to Plaintiffs.  For example, as part of its settlement cooperation, R.P. Martin produced its internal investigation files compiled as part of its investigation into the manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-Based Derivatives.  These internal investigation files included interview notes with former brokers.  These interview notes provide specifics on the means by which R.P. Martin and other Defendants manipulated Yen-LIBOR, the identities of R.P. Martin's principal co-conspirators, and specific examples of instances in which R.P. Martin and other Defendants manipulated Yen-LIBOR.

33.     Aside from R.P. Martin's interview notes, R.P. Martin also provided the underlying documents and audio files that it produced directly to global regulators during the course of the regulators' investigation of Yen-LIBOR and Euroyen TIBOR manipulation.  These underlying source documents have helped identify the names of Yen traders and submitters at other Defendants who were active participants in the manipulation.  These materials also provide additional examples of the manipulation of Yen-LIBOR.

34.     R.P. Martin also produced its "BOSS" database which included over twelve gigabytes of market data and prices that has helped Plaintiffs analyze the level of artificiality caused by Defendants' manipulation in the market on a daily basis.  This market data will also help build a proposed Distribution Plan.

35.     **Citi Settlement Negotiations**.  The negotiations with Citi occurred over approximately four months, beginning in early April 2015 and continuing until the Citi Settlement

was executed in August 2015.

36. Following initial phone calls with Citi's counsel during the first week of April 2015, Lowey and Citi met in person on April 9, 2015.  At the April 9 meeting, Lowey presented to Citi's counsel and a representative for Citi what Lowey perceived to be the strengths and weaknesses of the litigation as well as Citi's litigation exposure.  The April 9 meeting did not result in a settlement.

37. Over the next several weeks, Lowey and counsel for Citi had numerous phone calls and continued to present to each other the perceived strengths and weaknesses of the litigation.

38. On May 26, 2015, counsel for Citi and Lowey signed a Memorandum of Understanding ("MOU").  The MOU set forth the terms on which the parties agreed, subject to the preparation of a full Settlement Agreement, to settle Plaintiffs' claims against Citi.  At the time the MOU was executed, Lowey was well-informed about the legal risks, factual uncertainties, potential damages and others aspects of the strengths and weaknesses asserted herein.

39. Following months of arm's-length negotiations, consisting of in-person meetings and presentations to Citi, teleconferences, exchanges of draft settlement terms, Lowey, on behalf of Plaintiffs and Citi entered into the Citi Settlement on August 11, 2015.  The Citi Settlement was the culmination of arms-length settlement negotiations that had extended over many months.   On that same day, the Parties reported to the Court and Defendants that a settlement had been reached.

40. The Settlements were not the product of collusion.  Before any financial numbers were discussed in the settlement negotiations and before any demand or counter-offer was ever made, I was well informed about the legal risks, factual uncertainties, potential damages, and other aspects of the strengths and weaknesses of the claims against R.P. Martin and Citi.

41. The Settlements involve a structure and terms that are common in class action settlements in this District.

42. The consideration that Citi has agreed to pay in the initial, "ice-breaker" settlement is

within the range of that which may be found to be fair, reasonable, and adequate at final approval.

43. Lowey has strong reason to believe that there are at least hundreds of geographically dispersed persons and entities that fall within the Settlement Class definition. This belief is based on data from the Bank of International Settlements which shows that trillions of dollars of Euroyen-based interest rate swaps and forward rate agreements were traded within the United States from 2006 through 2011.

44. Lowey has diligently represented the interests of the Class in this litigation. They investigated and brought the *Laydon* and *Sonterra* actions. Lowey preserved the statute of limitations. Lowey negotiated with R.P. Martin and Citi. They performed all of the necessary work to prosecute this litigation for the past 45 months. Lowey will continue to zealously represent the Class to prosecute the Class' claims against the non-settling Defendants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 1, 2016
White Plains, New York

_____
Vincent Briganti