# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FUND LIQUIDATION HOLDINGS LLC as assignee and
successor-in-interest to Sonterra Capital Master Fund, Ltd.,
HAYMAN CAPITAL MASTER FUND, L.P., JAPAN MACRO
OPPORTUNITIES MASTER FUND, L.P., and CALIFORNIA
STATE TEACHERS' RETIREMENT SYSTEM, on behalf of
themselves and all others similarly situated,

                Plaintiffs,

                - against -

UBS AG, UBS SECURITIES JAPAN CO. LTD., SOCIÉTÉ
GÉNÉRALE S.A., THE ROYAL BANK OF SCOTLAND GROUP
PLC, NATWEST MARKETS PLC, NATWEST MARKETS
SECURITIES JAPAN LTD., NATWEST MARKETS
SECURITIES, INC., BARCLAYS BANK PLC, BARCLAYS PLC,
COÖPERATIEVE RABOBANK U.A., LLOYDS BANKING
GROUP PLC, LLOYDS BANK PLC, NEX INTERNATIONAL
LIMITED, ICAP EUROPE LIMITED, TP ICAP PLC, BANK OF
AMERICA CORPORATION, BANK OF AMERICA, N.A.,
MERRILL LYNCH INTERNATIONAL, AND JOHN DOE NOS.
1-50,

                Defendants.

Docket No. 15-cv-5844

ECF Case

**SECOND AMENDED
CLASS ACTION
COMPLAINT**

**JURY TRIAL
DEMANDED**

# TABLE OF CONTENTS

TABLE OF EXHIBITS ............................................................................................. xi

INTRODUCTION ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 18

PARTIES AND DEFENDANTS' CO-CONSPIRATORS ......................................... 20

    A.  Plaintiffs ............................................................................................. 20

    B.  The Bank of America Defendants ......................................................... 22

    C.  The Barclays Defendants ..................................................................... 24

    D.  The Lloyds Defendants ....................................................................... 25

    E.  The Rabobank Defendant ..................................................................... 26

    F.  The Royal Bank of Scotland Defendants ............................................. 27

    G.  The Société Générale Defendant .......................................................... 29

    H.  The UBS Defendants ........................................................................... 30

    I.  The Bank of Tokyo-Mitsubishi Co-Conspirators ................................. 32

    J.  The Citibank Co-conspirators .............................................................. 33

    K.  The Deutsche Bank Co-conspirators .................................................... 34

    L.  The HSBC Co-conspirators .................................................................. 35

    M.  The JPMorgan Co-conspirators ........................................................... 36

    N.  The Mizuho Co-conspirator ................................................................. 37

    O.  The Norinchukin Co-conspirator ......................................................... 39

    P.  The R.P. Martin Co-conspirators ......................................................... 40

    Q.  The Sumitomo Mitsui Co-conspirator ................................................. 40

    R.  The TP ICAP PLC Defendants ............................................................ 41

PERSONAL JURISDICTION ................................................................................. 44

I.    Each Defendant Formed Purposeful, Suit-Related Contacts with the Forum .................. 44

    A.  Rabobank ............................................................................................ 44

    B.  UBS AG and UBS Securities Japan ..................................................... 50

    C.  Barclays PLC and Barclays Bank PLC ................................................ 54

    D.  The Royal Bank of Scotland Group plc, RBS, and RBS Japan ............... 58

E. Société Générale .................................................................................. 62

F. Lloyds ................................................................................................... 64

G. The Broker Defendants. ....................................................................... 66

II. Barclays Bank PLC and Merrill Lynch International Consented to Personal Jurisdiction
and Venue in this District Through Contracts with the Hayman Plaintiffs. .................... 68

A. Barclays Bank PLC ............................................................................. 71

B. Merrill Lynch International .................................................................. 73

AGENTS AND UNNAMED CO-CONSPIRATORS .................................................... 80

SUBSTANTIVE ALLEGATIONS ................................................................................ 80

I. Background .................................................................................................... 80

A. Yen-LIBOR ......................................................................................... 80

B. Yen-LIBOR-based Derivatives ........................................................... 81

1. Interest Rate Swaps and Options on Interest Rate Swaps ........................... 82

2. Forward Rate Agreement. ..................................................................... 84

3. Foreign Exchange Forwards ................................................................. 84

II. Defendants and their Co-conspirators Restrained Trade and Intentionally Manipulated
Yen-LIBOR-based Derivatives Prices By Falsely Reporting Yen-LIBOR Rates to the
BBA ................................................................................................................. 86

III. Defendants and their Co-conspirators Restrained Trade and Manipulated the Prices of
Yen-LIBOR-based Derivatives By Their Illegitimate, Non-Bona Fide Trading of Yen-
LIBOR-based Derivatives ............................................................................... 88

IV. Defendants' Unlawful Conduct Has Led to Deferred Criminal Prosecution Agreements,
Criminal Charges, Guilty Pleas and Settlements Resulting in the Payment of Fines and
Penalties in Excess of $7 Billion to Governmental Authorities in the U.S. and Abroad.. 89

A. Defendants Created an Environment Ripe For the Pervasive and Persistent
Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives ........ 90

1. The Contributor Bank Defendants Created Inherent Conflicts of Interest that
Corrupted their Yen-LIBOR Submission Process and Facilitated Their Unlawful
Manipulation and Collusion .................................................................................. 90

a. Defendants Permitted Traders – Whose Compensation Was Directly Linked to
Their Success in Trading Yen-LIBOR-based Derivatives – To Improperly
Influence Their Yen-LIBOR Submissions .......................................................... 90

i. UBS ........................................................................................................ 90

  ii. RBS. ................................................................................................ 93

  iii. Rabobank. ..................................................................................... 95

  iv. Lloyds ........................................................................................... 99

  v. Deutsche Bank ............................................................................. 100

  vi. Société Générale .......................................................................... 103

2. Defendants Lacked Internal Controls to Oversee Their Involvement in the Yen-LIBOR Submission Process and To Monitor Their Communications With Other Banks and Brokers. ..................................................................................... 105

  a. ICAP. ............................................................................................. 105

  b. R.P. Martin. ................................................................................... 107

  c. Deutsche Bank ............................................................................. 108

  d. UBS. .............................................................................................. 110

  e. Société Générale .......................................................................... 112

3. The Contributor Banks and Co-conspirators and Broker Defendants' Yen Desk Managers Were Active Participants in the Pervasive and Persistent Manipulation of Yen-LIBOR and Yen-LIBOR-based derivatives Prices by Their Traders, Submitters and Brokers ............................................................................................... 114

  a. UBS. .............................................................................................. 114

  b. RBS. .............................................................................................. 116

  c. Rabobank. ..................................................................................... 117

  d. Lloyds. .......................................................................................... 119

  e. Deutsche Bank ............................................................................. 119

B. Defendants and their Co-conspirators Successfully Manipulated Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives.................................................... 120

1. Through Their False Reporting of Yen-LIBOR, Among Other Unlawful Conduct, the Contributor Bank and Broker Defendants Successfully Manipulated Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives.......................................... 120

  a. UBS. .............................................................................................. 120

  b. RBS. .............................................................................................. 129

  c. Rabobank. ..................................................................................... 136

  d. Barclays......................................................................................... 153

  e. Lloyds. .......................................................................................... 153

    f.   Deutsche Bank. ........................................................................................ 154

    g.   Société Générale. ................................................................................... 155

2.  Defendants Exploited the LIBOR Fixing to Maximize the Impact of their False Yen-LIBOR Submissions ................................................................................... 160

C.  The Contributor Bank Defendants and Co-Conspirators Colluded With the Broker Defendants to Successfully Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives. ................................................................................... 162

1.  UBS Colluded With the Broker Defendants to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives ............................................................. 165

    a.   "Suggested LIBORs" .............................................................................. 168

2.  The Broker Defendants Were Active Co-Conspirators with the Contributor Bank Defendants. ........................................................................................... 171

3.  The Contributor Bank Defendants Knew the Broker Defendants and Co-Conspirators Were Actively Conspiring to Manipulate Yen-LIBOR. ............................................ 177

D.  The Broker Defendants Reaped Commissions, Bonuses and Accepted Bribes in the Form of Wash Trades from the Contributor Bank Defendants for Their Critical Assistance in the Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives ................................................................................................... 178

1.  Extra Trades to Generate Unearned Commissions ..................................................... 178

2.  Gifts and Other Bribes ........................................................................................... 179

3.  "Wash" Trades to Generate Illegitimate Commissions ............................................. 181

4.  UBS Paid a Special "Bonus" To Broker Defendant ICAP ....................................... 185

E.  Rabobank Colluded with Broker Defendant ICAP and Co-Conspirator R.P. Martin to Manipulate Yen-LIBOR to Benefit Rabobank's Yen-LIBOR-based Derivatives Positions. ........................................................................................... 186

F.  RBS Manipulated Yen-LIBOR through Brokers and Engaged in Wash Trades to Compensate the Broker Defendants for Their Assistance. ....................................... 188

G.  Deutsche Bank Used Inter-dealer Brokers to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives ........................................................... 191

H.  The Hayes Trial, Broker Trial, and Settlement Cooperation Produced to Plaintiffs by R.P. Martin Provided New Information Regarding the Scope and Inner-Workings of the Contributor Bank Defendants' and Broker Defendants' Conspiracy ................. 192

    a.   R.P. Martin ............................................................................................ 193

        i.   HSBC ........................................................................................ 196

ii. RBS ................................................................................................ 196

iii. JPMorgan .................................................................................... 199

iv. Norinchukin ............................................................................... 202

v. Rabobank .................................................................................... 206

vi. Société Générale ........................................................................ 208

vii. Mizuho Bank.............................................................................. 210

viii. Deutsche Bank ........................................................................... 211

ix. Lloyds ........................................................................................ 213

x. Merrill Lynch.............................................................................. 214

xi. Bank of Tokyo-Mitsubishi ........................................................ 217

b. ICAP .................................................................................................. 218

c. Tullett Prebon.................................................................................... 222

i. Tullett Prebon Management Directed Brokers to Engage in More Wash Trades.................................................................................. 222

ii. Tullett Brokers Coordinated False Yen-LIBOR Submissions Among Multiple Contributor Bank Defendants ................................ 224

I. The Contributor Bank Defendants Colluded Directly with One Another To Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives............. 229

1. UBS' Admitted Collusion with Other Panel Banks.................................................... 229

2. As Part of Its DOJ Deferred Prosecution Agreement, RBS Admitted To Colluding with UBS to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives. ...................................................................................... 247

3. As Part of Their DOJ Deferred Prosecution Agreements, Rabobank and Lloyds Each Admitted That They Had a Standing Agreement to Collude..................................... 250

4. Deutsche Bank Regularly Colluded with Contributor Bank Defendants ................. 255

5. HSBC Joined the Conspiracy.................................................................................... 255

6. Citibank Joined the Conspiracy to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives........................................................................................ 265

7. Currently Known Long-Term Campaigns to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives .......................................................................... 271

a. The January to May 2007 Campaign: Defendants Coordinated the Manipulation of Three-Month Yen-LIBOR ................................................. 271

v

i.   Phase One ......................................................................... 272

ii.  Phase Two: lower three-month Yen-LIBOR during April 2007 and May 2007 ............................................................................ 274

b.  Summer 2009: The "Turn Campaign" and "Operation 6M" ....................... 277

i.   The Turn Campaign ............................................................ 278

ii.  Operation 6M .................................................................. 286

8.  Société Générale ......................................................................... 293

9.  Bank of America ......................................................................... 294

J.  The Contributor Bank and Broker Defendants Knew That Other Contributor Bank Defendants Were Manipulating Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives. ......................................................... 295

K.  As Sophisticated Market Participants, the Contributor Bank and Broker Defendants Knew Their Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives Would Have (And Did Have) Adverse Financial Consequences on Other Yen-LIBOR-based derivatives Market Participants ................................ 297

L.  Defendants Concocted False Stories They Could Give in the Event Someone Questioned Their Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives. ......................................................... 300

1.  RBS   ......................................................................... 300

2.  Deutsche Bank ................................................................. 301

3.  Rabobank ..................................................................... 306

M.  Defendants Used Code Words to Conceal Their Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives ........................................ 308

1.  ICAP Yen Brokers Used Code Words and Personal Cell Phones To Try and Conceal Their Yen-LIBOR Services ................................................... 308

2.  R.P. Martin Brokers and Hayes Attempted to Conceal Their Improper Conduct Surrounding the Wash Trades .................................................. 310

N.  After the Contributor Bank Defendants Were Placed on Notice of Government Investigations into the Manipulation of U.S. Dollar LIBOR, Defendants Continued to Manipulate Yen-LIBOR  and the Prices of Yen-LIBOR-based Derivatives ............ 311

O.  Defendants Obstructed Government Investigations and Lied to Their Attorneys during Their Own Internal Investigations of LIBOR Manipulation. ...................... 312

P.  Legal Findings and Implications of Defendants' Manipulative and
    Collusive Conduct.................................................................................. 313

1.  The CFTC Determined Yen-LIBOR is a Commodity in Interstate Commerce. ...... 313

2.  As Part of its Non-Prosecution Agreement with the DOJ, UBS Admits That False and
    Misleading Yen-LIBOR Contributions Affected Financial Instruments Traded in the
    United States. ..................................................................................... 316

3.  Defendants and their Co-conspirators Admit They Successfully Manipulated Yen-
    LIBOR.............................................................................................. 316

4.  The CFTC Has Determined That Contributor Bank Defendants and Co-conspirators
    UBS, RBS, Rabobank, Deutsche Bank, Barclays, Lloyds, and Société Générale
    Successfully Manipulated Yen-LIBOR. ..................................................... 317

5.  The CFTC Has Determined that Broker Defendant ICAP and Co-Conspirator R.P.
    Martin Successfully Manipulated Yen-LIBOR and the Prices of Yen-LIBOR-based
    Derivatives. ....................................................................................... 317

6.  The CFTC Has Determined that Contributor Bank Defendants and Co-Conspirators
    UBS, RBS, Rabobank, Deutsche Bank and Lloyds Aided and Abetted the
    Manipulation of Yen-LIBOR.................................................................. 318

7.  The CFTC Has Determined that Broker Defendant ICAP and Co-Conspirator R.P.
    Martin Aided and Abetted the Manipulation of Yen-LIBOR.............................. 319

8.  The CFTC Has Determined Contributor Bank Defendants and Co-Conspirators UBS,
    RBS, Rabobank, Lloyds, ICAP, R.P. Martin, Deutsche Bank, Barclays, and Société
    Générale Are Vicariously Liable for the Acts of their Employees in the Manipulation
    of Yen-LIBOR. .................................................................................. 319

9.  Contributor Bank Defendants and Co-Contributors UBS, RBS, Rabobank, Lloyds,
    Deutsche Bank, Barclays, and Société Générale Acknowledge Same in their Non-
    Prosecution and Deferred Prosecution Agreements with the DOJ. ......................... 320

10. Contributor Bank Defendants and Co-Conspirators UBS, RBS, Rabobank, Deutsche
    Bank, Barclays, and Société Générale Admit They Engaged in a Deceptive Course of
    Conduct When They Submitted or Caused to Be Submitted False and Misleading
    Yen-LIBOR Submissions Designed to Derive Illicit Profits at the Expense of Their
    Counterparties and other Yen-LIBOR-based Derivatives Participants. ................... 320

11. Defendants Admit They Were Competitors. ............................................. 322

Q.  Defendants Plead Guilty or Agree to Waive Indictment to Criminal Charges of Wire
    Fraud in Connection with Their Manipulation of the Prices of Yen-LIBOR-based
    Derivatives. ....................................................................................... 323

1. UBS Japan. ............................................................................................ 323

2. RBS Japan. ........................................................................................... 324

3. Rabobank. ............................................................................................ 324

4. Deutsche Bank .................................................................................... 325

5. UBS Waived Indictment and Pled Guilty After the DOJ Revoked a Non-Prosecution Agreement Based on UBS' Continued Market Manipulation and Serial Criminal Conduct ................................................................................................. 325

6. Société Générale Pled Guilty and Settled with the CFTF for Manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives. ......................................... 327

R. Defendants Former Traders and Brokers Have Been Criminally Charged with an Antitrust Violation, Wire Fraud and Conspiracy to Defraud Charges in the U.S. and U.K. ....................................................................................................... 328

1. Former UBS and Citibank Yen Trader Thomas Hayes and Former UBS Yen Trader Roger Darin ............................................................................................. 328

2. Former ICAP Brokers. ......................................................................... 331

3. Former R.P. Martin Brokers Terry John Farr and James Andrew Gilmour. ............ 332

4. Former Rabobank Traders. ................................................................... 332

V. Defendants' and their Co-conspirators' Unlawful Conduct Has Also Led to Investigations, Issuance Of Findings of Misconduct and Administrative Sanctions With Governmental Authorities in the U.S. and Abroad ..................................................... 332

A. JFSA Investigation ............................................................................... 333

B. Swiss Competition Commission Investigation ......................................... 334

C. Dozens of Defendants' and their Co-conspirators' Employees Are Under Investigation and/or Have Resigned, or Been Suspended, or Fired or Arrested ...... 335

1. RBS    ................................................................................................... 335

2. Citibank/Citigroup ............................................................................... 337

3. UBS    ................................................................................................... 338

4. JPMorgan Chase .................................................................................. 338

5. Deutsche Bank ..................................................................................... 339

6. HSBC    ................................................................................................. 340

7. Barclays ................................................................................................ 340

8. Bank of Tokyo-Mitsubishi UFJ/Mitsubishi UFJ Financial Group .................... 340

9.  Rabobank ................................................................................................. 341

10. R.P. Martin................................................................................................ 341

11. ICAP   ...................................................................................................... 341

12. Tullett Prebon........................................................................................... 341

D.  The BBA's Re-Evaluation of Rate-Setting Process.................................... 342

VI.    Independent Analyses Demonstrate that Yen-LIBOR Was Artificial During the Class
Period .......................................................................................................... 343

A.  Yen-LIBOR Diverged Dramatically From its Historical Relationship with the
Euroyen Deposit Rate ................................................................................ 343

B.  Analyses of the Defendant Banks' and Co-conspirators Yen-LIBOR Quotes
Submitted During the Class Period, as Compared to the then Prevailing EYDR,
Further Demonstrate Artificiality. ............................................................. 346

C.  The Difference Between Defendants' Reported Yen-LIBOR Quotes and their CDS
Spreads Strongly Supports Yen-LIBOR Artificiality ................................. 357

VII.   During the Class Period, Plaintiffs Transacted in Yen-LIBOR-based derivatives at
Artificial Prices Proximately Resulting From Defendants' Manipulation and False
Reporting of Yen-LIBOR ............................................................................. 361

A.  FLH as Assignee and Successor to Sonterra............................................. 361

B.  The Hayman Plaintiffs .............................................................................. 362

1.  Plaintiff JMOF ......................................................................................... 362

2.  Plaintiff HCMF ........................................................................................ 363

C.  Plaintiff CalSTRS ..................................................................................... 371

D.  Plaintiffs CalSTRS, Hayman & Sonterra.................................................. 375

CLASS ACTION ALLEGATIONS ............................................................................ 376

TOLLING AND FRAUDULENT CONCEALMENT.................................................. 378

A.  Dates of Initial Public Disclosures........................................................... 380

B.  Plaintiffs' Due Diligence Efforts .............................................................. 382

C.  Government Proceeding Antitrust Tolling.................................................. 389

D.  Defendants Affirmatively Concealed their Unlawful Conduct. ................. 391

CLAIMS FOR RELIEF .............................................................................................. 393

FIRST CLAIM FOR RELIEF .................................................................................... 393

SECOND CLAIM FOR RELIEF ............................................................................................... 394

THIRD CLAIM FOR RELIEF .................................................................................................. 407

FOURTH CLAIM FOR RELIEF ............................................................................................. 408

FIFTH CLAIM FOR RELIEF .................................................................................................. 410

PRAYER FOR RELIEF .......................................................................................................... 411

DEMAND FOR A JURY TRIAL ............................................................................................. 412

**TABLE OF EXHIBITS**

| Exhibit ("Ex.") Reference | Description |
|---|---|
| Ex. A-1 | United States Department of Justice, Criminal Division, Fraud Section Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG (Dec. 18, 2012) |
| Ex. A-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., CFTC Docket No. 13-09 (Dec. 19, 2012) |
| Ex. A-3 | Financial Services Authority Final Notice against UBS AG, FSA Ref. No. 186958 (Dec. 19, 2012) |
| Ex. A-4 | United States Department of Justice, Criminal Division, Fraud Section Criminal Information against UBS Securities Japan Co., Ltd. 12-cr-00268 (Dec. 19, 2012) |
| Ex. A-5 | United States Department of Justice, Criminal Division, Fraud Section Plea Agreement with UBS Securities Japan Co., Ltd. 12-cr-00268 (Dec. 19, 2012) |
| Ex. A-6 | United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Criminal Complaint against Tom Alexander William Hayes and Roger Darin, 12-mag-03229 (S.D.N.Y. Dec. 12, 2012) |
| Ex. A-7 | United States Department of Justice, Criminal Division, Fraud Section Plea Agreement with UBS AG, 15-cr-00076 (D. Conn. May 20, 2015) |
| Ex. B-1 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement and Attachment A Statement of Facts with The Royal Bank of Scotland plc, (Feb. 6, 2013) |
| Ex. B-2 | United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Plea Agreement and Statement of Facts with the RBS Securities Japan Limited (Apr. 12, 2013) |
| Ex. B-3 | United States Department of Justice, Fraud Section, Criminal Division and Antitrust |

| | |
|---|---|
| | Division Criminal Information against RBS Securities Japan Limited (Apr. 12, 2013) |
| Ex. B-4 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against The Royal Bank of Scotland plc and RBS Securities Japan Limited, CFTC Docket No. 13-14 (February 6, 2013) |
| Ex. B-5 | Financial Services Authority Final Notice against The Royal Bank of Scotland plc, FSA Ref. No. 121882 (Feb. 6, 2013) |
| Ex. C-1 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against ICAP Europe Limited, CFTC Docket No. 13-38 (Sept. 25, 2013) |
| Ex. C-2 | Financial Conduct Authority Final Notice against ICAP Europe Ltd., FCA Ref. No. 188984 (Sept. 25, 2013) |
| Ex. C-3 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Criminal Complaint against Darrell Read, Daniel Wilkinson, and Colin Goodman, 13-mag-2224 (S.D.N.Y. Sept. 13, 2013) |
| Ex. C-4 | The European Commission Press Release, "Antitrust: Commission fines broker ICAP € 14.9 million for participation in several cartels in Yen interest rate derivatives sector," IP/15/4104 & Memo/13/1090 (Feb. 4, 2015) |
| Ex. D-1 | United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Deferred Prosecution Agreement and Attachment A Statement of Facts with Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Oct. 29, 2013) |
| Ex. D-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against Coöperatieve Centrale Raiffeisen- |

| | |
|---|---|
| | Boerenleenbank B.A., CFTC Docket No. 14-02 (Oct. 29, 2013) |
| Ex. D-3 | Financial Conduct Authority Final Notice against Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., FCA Ref. No. 171596 (Oct. 29, 2013) |
| Ex. D-4 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Criminal Information against Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Oct. 29, 2013) |
| Ex. D-5 | United States Department of Justice Criminal Division, Fraud Section, and Antitrust Division Criminal Complaint against Paul Robson, Paul Thompson, and Tetsuya Motomura, 14-mag-0069 (S.D.N.Y. Jan. 13, 2014) |
| Ex. D-6 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Superseding Information against Takayuki Yagami, 14-cr-00272 (S.D.N.Y. June 10, 2014) |
| Ex. D-7 | United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Criminal Indictment against Paul Robson, Paul Thompson, and Tetsuya Motomura, 14-cr-272 (S.D.N.Y. Apr. 28, 2014) |
| Ex. D-8 | United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Superseding Indictment against Anthony Allen, Paul Thompson, Tetsuya Motomura, and Anthony Conti, 14-cr-272 (S.D.N.Y. Oct. 16, 2014) |
| Ex. E-1 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against RP Martin Holdings Limited and Martin Brokers (UK) Ltd., CFTC Docket No. 14-16 (May 15, 2014) |
| Ex. E-2 | Financial Conduct Authority Final Notice against Martin Brokers (UK) Ltd., FCA Ref. No. 187916 (May 15, 2014) |

| | |
|---|---|
| Ex. F-1 | The European Commission Press Release, "Antitrust: Commission fines banks € 1.71 billion for participating in cartels in the interest rate derivatives industry," IP/13/120 & Memo/13/1090 (Dec. 4, 2013) |
| Ex. G-1 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Non-Prosecution Agreement and Appendix A Statement of Facts with Barclays Bank PLC (June 26, 2012) |
| Ex. G-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, As Amended, Making Findings and Imposing Remedial Sanctions against Barclays PLC, Barclays Bank PLC and Barclays Capital, Inc. CFTC Docket No. 12-25 (June 27, 2012) |
| Ex. G-3 | Financial Services Authority Final Notice against Barclays Bank PLC, FSA Ref. No. 122702 (June 27, 2012) |
| Ex. H-1 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement and Appendix A Statement of Facts with Lloyds Banking Group plc (July 28, 2014) |
| Ex. H-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, As Amended, Making Findings and Imposing Remedial Sanctions against Lloyds Banking Group plc and Lloyds Bank plc (July 28, 2014) |
| Ex. H-3 | Financial Conduct Authority Final Notice against Lloyds Bank plc and Bank of Scotland plc (July 28, 2014) |
| Ex. H-4 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Criminal Information against Lloyds Banking Group PLC (Jul. 28, 2014) |
| Ex. I-1 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement and Appendix A Statement of Facts with Deutsche Bank AG (Apr. 23, 2015) |

| | |
|---|---|
| Ex. I-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, As Amended, Making Findings and Imposing Remedial Sanctions against Deutsche Bank AG (Apr. 23, 2015) |
| Ex. I-3 | Financial Conduct Authority Final Notice against Deutsche Bank AG (Apr. 23, 2015) |
| Ex. I-5 | New York State Department of Financial Services Consent Order Under New York Banking Law §§ 44 and 44-a against Deutsche Bank AG and Deutsche Bank AG, New York Branch (Apr. 23, 2015) |
| Ex. I-6 | The Federal Financial Supervisory Authority, BaFin, Audit report for the IBOR special audit by Ernst & Young against Deutsche Bank AG (May 11, 2015) |
| Ex. I-7 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Criminal Information against Deutsche Bank A.G. (Apr. 23, 2015) |
| Ex. J-1 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against Société Générale S.A. (June 4, 2018) |
| Ex. J-2 | United States Department of Justice, Criminal Division, Fraud Section, Deferred Prosecution Agreement and Appendix A Statement of Facts with Société Générale S.A. (June 5, 2018) |

Plaintiffs Fund Liquidation Holdings LLC ("FLH") as assignee and successor-in-interest to Sonterra Capital Master Fund, Ltd., Hayman Capital Master Fund, L.P. ("HCMF"), Japan Macro Opportunities Master Fund, L.P. ("JMOF") (collectively, "Hayman" or "the Hayman Plaintiffs"), and the California State Teachers' Retirement System ("CalSTRS") (collectively, "Plaintiffs") complain, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, against Defendants (defined in Parties, below) as follows:

## INTRODUCTION

1.      This action arises from Defendants' and their co-conspirators' unlawful combination, agreement, and conspiracy to fix prices and restrain trade in the domestic market for Yen-LIBOR-based derivatives (defined in Part I.B, below). The Defendants and their co-conspirators accomplished their unlawful goals by, among other things, rigging the process used to set Yen-LIBOR (the London Interbank Offered Rate for the Japanese yen), which is a component of price of Yen-LIBOR-based derivatives (*see* Part II, below) during the period of at least January 1, 2006 through at least June 30, 2011 (the "Class Period") in violation of the Sherman Act, 15 U.S.C. § 1, *et seq*., the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and common law.

2.      Defendants' and their co-conspirators' rigging of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives in the United States during the Class Period was intentional, persistent, and knowingly unlawful.  Defendants' misconduct, and the far-reaching, harmful impact on the Yen-LIBOR-based derivatives market in the United States is detailed in numerous guilty pleas, government settlements, deferred prosecution agreements, criminal charges, and findings of fact released in connection with investigations and regulatory actions by governmental agencies in the U.S. and abroad.

1

3.     Each of these government findings demonstrate that the Defendants' and their co-conspirators' goal was to earn illicit trading profits (or limit losses) on Yen-LIBOR-based derivatives positions. Accordingly, the Defendants knowingly fixed the prices of Yen-LIBOR-based-derivatives positions that each Defendant held with investors in the United States, including Plaintiffs and other U.S.-based counterparties, using offices located in this District. *See* Personal Jurisdiction, Part I, below. Plaintiffs and the Class were directly harmed when Defendants and their co-conspirators intentionally caused them to pay more or receive less on their Yen-LIBOR-based derivatives transactions in the United States.

**<u>Guilty Pleas and Government Settlements Involving the Contributor Bank Defendants and Co-conspirators</u>[1]**

4.     The breadth and impact of the wrongdoing alleged herein is staggering.  As the U.S. Department of Justice ("DOJ") put it in connection with the guilty plea of Defendant Coöperatieve Rabobank U.A.'s (f/k/a Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.) ("Rabobank") former Yen-LIBOR-based derivatives trader, Takayuki Yagami:

> This conduct distorted transactions and financial products around the world.  Manipulating LIBOR effectively rigs the global financial system, compromising the fairness of world markets.
>
> *     *     *
>
> This was the ultimate inside job.  As alleged, traders illegally influenced the very interest rate on which their trades were based, using fraud to gain an unfair advantage.  Takayuki Yagami is the ninth person charged by the Justice Department in connection with the industry-wide LIBOR investigation, and we are determined to pursue other individuals and institutions who engaged in this crime.

---

[1] Contributor Bank Defendants and Co-conspirators are identified in the Parties and Defendants' Co-conspirators section below.

2

5.      Defendant UBS AG ("UBS") has already self-reported criminal cartel activity to the DOJ pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") for its admitted manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives that UBS traded in the United States.  UBS thereafter pled guilty to criminal wire fraud charges for manipulating the prices of Yen-LIBOR-based derivatives that traded in United States financial markets.[2]

6.      Following UBS' footsteps, Defendants UBS Securities Japan Co., Ltd. ("UBS Japan") and NatWest Markets Securities Japan Ltd. (f/k/a RBS Securities Japan Limited ("RBS Japan")) each agreed to waive indictment and plead guilty to a one-count criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section, and the Antitrust Division of the DOJ charging each with wire fraud, in violation of 18 U.S.C. § 1343, in connection with their manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  As part of its Deferred Prosecution Agreement with the DOJ, RBS Japan's corporate parent NatWest Markets plc (f/k/a The Royal Bank of Scotland plc) ("RBS") was also charged with wire fraud and price-fixing in violation of Section 1 of the Sherman Act in connection with its manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives that these Defendants traded in the United States.

7.      Defendant Rabobank global head of liquidity Anthony Allen and senior trader Anthony Conti were each convicted of wire fraud as well as conspiracy to commit wire fraud and bank fraud charges in this District, following a jury trial before Judge Rakoff ("Allen/Conti Trial"), for their participation in the conspiracy to manipulate Yen-LIBOR and the prices of Yen-

---

[2] Ex. A-7 (In that plea, UBS admitted that "on or about June 29, 2009, in furtherance of a scheme to defraud counterparties to interest rate derivatives transactions by secretly manipulating benchmark interest rates to which the profitably of those transactions was tied, UBS transmitted or caused the transmission of electronic communications in interstate and foreign commerce, in violation of Title 18, United States Code, Sections 1343 and 2.").

LIBOR-based derivatives.[3]  Other Rabobank traders, including Paul Robson[4] and Takayuki Yagami,[5] have also pled guilty to conspiracy to commit wire fraud and bank fraud in this District for manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives traded in the United States.

8.     Numerous cartel members, including RBS, Deutsche Bank AG ("Deutsche Bank"), Rabobank, J.P. Morgan Chase & Co. ("JPMorgan"), Citigroup, Inc. ("Citigroup"), Lloyds Bank plc (f/k/a Lloyds TSB Bank plc) ("Lloyds") and its corporate parent Lloyds Banking Group plc, Barclays Bank PLC, Barclays Capital Inc. ("Barclays") and their corporate parent Barclays PLC,[6] R.P. Martin Holdings Limited ("R.P. Martin"), DB Group Services UK Limited ("DB Group"),  ICAP Europe Limited ("ICAP"), and Société Génerale S.A. ("Société Génerale") have agreed to historic settlements with regulators, collectively paying (with UBS) over **$7 billion** in criminal fines and penalties.  The settlements resolve DOJ, U.S. Commodity Futures Trading Commission ("CFTC"), the U.K. Financial Services Authority ("FSA"),[7] New York State Department of Financial Services ("NYSDFS"), and European Commission ("EC") charges relating to restraints of trade and manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

---

[3] Nate Raymond & Brendan Pierson, *Former Rabobank Traders Convicted in U.S. Over LIBOR Rigging*, REUTERS (Nov. 5. 2015), http://www.reuters.com/article/2015/11/05/us-rabobank-libor-trial-idUSKCN0SU2HX20151105. These convictions were later overturned based on evidence improperly admitted on Fifth Amendment grounds, but the jury's factual findings based on the evidence presented at trial were not disturbed.

[4] *Former Rabobank LIBOR Submitter Pleads Guilty for Scheme to Manipulate Yen LIBOR*, DEPARTMENT OF JUSTICE (Aug. 18, 2014), http://www.justice.gov/opa/pr/former-rabobank-libor-submitter-pleads-guilty-scheme-manipulate-yen-libor.

[5] *Former Rabobank Trader Pleads Guilty for Scheme to Manipulate Yen LIBOR*, DEPARTMENT OF JUSTICE (June 10, 2014), http://www.justice.gov/opa/pr/former-rabobank-trader-pleads-guilty-scheme-manipulate-yen-libor.

[6] Barclays PLC, the parent company of both Barclays Capital Inc. and Barclays Bank PLC, merged Barclays Capital Inc. into Barclays Bank PLC after the end of the Class Period. Accordingly, both Barclays Capital Inc. and Barclays Bank PLC are referred to as "Barclays."

[7] On April 1, 2013, the Financial Services Authority changed its name to the Financial Conduct Authority ("FCA").

9.      The factual findings that accompanied the UBS, RBS, Rabobank, Barclays,

Deutsche Bank, Lloyds, and Société Génerale settlements each included a "Statement of Facts"

("SOF") (which UBS, RBS, Rabobank, Barclays, Deutsche Bank,  Lloyds, and Société Génerale

respectively, admitted as "true and accurate") that are attached to, and incorporated by reference

in, various non-prosecution or deferred prosecution agreements entered with the DOJ's Criminal

Division, Fraud Section.  UBS's, RBS's, Rabobank's, Barclays's, Deutsche Bank's,  Lloyds's,

and Société Génerale's admissions include, *inter alia*:

10.      **UBS**.  During the period of at least January 2005 through at least June 2010, UBS

orchestrated a sustained, wide-ranging and systematic scheme to manipulate Yen-LIBOR and the

prices of Yen-LIBOR-based derivatives through: (i) intentional and deliberate false reporting of

UBS' own Yen-LIBOR submissions; (ii) conspiring with and paying bribes to interdealer

brokers (employed by the Broker Defendants) to aid in the manipulation of Yen-LIBOR; and (iii)

colluding directly with other interest rate derivatives traders at other Contributor Bank

Defendants and Co-conspirators,[8] to increase the likelihood of success in manipulating the prices

of Yen-LIBOR-based derivatives. UBS further admitted that it traded in Yen-LIBOR-based

derivatives in the United States while it was intentionally fixing the prices of these same

instruments.

11.      **RBS**.  As part of its Deferred Prosecution Agreement, RBS and RBS Japan

admitted that they manipulated Yen-LIBOR and the prices of Yen-LIBOR-based derivatives

from at least 2006 through 2010 through hundreds of instances in which RBS: (i) falsely reported

its own Yen-LIBOR submissions; and (ii) colluded directly with UBS and other co-conspirators

---

[8] The Defendants that served on BBA Yen-LIBOR panel during the Class Period are collectively referred to herein as the "Contributor Bank Defendants." The Contributor Bank Defendants and their co-conspirators that also served on the BBA Yen-LIBOR panel are collectively referred to herein as the "Contributor Bank Defendants and Co-conspirators."

through interdealer brokers. RBS and RBS Japan further admitted that they engaged in this unlawful conduct in order to benefit their Yen-LIBOR-based derivatives positions, and also established Yen-LIBOR-based derivatives positions that would benefit from planned manipulation. RBS and RBS Japan traded Yen-LIBOR-based derivatives in the United States, including in this District, while engaging in this intentional misconduct.

12.    **Rabobank**.  As part of its own Deferred Prosecution Agreement, Rabobank admitted that it manipulated Yen-LIBOR and the prices of Yen-LIBOR-based derivatives from May 2006 through November 2010 in order to illegitimately profit on its own Yen-LIBOR-based derivatives positions.  Rabobank also admitted that from as early as May 2006 and continuing at least through October 2008, Rabobank colluded with a trader at another Contributor Bank Defendant (Lloyds) and agreed that they would, upon request, manipulate their own Yen-LIBOR submissions to benefit each other's Yen-LIBOR-based derivatives positions or the trading positions of other co-conspirators.

13.    **Barclays**.  Barclays admitted that its derivatives traders, from at least as early as August 2006 through approximately June 2007, and also in June 2009, made at least 26 requests to its rate submitters to manipulate Barclays' Yen-LIBOR submissions in a direction that would benefit Barclays' Yen-LIBOR-based derivatives positions.  Barclays further admitted that certain of its swaps traders colluded with traders at other Contributor Bank Defendants and Co-conspirators to make Yen-LIBOR false submissions, and on occasion accommodated requests for false Yen-LIBOR submissions made by traders at other Contributor Bank Defendants and Co-conspirators, so as to coordinate their manipulative and anticompetitive conduct. Barclays further admitted that it established Yen-LIBOR-based derivatives positions in the United States while it was intentionally fixing the prices of these instruments by manipulating Yen-LIBOR.

14.     **Deutsche Bank.**  As part of its Deferred Prosecution Agreement with the DOJ,

co-conspirator Deutsche Bank[9] admitted that it manipulated Yen-LIBOR and the prices of Yen-

LIBOR-based derivatives from at least 2006 through 2010.  Deutsche Bank also agreed to waive

indictment and plead guilty to manipulating Yen-LIBOR and the prices of Yen-LIBOR-based

derivatives in violation of § 1 of the Sherman Act.  Deutsche Bank admitted that its traders

regularly requested false Yen-LIBOR submissions to benefit their Yen-LIBOR-based derivatives

positions, including positions that these traders held in the United States, and that its Yen-LIBOR

submitters honored these requests.  Deutsche Bank also admitted that from at least 2008, it

colluded with former UBS and Citibank Yen Trader, Tom Hayes, to manipulate Yen-LIBOR and

the prices of Yen-LIBOR-based derivatives.  In addition, Deutsche Bank admitted that it failed to

cooperate with the DOJ's investigation in several respects by slowly producing relevant

information, not providing evidence of its coordination with other banks, destroying documents,

audio, and data, and hiding the Federal Financial Supervisory Authority for Germany's

("BaFin") LIBOR misconduct findings from the DOJ.

15.     **Lloyds**.  As part of its Deferred Prosecution Agreement, Lloyds admitted that

between at least as early as 2006 and at least as late as July 2009, it manipulated Yen-LIBOR to

illegitimately profit from its Yen-LIBOR-based derivatives positions, including positions that

Lloyds held in the United States.  Lloyds also admitted that from as early as June 2006 through

at least October 2008, it colluded directly with Rabobank and Rabobank's Yen-LIBOR submitter

Paul Robson to make Yen-LIBOR submissions that mutually benefitted their Yen-LIBOR-based

derivatives trading positions.

---

[9] The banks and brokers identified in the Parties section, Parts I-Q, are no longer Defendants in this action. They are
included here as co-conspirators rather than named as Defendants.

16.    **Société Générale**.  As part of its Deferred Prosecution Agreement with the DOJ and a separate settlement with the CFTC, Société Générale admitted that it manipulated Yen-LIBOR in order to illegitimately profit from its own Yen-LIBOR-based derivatives positions between at least 2006 and 2007.  Société Générale also admitted that its misconduct caused significant damage to the global financial markets, and further admitted that executives within the company's investment bank division were aware of or involved in the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives. Société Générale traded Yen-LIBOR-based derivatives within the United States, including directly with Plaintiff CalSTRS, while engaging in this admitted misconduct.

17.    The UBS, RBS, Rabobank, Barclays, Société Générale, and Lloyds settlements are also memorialized in "CFTC Orders" and "FSA Final Notices" which include additional factual allegations consistent with the admissions contained in the DOJ statement of facts regarding unlawful acts by Defendants UBS, RBS, Rabobank, Barclays, Société Générale and Lloyds.

18.    In December 2013, the EC collectively fined Defendants UBS and RBS, as well as co-conspirators Deutsche Bank, JPMorgan, Citigroup, and R.P. Martin more than $870 million for participating in "Yen Interest Rate Derivatives cartels" between 2007 and 2010.  The EC uncovered seven distinct "infringements" lasting between 1 and 10 months and found that these Defendants colluded to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

19.    **Government Settlements Involving the Broker Defendants.**  As detailed herein, the Broker Defendants played a critical role in the successful manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  They acted as the proverbial hub in the

conspiratorial wheel by coordinating and directing the submission of false reports and other manipulative conduct between the Contributor Bank Defendants and Co-conspirators, contributing to the restraint of trade in the Yen-LIBOR-based derivatives market.

20.    To date, Broker Defendant ICAP Europe Limited ("ICAP") and co-conspirator R.P. Martin have reached settlements with the CFTC and FCA agreeing to pay $87 million (ICAP) and $2.2 million (R.P. Martin), respectively.

21.    **ICAP**.  UBS, in particular former UBS Senior Yen Trader Tom Hayes ("Hayes"), colluded with ICAP Yen brokers and requested their assistance more than 400 times in manipulating Yen-LIBOR to benefit his Yen-LIBOR-based derivatives positions and those of his co-conspirators during the Class Period.  ICAP brokers readily agreed and accommodated those and other manipulative requests by issuing, via a Yen cash broker, group emails to panel banks and others containing "Suggested LIBORs" for Yen-LIBOR.  The Suggested LIBORs reflected artificial rates that would financially benefit UBS' and Hayes' Yen-LIBOR-based derivatives positions.

22.    This manipulative strategy was successful as almost all of the Yen-LIBOR Contributor Banks received the Suggested LIBORs, and, in violation of British Bankers' Association ("BBA") rules, several improperly relied on them in making their Yen-LIBOR submissions despite knowing that ICAP brokers depended upon repeat business from Contributor Bank Defendants and Co-conspirators with a financial interest in the outcome of the Yen-LIBOR fixings. This occurred despite express BBA guidelines that prohibited Contributor Banks from relying on brokers' "Suggested LIBORs" when making their Yen-LIBOR submissions.

23.     ICAP Yen brokers were well compensated for colluding with UBS, receiving hundreds of thousands of dollars in bribes and kickbacks for their "LIBOR services."

24.     **R.P. Martin**.  Like ICAP brokers, R.P. Martin brokers on its Yen desks knowingly disseminated false information concerning Yen borrowing rates to market participants to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  R.P. Martin brokers did so primarily to aid and abet former UBS Senior Yen Trader Hayes.  The FCA determined that, during the Class Period, UBS made at least 600 manipulative requests to R.P. Martin.  R.P. Martin contacted Contributor Bank Defendants' and Co-conspirators' Yen-LIBOR submitters directly and asked them to move their submissions in an artificial direction that would benefit UBS' and Hayes' Yen-LIBOR-based derivatives positions.  In exchange for their unlawful assistance, R.P. Martin brokers accepted bribes and other illicit compensation from UBS, other Contributor Bank Defendants, and their co-conspirators totaling more than $400,000.

25.     **Direct Evidence of Manipulative and Anticompetitive Conduct**.  Although only a small fraction of Defendants' communications have thus far been made public in connection with the UBS, RBS, Rabobank, ICAP, R.P. Martin, Barclays, Deutsche Bank, Lloyds and Société Générale settlements, those communications already include what courts have characterized as "rare," "smoking gun," and "direct" evidence of blatant market manipulation and illicit conspiratorial conduct.  Defendants' own words are unencumbered by any concern of market oversight, internal supervision, legal recourse, or the far reaching, negative, and material impact of their misconduct on the prices of Yen-LIBOR-based derivatives traded in the United States.  Corruption of the Yen-LIBOR-based derivatives market became so widespread that in the words of an RBS Senior Yen Trader, Jimmy Tan, the banks setting Yen-LIBOR had become a "cartel."

26.     For example, in one communication, Hayes and R.P. Martin broker Terry Farr congratulated each other on the financial success of Defendants' and their co-conspirators' manipulative conduct: "**mate yur getting bloody good at this libor game….think of me whn yur on yur yacht in monaco wont you**" (emphasis added).   In another communication, Jimmy Tan at RBS bragged: "**its just amazing how libor fixing can make you that much money**" and that the manipulation was a "good way to boost share price" (emphasis added).   Additionally, traders routinely thanked rate submitters for carrying out their instructions to submit false Yen-LIBOR rates that benefitted their Yen-LIBOR-based derivatives positions, remarking "cheers," "thanks mate," and "thanks for that."

27.     When Rabobank's Paul Robson pled guilty to conspiracy to commit bank fraud and wire fraud in this District, he admitted he intended for Rabobank's counterparties to Yen-LIBOR-based derivatives positions located in the United States to be negatively impacted by his Yen-LIBOR manipulation:

> I tailored the yen LIBOR submissions I made on behalf of Rabobank in order to profit the bank's position . . . I understood the parties taking opposite trading positions could be negatively affected and I knew that some of these parties that could be affected were American financial institution…When I made these submissions designed to favor the bank's trading positions, I knew that it was wrong to do so.[10]

28.     **Other Indicia of Unlawful Conduct: Knowledge of Unlawfulness and Conduct to Escape Detection**.   Defendants and their co-conspirators continued their pervasive manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives long after authorities launched investigations into false reporting and manipulation of U.S. Dollar LIBOR. For example, RBS traders and submitters acknowledged internally by at least September 2010

---

[10] *United States v. Robson*, No. 14-cr-272, ECF No. 21 at 12-13 (S.D.N.Y. Sep. 2, 2014).

that regulators were investigating false reporting of U.S. Dollar LIBOR, but nonetheless agreed to continue manipulating Yen-LIBOR and other interest rates.  RBS traders and submitters, however, recognized that they should be more careful to cover their tracks to avoid detection by no longer discussing in writing their manipulation of Yen-LIBOR, at least while regulators investigated U.S. Dollar LIBOR manipulation.

29.     For example, in one exchange on November 22, 2010, RBS traders Jimmy Tan and Neil Danziger acknowledged that "at the moment the FED are all over us about USD libors" but because they did not "think anyone cares [about] JPY [Yen] libor" at least "not yet," – they had the green light to continue manipulating the prices of Yen-LIBOR-based derivatives.

30.     Other instant messages and communications produced in connection with the government settlements evidence that the knowing submission of false Yen-LIBOR rates to financially benefit Yen-LIBOR-based derivatives positions was the norm, while submitting rates reflective of prevailing (true) interbank borrowing costs in accordance with BBA rules was the exception.

31.     **<u>Other Indicia of Unlawful Conduct: The Role of Managers</u>**.  Unlike prior manipulation cases where a rogue trader singularly concocted and orchestrated a manipulation, the manipulation here had the blessing—and in many instances was at the immediate direction— of the Contributor Bank Defendants', Broker Defendants', and their co-conspirators' senior managers who were charged with supervising Yen-LIBOR-based derivatives trading at the firm. For example, at Deutsche Bank, management created "Monday Risk Calls" to ensure that its Yen-LIBOR traders and submitters were on the same page and would manipulate Yen-LIBOR in the most beneficial direction for their Yen-LIBOR-based derivatives positions.

32.     In another example, on December 11, 2007, UBS Manager Mike Pieri emailed another UBS Senior Manager to see "how much pressure" they could "exert" on UBS's upcoming Yen-LIBOR submissions because UBS had a potential exposure of "2[million/per basis point]" on the approaching December International Monetary Market ("IMM") date.[11]  To justify the manipulation, Pieri stated that because "everyone will be trying to influence the [upcoming Yen-LIBOR] fixing," UBS could lose on its Yen-LIBOR-based derivatives positions if UBS did not "do the same."  In response, UBS Senior Manager "D" promised he would handle the situation and discuss it with another UBS senior manager.  A distressed Pieri followed up with Senior Manager "D" three days later, on December 14, 2007, to see if the manipulation had been approved: "How was the discussion… I need some assurance they will put their rate up please… our rate input can make a significant difference."

33.     **Direct Evidence of Anticompetitive Conduct**.  The communications made public so far show rampant collusion and an agreement to restrain trade in the Yen-LIBOR-based derivatives market.  The Contributor Bank Defendants and Co-conspirators agreed to "back scratching" arrangements, whereby co-conspirators explicitly agreed to submit artificial Yen-LIBOR rates to financially benefit their co-conspirators' Yen-LIBOR-based derivatives positions in return for reciprocity sometime in the future.

34.     The Contributor Bank Defendants and Co-conspirators, aided and abetted by the Broker Defendants, agreed to stagger false reporting of Yen-LIBOR rates over successive trading days (*e.g.*, agreeing that an artificially low rate would be submitted by manipulator A today, by manipulator B tomorrow and manipulator C the next day, etc.) in order to exert greater

---

[11] IMM dates occur on the third Wednesday of March, June, September, and December.  Many Yen-LIBOR-based derivatives are priced, benchmarked, and/or settled on IMM dates.

and longer-lasting manipulative pressure on Yen-LIBOR-based derivatives prices and to mask
their false reporting.  In one such example, ICAP Broker Darrell Read developed a strategy in
July 2009 with former UBS Senior Yen Trader Hayes to artificially lower the six-month Yen-
LIBOR.  The ICAP Broker cautioned Hayes that, "if you drop your 6m dramatically on the 11th
[of August] mate, it will look v[ery] fishy, especially if [HSBC] and [Deutsche Bank] go with
you[,] I'd be v[ery] careful how you play it… might get people questioning you."  UBS Senior
Yen Trader Hayes, seasoned in this practice, said, "don't worry will stagger the drops ie 5bp then
5bp…us then [Deutsche Bank] then [HSBC] then us then [Deutsche Bank] then [HSBC]."  The
ICAP Broker confirmed their agreement to collusively manipulate six-month Yen-LIBOR
artificially lower and said, "great the plan is hatched and sounds sensible."

35.    There are hundreds of publicly available instant messages showing collusion
between UBS, RBS, Rabobank, ICAP, R.P. Martin, Société Générale, and Lloyds and other
Contributor Bank Defendants and Co-conspirators.  In one message alone, former UBS Senior
Yen Trader Hayes enlisted Broker Defendant TP ICAP plc (f/k/a Tullett Prebon plc) ("Tullett
Prebon") to solicit 9 of the 16 Contributor Panel banks to join the conspiracy to manipulate Yen-
LIBOR and the prices of Yen-LIBOR-based derivatives.  Other messages show that one
additional bank (the 10th) agreed with UBS to artificially increase Yen-LIBOR on March 31,
2009.

36.    **Defendants' Former Traders and Rate-Submitters Have Been Criminally
Charged in this District and Abroad**.  Former UBS and Citibank Yen Trader Hayes, along
with another UBS Yen Trader, Roger Darin, were charged with conspiracy to commit wire fraud
in a criminal complaint unsealed in Manhattan federal court in December 2012.  Hayes also faces

wire fraud and Sherman Act charges from alleged anticompetitive conduct in relation to Yen-LIBOR from at least September 2006 through September 2009.  *See* Ex. A-6.

37.     The DOJ also charged three former ICAP brokers, Darrell Read, Daniel Wilkinson and Colin Goodman, with conspiracy to commit wire fraud and wire fraud in connection with the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives from at least July 2006 through September 2010.  *See* Ex. C-3.

38.     The DOJ also charged three former Rabobank traders, Paul Robson, Paul Thompson and Tetsuya Motomura with conspiracy to commit wire fraud, conspiracy to commit bank fraud, and wire fraud in connection with the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives from May 2006 through early 2011.  *See* Ex. D-5.  Former Rabobank trader Takayuki Yagami and former Rabobank Yen-LIBOR submitter Paul Robson each pleaded guilty to conspiracy to commit wire fraud and bank fraud in this District before Judge Rakoff for their role in the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  *See* Ex. D-6.  Both Yagami and Robson are cooperating with the DOJ in its ongoing investigation of the criminal conduct alleged herein.

39.     In June 2013, the U.K. Serious Fraud Office ("SFO") charged former UBS and Citibank Senior Yen Trader Hayes with eight counts of conspiracy to defraud and directly implicated Defendants and their co-conspirators, including (i) UBS AG; (ii) Citigroup Global Markets Japan Limited, (iii) Deutsche Bank AG, (iv) UBS Japan, (v) JP Morgan Chase & Co., (vi) RBS, (vii) HSBC, and (viii) Rabobank, as well as Broker Defendants (i) ICAP and (ii) Tullett Prebon in the manipulation of Yen-LIBOR and "other interbank offered rates" from August 2006 through December 2010.  Hayes was convicted of all eight counts of conspiracy to defraud in August 2015.  Initially, Hayes was sentenced to fourteen years (later reduced to 11

years) in prison for charges that included manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

40.     In July 2013, the SFO also charged former R.P. Martin brokers Terry Farr and James Gilmour with conspiracy to defraud from August 2006 through September 2010 in connection with the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

41.     In addition, in March 2014, the SFO charged former ICAP brokers Danny Wilkinson, Darrell Read, and Colin Goodman with conspiracy to defraud from August 2006 through September 2010 in connection with the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

42.     **Disciplinary Proceedings, Terminations, Resignations and Withdrawals from Rate-Setting Panels**.  More than 25 people resigned from UBS following an internal review of the bank's involvement in the alleged manipulation of Yen-LIBOR rates and the prices of Yen-LIBOR-based derivatives.  RBS has also terminated four employees, and is reportedly weighing further disciplinary proceedings against additional employees.  Barclays Chairman Marcus Agius, and its Chief Executive Officer, Robert E. Diamond, Jr., resigned within days of the announcement of the Barclays Settlement.  In connection with his resignation, Mr. Diamond revealed that at least 14 traders at Barclays were involved in rate-setting wrongdoing at the bank. The Chief Executive of Defendant RBS Japan resigned in the wake of the Japanese Financial Services Agency's ("JFSA") administrative sanctions against Defendant RBS Japan.

43.     **Public Officials and Other Market Participants Acknowledge the Existence of Wide-Spread Collusion in the Yen-LIBOR-based Derivatives Market**.  The EC fined Defendants UBS and RBS, and their co-conspirators Deutsche Bank, JP Morgan, Citigroup and

16

R.P. Martin, a total of $870 million for their participation in "Yen Interest Rate Derivatives Cartels." Joaquin Alminia, Vice-President of the EC, commented "What is shocking about the LIBOR…scandal[] is not only the manipulation of benchmarks, which is being tackled by financial regulators worldwide, but also *the collusion between banks who are supposed to be competing with each other*. Today's decision sends a clear message that the Commission is determined to fight and sanction these cartels in the financial sector. Healthy competition and transparency are crucial for financial markets to work properly, at the service of the real economy rather than the interests of a few." (Emphasis added).

44. CFTC Chairman Gary Gensler expressed a similar sentiment, stating that: "Barclays, UBS and RBS were fined $2.5 billion for manipulative conduct by the CFTC, the UK Financial Services Authority (FSA) and the DOJ. At each bank, the misconduct spanned many years, took place in offices in several cities around the globe, included numerous people – sometimes dozens, even included senior management, and involved multiple benchmark rates and currencies. In each case, there was evidence of collusion."

45. **Evidence Revealed at Hayes' Criminal Trial Confirms Plaintiffs' Allegations.** Former UBS Senior Yen Trader Hayes, who at times accounted for roughly 40% of the over-the-counter Yen-LIBOR-based derivatives market and has been described as the "ringmaster" of Defendants' scheme, was arrested in the U.K. on December 11, 2012, and charged with eight counts of conspiracy to defraud for his involvement in rigging Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

46. Hayes' criminal trial, *R. v. Hayes*, T No. T20137308 ("Hayes Trial") began in the Southwark Crown Court on May 26, 2015. The trial provided additional insight into how Defendants manipulated Yen-LIBOR to fix the prices of Yen-LIBOR-based derivatives at

artificial levels for their benefit, including, *inter alia*, highlights from more than 80 hours of recorded testimony Hayes gave to the SFO, live witnesses from Hayes' former employer Citibank, and hundreds of new communications beyond those released in Defendants' and their co-conspirators' government settlements.

47.    Hayes' trial testimony further demonstrates that Defendants and their co-conspirators rigged Yen-LIBOR on a daily basis, coordinating their false Yen-LIBOR submissions with dozens of traders, submitters, and inter-dealer brokers.  By working together, Defendants and their co-conspirators rigged the market for Yen-LIBOR-based derivatives for long periods of time, including during at least seven long-term "campaigns," demonstrating that prices were artificial throughout the Class Period.  The pervasive and persistent nature of Defendants' and their co-conspirators' Yen-LIBOR manipulation extended beyond their trading desks to company management, who not only knew that the prices of Yen-LIBOR-based derivatives—including Yen-LIBOR-based derivatives positions that Defendants and their co-conspirators established in the United States—were being manipulated for their benefit, but encouraged that practice.

## JURISDICTION AND VENUE

48.    This Court has jurisdiction over this action pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), Section 1964 of RICO, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337, respectively.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

49.     Venue is proper in the Southern District of New York, pursuant to, among other statutes, Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, Section 1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. §1391(b), (c) and (d).  Each Defendant resided, transacted business, was found, or had agents in the District, and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

50.     Defendants and their co-conspirators, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate and/or international commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

51.     Defendants' restraint of trade and manipulation of Yen-LIBOR, and the prices of Yen-LIBOR-based derivatives had direct, substantial, and reasonably foreseeable effects in the U.S., and on Plaintiffs and members of the Class.  Yen-LIBOR-based derivatives are actively traded in the United States and by U.S.-based counterparties.  Defendants, as sophisticated market participants and active participants in the United States Yen-LIBOR-based derivatives market (*see* Personal Jurisdiction, Part I, below), knew that Yen-LIBOR rates published and compiled by and on behalf of the BBA are disseminated in the U.S. through electronic means, and are used to price, settle, and benchmark Yen-LIBOR-based derivatives traded in the U.S. and by U.S. investors.  Indeed, the Defendants and their co-conspirators intended for their manipulative conduct to directly impact their own Yen-LIBOR-based derivatives positions that each of them established in this District and throughout the United States. *See* Personal Jurisdiction, Part I, below.  For these reasons, Defendants and their co-conspirators knew that their intentional misreporting of Yen-LIBOR rates to the BBA, as well as Defendants' and their co-conspirators' other manipulative and collusive conduct would, and did, have direct,

19

substantial and reasonably foreseeable effects in the United States, including on the prices of Yen-LIBOR-based derivatives transacted domestically.

## PARTIES AND DEFENDANTS' CO-CONSPIRATORS

A.  Plaintiffs

52.     Hayman Capital Management L.P. (formerly Hayman Advisors, L.P.), an investment advisor incorporated in Delaware with its principal place of business in Dallas, Texas, brings claims on behalf of the investment funds it operates, including Plaintiffs HCMF and JMOF (collectively "Hayman" or "the Hayman Plaintiffs"). Hayman Capital Management L.P. was authorized to enter into binding contracts on behalf of HCMF and JMOF throughout the Class Period. All of Hayman's Yen-LIBOR-based derivatives traders are located in Dallas, Texas, and entered into Yen-LIBOR-based derivatives trades from Dallas, Texas on behalf of the Hayman Plaintiffs.  HCMF and JMOF engaged in U.S.-based transactions for Yen-LIBOR-based derivatives, including Yen-LIBOR-based interest rate swaps and Yen-LIBOR-based "swaptions," *i.e.*, options on Yen-LIBOR-based interest rate swaps, directly with Defendants Barclays Bank PLC and Merrill Lynch International, and co-conspirators JPMorgan and Deutsche Bank, during the Class Period.  Because these Yen-LIBOR-based derivatives are priced, benchmarked, and settled based on Yen-LIBOR (*see* Part IV, below), the Hayman Plaintiffs transacted at artificial prices that were directly and proximately caused by Defendants' rigging of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives in Defendants' favor and to the detriment of their counterparties and other U.S. investors.  As a result of Defendants' manipulative conduct, the Hayman Plaintiffs were damaged and suffered legal injury.  *See* Parts VII.B and IX.D, *infra*.

53.     Plaintiff California State Teachers' Retirement System ("CalSTRS") is the largest U.S. teachers' retirement fund, with approximately $246 billion in assets and close to one million

members.  CalSTRS engaged in U.S.-based transactions for Yen-LIBOR-based derivatives, including Yen foreign exchange forwards that were priced based on Yen-LIBOR (*see* Part VII.C., below), with Defendants UBS, RBS, Bank of America, Barclays and Société Générale, as well as co-conspirators Citibank, Deutsche Bank,  HSBC, and JPMorgan during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  As a result of Defendants' manipulative conduct, CalSTRS was damaged and suffered injury.  *See* Parts VII.C and VII.D, *infra*.

54.     Plaintiff Fund Liquidation Holdings LLC ("FLH") is a Delaware limited liability company with its principal place of business in Massachusetts.

55.     Sonterra Capital Master Fund, Ltd. ("Sonterra") was an investment fund incorporated under Cayman law with its principal place of business in New York.

56.     Between 2009 and 2011, Sonterra engaged in over 200 U.S.-based transactions for Yen-LIBOR-based derivatives at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  As a result of Defendants' manipulative conduct, Sonterra was damaged and suffered legal injury.  *See* Parts VII.A and VII.D, *infra*.

57.     Sonterra voluntarily wound up its operations and dissolved on December 28, 2012. Prior to (and in preparation for) its dissolution, on August 3, 2012, Sonterra entered into a valid Asset Purchase Agreement ("APA") with Plaintiff FLH. The APA conveyed to FLH "all monetary, legal, and other rights" in all of Sonterra's existing and future claims related to its ownership of or transactions in the "Traded Securities" listed in its "Trade Data."  The "Trade Data," provided to FLH pursuant to the APA, lists thousands of transactions in various financial

products, primarily FX forwards. Sonterra's Yen-LIBOR-based derivative transactions between 2009 and 2011 are included in the Trade Data.

58.     The APA placed no limits on the types of claims that FLH, as Sonterra's assignee, could bring pertaining to the Traded Securities listed in the Trade Data. Instead, it defined "Future Claims" to encompass "any and all claims," "including, without limitation…any future class action lawsuit…or other lawsuits." FLH and Sonterra did not exclude or intend to exclude antitrust claims or Commodity Exchange Act claims from the APA.

59.     In addition to transferring all "right, title and interest" in its claims to FLH, Sonterra also granted FLH an irrevocable power of attorney coupled with an interest, giving FLH the right to take any steps it deemed reasonable and necessary to maximize the value of the assets FLH acquired from Sonterra pursuant to the APA. These rights include, without limitation, the power to participate in and initiate lawsuits in Sonterra's "name, place, and stead." The APA further provides that FLH's power to act pursuant to the APA may not be terminated or revoked at any time by Sonterra and survives Sonterra's dissolution.

60.     FLH, therefore, commenced this action in 2015 in the name of Sonterra, believing that to be the proper course of action under the power of attorney's express language as well as Cayman law. FLH has since determined that because it is the real party in interest (and at all relevant times hereto was)—the assignee of Sonterra's claims—it can and should instead bring this action in its own name for the harm Sonterra suffered when it transacted in Yen-LIBOR-based derivatives at artificial prices as a result of Defendants' unlawful conduct.

B.  The Bank of America Defendants

61.     Defendant Bank of America Corporation is incorporated in Delaware and headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255.  Bank of America Corporation operates an investment banking division located in this District at the Bank of

America Tower, One Bryant Park, 1111 Avenue of the Americas, New York, New York 10036.

Merrill Lynch & Co., Inc. and the entire Merrill Lynch family are subsidiaries of Bank of

America Corporation. Bank of America Corporation receives and recognizes the revenues from

all of its wholly-owned subsidiaries, including Defendants Bank of American N.A. and Merrill

Lynch International.  In 2013, Merrill Lynch & Co., Inc. merged into Bank of America

Corporation.[12]  Bank of America assumed all of Merrill Lynch & Co. Inc.'s liabilities following

the merger.[13]

62.     Defendant Bank of America, N.A. ("Bank of America") is a federally-chartered

national banking association headquartered at 101 South Tyron Street, Charlotte, North Carolina

28255.  Bank of America is a wholly-owned subsidiary of Bank of America Corporation.  Bank

of America operates an office in this District at the Bank of America Tower, One Bryant Park,

1111 Avenue of the Americas, New York, New York 10036.  Bank of America is a provisionally

registered swap dealer with the CFTC.[14]  During the Class Period, Bank of America was a

member of the BBA Yen-LIBOR panel.

63.     Defendant Merrill Lynch International ("Merrill Lynch") is an investment advisor

headquartered in London.  Merrill Lynch is a provisionally registered swap dealer with the

CFTC. Both Merrill Lynch and Bank of America are wholly-owned subsidiaries of Bank of

America Corporation. Plaintiff HCMF traded Yen-LIBOR-based derivatives from within the

---

[12] Dakin Campbell, *Bank of America Finishes Merger of Merrill Lynch Into Parent*, BLOOMBERG BUSINESS (Oct. 1, 2013), available at http://www.bloomberg.com/news/articles/2013-10-01/bank-of-america-finishes-merger-of-merrill-lynch-into-parent-1-.

[13] *Id.*

[14] The CFTC delegates swap dealer registration to the National Futures Association (the "NFA"). The NFA defines a swap dealer as "an entity that holds itself out as a dealer in swaps; makes a market in swaps; regularly enters into swaps with counterparties as an ordinary course of business for its own account; or engages in any activity causing the entity to be commonly known in the trade as a dealer or market maker in swaps." Firms that conduct at least $8 billion in swap transactions in the United States annually are required to register as a swap dealer.

United States directly with Merrill Lynch, and paid too much and received too little on these transactions as a result of Defendants' conspiracy. *See* Part VII, below.

C.  The Barclays Defendants

64.     Defendant Barclays PLC is a global financial services provider headquartered and incorporated in England.  Barclays PLC's "material entities" within the United States are Barclays Bank PLC New York Branch and, during the Class Period, Barclays Capital, Inc.[15] Barclays PLC owns all of the issued ordinary share capital of Defendant Barclays Bank PLC.[16]

65.     Defendant Barclays Bank PLC ("Barclays"), a wholly-owned subsidiary of Defendant Barclays PLC, maintains an office in this District at 745 Seventh Avenue New York, New York 10019 ("Barclays Bank PLC, New York Branch").  During the Class Period, Barclays was a member of the BBA Yen-LIBOR panel.

66.     Barclays Bank PLC, New York Branch has been licensed, supervised, and regulated by the NYSDFS to do business in this state since 1963.  Barclays Bank PLC, New York Branch has over 500 employees and more than $36 billion in total assets.  Barclays is also regulated by the Board of Governors of the Federal Reserve System and the Florida Office of Financial Regulation.  Barclays is a provisionally registered swap dealer with the CFTC. Barclays' shares are listed on the New York Stock Exchange ("NYSE").  Barclays traded Yen-LIBOR-based derivatives in the United States directly with Plaintiffs JMOF, HCMF, and CalSTRS.

---

[15] Resolution Plan, Section 1: US Public Section, BARCLAYS, at 2 (July 2012).

[16] Barclays PLC, Financial Review (Form 20-F) (May 6, 2005).

67.    Barclays admitted as true in its DOJ settlement that "Barclays employs derivatives traders in New York, New York and in London, England who trade financial instruments tied to [Yen-]LIBOR [], including interest rate swaps[.]"[17]

68.    Barclays Capital Inc. ("BCI") was a wholly-owned subsidiary of Barclays PLC, that was a financial services firm incorporated in Connecticut that offered advisory, brokerage, and banking services on behalf of Barclays. BCI operated as part of Barclays' Investment Bank Division. BCI maintained its headquarters in this District at 745 Seventh Avenue New York, New York 10019 – the same address as Barclays Bank PLC New York Branch.  BCI was a clearing firm on the Chicago Mercantile Exchange ("CME"), the Chicago Board of Trade ("CBOT"), the New York Mercantile Exchange ("NYMEX"), and the Commodity Exchange, Inc. ("COMEX").  BCI was registered with the CFTC as a Futures Commission Merchant, an Exempt Foreign Agent, and a Commodity Pool Operator and Commodity Trading Advisor. Plaintiff CalSTRS traded Yen-LIBOR-based derivatives from within the United States directly with BCI. BCI has since merged into Barclays, which has continued operating BCI's Yen-LIBOR-based derivatives activities within the United States.

D.  The Lloyds Defendants

69.    Defendant Lloyds Banking Group plc is a U.K.-based financial services group that provides a wide range of retail and commercial banking services through operating entities that carry out its banking activities.  Lloyds Banking Group plc was formed on January 19, 2009 when Lloyds TSB Group plc (the parent company of Lloyds TSB Bank plc) acquired HBOS plc. After this acquisition, Lloyds TSB Group plc changed its name to Lloyds Banking Group plc, the ultimate parent of Lloyds TSB Bank plc and HBOS.  On September 23, 2013, Lloyds TSB Bank

---

[17] Ex. G-1 at 4-5.

plc changed its name to Lloyds Bank plc.  Lloyds Banking Group plc's U.S. activities "are primarily undertaken" by the New York branch of Defendant Lloyds Bank plc.[18]  Lloyds Banking Group plc designates the Lloyds Bank plc New York branch as its "material entity" in the United States.[19]  Lloyds Banking Group plc's ADRs are listed on the NYSE.

70.     Defendant Lloyds Bank plc (f/k/a Lloyds TSB Bank plc) ("Lloyds") maintains an office in this District at 1095 Avenue of the Americas, New York, New York 10036.  Lloyds is licensed, supervised, and regulated by the NYSDFS to do business in this state.  Lloyds is also registered with the Federal Reserve Bank of New York.  Lloyds is a provisionally registered swap dealer with the CFTC.  As of 2013, Lloyds became the parent company of HBOS, its principal subsidiary.  During the Class Period, Lloyds was a member of the BBA Yen-LIBOR panel.

71.     In its DOJ settlement, Lloyds admitted that "[s]ome of [its] counterparties to [Yen-LIBOR-based derivatives transactions] were located in the United States.  Those United States counterparties included, among others, asset management corporations, mortgage and loan corporations, and insurance companies."[20]

E.  The Rabobank Defendant

72.     Defendant Rabobank is a financial services corporation that maintains a United States Headquarted in this District at 245 Park Avenue, 37th Floor, New York, New York 10167, and several other representative offices throughout the United States.  During the Class Period,

---

[18] Resolution Plain 1. Public Section, LLOYDS BANKING GROUP, at 2 (Dec. 31, 2013), available at http://www.federalreserve.gov/bankinforeg/resolution-plans/lloyds-bk-3g-20131231.pdf.

[19] *Id.* at 4.

[20] Ex. H-1 at A-18.

Rabobank was a member of the BBA Yen-LIBOR panel.  Rabobank withdrew from the BBA

Yen-LIBOR panel in mid-2012.

73.     Rabobank has banking divisions and branches around the world, including in the

United States, with its United States headquarters in New York.  Rabobank employs derivatives

traders in New York who trade Yen-LIBOR-based derivatives, including interest rate swaps.  In

its 2014 U.S. Resolution Plan, Rabobank declared its New York Branch as its only "material

entity" within the United States.  Rabobank is licensed, supervised, and regulated by the

NYSDFS to do business in this state.  Rabobank is also registered with the Federal Reserve Bank

of New York, the SEC, the Office of the Comptroller of the Currency, the CFTC, and the

Consumer Financial Protection Bureau.

74.     Rabobank admitted as true in its settlement with the DOJ that "Rabobank employs

derivatives traders throughout the world – including in New York . . . who trade financial

instruments tied to [Yen] LIBOR . . .  including interest rate swaps[.]"

F.   The Royal Bank of Scotland Defendants

75.     Defendant The Royal Bank of Scotland Group plc is a registered bank holding

company.  According to The Royal Bank of Scotland Group plc's 2013 U.S. Resolution Plan, the

Group made 20% of its income for the 2012 year in the United States.[21]

76.     Defendant RBS, a direct, wholly-owned subsidiary of The Royal Bank of

Scotland Group plc, is a banking and financial services company that maintains an office in this

District at 340 Madison Avenue, New York, New York 10173.   RBS's U.S. Headquarters are

---

[21] RBS Group plc Resolution Plan Pursuant to 12 C.F.R. Parts 217 & 381 and RBS Citizens, N.A. Resolution Plan
Pursuant to 12 C.F.R. 360, at i-2 (Jul. 1, 2013).

located at 600 Washington Boulevard, Stamford, CT 06901.  During the Class Period, RBS was a member of the BBA Yen-LIBOR panel.

77.     RBS is licensed, supervised, and regulated by the NYSDFS to do business in this state.  RBS's Stamford Branch is licensed by the Connecticut Department of Banking ("DOB").  RBS is a Clearing Firm on several of the CME Group's U.S-based Exchanges, including the CME, NYMEX, CBOT, and COMEX, and is a registered swap dealer with the CFTC.  RBS is also regulated by the Board of Governors of the Federal Reserve System.

78.     RBS transacted in Yen-LIBOR-based derivatives from Stamford, Connecticut with U.S.-based counterparties during the Class Period, including with counterparties located in this District.  As part of its Deferred Prosecution Agreement with the DOJ, RBS admitted that "RBS entered into interest rate derivatives transaction tied to Yen . . . with various counterparties, some of which were located in the United States.  U.S. counterparties included banks and other financial institutions in the United States or located abroad with branches in the United States.  Those counterparties also included, among others, asset management corporations, business corporations, insurance companies, universities, and non-profit organizations."[22]  RBS traded Yen-LIBOR-based derivatives in the United States during the Class Period directly with Plaintiff CalSTRS.

79.     Defendant RBS Japan is a wholly-owned subsidiary of RBS that functions as a broker-dealer in addition to having market operations.  As part of its Plea Agreement with the Fraud Section of the Criminal Division and Antitrust Division of the DOJ, Defendant RBS Japan admitted as true and accurate that "the market for derivatives and other financial products linked to Yen LIBOR is global and is one of the largest and most active markets for such products in

---

[22] Ex. B-1 at 38 ¶ 79.

the world.  A number of these products are traded in the United States – such as Yen-based

swaps contracts traded over the counter – in transactions involving U.S.-based counterparties."

80.     Defendant NatWest Markets Securities Inc. ("RBS Securities"), formerly known

as Greenwich Capital Markets and RBS Securities Inc., is a Delaware company with its

headquarters located at 600 Washington Boulevard, Stamford, CT 06901.  RBS Securities is an

SEC registered broker-dealer, a designated Futures Commission Merchant, and a clearing

member on the CME, CBOT, NYMEX, and COMEX.

G.  The Société Générale Defendant

81.     Société Générale is a financial services company that maintains offices in this

District, including at 1221 Avenue of the Americas, New York, New York 10020 and 245 Park

Avenue, New York, New York 10167.  During the Class Period, Société Générale was a member

of the BBA Yen-LIBOR panel.

82.     Société Générale is licensed, supervised, and regulated by the NYSDFS to do

business in this state.  Société Générale is also regulated by the Board of Governors of the

Federal Reserve System. Société Générale is also a registered swap dealer with the CFTC, a

swap firm and guaranteed introducing broker with the NFA, and an OTC clearing firm with the

CME Group.  Plaintiff CalSTRS traded Yen-LIBOR-based derivatives from within the United

States directly with Société Générale.

83.     In Société Générale's 2014 U.S. Resolution Plan, it stated that its core business

line within the United States is Global Banking and Investor Solutions, as well as declaring its

New York Branch as a "material entity."  Société Générale engages in "significant U.S.

activities" in several core business areas—including corporate and investment banking, which

includes financial and commodities futures brokerage services.   In 1938, Société Générale

opened its first U.S. offices and now employs 1,800 corporate professionals in seven U.S. cities.

H.  The UBS Defendants

84.     Defendant UBS AG ("UBS") is a banking and financial services company that maintains an office in this District at 1285 Avenue of the Americas, New York, New York 10019.  During the Class Period, UBS was a member of the BBA Yen-LIBOR panel.

85.     In addition to its New York Branch, UBS also maintains branches in Stamford, Connecticut and Miami, Florida.  UBS' New York Branch is licensed, supervised, and regulated by the Office of the Comptroller of the Currency ("OCC") and UBS' Stamford Branch is licensed, supervised, and regulated by the DOB.  UBS is a provisionally registered swap dealer with the CFTC.  UBS is also regulated by the Board of Governors of the Federal Reserve System.

86.     In UBS' 2014 Resolution Plan, it designated UBS AG New York Branch and UBS AG Stamford Branch as "material entities."[23]  The Stamford Branch is the center of operations for UBS' Treasury function and payment operations in the United States and the primary booking center for the UBS Investment Bank's Yen-LIBOR-based derivatives transactions with U.S. clients and U.S. corporate lending businesses.  UBS' New York Branch houses its U.S. retail activities of its Wealth Management Americas ("WMA") division and provides investment management and custody service to WMA clients.  UBS' shares are registered as Global Registered Shares on the NYSE.

87.     UBS employs derivatives traders in its Stamford Branch who trade Yen-LIBOR-based derivatives, including interest rate swaps.[24]  Plaintiff CalSTRS traded Yen-LIBOR-based derivatives from within the United States directly with UBS.

---

[23] 2014 UBS US Resolution Plan Public Section, at 5 (July 2014), available at
http://www.federalreserve.gov/bankinforeg/resolution-plans/ubs-1g-20140701.pdf.

[24] Ex. A-1 at 6.

88.     UBS self-reported its criminal cartel activity to the DOJ pursuant to ACPERA for its admitted manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives within the United States.  In its settlement with the DOJ, UBS admitted that it "employs derivatives traders throughout the world – including in Stamford, Connecticut . . . who trade financial instruments tied to [Yen] LIBOR . . ., including interest rate swaps…"[25]

89.     Defendant UBS Securities Japan Co. Ltd., the successor company to UBS Securities Japan, Ltd. (collectively, "UBS Japan"), is one of UBS' wholly-owned subsidiaries that engages in investment banking and broker-dealer operations as part of UBS' Investment Bank division.  UBS Japan pled guilty to wire fraud, in violation of 18 U.S.C. §§ 1343 and 1342, in the District of Connecticut for its manipulation of Yen-LIBOR on February 25, 2009.[26]  UBS Securities Japan Co. Ltd. admitted and acknowledged that it is responsible for the acts of its predecessor company's officers and employees.  UBS Japan further admitted that "a meaningful portion of the total value of the transactions entered into by [its] most successful Yen derivatives trader from 2007 through 2009 involved U.S.-based counterparties."  UBS Japan also admitted that it "entered into interest rate derivatives transactions tied to LIBOR…– such as derivatives, forward rate agreements, and futures – with counterparties to those transactions.  Many of those counterparties were located in the United States.  Those United States counterparties included, among others, asset management corporations, mortgage and loan corporations, and insurance companies.  Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States."  UBS Japan also admitted that on February 25, 2009, one of its derivatives traders asked an inter-dealer broker via

---

[25] Id.

[26] Ex. A-5.

electronic chat to influence the Yen-LIBOR submitters at other panel banks.  UBS transmitted this electronic chat through a UBS server in Stamford, Connecticut, using U.S. wires.[27]

I.   The Bank of Tokyo-Mitsubishi Co-Conspirators

90.   Co-conspirator The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo-Mitsubishi") is a Japanese commercial bank that provides deposits, loans, insurance agency, and securities investment trusts for individuals and businesses.  During the Class Period, the Bank of Tokyo-Mitsubishi was a member of the BBA Yen-LIBOR panel.

91.   Bank of Tokyo-Mitsubishi maintains a branch in this District at 1251 Avenue of the Americas, New York, New York 10020-1104, as well as Chicago and Los Angeles branches.[28]  Bank of Tokyo-Mitsubishi has maintained "a presence in New York since 1880"[29] and is a provisionally registered swap dealer with the CFTC.

92.   The Bank of Tokyo-Mitsubishi New York Branch is licensed, supervised, and regulated by the NYSDFS to do business in this state.  Bank of Tokyo-Mitsubishi is also regulated by the Board of Governors of the Federal Reserve System and the NFA.  As of March 31, 2014, Bank of Tokyo-Mitsubishi had $134 billion in total assets and 2,135 full-time employees at its New York Branch.[30]  One of the New York Branch's "core business lines" is its Global Markets Division for the Americas-Portfolio Management Group, which transacts in financial market products and is responsible for market risk control management, hedge income

---

[27] *Id.*, Ex. 3 Factual Basis for Plea at 4.

[28] *The Americas*, THE BANK OF TOKYO-MITSUBISHI UFJ, LTD. (last accessed on Nov. 6, 2015), available at http://www.bk.mufg.jp/global/globalnetwork/americas/.

[29] *New York*, THE BANK OF TOKYO-MITSUBISHI UFJ, LTD. (last accessed on Nov. 6, 2015), available at http://www.bk.mufg.jp/global/.

[30] *Public: Mitsubishi UFJ Financial Group, Inc. Resolution Plan*, MITSUBISHI UFJ FINANCIAL GROUP INC., at 5, 6 (July 1, 2014), available at http://www.federalreserve.gov/bankinforeg/resolution-plans/mitsubishi-fin-3g-20141231.pdf.

management, and liquidity risk control.[31]  Bank of Tokyo-Mitsubishi New York Branch's other core business line is the U.S. Corporate Banking Division, which transacts in foreign exchange and derivatives products.[32]  Bank of Tokyo-Mitsubishi New York Branch is an Automated Clearing House, *i.e.*, it provides an electronic network for U.S. financial transactions.[33]

93.     Bank of Tokyo-Mitsubishi served as a TFX trading and clearing member during the Class Period.

J.   The Citibank Co-conspirators

94.     Co-conspirator Citigroup, Inc. ("Citigroup") is a Delaware corporation with its headquarters in this District at 399 Park Avenue, New York, New York 10043.  Co-conspirator Citibank, N.A. is a federally-chartered national banking association incorporated in South Dakota and a wholly-owned subsidiary of co-conspirator Citigroup Inc.  Citibank, N.A. maintains an office in this District at 399 Park Avenue, New York, New York 10043.  Citibank, N.A. was a member of the BBA Yen-LIBOR panel during the Class Period.

95.     Co-conspirator Citibank, Japan Ltd. ("Citibank Japan") is a Japanese commercial bank headquartered in Tokyo and a wholly-owned subsidiary of co-conspirator Citigroup Inc.

96.     Co-conspirator Citigroup Global Markets Japan Inc. ("Citigroup Global Markets") is a Japanese wholesale investment bank headquartered in Tokyo.  Citigroup Global Markets is a wholly-owned subsidiary of co-conspirator Citigroup, Inc. and an affiliate of Citibank Japan.

---

[31] *Id.* at 10.

[32] Id.

[33] *Id.* at 22.

97.     Collectively, Citigroup, Citibank N.A., Citibank Japan, and Citigroup Global Markets are referred to as "Citibank."  Plaintiff CalSTRS traded Yen-LIBOR-based derivatives from within the United States directly with Citibank.

K.  The Deutsche Bank Co-conspirators

98.     Co-conspirator Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  During the Class Period, Deutsche Bank was a member of the BBA Yen- LIBOR panel.

99.     Deutsche Bank's U.S. headquarters are in New York.  Its New York Branch ("Deutsche Bank AG, New York Branch") is located in this District at 60 Wall Street, New York, New York 10005.  Deutsche Bank considers Deutsche Bank AG, New York Branch to be a "material entity" within the United States.  Deutsche Bank AG, New York Branch is licensed, supervised, and regulated by the NYSDFS to do business in this state.  Deutsche Bank is also registered with the Board of Governors of the Federal Reserve System.  Deutsche Bank AG, New York Branch has more than 1,700 employees and total assets exceeding $152 billion. Deutsche Bank is a registered swap dealer with the CFTC.  Deutsche Bank engages in Yen-LIBOR-based derivatives trading activities from its New York Branch, including interest rate derivatives priced based on Yen-LIBOR.  The Hayman Plaintiffs and Plaintiff CalSTRS traded Yen-LIBOR-based derivatives from within the United States directly with Deutsche Bank.

100.     From 2006 through 2011, Deutsche Bank operated its Global Finance and Foreign Exchange ("GFFX") desk—which includes its Global Finance FX Forwards ("GFF") and foreign exchange ("FX") units—from several offices around the world, including in New York. The GFF unit engaged in pool trading and money market derivatives ("MMD") throughout the Class Period from its offices located in this District, including trading of Yen LIBOR-Based Derivatives from within this District.  Deutsche Bank admitted in its NYSDFS Consent Order

34

that "Deutsche Bank AG and the New York Branch manipulated or attempted to manipulate submissions for the London Interbank Offered Rate ("LIBOR"), . . . which [is a] benchmark interest rates used in financial markets around the world, by, at times, submitting rates that would benefit Deutsche Bank's trading positions, rather than rates that complied with the definitions of the rates[.]"[34]

101.    Co-conspirator DB Group Services (UK) Limited ("DB Group Services") is a wholly-owned subsidiary of co-conspirator Deutsche Bank. DB Group Services is incorporated and operates its principal place of business in the United Kingdom. DB Group Services settled with the DOJ, admitting that it employed all of Deutsche Bank's London-based pool and MMD traders that were responsible for manipulating Yen-LIBOR. DB Group Services also pled guilty to felony wire fraud in the District of Connecticut for its involvement in Defendants' and their co-conspirators' LIBOR manipulation scheme.

L.    The HSBC Co-conspirators

102.    HSBC Holdings plc is a United Kingdom public limited company headquartered in London. HSBC Holdings plc is the ultimate parent company of one of the world's largest banking and financial services groups. HSBC Holdings plc and its subsidiaries provide services in 75 countries and territories, with approximately 16,000 employees in the United States. HSBC Holdings plc "is the primary source of equity capital for its subsidiaries and provides non-equity capital to them when necessary." HSBC Holdings plc disclosed approximately $22.6 billion in profit before tax for the year ended December 31, 2013, with $8.8 billion in revenue and $1.221 billion in profit before tax in North America. HSBC Holdings plc and its subsidiaries' "core business lines" within the United States include its Global Markets–Rates

---

[34] Ex. I-5 at 1.

Division, which transacts in interest rate swaps and other derivatives.   HSBC Holdings plc's

American Depository Receipts ("ADRs") are listed on the NYSE.

103.    Co-conspirator HSBC Bank plc is a wholly-owned subsidiary of HSBC Holdings

plc that is headquartered and incorporated in England.  HSBC Bank plc is a provisionally

registered swap dealer with the CFTC.  During the Class Period, HSBC Bank plc was a member

of the BBA Yen-LIBOR panel.  Plaintiff CalSTRS traded Yen-LIBOR-based derivatives from

within the United States directly with HSBC Bank plc.

104.    Collectively, HSBC Holdings plc and HSBC Bank plc are referred to as "HSBC."

M.  The JPMorgan Co-conspirators

105.    Co-conspirator JPMorgan Chase & Co. is a Delaware corporation with its

headquarters in this District at 270 Park Avenue, New York, New York.  JPMorgan Chase & Co.

provides businesses, institutions, and individuals with investment banking, treasury and

securities, asset management, private banking, and commercial banking services.  Its U.S.-based

dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes

interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[35]

JPMorgan Chase & Co. is registered with the Board of Governors of the Federal Reserve

System.  During the Class Period, JPMorgan Chase & Co. was a member of the BBA Yen-

LIBOR panel.

106.    Co-conspirator JPMorgan Chase Bank, N.A. is a federally-chartered national

banking association headquartered in this District at 270 Park Avenue, New York, New York

10017.  JPMorgan Chase Bank, N.A. is a wholly owned subsidiary of co-conspirator J.P. Morgan

---

[35] *See* Federal Reserve Bank of New York 2007 Survey, at 12, 16-17 (JPMorgan participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction.").

Chase & Co.  JPMorgan Chase Bank, N.A. is a provisionally registered swap dealer with the CFTC.  Plaintiff HCMF and Plaintiff CalSTRS traded Yen-LIBOR-based derivatives from within the United States directly with JPMorgan Chase Bank, N.A.

107.    Co-conspirator J.P. Morgan Securities plc (formerly J.P. Morgan Securities Ltd.) is a subsidiary of co-conspirator JPMorgan Chase & Co.  J.P. Morgan Securities plc provides brokerage and clearing services for exchange-traded futures and options contracts.  J.P. Morgan Securities plc is a provisionally registered swap dealer with the CFTC.

108.    Collectively, J.P. Morgan Chase & Co., JPMorgan Chase Bank, N.A., and JP Morgan Securities PLC are referred to as "JPMorgan".

N.  The Mizuho Co-conspirator

109.    In 2000, three of Japan's largest banks, the Dai-Ichi Kangyou Bank, Limited, The Fuji Bank, Limited, and The Industrial Bank of Japan, Limited consolidated into a bank holding company, Mizuho Holdings, Inc. and formed a new financial services group, the Mizuho Financial Group.[36]  In 2002, as part of Phase 2 of the consolidation, the Mizuho Financial Group reorganized Dai-Ichi Kangyou's, Fuji Bank's, and The Industrial Bank of Japan's operations into Mizuho Bank, Ltd. and co-conspirator Mizuho Corporate Bank, Ltd.[37]  During the Class Period, Mizuho Corporate Bank, Ltd. was a member of the BBA Yen-LIBOR panel.

110.    On December 18, 2006, Mizuho Corporate Bank, Ltd. became a Financial Holding Company in the United States, supervised and licensed by the Board of Governors of the Federal Reserve System.  This license permitted Mizuho Corporate Bank, Ltd. to engage in

---

[36] *Foundation of the Mizuho Financial Group ("MHFG") Through the Consolidation of DKB, Fuji Bank, and IBJ*, PRESS RELEASE (Dec. 22, 1999), available at http://www.mizuho-fg.co.jp/english/company/info/pdf/19991222release_eng.pdf.

[37] *Reorganization of the Mizuho Financial Group ("MHFC") --- Announcement of Execution of the Corporate Split Agreement*, Mizuho Holdings, Inc. (Jan. 17, 2002), available at http://www.mizuho-fg.co.jp/english/company/info/pdf/20020117release_eng.pdf.

comprehensive investment banking businesses, such as underwriting and dealing of corporate bonds, equities, and other types of securities.[38]  Up and until June 28, 2013, Mizuho Corporate Bank, Ltd. was licensed, supervised, and regulated by the NYSDFS to do business in this state.

111.    On July 1, 2013, the Mizuho Financial Group merged its corporate bank (Mizuho Corporate Bank, Ltd.) and retail bank (Mizuho Bank, Ltd.) into one streamlined bank, co-conspirator Mizuho Bank, Ltd. (hereinafter "Mizuho Bank").[39]  The merger was an "absorption-type merger," whereby Mizuho Corporate Bank, Ltd. was the surviving company and Mizuho Bank, Ltd. dissolved.[40]  The surviving company's name was changed to Mizuho Bank, Ltd. upon execution of the agreement.[41]

112.    Mizuho Bank has an office in this District at 1251 Avenue of the Americas, New York, New York 10020.  Mizuho Bank's New York Branch is licensed, supervised, and regulated by the NYSDFS to do business in this state.  Mizuho Bank also operates a Los Angeles branch and a San Francisco Representative Office, which are supervised by the Federal Reserve Bank of San Francisco and the California Department of Business Oversight, a Chicago Branch supervised by the Illinois Department of Financial and Professional Regulation, and Atlanta and Houston Representative Offices.  Mizuho Bank is Mizuho Financial Group, Inc.'s "material entity" within the United States.[42]  Mizuho Bank's New York Branch primarily engages in

---

[38] *Financial Holding Company status obtained in the U.S.*, MIZUHO (Dec. 19, 2006), available at http://www.mizuhobank.com/company/release/cb/pdf/news_20061219.pdf.

[39] *Start of the New Mizuho Bank*, Mizuho (July 1, 2013), available at http://www.mizuho-fg.co.jp/english/release/20130701release_eng.html.

[40] *Memorandum of Understanding on Merger between Mizuho Bank, Ltd. and Mizuho Corporate Bank, Ltd.*, Mizuho Financial Group, Inc. (Nov. 14, 2011), available at http://www.mizuho-fg.co.jp/english/company/info/pdf/20111114_2release_eng.pdf.

[41] Id.

[42] *Mizuho Financial Group, Inc. U.S. Resolution Plan 2013 Section 1: Public Section*, Mizuho Financial Group Inc. (2013), available at http://www.federalreserve.gov/bankinforeg/resolution-plans/mizuho-fin-3g-20131231.pdf.

wholesale commercial banking services, as well as treasury operations, offering foreign exchange, money market instruments, and securities lending.[43]

113.    Co-conspirator Mizuho Trust and Banking Co. Ltd. is a corporate subsidiary of the Mizuho Financial Group.  Mizuho Trust and Banking Co. Ltd. was created when the trust and banking subsidiaries of the three banks, Dai-Ichi Kangyo Fuji Trust & Banking Co., Ltd. and the IBJ Trust & Banking Co., Ltd., merged into one entity.[44]

O.  The Norinchukin Co-conspirator

114.    Co-conspirator The Norinchukin Bank ("Norinchukin") is a banking and financial services company that maintains an office in this District at 245 Park Avenue, New York, New York 10167-0104.  During the Class Period, Norinchukin was a member of the BBA Yen-LIBOR panel.

115.    Norinchukin's New York Branch is licensed, supervised, and regulated by the NYSDFS to do business in this state.  Norinchukin considers its New York branch a "material entity" within the United States.[45]  As of March 31, 2013, Norinchukin's New York branch had total assets of $81.1 billion.[46]  Norinchukin's New York ranch transacts in Yen-LIBOR-based derivatives, such as currency swaps and foreign exchange forwards.[47]

---

[43] *Id.* at 2.

[44] *Foundation of the Mizuho Financial Group ("MHFG") Through the Consolidation of DKB, Fuji Bank, and IBJ*, PRESS RELEASE (Dec. 22, 1999), available at http://www.mizuho-fg.co.jp/english/company/info/pdf/19991222release_eng.pdf.

[45] *U.S. Resolution Plain Section 1: Public Section*, THE NORINCHUKIN BANK (Dec. 24, 2013), available at http://www.federalreserve.gov/bankinforeg/resolution-plans/norinchukin-bk-3g-20131231.pdf.

[46] *Id.* at 7.

[47] *Id.*

P.   The R.P. Martin Co-conspirators

116.   Co-conspirator R.P. Martin Holdings Limited was a U.K.-based wholesale brokerage firm.  Co-conspirator Martin Brokers (UK) Ltd. was a wholly owned subsidiary of Martin Brokers Group Ltd. that brokers cash deposits and derivatives based on Yen-LIBOR between banks.  R.P. Martin Holdings Limited and Martin Brokers (UK) Ltd. are collectively referred to herein as "R.P. Martin."

Q.  The Sumitomo Mitsui Co-conspirator

117.   Co-conspirator Sumitomo Mitsui Banking Corporation ("Sumitomo Mitsui") is a Japanese commercial banking company that maintains an office in this District at 277 Park Avenue, New York, New York 10172 ("Sumitomo Mitsui New York Branch").  During the Class Period, Sumitomo Mitsui was a member of the BBA Yen-LIBOR panel.

118.   The Sumitomo Mitsui New York Branch is licensed, supervised, and regulated by the NYSDFS to do business in this state.  Sumitomo is also regulated by the Federal Reserve Bank of New York and the Board of Governors of the Federal Reserve System.  Sumitomo Mitsui also operates branches in Los Angeles and San Francisco that are supervised by the California Department of Business Oversight and the Federal Reserve Bank of San Francisco, as well as a representative office in Houston supervised by the Texas Department of Financial Institutions and the Federal Reserve Bank of Dallas.  Sumitomo Mitsui considers its New York Branch a "material entity" for conducting business within the United States.[48]  One of the Sumitomo Mitsui New York Branch's "core business lines" is its Trading Department, which primarily focuses on sales and trading of foreign exchange products.[49]

---

[48] Sumitomo Mitsui Financial Group U.S. Resolution Plan Public Section, at 4 (2013).

[49] *Id.* at 6.

R.  The TP ICAP PLC Defendants

119.    TP ICAP plc (f/k/a Tullett Prebon plc) ("Tullett Prebon") was an inter-dealer broker headquartered in London during the Class Period. In 2015, Tullett Prebon purchased co-conspirator ICAP plc, including ICAP plc's wholly-owned subsidiary, Defendant ICAP Europe Limited ("ICAP"). Tullett Prebon facilitates the trading activities of its clients, in particular commercial and investment banks.

120.    Tullett Prebon had at least two wholly-owned U.S. subsidiaries, Tullett Prebon Americas Corp. ("Tullett Americas") and Tullett Prebon Financial Services LLC ("Tullett Financial").  Tullett Americas is incorporated in Delaware and operates its main office at 101 Hudson Street, Jersey City, New Jersey 07302-3908.  Tullett Financial is incorporated in Delaware and operates its main office at One Seaport Plaza, New York, New York 10038.

121.    Tullett Americas and Tullett Financial comprise the U.S. arm and alter ego of their corporate parent, Tullett Prebon.  In an action filed in the District of New Jersey alleging damages derived from harm to Tullett Prebon's U.S. subsidiaries, Tullett Prebon admitted that "[a]lthough Tullett Prebon is a United Kingdom public company headquartered in London, all of its North American operations are headquartered and based in New Jersey."[50]  In its opposition to the defendants' motion to dismiss, Tullett Prebon argued that it was "the real party in interest" when the defendant, BGC Partners, Inc., lured seventy-seven brokers employed by Tullett Prebon's subsidiaries' to join BGC.[51]  Even though BGC's actions were taken against Tullett America and Tullett Financial, Tullett Prebon argued that the raids "caused a direct and distinct

---

[50] *Tullett Prebon plc v. BGC Partners, Inc.,* No. 09-cv-05365, ECF No. 39, Memorandum of Law of Plaintiff Tullett Prebon plc In Opposition to Defendant BGC Partners, Inc.'s Motion to Dismiss and Motion to Stay at 10 (Mar. 10, 2010).

[51] Id.

injury" to Tullett Prebon and it was "the <u>only</u> party that has standing to recover for certain of the injuries it sustained[.]"[52]  Tullett Prebon stated that the raid caused a decline in its market capitalization and "continues to threaten Tullett Prebon with enormous economic and reputational harm."[53]

122.    Defendant NEX International Limited (f/k/a ICAP plc) ("ICAP plc") was the world's largest voice and electronic inter-dealer broker during the Class Period. ICAP plc is a wholly-owned subsidiary of NEX Group plc, which is a wholly-owned subsidiary of CME Group Inc. Defendant ICAP Europe Limited was a wholly-owned subsidiary of ICAP plc during the Class Period, but is now a wholly-owned subsidiary of Defendant TP ICAP plc.

123.    ICAP plc provides independent brokerage services to commercial banks, investment banks, and other liquidity providers and is active in the wholesale markets for OTC derivatives, fixed income securities, money market products, foreign exchange, and equity derivatives.  ICAP plc maintains dedicated derivatives teams within the United States, in New York and Chicago.  ICAP plc's voice brokerage business, now part of Defendant TP ICAP plc, which handles interest rate derivatives and foreign exchange, generated $792 million in revenue from the Americas during the 2012 fiscal year.

124.    In a criminal complaint filed in this District against former ICAP brokers Darrell Read, Danny Wilkinson, and Colin Goodman, the DOJ alleges that Read and Wilkinson conspired with former UBS trader, Tom Hayes, through, among other means, electronic chats routed through servers located in New York and that Goodman distributed false run-thrus, or "suggested LIBORs" (*see* IV.C.1.a., *infra*), through U.S. wires to email recipients in New York

---

[52] *Id.* at 3.

[53] *Id.* at 8.

and to an ICAP colleague located in the United States.[54]  In addition, the DOJ alleges Read brokered trades between Hayes and U.S. counterparties located in New York on at least October 24, 2006, November 9, 2006, July 4, 2008, and July 8, 2008.[55]

125.    The Defendants that served on the BBA Yen-LIBOR panel during the Class Period are collectively referred to herein as the "Contributor Bank Defendants." The Contributor Bank Defendants and their co-conspirators that also served on the BBA Yen-LIBOR panel are collectively referred to herein as the "Contributor Bank Defendants and Co-conspirators."

126.    **Yen-LIBOR Panel**.  The following Contributor Bank Defendants and Co-conspirators served on the BBA Yen-LIBOR panel during the Class Period: (i) The Bank of Tokyo-Mitsubishi UFJ, Ltd.; (ii) The Norinchukin Bank; (iii) Sumitomo Mitsui Banking Corporation; (iv) J.P. Morgan Chase & Co.; (v) Mizuho Corporate Bank, Ltd.; (vi)  Deutsche Bank AG; (vii) UBS AG; (viii) Société Générale S.A.; (ix) RBS; (x) Barclays Bank PLC; (xi) Citibank, N.A.; (xii) Rabobank; (xiii) HSBC; (xiv) Lloyds; and (xv) Bank of America.

127.    Defendants ICAP and Tullett Prebon, along with additional yet-to-be identified derivative and cash broker defendants, are collectively referred to herein as the "Broker Defendants."

128.    John Doe Defendants Nos. 1-50 are other entities or persons, including banks, inter-dealer brokers, cash brokers and other co-conspirators whose identities are currently unknown to Plaintiffs.  The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the

---

[54] Ex. C-3 at 2.

[55] *Id*.

restraint of trade, fixing, and manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

## PERSONAL JURISDICTION

### I.   Each Defendant Formed Purposeful, Suit-Related Contacts with the Forum

129.   Defendants engaged in numerous volitional acts within the United States, invoking the benefits and protections of the laws of New York and the United States.  By these acts, Defendants availed themselves of the privilege of conducting activities within this District and the United States, including in furtherance of Defendants' conspiracy to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, and are subject to jurisdiction here.

A.   Rabobank

130.   During the Class Period, Defendant Rabobank, acting through its New York branch and other United States branches, enacted, effectuated, and consummated the alleged conspiracy and manipulation by conduct in the United States, including by trading Yen-LIBOR-based derivatives in the United States with U.S. counterparties while conspiring to fix the prices of these instruments. Rabobank also engaged in purposeful marketing to attract U.S. investors as counterparties to Rabobank in Yen-LIBOR-based derivatives that Rabobank intentionally manipulated through its participation in the conspiracy described in this Complaint.

131.   During the Class Period, Defendant Rabobank acted through bank branches in the United States, including its New York branch located in this District. In its 2012 Resolution Plan submitted to the Federal Reserve, Rabobank disclosed that its New York branch "operates in the United States as a legal extension of Rabobank Nederland. It is licensed by the New York State Department of Financial Services ("NYDFS") and regulated by the Federal Reserve Bank of New York ("FRBNY")." Rabobank established the New York branch in 1970.

132.     Rabobank reports revenues and organizes itself on a divisional basis. One of these internal divisions is called the "Wholesale" division. The Wholesale division is the operational division at Rabobank that trades derivatives, which includes Yen-LIBOR-based derivatives. In its 2012 U.S. Resolution Plan, Rabobank wrote that it "conducts wholesale activities through [the] New York branch." Rabobank describes its New York branch as a "material entity," which means that it is an "office of [Rabobank] that is significant to the activities of a critical operation or core business line." David Basset leads Rabobank's Wholesale division for the "Americas" region, which includes North and South America, from Rabobank's New York branch.

133.     Although the Americas region for Rabobank's Wholesale division is headquartered in its New York branch, it also maintains representative offices throughout the United States, including in Atlanta, Chicago, Dallas, St. Louis, and San Francisco.

134.     During the Class Period, Defendant Rabobank operated a Financial Markets group headquartered in New York City, that was specifically dedicated to carrying out Rabobank's Wholesale division's derivatives trading operations in the United States, including the trading and sale of Yen-LIBOR-based derivatives. The Financial Markets group is led by Nader Pasdar, who previously led the Wholesale division's Derivatives sales teams for the West Coast of the United States from Rabobank's San Francisco office. Pasdar's sales team marketed and arranged derivatives transactions, including Yen-LIBOR-based derivatives transactions, with customers in the United States on behalf of Rabobank.

135.    During the Class Period, Defendant Rabobank, through the New York Branch, operated an Interest Rate Derivatives Trading Desk, as a subset of its Global Financial Markets Group.[56]

136.    Defendant Rabobank's Interest Rate Derivatives Trading Desk provided Defendant Rabobank's United States-based customers with "interest rate swaps and options, cross currency swaps and options, and individually-tailored derivatives designed to hedge commodity or credit risk." The products that Rabobank traded in the United States included Yen-LIBOR derivatives, including Yen-LIBOR based interest rate swaps.

137.    Defendant Rabobank used the sales arms of its United States offices to solicit United States investors to use its Yen-LIBOR-based derivatives services, including for trading foreign exchange contracts, currency and interest rate futures, forward rate agreements, currency and interest rate swaps, and currency and interest rate options.

138.    During the Class Period Rabobank instructed and required its United States customers to contact their New York derivatives desk to purchase "interest rate swaps and options, cross currency swaps and options, and individually tailored derivatives designed to hedge commodity or credit risk" including Yen-LIBOR-based instruments.[57]

139.    Furthermore, Rabobank admitted as true in its settlement with the DOJ that "Rabobank employs derivatives traders throughout the world – including in New York . . . who trade financial instruments tied to LIBOR . . .  including interest rate swaps[.]"

---

[56] *See* Global Financial Markets, RABOBANK INTERNATIONAL, https://web.archive.org/web/20060509020401/http://www.rabobankamerica.com/raboIntl_locations.aspx (last viewed March 15, 2017; snap shot of May 9, 2006).

[57] Global Financial Markets, RABOBANK INTERNATIONAL, https://web.archive.org/web/20060517195051/http://www.rabobankamerica.com/raboIntl_global_markets.aspx (last viewed March 15, 2017; archive from May 17, 2006 website).

140.    This admission was corroborated when Rabobank's Paul Robson and Takayuki Yagami pled guilty in this District for conspiring to commit wire fraud and bank fraud by rigging the Yen-LIBOR-based derivatives market.[58]  Robson and Yagami admitted that they understood that American financial institutions would be negatively impacted by their Yen-LIBOR manipulation.[59]  For example, during his plea allocution, Robson explained:

> I tailored the yen LIBOR submissions I made on behalf of Rabobank in order to profit the bank's position . . . I understood the parties taking opposing trading positions could be negatively affected, and I knew that some of these parties that could be affected were American financial institutions…When I made these submissions designed to favor the bank's trading positions, I knew that it was wrong to do so.[60]

141.    Anthony Allen was Rabobank's Global Head of Cash, including Yen, and Anthony Conti was Rabobank's Senior Trader and backup Yen-LIBOR submitter.  Testimony from their trial shows that they frequently colluded with New York-based Rabobank employees, including Christian Schluep.  Christian Schluep was a Rabobank Yen derivatives trader.[61] Allen's trial testimony demonstrates that he and others at Rabobank knew and intended that the effects of their manipulative conduct were expressly aimed at the United States and U.S. market participants:

> Q.    And you understood that the interest rate swaps involved yen LIBOR, US dollar LIBOR?
>
> A.    Amongst other currencies, yes.
>
> Q.    And there are counterparties on the other side of these Rabobank interest rate swaps?

---

[58] Ex. D-7.

[59] *United States v. Robson*, No. 14-cr-272, ECF No. 21 (Sept. 2, 2014); *United States v. Yagami,* No. 14-cr-272, ECF No. 16 (Jul. 1, 2014).

[60] *United States v. Robson*, No. 14-cr-272, ECF No. 21 at 12-13 (Sept. 2, 2014).

[61] *See* Caroline Binham, Daniel Shafer, and Philip Stafford, *Rabobank to settle over Libor*, FINANCIAL TIMES (Sept. 26, 2013), available at http://www.ft.com/intl/cms/s/60c7e6f4-26d2-11e3-bbeb-00144feab7de.html#axzz3qdSZhNad

A.      Yes.

Q.      Located all over the world?

A.      Yes.

Q.      Located here in the US?

A.      Yes.

Q.      Located here in New York?

A.      Yes.

* * *

Q.      And you understood that if the individual on one side of an interest rate swap was manipulating LIBOR, the other side would lose money?

A.      Yes.[62]

142. The criminal complaint alleged that Rabobank traded in derivative products tied to Yen LIBOR with counterparties based in New York, New York,[63] describing one such instance from March 19, 2008. Rabobank Yen trader Motomura asked Trader-R to make the rate as high as possible. Trader-R then emailed Robson:

> **Trader-R:** "We have loads of 6mth fixings today. If possible, could you set 6m libor to 1.10% please? We don't have particular interest in other libors."
>
> **Robson:** "sry just to confirm 6m you want at 1.10??? Ok will do that but I will prob get a phone call at I set 02 yesterday and brokers reckon everything a little lower today ... indications are ... 1m 85 2m 91 3m 975 6m 1.03."
>
> **Trader-R**: "actually,,, moto man [Motomura] would like 6m to be higher today ..... If it is not appropriate, it is fine mate, I will explain the situation to him."

---

[62] *United States v. Allen*, No. 14-cf-272, Transcript of Trial at 1265-1266 ().

[63] USA v. Robson et al, 1:14-cr-272-JSR (ECF No. 1, at 17)

> **Robson**: "Well its no prob mate - I can set it that high .... It will be quite funny to see the reaction!"[64]

143.    That day, Robson caused Rabobank to submit a 6-month Yen LIBOR of 1.10 percent, eight basis points higher than Rabobank's submission the day before, moving its submission from the middle of the panel to the panel's second highest.[65]

144.    Rabobank had previously entered into a swap contract with a financial institution which was a federally chartered financial institution within the definition of 18 U.S.C. § 20. The profitability of that transaction was directly affected by the Yen LIBOR rate on March 19, 2008. On March 20, 2008, as a result of the March 19, 2008 conversation described above, Robson, Motomura, and Trader-R caused one such payment to be transmitted via wire transfer from Rabobank's offices in Utrecht, Netherlands to a counterparty in New York, New York.[66]

145.    Takayuki Yagami (a Rabobank Yen trader) also testified at the Allen/Conti Trial that he knew manipulating Yen-LIBOR created an "unfair advantage" over his counterparties, including those located in the United States, but he continued to manipulate Yen-LIBOR because it increased his bonus which was based on the performance of his trading books.[67]

146.    All of Rabobank's wholesale banking activities in the United States, including transactions in Yen-LIBOR-based derivatives and financial instruments, are conducted through its New York branch, a material entity according to their U.S. Resolution Plan, which is not a

---

[64] USA v. Robson et al, 1:14-cr-272-JSR (ECF No. 1, at 18).

[65] Id.

[66] *Id.*

[67] *United States v. Allen*, No. 14-cf-272, Transcript of Trial at 697 (Oct. 19, 2015).

49

separate legal entity from Rabobank but a direct extension into the U.S. market.[68] Rabobank's

New York branch is regulated by the FRB, NYSDFS, SEC, OCC, FDIC, CFTC, and CFPB.[69]

147.    Rabobank states that its "entities have strong interrelationships due to Rabobank's

cooperative structure" including its entities located in the United States.

148.    Rabobank Group, the name that Rabobank uses to describe itself and all of its

subsidiaries, centrally manages risk at various levels across the organization through a Managing

Board and Supervisory Board. The Managing Board determines the risk strategy that Rabobank

and its subsidiaries will pursue, the risk appetite, and the policy framework, as well as the limits.

The Supervisory Board assesses the risks attached to the activities and portfolio of Rabobank.

This strategy is then implemented at the Group level, including throughout its U.S. operations.

149.    Accordingly, even Rabobank's foreign Yen-LIBOR-based risk management was

affected by its U.S. Yen-LIBOR-based derivatives trading.

150.    During the Class Period, Rabobank manipulated Yen-LIBOR and the prices of

Yen-LIBOR-based derivatives traded in the U.S. and with U.S. counterparties to benefit their

Yen-LIBOR derivatives positions.

B.  UBS AG and UBS Securities Japan

151.    UBS AG organizes its activities and those of its subsidiaries into different

divisions based on function. UBS AG maintains an investment banking division known as "UBS

Investment Bank." UBS Investment Bank is a global division that is not formally headquartered

in any one location, but instead operates through affiliated, commonly-owned and managed

---

[68] Coöperatieve Rabobank, *United States*, https://www.rabobank.com/en/locate-us/americas/usa.html; Coöperatieve Rabobank, *United States – Contact*, https://www.rabobank.com/en/locate-us/americas/usa/contact.htm; Rabobank, 2018 U.S. Resolution at 2.

[69] Rabobank, 2018 U.S. Resolution at 14.

entities and/or offices in locations that UBS AG considers particularly important to its UBS

Investment Bank division. UBS AG describes these offices as "headquarters." UBS Investment

Bank is also the division of UBS AG that engages in Yen-LIBOR-based-derivatives sales and

trading.

152.    UBS AG reports the results and recognizes revenues from its UBS Investment

Bank on a consolidated basis. Accordingly, the derivatives trading profits generated by UBS AG

and UBS Japan are all reported within the "UBS Investment Bank" business in UBS AG's

annual reports.[70] UBS AG is also responsible for determining the operating budget, risk limits,

and compliance and oversight functions governing UBS Investment Bank (which includes the

Yen-LIBOR-based-derivatives trading activities of UBS Japan).

153.    UBS AG has two offices that are very significant to UBS Investment Bank's

global operations located in the United States, which UBS AG describes as its U.S.

"headquarters." One of UBS AG's U.S. headquarters is located in Stamford, CT, and the other is

located in this District.

154.    UBS AG maintains a bank account in this District through its New York

headquarters to receive and process payments due under Yen-LIBOR-based-derivatives trades

with counterparties located in this District and throughout the United States.[71] UBS AG books

Yen-LIBOR-based-derivatives transactions, including the transactions UBS AG entered into

with Plaintiff CalSTRS, to its Stamford headquarters.[72] Accordingly, UBS AG transacted Yen-

---

[70] UBS AG, 2012 Annual Report, p. 106.

[71] https://www.federalreserve.gov/bankinforeg/resolution-plans/ubs-1g-
20150701.pdf#:~:text=The%20UBS%20US%20Resolution%20Plan%20addresses%20the%20resolution,in%20the
%20UBS%20US%20Resolution%20Plan%20relates%20to; https://listofbanksin.com/List-of-correspondentbanks-
SWIFT-Codes.htm.

[72] https://www.federalreserve.gov/bankinforeg/resolution-plans/ubs-1g-
20150701.pdf#:~:text=The%20UBS%20US%20Resolution%20Plan%20addresses%20the%20resolution,in%20the

LIBOR-based-derivatives in the United States with Plaintiff CalSTRS and members of the Class using a bank account located in this District and booked through its Stamford Branch.

155.   UBS AG reported that its Investment Bank division used a "global coverage" model to provide derivatives sales and trading to institutional investors in major financial markets. It further reported that it maintained "Financial Hubs" in financial markets that are particularly important to its business. One of these "Financial Hubs" is located in Chicago, Illinois. Another "Financial Hub" is located in New York, NY, at UBS AG's New York branch.

156.   One of the entities that UBS AG uses to operate the UBS Investment Bank division is UBS Japan. UBS Japan employed a trader described by the DOJ as "UBS's most successful Yen derivatives trader," Tom Hayes. Hayes's affiliation with UBS Investment Bank, and his access to the United States Yen-LIBOR-based-derivatives market through UBS Investment Bank's two "U.S. headquarters," allowed Hayes to establish substantial Yen-LIBOR-based-derivatives positions in the United States. For example, the DOJ found (and UBS admitted) in the Statement of Facts attached to UBS AG's plea agreement that "a meaningful portion of the total value of transactions entered into" by Hayes "involved counterparties located in the United States." Other traders on UBS AG's Yen desk, which included traders employed by UBS Japan operating as part of UBS AG's Investment Bank division, also established Yen-LIBOR-based derivatives positions in the United States during the Class Period.

157.   In guilty pleas, UBS AG and UBS Japan admitted that profiting from these trading positions was the motivation behind their manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

---

%20UBS%20US%20Resolution%20Plan%20relates%20to

158.     These trading positions included Yen-LIBOR-based derivatives trades that UBS AG executed with CalSTRS in the United States. For example, UBS AG entered into dozens of yen foreign exchange forwards (a type of Yen-LIBOR-based derivative, *see* Part I.B, below), directly with CalSTRS in the United States throughout the Class Period.

159.     Accordingly, UBS AG and UBS Japan operating as part of UBS AG's UBS Investment Bank, intentionally manipulated the prices of Yen-LIBOR-based-derivatives that these Defendants established in this District and in the United States, including Yen-LIBOR-based derivatives trades that UBS AG booked with CalSTRS in the United States using UBS AG's New York office, and collected the illicit proceeds arising from these transactions in this District at UBS AG's New York headquarters.

160.     UBS AG admitted that it "employs derivatives traders throughout the world – including in Stamford, Connecticut . . . who trade financial instruments tied to LIBOR . . ., including interest rate swaps . . ."[73]  The Short Term Interest Rate ("STIR") traders at UBS AG, operating as part of its Investment Bank division, established Yen-LIBOR-based derivatives positions in the United States with counterparties located in the United States. Many of those counterparties included investors located in this District.

161.     



---

[73] Ex. A-1 at 6.

[74] 

[75]



162.     UBS Japan committed significant resources to growing its U.S. client base, even dispatching Japan-based employees on New York marketing trips during the Class Period.

163.     UBS Japan's senior economist Takuji Aida, who had served in a similar role for Defendant Barclays Bank earlier in the Class Period, contributed an op-ed to the *Wall Street Journal* on March 9, 2011 reassuring the *Journal*'s readers in the U.S. financial sector that Japan's economy "has plenty of life left in it."[77] Aida also regularly offered comment to coverage of the Japanese economy in other U.S. newspapers, including *The New York Times* and the *New York Post*.

C.   Barclays PLC and Barclays Bank PLC.

164.     Defendant Barclays PLC is a multinational financial services provider headquartered and incorporated in England. Barclays PLC organizes its activities and those of its subsidiaries into different divisions based on function. Its derivatives trading activity, including its Yen-LIBOR-based derivatives trading, is carried out by Defendant Barclays under the trade name Barclays Investment Bank. As the derivatives trading arm of the Barclays group, Barclays is a "ring-fenced" entity, meaning that it is separate from Barclays PLC's consumer and small business banking activities.

---

[76] ▮

[77] Takuji Aida, "Making Sense of Japanese Cycles," WALL ST. J., Mar. 9, 2011, available at https://www.wsj.com/articles/SB10001424052748704623404576187431146921362.

165.    According to a recent Resolution Plan filed in 2018, Barclays's wholesale bank services[78] are anchored in its "two home markets of the UK and US with global reach." As reported, the United States is Barclays' "second home market and is fundamental to Barclays' transatlantic strategy. The U.S. accounts for a significant portion of Barclays PLC's employees, revenue and profit".[79] Barclays PLC's U.S. operations are carried out by Defendant Barclays.

166.    Barclays PLC enters into derivative contracts, including Yen-LIBOR-based derivatives contracts, for proprietary trading purposes and to manage Barclays' exposure to market, interest rate and credit risks resulting from its trading, market making and other business activities. It engages in these activities in the United States from its offices located in this District.

167.    Barclays is a clearing member of derivative clearing organizations, clearing eligible OTC derivatives products in the United States, including Yen-LIBOR-based derivatives.

168.    Barclays is a clearing firm on the CME, the CBOT, NYMEX, and COMEX. Barclays is registered with the CFTC as a Futures Commission Merchant, an Exempt Foreign Agent, and a Commodity Pool Operator and Commodity Trading Advisor.

169.    Barclays traded substantial volumes of Yen-LIBOR-based derivatives in the United States during the Class Period, including directly with the Hayman Plaintiffs, *see* Part II.A., below, through its branch office located in this District at 745 Seventh Avenue, New York, New York 10019. For example, Barclays reported that its New York branch held a total notional outstanding amount of $538 billion in derivative contracts, including Yen-LIBOR-Based

---

[78] Wholesale bank services includes Yen-LIBOR-based derivatives sales and trading.

[79] 2018 US Resolution Plan, Barclays PLC, at 9.

derivatives as of 2011.[80] Barclays further reported that it "offer[ed] a full product set in USD, all major European currencies, and Yen."[81]

170.    Barclays maintained a practice through which it booked all of its swap transactions, including Yen-LIBOR-Based swaps, to the New York branch of its only U.S.-registered swap dealer with the CFTC and SEC, Barclays Bank PLC. Barclays designates its New York office as the location for payment and trade settlement for Yen-LIBOR-based derivatives contracts that it trades in the United States.[82]

171.    Barclays Bank PLC, New York Branch has been licensed, supervised, and regulated by the NYSDFS to do business in this state since 1963.  Barclays Bank PLC, New York Branch has over 500 employees and more than $36 billion in total assets.  Barclays is also regulated by the Board of Governors of the Federal Reserve System and the Florida Office of Financial Regulation and its shares are listed on the NYSE.

172.    Barclays maintains a website in the United States where it advertises that "We serve our institutional investor clients by helping them to understand developments in global markets and offering execution and risk management tools across each major asset class."

173.    One of the ways in which Barclays serves its institutional investor clients is by transacting in Yen-LIBOR-based derivatives with investors like the Hayman Plaintiffs (*see* Part II.A., below) and CalSTRS.

---

[80] Barclays Capital Inc., Statement of Financial Condition, 2011, at 16. Barclays conducted Yen-LIBOR-based derivatives trading in the United States both on its own and through Barclays Capital Inc., a New York-based subsidiary, during the Class Period. Barclays has since absorbed Barclays Capital Inc. as part of an internal reorganization, and now continues to trade Yen-LIBOR-based derivatives in the United States through Barclays Bank PLC's New York offices.

[81] https://www.federalreserve.gov/bankinforeg/resolution-plans/barclays-plc-1g-20120702.pdf, at 4.

[82] 2018 US Resolution Plan, Barclays PLC, at 22.

174.     Barclays admitted as true in its DOJ settlement that "Barclays employs derivatives traders in New York, New York and in London, England who trade financial instruments tied to [Yen-] LIBOR and EURIBOR, including interest rate swaps[.]"[83] This includes derivatives traders who traded Yen-LIBOR-based interest rate swaps from its New York branch as well as Barclays traders who engaged in Yen-LIBOR based interest rate swaps with U.S. counterparties from offices overseas.

175.     Multiple government regulators, including the DOJ and the FSA, have determined that Barclays manipulated Yen-LIBOR in order to unlawfully benefit its Yen-LIBOR-based derivatives positions. Because Barclays purposefully marketed, executed, and collected supra-competitive payments due under Yen-LIBOR-based derivatives within the United States (including directly with Plaintiffs HCMF and JMOF, *see* Personal Jurisdiction, Part II.A., below, and directly with Plaintiff CalSTRS), at the same time as it was manipulating Yen-LIBOR to benefit these derivatives positions, Barclays is subject to personal jurisdiction here.

176.     Barclays often selected New York law to govern these Yen-LIBOR-Based derivatives transactions in the trade documentation governing these trades, including trades with the Hayman Plaintiffs. *See* Personal Jurisdiction, Part II.A., below.

177.     Barclays's Director of Compliance was based in its New York office during the Class Period, a fact that Barclays regularly noted on trade documentation governing its Yen-LIBOR-based derivatives trades with counterparties in the United States.

178.     Barclays admitted as true in its DOJ settlement that it "employs derivatives traders in New York, New York and in London, England who trade financial instruments tied to

---

[83] Ex. G-1 at 5-6.

[Yen-LIBOR], including interest rate swaps[.]"[84] The interest rate swaps that Barclays transacted in the United States included swaps tied to Yen-LIBOR. *See* Part I.B., below. Barclays further admitted in its settlement with the DOJ that, during the Class Period, "Barclays Yen swaps traders made requests for favorable Yen LIBOR settings to the Barclays Yen LIBOR submitters." Barclays' admission that Yen swaps traders engaged in Yen-LIBOR manipulation, at least some of whom were located in Barclays Bank PLC's New York office during the Class Period, further supports the exercise of personal jurisdiction.

179.    Barclays actively marketed and promoted Yen-LIBOR-based derivatives to investors in the United States market during the Class Period. For instance, from at least March to December 2007, Barclays regularly published and widely disseminated a newsletter called Zen on Yen: Japan Strategy and Economics Weekly. Each issue of this newsletter provided several pages of English-language analyses and projections related to Yen-denominated interest rates and Yen-LIBOR-based derivatives. Each issue also concluded with a solicitation to "any U.S. person wishing to effect a transaction in any security discussed herein" to contact a representative of Defendant Barclays [Bank PLC]."

D.  The Royal Bank of Scotland Group plc, RBS, and RBS Japan

180.    Defendant The Royal Bank of Scotland Group plc ("RBS Group") organizes its activities and those of its subsidiaries "on a divisional basis" according to function.  During the Class Period, it conducted fixed income sales and trading, including Yen-LIBOR-based derivatives sales and trading, through its "Markets" division.  RBS Group explains that these subsidiaries that undertake activities within the Markets division do so as part of a "unified

---

[84] Ex. G-1 at 5-6.

service" for RBS Group's corporate and institutional clients, which include pension funds and other institutional investors.

181.    RBS Group reported the results and recognized revenues from its Markets division on a consolidated basis. Accordingly, the derivatives trading profits generated by any RBS Group subsidiaries were reported within the Markets division in RBS Group's annual reports.[85] RBS Group was also responsible for determining the operating budget, risk limits, and compliance and oversight functions governing Markets (which includes the Yen-LIBOR-based-derivatives trading activities of Defendants NatWest Markets Securities Japan Limited (f/k/a RBS Securities Japan Limited) ("NatWest Securities Japan") and RBS Bank).

182.    Defendant NatWest Markets plc (f/k/a The Royal Bank of Scotland plc) ("RBS") operates three U.S. branches in San Francisco, California, San Jose, California, and Stamford, Connecticut.

183.    RBS reports that it operates three global derivative trading "hubs," one of which is located in Stamford, Connecticut. RBS uses these derivatives trading hubs to execute and collect payments due under derivatives transactions, including Yen-LIBOR-based derivatives transactions, with investors in the geographic market in which the trading hub is located.  RBS also reports that it operates "sales offices across key locations in the UK, EU, US and Asia." During the Class Period, RBS, through its trading hub in Stamford and its sales offices in the United States, marketed, priced, and executed Yen-LIBOR-based-derivatives transactions with investors located in the United States.

184.    Traders at RBS, also operating within the Global Banking & Markets division, transacted Yen-LIBOR-based-derivatives with United States counterparties. Traders operating as

---

[85] The Royal Bank of Scotland Group plc, 2012 Annual Report, 84-86.

part of RBS's STM Desk (*see* Part IV.A.1.ii), also established Yen-LIBOR-based derivatives in the United States and with counterparties located in this District throughout the Class Period.

185.    The DOJ found (and RBS Japan admitted) in the Statement of Facts attached to RBS Japan's plea agreement that "more than 15% of the total notional value of the transactions entered into by RBS's Yen derivatives traders from 2006 through 2010 involved U.S.-based counterparties."

186.    In guilty pleas, RBS and RBS Japan also admitted that profiting from these trading positions was the motivation for their manipulation of Yen-LIBOR.

187.    These trading positions included Yen-LIBOR-based derivatives trades that RBS executed with CalSTRS in the United States. For example, on November 13, 2006, RBS entered into a yen foreign exchange forward (a type of Yen-LIBOR-based derivative, *see* Part I.B, below), in which CalSTRS contracted to receive $21.559 million from RBS and deliver JPY 2.546 billion to RBS in the United States.

188.    Accordingly, RBS and RBS Japan, operating as part of RBS Group's Markets business, intentionally manipulated the prices of Yen-LIBOR-based-derivatives that these Defendants established in this District and in the United States, including Yen-LIBOR-based derivatives trades that RBS booked with CalSTRS in the United States, and collected the illicit proceeds arising from these transactions in the United States.

189.    RBS's success in exploiting the United States market for Yen-LIBOR-based-derivatives is the result of sustained marketing and promotional efforts throughout the Class Period.  For instance, RBS regularly published and widely disseminated a weekly newsletter called Japan Strategy and Economics Weekly. Each issue of this newsletter provided several pages of English-language analyses and projections related to Yen-denominated interest rates

and Yen-LIBOR-based financial instruments. Each issue also concluded with an invitation to "major U.S. institutional investors…[that] wish to effect a transaction in any Securities mentioned herein" to contact representatives of Defendant RBS Securities f/k/a Greenwich Capital Markets, Inc. in Greenwich, Connecticut. RBS distributed this publication, along with other marketing materials, to its substantial Yen-LIBOR-based derivatives customer base in the United States and in this District.

190.    RBS and RBS Securities conduct business in this District, including by executing Yen-LIBOR-based derivative transactions directly with investors located in this District.

191.    RBS gave its Tokyo-based Markets Yen trader, Jimmy Tan, significant discretion to take risks with his trading book.[86]  While it was nighttime in Tokyo, Tan, formally employed by RBS Japan, passed his Yen-LIBOR-based derivatives book to RBS's Neil Danziger in London to continue trading.[87]  When the trading day ended in London, Danziger then passed Tan's Yen-LIBOR-based derivatives trading book to Defendant RBS Securities' Yen-LIBOR-based derivatives trader, David Pieri, based in Stamford, Connecticut.[88]  Pieri continued trading Jimmy Tan's positions from within the United States. Once business closed in Stamford and the trading day resumed in Asia, Pieri sent the trading book back to Jimmy Tan.[89]  This strategy substantially paid off, Jimmy Tan's Yen book generated $200 million for RBS from 2006 through 2010, based in part on Pieri's trades executed from within the United States.[90]

---

[86] Ex. B-3 at 7.

[87] *Id.*

[88] Andrea Tan, Gavin Finch and Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders,* BLOOMBERG BUSINESS (Sept. 25, 2012), available at http://www.bloomberg.com/news/articles/2012-09-25/rbs-instant-messages-show-libor-rates-skewed-for-traders.

[89] Ex. B-3 at 8.

[90] Id.

192.    Pieri was involved in RBS's manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives within the United States.  For example, on April 2, 2008, Tan messaged Neil Danziger and David Pieri, stating "Nice Libor," and "Our six-month fixing moved the entire fi[x]ing, hahahah."[91]

193.    Because RBS Group's Stamford-based trader, David Pieri, manipulated Yen-LIBOR and traded Yen-LIBOR-based derivatives that financially benefitted from RBS's manipulative conduct from within the United States, RBS Group, NatWest, and NatWest Securities Japan are subject to jurisdiction in this Court.

E.    Société Générale

194.    Société Générale organizes the operations of itself and its subsidiaries into divisions that it describes as "business lines." Société Générale organizes business lines according to function, and the division that engages in Yen-LIBOR-based derivatives trading is called the Corporate and Investment Banking Division ("SGCIB").

195.    Société Générale reports that its operations in the United States are "conducted largely within the SGCIB []  business line[] through the following legal entities: SG's New York Branch (SGNY);[92] SG's U.S. broker-dealer subsidiary, SG Americas Securities, LLC (SGAS); and Newedge USA, LLC (NUSA), a registered broker dealer, swap dealer and futures commission merchant in which SG holds a 50% ownership interest."

196.    Société Générale, through its New York branch, and SGAS, are both registered swap firms and introducing brokers with the United States National Futures Association.

---

[91] Andrea Tan, Gavin Finch and Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders,* BLOOMBERG BUSINESS (Sept. 25, 2012), available at http://www.bloomberg.com/news/articles/2012-09-25/rbs-instant-messages-show-libor-rates-skewed-for-traders

[92] Société Générale's New York Branch is a Société Générale office that is registered with the New York Department of Financial Services—it is not a separate legal entity.

197.   Société Générale's New York Branch and SGAS are headquartered at the same location in this District, 245 Park Avenue, New York, NY. In the "North America" section of Société Générale's website, it describes this office as the "New York Head Office" for both Société Générale and SGAS.

198.   Société Générale uses its registration as a swaps dealer, its control over SGAS (a wholly-owned subsidiary operating as part of SGCIB), and its New York office to arrange, execute, and collect payments due under Yen-LIBOR-based derivatives transactions with U.S. counterparties. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

199.   Société Générale pled guilty in New York for manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives. Société Générale's plea agreement shows that its Yen-LIBOR manipulation was led by a senior trader on Société Générale's Yen trading desk employed as part of SGCIB, who often manipulated Yen-LIBOR to benefit his own trading positions, those of his SGCIB colleagues, and other co-conspirators. Société Générale, through its SGCIB division, transacted in Yen-LIBOR-based derivatives in the United States through its New York office, including Yen foreign exchange forwards directly with Plaintiff CalSTRS, while it was engaged in a conspiracy to manipulate the prices of these products.

200.   In the Statement of Facts attached to its Deferred Prosecution Agreement with the DOJ, Société Générale's admissions included: (1) that the bank's "LIBOR misconduct" had a "broad impact" and "caused significant damage to the global financial markets"; (2) that "even small movements in Yen LIBOR had a substantial impact on the profitability of trading

positions"; and (3) that Société Générale's false Yen LIBOR submissions "benefited [Société Générale's Yen traders'] trading positions and the positions of other traders . . . to the detriment of counterparties."[93] The counterparties injured as a result of this admitted misconduct include investors in the U.S. Yen-LIBOR-based derivatives market, including CalSTRS and members of the Class.

F.   Lloyds

201.   During the Class Period, Lloyds Banking Group plc, which has full ownership over Lloyds, reported that its U.S.-based activities were "primarily undertaken by the New York branch of [Lloyds] and Bank of Scotland plc." Lloyds listed its New York branch as a "material entity" in its U.S. resolution plans filed with the Federal Reserve. A "material entity" is "an entity that is significant to the activities of a core business line or critical operation." Lloyds Banking Group plc further wrote that Lloyds' New York branch is "the primary operating entity for [Lloyds Banking Group PLC's] U.S. operations."[94] This New York Branch is licensed and regulated by the NYDFS to do business in New York.

202.   Lloyds Banking Group plc further reported that Lloyds' New York Branch's U.S. activities are "concentrated in Commercial Banking." According to shareholder annual reports, the Commercial Banking division of Lloyds executes derivatives transactions with clients. These derivatives transactions include Yen-LIBOR-based derivatives transactions.

203.   One of the activities that Lloyds conducts through its New York branch is arranging and executing derivatives transactions—including Yen-LIBOR-based derivatives transactions. For example, Lloyds recruited and employed "relationship managers" (the term that

---

[93] Deferred Prosecution Agreement, at 8, A-55.

[94] Lloyds's New York Branch operations were transferred to a new entity, Lloyds Bank Corporate Markets plc, in late 2018.

Lloyds uses for sales personnel) based in its New York Branch. These employees engage in marketing and sales of products for Lloyds' Commercial Banking operations, including the marketing and sale of Yen-LIBOR-based derivatives to customers located in this District and in the United States.

204.    In its settlement with the CFTC for manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, the CFTC found that "[Lloyds] colluded with Rabobank to make false reports, to attempt to manipulate and to manipulate Yen-LIBOR for the benefit of [Lloyds's] and Rabobank's trading positions." By intentionally manipulating Yen-LIBOR to benefit its Yen-LIBOR-based derivatives positions while trading these products in the United States through its New York office, Lloyds purposefully availed itself of the forum.

205.    Lloyds also operates a broker-dealer subsidiary headquartered in New York, called Lloyds Securities Inc. Lloyds Securities Inc. does not itself hold derivatives positions, but engages in derivatives trading on behalf of Lloyds as part of Lloyds' Commercial Banking division. Lloyds Securities Inc. shares employees with Lloyds's New York Branch, including sales personnel and compliance personnel. Lloyds Securities Inc. is headquartered in New York at 1095 Avenue of the Americas—the same office as Lloyds' New York Branch, and uses the same telephone number. Lloyds Securities Inc. and Lloyds' New York Branch have the same Chief Executive Officer, the same Chief Risk Officer, and the same Chief Legal Officer.

206.    Lloyds' New York Branch also housed senior executives responsible for Governance and Compliance, including a Vice President of Governance and Compliance, throughout the entire Class Period. In its settlement with the CFTC for manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, Lloyds admitted that it "failed to adequately supervise [its] [Yen-]LIBOR submitters and the [Yen-]LIBOR submission process and did not

have any specific policies, internal controls or procedures for determining or monitoring [its] [Yen-]LIBOR submissions to ensure that [its] submissions reflected an honest assessment of the costs of borrowing unsecured funds in the London interbank market." Accordingly, Lloyds' compliance failures that enabled its participation in the conspiracy to remain undetected occurred in substantial part in this District.

G.  The Broker Defendants.

207.    The Broker Defendants are subject to personal jurisdiction because they furthered Defendants' manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives from within the United States. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████[95]  Tullett Prebon's brokers, including Mark Jones, also conspired with Danziger in Las Vegas, spending long weekends there and planning their manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.[96]  Danziger entered a separate series of wash trades with Hayes to generate commissions to compensate the Tullett Prebon brokers for their assistance in manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, including by distributing false suggested LIBOR submissions to other banks that served on the BBA Yen-LIBOR Panel.[97]

---

[95] ██████████

[96] David Enrich and Jean Eaglesham, *Clubby London Trading Scene Fostered Libor Rate-Fixing Scandal*, THE WALL STREET JOURNAL (May 2, 2013), available at http://www.wsj.com/articles/SB10001424127887323296504578396670651342096?alg=y.

[97] *Id.*

208.    Additionally, Defendants and their co-conspirators, including Bank of America, Bank of Tokyo-Mitsubishi, Barclays, Citigroup, Deutsche Bank AG, HSBC Bank, Merrill Lynch, RBS, Société Générale, Sumitomo Mitsui, and UBS purposefully availed themselves of the privilege and benefit of trading Yen-LIBOR-based derivatives in the United States throughout the Class Period.[98]   Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign exchange market. This survey measures the "turnover," or volume of transactions, in foreign exchange and interest rate derivatives within the United States.  The Federal Reserve Bank of New York survey only includes data from dealers located within the United States and transactions that are located within the United States.  Dealers located outside of the United States report their figures to the central bank where they are located.

209.    Defendants and their co-conspirators, including Bank of America, Bank of Tokyo-Mitsubishi, Barclays Capital, Citigroup, Deutsche Bank AG, HSBC Bank, Merrill Lynch, RBS, Société Générale, Sumitomo Mitsui, and UBS each participated in the Federal Reserve Bank of New York's survey of foreign exchange and interest rate derivatives dealers throughout the Class Period, indicating that they entered into foreign exchange and interest rate derivatives transactions, including transactions priced, benchmarked, and/or settled to Yen-LIBOR, from within the United States.  At least some of these derivatives transactions were cleared in the United States and sold to U.S. counterparties at artificial prices that were caused by Defendants' and their co-conspirators' misconduct.  Defendants and their co-conspirators intended that those

---

[98] *See* The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, THE FEDERAL RESERVE BANK OF NEW YORK (Apr. 2013); The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, THE FEDERAL RESERVE BANK OF NEW YORK (Apr. 2007).

prices would manifest in the U.S. market and in U.S. transactions, harming Plaintiffs and the Class.

## II. Barclays Bank PLC and Merrill Lynch International Consented to Personal Jurisdiction and Venue in this District Through Contracts with the Hayman Plaintiffs.

210. **ISDA Master Agreements**. The International Swaps and Derivatives Association ("ISDA") is a trade association formed by dealer banks, including each of the Defendants. ISDA determines and promulgates industry-standard form contracts that facilitate trading between derivatives market participants. One such contract is an ISDA Master Agreement. An ISDA Master Agreement is a standard form agreement with 14 sections, designed so that parties who intend to enter into a series of over-the-counter derivative transactions (e.g., Yen-LIBOR-based derivatives) can improve efficiency by agreeing in advance on certain terms that will apply in every trade. These forms are periodically updated by ISDA and identified by the year of the update. Commonly used examples include the "1992 form."

211. The parties to each ISDA Master Agreement are required to make certain elections when completing the standard form, such as which law will govern their agreement, where collateral for transactions should be wired, and who should be notified of any default event. These choices are typically reflected in the Schedule and Credit Support Annex, which are executed with the ISDA Master Agreement.

212. The terms specified in the ISDA Master Agreement, Schedule, and Credit Support Annex are incorporated into and apply to each subsequent transaction entered by the parties. This is codified by Section 1 of the 1992 ISDA Master Agreement, which provides that "[a]ll Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this 'Agreement'), and the parties would not otherwise enter into any Transactions."

68

213.     Section 4 of the 1992 ISDA Master Agreement requires each party to "comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party."

214.     The parties to an ISDA Master Agreement may also designate themselves as a "Multibranch Party" under Section 10 of the 1992 form. Multibranch Parties act as a single entity for the purposes of a derivatives transactions and "may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule." Consistent with this single entity concept, Section 10(a) of the 1992 ISDA Master Agreement further provides that:

> each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or oganisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office.

215.     Section 13 of the 1992 ISDA Master Agreement requires parties to agree in advance on the substantive law that will govern their agreement and to designate a forum that will have jurisdiction to hear any disputes. There are two standard options for choice of law: the laws of the State of New York or English law. The parties typically indicate their selection in Part 4 of the Schedule attached to their ISDA Master Agreement. If New York law is selected, then under Section 13(b) of the 1992 ISDA Master Agreement, the parties irrevocably submit to the "non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City."

216.     Section 13 of the 1992 ISDA Master Agreement states in relevant part:

**13.    Governing Law and Jurisdiction**
(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

69

(b) *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:

(i) submits to the jurisdiction of the English Courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

217.    A dealer and customer will often execute dozens or hundreds of trades, if not more, pursuant to a single ISDA Master Agreement, which can stay in effect for years and cover a variety of OTC derivatives products and all subsequent transactions between the parties to the ISDA Master Agreement are incorporated into and subject to the terms of the ISDA Master Agreement.

218.    During the Class Period, HCMF and JMOF entered into dozens of Yen LIBOR-Based Derivatives transactions with Defendants Barclays Bank PLC and Merrill Lynch International (among others) pursuant to the terms of their respective ISDA Master Agreements.

219.    Each of Plaintiffs' ISDA Master Agreements with Defendants Barclays Bank PLC, Merrill Lynch Capital Services, Inc, and Merrill Lynch International used the 1992 form. These agreements were each negotiated and executed from within the United States. The specific terms of certain example Yen-LIBOR-based derivatives transactions that Plaintiffs entered with Defendants, along with the relevant ISDA Master agreements governing those trades are included below.

A.  Barclays Bank PLC

220.    On March 31, 2008, HCMF entered into an ISDA Master Agreement with

Barclays Bank PLC (the "HCMF-Barclays ISDA Master Agreement"). The HCMF-Barclays

ISDA Master Agreement used the 1992 form ISDA Master Agreement.

221.    The HCMF-Barclays ISDA Master Agreement contained the standard 1992 form

provision on "Governing Law and Jurisdiction" described above. This provision states that each

party irrevocably:

> (i) submits to the jurisdiction of the English courts, if this Agreement
> is expressed to be governed by English law, or to the non-exclusive
> jurisdiction of the courts of the State of New York and the United
> States District Court located in the Borough of Manhattan in New
> York City, if this Agreement is expressed to be governed by the laws
> of the State of New York; and

> (ii) waives any objection which it may have at any time to the laying
> of venue of any Proceedings brought in any such court, waives any
> claim that such Proceedings have been brought in an inconvenient
> forum and further waives the right to object, with respect to such
> Proceedings, that such court does not have any jurisdiction over
> such party.

222.    The HCMF-Barclays ISDA Master Agreement further provided that it govern any

existing or subsequent transactions between Barclays and HCMF.

223.    In the Schedule to the HCMF-Barclays ISDA Master Agreement Barclays

designated itself as a "Multibranch Party" stating that it may act through its offices in New York,

among others, as well as any other office specified in a confirmation. In the HCMF-Barclays

ISDA Master Agreement, Barclays also designated its New York branch at 200 Park Avenue,

New York, New York 10166, as its address for all notices or communications arising under the

agreement.

224.    In the Schedule to the HCMF-Barclays ISDA Master Agreement, Barclays

represented that "With respect to payments made to Party A which are effectively connected to

71

the United States: Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the United States."

225.    The Credit Support Annex to the HCMF-Barclays ISDA Master Agreement required HCMF make all transfer cash collateral for their transactions to Barclays Bank PLC, NY.

226.    The parties to the HCMF-Barclays ISDA Master Agreement selected New York law as the governing law for their agreement. Provision (h) of Part 4 of the Schedule to the HCMF-Barclays ISDA Master Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

227.    Pursuant to Section 13 of the 1992 ISDA Master Agreement, by selecting New York Law in Part 4 of the Schedule to the HCMF-Barclays ISDA Master Agreement Defendant Barclays Bank PLC concerned to personal jurisdiction in this District for "any suit, action or proceedings relating to this Agreement." *See* above.

228.    Barclays Bank PLC entered into at least 5 Yen LIBOR-based derivatives transactions with HCMF pursuant to their ISDA Master Agreement, during the Class Period, including:

   a.   On April 6, 2010, HCMF purchased a Yen-LIBOR-based receiver swaption from Barclays Bank PLC. This swaption gave HCMF the right, but not the obligation, to enter into an interest rate swap with Barclays Bank PLC on April 8, 2013 in which HCMF would pay a fixed interest rate of 3.5% per year on ¥9,500,000,000 in exchange for receiving floating rate payments tied to Yen-LIBOR. HCMF paid an artificially inflated premium of $1,038,086.14 for this swaption as a result of Defendants' conspiracy.

   b.   On April 23, 2010, HCMF purchased a Yen-LIBOR-based receiver swaption from Barclays Bank PLC. This swaption gave HCMF the right, but not the obligation, to enter into an interest rate swap with Barclays Bank PLC on April

23, 2013 in which HCMF would pay a fixed rate of 3.00% per year on ¥3,600,000,000 in exchange for receiving floating rate payments tied to Yen-LIBOR. HCMF paid an artificially inflated premium of $493,361.88 for this swaption as a result of Defendants' conspiracy.

229.     Under Section 1 of the HCMF-Barclays ISDA Master Agreement, each of these Yen LIBOR-Based Derivatives transactions was incorporated into and formed a single agreement with the HCMF-Barclays ISDA Master Agreement. *See* above.

230.     As described above, HCMF alleges that it was overcharged on these specific transactions as a result of the conspiracy alleged in this Complaint. Therefore, Barclays Bank PLC consented to personal jurisdiction and waived any objection to venue for HCMF's claims in the Southern District of New York, which "arise out of" or are otherwise made "in connection with" Yen-LIBOR-based derivatives transactions that are covered by the HCMF-Barclays ISDA Master Agreement,.

B.  Merrill Lynch International

231.     On September 29, 2006, HCMF entered into an ISDA Master Agreement with Defendant Merrill Lynch International. (the "HCMF-Merrill Lynch ISDA Master Agreement"). The agreement used the 1992 form ISDA Master Agreement.

232.     The HCMF-Merrill Lynch ISDA Master Agreement contained the standard 1992 form provision on "Governing Law and Jurisdiction" described above. *See* above. This provision states that each party irrevocably:

> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and
>
> (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient

forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

233.    The HCMF-Merrill Lynch ISDA Master Agreement further provided that it govern any existing or subsequent transactions between Merrill Lynch International and HCMF.

234.    In an exhibit to the HCMF-Merrill Lynch ISDA Master Agreement, Merrill Lynch International's parent company, Merrill Lynch & Co., Inc., a Delaware based company, guaranteed to HCMF "the due and punctual payment of any and all amounts payable by Merrill Lynch International…under the terms of the Master Agreement." The guarantee also provided that it "shall be governed by, and construed in accordance with, the laws of the State of New York."

235.    In the Schedule to the HCMF-Merrill Lynch ISDA Master Agreement, Merrill Lynch International designated its "World Headquarters" at 4 World Financial Center, New York, New York 10080 as its address for all notices and communications arising under the agreement. Merrill Lynch also designated its New York branch at 222 Broadway, 16th Floor, New York, New York 10038 as its agent for service of process.

236.    The parties to the HCMF-Merrill Lynch ISDA Master Agreement selected New York law as the governing law for their agreement. Provision (h) of Part 4 of the Schedule to the HCMF-Merrill Lynch ISDA Master Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

237.    Merrill Lynch International entered into at last 15 Yen-LIBOR-based derivatives

transactions with HCMF pursuant to their ISDA Master Agreement, during the Class Period,

including:

a.  On July 15, 2009, HCMF entered into an interest rate swap with Merrill Lynch
International agreeing to pay a fixed rate of 1.515% per year  on ¥2,500,000,000
every 6 months for 10 years starting on January 17, 2011 in exchange for receiving
floating rate payments ties to Yen-LIBOR. HCMF paid Merrill Lynch International
an artificially inflated $1,129,143.65 to terminate this swap on July 20, 2010 as a
direct result of Defendants' conspiracy.

b.  On January 8, 2010, HCMF purchased a Yen-LIBOR-based receiver swaption
option from Merrill Lynch. This swaption  gave HCMF the right, but not the
obligation, to enter into an interest rate swap with Merrill Lynch International on
January 12, 2012 in which HCMF would pay a fixed rate of 3.00% per year  on
¥16,170,000,000 in exchange for receiving floating rate payments tied to Yen-
LIBOR. HCMF paid Merrill Lynch International an artificially inflated premium of
$2,000,037.48 for this swaption as a direct result of Defendants' conspiracy.

c.  On April 23, 2010, HCMF purchased a Yen-LIBOR-based payer swaption from
Merrill Lynch International. This swaption gave  HCMF the right, but not the
obligation, to enter into an interest rate swap with Merrill Lynch International on
April 23, 2012 in which HCMF would receive a fixed rate of 3.00% per year  on
¥17,300,000,000 in exchange for making floating rate payments tied to Yen-
LIBOR. HCMF paid Merrill Lynch International an artificially inflated premium of
$1,000,214.00 for this swaption as a direct result of Defendants' conspiracy.

d.  On April 23, 2010, HCMF purchased a Yen-LIBOR-based receiver swaption  from
Merrill Lynch International. This swaption gave HCMF the right, but not the
obligation, to enter into an interest rate swap with Merrill Lynch International on
April 23, 2013 in which HCMF would pay a fixed rate of 3.00% per year  on
¥3,650,000,000 in exchange for receiving floating rate payments tied to Yen-
LIBOR. HCMF paid Merrill Lynch International an artificially inflated premium of
¥500,214 for this swaption as a direct result of Defendants' conspiracy.

e.  On June 17, 2010, HCMF purchased a Yen-LIBOR-based receiver swaption from
Merrill Lynch International. This swaption gave HCMF the right, but not the
obligation, to enter into an interest rate swap with Merrill Lynch International on
June 21, 2011 in which HCMF would pay a fixed rate of 2.50% per year  on
¥152,000,000,000 in exchange for receiving floating rate payments tied to Yen-
LIBOR. HCMF paid Merrill Lynch International an artificially inflated premium of
$199,934.00 for this swaption as a direct result of Defendants' conspiracy.

f.  On August 20, 2010, HCMF purchased a Yen-LIBOR-based receiver swaption
from Merrill Lynch International. This swaption gave HCMF the right, but not the

obligation, to enter into an interest rate swap with Merrill Lynch International on August 22, 2012 in which HCMF would pay a fixed rate of 2.50% per year on ¥115,000,000,000 in exchange for receiving floating rate payments tied to Yen-LIBOR. HCMF paid Merrill Lynch International an artificially inflated premium of $1,199,883.00 for this swaption as a direct result of Defendants' conspiracy.

g. On August 20, 2010, HCMF purchased a Yen-LIBOR-based receiver swaption from Merrill Lynch International.  This swaption gave HCMF the right, but not the obligation, to enter into an interest rate swap with Merrill Lynch International on August 24, 2011 in which HCMF would pay a fixed rate of 2.50% per year on ¥511,800,000,000 in exchange for receiving floating rate payments tied to Yen-LIBOR. HCMF paid an artificially inflated premium of $600,000.00 for this swaption as a direct result of Defendants' conspiracy.

238. Under Section 1 of the HCMF-Merrill Lynch ISDA Master Agreement, each of these Yen LIBOR-Based Derivatives transactions was incorporated into and formed a single agreement with the HCMF-Merrill Lynch ISDA Master Agreement. *See* ¶ 212, *supra*.

239. As described above, HCMF alleges that it was overcharged on these specific transactions as a result of the conspiracy alleged in this Complaint. Therefore  Merrill Lynch International consented to personal jurisdiction and waived any objection to venue for HCMF's claims in the Southern District of New York, which "arise out of" or are otherwise made "in connection with" Yen-LIBOR-based derivatives transactions that are covered by the HCMF-Merrill Lynch ISDA Master Agreement. As a general practice, Defendants and their co-conspirators chose New York law when negotiating and signing ISDA Master Agreements with U.S. counterparties.  Under the terms of these ISDA Master Agreements, Defendants transacted in Yen-LIBOR-based interest rate swaps and forward rate agreements with U.S. counterparties, subjecting Defendants to jurisdiction and venue in New York for disputes arising under these contracts.

240. Defendants and their co-conspirators, including Deutsche Bank, Société Générale, Barclays Bank, Rabobank, RBS, Bank of Tokyo-Mitsubishi, Mizuho Bank, Norinchukin, Mitsubishi UFJ, Sumitomo Mitsui, and Lloyds Bank also registered their New York branch or

76

representative offices with the NYSDFS under New York Banking Law §§ 200 and 200-b.

Defendants RBS and UBS registered with the DOB under Section 36a-428g of the Connecticut

General Statutes.  In order to benefit from the advantages of transacting business in this forum,

these Defendants registered as foreign branches with the NYSDFS and DOB, which confers

privileges and benefits and binds these entities to the same judicial constraints as domestic

corporations.[99]  Deutsche Bank, Société Générale, Barclays, Rabobank, RBS, Bank of Tokyo-

Mitsubishi, Mizuho Bank, Norinchukin, Sumitomo Mitsui, Lloyds Bank, and UBS used these

registrations in New York and Connecticut to execute Yen-LIBOR-based derivatives in those

states while engaging in the conspiracy alleged in this Complaint.

241.    Defendants additionally purposefully directed their activity at the United States,

taking intentional and tortious actions expressly aimed at the forum, transacting business

throughout the United States and this District, trading Yen-LIBOR-based derivatives, priced,

benchmarked and/or settled based on Yen-LIBOR with U.S. counterparties.  Defendants and co-

conspirators Barclays, Rabobank, Deutsche Bank, UBS, and RBS admitted the following as "true

and accurate" in their Statement of Facts incorporated into their various agreements with the

DOJ:

> Barclays [Rabobank, Deutsche, and UBS] entered into interest rate derivatives
> transactions tied to LIBOR and EURIBOR – such as swaps, forward rate
> agreements, and futures – with counterparties to those transactions.  Many of those
> counterparties were located in the United States.  Those United States
> counterparties included, among others, asset management corporations, retirement
> funds, mortgage and loan corporations, and insurance companies.  Those
> counterparties also included banks and other financial institutions in the United
> States or located abroad with branches in the United States.[100]

---

[99] *Id.* at *24-25.

[100] Ex. E-1 at 13-14; Ex. C-1 at 40; Ex. F-1 at 70; Ex. A-1 at 36; Ex B-1 at 38.

242.     Defendants knowingly and purposefully directed their price fixing and other manipulative acts to cause an effect in the United States and harm U.S. counterparties to generate illicit profits.  Defendants and their co-conspirators Barclays, Deutsche Bank, JPMorgan, and Merrill Lynch traded Yen-LIBOR-based derivatives products with U.S. counterparties, including Plaintiff HCMF.  Defendants Bank of America, UBS, RBS, Société Générale, and Barclays transacted in Yen-LIBOR-based derivatives products with U.S. counterparties, including Plaintiff CalSTRS.  Defendants expressly aimed their unlawful price-fixing and manipulation at increasing the value of their Yen-LIBOR-based derivatives transactions in order to gain an anticompetitive financial advantage over U.S. counterparties, including Plaintiffs and the Class, thereby causing them to suffer antitrust injuries. Accordingly, these Defendants subjected themselves to jurisdiction in this District with respect to the claims asserted in this Complaint.

243.     Defendants and co-conspirators transacted in Yen-LIBOR-based derivatives with other U.S. counterparties and reaped illicit profits from within the United States as a result of their manipulative conduct.

244.     

[101]

245.     Defendants are further subject to the jurisdiction of this Court because they used U.S. domestic and interstate wires to accomplish their fixing and manipulation of Yen-LIBOR

---

[101]

and the prices of Yen-LIBOR-based derivatives.  Defendants admitted that "[o]n a daily basis, [Defendants], through the transmission of an electronic spreadsheet to Thomson Reuters, knowingly delivered or caused to be delivered its . . . Yen  . . . LIBOR . . . submissions through the mails or interstate commerce. [Defendants'] submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally."[102]  Defendants knowingly aimed their Yen-LIBOR submissions to the United States when they made their submissions to Thomson Reuters and caused Thomson Reuters to publish a false and artificial rate to investors in the United States, using U.S. wires, through Bloomberg and other financial services platforms, intending that these false rates would be used to price trades that these Defendants executed in the United States.

246.    Defendants sent electronic chats across U.S. domestic and interstate wires in furtherance of their conspiracy to manipulate Yen-LIBOR and fix the prices of Yen-LIBOR-based derivatives.  For example, Defendant UBS Japan pled guilty to one count of wire fraud in the District of Connecticut, admitting that its employee's February 25, 2009 electronic chat "was transmitted through, among other locations and facilities, a UBS server located in Stamford, Connecticut."[103]

247.    Given the structure of Bloomberg's network, these electronic communications are located within the United States and were transmitted into the United States, crossing U.S. wires, through servers located in the United States.  Bloomberg transport specifications require that all users connect to internet protocol ("IP") addresses located within the United States in order to access Bloomberg's U.S.-based servers, which are used to send messages in addition to

---

[102] Ex. G-2 at 26; Ex. D-2 at 45; A-2 at 52-53; Ex. I-2 at 36; Ex. B-4 at 33.

[103] A-5 at 4.

accessing financial information.  These servers also host the Instant Bloomberg chat rooms that Defendants' utilized in their scheme.[104]

## AGENTS AND UNNAMED CO-CONSPIRATORS

248.    Various other entities and individuals, including, but not limited to, dealer subsidiaries and/or affiliates of the Contributor Bank Defendants and Co-conspirators and the Broker Defendants participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein.  The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives traded in the United States Yen-LIBOR-based derivatives market.

## SUBSTANTIVE ALLEGATIONS

I.   **Background**

A.  Yen-LIBOR

249.    Yen-LIBOR is a daily reference rate intended to reflect the interest rates at which banks offer to lend unsecured funds denominated in Japanese Yen to other banks in the London wholesale money market (or interbank market).  The higher the credit risk for a bank (or credit risk environment), the higher the rate that bank would (and should) have to pay for borrowing unsecured funds denominated in Japanese Yen.

250.    In addition to its use as a benchmark in pricing loans, Yen-LIBOR is used as the basis for settlement of interest rate derivatives contracts traded in over-the-counter markets.

---

[104] *See Transport and Security Specifications*, BLOOMBERG L.P. (Nov. 13, 2014) at 7, 12 (listing Bloomberg IP addresses and diagraming network structure with endpoints in New York and New Jersey).

251.     Yen-LIBOR is set through the BBA by its member banks.  According to the BBA, each contributor bank is selected to "reflect[] the balance of the market."   Each contributor bank is selected based upon the following criteria "the scale of market activity, reputation and perceived expertise in the currency concerned."

252.     Yen-LIBOR is calculated each business day as of 11:00 a.m. London time.  Each Yen-LIBOR contributor bank quotes Yen-LIBOR for fifteen (15) maturities, ranging from overnight to twelve months, including three months.

253.     In calculating Yen-LIBOR, contributed rates are ranked in descending order and the arithmetic mean of only the middle two quartiles is used to formulate the resulting BBA Yen-LIBOR calculation.  The contributor banks respond to the BBA's question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"

254.     Thomson Reuters serves as the BBA's agent for the collection, calculation, publication, and dissemination of the daily Yen-LIBOR.

255.     The BBA prohibited banks from reporting rates that reflected factors unrelated to prevailing costs of borrowing unsecured funds in the interbank market, *i.e.*, submissions that are based on the banks' Yen-LIBOR-based derivatives positions.  Notwithstanding this blanket prohibition, the Contributor Bank Defendants and Co-conspirators, aided and abetted by the Broker Defendants, systematically reported false Yen-LIBOR rates to the BBA in order to manipulate those rates to artificial levels that financially benefitted their Yen-LIBOR-based derivatives positions.

B.  Yen-LIBOR-based Derivatives

256.     "Yen-LIBOR-based derivatives" are financial instruments priced, benchmarked, and/or settled based on Yen-LIBOR.  These include, *inter alia*: (i) Yen-LIBOR interest rate

swaps and options on interest rate swaps; (ii) Yen-LIBOR forward rate agreements; and (iii) Yen foreign exchange forwards.

1.   Interest Rate Swaps and Options on Interest Rate Swaps

257.   Interest rate swaps are the most common type of interest rate derivatives.  They are traded over-the-counter, *i.e.*, outside of a public exchange, and allow two counterparties to exchange interest rate payment obligations on an agreed upon "notional" or principal amount. There are several types of interest rate swaps.  The simplest interest rate swap is a "plain vanilla" interest rate swap, which involves the exchange of a fixed stream of interest rate payments, *e.g.* 2% per year, for one based on a "floating" reference rate, *e.g.*, Yen-LIBOR, which may change every day.

258.   The parties to a plain vanilla interest rate swap are typically referred to by their relationship to the stream of fixed interest rate payments.  The party exchanging its floating rate obligation for a stream of fixed interest rate payments is known as the "receiver," while the party making fixed interest rate payments in exchange for a stream of payments tied to a floating reference rate is known as the "payer."

259.   Payment under an interest rate swap is due at regular intervals, *e.g.*, every six months, for the life of the agreement.  Each time a payment is due, the amounts owed by the payer and receiver are netted against each other.  Only the party with the larger obligation, fixed or floating, makes a payment reflecting the difference between the two interest rates as applied to the agreed upon notional amount.  For example, assume Party A enters into an interest rate swap with Party B and agrees to make a fixed rate payments of 0.5% on ¥10,000,000 to Party B in exchange for receiving floating rate payments based on six-month Yen-LIBOR on the same underlying amount.  On each "fixing" or "reset" date, if six-month Yen-LIBOR is lower than the

fixed rate, *e.g.*, 0.4%, Party A has the larger obligation and will make a payment to Party B equal to the difference between the fixed and floating rates, in this case 0.1%.  However, if six-month Yen-LIBOR is higher than the fixed rate, *e.g.*, 0.6%, Party B has the larger obligation and will make a payment to Party A equal to the difference between the fixed and floating rates.

260.    The value of an interest rate swap is represented by the difference between the total interest to be paid and received under the swap agreement.  For example, if the total present value of interest owed to a party is greater than the total present value of the interest that the party must pay out over the life of the interest rate swap, then the swap has a positive value.  As a result, Yen-LIBOR affects the value of Yen-LIBOR-based interest rate swaps by determining the value of the floating rate payments due under that swap contract.

261.    Interest rate swaps may be terminated or closed prior to maturity. At termination, the parties exchange payments reflecting the current value of the interest rate swap. For a Yen-LIBOR-based interest rate swap, this payment is determined by Yen-LIBOR.

262.    A "swaption" is an option on an interest rate swap and gives the buyer the right, but not the obligation, to enter into a certain interest rate swap with the swaption issuer on a specified future date, known as the "exercise date." The cost to purchase a swaption is referred to as the "premium." An investor that purchases a swaption pays the premium to the seller at the time of the transaction.

263.    The value of a swaption, and thus the amount of premium paid by the buyer and received by the seller, is determined by the value of the underlying interest rate swap.  As a result, the value (and premium paid or received at the time of purchase) of a swaption that gives the buyer the right to enter into a Yen-LIBOR-based interest rate swap will be affected by a change in Yen-LIBOR because Yen-LIBOR determines the value of the interest rate swap

underlying that swaption. If the buyer purchases the right to receive payments based on Yen-LIBOR in the underlying swap, then the purchase price (and value) increases as Yen-LIBOR increases, and vice-versa. If the buyer purchases the right to make payments based on Yen-LIBOR in the underlying swap, then the purchase price (and value) decreases as Yen-LIBOR increases, and vice-versa.

264.    A swaption may also be terminated or closed after it is initially purchased. At termination, the parties exchange payments reflecting the current value of the swaption. For swaptions that provide the option to enter a Yen-LIBOR-based interest rate swap, this amount is determined by Yen-LIBOR.

2.   Forward Rate Agreement.

265.    A forward rate agreement ("FRA") is an interest rate forward contract.  The contract sets a rate of interest to be paid or received on an obligation beginning at a future start date.  The contract will determine the interest rate to be used along with the termination date and notional value.  Similar to an interest rate swap, on the settlement date, the party with the larger obligation makes an interest rate payment equal to the difference between the fixed and floating rate.  For example, assume Party A enters into a FRA with Party B in which Party A will receive 0.5% interest on ¥10,000,000.  In return, Party B will receive six-month Yen-LIBOR, determined on year in the future, on the same underlying amount.  If, after one year, six-month Yen-LIBOR is higher than 0.5%, *e.g.*, 0.6%, Party A must pay Party B the difference in interest, *i.e.*, 0.1%, on the underlying ¥10,000,000.  However, if six-month Yen-LIBOR is lower than 0.5%, Party B must pay Party A the difference in interest.

3.   Foreign Exchange Forwards

266.     A foreign exchange forward is a derivative in which one party agrees to buy or sell a certain amount of a specified currency, *e.g.*, Yen, from another party on some future date, at a price agreed upon today.  The price of a Yen foreign exchange forward is based on Yen-LIBOR, which is used to take the "spot price," *i.e.*, the cost of Yen for immediate delivery, and adjust it to account for the "cost of carry," *i.e.*, the amount of interest paid or received on Yen deposits, over the duration of the agreement.  This calculation and thus the value of a Yen foreign exchange forward is determined by the pricing formula below,[105] which incorporates Yen-LIBOR as either "Rterm" or "Rbase."[106]

$$\text{Future Price} = \text{Spot Price} \times \left( \frac{1 + [\text{Rterm} \times (d / 360)]}{1 + [\text{Rbase} \times (d / 360)]} \right)$$

267.     It is well established that derivatives traders use Yen-LIBOR to price Yen foreign exchange forwards because they can borrow short-term funds at the LIBOR quotes of other financial institutions.[107]  This is confirmed by the CFTC, which has found in its settlements with Defendants RBS and Rabobank, that Yen foreign exchange forwards are derivatives that are "priced based on" and "priced off of" Yen-LIBOR:

---

[105] *See e.g.*, John W. Labuszewski, Sandra Ro & David Gibbs, *Understanding FX Futures*, CME Group, at 3, 8, http://www.cmegroup.com/education/files/understanding-fx-futures.pdf  (hereinafter "Understanding FX Futures") (applying pricing formula to both currency futures contracts and forwards).

[106] Foreign exchange forwards and currency futures transactions involve a currency pair, *e.g.*, JPY/USD.  In each pair, the first currency listed is referred to as the "Base Currency," while the other is referred to as the "Term Currency."  As prices are typically quoted "in terms of" units of the Term Currency, *e.g.*, for JPY/USD the number of dollars per one Yen, the currency listed first will depend on which currency is being purchased/sold by the buyer/seller.  The variables Rterm and Rbase in ¶ 199 refer to the rate of interest paid on deposits of the Term Currency and Base Currency, respectively, and will change depending on the order of the currency pair.  *See id.* at 3.

[107] *See e.g.*, John C. Hull, OPTIONS, FUTURES, AND OTHER DERIVATIVES (7th Ed., 2009) 74, 112-115.

> RBS Yen and Swiss Franc derivatives traders traded various derivatives that were **priced based on Yen or Swiss Franc LIBOR**. These products included interest rate swaps, Forward Rate Agreements, **foreign exchange ("FX") forwards**, cross-currency swaps, overnight index swaps, and tenor basis swaps.[108]

> Rabobank…traders regularly transacted in…derivatives products, including interest rate swaps, forward rate agreements, **foreign exchange forwards**, cross-currency swaps, overnight index swaps, and tenor basis swaps…The position held by the traders were often **priced off of LIBOR**, particularly, U.S. Dollar, **Yen**, and Sterling LIBOR…[109]

268.    

[110]

269.    The Yen foreign exchange forwards that Plaintiffs entered into, including those entered into by Plaintiff CalSTRs, were priced based on Yen-LIBOR.

## II.    Defendants and their Co-conspirators Restrained Trade and Intentionally Manipulated Yen-LIBOR-based Derivatives Prices By Falsely Reporting Yen-LIBOR Rates to the BBA

270.    Defendants methodically and purposefully manipulated the prices of Yen-LIBOR-based derivatives through their deliberate and systematic submission of false Yen-LIBOR rates to the BBA throughout the Class Period. Defendants did so in order to unlawfully profit financially from trading Yen-LIBOR-based derivatives held by them or their co-conspirators.

271.    Each Contributor Bank Defendant and Co-conspirator's Yen-LIBOR submitters regularly and improperly conspired with and agreed to change their bank's Yen-LIBOR submissions at the request of Yen-LIBOR-based derivatives traders employed by their bank

---

[108] Ex. B-4 at 6.

[109] Ex. D-2 at 6.

[110]

and/or other Contributor Bank Defendants.  As revealed by the Defendants' government

settlements, criminal trial of UBS trader Tom Hayes, criminal trial of Rabobank traders Anthony

Allen and Anthony Conti, and criminal trial of multiple inter-dealer brokers employed by the

Broker Defendants, this was an open, common and pervasive practice on each Contributor Bank

Defendant or Co-conspirator's trading desk.  Traders frequently discussed their requests for false

submissions and other manipulative conduct before sending them to their Yen-LIBOR

submitters.  For example, Rabobank traders had a standing meeting each morning known as

"LIBOR Time" where they openly planned to make false Yen-LIBOR submissions.  As a direct,

intended and proximate consequence of the Contributor Bank Defendants' and Co-conspirator's

unlawful conduct, the Contributor Bank Defendants and Co-conspirators manipulated the prices

of Yen-LIBOR-based derivatives to artificial levels throughout the Class Period.

272.    Each Contributor Bank Defendant's and Co-conspirator's interest rate derivatives

traders also regularly and improperly conspired with each other, with traders at other Contributor

Bank Defendants and Co-conspirators, and with brokers employed by the Broker Defendants to

coordinate their false Yen-LIBOR submissions.  By coordinating their Yen-LIBOR submissions,

Defendants maximized the manipulative and anticompetitive impact of their submissions on

Yen-LIBOR.  This coordination financially benefited Contributor Bank Defendants and Co-

conspirators by increasing the value of their Yen-LIBOR-based derivatives positions.

273.    Defendants and their co-conspirators knew that the BBA used the false rates

Defendants and their co-conspirators submitted to calculate and publish Yen-LIBOR.

Defendants also knew that their false Yen-LIBOR submissions, in addition to the false resulting

Yen-LIBOR fix, were published and distributed electronically within the United States using

U.S. wires.  Defendants also knew, as sophisticated market participants who themselves

regularly transacted Yen-LIBOR-based derivatives within the United States, that their false Yen-LIBOR submissions impacted the prices of Yen-LIBOR-based derivatives traded by U.S. investors, who used the daily Yen-LIBOR fix to price, benchmark and/or settle their Yen-LIBOR-based derivatives transactions.

III.    **Defendants and their Co-conspirators Restrained Trade and Manipulated the Prices of Yen-LIBOR-based Derivatives By Their Illegitimate, Non-Bona Fide Trading of Yen-LIBOR-based Derivatives**

274.    As alleged herein, Defendants traded Yen-LIBOR-based derivatives at times they knew the prices of such financial instruments were being distorted by Defendants' systematic false reporting of Yen-LIBOR (among other unlawful collusive and manipulative conduct).  This destroyed the legitimate price discovery function of Yen-LIBOR-based derivatives, created or contributed to prices which were not reflective of legitimate forces of supply and demand, and furthered Defendants' conspiracy to manipulate and unlawfully restrain trade in and fix the prices of Yen-LIBOR-based derivatives to artificial levels during the Class Period to the detriment of Plaintiffs and the Class.  Because Defendants' positions were illegitimate and manipulative parts of the supply-demand equation for Yen-LIBOR-based derivatives, Defendants' impact on Yen-LIBOR-based derivatives was an artificial one that restrained trade and caused artificial prices.

275.    Defendants' derivatives traders, by knowing their Yen-LIBOR-based derivatives positions, knew the amount of their exposure to movements in Yen-LIBOR.  For example, on any given day, the derivatives traders may have had exposure to Yen-LIBOR in particular maturities if payments were owed to or by them on interest rate swaps or FRA settling on that day.  The amount owed to or by the traders was affected by movements in Yen-LIBOR.  A beneficial movement could have made the derivatives traders a profit or reduced a loss.  In the foregoing context, each Defendant's derivatives traders repeatedly communicated with the Yen-

LIBOR submitters at that Defendant and others in order to cause their firm to make false Yen-LIBOR submissions that favored the traders' Yen-LIBOR-based derivatives positions.

**IV.**   **Defendants' Unlawful Conduct Has Led to Deferred Criminal Prosecution Agreements, Criminal Charges, Guilty Pleas and Settlements Resulting in the Payment of Fines and Penalties in Excess of $7 Billion to Governmental Authorities in the U.S. and Abroad**

276.   Defendants' and their co-conspirators' unlawful conduct has resulted in agreements with government regulators and the collective payment of over **$7 billion** in fines and penalties to date (among other relief) by Defendants UBS ($1.5 billion), RBS ($964 million), Société Générale ($750 million), ICAP Europe Limited ($104.8 million), Rabobank ($1 billion), R.P. Martin ($2.5 million), Deutsche Bank ($2.5 billion), Lloyds ($269 million), JPMorgan ($108 million), Citigroup ($94 million) and Barclays ($450 million) for their manipulation of Yen-LIBOR (among other rates) and the prices of Yen-LIBOR-based derivatives.

277.   The settlements resolve DOJ, CFTC, FSA, NYSDFS and EC criminal and/or civil charges relating to restraints of trade and manipulation of Yen-LIBOR, and the prices of Yen-LIBOR-based derivatives.   The factual findings that accompanied the UBS, RBS, Rabobank, Barclays, Lloyds, Deutsche Bank, and Société Générale settlements each included a "Statement of Facts" ("SOF") attached to, and incorporated by reference in, various non-prosecution or deferred prosecution agreements entered with the DOJ's Criminal Division, Fraud Section. UBS, RBS, Rabobank, Barclays, Lloyds, Deutsche Bank, and Société Générale, respectively, admitted that the contents of the SOF included with their settlement was "true and accurate."

278.   Defendants created an environment that promoted, indeed encouraged and rewarded, pervasive manipulative and collusive misconduct.   Throughout the Class Period, the Contributor Bank Defendants and Co-Conspirators and Broker Defendants used several principal and interrelated methods to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives including: (i) falsifying their own Yen-LIBOR submissions; (ii) colluding with cash

brokers, including the Broker Defendants, to manipulate Yen-LIBOR; and (iii) colluding directly

with Yen-LIBOR-based derivatives traders and submitters (among others) at other Yen-LIBOR

Contributor Banks, either directly or through the Broker Defendants, in order to manipulate Yen-

LIBOR and the prices of Yen-LIBOR-based derivatives.

A. Defendants Created an Environment Ripe For the Pervasive and Persistent
   Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives

   1. The Contributor Bank Defendants Created Inherent Conflicts of Interest that
      Corrupted their Yen-LIBOR Submission Process and Facilitated Their Unlawful
      Manipulation and Collusion

279.    The driving force behind Defendants' manipulation of Yen-LIBOR and the prices

of Yen-LIBOR-based derivatives was simple: greed.  Because of the high notional value of Yen-

LIBOR-based derivatives, even very small movements in Yen-LIBOR would and did have a

significant positive impact on the profitability of the Contributor Bank Defendants' and Co-

conspirators' Yen-LIBOR-based derivatives positions, and a correspondingly negative impact on

their U.S. counterparties' trading positions.  Thus, because traders' compensation was based in

part on the profit and loss calculation of the Contributor Bank Defendants' and Co-conspirators'

trading books, the manipulation of prices of Yen-LIBOR-based derivatives provided a

substantial financial benefit to their traders' compensation.

**a. Defendants Permitted Traders – Whose Compensation Was
Directly Linked to Their Success in Trading Yen-LIBOR-based
Derivatives – To Improperly Influence Their Yen-LIBOR
Submissions.**

**i. <u>UBS.</u>**

280.    Until August 2008, UBS had no specific internal controls or procedures governing

its Yen-LIBOR submissions to manage conflicts of interest or ensure that its submissions did not

take into account impermissible factors, such as UBS' Yen-LIBOR-based derivatives positions.

UBS provided no training concerning the benchmark interest rate submission process or how to manage the inherent conflict between making such submissions, and the fact that the trader-submitters were supposed to make money for UBS.

281.    UBS made trader-submitters who worked in UBS' Investment Banking Division responsible for making all benchmark interest rate submissions.  From at least January 2005 through September 2009, derivatives traders, who sat on Short Term Interest Rate ("STIR") trading desks in Zurich and traded short-term derivatives products, made submissions for Yen-LIBOR.  UBS' derivatives traders traded many Yen-LIBOR-based derivatives, including Yen-LIBOR-based interest rate swaps and FRAs, among others.  Many of their derivatives contracts settled or reset on IMM dates, which made the Yen-LIBOR rates on these particular dates especially important.

282.    The STIR desk generated significant income for UBS by trading derivatives products, whose value depended on Yen-LIBOR.  STIR also managed UBS' short-term cash position and engaged in cash trading in the money markets for each currency, including Yen, primarily through traders located in Connecticut, Zurich and Singapore.  STIR was also responsible for managing UBS' interest rate risk.

283.    Even after conducting a limited review and developing some procedures for its U.S. Dollar LIBOR submission process in mid-to-late 2008, UBS did not remove the inherent conflicts of interest as alleged herein or provide any training to its trader-submitters.  Rather than strengthening internal controls and removing the inherent conflicts of interest, UBS delegated oversight responsibility for Yen-LIBOR submissions to managers who not only knew that derivatives traders and trader-submitters were engaged in efforts to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, but who also made requests for submissions to

benefit their own individual Yen-LIBOR-based derivatives trading positions.  Certain derivatives traders, trader-submitters and managers completely disregarded the few procedures UBS eventually implemented.

284.    In September 2009, UBS transferred responsibility for determining Yen-LIBOR submissions to Asset and Liability Management ("ALM") located in Zurich.

285.    Prior to September 2009, ALM pushed the trader-submitters to consider directions that the Yen-LIBOR rates should move and eventually provided the trader-submitters with the exact rate ALM wanted them to submit.  After ALM assumed such responsibility, other UBS derivatives traders continued to demand false Yen-LIBOR submissions. The ALM submitters improperly considered input from UBS traders along with the previous day's submissions in determining their daily rate submissions.

286.    By allowing interest rate derivatives traders to act as both trader and rate submitter, UBS created an inherent conflict of interest that compromised the integrity of UBS' rate submission process, and established an environment ripe for derivatives traders and trader-submitters to abuse.  UBS' trader-submitters had significant financial interests to make Yen-LIBOR submissions that benefited their Yen-LIBOR-based derivatives trading positions.  UBS' trader-submitters' financial interests were in direct conflict with UBS' duty to make honest and reliable assessments of Yen-LIBOR rates, and ensure its submissions were made in accordance with BBA criteria.

287.    This environment enabled certain derivatives traders to engage in widespread, long-term systematic misconduct to manipulate Yen-LIBOR  and the prices of Yen-LIBOR-based derivatives within UBS, and in concert with other Contributor Banks and inter-dealer brokers.

## ii.   **RBS.**

288.     Until March 2012, certain London-based money market traders were responsible for making RBS' Yen-LIBOR submissions.  RBS money market traders were also responsible for ensuring that the bank met its funding needs each day in all currencies, including Yen.  To do so, RBS money market traders engaged in both intra-bank and inter-bank borrowing and lending transactions.  RBS money market traders also traded derivatives products that were indexed to, and therefore priced based on, Yen-LIBOR.  One money market trader, Paul White, was primarily responsible for making RBS' Yen-LIBOR submissions ("Primary Submitter"), though other traders also made RBS' Yen-LIBOR submissions.

289.     RBS Yen-LIBOR submitters improperly considered the value of their own Yen-LIBOR-based derivatives positions, and those of other RBS traders and co-conspirators, in making false Yen-LIBOR submissions to financially benefit those positions.

290.     RBS Yen-LIBOR-based derivatives traders traded various Yen-LIBOR-based derivatives that were priced, benchmarked, and/or settled based on Yen-LIBOR, including interest rate swaps and foreign exchange forwards, which were used to manage the desk's interest rate risk and also to generate a profit for the desk.  Indeed, the statement of RBS Senior Yen Trader, Jimmy Tan ("Tan"), makes this motivation clear: "[I]ts [sic] just amazing how libor fixing can make you that much money."  Many of RBS' Yen-LIBOR-based derivatives trades settled or reset on IMM dates.  RBS' derivatives trading books were traded 24 hours a day, from RBS trading desks in the United States, U.K., and Asia under the direction of the RBS Yen Manager and the RBS Senior Yen Trader.  Tan was assisted by a Yen derivatives trader in Connecticut, David Pieri, and Yen Trader 1, Neil Danziger ("Danziger").  Danziger also was the backup Yen-LIBOR submitter.

291.    In October 2006, RBS senior management decided to facilitate manipulative communications between derivatives traders and money market traders, some of whom were also Yen-LIBOR submitters, by locating them on the same RBS currency trading desks.  This co-location plan was known as the Short-Term Markets Desk ("STM").  The express purpose of STM was to encourage derivatives and money market traders to communicate about the relevant market conditions that could impact trading and funding decisions.  The seating arrangement, however, exacerbated the preexisting conflict of interest between the profit motive of traders and the responsibility of submitters to make accurate Yen-LIBOR submissions that reflected RBS' cost of borrowing Yen in the inter-bank market.  RBS did not provide any guidance or controls over what constituted appropriate communications between the derivatives traders and money market traders in charge of Yen-LIBOR submissions.  The result was an environment where the RBS Yen traders were able to seize opportunities to manipulate Yen-LIBOR for RBS' and their individual financial benefit.

292.    RBS' Yen-LIBOR-based derivatives traders quickly took advantage of this new arrangement.  RBS' Yen-LIBOR-based derivatives traders routinely told the Primary Submitter their trading positions and pushed him to make artificial Yen-LIBOR submissions that would make their Yen-LIBOR-based derivatives positions more profitable.  If the Primary Submitter was not at the desk, the traders made written demands to submit artificial Yen-LIBOR via Bloomberg chats or instant messages.

293.    Substitute submitters also ensured that the Yen-LIBOR submissions were beneficial either to the Yen-LIBOR-based derivatives positions held by other RBS traders, or Yen-LIBOR-based derivatives positions held in RBS' Yen money market trading book.

294.    STM was in place formally until mid-2008 and continued informally for Yen traders into 2009.  In the spring of 2009, the trading floor was reorganized, and the derivatives traders and submitters were separated onto different desks.  The seating change did not reduce the amount of manipulative conduct at RBS.  When they were no longer in close proximity to RBS' Yen-LIBOR submitters, RBS' Yen-LIBOR-based derivatives traders increased their use of Bloomberg chats and instant messages to continue demanding artificial Yen-LIBOR submissions that benefitted their Yen-LIBOR-based derivatives positions, which were frequently accommodated.

### iii.    Rabobank.

295.    From mid-2005 through early 2011, Rabobank failed to recognize and address conflicts of interest, and failed to adequately supervise its derivatives traders and submitters.  Further, Rabobank did not have any policies, internal controls or procedures for determining, monitoring or supervising its Yen-LIBOR submissions to ensure that Rabobank's submissions reflected an honest assessment of the costs of borrowing unsecured funds in the interbank market.

296.    Rabobank assigned responsibility for making its LIBOR submissions to individuals who traded both cash and derivatives products.  In 2004, Rabobank combined its money market desks (which were responsible for cash trading) with its short-term derivatives trading desk.  These traders regularly transacted in interbank cash deposits and loans to meet the bank's daily funding needs in all currencies, including Yen, and in Yen-LIBOR-based derivatives products, including interest rate swaps, forward rate agreements, foreign exchange forwards, cross-currency swaps, overnight index swaps, and tenor basis swaps.  The traders engaged in derivatives transactions not only to hedge risk, but also to generate profits for Rabobank and themselves.  Yen-LIBOR submissions, by definition, should reflect only the costs

of borrowing in the relevant markets, and not derivatives trading positions.  By assigning the Yen-LIBOR submissions to derivative traders whose profits depended upon the fixings of Yen-LIBOR, Rabobank created an inherent conflict of interest.

297.    This conflict of interest was heightened by the fact that Rabobank had its LIBOR submitters sitting next to and working with the other derivatives traders on trading desks.  One dominant derivatives trader simply shouted his requests across the desk to the submitters.

298.    Even Rabobank managers and at least one senior manager expected the traders and submitters to communicate their individual trading positions.  A senior manager in London ("Senior Manager 1"), who was Rabobank's representative to the BBA, oversaw cash and derivatives traders, including the traders responsible for Rabobank's Yen-LIBOR submissions. A former LIBOR submitter himself, Senior Manager 1 encouraged communication among the traders and submitters, and even instructed one Yen-LIBOR submitter to contact derivatives traders in another office to obtain the rates to submit each day.  Traders, submitters and Rabobank Senior Manager 1 openly discussed individual trading positions across the trading desks, and also utilized Bloomberg chat and email to provide each other with instant and continuous written communication about such positions.  This free flow of information and the encouragement of managers ensured that submitters would improperly make Yen-LIBOR submissions beneficial to Rabobank traders' derivatives trading positions.

299.    Because of the submitters' dual role as submitters and traders, and the open communication policy promoted by senior managers, which encouraged the sharing of information about trading positions, several submitters routinely used their own and other traders' Yen-LIBOR-based derivatives trading positions when determining their Yen-LIBOR submissions and thereby skewed their Yen-LIBOR submissions to manipulate Yen-LIBOR.  In

addition, certain submitters and traders coordinated, at times, with inter-dealer brokers employed by the Broker Defendants and traders from at least two other Contributor Bank Defendants or Co-conspirators to manipulate Yen-LIBOR.

300.    By failing to separate responsibilities for Yen-LIBOR submissions from its trading functions, Rabobank created an inherent conflict of interest that incentivized submitters to prioritize profit over their responsibility to make accurate Yen-LIBOR submissions that reflected Rabobank's cost of borrowing Yen in the inter-bank market.  Rabobank created, and its Yen-LIBOR-based derivatives traders took full advantage of, an environment that yielded unfettered opportunities to manipulate Yen-LIBOR submissions to financially benefit their Yen-LIBOR-based derivatives positions.  This is exemplified by the widespread nature of Rabobank's manipulative conduct, which involved over two dozen traders, including desk managers, and the knowing involvement of at least one senior manager.

301.    In April 2010, Rabobank received the CFTC's request to conduct an internal investigation of its U.S. Dollar LIBOR practices.  During this investigation, a Rabobank senior manager informed submitters that it was inappropriate for derivatives traders to provide the rates to submit for Yen-LIBOR.  Despite an admonishment resulting from the internal investigation, Rabobank failed to improve its internal controls or monitor its traders.  Rabobank traders continued their manipulation of Yen-LIBOR through the use of brokers into early 2011.

302.    Rabobank's failure to provide internal controls to address benchmark interest rate submissions, allowance of inappropriate communications between traders and Rabobank's submitters, and financial incentives to manipulate the rates amplified the pattern of misconduct, which continued for a number of years.

303.     At the Allen/Conti criminal trial, Rabobank's traders and submitters testified that this seating structure permitted them to make undocumented requests for false Yen-LIBOR submissions.  Lee Bruce Stewart, a former Rabobank trader who pled guilty to conspiracy to commit wire fraud and bank fraud in this District, testified that "the vast majority" of requests for false submissions were made in person or verbally, not in writing:

> Government [Young]: Can you tell us of the times that you made LIBOR requests, what portion of your requests were in writing and what portion of your requests were in in person or verbally?
>
> Rabobank [Stewart]: The majority would be done in just over the desk, so not in writing.
>
> Government [Young]: Could you tell us how big of a majority, a percentage maybe or a portion?
>
> Rabobank [Stewart]: The vast majority[111]

304.     Takayuki Yagami was a Yen derivatives trader at Rabobank.  During the Allen/Conti Trial, Yagami testified that as time went on, he started to actively conceal his requests for false Yen-LIBOR submissions by using the telephone to avoid making requests in writing:

> Rabobank [Yagami]:  The telephone call, we are talking about – the main reason I wanted to find out who was responsible for setting LIBORs was I wanted to know whether I can still request the yen LIBORs based on my positions. But I knew by then that I cannot ask or cannot write an email – I knew by then that I was – I should be more careful about being subtle, so I did not write e-mail to ask Mr. Tony Conti whether I can still keep requesting LIBORs based on our positions.
>
> ***
>
> Government [Slipperly]: When Mr. Conti says, so if it suits you for us to go a bit higher or a bit lower, I am sure that is not a problem at all. What did you understand him to be telling you?

---

[111] *United States v. Allen*, 14-cr-272, Transcript of Trial at 246-47 (Oct 19, 2015).

> <u>Rabobank [Yagami]</u>: I understood that if I have preferences beyond LIBOR submissions, higher or lower, I can still request the setter to do so.  And it is not a problem, not a problem.[112]

### iv.   **Lloyds**

305.    Lloyds assigned its money market traders to submit the bank's LIBOR submissions.  These traders were charged with raising wholesale funds for Lloyds in various currencies.  These traders also traded LIBOR-based derivatives, including Yen-LIBOR-based derivatives that were priced, benchmarked and/or settled based on Yen-LIBOR.

306.    Throughout the Class Period, and up until March 2011, Lloyds did not have any internal controls governing procedures for making Yen-LIBOR submissions.  Lloyds did not (1) undertake any efforts to review the integrity of its Yen-LIBOR submission process; (2) put in place any systems or policies detailing the proper process for submitting Yen-LIBOR submissions; (3) provide any training to its submitters on appropriate and inappropriate information to consider when making LIBOR submissions; and (4) monitor its own submissions.

307.    Lloyds linked its trader-submitter bonuses in part to the profit and loss of its Money Markets Desk.  The profits and losses of the Money Market Desk were impacted by LIBOR, including Yen-LIBOR, as LIBOR was used for reference rates in large new cash transactions, and where LIBOR was fixed determined the profitability of the cash transactions.  Further, LIBOR also affected the traders' management of existing borrowing and lending facilities.  In sum, traders could greatly improve the desk's profitability (and thus improve their bonuses) by manipulating LIBOR, including Yen-LIBOR, to financially benefit these transactions.  Lloyds failed to develop procedures that would prevent its trader-submitters from

---

[112] *United States v. Allen*, 14-cr-272, Transcript of Trial at 694-95 (Oct. 22, 2015).

taking into account their money market trading positions in setting Lloyds' Yen-LIBOR submissions.

308.    Lloyds' failure to implement controls and account for the risks involved with its traders setting Yen-LIBOR led to pervasive manipulation of Yen-LIBOR by Lloyds, including collusion with Rabobank to set Yen-LIBOR to benefit the banks' trading positions at the expense of Plaintiffs and the Class.

### v.    Deutsche Bank

309.    Deutsche Bank did not have any LIBOR-specific systems and controls in place governing its LIBOR submissions throughout the Class Period.  It did not keep records of which employees made its Yen-LIBOR  submissions, or of the rationale behind those submissions, nor did it train its employees regarding how to make submissions.[113]  Instead, Deutsche Bank promoted a company culture of increasing profits without concern for the overall integrity of the market, including awarding bonuses and promoting employees based on the profits and losses of their trading books.[114]  For example, two LIBOR traders, Christian Bittar and Carl Maine, generated extraordinary profits for Deutsche Bank.  Senior management, including Anshu Jain, the future co-CEO of Deutsche Bank, regarded them as "the best people on the street" and "the best guys [Deutsche Bank's] got."  As a result, Bittar, the "guaranteed money maker," and Maine were generously compensated, receiving a combined €130 million bonus based on their 2008 performances alone.

310.    Starting in 2006, to increase Deutsche Bank's profits, Anshu Jain (then, the Global Head of Global Markets) and Alan Cloete (the Global Head of Global Financial and

---

[113] Ex. I-5 at 14.

[114] Id.

Foreign Exchange Forwards) merged the bank's pool trading and money market derivatives ("MMD") desks, creating the Global Financial and Foreign Exchange Forwards ("GFFX") desk. Deutsche Bank's GFFX desks operated in various offices around the world, including within the United States from Deutsche Bank New York Branch.[115] The sole purpose of creating this seating structure was to make it easier for Deutsche Bank's traders and submitters to communicate regularly so that its LIBOR submitters, including Yen-LIBOR, would be aware of the false rates they needed to submit to financially benefit each of the bank's trading positions.[116] This seating strategy, while inherently creating a conflict of interest, proved incredibly profitable for Deutsche Bank, with its MMD desk alone generating €1.9 billion in 2008 and €2.9 billion in 2009.[117]

311. Upon creating the GFFX desk, Deutsche Bank also implemented a new trading strategy, focused on the "spread" or difference between certain LIBOR tenors, including Yen-LIBOR. Deutsche Bank's traders capitalized on the relationship between tenors by entering into "massive derivatives basis trading positions" which increased in value as they manipulated the spread between tenors wider.

312. Deutsche Bank educated its traders and submitters to ensure that this plan was well known and utilized across currency desks, including those that traded Yen-LIBOR-based derivatives. David Nicholls, the Head of Global Finance Europe and other senior traders from Deutsche Bank's London, New York, Tokyo, and Frankfurt GFFX desks held weekly meetings, termed "Monday Risk Calls," where they openly discussed the use of this trading strategy so that everyone involved understood the plan. As a result, the CFTC found that Deutsche Bank's

---

[115] Ex. I-1 at 8; Ex. I-6 at 13, 17, 22.

[116] Ex. I-6 at 5.

[117] *Id.* at 6.

LIBOR submitters, including those who made Deutsche Bank's Yen-LIBOR submissions, routinely built this spread "bias" into Deutsche Bank's LIBOR submissions, manipulating the spread between different tenors of LIBOR wider, even in the absence of written communications from traders requesting a specific false rate.

313.    Deutsche Bank admitted in its NYSDFS Consent Order that "Deutsche Bank AG and the New York Branch manipulated or attempted to manipulate submissions for the London Interbank Offered Rate ("LIBOR"), . . . which [is a] benchmark interest rate[] used in financial markets around the world, by, at times, submitting rates that would benefit Deutsche Bank's trading positions, rather than rates that complied with the definitions of the rates[.]"[118] Deutsche Bank employed trader Tim Prentice at its New York branch.  Prentice conspired with R.P. Martin's Lee Aaron to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives that Prentice traded in the United States.

314.    Deutsche Bank AG's manager, David Nicolls, held telephone calls each week, where Deutsche Bank's traders, including those located on its New York-based derivatives trading desk, discussed their trading strategy and trading positions, including their Yen-LIBOR submissions and Yen-LIBOR-based derivatives positions.[119]  DB Group Services employed all of Deutsche Bank's London-based pool and MMD traders, who also participated on the phone calls and conspired with Deutsche Bank's New York Branch.[120]  These Monday Risk Calls continued throughout the Class Period and were one of multiple means by which Deutsche Bank and DB Group Services fixed and manipulated Yen-LIBOR.

---

[118] Ex. I-5 at 1.

[119] Ex. F-6 at 9.

[120] Ex. I-1 at 27.

315.    Deutsche Bank further facilitated its employees' LIBOR manipulation by assigning a single employee with the responsibilities of making Deutsche Bank's Yen-LIBOR submissions and trading Yen-LIBOR-based derivatives, which created an inherent conflict of interest.[121]  From 2008 through 2009, a senior Yen trader, Guillaume Adolph, referred to as "Trader-11" in Deutsche Bank's and DB Group Services' DOJ settlements and "Senior Yen Trader-Submitter" in Deutsche Bank's CFTC settlement, made Deutsche Bank's Yen-LIBOR submissions and traded Yen-LIBOR-based derivative products.[122]  Prior to Adolph, two DB Group Services employees, Submitter-2 and Submitter-3, were responsible for making Deutsche Bank's Yen-LIBOR submissions and trading Yen-LIBOR-based derivative products from 2006 through 2007.[123]

316.    This and other conflicts of interest went unnoticed as Deutsche Bank did not have a formal policy about conflicts of interest among traders and submitters relating to its benchmark submissions until February 2013, almost three years after government regulators began their probe into Deutsche Bank's LIBOR-related misconduct.[124]  By merging the responsibility of trading Yen-LIBOR-based derivatives and making Yen-LIBOR submissions into the same desk (and sometimes even the same person), Deutsche Bank intentionally created an environment that provided significant opportunities and incentives to manipulate Yen-LIBOR.

### vi.    Société Générale

317.    Throughout the Class Period, Société Générale did not have policies, internal controls, or procedures for determining or monitoring its Yen-LIBOR submissions to ensure that

---

[121] Ex. I-3 at 11.

[122] Ex. I-1 at 47.

[123] *See* Ex. I-4 at 27 (DB Group Services employed all of Deutsche Bank's London-based traders).

[124] Ex. I-2 at 4.

submissions were made based on an assessment of its costs of borrowing unsecured funds in the interbank market.

318.    Société Générale failed to: (1) provide internal training or establish standards for its Yen-LIBOR submissions; (2) prohibit inappropriate communications between its traders and submitters; and (3) recognize and monitor conflicts of interest.  These shortcomings created a culture of misconduct at Société Générale and allowed such misconduct to continue for years.

319.    Société Générale's Treasury Desk located in London ("London Treasury Desk") made its Yen-LIBOR submissions. The London Treasury Desk included money market traders who dealt in borrowing and lending transactions, and also engaged in trading of Yen-LIBOR-based derivatives.  Certain members of the London Treasury Desk were responsible for making Société Générale's Yen-LIBOR submissions. Utilizing the same individuals who had Yen-LIBOR-based derivatives positions that were tied to Yen-LIBOR to also calculate the bank's Yen-LIBOR submissions created an inherent conflict of interest.  This conflict of interest led the London Treasury Desk employees to prioritize financially benefiting their trading book from Société Générale's Yen-LIBOR submissions rather than submitting proper Yen-LIBOR submissions on behalf of the bank. These employees established Yen-LIBOR-based derivatives positions in the United States.

320.    Société Générale's submitters and substitute submitters also accounted for other derivatives traders' Yen-LIBOR-based derivatives positions when making Yen-LIBOR submissions.  This directive came from the top, as evidenced by an August 31, 2006 communication between Société Générale's Senior Yen Derivatives Trader and its Head of Treasury for Europe and Asia:

> Senior Yen Derivatives Trader: say, who is replacing [Yen-LIBOR Submitter]?? Can you tell him to put the 3m JPY LIBOR as high as possible, and the 6m as low as

possible and to really go to battle, there is 400b on the two fixings…they're already going to cost us a lot.

Head of Treasury for Europe and Asia: [Back-up Yen-LIBOR Submitter], he knows what is going on.[125]

321.    Société Générale's failure to implement controls to account for the risks of Yen-LIBOR submissions made by the London Treasury Desk led to pervasive manipulation of Yen-LIBOR by Société Générale, including collusion with UBS to benefit the banks' trading positions at the expense of the Class.

      2.    Defendants Lacked Internal Controls to Oversee Their Involvement in the Yen-LIBOR Submission Process and To Monitor Their Communications With Other Banks and Brokers.

### a.  ICAP.

322.    During the Class Period, ICAP failed to implement adequate internal controls and procedures to govern its Yen brokers' communications and interactions with clients and prospective clients.  Nor did it adequately supervise and oversee its Yen brokers and the Yen and Cash Desks.

323.    ICAP used a regional-based system of policies, procedures, and controls that applied to all ICAP plc subsidiaries during the Class Period.  Further, ICAP did not have its own chief compliance officer.  A single person served as the dedicated chief compliance officer for all ICAP plc subsidiaries, including ICAP.  This system of compliance failed to detect and deter the wrongful conduct of the ICAP brokers.

324.    ICAP's regional compliance system lacked internal controls, policies and procedures to guide and monitor Yen brokers in their communications with clients, or the

---

[125] Ex. J-1 at 46.

provision of market information to clients and other Contributor Panel banks. Furthermore, ICAP did not have procedures for approving the dissemination of market information, or for verifying the basis for the market information being disseminated by ICAP brokers.

325.    ICAP's Yen and Cash Desks were inadequately supervised. The Yen brokers, including the "ICAP Yen Desk Head," Danny Wilkinson, worked with little to no supervision from senior ICAP management. Goodman, the only Yen cash broker at ICAP, operated independently with little to no supervision from the head of the Cash Desk. Likewise, ICAP left compliance oversight to the Yen and Cash Desk Heads who were expected to report any suspicious conduct to ICAP's compliance officer. This system of compliance and supervision was of course all but useless as the Yen Desk Head Wilkinson was an active participant in the misconduct taking place on the Yen Desk.

326.    These compliance flaws were exacerbated by the fact that the Yen Desk was not perceived as a potential compliance risk, and was not subjected to any compliance reviews or audits during the Class Period. Because there were no audits of the Yen Desk for more than four years, ICAP did not discover that: (1) former UBS and Citibank Senior Yen Trader Hayes was "Derivatives Broker 1," Darrell Read's, exclusive client and a significant source of revenue for the ICAP Yen Desk; (2) the ICAP Yen brokers regularly engaged in the manipulation of Yen-LIBOR on behalf of former UBS and Citibank Senior Yen Trader Hayes; and (3) ICAP successfully negotiated a special bonus from UBS to pay Goodman for "LIBOR services" which were in fact services to disseminate false market information intended to benefit the Yen-LIBOR-based derivatives positions of UBS Senior Yen Trader Hayes.

327.    ICAP's failure to provide specific internal controls and procedures to determine permissible market information to be provided by its Yen brokers to clients and others, and the

overall lack of supervision of the Yen and Cash Desks, allowed the misconduct to continue
unabated throughout the Class Period.

### b. R.P. Martin.

328.    R.P. Martin failed to establish an adequate compliance function, failed to
adequately supervise and oversee its Yen brokers and the Yen Desk, and failed to implement
adequate internal controls and procedures to govern its Yen brokers' communications and
interactions with clients and prospective clients.

329.    Prior to February 2010, R.P. Martin did not have a compliance office or
compliance department.  Instead, R.P. Martin assigned employees from other departments to
handle compliance issues on a part-time basis.  For example, R.P. Martin's head of compliance
consisted of an inexperienced officer who had other responsibilities that were in conflict with his
compliance duties.

330.    R.P. Martin also failed to ensure that staff were adequately trained and
supervised.  Staff received little to no compliance training.  Further, Desk Heads were given little
instruction regarding their roles and responsibilities in supervising the brokers on their desks.
Instead, brokers routinely raised concerns and issues directly with senior management, who had
earned the reputation of prioritizing the happiness of profitable brokers over ensuring a
compliant environment.  Senior Management dealt with broker complaints as they arose, rather
than ensuring proactive supervision of brokers and desk heads.  R.P. Martin's currency desks,
including the Yen Desk, were inadequately supervised.  The Yen brokers, including the Yen
Desk Head Terry Farr, worked with minimal supervision from senior management.

331.    As part of this insufficient system of compliance, R.P. Martin did not have
adequate internal controls, policies, and procedures to guide and monitor Yen brokers in their

communications with clients, or the provision of market information or market color, or for verification of the basis for the market information being disseminated by R.P. Martin brokers. Accordingly, although the improper communications between former UBS and Citibank Senior Yen Trader Hayes, and R.P. Martin Yen brokers were well-known by most, if not all, of the brokers on the Yen Desk, no one informed compliance or senior management that such improper conversations were taking place.

332.    R.P. Martin's lackadaisical attitude toward compliance was evident when the company became aware of UBS' improper broker compensation activity.  The R.P. Martin manager who monitored back-office brokerage activity on a daily basis immediately noticed an unusually large amount of commissions generated from "wash trades," in which the same financial instrument was purchased and sold, occurring between UBS and RBS.  However, when he questioned the Yen Desk about these trades, at least one Yen broker said to him, "You really don't want to know."  The R.P. Martin manager discussed the wash trades with at least one member of R.P. Martin senior management but the discussion did not generate any action, and no one at R.P. Martin further investigated why RBS and UBS had agreed to generate unusually large wash trade commissions for the R.P. Martin Yen Desk.

333.    R.P. Martin's lack of specific internal controls and procedures related to external communications, such as what market information Yen brokers can appropriately send to their clients as well as its overall failure to supervise the Yen Desk, allowed the misconduct to continue unabated.

### c.  Deutsche Bank

334.    Starting in August of 2007, Deutsche Bank's MMD desk's profits skyrocketed. MMD revenue alone more than quadrupled, increasing from €399 million in 2007 to over €1.9

billion, or roughly 14% of the bank's *total* revenue, in 2008.[126]  Despite this giant red flag,

Deutsche Bank's management did not order an internal investigation for well over a year.  When

Deutsche Bank's Global Head of Global Markets, Anshu Jain, finally launched an investigation

in January of 2009, he requested that William Broeksmit, the Head of Capital and Risk-

Optimization, look at whether the MMD desk's profits were real or caused by false valuations or

internal transactions (the "Broeksmit Investigation").  The Broeksmit Investigation was not

intended to uncover the source of these abnormally large profits, *i.e.*, Deutsche Bank's pervasive

LIBOR manipulation, but rather only inquired into whether the money represented by these

profits actually existed.  Because of the limited nature of the Broeksmit Investigation, Deutsche

Bank continued to profit from its LIBOR manipulation.

335.    In another 2009 investigation, Deutsche Bank's Co-Chief Operating Officer in

Global Markets, Henry Ritchottes, requested that the Business Integrity Review Group ("BIRG")

conduct a review into whether Deutsche Bank's profits were a fraud (the "BIRG Review").

Deutsche Bank assigned only one person, Mr. Mulcany, with the task of reviewing a tremendous

amount of documents (over 800,000).  Many of these documents were written in French, a

language that Mr. Mulcany did not speak.[127]  The BIRG Review further failed because it used an

incomplete list of search terms, failed to detect many of the important later-discovered

communications, and lacked any independence as Mr. Cloete, the head of the very division that

was being investigated, was allowed to make changes to the report before it was passed off.[128]

On November 30, 2009, Mr. Cloete further compromised the BIRG Report, making "the

situation appear better" by removing all compliance-related topics before it was presented to the

---

[126] *Id.* at 9 n.16.

[127] Ex. I-6 at 21

[128] *Id.* at 10.

109

Management Board, ensuring that Deutsche Bank would not implement any measures to restrict the GFFX desk's profits.[129]

336.    Both of these investigations were inadequate responses to the major red flags that Deutsche Bank's LIBOR-submission process raised.  As a result, Deutsche Bank's traders and submitters continued to manipulate Yen-LIBOR without any consequences.

### d.  UBS

337.    UBS also did not have any systems or controls in place to monitor its LIBOR submission process, which permitted its traders and submitters to manipulate LIBOR.[130]  When UBS' Compliance department launched an internal review of its LIBOR submission processes and procedures (the "2008 Review"),[131] it chose to limit its 2008 Review solely to U.S. Dollar LIBOR, ignoring the likely possibility that its traders and submitters, whom management placed next to each other on the STIR desk, were involved in manipulating LIBOR for multiple currencies, a reality confirmed by UBS' guilty plea to wire fraud in connection with its LIBOR-related misconduct.[132]

338.    To ensure the 2008 Review did not uncover LIBOR-related misconduct, UBS' Compliance department placed one of its own LIBOR submitters in charge.  This created a direct conflict of interest, giving the submitter an opportunity to conceal any misconduct that might get him or his co-workers in trouble.  For example, the LIBOR submitter selected to lead the 2008 Review had himself received at least one request for a false LIBOR submission during the

---

[129] *Id.* at 21, 24.

[130] Ex. A-1 at 34.

[131] *Id.* at 27.

[132] *United States v. UBS AG*, Plea Agreement, No. 15-cv-76, ECF No. 6, at 1.

relevant period.[133]  Proof that the 2008 Review was a sham, the LIBOR submitter found nothing

wrong with UBS' USD LIBOR submission process even though he had direct knowledge that

UBS' traders were manipulating LIBOR.[134]  UBS' Compliance department naïvely terminated its

limited inquiry into the LIBOR submitting process at the bank, permitting UBS' LIBOR

manipulation to continue without consequence.

339.    To give the appearance that UBS was making a serious effort to end LIBOR-

related misconduct, Compliance decided in August 2008 that it was finally time to draft formal

procedures and guidelines (the "2008 Guidelines") for UBS' LIBOR submission process.  The

2008 guidelines, like the 2008 Review, were also a sham and never actually circulated to UBS'

employees.  UBS' Compliance department only drafted them as a protective measure, in the

event they were ever questioned about what procedures they had in place.[135]  The 2008

Guidelines were illusory, and neglected to address key failures within the bank's LIBOR

submission process: the inherent conflicts of interest (*e.g.,* assigning trading and submitting

responsibilities to the same individual at the STIR desk) and lack of training for LIBOR

submitters on how to properly calculate UBS' daily LIBOR submission.

340.    The 2008 Guidelines also created an "exception reporting regime" intended to

give the appearance that UBS actively monitored its LIBOR submissions for false reporting.

Under this new system, compliance was to make weekly comparisons of UBS' LIBOR

submissions to UBS' actual cost of borrowing and/or the published LIBOR for the day.  Large

differences would be considered "exceptions" and flagged for further review.  While this

sounded reasonable, compliance configured the exception reporting regime to only be triggered

---

[133] Ex. A-3 at 28.

[134] See, e.g., id.

[135] *Id.* at 29-30.

by extremely large differences between UBS' LIBOR submission and actual cost of borrowing, effectively neutering the system.  As a result, despite UBS' admitted false reporting in multiple LIBOR currencies throughout the Class Period, the exception reporting regime did not detect a single false LIBOR submission while it was in place.[136]

### e.  Société Générale

341.     During the Class Period, Société Générale failed to implement internal controls and procedures to govern its London Treasury Desk's communications and interactions regarding Yen-LIBOR submissions, which allowed its traders and submitters to manipulate Yen-LIBOR. For example, in a July 18, 2006 email, Trader-1, a Tokyo-based derivates trader for Société Générale, emailed Submitter-5, an employee on Société Générale's London Treasury Desk, and requested that Société Générale's one-month Yen-LIBOR submission be manipulated artificially lower to benefit Trader-1's Yen-LIBOR-based derivatives position. On July 19, 2006, Submitter-5 made a one-month Yen-LIBOR submission that was five basis points lower than Société Générale's submission on July 18, 2006.[137]

342.     Société Générale did not have any concern with its lack of controls until the BBA asked it to provide an attestation as to the adequacy of the systems and controls overseeing their LIBOR submission process.  This attestation required Société Générale to provide assurances from management about the integrity and accuracy of its LIBOR submissions.

> <u>Head of London Treasury</u>: [ . . . ] an ongoing issue is that letter from the [market regulator . . . ]they actually talk about [ . . . ] Libor submissions [ . . . ] in terms of the definitions [ . . . ] tread very carefully because the [market regulator] can come in and look at our books. [ . . . ] they're just asking that the senior management are comfortable with the processes and the systems and controls [ . . . and that] our Libor basic submission[s . . . ] are [ . . . ] reflective of our funding conditions[ . . . ].

---

[136] *Id.* at 29.

[137] Ex. J-2, at A-56-57.

> Head of Treasury for Europe and Asia: [ . . . ] The point is we do not contribute our
> real funding. So, what do you want? [ . . . ] The issue now is that there is more scrutiny
> from the [market regulator . . .] And we [will] put that to [the Head of SCIB, the Head
> of U.K. Group Compliance, and the Group Head for the U.K. ][138]

343.    Despite his concerns, Société Générale's Head of London Treasury was pressured by management in Société Générale's London office into signing the BBA's attestation which guaranteed the integrity of Société Générale's LIBOR submissions and its LIBOR submission process.[139]

344.    After it received requests for information from the CFTC in 2011, early in 2012, Société Générale conducted an internal audit of its LIBOR submission process in London for 2011. Despite conducting the internal audit, Société Générale failed to identify both glaring improprieties with its LIBOR submission process and inconsistencies with its LIBOR submissions and its costs of funding. The March 2012 internal audit report offered the perfunctory conclusion that Société Générale's LIBOR submissions were consistent with the BBA guidelines. Société Générale conducted the internal audit to create the appearance that it performed a fulsome review of its LIBOR submissions and related procedures.[140]  This is a typical example of Société Générale's facilitation of LIBOR manipulation and its failure to maintain integrity in its LIBOR submission process, prior to its cooperation with the CFTC in its investigation.

---

[138] Ex. J-1 at 27.

[139] *Id.* at 27 n. 17.

[140] Ex. J-1 at 47.

3.  The Contributor Banks and Co-conspirators and Broker Defendants' Yen Desk Managers Were Active Participants in the Pervasive and Persistent Manipulation of Yen-LIBOR and Yen-LIBOR-based derivatives Prices by Their Traders, Submitters and Brokers

a.  **UBS.**

345.    UBS managers and senior managers were aware of the manipulation of Yen-LIBOR and Yen-LIBOR-based derivatives prices by their derivatives traders.  For example, former Senior Yen Trader Hayes' manager knew, at least as early as 2007, that internal pressure was placed on UBS' Yen-LIBOR submitters, to contribute submissions to financially benefit the Yen trading book.  Further, certain Zurich-based managers and more senior managers heading the derivatives desks in all currencies were informed of the pressure the Yen trading desk placed on the Yen-LIBOR submitters to contribute submissions that would benefit UBS and their traders' Yen-LIBOR-based derivatives positions.

346.    For example, the FCA determined (a) at least four UBS Managers were directly involved in making requests for false submissions to UBS' Yen-LIBOR submitters; (b) at least three other Managers and least four Senior Managers were aware that requests for false Yen-LIBOR submissions UBS traders were making; (d) at least one Manager was directly involved in making requests for manipulative conduct to Broker Defendants; (e) at least one other Manager was aware that UBS was making requests for manipulative conduct to Broker Defendants; (f) at least three Managers were aware that requests for false Yen-LIBOR submissions were made to other Contributor Bank Defendants; and (g) at least one Senior Manager was aware that requests for false Yen-LIBOR misconduct with other Contributor Bank Defendants and Co-conspirators. In total, requests to manipulate Yen-LIBOR directly involved approximately 40 individuals at UBS, 11 of whom were managers.  Furthermore, the practice of submitting false Yen-LIBOR

submissions to benefit Yen-LIBOR-based trading positions was often openly discussed between certain individuals in open chat forums and in group emails, which included at least 70 individuals at UBS.

347.    UBS managers were also on notice of UBS Senior Yen Trader Hayes' communications with his counterpart traders and Yen-LIBOR submitters at other Contributor Panel Banks about obtaining favorable and artificial Yen-LIBOR submissions to benefit his Yen-LIBOR-based derivatives positions.  In a July 3, 2009 email, a UBS  manager, in an attempt to keep Hayes from leaving for another bank, lobbied other UBS managers to award a sizable bonus to Hayes.  In the email, Hayes' manager listed some of his attributes, such as "strong connections with Libor setters in London.  This information is invaluable for the derivatives books."  This email was sent to a senior manager of the Investment Bank in Zurich, who forwarded it to derivatives desk managers, asking for their input.  One manager replied:

> [Hayes] does also know some of the traders at other banks (from his
> London days) but personally I find it embarrassing when he calls up
> his mates to ask for favours on high/low fixings . . . it makes UBS
> appear to manipulate others to suit our position; **what's the legal
> risk of UBS asking others to move their fixing?**

348.    Despite these communications to UBS managers and senior managers, no one at UBS disciplined or even reprimanded Hayes, and no one referred the matter to compliance. Hayes continued working as a derivatives trader at UBS until he left following a compensation dispute in September 2009 to work for co-conspirator Citibank Japan.

349.    The majority of UBS Yen-LIBOR submitters, Yen derivatives traders, and their supervisors, as well as the more senior managers at UBS who were aware of this conduct, knew that making false Yen-LIBOR submissions was inappropriate, yet continued to encourage, allow, and participate in this conduct.  For example, Hayes' manager, a senior manager in the

Investment Bank, the primary Yen-LIBOR submitters, and other derivatives traders knew it was contrary to the definition of Yen-LIBOR to consider derivative trading positions in making their Yen-LIBOR submissions. On October 9, 2008, "Submitter-1" Roger Darin complained to several other managers that: "one of the things we signed up for when UBS agreed to join the fixing panel was the condition that fixing contributions shall be made regardless of trading positions."

350.    As an active participant in the manipulation of Yen-LIBOR, a UBS derivatives desk manager sought to obstruct the investigation of the LIBOR manipulation. For example, in December 2010, Submitter-4, the UBS derivatives desk manager who supervised Rolf Keiser ("Submitter-2") in 2009, instructed Keiser to lie to UBS attorneys during the investigation. Among other things, the UBS manager instructed Keiser to (a) falsely claim that the UBS Yen trading desks did not have any derivative positions with exposure to Yen-LIBOR; (b) avoid mentioning Hayes; (c) falsely indicate that the Yen-LIBOR submission process did not take into account trading positions; (d) falsely claim that they never moved the Yen-LIBOR submissions to benefit the Yen trading desks; (e) falsely claim that when contributing Yen-LIBOR submissions, UBS tried to be "as close to the market as possible."

### b. RBS.

351.    At least two RBS managers were aware of significant conflicts of interest with derivatives traders acting as backup Yen-LIBOR submitters. Moreover, one of these managers was aware of, and at times participated in, the manipulation of the RBS Yen-LIBOR submissions by derivatives traders.

352.    For example, on August 22, 2007, Manager-l (employed by Defendant RBS Japan at this time) Jezri Mohideen became aware that "Trader-2," Neil Danziger, who acted as a

backup Yen-LIBOR submitter that day, made RBS' submission for his own benefit. Mohideen asked, "Hi Mate, where are u calling the 6m and 3s Libor today?" Danziger responded, "i put in 1.05 and 1.15." Mohideen said "ok cool. . . is that close to consensus?" to which Danziger responded, "i think my 3s are too high . . . 6s will prob be 1.13 too . . . but i wanted high fixes today." Later, Danziger asked, "well let me know if you have any preferencves . . . each day." Jezri Mohideen responded, "thx will do."

353.    In an electronic chat on December 3, 2007, Jezri Mohideen communicated his own requests for the direction of Yen-LIBOR to "Trader-3," Will Hall, with whom he shared a Yen trading book. Mohideen said to Hall, "for choice we want lower libors... let the MM [money market] guys know pls." Hall responded that he was serving as the submitter that day "as [Trader-2] and cash guy off." Mohideen then said "great. . . set it nice and low." Hall suggested 1.02 "or lower" for the six-month Yen-LIBOR submission, to which Mohideen responded, "yeh lower." Hall indicated that he could go down one more basis point to 1.01, which he did - making RBS the lowest of all Contributor Panel Banks whose Yen-LIBOR submissions were counted in that day's fixing.

### c.    Rabobank.

354.    Rabobank "Submitter-3" as identified in the Rabobank DOJ SOF, was Rabobank's Global Head of Liquidity and Finance, Anthony Allen. Anthony Allen was the head of Rabobank's money market desk in London, directly supervising other Rabobank Yen-LIBOR Submitters. Anthony Allen knew that requests were made to Rabobank's Yen-LIBOR submitters to contribute false submissions to benefit swaps traders' trading books, and he not only tolerated such activity, but directly participated in it.

355.    Rabobank "Trader-9" later replaced Anthony Allen as the Global Head of Liquidity and Finance, previously having served as the Head of Liquidity and Finance for Europe.  Trader-9 was the head of Rabobank's money market desk in Utrecht, directly supervising other Rabobank LIBOR Submitters.  Trader-9 was informed that Rabobank "Trader-5," Takayuki Yagami, would forward requests to the submitters under Trader-9's supervision, but Trader-9 did not act to stop such conduct.  Further, many of the submitters under Trader-9's supervision were not trained to calculate LIBOR submissions, which increased the ability for traders to exert substantial influence on the submitters and for Yagami to take over the Yen-LIBOR setting process.

356.    In addition, Rabobank's "Trader-6," Tetsuya Motomura, was the head of Global Financial Markets Trading for Tokyo and, starting in October 2008, the head of Global Financial Markets for Tokyo.  Tetsuya Motomura directly supervised numerous Rabobank traders who made numerous requests to Rabobank's Yen-LIBOR submitters to financially benefit their trading books.  Tetsuya Motomura also made numerous requests to Rabobank's Yen-LIBOR submitters to benefit his own trading book, was aware of the fact that Takayuki Yagami made similar requests, and directed Takayuki Yagami to make requests on Tetsuya Motomura's behalf.

357.    Further, Rabobank's "Trader-4," Paul Thompson, was the Head of Money Markets and Derivatives Trading for Northeast Asia and the Head of Local Currency Trading for Asia Pacific, eventually being promoted to Head of Liquidity and Finance for Asia Pacific in November 2010.  Paul Thompson not only was aware of the fact that Takayuki Yagami made requests to Rabobank's Yen-LIBOR submitters to benefit his Yen-LIBOR-based derivatives trading book, but Paul Thompson previously made numerous such requests on his own behalf.

### d.  Lloyds.

358.     At least four managers at Lloyds were aware of Yen-LIBOR manipulation by its submitters, how the scheme functioned, and the profits the scheme would generate for the bank. In one example, on July 19, 2007, a Lloyds trader-submitter and a manager discussed a request from a Lloyds trader for a low Yen-LIBOR submission.  In relaying the request, the trader-submitter remarked that "every little helps . . . It's like Tescos," an ironic play on the slogan of the British multinational grocery and merchandise retailer known for providing a good value and taking care of its customers. Quite the opposite occurred here; Lloyds' profit-making scheme took advantage of the Yen-LIBOR manipulation to provide value to Lloyds at the expense of its customers and the public.  The Lloyds manager agreed with the trader-submitter's sentiments, replying "Absolutely every little helps."

### e.  Deutsche Bank

359.     Deutsche Bank's management went so far as to facilitate requests for false submissions by soliciting requests from its traders, passing them along to the submitters, and following-up to ensure that the favorable submissions were made.[141]  For example, in the following communication, the Tokyo Regional Manager reached out to a Deutsche Bank Yen-LIBOR submitter to inquire to whom he should direct his requests for false submissions, the right person was the Senior Yen LIBOR Submitter.  Another manager, Yen Desk Manager, had to pass along the request for high one-month and six-month Yen-LIBOR submissions because the Senior Yen LIBOR Submitter did not answer the Tokyo Regional Manager's phone call.

> **December 21, 2006**:
>
> Tokyo Regional Manager: are you doing libors today, esp JPY or is [Senior Yen LIBOR Submitter]?

---

[141] Ex. I-2 at 23.

> Junior Yen LIBOR Submitter: shld be [Yen Desk Manager] setting, let him know yr axes . . . i'll be inputting next week if need anything then mate
>
> Tokyo Regional Manager: [Senior Yen Trader-Tokyo] will BBG you next week if he needs anything .. cheers mate

Follow-up instant message to Yen Desk Manager the same day:

> Tokyo Regional Manager: is [Senior Yen LIBOR Submitter] in or are you doing JPY libors today?
>
> Yen Desk Manager: [Senior Yen LIBOR Submitter] is doing it
>
> Tokyo Regional Manager: he is not picking [Senior Yen Trader-Tokyo] up... could you ask him to go high in 1m and 6m?[142]

B.  Defendants and their Co-conspirators Successfully Manipulated Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives.

   1.  Through Their False Reporting of Yen-LIBOR, Among Other Unlawful Conduct, the Contributor Bank and Broker Defendants Successfully Manipulated Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives.

   a.  **UBS.**[143]

360.    Over a period of approximately six years, from at least January 2005 through at least June 2010, UBS Derivatives Traders and Trader-Submitters engaged in sustained, wide-ranging, and systematic efforts to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives to benefit UBS' trading positions.  This conduct encompassed, among other things, hundreds of instances in which UBS employees sought to influence benchmark rates.  During some periods, UBS employees engaged in this activity on nearly a daily basis.

361.    For example, the CFTC determined that UBS Derivatives Traders made approximately 2,000 written requests of UBS' trader-submitters, traders at other panel banks and

---

[142] *Id.* at 24.

[143] *See also* Ex. A-2 at 11-17.

inter-dealer brokers to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives. The written requests of the UBS Derivatives Traders occurred on approximately 570 trading/reporting days, mostly between late 2006 and late 2009, which is approximately 75% of the days UBS participated in the submissions.

362.    Former UBS Senior Yen Trader Hayes made at least 800 requests in writing, on UBS' email and chat systems, to the UBS trader-submitters for adjustments to UBS' Yen-LIBOR submissions.  Sometimes, Hayes made requests to benefit the trading positions of other UBS Yen Derivatives Traders on the desk, if it happened that Yen-LIBOR fixings would not impact his own positions.

363.    UBS' submission of false Yen-LIBOR to benefit UBS derivatives traders' positions began to occur far more frequently after July 2006, when UBS hired Hayes.  Beginning in September 2006, and continuing until soon before he left UBS in September 2009, Hayes, and occasionally other UBS Yen derivatives traders, regularly requested that UBS Yen-LIBOR submitters contribute Yen-LIBOR submissions to benefit their trading books.  Hayes and his colleagues engaged in this conduct on the majority of total trading days during this more-than-three-year period.

364.    UBS' Yen derivatives traders' requests typically were for the one-month, three-month, and six-month tenors for Yen-LIBOR.  The trader-submitters on many occasions acquiesced to those requests and made Yen-LIBOR submissions with the purpose of benefiting UBS' derivative trading positions.  The requests were made over UBS' email or chat networks and additional requests were made orally by traders who sat near to or spoke by telephone with trader-submitters, with traders at other banks or with brokers.  In addition, certain trader-

submitters based submissions at times on his or her own or the desk's trading positions, without consulting with anyone else.

365.     Multiple UBS traders and submitters, including Hayes' supervisor, were aware of Hayes' efforts to manipulate Yen-LIBOR through his internal requests to the submitters. UBS managers in Tokyo and Zurich also were aware of Hayes' requests.  The UBS managers encouraged and allowed Hayes to engage in his conduct, which ended only when he decided to leave UBS following a pay dispute.  No one involved in or aware of the misconduct reported it as wrongful to more senior management, or to UBS' compliance or legal departments.  On the contrary, some of these individuals, including Hayes' Yen Desk Manager in Tokyo, Mike Pieri, engaged in the same misconduct by making their own requests to UBS' Trader-Submitters for the manipulation of Yen-LIBOR or facilitating Hayes' requests.

366.     During his criminal trial, Hayes confirmed that his managers were fully aware of his manipulation, stating: "I acted with complete transparency to my employers. My managers knew, my manager's manager knew.  In some cases the CEO [chief executive] was aware of it[.]"[144]

367.     In making requests, Hayes at times identified the tenor and/or direction for which he sought assistance, using terms such as "low 1m" (indicating that he wanted a low submission for the Yen-LIBOR one-month tenor submission), "high 3m" (for the three-month Yen-LIBOR submission) or "unchanged."  The requests were so common that Hayes sometimes merely asked for the "usual axe on libors," meaning his typical requests.  Certain trader-submitters also understood that Hayes had a "standing order," meaning Hayes had a preference for a higher or

---

[144] Mark Broad, *Libor trader: Who is Tom Hayes?*  BBC NEWS (Aug. 3, 2015), available at http://www.bbc.com/news/business-33635340.

lower submission and that this preference remained in operation for a period of several days, if not longer.  Moreover, UBS trader-submitters sometimes initiated contact with Hayes to see if he needed any adjustments made to the Yen-LIBOR submissions.

368.    Hayes also sometimes emphasized to UBS' trader-submitters when one of his requests was particularly important, such as by saying he had a "big fix" or even a "massive fix." At times, Hayes was more specific, quantifying the potential benefit to UBS' derivatives position: "have 385b 6m fix today so really need it low ... half a point is 10mjpy!" As Hayes once exclaimed to the UBS Senior Yen Trader-Submitter, Roger Darin: "**I live and die by these libors**, even **dream about them**." (Emphasis added).

369.    UBS trader-submitters regularly accommodated Hayes' requests.  In fact, one UBS Yen trader-submitter indicated that he would at times adjust his submissions by up to several basis points to accommodate Hayes' requests.  The requests and accommodations occurred on a regular basis even after UBS had received the CFTC Division of Enforcement's demand in October 2008 for information and documents relating to UBS' U.S. Dollar LIBOR submissions.

370.    For example, on Monday, November 20, 2006, Hayes reached out to the UBS Yen-LIBOR "Submitter-3," Joachim Ruh, who was substituting for the regular "Submitter-1," Roger Darin, that day: "hi . . . [Roger] and I generally coordinate ie sometimes trade if ity [sic] suits, otherwise skew the libors a bit."  Hayes went on to request, "really need high 6m [6-month] fixes till Thursday."  Ruh responded, "yep we on the case there . . . will def[initely] be on the high side."  The day before this request, UBS' six-month Yen-LIBOR submission had been tied with the lowest submissions included in the calculation of the LIBOR fix.  Immediately after this request for high submissions, however, UBS' six-month Yen-LIBOR submissions rose to the

highest submission of any bank in the Contributor Panel and remained tied for the highest until

Thursday as Hayes had requested.

371.    In early 2007, Roger Darin, who was also a UBS manager and Yen derivatives

trader, trained a new UBS Yen-LIBOR "Submitter-2," Rolf Keiser.  During that training, Keiser

was instructed that the primary factor in determining UBS' Yen-LIBOR submissions each day

was the UBS Yen derivatives traders' requests, which were to be accommodated.  Keiser

followed that directive, and accommodated Hayes and other UBS Yen derivatives traders'

requests for LIBOR submissions through July 2009, when his responsibilities at UBS changed.

372.    From at least August 2007 and at various times through at least September 2009,

the manager of one of the Yen derivatives trading desks in Tokyo exerted pressure on Yen-

LIBOR submitters to take derivatives traders' positions into account when setting Yen-LIBOR.

Yen derivatives traders routinely requested that the submitters contribute Yen-LIBOR

submissions to benefit their trading books, and the submitters, in accordance with the

instructions from their superiors at UBS, accommodated derivatives traders' requests.

373.    An example of such an accommodation occurred on March 29, 2007, when Hayes

asked UBS submitter Roger Darin, "can we go low 3[month] and 6[month] pls? . . . 3[month]

esp." Darin responded "ok", and then the two had the following exchange by electronic chat:

> **March 29, 2007**:
>
> UBS [Hayes]:  what are we going to set?
>
> UBS [Darin]:   too early to say yet . . . prob[ably] .69 would be our
> unbiased contribution
>
> UBS [Hayes]:  ok wd really help if we cld keep 3m low pls
>
> UBS [Darin]:   as i said before - i [don't] mind helping on your fixings, but i'm
> not setting libor 7bp away from the truth. . . i'll get ubs banned if i
> do that, no interest in that.

> UBS [Hayes]:  ok obviousl;y [sic] no int[erest] in that happening either . . . not asking for it to be 7bp from reality anyway any help appreciated[.]

374.    Hayes received the help he requested.  Although UBS' "unbiased contribution" for three-month Yen-LIBOR would have been .69 that day, Darin lowered his submission to .67.

375.    As another example, a series of electronic chats between March 12 and 17, 2008, demonstrate that Hayes caused UBS' Yen-LIBOR submission to move three basis points over a five-day period.  On Wednesday, March 12, 2008, Hayes asked "Submitter-2," Rolf Keiser, to raise the three-month Yen-LIBOR submission from the previous day's .99 contribution, because "we have [$2 million] usd fix in 3[month Yen-LIBOR] on Monday [March 17] per bp."  Keiser responded: "with yesterdays 99 i was already on the very high side. i need to go down a touch lower on the back to what happened yesterday. . . thought about .97."  Hayes responded: "cool no chance of .98? anyway the actual fix is Monady [sic] [March 17] so that's the key day."  Although Keiser had intended to drop his Yen-LIBOR contribution down to .97 on March 12, he instead raised UBS' Yen-LIBOR submissions to .98.  The following day, Keiser raised it again to .99, and on Monday, March 17, 2008 the following exchange occurred:

> **March 17, 2008**:
>
> UBS [Hayes]: been chatting with [your supervisor, Roger Darin] . . . can we go . . . high 3[month Yen-LIBOR] . . . obviously with the size of the fix today and confusion over levels if we could push it a bit more than usual it would be great
>
> ***
>
> UBS [Keiser]: Friday fixed 3mt at 0.99
>
> UBS [Hayes]: thx [Keiser]
>
> UBS [Keiser]: shall I go fro 1%?
>
> UBS [Hayes]: pls
>
> UBS [Keiser]: ok will do

376.    As promised, Keiser made UBS contribute a Yen-LIBOR submission of 1% that day, three basis points higher than where he had intended to submit a few days earlier.

377.    In a March 28, 2008, electronic chat between Hayes and Keiser, Hayes was again successful in manipulating UBS' Yen-LIBOR submission to benefit his trading positions:

> **March 28, 2008**:
>
> UBS [Hayes]:  just for my guide [Keiser] roughly wher are we going to set 3m and 6m?
>
> UBS [Keiser]:  3m0.92 6m 0.96
>
> UBS [Hayes]:  can we go lower?
>
> UBS [Keiser]:  sure . . . dont think it will be that low though . . . but can do 090
>
> ***
>
> UBS [Hayes]:  so can we set 6m at .94 too? . . . 6m is much more urgent . . . most urgent of the lot
>
> ***
>
> UBS [Keiser]:  i just put in 0.95 for 6mt
>
> UBS [Hayes]:  ok . . . Thx

378.    On March 28, 2008, Keiser lowered UBS' three-month Yen-LIBOR submission from .92 to .90, and lowered UBS' six-month submission from .96 to .95, as discussed above.

379.    On some occasions, UBS Yen-LIBOR submitters would also amend, if possible, previously submitted Yen-LIBOR contributions to accommodate UBS' trading positions.  For example, in an April 4, 2008 electronic chat between Hayes and Keiser, the following exchange occurred:

> **April 4, 2008**:
>
> UBS [Hayes]:  have you put the [Yen] libors in?

126

UBS [Keiser]: y[es] . . . any changes?

UBS [Hayes]: oh was going to ask high 6m if not too late

UBS [Keiser]: i input 95 . . . which is on the lower side

UBS [Hayes]: ok is it too late to change? . . . if not no drama

UBS [Keiser]: i try to change it now but cannot gaurantee if it gets accepted

\*\*\*

UBS [Keiser]: just cahnged [sic] it to 0.98

380. UBS' six-month Yen-LIBOR submission that day was indeed .98, three basis points higher than Keiser's originally intended submission.

381. As another example, on June 29, 2009, Hayes contacted Keiser by electronic chat, explaining that he had huge positions that day and asking, "can we [submit] 6 mlibor high pls." Keiser stated "…we dont have any fix at mom." Hayes responded by asking, "can we go 74 or 75 [meaning .74 or .75] . . . we have [$2 million per basis point exposure] for the next week." Keiser agreed to accommodate this request, responding, "yes sure will.  I go with .75 for you[.]" Thus, Keiser agreed to move UBS' six-month Yen-LIBOR submission by 3.5 basis points that day to benefit Hayes' position.

382. Traders on the UBS Yen desk continued to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives to benefit UBS' derivatives trading positions after Hayes left UBS in September 2009.  These traders utilized some of the same methods, internal requests, use of inter-dealer brokers, and coordination with other banks.  The UBS Yen-LIBOR-based derivatives traders, on their own and at their manager Mike Pieri's direction, also continued to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives through UBS'

submissions in order to manage Hayes' positions or to benefit UBS' other Yen-LIBOR-based derivatives trading positions.

383.    At least one broker reached out shortly after Hayes' departure to assure one of UBS' Yen-LIBOR-based derivatives traders that he would continue to help UBS influence the rates submitted by other banks.  For example, on September 10, 2009, "UBS Yen Trader 2," Mirhat Alykulov, reminded Darrell Read at Broker Defendant ICAP that "Monday is the d-day" due to big fixes on swap transactions tied to three and six month Yen-LIBOR, both of which he needed low.  Read assured Mirhat Alykulov he would help him to influence the three-month fix:

> ... you realise that you have the ability to influence the 3m fix, you are currently sitting at the upper end of the range. The 6m will have to come down to others as you are already v low .. .ill remind you to chase your cash boys as well:-)

384.    

[145]

---

[145]

b.  **RBS.**[146]

385.     From mid-2006 through late 2010, multiple RBS Yen traders and at least one

manager manipulated Yen-LIBOR by making hundreds of manipulative requests of RBS'

Primary Submitter, Paul White, and London-based traders, including RBS Yen Traders 1 and 2,

Neil Danziger and Will Hall.  RBS' Senior Yen Trader, Jimmy Tan, made most of the requests,

but RBS' Yen Manager, Jezri Mohideen, and other RBS Yen traders also made such requests.

London-based Yen-LIBOR-based derivatives traders also made their own requests of RBS'

Primary Submitter, Paul White, both in person as they sat together, and through Bloomberg chats

and other means.  RBS' derivatives traders' requests for artificial Yen-LIBOR submissions were

common and made openly on the trading floors in Asia and London.  At times, at least one RBS

manager was present when requests were made.

386.     The requests were often accommodated by RBS' Primary Submitter, Paul White,

and by RBS' backup submitters, including most often RBS Yen Trader 1, Neil Danziger.  Yen-

LIBOR-based derivatives traders' requests for beneficial submissions were usually for the most

frequently traded tenors: one-month, three-month, and six-month.  At times, the requests covered

other tenors as well.  Always seeking to maximize profit, the traders either asked for specific

rates to be submitted or asked for a directional move, either higher or lower, in RBS'

submissions.  The requests were either for a particular day or for several days, and on some

occasions, even weeks of submissions.

387.     Starting as early as August 2006, a Yen-LIBOR-based derivatives trader

employed by RBS Japan sent requests for favorable Yen-LIBOR submissions to a Yen

---

[146] *See also* Ex. B-4 at 8-18.

derivatives trader in London, who in turn sometimes indicated he would seek accommodations from Paul White.

388.    Starting in early 2007, RBS Yen-LIBOR-based derivatives traders made more frequent requests for specific Yen-LIBOR submission in order to benefit their trading positions. This increase in 2007 began shortly after Jimmy Tan in Tokyo (who was employed by RBS Japan until December 2009) began working with Neil Danziger in London on the Yen derivatives book, and Will Hall joined the Yen derivatives swaps desk in London.

389.    Tan and Danziger often discussed their need for Yen-LIBOR in a specific tenor to move in a particular direction on a specific day or over a period of days to benefit a Yen derivatives trading position, and Danziger generally passed on the request to Paul White.

390.    Tan sometimes passed his requests through other money market traders.  For example, in an electronic chat on May 3, 2007, Tan asked a junior derivatives trader who acted as a backup Yen-LIBOR submitter, "can you do me a favour? ..can you drop a note to [Paul White] (JPY money mkt dealer) to set low 1m and low 3m Yen-LIBOR today please? Thanks."  The junior backup submitter responded, "just gave him a shout, said already on it..."

391.    Danziger also served as a backup Yen-LIBOR submitter during times when White was away from the desk and made Yen-LIBOR submissions to benefit derivatives trading books.  For example, on August 20, 2007, Tan noted in an electronic chat that "[Danziger] is the one setting jpy [Yen] libor in london now ..for this week and next."  The reason was that "[White] is on leave."  That same day day, another Tokyo-based derivatives trader, Trader-4,[147] asked "where's young [Danziger] thinking of setting it?"  Tan responded, "where would you like it[,] libor that is[,] same as yesterday is call."  Trader-4 said, "haha, glad you clarified! mixed feeling

---

[147] Trader-4 was employed by RBS Japan.

but mostly I'd like it all lower so the world starts to make a little more sense."  Tan then weighed

in, observing that "the whole HF world will be kissing you instead of calling me if libor move

lower."  Danziger responded, "ok, i will move the curve down …1 bp…maybe more…if i can."

Tan suggested that the time to move was not now: "maybe after tomorrow fixing hehehe."

Danziger responded, "fine…will go with same as yesterday then."

392.     At times, derivatives traders who had different trading books and conflicting

interests in the direction of Yen-LIBOR competed for submissions.  On March 27, 2008, for

example, Tan and Danziger expressed frustration that Will Hall, another Yen derivatives trader

based in London, attempted to influence RBS' LIBOR submission.  Tan asked Danziger, "we

change the libor lower?," to which Danziger responded, "i was in a novation meeting and [Hall]

asked [a junior Yen derivatives trader serving as a backup Yen-LIBOR submitter] to put it low."

Tan opined that "[Hall] shud have just [squared] it with us if he need it lower...cos i dont think

they have as big position as us next few weeks...i dont think [Hall] or the long end guys shud

ever touch the libor...they shd check with us."  Danziger responded, "i know," and Tan

complained that "thats probably gonna cost us 200k gbp."

393.     Later in the same March 27, 2008 electronic chat, Tan and Danziger discussed

their need to increase Yen-LIBOR the next day to benefit their trading position:

> **March 27, 2008**:
>
> RBS [Tan]: tomorrow we need to bump it [six-month LIBOR] way up
> high…highest among all if possible
>
> ***
> RBS [Tan]: we need to bump up all the way in the 3mth libor tomorrow
> as well
>
> RBS [Danziger]: we will put it in tonmorrow morning and no one will touch
> it i promise you.

394.     The next day, RBS increased its three-month Yen-LIBOR submission by three basis points, making it the second-highest submission, and increased its six-month submission by five basis points, making it the third-highest submission.

395.     On at least one occasion, an RBS Yen derivatives trader recognized that it might be necessary to have an excuse for manipulating RBS' Yen-LIBOR contributions that day.  On August 28, 2008, Danziger asked Tan, "where shall we put libors."  Tan responded, "high 3m ... low 6m."  They then discussed the one-month LIBOR submission.  Danziger said, "1s?", to which Tan responded: "low . . . so we dont need to change 1 today . . . pretend we forgot . . .we can change it tomorrow . . . assuming no one else in bank has any position in 1s."  RBS kept its one-month Yen-LIBOR submission unchanged that day, tying it for the third lowest of all Contributor Panel Banks.  Consistent with Tan's request, RBS' three-month Yen-LIBOR submission increased by two basis points and its six-month Yen-LIBOR submission declined by one basis point.

396.     Tan and Danziger on occasion passed their requests to Paul White for Yen-LIBOR submissions through a junior derivatives trader, Trader-5, who worked on the Yen desk in London under Danziger.  For example, on April 24, 2009, Trader-5 asked White, "Can we go with high 3s and high 6s plz today."  White responded, "they are lookingh bit softer, but will try and keep ours unch."[148]  Trader-5 responded, "thnx."  RBS' three-month and six-month Yen-LIBOR submissions on that day were unchanged from the day before, and both were above the actual Yen-LIBOR fix.

---

[148] In the context of the RBS chats, "unch" appears to mean that the LIBOR would be unchanged from the previous day.

397.     On another occasion, in an electronic chat on September 23, 2009, Tan said to Trader-5, "hey... can you ask [Paul White] if he can lower his 3mth Libor by 1 bp today?  and everything else unchange."  Trader-5 responded, "yes," then "asking," and finally, "agreed."  On that day, RBS lowered its three-month Yen-LIBOR submission one basis point compared to the previous day.

398.     On another occasion, on April 22, 2009, Danziger asked White in an electronic chat, "can we push up 6m again pls?"  White responded, "ok will try."  Danziger then asked, "what do you think we can go for?,"  to which White responded, "77."  That day, RBS' six-month Yen-LIBOR submission increased by one basis point to 0.77, making RBS the highest submitter among the eight banks included in that day's Yen-LIBOR fixing.  RBS also had increased this submission one basis point on the previous day.

399.     Requests for favorable Yen-LIBOR submissions were often treated in a routine, even casual, manner.  One example is a May 20, 2009 exchange in an electronic chat involving Danziger and White, among others:

> **May 20, 2009**:
>
> RBS [Danziger]: high 3s and low 6s pls [Paul White]
>
> RBS [White]: no problems
>
> RBS [Danziger]: grazias amigo . . . where will you lower 6s to?
>
> RBS [White]: 70

400.     RBS' six-month Yen-LIBOR submission on May 20th dropped two basis points from 0.72 (where it had been the preceding two days) to 0.70, and on the following two days it reverted to 0.72.

401.     A second example is an electronic chat dated September 15, 2009, in which Danziger asked, "can we lower our fixings today please [White]."  White responded, "make your mind up," then "haha, yes no probs."  Danziger stated, "im like a whores drawers."  RBS lowered its three-month and six-month Yen-LIBOR submissions on that day, and kept its one-month submission the same.

402.     Jimmy Tan's and Danziger's requests for false Yen-LIBOR submissions continued throughout 2010.  For example, on July 20, 2010, Tan, in an electronic chat with Danziger, asked, "can you ask [Paul White] to set 6m JPY higher today? 45 would be good..." Danziger responded, "yes i did" and "he will bump it up a point."  On that day, RBS' six-month Yen-LIBOR submission increased from 0.44 to 0.45.

403.     By at least September 2010, certain RBS Yen derivatives traders became aware of a prohibition on communicating about requests for LIBOR submissions.  On September 24, 2010, in an electronic chat involving Tan, Danziger, and Trader-5, among others, Tan initiated a request by stating, "hey [Danziger], can you ask [White] to push 6m Yen-LIBOR up 2 bps to 44."  Danziger responded, "ha . . . i will mention it ... no emails anymore . . . after tom," referring to former UBS trader Tom Hayes.  Tan replied, "haha...i heard he called up BBA to ask them to change the way they fix the libor."

404.     A month later, on October 28, 2010, Tan, in an electronic chat with Danziger, indicated that he would make his request orally rather than in an electronic communication "after the tomhayes thing":

**October 28, 2010**:

RBS [Tan]: it would help if [Paul White] hike up 1 bp today

RBS [Danziger]: i try, after the tomhayes thing its more difficult . . . i feel the more i ask the more he wont . . . out of principal

RBS [Tan]: true

RBS [Danziger]: cos i cant type it on chat anymore . . . i have to walk over

405.    In a November 22, 2010, electronic chat, Tan and Danziger discussed their view that they should take over submitting Yen-LIBOR on RBS' behalf:

**November 22, 2010**:

RBS [Tan]: actually we shd just take over the libor setting

RBS [Danziger]: hahaha

RBS [Tan]: doesnt make sense for him [Paul White] cuz he doesnt have any risk

RBS [Danziger]: i agree

RBS [Tan]: [A manager in Singapore] question today why [Paul White] sets it when he doesnt even have any risk

RBS [Danziger]: but libor i guess technically isnt meant to be set by risk takers

RBS [Tan]: yes but why give it away the advantage?

406.    Earlier in that same electronic chat, Tan and Danziger indicated they were aware that LIBOR was coming under scrutiny, yet they continued to discuss how to manipulate Yen-LIBOR for their benefit:

**November 22, 2010**:

RBS [Tan]: hey ... you think we be able to convince [Paul White] to change the libor today?

RBS [Danziger]: i can try

RBS [Tan]: need to drop 3mth Libor and hike 6m Libor

RBS [Tan]: he dropped 6m by 2 bps last friday

RBS [Danziger]: at the moment the FED are all over us about libors

RBS [Tan]: thats for the USD?

> RBS [Danziger]: yers
>
> RBS [Tan]: dun think anyone cares the Yen-LIBOR
>
> RBS [Danziger]: **not yet**

407.   In 2010, after RBS began an investigation into U.S. Dollar LIBOR reporting practices in response to inquiries from governmental authorities, the head of money market trading in London instructed other money market traders that they were not to accept requests for LIBOR submissions from derivatives traders.  Nonetheless, on November 24, 2010, after Tan sent an electronic message to Paul White asking to increase RBS' six-month Yen-LIBOR submission to suit a trading position, White called Tan and stated that "we are not allowed to have those conversations on Mindalign [RBS' Internal Electronic Chat System]."  Tan referenced "the BBA thing," after which White stated, "leave it with me and, uh, it won't be a problem. . ."  Tan responded, "ok, great."

### c.  Rabobank.[149]

408.   For nearly six years, from at least mid-2005 through at least early 2011, Rabobank, through its Yen-LIBOR-based derivatives traders and Yen-LIBOR submitters, frequently attempted to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives and consistently made false Yen-LIBOR submissions in furtherance of those attempts.  At times, Rabobank successfully manipulated Yen-LIBOR.  Several Rabobank traders transmitted hundreds of requests to its Yen-LIBOR submitters for false LIBOR submissions to benefit the traders' (and Rabobank's) LIBOR-based trading positions.  The submitters accommodated those

---

[149] *See also* Ex. D-2 at 12-20, 24-33.

requests on a regular basis and certain submitters also took into account their own trading positions when making LIBOR submissions.

409.    For example, on October 11, 2006, a Yen-LIBOR-based derivatives trader, Paul Thompson, emailed Rabobank's Yen-LIBOR submitter, Paul Robson, with the subject line: "3mths."  In the email, Paul Thompson wrote: "If in 2 minds on 3mth yen libor today, prefer u to go higher rather than lower mate if you've got ntg in it."  Paul Robson replied: "no prob mate...what u want me to set mate 43?....44?"  Thompson wrote back: "0.44 if you can keep a straight face.."  Robson responded: "no prob mate 44 it is!"  That day, as requested, Rabobank's three-month Yen-LIBOR submission was 0.44, an increase of one basis point.  Rabobank's submission went from being tied as the fifth-highest submission on the Contributor Panel on the previous day to being tied as the second-highest submission on the Contributor Panel.

410.    Two weeks later, on Wednesday, October 25, 2006, Paul Thompson emailed the backup Yen-LIBOR submitter "Submitter-5," Paul Butler, with the subject line: "libors."  In the email, Paul Thompson wrote: "I have a few chunky rolls in the 3 mth yen libors in the next few days. I don't want to compromise your integrity.. but if you've got ntg in it maybe a smidge lower today (actually shud be anyway as futures are a abt 1 higher anyway) and then high for Thurs and Fri would be great then I will be back in my box for another 2 weeks."  Paul Butler responded: "sure no problem mate if you have a sec can i have the lvls plse."  That day, Rabobank's three-month Yen-LIBOR submission was consistent with Thompson's request, decreasing one basis point from 0.45 to 0.44.  Rabobank's submission went from being tied as the fourth-highest submission on the Contributor Panel on the previous day to being tied as the twelfth-highest submission on the Contributor Panel.  On the next day, Thursday, October 26, 2006, Rabobank's contribution was again consistent with Paul Thompson's request, increasing

one basis point, from 0.44 to 0.45, whereas the rest of the Contributor Panel either remained

unchanged or decreased their submissions.  Rabobank's submission went from being tied as the

twelfth highest submission on the Contributor Panel to being tied as the second highest

submission on the Contributor Panel.  The next day, Friday, October 27, 2006, Rabobank's

contribution was again consistent with Thompson's request, remaining at 0.45, whereas the rest

of the Contributor Panel decreased its submissions by an average of approximately half a basis

point.  Rabobank's submission remained tied as the second highest submission on the

Contributor Panel.

411.    Two weeks later, on November 8, 2006, Paul Thompson wrote to Rabobank Yen-

LIBOR submitter Paul Robson: "Got a few big 3mth fixings in next 2 days, any chance you cud

bump it up a couple?  What do u actually think 3mth today 45.25-45.5 ish?"  Paul Robson wrote

back: "will set them high and dry skip!"  The next day, Paul Thompson wrote back: "Thx skip, 1

more today - only has to be 3 mths, others do as you pls, then im relatively square for a while.."

Paul Robson replied: "no prob mate will set it high again...is 46 lvl ok or higher?"  On both days,

Rabobank's three-month Yen-LIBOR submissions were consistent with Paul Thompson's

request.  On November 8, 2006, Rabobank's submission was 0.46, an increase of three basis

points from the previous day's submission, whereas the rest of the Contributor Panel stayed

approximately the same on average.  Rabobank's submission went from being tied as the second-

lowest submission on the Contributor Panel on the previous day to being tied as the third highest

submission on the Contributor Panel.  On November 9, 2006, Rabobank's submission was again

0.46, keeping Rabobank's submission tied as the third-highest submission on the Contributor

Panel.

412.     Multiple Yen-LIBOR submitters on the desk regularly accommodated requests, and when one submitter on the desk was out, swaps traders knew to make their requests to substitute submitters to ensure that their requests would be accommodated.  For example, on February 9, 2007, Paul Thompson emailed Paul Robson with the subject line: "3 mth libors."  In the message, Paul Thompson wrote: "Mate, be great if you could keep your 3 mth libor unchanged today if you can get away with it and its ok with your posy."  Paul Robson replied: "you need a high one? no prob skip."  Paul Thompson wrote back: "Yes pls mate, my only major fixing for a while, cheers."  Robson replied: "off next week mate so if u need any libor requests next week -give [Paul Butler] a shout."  That day, as requested, Rabobank's three-month Yen-LIBOR submission was 0.55, the same as the previous day, tied as the highest submission on the Contributor Panel.  The next week, on February 14, 2007, Paul Thompson wrote to Paul Butler with the subject line "6m yen libor," and asked: "Can you keep your 6m yen libor at 0.62 today if poss as have a large fixing today?"  Paul Butler wrote back: "sure will do mate."  That day, as requested, Rabobank's six-month Yen-LIBOR submission remained at 0.62.  Rabobank's submission went from being tied as the third-highest submission on the Contributor Panel on the previous day to being the highest submission on the Contributor Panel.

413.     In addition to accommodating swaps traders' requests, Rabobank Yen-LIBOR submitters also took their own Yen-LIBOR-based derivatives trading positions into account. When multiple Rabobank swaps traders had trading positions that conflicted with each other, submitters had to balance competing requests.  For example, on Monday, March 26, 2007, Paul Thompson emailed Paul Robson: "On libors, this week have a fair bit of 6mths rolling off, I am short so if you can discreetly drop your 6m by 1-2 bp without any trouble would be great - if not no probs mate" and "Im happy for you to keep your 1 mth high as both [another Yen swaps

trader ("Trader-5," Takayuki Yagami)] and I are long a fair bit of those till Wed." Paul Robson wrote back: "sure no prob - all my stuff is mainly 1 mth so will keep that high and drop 6's cheers." On Tuesday, March 27, 2007, as requested, Rabobank's six-month Yen-LIBOR submission decreased two basis points, from 0.74 to 0.72. Rabobank's submission went from being tied as the second-highest submission on the Contributor Panel on the previous day to being tied as the eighth-highest submission on the Contributor Panel. Likewise, Rabobank's one-month Yen-LIBOR submission decreased three basis points, whereas the other panel banks' submissions decreased by approximately four and three-quarters basis points on average. As a result, Rabobank's submission went from being tied as the second-highest submission on the Contributor Panel on the previous day to being tied as the highest submission on the Contributor Panel.

414. Rabobank's Yen-LIBOR submitters accommodated swaps traders' requests to the point of allowing the swaps traders to significantly influence the setting process, particularly Takayuki Yagami, who made regular requests to Rabobank's London-based Yen setters. For example, on August 21, 2007, Takayuki Yagami emailed Paul Butler with the subject line "LIBORS" and asked: "If you can make 1 month LIBOR higher today, that would be a help mate." Paul Butler replied: "Ok what level you looking at?" Takayuki Yagami wrote back: "If possible, woud prefer it to be 0.82%." Paul Butler wrote back: "Ok mate will do." Takayuki Yagami then wrote: "Thank you for help mate. What do you guess tdy's 3m ad 6m yen libors? Higher or lower?" Paul Butler responded: "Hahah you tell me I m not really watching the yen libors all my stuff going a bit mad at mom." Yagami later asked: "Where are you setting 3mth and 6mth libor today?" Butler repeated: "You tell me what you want mate he has no fixing at mom." Yagami responded: "1m 0.82 . . . 3m 1.00 6m 1.06 If you can put those rates…would be

nice mate." Butler then offered: "**Great will do if you want to give me them each day ill input whatever you want** mate ok cheers."  That day, as requested, Rabobank's one-month Yen-LIBOR submission was 0.82, an increase of four basis points.  Rabobank's submission went from being tied as the eleventh-highest submission on the Contributor Panel on the previous day to being tied as the second-highest submission on the Contributor Panel.  Likewise, as requested, Rabobank's three-month Yen-LIBOR submission was 1.00, and its six-month Yen-LIBOR submission was 1.06.

415.    As another example, on August 24, 2007, Takayuki Yagami emailed Paul Butler with the subject line "libors" and stated: "I would like today's 6m libor lower today mate," to which Paul Butler replied:  "Ok mate what level do you want mate."  Later that day, Takayuki Yagami emailed Paul Butler again and asked: "What rate did you input for libors?"  Paul Butler responded: "Himmate I have not done them what do u want."  Takayuki Yagami wrote back: "1m 0.78," "3m 0.99," "6m 1.00."  Later that day, after the Yen-LIBOR submissions and fixing had been published, Takayuki Yagami replied again: "Ops... Sorry that I meant 6m is 1.10.... Not 1.00%.  Just bit surprised when I saw our 6m libor price."  That day, as requested, Rabobank's one-month Yen-LIBOR submission was 0.78, and its three-month Yen-LIBOR submission was 0.99.  Rabobank's six-month Yen-LIBOR submission was 1.00, consistent with Takayuki Yagami's mistaken request, a fifteen basis point decrease from the previous day's submission, whereas the other panel banks' submissions decreased by approximately half a basis point on average.

416.    Rabobank's Yen-LIBOR submitters knew their Yen-LIBOR submissions were false.  For example, on September 21, 2007, Takayuki Yagami emailed Paul Robson with the subject line "libors," writing: "Wehre do you think today's libors are?  If you can, I would like

lmth libors higher today." Paul Robson replied: "Bookies reckon lm sets at .85." Takayuki Yagami wrote back: "I have some fixings in 1 mth so would appreciate if you can put it higher mate." Paul Robson replied: "No prob mate let me know your level." Takayuki Yagami responded: "Wud be nice if you could put 0.90% for lmth cheers." Paul Robson wrote back: "Sure no prob. I'll probably get a few phone calls but no worries mate!" Takayuki Yagami replied: "If you may get a few phone calls then put 0.88% then." Paul Robson responded: "Don't worry mate – there's bigger crooks in the market than us guys!" That day, as requested, Rabobank's one-month Yen-LIBOR submission was 0.90, an increase of seven basis points from its previous submission. Rabobank's submission went from being tied as the tenth-highest submission on the Contributor Panel on the previous day to being the highest submission on the Contributor Panel.

417.    Similarly, on October 17, 2008, Takayuki Yagami emailed Paul Robson, and asked: "If possible, could you keep setting 6m libor at 0.80% for a while please?" Paul Robson wrote back: "Hi mate - oh yes - we are now setting all libors significantly under the market levels."

418.    On March 19, 2008, Takayuki Yagami emailed Paul Robson with the subject line "LIBORs," and wrote: "We have loads of 6mth fixings today. If possible, could you set 6m libor to 1.10% please? We don't have particular interest in other libors." Paul Robson wrote back: "Sry just to confirm 6m you want at 1.10??? Ok will do that but I will prob get a phone call at I set 02 yesterday and brokers reckon everything a little lower today," continuing: "But will set your level cheers." Takayuki Yagami wrote back: "Actually…[another Yen Trader and Takayuki Yagami's supervisor ("Trader-6," Tetsuya Motomura)] would like 6m to be higher today.... If it is not appropriate, it is fine mate, I will explain the situation to him. He will understand the

situation.  He is on holiday today.  He just called me up in this morning to ask you to put libors higher."  Paul Robson replied: "Well its no prob mate -1 can set it that high, it will be quite funny to see the reaction!"  Takayuki Yagami wrote back: "I felt that it was a little funny so…if you can put a little higher 6mth up to the lvl you feel comfortable, lbp or a couple of bp would be fine for him mate."  Paul Robson wrote back: "No worres mate - I'll set it at 1.10[.]"  That day, as requested, Rabobank's six-month Yen-LIBOR submission was 1.10, an increase of eight basis points from its previous submission of 1.02, , whereas the other panel banks' submissions decreased by approximately a third of a basis point on average.

419.    Robson then contacted Andy Doe from Lloyds to request a similar manipulation of Lloyds' Yen-LIBOR submission for that day: "[Yagami] needs a high 6m libor if u can help skip - asked me to set 1.10!"  Doe answered: "oops my 6s is 1.15!!!," "he'll love me," and "send him my regards the lovely fella....not heard from him in a while….."  Doe followed through on his promise, submitting six-month Yen-LIBOR at 1.15 on March 19, 2008.  Rabobank's submission went from being tied as the tenth highest submission on the Contributor Panel on the previous day to being the second highest submission on the Contributor Panel.

420.    Anthony Allen, who supervised the Yen-LIBOR submitters in addition to the U.S. Dollar LIBOR submitters, was aware of the conduct on the desk he supervised and played an active role in it.  As an example, on March 14, 2007, Paul Thompson messaged Anthony Allen and asked: "Is [Paul Butler] in mate?"  Anthony Allen replied: "Not yet," and asked: "can I help ?"  Paul Thompson wrote back: "No worries mate, I think [Paul Robson] just wanted him to nudge up a few of the LIBORs.. Will send him a mail."  Allen replied: "Ok cc [additional individual] and ["Submitter-1" Anthony Conti] on it aswell mate, just in case."  Thompson replied: "I got hold opf [Paul Butler] mate and he said all in hand, cheers."

421.    In January 2009, new submitters took responsibility for setting LIBOR with limited knowledge of the process and without training.  As a result, Rabobank Yen trader Takayuki Yagami began to exercise even more control over the LIBOR setting process. As an example, on January 28, 2009, Takayuki Yagami emailed the new Yen-LIBOR submitter ("Submitter-6" Jeroen Beaard): "Could you set todays libors,,,3mth at 0.65% 6mth at 0.83% pls?"  Later, Yagami emailed Jeroen Beaard again: "If you haven't set 6m libor yet,,, could you set it at 0.82% instead of 0.83% pls? 3mth is ok with 0.65%."  That day, as requested, Rabobank's three-month Yen-LIBOR was 0.65.  Likewise, as requested, Rabobank's six-month Yen-LIBOR submission was 0.82, a decrease of eight basis points from its previous submission, whereas the other panel banks' submissions stayed approximately constant on average. Rabobank's submission went from being tied as the fourth highest submission on the Contributor Panel on the previous day to being tied as the eleventh highest submission on the Contributor Panel.

422.    After January 2009, Takayuki Yagami frequently sent an entire slate of LIBOR rates to the submitters for them to input.  For instance, on February 25, 2009, Takayuki Yagami wrote to Jeroen Beaard with the subject line "libors" and wrote: "Could you set libors for today as below please?": "1m 0.39;" "2m 0.60;" "3m 0.65;" "4m 0.71;" "5m 0.76;" "6m 0.80."  The next day, he wrote again to Jeroen Beaard with the subject line "libors" and wrote: "Could you put the below libors for today pls?": "lm 0.55%;" "2m 0.60%;" "3m 0.65%;" "4m 0.71%;" "5m 0.76%;" "6m 0.80%."  On both days, Rabobank's Yen-LIBOR submissions were made as requested.

423.    Submitters would often seek out Takayuki Yagami's input in the setting process. For instance, on January 30, 2009, Jeroen Beaard messaged Takayuki Yagami: "any preferences

in fixings today?"  Takayuki Yagami wrote back: "6m 0.82% pls," to which Jeroen Beaard responded: "will do."  That day, as requested, Rabobank's six-month Yen-LIBOR submission was 0.82, a decrease of three basis points from its previous submission, whereas the other panel banks' submissions decreased by approximately a basis point on average.  Rabobank's submission went from being tied as the eighth-highest submission on the Contributor Panel on the previous day to being the eleventh-highest submission on the Contributor Panel.

424.    Takayuki Yagami monitored Rabobank's Yen-LIBOR submissions and would follow up with the submitters on the occasions when their submissions strayed from his requests. 'For example, on January 30, 2009, Takayuki Yagami emailed Jeroen Beaard and wrote: "Why did you moved up 3m libor by 10.5bp?  It is ridiculous."  Jeroen Beaard wrote back: "had again problems with publishing from my sheet," "Wrong figure came across by putting in manual adjustments," "Gonna automatize it today."  Takayuki Yagami wrote back: "3m libor could have been below 0.67 if we, Rabo, didn't moved up by 10.5bp!"  Jeroen Beaard responded: "They didn't call from reuters why we were 10.5 tics out which they should have done," continuing: "And they take the outliers out of their calculations, so the 76.5 price shouldn't be included."  Takayuki Yagami explained: "If we have stayed at 0.66% instead of 0.765, then the 3mth libor should have been 0.668125% instead of 0.67063%. so it is below 0.67%."

425.    On October 18, 2010, Takayuki Yagami emailed Jeroen Beaard's replacement as the Yen-LIBOR submitter ("Submitter-8") and wrote: "Why did you put all the Yen-LIBORs higher for today without telling me?  Where is the team play?  You know my position is? I cant believe you did this without telling me.  If you had to put them higher for some reason but at least you could have told me in before hand.  Im really fukked."  At around the same time, Takayuki Yagami messaged Submitter-8: "why did you put libors all higher?" Submitter-8 wrote

back: "Hi made I just saw your email and replied.. I fukked up., you gave [the new back-up Yen-LIBOR submitter ("Submitter-7")] new libors last week., didn't save the sheet and today I used my own computer for libors..  I fukked up, my mistake., not on perpose mate," "I am really sorry," "And I would never change libors without consulting you."  Takayuki Yagami messaged back: "i got so surprised when i saw rabos number, you know my position then put libors higher," explaining: "some ppl react in this way so i worried as well if you were this kind of a guy."

426.    At times, Takayuki Yagami made clear to the setters that the purpose of manipulating Rabobank's Yen-LIBOR submission was to affect the final Yen-LIBOR fix.  For example, on January 29, 2009, Jeroen Beaard messaged Takayuki Yagami and wrote: "saw the 6m vs 3m basis collapsing last night.."  Takayuki Yagami wrote back: "because we lowered 6m libor !"  Jeroen Beaard responded: "heheh absolutely., it comes ur way i presume," and later: "preferences in the fixing today?"  On October 20, 2010, Submitter-8 chatted with Takayuki Yagami, writing: "so whats the reason that you dont put down Rabo Yen libor numbers? just one tick to see what happens? Or is that sort of manipulation and not done?  or am I saying something stupid now?"  Takayuki Yagami responded: "Rabo Yen-LIBOR numbers are already one of the lowest four banks among 16 panel banks so even if we put them lower further, it wouldnt give any change on yen libors," to which Submitter-8 replied: "I see.."  Takayuki Yagami then wrote: "and i think just keep libors one of the lowest four banks is the good, idea because it isnt obvious so that ppl wouldnt notice, **if it is too obvious, ppl could start looking at us manipulating libors**."  (Emphasis added).

427.    Takayuki Yagami had almost complete control over the Yen-LIBOR setting process at Rabobank after Rabobank's LIBOR submitters moved to Utrecht in January 2009.

146

For instance, on August 4, 2009, Takayuki Yagami asked Submitter-7: "have you put todays libors?" Submitter-7 wrote back: "nope you can set them if you like." Takayuki Yagami wrote back: "just sent it out now. thank you." On June 12, 2009, Takayuki Yagami messaged Submitter-7: "i sent a email about LIBORs... did you get it?" Submitter-7 wrote back: "i will input them," to which Takayuki Yagami responded: "thank you for your help!" In fact, Takayuki Yagami's control of the process was so significant that after Rabobank prohibited swaps traders from communicating about LIBOR rate setting with submitters on November 30, 2010, Takayuki Yagami explained to a broker: "Till two weeks ago I was seting libors for rabo but due to BBA investigation someone out side of europe shudnt have any influence of libors then I cudnt be involved in libors after then."[150]

428.    Takayuki Yagami's own supervisor, and the head of Rabobank's Yen derivatives desk in Tokyo, Tetsuya Motomura ("Trader-6"), was also aware of and intimately involved in Takayuki Yagami's conduct, directing requests to submitters through Takayuki Yagami to benefit Tetsuya Motomura's trading positions. For example, on October 8, 2008, Takayuki Yagami emailed Paul Robson with the subject line "Todays libors..." writing: "If is it ok,,, [Trader-6] would like todays 6m libor at 1.10%. Thank you very much for help." Paul Robson wrote back: "Ok skip." That day, as requested, Rabobank's 6-month Yen-LIBOR submission was 1.10, a decrease of ten basis points from its previous submission, whereas the other panel banks' submissions increased by approximately one and three-quarters basis points on average. Rabobank's submission went from being tied as the fifth highest submission on the Contributor

---

[150] Even after Takayuki Yagami was instructed not to influence Rabobank's Yen-LIBOR submissions, he continued to manipulate Yen-LIBOR with other Contributor Panel Banks.

Panel on the previous day to being tied as the twelfth highest submission on the Contributor Panel.

429.   Likewise, on July 24, 2008, Yagami wrote to Robson: "As for the today's libors. Could you set 6m at 0.97% please? [Tetsuya Motomura] has big fixings over the next couple of weeks so that it would be nice if you could keep it as low as possible for some time."  Paul Robson responded: "Will do mate."  That day, as requested, Rabobank's six-month Yen-LIBOR submission was 0.97, a decrease of three basis points.  Rabobank's submission went from being tied as the sixth lowest submission on the Contributor Panel on the previous day to being tied as the second lowest submission on the Contributor Panel.

430.   In a call on July 25, 2008, Tetsuya Motomura told a third party at another financial institution: "Sometimes if you want the LIBOR to be set, if you want today's LIBOR at a certain price, your desired number [would be achieved]."  After the third party replied: "Really?" Tetsuya Motomura explained: "Well we are the ones who set [the LIBOR]."  Tetsuya Motomura continued: "The recent 97 had been set at 97 due to my wishes," explaining: "That is obviously ... that's a little bad ...  Well, anyway, the person with the strongest wishes gets to decide it [LIBOR].  Well, this is the way it is."

431.   On occasion, other traders on Tetsuya Motomura's desk made requests when Yagami was absent.  On May 25, 2009, Jeroen Beaard forwarded Yagami's out-of-office message to the junior trader on Yagami's desk ("Trader-8").  Trader-8 wrote back: "What can I help you ??"  Jeroen Beaard responded: "Normally [Yagami] sends us his preferences for the JPY [Yen] libors.  If you have any let me know."  Trader-8 wrote back: "We don't have any special requests for libors today."  The next day, Trader-8 replied again: "About libors.. Same as last Friday pls. if no particular int from others."

432.     On occasion, Tetsuya Motomura also made requests directly to Rabobank's Yen-LIBOR submitters.  For example, on August 4, 2008, Tetsuya Motomura messaged Paul Robson: "Please set today's 6mth LIBOR at 0.96," continuing: "I have chunky fixing....  Thanks for your help," to which Paul Robson replied: "No worries mate."  That day, as requested, Rabobank's six-month Yen-LIBOR submission was 0.96, a decrease of three basis points, whereas the other panel banks' submissions stayed approximately constant on average.  Rabobank's submission went from being tied as the fourth-lowest submission on the Contributor Panel on the previous day to being the second-lowest submission on the Contributor Panel.  Two days later, on August 6, 2008, Tetsuya Motomura messaged Paul Robson again: "I have another side of fixing today and tomorrow," continuing: "can we make 6mth LIBOR at 0.98?"  Paul Robson wrote back: "Ok higher?...sure thing."  Tetsuya Motomura responded: "Yes, only today and tomorrow...thanks."  That day, Rabobank's six-month Yen-LIBOR submission was even higher than requested, 1.00, an increase of four basis points, whereas the other panel banks' submissions stayed approximately constant on average.  Rabobank's submission went from being the second-lowest submission on the Contributor Panel on the previous day to being tied as the fourth-highest submission on the Contributor Panel.  Rabobank's submission the next day remained the same, as did its submission's place on the Contributor Panel.

433.     On Friday, August 8, 2008, Tetsuya Motomura messaged Paul Robson again: "Could you make it 6mth LIBOR at 0.97 today," explaining: "I have big fixing coming two weeks...."  That day, as requested, Rabobank's six-month Yen-LIBOR submission was 0.97, a decrease of three basis points, whereas the other panel banks' submissions stayed approximately constant on average.  Rabobank's submission went from being tied as the fourth-highest submission on the Contributor Panel on the previous day to being tied as the second-lowest

submission on the Contributor Panel.  Rabobank's submission remained the same on Monday, August 11, 2008, Tuesday, August 12, 2008, and Wednesday, August 13, 2008.

434.    On August 14, 2008, Tetsuya Motomura messaged Paul Robson yet again and wrote: "Today and 19th Aug are the biggest fixing for us.  Could you set 6m LIBOR at 0.93 today."  That day, Rabobank's six-month Yen-LIBOR submission was 0.94, a decrease of three basis points, whereas the other panel banks' submissions stayed approximately constant on average.  Rabobank's submission went from being tied as the seventh-lowest submission on the Contributor Panel on the previous day to being tied as the second-lowest submission on the Contributor Panel.  On August 19, 2008, Rabobank's six-month Yen-LIBOR submission was 0.93, making it tied as the lowest submission on the Contributor Panel.

435.    Other Rabobank traders continued to make requests as well.  For instance, on June 25, 2009, another Yen trader ("Trader-7") emailed Submitter-7 and wrote: "could you set input for the Yen 6M libor very low today (65 or so).  We have a very large fixing today in the 6 month's."  That day, as requested, Rabobank's six-month Yen-LIBOR submission was 0.65, a decrease of six basis points from its previous submission, whereas the other panel banks' submissions decreased by approximately a basis point on average.  Rabobank's submission went from being tied as the eighth-lowest submission on the Contributor Panel on the previous day to being tied as the second lowest submission on the Contributor Panel.

436.    Traders and submitters did not hide the fact that traders had influence over the Yen-LIBOR submission process from their supervisors.  The Head of Liquidity and Finance for Europe, and later Anthony Allen's replacement as Global Head of Liquidity and Finance ("Trader-9"), was informed that Takayuki Yagami would sometimes email the Yen-LIBOR submitter with requests.  On December 9, 2008, Trader-9 emailed Anthony Allen and

150

"Submitter-5," Paul Butler, with the subject line: "LIBORS."  In the email, Trader-9 wrote: "Good to hear that [Submitter-8] is up and running. Short question: only question mark for me is him sending out the daily Rabo Libor fixings.  He told me that he will just 'copy, paste' the previous days Libors.  Don't blame [Submitter-8] of course, but he has got no clue on this yet. What you think, is this going ok?  Want to prevent that we get questions from BBA on this?" Paul Butler replied: "Yes [Submitter-8] is doing fine, regarding the libors," explaining that with: "the yen libors sometimes [Takayuki Yagami] will email from Tokyo to ask for any special requests."

437.    In March 2009, when Rabobank conducted an operational audit of the Money Markets desks, the auditor, after meeting with Jeroen Beaard, wrote in her work papers that: "Jeroen Beaard also inputs the Yen-Libor rates on behalf of the Tokyo team to the BBA as they have no access to do this.  They provide this via email."  Within her work papers, the auditor included an email from Takayuki Yagami to Jeroen Beaard in which Takayuki Yagami sent LIBOR rates to Jeroen Beaard for submission.

438.    During the Allen/Conti Trial, Rabobank's Yen-LIBOR submitter Paul Robson testified that it was "common sense" that making false Yen-LIBOR submissions to benefit Rabobank's Yen-LIBOR-based derivatives positions was wrong:

> Government [Sipperly]: What did you do?
>
> Rabobank [Robson]:  I sought rates from brokers in the market and also biased those numbers at the request of traders.
>
> Government [Sipperly]: When you say biased, do you mean after you figured out the rate from the brokers you would then favor it to help traders benefit on interest rate swaps?
>
> Rabobank [Robson]: Yes, I would.

Government [Sipperly]: When you were doing this, did you think you were permitted to do this?

Rabobank [Robson]: No, I didn't think we were permitted to do it no.

Government [Sipperly]: So did you know if it was right or wrong?

Rabobank [Robson]: I thought it was wrong, yeah.

Government [Sipperly]: Why is it at that time that you understood it was wrong?

Rabobank [Robson]: It's pretty much common sense, really.  We had privileged access to a number, a reference number, and we were using it to our own benefit.[151]

439.    Robson continuously made false Yen-LIBOR submissions to benefit Rabobank's Yen-LIBOR-based derivatives positions even though he knew it was wrong.  Over time, it became "standard practice" for Robson to make false Yen-LIBOR submissions upon Rabobank Senior Yen trader Takayuki Yagami's request.  Robson testified that as time went on, Yagami just sent Robson submissions that would financially benefit his Yen-LIBOR-based derivatives positions and Robson directly submitted those numbers without consideration of Rabobank's actual cost of borrowing Yen:

Government [Slipperly]: And how would he ask you?  If you could just give an example like in an e-mail or a call, the sort of thing he would say to you earlier in your relationship.

Rabobank [Robson]: In the early stages of the relationship, it probably would have been along the lines of, can you please or I would like or I need.  So it would be kind of a statement about -- kind of a semi explanation of why he needed it as well.

Government [Slipperly]: Does there come a time when the relationship gets more comfortable?

Rabobank [Robson]: Yeah.  It becomes, as I say, standard practice, so the conversations become condensed into just like a list of numbers.

\*\*\*

---

[151] *United States v. Allen,* No. 14-cr-272, Transcript of Trial at 322 (Oct. 19, 2015).

Government [Slipperly]: Is that the way it happened in 2008 on?

Rabobank [Robson]: Yeah.  I would have put those numbers straight in as a given that they would have been submitted.[152]

### d.  Barclays.

440.    From at least as early as August 2006 through approximately January 2007, then on another occasion in approximately June 2009, Barclays' Yen swaps traders made requests for favorable Yen-LIBOR submissions to Barclays' Yen-LIBOR submitters in order to benefit Barclays and the Barclays' derivatives traders' Yen-LIBOR-based derivatives positions. Barclays' Yen-LIBOR submitters accommodated the requests on some occasions.  Specifically, between August 2006 and June 2009, the FCA (formerly FSA) determined that Barclays' derivatives traders made at least 26 requests to manipulate Barclays' Yen-LIBOR submissions.

### e.  Lloyds.

441.    Over a period of three years, from 2006 to 2009, Lloyds' Yen-LIBOR submitter, Andy Doe, "routinely" made Yen-LIBOR submissions designed to benefit the positions of traders at Lloyds and other Contributor Bank Defendants.  Lloyds' manipulation of LIBOR, including Yen-LIBOR, was known among its traders, and involved at least twelve individuals, including four managers.  Multiple Yen-LIBOR submissions were manipulated, including at least one occasion in which a Lloyds trader not on the Money Market Desk made a request for a "low 3s" Yen-LIBOR submission, which Andy Doe factored in when making the bank's Yen-LIBOR submission to Thomson Reuters.

---

[152] *Id.* at 355-56.

### f.  Deutsche Bank.

442.    From 2005 through 2011, approximately twenty-nine Deutsche Bank employees,

including senior management, derivative traders, and submitters manipulated Yen-LIBOR

various offices, including New York, London, Frankfurt, and Tokyo.[153]  DB Group Services

employed all of Deutsche Bank's Yen-LIBOR-based money market derivatives ("MMD")

traders and pool traders that were located in London.  Because Deutsche Bank's MMD and pool

traders sat at the same GFFX desk, the traders were able to orally communicate favorable

requests, as well as execute written requests, which were regularly taken into account by

Deutsche Bank's submitters.[154]  Deutsche Bank's submitters also openly solicited requests from

traders to confirm that their false submissions would not be harmful to the traders' respective

Yen-LIBOR-based derivatives positions.[155]  This practice was well-known, with "Trader-11,"

Guillaume Adolph, telling another trader: "ON JPY WE TRY TO HAVE OUT LIBORS WITH

OUR POSITIONS NOT AGAINS[T]."

443.    Deutsche Bank was successful in manipulating Yen-LIBOR.  For

example, over the course of two successive days, unidentified Derivatives Trader B and

Submitter A manipulated one-month Yen-LIBOR higher and then lowered it the very

next day:

>    **April 4, 2006:**
>
>    Deutsche Bank Derivatives
>    Trader B: . . . could u set 1m at 8bps [0.08] pls? thanks
>
>    Deutsche Bank Submitter A: done mate
>
>    **April 5, 2006:**

---

[153] Ex. I-5 at 4.

[154] Ex. I-2 at 23.

[155] Id.

> Deutsche Bank Derivatives
> Trader B: Thanks mate… the 1m back to 7bps [0.07] today pls
>
> Deutsche Bank Submitter A: affirmative[156]

444.    On each of these days, Deutsche Bank's one-month Yen-LIBOR

submissions exactly matched Derivatives Trader B's request. [157]

445.    In another example, when Submitter-3's Yen-LIBOR-based derivatives positions

were to reset or mature, he requested that Submitter-8 make a false Yen-LIBOR submission to

benefit his trading book:

> **May 22, 2006:**
>
> Deutsche Bank Submitter-3: I've got a 3m jpy libor pay set today, could
> you go in low if it suits? thx
>
> Deutsche Bank Submitter-8:  YES SURE[158]

### g.   Société Générale.

446.    From at least July 2006, "Trader-1," a derivatives trader in Société Générale's

Tokyo office made requests for favorable Yen-LIBOR submissions to "Submitter-5," a Yen-

LIBOR submitter on Société Générale's London Treasury Desk, to benefit Société Générale's

and his own Yen-LIBOR-based derivatives positions. Submitter-5 frequently accommodated

Trader-1's requests to manipulate Yen-LIBOR, often under the direction of his supervisor,

Manager-4, part of Société Générale's Europe and Asia Treasury Department in London.

447.    On a July 13, 2006 telephone call, Trader-1 informed Submitter-5 that he had

large Yen-LIBOR-based derivatives positions. Trader-1 asked Submitter-5 to manipulate Yen-

---

[156] Ex. I-3 at 13.

[157] Id.

[158] Ex. I-1 at 48.

LIBOR based on his Yen-LIBOR-based derivatives positions and discussed how the two could coordinate future Yen-LIBOR submissions on days when he had a large Yen-LIBOR-based derivatives position. Submitter-5 agreed that Trader-1 would reach out to him for favorable Yen-LIBOR submissions on days when he had a large Yen-LIBOR-based derivatives position.[159]

448.    One week later, on July 20, 2006, Trader-1 emailed Submitter-5 to request a higher six-month Yen-LIBOR fixing to benefit his Yen-LIBOR-based derivatives position. Submitter-5 complied with the request and raised Société Générale's six-month Yen-LIBOR submission by two basis points over the previous day's submission.[160] This change in Société Générale's six-month Yen-LIBOR submission caused its position in the panel to increase from tied for 10th to tied for 3rd.

449.    On July 26, 2006, Trader-1 thanked Submitter-5 for accommodating his request from the day before and made additional requests for Submitter-5 to manipulate Société Générale's Yen-LIBOR submissions.

> **July 26, 2006:**
>
> Société Générale Trader-1: THANK YOU FOR YDAY. CAN U TRY TO MAKE 1M LIBOR A TAD LOWER AND 6 M A TAD HIGHER ???? THANK YOU ....

450.    Submitter-5 again complied with both of Trader-1's requests for manipulated Yen-LIBOR submissions to benefit his Yen-LIBOR-based derivative positions. Submitter-5 made a one-month Yen-LIBOR submission that was one and a half basis points lower than the previous day's submission and a six-month Yen-LIBOR submission that was one basis point lower than the previous day's submission.[161] Société Générale's manipulation of one-month

---

[159] Ex. J-2 at A-56.

[160] *Id.* at A-57.

[161] *Id.*

Yen-LIBOR caused its position in the panel to decrease from tied for 2nd highest on July 25, 2006 to the 11th lowest on July 26, 2006.

451.    Approximately one month later, Trader-1 again asked Submitter-5 to manipulate multiple tenors of Yen-LIBOR due to large Yen-LIBOR-based derivatives positions.

**August 28, 2006:**

Société Générale Trader-1: HELLO CAN U MAKE 6M LIBOR LOWER & 3M LIBOR HIGHER PLEASE. WERE HAVING BIG FIX SO TRY TO MOVE THEM AS MUCH AS YOU CAN, TKS. [162]

452.    Submitter-5 complied with Trader-1's request for a lower six-month Yen-LIBOR submission. Submitter-5 made a six-month Yen-LIBOR submission that was three basis points lower than the previous day's submission. Due to the manipulation of its six-month Yen-LIBOR submission, Société Générale's position in the panel fell from tied for the third highest six-month submission to tied for the 11th lowest submission.

453.    Société Générale continued to manipulate Yen-LIBOR to benefit its Yen-LIBOR-based derivative positions throughout September 2006.  On September 5, 2006, Submitter-5 let Trader-1 know his views on the requested submissions.

**September 5, 2006:**

Société Générale Submitter-5: just had a look. 6m should be ok. 3m looks difficult.

Société Générale Trader-1: ok. I KNOW YOU CONTRIBUTED 0.46 yday. ANYTHING LOWER IS APPRECIATED.[163]

454.    Accounting for Trader-1's request, Submitter-5 lowered Société Générale's six-month Yen-LIBOR submission by a basis point from 0.46 to 0.45 on September 5, 2006.

---

[162] *Id.*

[163] *Id.*

455.    On September 7, 2006, Trader-1 emailed Submitter-5 and requested that Submitter-5 make Société Générale's three-month and six-month Yen-LIBOR submissions based on Trader-1's Yen-LIBOR-based derivative positions.

> **September 7, 2006:**
>
> <u>Société Générale Trader</u>-1: HELLO WE HAVE A BIG FIXING TODAY. WE WOULD LIKE YOU TO MAKE 3M HIGHER (I KNOW U WERE ALREADY HIGH YDAY @ 43) AND MOSTLY 6M LOWER (YOU WERE RATHER HIGH YDAY @ 48, HSBC WAS @ 45 AND MANY OTHERS 46, IT WOULD REALLY BE VERY HELPFUL TO PUT IT 45-46 TODAY). THANK YOU VERY MUCH.[164]

456.    Submitter-5 complied with Trader-5's key request for a lower six-month Yen-LIBOR submission by lowering Société Générale's submission by two basis points, from 0.48 to 0.46. Due to the decrease of its submission, Société Générale's position in the panel fell from the third highest six-month Yen-LIBOR submission to tied for the 11th lowest submission.

457.    On September 8, 2006, Trader-5 thanked Submitter-5 for his help the previous day and said that he would still like a high three-month Yen-LIBOR submission and a low six-month Yen-LIBOR submission. Submitter-5 replied, "ok."[165]

458.    On September 8, 2006, Société Générale's three-month and six-month Yen-LIBOR submissions were unchanged at 0.43 and 0.46, respectively. However, Société Générale's three-month submission was tied for the second highest submission of any Yen-LIBOR panel bank and Société Générale's six-month submission was tied for the lowest submission of any Yen-LIBOR panel bank.

459.    On September 11, 2006, Trader-5 thanked Submitter-5 for his help on the previous trading day, September 8.  He informed Submitter-5 that his Yen-LIBOR-based

---

[164] *Id.* at A-58.

[165] *Id.*

positions are the same, so he would still like a high three-month Yen-LIBOR submission and a low six-month Yen-LIBOR submission. Submitter-5 again took note of Trader-5's requests and responded, "OK."[166]

460.    Later in the month, based on his Yen-LIBOR-based derivatives positions, Trader-1 made alternating requests on consecutive days to Submitter-5 for a higher, then lower, six-month Yen-LIBOR submission.

> **September 28, 2006:**
>
> Société Générale Trader-1: hello. Can u make libor 6m higher today ?? thank you.[167]
>
> **September 29, 2006:**
>
> Société Générale Trader-1: HELLO COULD U TRY TO MAKE 6M LIBOR LOWER TODAY ?T? TKS.[168]

461.    Submitter-5 accommodated both of these requests. On September 28, 2006, Société Générale increased its six-month Yen-LIBOR submission by a basis point, from 0.50 to 0.51. The following day, again in line with Trader-1's request, Société Générale lowered its six-month Yen-LIBOR submission from 0.51 to 0.48. Following Société Générale's decrease of its six-month Yen-LIBOR submission on September 29, 2006, it went from having the highest six-month Yen-LIBOR submission of any panel bank to tied for the 10th lowest submission of any panel bank.

---

[166] *Id.*

[167] *Id.*

[168] *Id.*

2.   Defendants Exploited the LIBOR Fixing to Maximize the Impact of their False Yen-LIBOR Submissions

462.    Defendants exploited the fact that a certain number of quotes were discarded before the published rates were calculated to skew the average calculation in their favor.  For example, by intentionally making false Yen-LIBOR submissions that were so high or low that they were excluded from the middle 50% of the Yen-LIBOR submissions used in the fixing calculation, Defendants manipulated Yen-LIBOR by knocking another contributor's submissions into the middle 50%.  As UBS' senior Yen trader, Tom Hayes, explained in his SFO interviews:

> So, the way you would influence the actual published LIBOR rate was by dropping in and out of the pack.  So you'd either want to be in the top quartile or the bottom quartile…All you'd want to do is drop out, so someone who is, you know in somewhere else within the region would come in and the rate would move very, very slightly.

463.    The impact of dropping in and out of the fixing was quantifiable.  Below Hayes explained to his stepbrother, Peter O'Leary, a trader at co-conspirator HSBC, how a single false Yen-LIBOR submission in the "bottom four," *i.e.*, the four lowest quotes excluded from the calculation, would manipulate the fix by an eighth of a basis point:

> **April 20, 2007**:
>
> Hayes: You know how LIBOR's set yeah? Panel of sixteen…
>
> O'Leary: Yeah
>
> Hayes: Cut the top four off.  So if he [HSBC] sets it in the bottom four, it move it by an eighth of a basis point, which on the size of the fix I've got is worth like a hundred and twenty five thousand bucks.

464.    Traders at other banks, including Rabobank, also knew that a single Yen-LIBOR submission in the top or bottom 25% of the Yen-LIBOR could move the entire fixing.  For

example, at the Allen/Conti Trial, former Rabobank trader Lee Bruce Stewart testified that a low

LIBOR submission that was excluded from the fix still manipulated the LIBOR fix lower:

> **October 19, 2015**:
>
> Government [Young]: Does a single LIBOR submission have the potential to impact the overall fix, even if it gets averaged out of the eight?
>
> Rabobank [Stewart]: Yeah. If you were low balled – if you were low balling LIBOR, **the average was automatically come down** because the fifth lowest would be taken into consideration.[169]

465.     Rabobank's Yen-LIBOR submitter Paul Robson corroborated this testimony at

the Allen/Conti Trial.  Robson testified that one false submission would impact the entire Yen-

LIBOR fix even if it was outside of the middle 50%:

> Government [Slipperly]: Let say the LIBOR was trending lower but they wanted high, was there a way to accommodate [the traders] under those circumstances?
>
> Rabobank [Robson]: Yes.  Even if the rates were going down, if you could – if rates were still going down, you could just not set as level one as everybody else was setting; or if you could, leave your rate unchanged. When the band of rates was moving down, even if the bank of rates was moving down, you could still set your rate towards the top of that band to kind of limit the damage of the rates going down.
>
> Government [Slipperly]: And just in the general context, would one bank's submission be able to affect the rate so that if you were to set a favored rate, would one bank's submission be able to move the LIBOR rate ultimately?
>
> Rabobank [Robson]: It could be, yes.[170]

466.     Traders at RBS also utilized this manipulative technique.  For example, on March

27, 2008, RBS traders discussed how they needed to be the "highest among all" to manipulate

the three-month and six-month Yen-LIBOR fixings higher.  In accordance with this request,

RBS increased both its three-month and six-month Yen-LIBOR submissions on March 28, 2008,

---

[169] *United States v. Allen*, No. 14-cr-272, Transcript of Trial at 258 (Oct. 19, 2015).

[170] *Id.* at 343-44.

moving from the lowest quote included in the average calculation for both tenors, to being excluded from both fixings for being too high:

> **March 27, 2008**:
>
> RBS [Tan]: tomorrow we need to bump it [six-month Yen-LIBOR] way up high…highest among all if possible
>
> RBS [Danziger]: we need to bump all the way in 3mth libor tomorrow as well
>
> RBS [Danziger]: we will put it in tomorrow morning and no one will touch it i promise you[171]

467.    Defendants used this technique when they needed to manipulate Yen-LIBOR in a specific direction very quickly, for example, during "Operation 6M," when Defendants planned to keep six-month Yen-LIBOR artificially higher until August 2009 and then rapidly cause the rate to decrease. *See* Part IV.7.B, *infra*.

   C.   The Contributor Bank Defendants and Co-Conspirators Colluded With the Broker Defendants to Successfully Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives. [172]

468.    Inter-dealer brokers, sometimes known as voice brokers, act as intermediaries between buyers and sellers in the money markets and derivatives markets.  The brokers match buyers and sellers in return for commissions, and also can be an important source of market information for banks.  Typically, commissions are based on a percentage of the notional value of consummated transactions, which means that brokers get paid more by brokering larger trades.  Within a brokerage firm, there are brokers for different currencies who intermediate derivatives transactions ("Derivatives Brokers") and brokers who intermediate cash transactions ("Cash Brokers").  In order to find matching counterparties, brokers provide bid or offer prices

---

[171] Ex. B-1 at 13.

[172] *See also* Exs. C-1, C-2, E-1 (pp. 10-14) and E-2, *passim*.

for a financial transaction.  Those prices are conveyed in multiple ways.  For example, brokers can use a "squawk box," *i.e.*, a speakerphone-like device that can speak simultaneously to multiple banks' trading desks, to broadly disseminate bid and offer prices.  Brokers also frequently use Bloomberg instant message chats and other messaging platforms, email, and dedicated telephone lines to contact their clients.

469.    Below is an example of a chat conversation between Rabobank trader Takayuki Yagami and R.P. Martin Broker Paul Robson, who previously worked as a Rabobank trader and submitter, demonstrating how inter-dealer brokers normally handle transactions in the over-the-counter market.  After Robson makes some opening price quotes, Yagami bids for a "T/N" or "Tomorrow-Next" Yen-denominated deposit ("PAY 0.01 in T/N").[173]  Following the initial offer, Robson proceeded to offer prices, working with his other clients, until he found a counterparty willing to accept Yagami's bid:

> **May 7, 2008**:
>
> R.P. Martin [Robson]: hi chaps good afternoon to you! 1-6m tonars at mo only 10 3/4 offers trying for better . . .
>
> Rabobank [Yagami]: PAY 0.01 In T/N
>
> R.P. Martin [Robson]: try skip cheers!
>
> R.P. Martin [Robson]: at mo depo offered at 05 poss 04 - trying for u at 01
>
> R.P. Martin [Robson]: tn depo 04 02 - bid by bid german
>
> R.P. Martin [Robson]: 03 offer tn depo
>
> R.P. Martin [Robson]: got offer at 02 in tn - not sure of size
>
> R.P. Martin [Robson]: still got german bid there fyg [for your guide]

---

[173] "Tomorrow-Next" is the duration of the deposit and indicates it will begin tomorrow and reverse the next day.

> R.P. Martin [Robson]: can i just ask if u are still ok paying .01 tn deep
>
> R.P. Martin [Robson]: checking you in 20 yds [20 billion] if ok?
>
> Rabobank [Yagami]: sure!
>
> R.P. Martin [Robson]: ok got 20 yds for you so far in tn jpy depo at 0.01
>
> Rabobank [Yagami]: thank you. agreed
>
> R.P. Martin [Robson]: cheers mate, great!

470.    Inter-dealer brokers, including the Broker Defendants, also provided clients with their views and advice on market pricing and trends.  Because brokers spoke to multiple clients at different financial institutions and share internally the information learned from clients, they have particular market insight about cash market prices and trends in otherwise opaque markets, offering an important price discovery function.  For example:

> **May 15, 2009**:
>
> Rabobank [Yagami]: Do you have any offers in 1m 3m and 6m today FMG [for my guide]?
>
> R.P. Martin [Robson]: let me see what I can get for you skipper!
>
> R.P. Margin [Robson]: 05 give t/n + s/n combined…best 1m 17,,,,3m poss 35 offr…6m only 60
>
> Rabobank [Yagami]: cheers mate

471.    In providing this market information, inter-dealer brokers implicitly represented that such market information reflected their third-party unbiased assessment of borrowing costs and market pricing based on objective, observable data, some of which they uniquely possessed. It was important that the information remain unbiased because, as one trader/submitter, Laurence Porter from Citibank, testified during the Hayes Trial, LIBOR submitters often relied on information provided by inter-dealer brokers in violation of BBA Guidelines when making their

Yen-LIBOR submissions because, in theory, the brokers had the best understanding of market prices.  The Contributor Bank Defendants and their co-conspirators capitalized on this, conspiring with the Broker Defendants to disseminate false pricing information to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives for their financial benefit.  *See* ¶¶ 476-484, *infra*.

1. UBS Colluded With the Broker Defendants to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives[174]

472.    Hayes coordinated on almost a daily basis with several inter-dealer brokers employed by at least five different brokerage firms to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  The charts below display Hayes' relationship with the Broker Defendants as described in his SFO interviews.  These charts were displayed at Hayes' Trial and include his primary contacts at each broker and the Contributor Bank Defendants for which U.K. regulators found documented evidence of manipulative conduct.  These charts represent the "tip of the iceberg" regarding the scope of the Broker Defendants' conspiracy with the Contributor Bank Defendants and Co-conspirators:

---

[174] *See also* Exs. A-1, pp. 17-25, ¶¶ 40-61; A-2, pp. 20-36; C-1, C-2, E-1, and E-2, *passim*.



473.    These brokers were specifically chosen for their ability to provide information on the "cash market," *i.e.*, the rates at which banks were offering to borrow and lend the very Yen-denominated deposits that were supposed to underlie their Yen-LIBOR submissions, as well as their relationship with (and thus their ability to influence) traders and submitters at specific Contributor Panel Banks.

474.    Working with multiple Broker Defendants allowed Hayes and his co-conspirators to gain maximum influence over the market by reaching as many banks as possible.  For example, Hayes worked with Terry Farr at R.P. Martin because he had good relationships with HSBC and Lloyds, in addition to contacts at at least Deutsche Bank, Bank of Tokyo-Mitsubishi, Merrill Lynch, Norinchukin, BNP Paribas, Royal Bank of Canada, Rabobank, RBS, and Société Générale.  ICAP provided access to other banks, including contacts at JPMorgan, West LB, and other smaller banks, while Tullett Prebon had access to Bank of America's Yen-LIBOR submitter, among others.

**<u>January 7, 2007</u>**:

<u>From</u>: Tom Hayes
<u>To</u>: Yvonne Murayama (UBS)
<u>Cc</u>: Michael Pieri

Can we have a chat about the ICAP bro deal when its convenient?. . .From my perspective ICAP offers me a lot of value in helping with London Libor resets, traders with London CP's (eg Chase) and with smaller European names.  Hence I am keen to keep a line with them.

475.    As alleged further below, in exchange for their critical assistance, Hayes compensated the Broker Defendants in various ways, including by directing commission-generating business to the brokers, such as wash trades, and even by having UBS structure fees to carve out cash bonuses to reward brokers for manipulative conduct.  Hayes also kept them in line by sometimes threatening to move his considerable volume of business to another broker.

During this period of late 2006 to late 2009, Hayes made approximately 1,200 manipulative requests to brokers.

### a.   "Suggested LIBORs"

476.    The Broker Defendants circulated via email or by telephone each morning daily run thrus containing, in addition to other pricing information, where they expected Yen-LIBOR to be fixed that day.  The Broker Defendants, also at times, shared with Contributor Bank Defendants and Co-Conspirators the intended LIBOR submissions of other panel banks. This tactic was effective because the Contributor Bank Defendants and Co-conspirators took this information into account in violation of BBA rules when making Yen-LIBOR submissions.

477.    During the Class Period, Defendant ICAP routinely disseminated run thrus with market pricing information every morning at approximately 7:00 A.M. London time, well before the BBA's 11:00 A.M. Yen-LIBOR submission deadline.  The run thrus contained the following: (1) a column stating where rates (prices) in basis points for Yen cash trades, for all tenors, were observed the previous trading day, broken down by Japanese and non-Japanese financial institutions; (2) a column stating the spread of rates for Yen cash trades for all tenors that were observed as of the market opening in London and late afternoon Tokyo, broken down by Japanese and non-Japanese financial institutions; and (3) a column titled "Suggested LIBORs," which contained "Cash Broker 1" Colin Goodman's suggestions as to the level of Yen-LIBOR for each tenor between one month and one year.[175]  Below is an example of a Yen run thru taken from ICAP's CFTC settlement that was sent on January 2, 2007:

---

[175] *See* Ex. C-1, pp. 6-15.

```
01/02/2007 07:05
From: [Cash Broker 1]
Sent: Tuesday, January 2, 2007 7:06 AM
Subject: yen runthro2.xls2/1

        GOOD MORNING YEN RUN THRU

    TODAY              YESTERDAY
    Japanese           Japanese
    T/N      35 33        T/N     46 43     SUGGESTED LIBORS
    S/N      35 33        S/N     40 35         1M      0.47375
    1Wk      36 34        1Wk     37 35         2M      0.535
    2Wk      37 35        2Wk     37 35         3M      0.5675
    3Wk      42 39        3Wk     42 39         4M      0.59125
    1m       47 45        1m      47 45         5M      0.61
    2m       56 53        2m      53 50         6M      0.63
    3m       59 56        3m      57 54         9M      0.695
    4m       61 58        4m      59 56         1YR     0.7525
    5m       63 60        5m      62 59
    6m       66 63        6m      64 61
    9m       72 69        9m      69 66
    1yr      78 75        1yr     76 73

    Non Japanese        Non Japanese
    T/N      34 32        T/N     46 45
    S/N      34 32        S/N     42 48
    1Wk      35 33        1Wk     38 35
    2Wk      38 35        2Wk     38 35
    3WK      42 38        3Wk     42 38
    1m       46 43        1m      47 44
    2m       53 50        2m      52 49
    3m       56 53        3m      56 53
    4m       58 55        4m      58 55
    5m       60 57        5m      60 57
    6m       63 60        6m      62 59
    9m       69 66        9m      67 64
    1yr      75 72        1yr     75 72

    cd       no trades    cd      no trades
    o/n      exp .26      o/nite  exp .26

    1am3     745 735      1am3    7325 7275
    1am6     755 745      1am6    74 73
    2yr      93625 92625  2yr            955 95

        CHEERS [Cash Broker 1]
```

478.    In the fall of 2006, shortly after Hayes joined UBS, he became a client of ICAP "Derivatives Broker 1" Darrell Read.  Hayes quickly became known as a high volume, aggressive, and dominant Yen-LIBOR-based derivatives trader who injected significant liquidity into the market.  Because he commanded a large trading volume, Hayes was a highly desirable and sought-after client for inter-dealer brokers, including the Broker Defendants

479.    Darrell Read, who was based in London at that time, agreed to work overnight (Tokyo is eight hours ahead of London) to better serve Hayes during Tokyo business hours and became Hayes' primary contact at ICAP.  As a result, Read gave up his other London-based clients, and by early 2007, relied almost exclusively on Hayes and UBS for their business and resulting commissions.

169

480.     Darrell Read routinely and aggressively assisted Hayes' efforts to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  When Read was out of the office, other Yen derivatives brokers on ICAP's Yen Desk, primarily Trevor Halligan ("Derivatives Broker 2") or Danny Wilkinson ("Yen Desk Head") coordinated with Hayes on his requests to manipulate Yen LIBOR; at times other brokers on the Yen desk helped him as well.

481.     To accomplish Hayes' manipulative goals, Read needed and obtained the critical assistance of Colin Goodman.  Goodman, one of ICAP's cash brokers, had long-standing relationships and daily contact with many of the Yen panel bank submitters.  He often discussed with submitters what their intended Yen-LIBOR submissions would be and what other panel banks might submit.  Goodman also issued the daily Suggested LIBORs as part of his run thrus which Yen-LIBOR submitters improperly relied upon in whole or in part at times to make their Yen-LIBOR submissions in violation of BBA rules.

482.     As early as October 2006, Darrell Read, acting on Hayes' behalf, began asking Goodman to skew the Suggested LIBORs that he provided in his run thru emails or in calls to traders or submitters to reflect the rates or levels that Hayes desired.  For example, during his interview with the SFO, Hayes stated that Colin originally reached out to him and said that he would contact Wilkinson to get him to try and influence the rates by sending run thrus that were a bit lower or "whatever."

483.     Goodman knew from the outset that such requests were for Hayes.  At times, Hayes reached out to Goodman directly, such as on March 23, 2007: "hi [Colin] know [Darrell] is away and this may seem strange given my recent requests but really need a high/unchanged 1m libor today, low for everything else. thanks as always [Hayes]."

484.     ICAP's run thrus were widely circulated among and valued by Yen market participants at the panel banks and elsewhere.  More than 100 cash and derivatives traders received Goodman's run thru emails, including traders from nearly all of the Yen-LIBOR panel banks and, at different times, submitters from at least eleven of the sixteen Yen-LIBOR panel banks.  Many, if not all of the recipients of the run thrus, asked to receive the emails.

     2.   The Broker Defendants Were Active Co-Conspirators with the Contributor Bank Defendants.

485.     The Broker Defendants actively conspired with the Contributor Bank Defendants to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives through multiple means.  As an example of how Defendants coordinated their manipulative conduct, the conversations below track the manipulation of three-month Yen-LIBOR on February 25, 2009.  The electronic communications used to carry out this manipulation were "transmitted through, among other locations and facilities, a UBS server located in Stamford, Connecticut" and served as the basis for UBS Securities Japan's guilty plea to wire fraud in the District of Connecticut.[176]

486.



---

[176] Ex. A-5, Factual Basis for Pleas at ¶ 11.





489.

---
[179] *Id.* at 1-2.



490.



491.

492.

493.



494.

495.

496.    This successful concerted effort is just one examples of how Defendants systematically organized using the Broker Defendants to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  Other example of coordinated misconduct involving the Broker Defendants and co-conspirators, including at least three known long-term manipulation campaigns, are included below.  *See* ¶¶ 711-752, *infra*.  Plaintiffs reasonably expect that additional examples of this type of coordinated manipulation will be uncovered in discovery.

       3.    The Contributor Bank Defendants Knew the Broker Defendants and Co-Conspirators Were Actively Conspiring to Manipulate Yen-LIBOR.

497.    Hayes' use of brokers to manipulate Yen-LIBOR was widely known among the traders on the UBS Yen trading desk from 2007 through 2009.  In fact, the desk held daily morning meetings before Yen-LIBOR was set, in which Hayes commonly announced the direction he intended to manipulate Yen-LIBOR that day.

498.    After Hayes left UBS in September 2009, the more junior trader who replaced him had discussions with the manager of the Yen trading desk.  Based on those discussions, the junior trader felt pressured to continue using brokers to manipulate Yen-LIBOR through at least January 2010.

499.    UBS' Yen-LIBOR submitters, derivatives traders, and their managers knew this conduct was wrong and attempted to avoid creating evidence of the manipulation.  For example, the manager of the Yen derivatives desk cautioned that they should avoid creating written records and should instead use cell phones when contacting brokers.  Moreover, to avoid detection of their manipulation, UBS derivatives traders and brokers used coded language in communications to discuss manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

D. The Broker Defendants Reaped Commissions, Bonuses and Accepted Bribes in the Form of Wash Trades from the Contributor Bank Defendants for Their Critical Assistance in the Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives[184]

500.    Hayes sought to ensure the Broker Defendants' cooperation by offering drinks and bottles of champagne, commission-generating business, and large cash bonuses for a Broker at Defendant ICAP.  The Broker Defendants were compensated for their assistance in several ways: (1) providing them with substantial amounts of business, thus generating fees or commissions; (2) by engaging in circular transactions (two equal and opposite transactions that canceled each other out) solely for the purpose of generating commissions for the brokers; and/or (3) by engineering a special compensation deal between UBS and Broker Defendant ICAP. Former UBS Senior Yen Trader Hayes also used his financial leverage with at least one broker for whom UBS generated significant commissions by threatening to cut off UBS' business with the brokerage if the firm did not comply with his requests.

1.   Extra Trades to Generate Unearned Commissions

501.    Hayes routinely offered brokers at ICAP, Tullett Prebon, and R.P. Martin extra transactions or other business, and thus UBS paid commissions to ensure that the Broker Defendants and co-conspirators would provide needed assistance.  For example, Hayes told inter-dealer brokers employed by the Broker Defendants and co-conspirators:

- "I still owe you some deals;"

- "we'll do some big tix soon i promise;"

- "do the bisness and i'll sort you out MASSIVE;"

- "if you get 3m down you'll get a decent deal from me tomorrow;"

---

[184] *See also* Exs. B-4 at 21-24; C-1, C-2, E-1 at 15-18 and E-2, *passim*.

- "if you manage that for the next 2 weeks you will see the benefits;"

- "make sure they know that it pays for them to help out;" and

- "i need to pay .. to give u a trade."

2. Gifts and Other Bribes

502.     The Broker Defendants and co-conspirators were also rewarded for manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives with gifts, free meals, and other bribes paid for by the Contributor Bank Defendants and Co-conspirators.  For example, in the conversation below, Hayes agreed to buy lunch for the ICAP Yen desk if they participated in the manipulation of six-month Yen-LIBOR over the next two days:

> **October 24, 2006**:
>
> ICAP [Read]: let me know a little later what you need…i know you want 6's high tomorrow
>
> UBS [Hayes]: well today and tomorrow then i can breath a little! 2morrow fix is huge 400b [400 billion yen]
>
> ICAP [Read]: i know you told me…ok as long as futs don't get outdone by any libor moves south?
>
> UBS [Hayes]: …libors going up saved me on day look like i was going to lose 50m jpy [50 million Yen] on futs vs libs
>
> ICAP [Read]: ouch!
>
> UBS [Hayes]: but then 6m went up a bp and i was saved well almost
>
> ICAP [Read]: a50 curry was cheap then :-D
>
> UBS [Hayes]: **seriously mate whatever it takes bill me!**[185]

503.     Relaying the message to Goodman, Read emphasized the importance of the request and instructed the ICAP cash broker to get his "curry order ready":

---

[185] Ex. C-1 at 12.

**October 24, 2006**:

ICAP [Read]: Realise it might be getting harder but need 6m kept as high as possible…tomorrow I have a massive fix, today just large!! Ta mate Get your curry order ready will send [Ryan Sherer] round tomorrow.

ICAP [Goodman]: How high…above 552?

ICAP [Read]: **If you can get them up there and keep them there tomorrow reckon the trader from ubs Tokyo will come over and buy you a curry himself!**[186]

504.    UBS also sent ICAP brokers bottles of champagne to reward them for

manipulative conduct:

**December 7, 2007**:

ICAP [Read]: Hi [Colin Goodman], Thanks again for all your efforts…Can you do your best to drive these libors higher, especially 3 mos if you can and it is still well bid…UBS had to stagger their move up but will definitely be in the count today… p.s. Bubbly on its way with [Hayes].[187]

505.    Hayes even promised to buy ICAP cash broker Colin Goodman a Ferrari if he

could keep three-month and six-month Yen-LIBOR at the desired level:

**February 29, 2008**:

ICAP [Read]: If u can pls move 3m up more than 6m wud be much appreciated :-P

ICAP [Goodman]: What happens if they go down.  3m looked higher yester pm and 6m no change

ICAP [Read]: Make 6m go lower! They r going up. **[Hayes] will buy you a ferrari next year if you move 3m up and no change 6m**

ICAP [Goodman]: Not bad isuppose 9625 against 01625.[188]

---

[186] *Id*. at 13.

[187] *Id*.

[188] *Id*.

3.   "Wash" Trades to Generate Illegitimate Commissions

506.    In his SFO interviews, Hayes described using two types of sham transactions to compensate R.P. Martin and Tullett Prebon for their assistance in manipulating Yen-LIBOR: (1) "wash trades" also known as a "flat switch" where Hayes and another counterparty exchanged financial instruments with the same notional value, at the same price; and (2) "switch trades" where the notional amounts would be identical but the prices would be slightly different, such that the party facilitating the trade (*i.e.* opposite Hayes) would be paid a little bit more in exchange for agreeing to assist with the sham transaction to compensate one of the Broker Defendants.  During the Class Period, wash trades and switch trades accounted for a substantial part of R.P. Martin's and Tullett Prebon's Yen-desk revenue, reaching 38% and 35% of the total commissions UBS paid to these brokers in 2009, respectively.

507.    While these trades resulted in a financial nullity for the counterparties, they generated significant illegitimate commissions for the Broker Defendants, in particular Broker co-conspirator R.P. Martin, who brokered both sides of the wash trades.  At R.P. Martin, the entire Yen Desk shared commissions, giving other R.P. Martin Yen brokers incentives to assist in Hayes' manipulative schemes.  For example, due to the large number of commissions generated from wash trades, UBS was R.P. Martin's Yen Desk's second-largest client during 2008 and 2009, accounting for nearly 9% of the R.P. Martin Yen desk's revenue.

508.    According to Hayes' SFO interviews, wash trades and switch trades started out closely linked to a Broker Defendant's assistance in manipulating Yen-LIBOR.  For example, Hayes said that he would be more inclined to make sure he paid the Broker Defendants to reflect the additional value that he perceived UBS or its Yen-LIBOR-based derivatives trading desk was getting from a Broker Defendant's ability to help manipulate Yen-LIBOR.  For example, below

is the first known manipulative conversation between Hayes and Noel Cryan at Broker

Defendant Tullett Prebon in which Hayes explained the use of wash trades and switch trades as

compensation:

> **February 9, 2009**:
>
> UBS [Hayes]: Do you know your cash desk, i.e. the guy who covers yen on your cash desk?
>
> Tullett Prebon [Cryan]: Yes, mate I do.
>
> UBS [Hayes]: Right. From now on I need you to ask him a favour on the fixes.  I will make sure it comes back to you.  I already do it with ICAP.  Basically can you ask him to broker 3M cash, i.e. LIBOR lower for me today?  I will look after you off the back of it.  I do that for RP Martins too.  So emphasize the importance to you.  Just suggest it look a little softer to his accounts.
>
> Tullett Prebon [Cryan]: OK, mate, I understand. I will go and speak to him.
>
> UBS [Hayes]: Stuff like that, thanks, mate, is very important to me today.
>
> Tullett Prebon [Cryan]: Just spoke to them, they're on the case[189]
>
> Hayes: Ok much appreciated.  If we do this going forwards it will come back to you in spades. Did you emphasise the importance?
>
> Tullett Prebon [Noel Cryan]: I did
>
> Hayes: ta.  Like I said what normally do is if I get help on the LIBORS over the month I normally do at the end of the month I normally do a couple of like in and outs
>
> Tullett Prebon [Noel Cryan]: That's good because Neil [Danziger at RBS] wants to pay for his trip to Vegas already, so he's been asking us about them already. Yeah so I'll be in touch over the month

509.    Hayes further explained in his SFO interview that he used wash trades and switch

trades as a monthly payment to the Broker Defendants.  The recurring nature of these payments

was in part to foster loyalty between Hayes and the Broker Defendants but also to keep the

---

[189] *Id*. at 29, 40.

brokers motivated.  Hayes recognized that he needed to incentivize and reward the Broker

Defendants for their continued participation in the conspiracy.

510.     R.P. Martin broker Terry Farr handled at least nine wash trades between

September 2008 and August 2009 on Hayes' behalf.  These trades alone generated more than

$412,000 in illegitimate commission revenue for the R.P. Martin Yen desk.  Accordingly, Farr

solicited the assistance of multiple members of the Yen desk, who found counterparties for the

wash trades and telephoned additional Yen-LIBOR submitters to ensure their Yen-LIBOR

submissions were consistent with Hayes' manipulative requests.

511.     For example, on September 18, 2008, Hayes offered Terry Farr $50,000 or

$100,000 or more in illicit commissions for R.P. Martin's assistance in the manipulation of six-

month Yen-LIBOR:

> if you keep 6s unchanged today I will do fucking one humongous deal with you ...
> Like a 50,000 buck deal whatever. I need you to keep it as low as possible ... I'll
> pay you, you know, 50,000 dollars, 100,000 dollars ... whatever you want. .. I'm a
> man of my word.

512.     The next day, on September 19, 2008, Hayes used Farr to engage in a series of

"wash" trades with several derivatives traders at other panel banks to generate the promised

$50,000 in commissions and fees for R.P. Martin.  *See e.g.*, ¶¶ 527, 549, 573-575, *infra*.

513.     Once the switch and wash trades became a regular practice, Broker Defendants

would proactively line up these sham transactions with other co-conspirators.  For example,

according to Hayes, Noel Cryan asked him to enter into switch trades, and Hayes agreed and

executed them. This was especially true near the end of the quarter, when extra commission

would help a Broker Defendant hit their budget, resulting in larger bonuses for the individual

brokers.  As Hayes described his relationship with R.P. Martin, "[t]he whole desk, I mean like

when it came to end of the quarter and they were short of hitting their budget you know, the

whole desk knew the score.  The whole desk, you know, like wanted Terr [Farr] to go in and try and do some big trades with me so that they, like hit budget and got their bonuses or whatever you know."

514.    Counterparties for wash trades and switch trades were easy to find.  Much like the Broker Defendants, who were willing to help Hayes and his co-conspirators manipulate Yen-LIBOR in exchange for extra commission payments, traders at other Contributor Banks Defendants, including RBS, were always willing to engage in sham transactions so long as they too were compensated.   Compensation usually took two forms: (1) entertainment, *e.g.*, a trip to Las Vegas; and (2) "gift trades," *i.e.*, the best deal coming through the broker's desk, which would be given only to the broker's best customers.

515.    One Yen-LIBOR-based derivatives trader in particular, Neil Danziger ("Danziger") at Defendant RBS, was always happy to engage in wash trades or switch trades in exchange for free entertainment.  As Hayes explained, brokers typically spent about 5% of their brokerage revenue entertaining clients.  Danziger, who preferred to put his wash trades through Tullett Prebon, knew that the more commission he generated for Tullett Prebon, the more they would be willing to spend entertaining him.  Because RBS' money was used to pay the excess commissions, it was a win-win for Danziger and Hayes, who benefited not only from the positive impact their manipulative conduct had on their respective trading books, but also from whatever kickbacks the Broker Defendants threw their way for paying excess commission.

516.    Hayes' superiors were aware of and expressly approved his use of wash trades and switch trades to compensate the Broker Defendants for their assistance in manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  Hayes explained in his SFO interview that after his first switch trade with R.P. Martin, he went to his direct boss, Michael Pieri, to

discuss what had happened.  Pieri was fine with this conduct.  In a follow-up conversation,

Hayes explained "[i]t was clear to me and to Mike that we were doing this for, like, for, well,

what I would have almost said was legitimate reasons to try and make the bank more money…So

if the bank was paying out brokerage it was getting it back in other ways."

       4.   UBS Paid a Special "Bonus" To Broker Defendant ICAP

517.    UBS, and in particular, Hayes, were significant clients of the Broker Defendants.

Hayes steered a considerable amount of business toward the Broker Defendants, resulting in

substantial bonuses based on the amount of commissions his business generated for the Broker

Defendants.  For example, beginning in June 2007, UBS paid Broker Defendant ICAP a monthly

fixed fee that averaged between 70,000 GBP and 85,000 GBP per month (US $126,000 and US

$153,000) for brokerage services performed on behalf of Hayes.  As a result, between April 2007

and March 2009, Hayes singlehandedly accounted for, on average, approximately fourteen

percent of ICAP's Yen desk's business (although at times, he accounted for as much as twenty

percent of ICAP's Yen desk's business), making him ICAP's Yen desk's biggest individual

client.  UBS was ICAP's Yen desk's overall largest client from October 2006 through January

2011, accounting for, on average, approximately twenty-three percent of ICAP's Yen desk's

revenue between April 2007 and March 2009 (although at times, it accounted for as much as

thirty percent of the Desk's revenue).

518.    In addition, Hayes acted as the counterparty to many transactions certain ICAP

brokers facilitated, thus further increasing ICAP's Yen desk's commissions.  The Yen desk

earned a fixed fee from UBS, but also received commissions based on the notional value of the

transactions from the counterparties to Hayes' trades.  Because he brought significant business to

the Yen desk, losing Hayes' business would have been, as stated by one ICAP Yen broker, "a significant loss."

      E.   Rabobank Colluded with Broker Defendant ICAP and Co-Conspirator R.P. Martin to Manipulate Yen-LIBOR to Benefit Rabobank's Yen-LIBOR-based Derivatives Positions.

519.    Despite awareness of an investigation related to LIBOR, Rabobank continued to manipulate Yen-LIBOR to benefit its Yen-LIBOR-based derivatives positions.  Rabobank now began to use the Broker Defendants and co-conspirators to facilitate the manipulation.

520.    On November 30, 2010, in the midst of the CFTC's investigation of Rabobank's U.S. Dollar LIBOR submission practices, Rabobank Senior Manager 2 instructed the Yen-LIBOR submitters at that time, Yen Trader-Submitter 3 and Yen Trader-Submitter 4, that it was improper to consider rate requests from traders when making Rabobank's LIBOR submissions and that the practice should stop.  That same day, when Takayuki Yagami sent the daily Yen-LIBOR rates to be submitted, the Yen-LIBOR submitters refused to assist him.  Reacting to the loss of his ability to influence the Yen-LIBOR fixings directly, the very next day Takayuki Yagami contacted Broker Defendant ICAP ("ICAP Cash Broker") and requested his assistance in manipulating Yen-LIBOR to benefit the Takayuki Yagami's Yen-LIBOR-based derivatives positions.  Takayuki Yagami admitted to ICAP cash broker, Colin Goodman, that he previously acted as Rabobank's Yen-LIBOR submitter and "influence[d]" the LIBOR submissions until November 30, 2010.

521.    Takayuki Yagami continued to request Colin Goodman's assistance in his manipulative efforts throughout the end of 2010 and into early 2011.  For example, on December 1, 2010, Takayuki Yagami wanted three-month and six-month Yen-LIBOR "down" on December 2.  Colin Goodman readily acquiesced and promised to "work some magic" to lower three-month and six-month Yen-LIBOR.

522.     On at least two occasions, Rabobank also communicated with another broker at Broker co-conspirator R.P. Martin and sought R.P. Martin's assistance in manipulating Yen-LIBOR.  For example, on one of these occasions, on January 19, 2011, Rabobank requested R.P. Martin's assistance in pushing the six-month Yen-LIBOR fixing in a favorable direction to benefit Rabobank's Yen-LIBOR-based derivatives positions.

523.     Rabobank also colluded with R.P. Martin. The Rabobank "Senior Yen Trader-Submitter," Paul Robson, communicated with Broker Co-Conspirator R.P. Martin to discuss the Yen market generally and Yen-LIBOR fixings in particular.  From at least May 2008 through at least September 2008, R.P. Martin asked Paul Robson at times to make particular Yen-LIBOR submissions, and on at least one occasion stated that the request was intended to benefit Hayes' Yen-LIBOR-based derivatives positions.  During the same period, Paul Robson also informed R.P. Martin that he received requests for particular Yen-LIBOR submissions for certain tenors from Takayuki Yagami.  On at least one occasion, Paul Robson indicated he would accommodate R.P. Martin's Yen-LIBOR request on Hayes' behalf, along with Takayuki Yagami's rate preference when making Rabobank's Yen-LIBOR submissions on that particular day.

524.     The below example reveals "back scratching," *i.e.*, explicit agreements by co-conspirators to submit artificial Yen-LIBOR rates to financially benefit other co-conspirators' Yen-LIBOR-based derivatives positions in return for the other co-conspirators' agreement to return the favor sometime in the future.  On July 18, 2008, R.P. Martin reached out to Rabobank to ask where Rabobank planned on setting its one-month Yen-LIBOR that particular day.  Paul Robson had not yet been told where to set Rabobank's one-month Yen-LIBOR and R.P. Martin requested Rabobank set one-month Yen-LIBOR at "65" or "as low as possible basically" at the

behest of a "geezer at UBS [Tom Hayes]."  Paul Robson agreed and went further by saying that

Rabobank would set its one-month Yen-LIBOR at .63 so long as R.P. Martin let UBS know in

order for UBS to "scratch [Rabobank's] back" in the future.  R.P. Martin promised to

"definitely" let UBS know in order to "play by the rules."  Consistent with his agreement to do

so, Rabobank's one-month Yen-LIBOR submission on July 18, 2008 was .63.

     F.    RBS Manipulated Yen-LIBOR through Brokers and Engaged in Wash Trades to Compensate the Broker Defendants for Their Assistance.

525.    By January 2007, "RBS Yen Trader 1," Neil Danziger, came to suspect that UBS

was using inter-dealer brokers to manipulate Yen-LIBOR.  At that time, Danziger commented to

another RBS trader, stating: "do you think brokers go and tell small banks where it should be? [

... ] on behalf of the bigger banks i could imagine UBS telling the brokers to go and get all the

small banks to mark libor up."  Several months later, in August 2007, Danziger commented

again to Senior Yen Trader, Jimmy Tan, about information he learned from "R.P. Martin Broker

B," Lee Aaron: "i was out with [Lee] yesterday every day [UBS Yen Trader Tom Hayes] comes

down and asks the jpy desk to tell all the banks to set [Yen] libor low."

526.    Beginning a year later, from September 2008 to August 2009, as requested by at

least Broker Defendants Tullett Prebon and Broker co-conspirator R.P. Martin, Neil Danziger

agreed to execute wash trades with UBS to generate additional illicit commission in recognition

for their assistance in helping manipulate Yen-LIBOR.  *See* ¶¶ 506-516, 544-548, 587-594.

527.    RBS paid brokerage commissions on some of these wash trades to maintain good

relationships with the inter-dealer brokers.  For example, on September 19, 2008, Lee Aaron

asked Danziger for a "favour" to enter into a "switch" or wash trade with UBS because UBS

wanted to pay R.P. Martin some illicit commission.  In exchange for entering such a large wash

trade with UBS, R.P. Martin promised to send around lunch to the RBS desk because the trade

was so large.  The exchange between Aaron and Danziger shown below:

> **September 19, 2008**:
>
> R.P. Martin [Aaron]: can you do me a favour ... you're not going to get
> paid any bro for this and we'll send you lunch around for the whole desk.  Can
> you flat ... can you switch two years semi at 5 3/4, 100 yards [meaning 100
> billion] ... between UBS. Just get ... take it from UBS, give it back to UBS. He
> wants to pay some bro. We won't bro you ...
>
> RBS [Danziger]: Yeah, yeah.[ ... ]
>
> R.P. Martin [Aaron]:Yeah. Yeah. 100 yards ... actually can you make it
> 150 and I'll send lunch around for everybody?
>
> RBS [Danziger]:  Yeah.
>
> R.P. Martin [Aaron]: Thanks very much. Cheers. Cheers, mate and you choose
> lunch.

528.    That same day, R.P. Martin also asked Danziger to enter an additional ¥100

billion in wash trades with UBS so that Hayes could pay approximately $31,000 in brokerage

fees to R.P. Martin as compensation for R.P. Martin's assistance with the manipulation of Yen-

LIBOR.  By agreeing to do so, Danziger knowingly assisted Hayes' manipulation because he

helped ensure that the inter-dealer broker was compensated.

529.    Danziger also eventually asked R.P. Martin, on at least one occasion, to influence

other panel banks' Yen-LIBOR submissions to benefit his Yen-LIBOR-based derivatives

positions.  For example, on June 26, 2009, Danziger asked R.P. Martin to assist in lowering six-

month Yen-LIBOR.  Aaron readily agreed saying "alright….we'll work on it":

> **June 26, 2009**:
>
> RBS [Danziger]: Has Tom [Hayes] been asking to get LIBORs up today?
>
> R.P. Martin [Aaron]: Sorry start again. Say that again?

RBS [Danziger]: Has Tom been asking you to put LIBORs up today?

R.P. Martin [Aaron]: [Talking in background to Terry Farr] Er Tel, what's Tom want LIBORs today? Has he said anything about LIBOR, what way he want them? Did you hear that?

RBS [Danziger]: No

R.P. Martin [Aaron]: Well he wants ones and threes a bit lower and sixes probably about the same, where they are now.  He wants them to stay the same.

RBS [Danziger]: I want them lower

R.P. Martin [Aaron]: You want them lower? Sixes?

RBS [Danziger]: Yeah

R.P. Martin [Aaron]: Alright well. Alright well we'll work on it.

530.    ████████████████████████████████

████████████████████████████████████████

████████████████

████████

████████████████████████

████████████

██████████████████████████████

████████████

██████████████████████████████

████████████████████

████████████

████████████████████

████████████



531. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

G. Deutsche Bank Used Inter-dealer Brokers to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives

532.     Deutsche Bank colluded with multiple Broker Defendants to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  For example, on July 10, 2009, Submitter-7 messaged inter-dealer Broker A-1, requesting that Broker A-1 get his Yen-LIBOR Contributor Bank clients to lower three-month Yen-LIBOR.  Submitter-7 stated, "3 mth libor today ? . . . any chance to get it lower or some resistance . . . ."  Broker A-1 replied, "ill try prob Monday can get it lower."

533.     Deutsche Bank also colluded with inter-dealer Broker B, R.P. Martin.  For example, on September 26, 2008, Deutsche Bank and R.P. Martin manipulated Yen-LIBOR artificially higher:  Guillaume Adolph messaged Terry Farr ("Broker B-1") in an electronic chat, "Morning libor to the roof today please," to which Broker B-1 replied, "yeah looks that way dude."

H. The Hayes Trial, Broker Trial, and Settlement Cooperation Produced to Plaintiffs by R.P. Martin Provided New Information Regarding the Scope and Inner-Workings of the Contributor Bank Defendants' and Broker Defendants' Conspiracy

534. The Hayes Trial, *R. v. Hayes*, began in the Southwark Crown Court on May 26, 2015, and concluded on August 3, 2015. Hayes was found guilty of all eight charges of conspiracy to defraud. The trial focused on Hayes' manipulation of Yen-LIBOR. The eleven-week trial included hundreds of trial exhibits and testimony from nine witnesses. A key feature of the trial was Hayes' testimony from 82 hours of recorded interviews that he gave to the SFO. This testimony was not available to Plaintiffs (or the public) prior to Hayes' trial. In addition, hundreds of new communications beyond those released in connection with the Defendants' government settlements were first made available to Plaintiffs at the Hayes Trial.

535. Additional evidence was also revealed in the U.K. criminal trial of six inter-dealer brokers, *R. v. Read & Ors.* ("Broker Trial"). The Broker Trial focuses on the manipulative conduct of six brokers employed by the Broker Defendants and co-conspirators, Darrell Read (ICAP), Colin Goodman (ICAP); Danny Wilkinson (ICAP), Terry Farr (R.P. Martin), James Gilmour (R.P. Martin), and Noel Cryan (Tullett Prebon) and their conspiratorial manipulation of Yen-LIBOR with the Contributor Bank Defendants during the Class Period.[191]

536. These trials, in addition to the documents produced to Plaintiffs by R.P. Martin as settlement cooperation, have confirmed the factual findings of multiple government regulators and expanded on the extent and nature of Defendants' conspiracy, including, the Broker Defendants' role in conspiring with multiple Contributor Bank Defendants to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

### a. R.P. Martin

537. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ ██ ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████[193]

538. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ ██ ████████████████████████████████████

██████████████████████[195]

539. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████[196]

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████[197] ████████████████

---

[192] ████████████

[193] ██████

[194] ███████

[195] ███████

[196] ███████

[197] ████████████████████████████████████████████



540.    Hayes knew that Farr had relationships with Yen-LIBOR-based derivatives

traders and Yen-LIBOR submitters at multiple banks.  During his SFO interview, Hayes

explained that Farr was valuable to him because he "knew people in the cash market", *i.e.*, the

market for yen deposits underlying Yen-LIBOR:

> Terry was someone who would try and get me the best deals . . . as
> they came across the desk, which was useful for me. And he was
> also somebody, who was able to give me information because Terry
> had moved from the Forward desk, from the Cash desk to the
> Forward desk. So obviously what was happening in the Cash Market
> was of vital importance to me, so having someone who understood

---

the cash market **knew people in the cash market** [was valuable]

541.



542.    As explained below, multiple Contributor Panel Banks used R.P. Martin brokers as a conduit to conspire with each other and manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives throughout the Class Period.



### i.   **HSBC**

543.    HSBC frequently conspired with UBS through R.P. Martin's Terry Farr to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives during the Class Period. HSBC's Yen-LIBOR submitter, Luke Madden, conspired to make false Yen-LIBOR submissions with multiple Contributor Bank Defendants through his good friend and R.P. Martin broker Terry Farr.  Through Farr, HSBC participated in multiple manipulative campaigns with UBS and other Contributor Bank Defendants, coordinating false Yen-LIBOR submissions among a large group of panel banks.  Many of these campaigns were successful at manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  *See* ¶¶ 668-696, *infra*.

### ii.   **RBS**

544.    RBS conspired with UBS through R.P. Martin brokers Lee Aaron and Terry Farr during the Class Period to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  RBS Yen-LIBOR-based derivatives trader Neil Danziger coordinated false Yen-LIBOR submissions with Hayes and traders at multiple Contributor Panel Defendants.  *See* ¶ 530, *supra*.  Danziger also executed wash trades in furtherance of Defendants' conspiracy to pay the brokers illicit commission as a reward for manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

545.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████
████████████████████████████
████████████████████



546.



547.



548. ███████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

    **iii.**   **JPMorgan**

549. ███████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████



550.



551.

[206] Tullett Prebon broker Noel Cryan explained to the SFO that it was common to stagger when wash trades were entered to make it look as though there was a legitimate reason for entering and exiting the position, providing the traders involved with a story they could use when questioned about the sham transactions. *R. v. Read & Ors* Transcript of Trial at 25:14-25 (Nov. 12, 2015).



552.

iv.   **Norinchukin**

554.



555.







559.

**v.   Rabobank**

560.



561.



562.

214

215

vi.    **<u>Société Générale</u>**

563.



564.

565.

██████████████████████████████████████████████████████████

████████████████████████████[218]

### vii.   <u>Mizuho Bank</u>

566.  ████████████████████████████████████



[219]

567. 

viii.   **<u>Deutsche Bank</u>**

568.

569.

220





**ix.**   **Lloyds**

571.

572.



**x.**   **Merrill Lynch**

573.

574. 

575.



xi.   **Bank of Tokyo-Mitsubishi**

576.



577.

**b. ICAP**

578.    ICAP also served as a conduit between multiple Contributor Bank Defendants to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives during the Class Period

---

229

using many means, including (1) disseminating false "run thrus"; and (2) coordinating false Yen-LIBOR submissions among Contributor Panel Banks.  For example, in the message below, Read notified UBS trader Tom Hayes that he had been in contact with West LB ("Bank A") and received confirmation that they would make an artificially lower Yen-LIBOR submissions on December 6, 2006:

> **December 6, 2006**:
>
> ICAP [Read]: i have spoken to [Bank A] about libors, he will be the lowest[230]

579.    To maximize their impact on Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, ICAP brokers worked as a team to leverage all their contacts when making requests for false Yen-LIBOR submissions.  For example, in the conversation below, Hayes asked Read to contact Lloyds' and Rabobank's Yen-LIBOR submitters to request higher six-month Yen-LIBOR submissions:

> **October 31, 2006**:
>
> UBS [Hayes]: hi do you speak to rabo or lollyds? have their 6m libors very very low thx for getting it up y/day
>
> ICAP [Read]: cash boys talk to lloyds but their guy has been away, will chase them today no contact with rabo cash
>
> UBS [Hayes]: ok they have probably just left the libors alone whilst he is away!
>
> ICAP [Read]: they will be wiped off the bottom anyway
>
> UBS [Hayes]: **yes evry little helps**
>
> ICAP [Read]: :-)[231]

---

[230] Ex. C-1 at 16.

[231] Ex. C-1 at 15.

580.    Following the discussion with Hayes above, Read passed the request for an artificially high six-month Yen-LIBOR submission to ICAP "Cash Broker 1," Colin Goodman, whom he knew was in contact with Lloyds' Yen-LIBOR submitter:

**October 31, 2006**:

ICAP [Read]: Morning [Colin], Still need these libors kept as high as possible please mate. … anything you can do to get them high will be much appreciated.

581.    ICAP brokers often conspired with and coordinated false Yen-LIBOR submissions among multiple Contributor Bank Defendants.  For example, in the conversation below, Read asked "ICAP Derivatives Broker 3" David James Smith to contact RBS' back up Yen-LIBOR submitter, Neil Danziger,[232] to coordinate a high six-month Yen-LIBOR submission among at least two Contributor Bank Defendants –  UBS and RBS:

**August 23, 2007**:

ICAP [Read]: [David] does [Neil Danziger] have any influence over their libor sets…if he does ask him to do us a favor and edge 6m up please…think [JPMorgan trader Paul Glands] was chasing [Colin] for a high fix as well, so should do us all a favour…thanks

ICAP [Smith]: [Neil Danziger] is doing them this wek , he wants 6's up so will be marking them up anyway

ICAP [Read]: **brooliant!! They are making fortunes with these high fixings!!! :-) that's UBS, RBS, and [JPMorgan] + M'Lord should be ok!![233]**

582.    ICAP cash broker Colin Goodman also communicated directly with traders and submitters he knew at panel banks to request false Yen-LIBOR submissions.  For example, Goodman contacted Deutsche Bank's Yen-LIBOR submitter on multiple occasions, including after receiving instructions from Darrell Read to request a false Yen-LIBOR submission on Tom

---

[232] Ex. B-4 at 7 (Neil Danziger was the backup Yen-LIBOR submitter).

[233] Ex. C-1 at 16.

Hayes' behalf.  For example, in the conversation below, Darrell Read asked ICAP "Junior Broker 1," Ryan Sherer, to ensure that Goodman would manipulate Yen-LIBOR lower during the next week:

> **October 19, 2007**:
>
> ICAP [Read]: want 1m and 6m libors to keep pushing down…3m to hold as best we can (6m down the most important thing) …**same goes for next week**, if you could just remind [Colin] each morning
>
> ICAP [Sherer]: will do thks[234]

583.    Following this request, Goodman contacted Deutsche Bank's Yen-LIBOR submitter the next week to request an artificially lower Yen-LIBOR submission.

584.    ICAP also was aware that Hayes was conspiring with R.P. Martin and other brokers to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  For example, in the conversation below, which was revealed during the Hayes Trial, Read and Hayes discussed the series of wash trades UBS entered with RBS and JPMorgan on September 19, 2008:

> **September 19, 2008**:
>
> ICAP [Read]: Did Stuart switch for you?
>
> UBS [Hayes]: Yeah 50b 2y and Neil [Danziger] at RBS 150b…Sorry 200b…I owe him 150b more…Total 400b…thx advice
>
> ICAP [Read]: Nice of them, 400bn on no cap is a lot of bro
>
> UBS [Hayes]: will only deal this month tho
>
> ICAP [Read]: cheap deal for you if he can move libor by a quarter of a basis point on a big fix…works both bays :-)
>
> UBS [Hayes]: He [Terry Farr] has a nice little niche there

---

[234] *Id.*

### c.  Tullett Prebon

585.     Tullett Prebon brokers were another means through which multiple Contributor

Bank Defendants conspired to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based

derivatives, including by coordinating false Yen-LIBOR submissions in furtherance of the

conspiracy.

### i.     <u>Tullett Prebon Management Directed Brokers to Engage in More Wash Trades</u>

586.     Tullett Prebon broker Noel Cryan described in his SFO interview how

management directed Tullett Prebon brokers to solicit wash trades from their clients in order to

boost profitability.  Around September 2008, there were rumors circulating that R.P. Martin was

generating approximately £100,000 per month in commission brokering trades for Yen off

balance sheet products.  After hearing of R.P. Martin's success, Tullett Prebon manager Angus

Wink instructed brokers to start engaging in more wash trades to generate additional revenue.

Brokers were more than willing to comply with Wink's directions.  During the Class Period,

Tullett Prebon brokers were paid roughly 33% of the commission they earned as a bonus each

quarter.  As a result, the more wash trades they could organize between clients, the more

commission they earned and the larger their quarterly bonus.

587.     Tullett Prebon brokers executed multiple wash trades in furtherance of the

Defendants' conspiracy, including with RBS Yen-LIBOR-based derivatives trader Neil

Danziger.  Danziger was a client of Mark Jones, a broker on the Yen off balance sheet desk, who

worked closely with Cryan.  Jones knew that Danziger had a certain "lifestyle" and was eager to

pay brokerage so he could earn free entertainment with RBS' money.  Capitalizing on this, Jones

routinely set up wash trades with Danziger to generate extra illicit commission.  Hayes was

frequently the counterparty on the other side of these wash trades as well.  To organize a wash

trade, Jones typically relayed the request to Cryan who then asked Hayes to execute the trade.

For example:

> **September 26, 2008**:
>
> Tullett Prebon [Cryan]: Neil Danziger has asked if you would flat switch 150 yard of 2Y for him.  Not sure why?
>
> UBS [Hayes]: Yeah I would
>
> Tullett Prebon [Cryan]: OK, thanks, any preference on the coupon? 1.105 if that's ok?[235]

588.     However, when Cryan was out of the office, Jones would set up a wash trade with

Danziger and then approach Hayes directly, as shown in the conversation below:

> **December 10, 2008**:
>
> Tullett Prebon [Jones]: Tom Hayes last day before hols today…Any chance of 200 yards 2y mine yours, if can get them to do it?
>
> RBS [Danziger]: If you want.
>
> \*\*\*
>
> *In a separate Bloomberg Chat…*
>
> Tullett Prebon [Jones]: Any chance of a 200yd 2yr switch RBS/RBS?
>
> UBS [Hayes]: Yeah/nett bro
>
> Tullett Prebon [Jones]: Of course, thank you.
>
> UBS [Hayes]: Ie i wont pay bro.  Okay then that's fine.[236]

589.     Once wash trades with RBS and Tullett Prebon became an established practice,

Hayes started using them as a means to pay Cryan illicit brokerage in exchange for his assistance

in coordinating false Yen-LIBOR submissions among Contributor Bank Defendants.

---

[235] *R. v. Read & Ors.*, Transcript of Trial at 3 (Nov. 12, 2015).

[236] *Id* at 20, 24.

ii. **Tullett Brokers Coordinated False Yen-LIBOR Submissions Among Multiple Contributor Bank Defendants**

590.     Tullett Prebon became more involved in the conspiracy to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives following Darrell Read's departure from ICAP in 2009.  With Read gone, UBS trader Hayes contacted Noel Cryan more frequently to coordinate Yen-LIBOR submissions among the Contributor Bank Defendants.  For example, in the conversation below, Hayes offered to "look after" Cryan with wash trades, as he already did with ICAP and R.P. Martin, if Cryan would help manipulate Yen-LIBOR:

> **February 9, 2009**:
>
> UBS [Hayes]: Do you know your cash desk, i.e. the guy who covers yen on your cash desk?
>
> Tullett Prebon [Cryan]: Yes, mate I do.
>
> UBS [Hayes]: Right. From now on I need you to ask him a favour on the fixes.  I will make sure it comes back to you.  I already do it with ICAP.  Basically can you ask him to broker 3M cash, i.e. LIBOR lower for me today?  I will look after you off the back of it.  I do that for RP Martins too.  So emphasize the importance to you.  Just suggest it look a little softer to his accounts.
>
> Tullett Prebon [Cryan]: OK, mate, I understand. I will go and speak to him.
>
> UBS [Hayes]: Stuff like that, thanks, mate, is very important to me today.
>
> Tullett Prebon [Cryan]: Just spoke to them, they're on the case.[237]

591.     Hayes asked Cryan to manipulate Yen-LIBOR again the next day, instructing him to "let them know you'll do better as a result," *i.e.*, to emphasize the wash trades when approaching Yen-LIBOR submitters at other Contributor Bank Defendants to coordinate false Yen-LIBOR submissions:

---

[237] *Id*. at 29, 40.

**February 10, 2009**:

Tullett Prebon [Cryan]: Morning mate, how are you?

UBS [Hayes]: OK mate.  Thanks for help on LIBORs.  Today I need low 1M and 3M but high 6M if you can ask your boys.

Tullett Prebon [Cryan]: OK, will do.

UBS [Hayes]: Is important. I'll make sure it evens out.

Tullett Prebon [Cryan]: Just been over there.

UBS [Hayes]: Thanks, mate.  Let them know you'll do better as a result.

Tullett Prebon [Cryan]: Got it, mate.[238]

592.    The next week, Cryan proactively asked Hayes which tenors of Yen-LIBOR to manipulate so he could coordinate false submissions among the Contributor Bank Defendants:

**February 16, 2009**:

Tullett Prebon [Cryan]: Morning mate, what are you looking for on LIBORs today?

UBS [Hayes]: Low 1M and 3M, 6M higher unchanged.[239]

593.    Later in the same chat, Hayes reaffirmed his promise to enter into a wash trade with RBS trader Neil Danziger to pay illicit brokerage as a reward for Tullett Prebon's participation in the conspiracy to manipulate Yen-LIBOR:

**February 16, 2009**:

UBS [Hayes]: We're getting toward month-end so will cross some stuff up for you then.  Normally do 100 to 150 billion to years, brokerage both sides.

Tullett Prebon [Cryan]: Thanks, mate.  I know Neil's back today and he's keen to do something as well.

---

[238] *Id*. at 58-59.

[239] *Id*. at 60-61.

UBS [Hayes]: OK. No problem. Neil is a lush.[240]

594.     As promised in the communication above, Hayes executed a wash trade with Neil
Danziger for ¥ 200 billion on February 16, 2009.  As a result of the trade Cryan received ¥ 2.5
million in illicit commission, more than $27,000, for assisting with the Defendants' conspiracy to
manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.[241]

595.     The requests for Tullett Prebon's brokers to coordinate false Yen-LIBOR
submissions among Contributor Bank Defendants continued following the February 16, 2009
wash trade.  For example, in the conversation below, Hayes asked Cryan to help manipulate
Yen-LIBOR in exchange for another wash trade that would pay illicit commission:

**February 25, 2009**:

UBS [Hayes]: Low everything, please, mate. 1M, 3M, 6M.

Tullett Prebon [Cryan]: Gotcha

UBS [Hayes]: Big effort on getting these LIBORs power today, please, if you can.
Really important. If you get 3M down you'll get a decent deal from me tomorrow.

Tullett Prebon [Cryan]: Hear you, mate. I'll go and speak to them again.[242]

596.     Tullett Prebon brokers contacted traders and/or submitters at multiple Contributor
Bank Defendants to coordinate false Yen-LIBOR submissions.  For example, below Hayes sent a
message to Cryan listing several banks to target on March 5, 2009, including HSBC, Lloyds,
Bank of Tokyo-Mitsubishi, Norinchukin, and Société Générale:

**March 5, 2009**:

UBS [Hayes]: Hi mate, really, really need low 3m and high 6m.  In 3M Bank of
Tokyo Mitsubishi is 64, Lloyds is as well.  Best not to ask him though.  HSBC is

---

[240] *Id*. at 70.

[241] *Id*. at 71 ("The switch went through as 200 billion").

[242] *Id*. at 85.

63.  Can he go down to 61?  Norinchukin is 65 and Société Générale is 64.[243]

597.    As another example, the communication below demonstrates how Tullett Prebon conspired with and coordinated false Yen-LIBOR submissions among a group of nine Contributor Bank Defendants and Co-conspirators to manipulate one-month Yen-LIBOR lower on March 31, 2009.  This same communication was originally included in UBS' CFTC settlement (Ex. A-2 at 25-26).  However, during the Hayes' Trial the names of the conspiring Contributor Bank Defendants, previously designated "Yen Banks A" through "G" were unmasked:

> **March 31, 2009**:
>
> UBS [Hayes]:  mate we have to get 1m and 3m down 1m barely fell yesterday real important
>
> Tullett Prebon [Cryan]: yeah ok
>
> UBS [Hayes]:  banks to have a go with in 1m are
> [Bank of Tokyo-Mitsubishi]
> [Lloyds]
> [Mizuho Bank]
> [Citibank]
> [Norinchukin]
> [JPMorgan]
> [RBS]
> [Sumitomo Mitsui]
> and [West LB]
>
> Tullett Prebon [Cryan]: got it mate[244]

598.    Defendants successfully manipulated Yen-LIBOR artificially lower on March 31, 2009.  That day, five of the nine Yen-LIBOR Contributor Panel Banks named in the conversation above lowered their one-month Yen-LIBOR submissions relative to the previous

---

[243] *Id.* at 89.

[244] Ex. A-2 at 25.

day, including Contributor Bank Defendants and co-conspirators: (i) Sumitomo Mitsui; (ii) Mizuho Corporate Bank; (iii) RBS; (iv) Norinchukin; and (v) Rabobank.  Another Contributor Bank Defendant, Barclays, also lowered its one-month Yen-LIBOR submission on March 31, 2009.  As a result, the published one-month Yen-LIBOR fix dropped by a full basis point from the day before.

599.    Other Tullett Prebon brokers, including Mark Jones, were also involved in the conspiracy and coordinated false Yen-LIBOR submissions among Contributor Bank Defendants. For example, in the conversation below, Hayes asked Jones to reach out to the submitters at Bank of America and Rabobank to request that they raise their six-month Yen-LIBOR submissions after an unsuspected drop of 5 basis points and 6 basis points, respectively, the day before:[245]

**June 26, 2009**:

Tullett Prebon [Jones]: Here I am

UBS [Hayes]: Hi

UBS [Hayes]: Please tell your cash boys I need a high 6M it's very, very important.

Tullett Prebon [Jones]: What [level] should I suggest? Yesterday's drop was a bit of a shocker in 6M LIBOR. Any idea why that happened?

UBS [Hayes]: 2 people moved it 11 basis points between them…

Tullett Prebon [Jones]: Who was it?

UBS [Hayes]: Rabobank and Bank of America if you can have a word.

Tullett Prebon [Jones]: Will do mate[246]

---

[245] During this time, Hayes was conspiring with multiple Contributor Bank Defendants to manipulate six-month Yen-LIBOR higher as part of Operation 6M.  *See* ¶¶ 741-752, *infra*.

[246] *R. v. Read & Ors*., No. 14-cr-272, Transcript of Trial at 87-88 (Oct. 12, 2015).

228

600.    Jones was successful and, consistent with the conversation above, Bank of America raised its six-month Yen-LIBOR submission by five basis points from 0.70 on June 25 to 0.75, on June 26, 2009.  With this increase Bank of America skipped over eight panel banks to move from the seventh-lowest submission on June 25, 2009, to the second-highest submission on June 26, 2009.  This jump, from the middle of the back to the top of the range, exactly followed Hayes' plan to move the fixing higher by intentionally submitting quotes that were excluded from the average calculation.  *See* ¶¶ 462-467, *supra*.

I.    The Contributor Bank Defendants Colluded Directly with One Another To Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives

1.    UBS' Admitted Collusion with Other Panel Banks[247]

601.    Hayes augmented his internal efforts to manipulate Yen-LIBOR for multiple tenors and the prices of Yen-LIBOR-based derivatives by coordinating with derivatives traders at other panel banks.  Hayes wanted to better exploit the averaging methodology used to calculate fixings, maximizing the impact of each corrupted submission on the official daily fixing of Yen-LIBOR.

602.    By at least January 2007, Hayes began coordinating regularly with derivatives traders at other panel banks.  Hayes communicated with traders employed by at least one Contributor Bank Defendant, RBS, and three co-conspirators, JPMorgan, Deutsche Bank, and HSBC, that he knew personally or worked with previously.  Most of the examples below are communications from the Hayes Trial.  Some of these communications were previously released, in part, in various Defendants' government settlements, however, the traders' identities and the banks that they worked for were obscured.

---

[247] *See also* Ex. A-2, pp. 17-20.

603.    For their own manipulative purposes of benefiting their Yen-LIBOR-based derivatives trading positions, certain of the derivatives traders at the other banks sought reciprocating assistance from Hayes to make requests on their behalf to UBS' submitters.  Hayes readily agreed to help them and often encouraged them to ask for help as a way to curry favor and ensure his requests were accommodated.

604.    Numerous communications between Hayes and derivatives traders at the other panel banks reveal:

- o   descriptions of Hayes' strategy and his success in keeping Yen-LIBOR "artificially high";

- o   how, as with the internal requests, Hayes pressed traders at the other banks for assistance particularly on key fixing dates around the IMM dates or the turn of the calendar year;

- o   how traders believed that Yen-LIBOR was vulnerable to manipulation and routinely submitted requests for artificial Yen-LIBOR submissions to benefit their derivatives positions;

- o   that communications requesting false Yen-LIBOR submissions frequently covered a range of days, such that a single request could result in multiple days of artificial Yen-LIBOR submissions impacting the published Yen-LIBOR during the same period;

- o   the pressure Hayes felt to keep making money for UBS; and

- o   that the traders believed they succeeded at times.

605.    On February 2, 2007, Hayes described this method of manipulating Yen-LIBOR in an electronic chat with his counterpart Yen derivatives trader ("Trader-A1"), Will Hall, at RBS ("Bank-A"):

**February 2, 2007**:

RBS [Hall]: jimmy tan[248] telling me the spread will widen over golden week??

---

[248] Jimmy Tan, an RBS Japan Yen trader in Singapore, was identified as Senior Yen Trader in RBS' CFTC settlement.

UBS [Hayes]: no way

RBS [Hall]: that's what I thought
he pays 15.5 too for that spread if you wanna do any more

UBS [Hayes]: he is an idiot

***

UBS [Hayes]:  3m libor is too high cause I have kept it artificially high

RBS [Hall]: how

UBS [Hayes]:  being mates with the cash desks, [JPMorgan] Chase and I always
help each other out

606.    Later in the same chat, Hayes shared proprietary and commercially-sensitive
information with Hall, letting him know that he was "long libor," *i.e.*, his Yen-LIBOR-based
derivatives positions would financially benefit from an increase in the rate.  As a result, Hayes
planned to manipulate Yen-LIBOR higher, before causing a "2bp swing in the fix," by
manipulating it artificially lower:

**February 2, 2007**:

RBS [Hall]:    Ok that's useful to know. So I assume 1s4s it will be soft

UBS [Hayes]: well I am long libor in 1v4m so will try to keep high them but
basicly 1bp is too high right now and come may I'll get it 1bp too low net net a
2bp swing in the fix

RBS [Hall]: Good man[249]

607.    Soon after telling Hall that he was manipulating the Yen market, Hayes asked
Hall to make false Yen-LIBOR submissions.  For example, in the conversation below, Hayes

---

[249] Ex. A-2 at 19.

asked Hall to keep RBS' one-month Yen-LIBOR submissions artificially lower over the next

several days:

> **February 8, 2007**:
>
> UBS [Hayes]: can you do me a huge favour, can you ask your cash guys
> to set lm libor low for the next few days . . . i'll return the favour as when you
> need it ... as long as it doesn't go against your fixes . . . have 30m jpy of fixes over
> the next few days
>
> RBS [Hall]: yeah i will try[250]

608.    Hall successfully kept RBS' one-month Yen-LIBOR submission artificially lower

and the next day Hayes thanked him for his manipulation:

> **February 9, 2007**:
>
> UBS [Hayes]: thx help lm y/day appreciated
>
> RBS [Hall]: no worries[251]

609.    The two traders then discussed whether their trading positions, and thus their

preferred Yen-LIBOR levels, were aligned, and Hayes requested a low fixing:

> **February 9, 2007**:
>
> UBS [Hayes]: can you ask for a low lm [Yen-LIBOR] again today pls if  ok? . . .
> todays fix is 12m . . . you need anything on 3m or 6m?
>
> RBS [Hall]: no my book is still tiny i will go for low [Yen] libor again
> ... it suits me too as i am short the spreads
>
> UBS [Hayes]: ok thanks…wait till you get clumped in 300b of 6m fra!... then you
> care…that's a 15m fix….typically I have about 10m-15m fixing every day in one
> bucket or another[252]

---

[250] Ex B-1 at 23.

[251] *Id.* at 24.

[252] *Id.*

610.     Later in the same chat, Hall and Hayes discussed their mutual interest in a low one-month and three-month Yen-LIBOR.  Hayes told Hall that he would contact JPMorgan to request false Yen-LIBOR submissions as well:

> **February 9, 2007**:
>
> RBS [Hall]: i told my cash guy i want low lm and 3m fixes and high 6 m that suits uu right
>
> UBS [Hayes]: yes absolutely, is that ok with you? we will be exactly the same . . . am going to talk to [JPMorgan] as well
>
> RBS [Hall]: perfect
>
> UBS [Hayes]: cool . . . you in monday?
>
> RBS [Hall]: yeah a bit
>
> UBS [Hayes]: ok get them to set the same fixes monday as well if ok
>
> RBS [Hall]: sure[253]

611.     Hayes messaged Hall on February 13, 2007 to request RBS keep its one-month Yen-LIBOR submissions low until February 15, 2007.  In an electronic chat on February 15, 2007, Hayes directed Hall to get RBS' Yen-LIBOR submitter to submit artificially low one-month and high six-month Yen-LIBOR submissions.  Hall agreed to do so:

> **February 15, 2007**:
>
> UBS [Hayes]: can you ask for a low lm fix again ...wd really help
>
> * * *
> RBS [Hall]: sure it suite me to get low 1s and s . . . 3s
>
> UBS [Hayes]:  thanks need high 6's tho if ok with you?
>
> * * *

---

[253] *Id*. at 25-26.

RBS [Hall]: i have got nothing in 6s until the 19 fix date when i need a high one too

UBS [Hayes]:  ok thx [Will]

RBS [Hall]: so yeah thats fine with me my cash guy is rubbish at guessing where [Yen] libors are going to be but he listens to what i say

UBS [Hayes]:  thats a releif[254]

612.   Later that same day, Hall asked Hayes, "how many people can you get to put this lm [Yen] libor low."  Hayes responded, "well us [JPMorgan] and a few others i think."  Within minutes of this exchange, Hayes asked Roger Darin to contribute a low one-month and six-month Yen-LIBOR submission.  Hayes then asked Roger Darin if he knew anyone at another Contributor Panel bank that he "could have a word with . . . as a favour."  Roger Darin replied that he lacked that "edge" but suggested that Hayes "have a word with [JPMorgan]."  In response, Hayes told Roger Darin submitter that he had "already done that . . . and rbs."[255]

613.   On a few occasions, Hall reported back to Hayes that he expected RBS' Yen-LIBOR submitters to accommodate Hayes' request.  For example, in an April 20, 2007 electronic chat, Hayes stated to Will Hall: "I know I only talk to you when I need something but if you could ask your guys to keep 3m [Yen-LIBOR] low wd be massive help as long as it doesn't interfere with your stuff . . . tx in advance."

614.   Approximately 30 minutes later, Hayes and Hall had the following chat:

**April 20, 2007:**

UBS [Hayes]: I know I only talk to you when I need something but if you could ask your guys to keep 3m low wd be massive help as long as it doesn't interfere with your stuff tx in advance . . . mate did you manage to spk to your cash boys?

RBS [Hall]:    yes u owe me they are going 65 and 71

---

[254] *Id.*

[255] *Id.* at 26.

> UBS Hayes:   thx mate yes I do . . . in fact I owe you big time

615.   Approximately 45 minutes later, after checking to see if RBS lowered its three-

month Yen-LIBOR submission to 65, Hayes sent the following message to Will Hall: "Mate they

set 64! . . . that's beyond the call of duty!"[256]

616.   Hayes rewarded Hall and RBS for their participation in the conspiracy with

proprietary, market-sensitive information, and by having UBS' submitters make false Yen-

LIBOR submissions for RBS' benefit.  For example, Hayes often told Hall where UBS was

putting its Yen-LIBOR submissions so that Hall could use that information to his advantage in

trading Yen-LIBOR-based derivatives.

> **February 26, 2007**:
>
> UBS [Hayes]: can you try to get your guys to leave their 3m and 1m [Yen] libors
> unchanged?
>
> RBS [Hall]: yeah i want low ones so that suits me
>
> UBS [Hayes]: gd thx mate ... we are going low too

617.   Hayes also asked UBS' submitters to make false Yen-LIBOR submissions for

Hall (RBS) in return for RBS' false Yen-LIBOR submissions which benefitted Hayes' (UBS')

Yen-LIBOR-based derivatives positions.  For example:

> **March 2, 2007**:
>
> RBS [Hall]: please please low 6m [Yen-LIBOR] fix on monday . . . i have got a
> [b]ig fix
>
> UBS [Hayes]:  sure no worries
>
> ***
>
> UBS [Hayes]: how big is the fix mate?

---

[256] Ex. A-2 at 19.

> RBS [Hall]: 100 us big for me
>
> UBS [Hayes]: 10m jpy? . . . yes thats quite lrge 200b 6m[257]

618.    Hall's requests for false Yen-LIBOR submissions, and Hayes' agreement to get UBS' submitters to accommodate those false requests, continued in March 2007 and beyond, as evidenced in the following chats:

> **<u>March 6, 2007</u>**:
>
> RBS [Hall]: yeah can u go fr low everything plse . . . i am
>
> UBS [Hayes]: will do cld do with high threes but won't get it we are the lowest[258]

619.    Later that day, Hayes relayed Hall's request to UBS' Yen-LIBOR submitter:

> **<u>March 6, 2007</u>:**
>
> UBS [Hayes]:  hi pls don't forget low lm and 6m! :) . . . have lots fixing
>
> UBS [Joachim Ruh]: mate i won't[259]

620.    Others at RBS knew that Hall was conspiring with Hayes, for example:

> **<u>March 27, 2008</u>**:
>
> RBS [Tan]: we change the [Yen] libor lower?
>
> RBS [Danziger]: [Will Hall] asked [a junior backup submitter] to put it low
>
> \*\*\*
> RBS [Danziger]: does he need it or Tom Hayes ask him to do it? . . . cos UBS wanted low[260]

621.    During 2008, Hayes started to send requests for false Yen-LIBOR submissions to RBS trader Brent Davies, "Trader-6" in RBS' DOJ settlement.  For example, in the email

---

[257] Ex. B-1 at 27.

[258] *Id.* at 27-28.

[259] *Id.* at 28.

[260] *Id.* at 30.

conversation below, Hayes asked Davies to secure low six-month Yen-LIBOR submissions from

RBS over the next few days:

>**May 7, 2008**:
>
>>UBS [Hayes]: Hi [Brent] . . . can you please ask for a low 6m in jpy for the next few days. Hope you are ok, was good seeing you last week
>>
>>RBS [Davies]: Hi mate, I mentioned it to our guy on Friday and he seemed to have no problem with it, so fingers crossed.[261]

622.    These requests continued at least throughout 2008, while Davies was still

employed by RBS, as evidenced in the following instant message between Hayes and Davies in

November 2008.

>**November 3, 2008**:
>
>>UBS [Hayes]: can you do me a favour and ask your guys for a low JPY 3m fix today if they can? . . . wld be massiive help
>>
>>RBS [Davies]: will ask
>>
>>UBS [Hayes]: have monster fix . . . thanks [Brent][262]

623.    Davies left RBS in (or around) July 2009 to become a cash broker for Broker

Defendant ICAP.  While at ICAP, Davies maintained his relationship with RBS' Yen-LIBOR

"Submitter 1," Paul White, and continued to conspire with Hayes to manipulate RBS' Yen-

LIBOR submissions.  For example, on March 3, 2010, Hayes (who by that time had left UBS

and joined Citibank) messaged Davies to request a false Yen-LIBOR submission from RBS:

>**March 3, 2010**:
>
>>Citibank [Hayes]: i really need a low 3m Yen-LIBOR into the imm . . . any favours you can get with the due at RBS would be much appreciated . . . even if he on;ly move 3m down lbp . . . from 25 to 24

---

[261] *Id*. at 30-31.

[262] *Id.* at 31.

ICAP [Davies]: I'll give him a nudge later, see what he can do

Citibank [Hayes]: thanks mate . . . really really would appreciate that

ICAP [Davies]: haven't seen him since i left so I might buy him a steak to catch up

Citibank [Hayes]: yeah[263]

624.     Davies reached out to White, offering a steak in exchange for a false Yen-LIBOR submission and letting him know it was for their "mutual friend" Tom Hayes:

**March 3, 2010**:

ICAP [Davies]: can i pick ur brain?

RBS [White]: yeah

ICAP [Davies]: u see 3m Yen-LIBOR going anywhere btween now and imm?

RBS [White]: looks fairly static to be honest, poss more pressure on the upside , but not alot

ICAP [Davies]:   oh. we hve a mutual friend who'd love to see it go down, no chance at all?

RBS [White]: haha TH [Tom Hayes] by chance

ICAP [Davies]: shhh

RBS [White]: hehehe , mine should remain flat , always suits me if anything to go lower as i rcve funds

ICAP [Davies]: gotcha, thanks, and, if u cud see ur way to a small drop there might be a steak in it for ya, haha

RBS [White]:  noted ;-)[264]

---

263 Ex. C-1 at 35.

264 *Id*. at 32-33.

625.    The next day, March 4, 2010, RBS' three-month Yen-LIBOR submission moved down by one basis point, from 25 to 24, consistent with Hayes' request.  In response to this beneficial submission, White messaged Davies:

**March 4, 2010**:

RBS [White]:  Libor lower ;-)

ICAP [Davies]: good work!!!![265]

626.    White continued to lower RBS' Yen-LIBOR submissions through March 9, 2010 by one basis point, and then lowered RBS' submission an additional basis point by March 11, 2010, tying Rabobank, another known Hayes co-conspirator, for the lowest Yen-LIBOR submission that day.  RBS' Yen-LIBOR submission remained tied with Rabobank's submission through March 17, 2010, the March 2010 IMM fixing date that Hayes originally referenced.  On March 17, 2010, RBS' Yen-LIBOR submission was 2.375 basis points below the BBA Yen-LIBOR fix.

627.    RBS' traders and submitters knew that by working with Hayes they were participating in a far-reaching and broad conspiracy to rig Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  For example, in the conversation below, RBS Yen Manager Jezri Mohideen acknowledged that one of the means that Hayes used to manipulated Yen-LIBOR was "partnering up with a number of cash guys," *i.e.*, Yen-LIBOR submitters at multiple banks:

**August 20, 2007:**

RBS [Mohideen]: it seems to be [UBS] is pushing for these [Yen] libors partnering up with number of cash guys as well

RBS [Hall]: yeah [Hayes] all over it[266]

---

[265] *Id*. at 33.

[266] Ex. B-4 at 14.

628.     RBS Senior Yen-Trader Jimmy Tan acknowledged in mid-2007 that Yen-LIBOR

had become a "cartel now" among UBS, RBS, and the other contributor panel banks:

> **August 20, 2007**:
>
> RBS [Tan]: this libor setting is getting nutss
>
> Bank A Trader: im puzzled as to why 3m libor fixing not coming off after the FED action
>
> Bank B Trader: [UBS] is lending dolls through my currencies in 3 month do usee him doing the same in urs
>
> RBS [Tan]: yes[,] he always led usd in my mkt[,] **the Yen-LIBOR is a cartel now**
>
> RBS [Tan]: **its just amazing how libor fixing can make you that much money**
>
> RBS [Tan]: its a cartel now in london[.] they smack all the 1yr irs  .. and fix it very high or low [.] they smack all the 1yr irs .. and fix it very high or low[267]

629.     Later in 2007, RBS traders and Jezri Mohideen described how there is "pure

manipulation going on" with the Yen-LIBOR fixing:

> **December 5, 2007**:
>
> RBS [Hall]: FYI [Yen] libors higher again today [ ... ]
>
> Yen Trader 4: 'ucksake. keep ours low if poss. don't understand why needs to go up in yen
>
> RBS [Hall]: **no reason dude[,] [Bank C] and [Bank D] went high yest**
>
> Yen Trader 4: send the boys round [ ... ]
>
> RBS [Mohideen]: **pure manipulation going on**[268]

---

[267] *Id*.

[268] Ex. B-4 at 15.

630.    Taking full advantage of this "pure manipulation," RBS continued to systematically conspire with Hayes to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives for their financial benefit at the expense of Plaintiffs and the Class during the remainder of the Class Period.

631.    Hayes also contacted Yen derivatives "Trader-B," Guillaume Adolph, at Bank-B, Deutsche Bank, to request Yen-LIBOR submissions that would benefit UBS' Yen trading positions.  For example, in the conversation below, Adolph and Hayes shared commercially-sensitive information regarding their proprietary Yen-LIBOR-based derivatives positions, and agreed to work together in making false submissions:

> **August 28, 2008**:
>
> UBS [Hayes]: That is thru my mid of 7/5…am axed but not that axed…city went nuts and distorted the mkr…how about we split it…67.875…then I can go home
>
> Deutsche Bank [Adolph]: ok I give you 50 b in each
>
> UBS [Hayes]: look i appreciate the business and the calls
> we should try to share info where possible
> **also let me know if you need fixes one way or the other**
>
> Deutsche Bank [Adolph]: sure sorry mate have to go too busy on many things
>
> UBS [Hayes]: and i'll do the same if you have any joy with you setters
>
> Deutsche Bank [Adolph]: no prob[269]

632.    In the following conversation, Adolph agreed to manipulate Yen-LIBOR to help Hayes who stood to make ¥ 75 million, approximately $750,000, for each basis point six-month Yen-LIBOR decreased:

> **September 18, 2008**:

---

[269] Ex. I-1 at 50-51.

UBS [Hayes]: you got any ax [interest] on 6m fix tonight?

Deutsche Bank [Adolph]: absolutely none **but I can help**

UBS [Hayes]: Can you set low as a favour for me?

Deutsche Bank [Adolph]: done

UBS [Hayes]: i'll return favour when i can just ask…have 75m m jpy a bp tonight

Deutsche Bank [Adolph]: np

UBS [Hayes]: thanks so much

Deutsche Bank [Adolph]: 73/90/99 am putting libors

UBS [Hayes]: great thanks mate[270]

633.    The next day, Hayes offered Adolph a deal at a favorable price, "in fact cause you help me on 6m yday," rewarding Adolph's successful manipulation of six-month Yen-LIBOR.[271]

634.    Adolph continued to manipulate Yen-LIBOR for Hayes through at least 2009.   In the conversation below, Hayes asked Adolph (and Adolph agreed) to manipulate six-month Yen-LIBOR to financially benefit a massive Yen-LIBOR-based derivatives position that Hayes held:

**May 21, 2009**:

UBS [Hayes]: cld you do me a favour would you mind moving your 6m libor up a bit today I have a gigantic fix…i am limit short cant…sell anymore just watch

Deutsche Bank [Adolph]: i can do that

UBS [Hayes]: thx[272]

635.    Consistent with Hayes' request, on May 21, 2009, six-month Yen-LIBOR increased by six-tenths of a basis point.

---

[270] *Id.* at 51.

[271] *Id.* at 52.

[272] *Id.* at 54.

636.     Deutsche Bank conspired with UBS so frequently that Adolph at times asked

Hayes, "where should i put my libors" and listed various options for Hayes to choose.[273]

Deutsche Bank also participated in several of the known long-term manipulation campaigns with

UBS, including "Operation 6M" and "The Turn Campaign" during which UBS, HSBC,

Deutsche Bank worked together to stagger drops in their six month Yen-LIBOR submissions

during the summer of 2009.  *See* Part IV.7.B., *infra*.

637.     In another example of a long-term manipulation, Hayes started planning in

March 2010, roughly ten months prior to the December 2010 IMM date, to manipulate three-

month Yen-LIBOR higher to benefit his "massive" Yen-LIBOR-based derivatives position.

Adolph again agreed to participate in the manipulation as Hayes promised to return the favor:

> **March 26, 2010:**
>
> UBS [Hayes]: you got much in 3m libor in dec?
>
> Deutsche Bank [Adolph]: nothing
>
> UBS [Hayes]: ok i really gonna need 3m lib up a bit in dec have massive imm fix vs [Nomura]
>
> Deutsche Bank [Adolph]: hum np
>
> UBS [Hayes]: thanks
>
> Deutsche Bank [Adolph]: we have time by then
>
> UBS [Hayes]: anything i can help with let me know[274]

638.     Hayes also asked his counterpart Yen derivatives trader ("Trader-C"), Stuart

Wiley, at JPMorgan ("Bank-C") to have JPMorgan contribute Yen-LIBOR submissions to

benefit UBS' Yen derivatives trading positions.  For example, in a January 29, 2007 electronic

---

[273] *Id.* at 57.

[274] *Id.* at 58.

chat with Hayes, Stuart Wiley asked: "[A]nything you need on [Yen] libors today?  High 6m

[Yen-LIBOR] would help me."  Hayes responded, "high 3m I'll sort our 6m rate for you thanks."

As promised, Hayes made a request to the UBS Yen-LIBOR submitter for a high six-month

contribution.

639.    In this January 19, 2007 conversation between Hayes and Wiley, Hayes asked

Wiley to keep JPMorgan's three-month Yen-LIBOR submissions artificially high.  Hayes

wanted to financially benefit several of his Yen-LIBOR-based derivatives positions which were

set to price settle over the next couple of days, referred to by Hayes as "massive 3m

fixes."  Hayes told Wiley he would return the favor by artificially driving up six-month Yen-

LIBOR to benefit JPMorgan's Yen-LIBOR-based derivatives positions.  Wiley agreed to the

manipulation.

> **January 19, 2007**:
>
> UBS [Hayes]: Hi Stuart, bit cheeky but if you know who sets your libors and you
> aren't the other way…I have some absolutely massive 3m fixes the next few days
> and would really appreciate a high 3m fix.  Chase were one of the lowest y/day at
> .51.  Anytimes I can return the favour let me know as the guys here are pretty
> accommodating to me.
>
> Cheers Tom
>
> JPMorgan [Wiley]: I will try my best, but really fed up with my guys, wanted a
> high 6m yesterday, but came in really low (our guys one of the main cultirpts) –
> got quite badly hit on that
>
> UBS [Hayes]: Your and me both, you need 6m high? If so will get my guys to set
> high for you today, yesterday they set 3m up at 57 for me!
>
> JPMorgan [Wiley]: Got nothing significant for next 7 days – so will try to get
> high for you – just really gutted about yesterday cost me alot[275]

---

[275] Ex. A-2 at 18-19.

640.    Wiley was successful at keeping JPMorgan's three-month Yen-LIBOR submissions and the three-month Yen-LIBOR fix artificially higher as indicated by Hayes' email below:

**January 22, 2007**:

UBS [Hayes]: Hi Stuart, thanks for the 3m fix the other day.  If you could try to keep 3m up again wd be much appreciated.  If you have 6m axe let me know…

Thanks

Tom

641.    Hayes also conspired with JPMorgan trader Paul Glands during the Class Period. For instance, in this January 25, 2007 communication, Glands agreed to keep JPMorgan's three-month Yen-LIBOR submission artificially high.

**January 25, 2007**:

UBS [Hayes]: could you do me a favour and ask your cash guys to try and keep 3m libor up today…thanks

JPMorgan [Glands]: WILL DO

642.    Other communications evidence Hayes' willingness to return the favor by making false Yen-LIBOR submissions to benefit JPMorgan's Yen-LIBOR-based derivatives positions. For example, in the conversation below, Hayes asked Wiley to set JPMorgan's one-month Yen-LIBOR submission artificially low over the next few days.  Hayes' request coincided with the same low one-month Yen-LIBOR request Hayes made to RBS.  *See* ¶ 607, *supra*.  In return, Hayes offered to assist JPMorgan with the six-month Yen-LIBOR fix (referred to as "6m" by Hayes) or anything else.  Even after receiving the news that JPMorgan might not be able to help with the one-month fixing, Hayes offered (and JPMorgan agreed) to have UBS make false six-month Yen-LIBOR submissions "all week" for JPMorgan's benefit.

245

**February 8, 2007**:

UBS [Hayes]: Hi Stuart, if you could ask your guys to set 1m low for the next few days would really appreciate it as have 30m jpy fixes, if you need anything done with 6m pls let me know.

Cheers Tom.

JPMorgan [Wiley]: Unfortunately they've gone all "we need to be independent" on us so unfortunately nothing much I can do for a while

UBS [Hayes]: no worries my guys are reasonable so just let me know when you need something

JPMorgan [Wiley]: thanks appreciate it need low 6m for all of next week

UBS [Hayes]: you got it

643.    As evidenced in this July 2, 2008 instant message, Hayes also repaid JPMorgan for its false Yen-LIBOR submissions and participation in the conspiracy by helping JPMorgan "trade out" of positions that were not financially going JPMorgan's way.

**July 2, 2008**:

UBS [Hayes]: Mate if you need to trade out of them let me know.  Think 6m is approaching a level it won't go up from much further.  Just give me what mid you are using and I'll see if it suits…

644.    Hayes also conspired with HSBC through his stepbrother Peter O'Leary, a trader at the bank, to influence HSBC's Yen-LIBOR submissions for the benefit of UBS' Yen-LIBOR-based derivatives positions.  For example, on June 28, 2007, Hayes messaged O'Leary: "pls ask ur mate for high 6m [Yen-LIBOR] mate . . . wd be really really grateful."  O'Leary responded: "will do, for the record he's def not my 'mate'! . . . but I'll [send him an electronic chat]." As requested, approximately 15 minutes later, O'Leary sent an electronic chat to the HSBC Yen-LIBOR submitter stating, "high 6m yen libor would be gd according to my brother!"  The Yen-LIBOR submitter responded, "WILL DO MY BEST."

645.    Hayes knew that coordinating with other Contributor Panel Banks to manipulate Yen-LIBOR and Yen-LIBOR-based derivatives prices was wrong.  In a July 22, 2009, electronic chat with ICAP broker, Darrell Read, Hayes described his plan to coordinate Yen-LIBOR submissions with other Contributor Panel Banks over the next few weeks while staggering drops in submissions so as to avoid detection:

> **July 22, 2009**:
>
> UBS [Hayes]: 11th aug is the big date . . . i still have lots of 6m [Yen-LIBOR] fixings till the 10th
>
> ***
>
> ICAP [Read]: if you drop your 6m [Yen-LIBOR] dramatically on the 11th mate, it will look v fishy, especially if [HSBC] and [Deutsche Bank] go with you. I'd be v careful how you play it, there might be cause for a drop as you cross into a new month but a couple of weeks in might get people questioning you.
>
> UBS [Hayes]:  don't worry will stagger the drops . . . ie 5bp then 5bp
>
> ICAP [Read]: ok mate, don't want you getting into sh it
>
> UBS [Hayes]: us then [Deutsche Bank] then [HSBC] then us then [Deutsche Bank] then [HSBC]
>
> ICAP [Read]: great the plan is hatched and sounds sensible

2.   **As Part of Its DOJ Deferred Prosecution Agreement, RBS Admitted To Colluding with UBS to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives.**[276]

646.    From at least as early as February 2007, an RBS derivatives trader, Will Hall, and Hayes agreed to request that their respective Yen-LIBOR submitters contribute Yen-LIBOR submissions to benefit their Yen-LIBOR-based derivatives positions.  In 2008, Hayes and another RBS trader, Brent Davies, agreed to make requests to benefit Hayes' trading positions.

---

[276] *See also* Ex. B-4 at 19-21.

In 2010, after Davies left RBS and moved to Broker Defendant ICAP, Hayes enlisted Davies to convey requests for false Yen-LIBOR submissions to RBS' Yen-LIBOR submitters.  Examples of manipulative communications between Hayes, and RBS traders Will Hall and Brent Davies are included above at ¶¶ 605-625, *supra*.

647.    As early as February 2, 2007, RBS trader Hall also knew that Hayes communicated with another Contributor Bank co-conspirator, JPMorgan, as part of Hayes' effort to manipulate Yen-LIBOR.  In an electronic chat with Hall that day, Hayes stated that he had kept three month Yen-LIBOR artificially high by "being mates with the cash desks, [JPMorgan] and I always help each other out."[277]

648.    On numerous occasions in 2007, Hayes requested that Hall ask the RBS Yen-LIBOR submitter to move RBS' Yen-LIBOR submission in a particular direction or to contribute a particular Yen-LIBOR submission in order to benefit Hayes' trading positions.  Hall often agreed to make the request.  On a few occasions, Hall similarly requested that Hayes ask UBS' Yen-LIBOR submitter to make false submissions that would benefit his trading positions, and Hayes agreed to make the request.

649.    For example, over a period of approximately ten days in February 2007, Hayes and Hall discussed lowering one-month Yen-LIBOR to benefit their trading positions in addition to coordinating requests in other tenors.[278]  *See* ¶ 607, *supra*.  Later in the same chat, Hayes noted that he "lost lots today…hence really need a hand on 1m lib…pls don't forget."  Hall responded, "ok i will try my best."  Hayes and Hall then discussed other topics, and at the end of

---

[277] Ex. B-1 at 22.

[278] *Id*. at 22-23.

the conversation, Hayes reminded Hall of his request for a low one-month Yen-LIBOR submission:

> **February 8, 2007**:
>
> UBS [Hayes]: oh well i am off home dreaming of a low 1m libor!
>
> RBS [Hall]: good luck what sort fo level do you want
>
> UBS [Hayes]: if you can get a .42 six that wd be great…fix…not six
>
> RBS [Hall]: 0.42
>
> UBS [Hayes]: thats the one!
>
> RBS [Hall]: ok will speak to me guy in a sec[279]

650.    Over the next several days, Hayes and Hall continued to discuss their mutual interest in manipulating Yen-LIBOR artificially lower during February 2007.[280]  *See* ¶¶ 608-612, *supra*.

651.    Hayes' requests to Hall for false Yen-LIBOR submissions continued throughout 2007.  For example, in an electronic chat the two traders had the following exchange:

> **November 1, 2007**:
>
> UBS [Hayes]: hello mate, real big favour to ask…could you try for low 6m fix today pls wld be most appreciated…thx mate
>
> RBS [Hall]: will try my best dude how u??
>
> UBS [Hall[: ok, trading like an idiot today, to be honest just want to take some risk off my book before i come back in dec, have had ok year but management still pushing me for more, have huge 6m fix so if you could help out today would really really really appreciate it! how are you?[281]

---

[279] *Id*. at 23-24.

[280] *Id*. at 24-27.

[281] *Id*. at 29.

652.    During 2008, just as Hayes had done with Will Hall, Hayes asked RBS trader Brent Davies to request that RBS' Yen-LIBOR submitter contribute RBS' Yen-LIBOR submissions at levels that benefited Hayes' trading positions. *See* ¶ 621, *supra*. In or around July 2009, Davies left RBS and began working as a cash broker for Broker Defendant ICAP.[282] While at ICAP, Davies maintained his relationship with RBS Yen-LIBOR submitter Paul White and continued to assist Hayes with influencing RBS' Yen-LIBOR submissions. *See* ¶¶ 623-625, *supra*.

> 3.   As Part of Their DOJ Deferred Prosecution Agreements, Rabobank and Lloyds Each Admitted That They Had a Standing Agreement to Collude[283]

653.    From as early as May 2006 and continuing at least through October 2008, "Submitter-4," Paul Robson, and a Lloyds Yen trader ("Trader-B"), Andy Doe, had an agreement that they would, upon request, contribute Yen-LIBOR submissions to benefit each other's Yen-LIBOR-based derivatives positions, or the Yen-LIBOR-based derivatives positions of other traders, whenever doing so did not adversely affect their own Yen-LIBOR-based derivatives positions. As Doe explained in an email forwarding a Yen-LIBOR submission request from Robson to the Yen-LIBOR submitters at Lloyds: "We usually try and help each other out...but only if it suits."

654.    On June 27, 2006, for example, Rabobank's Robson communicated with Lloyds' Doe: "i need a high lmth today - so i will be setting an obseenly high lmth." Doe responded: "sure mate no worries...give us an idea where and i'll try n oblige...;)," to which Robson replied: "ok great - well at mo thinking of setting mine around 17." Doe accommodated Robson's manipulation request, as Lloyds' one-month submission for that day was 0.17.

---

[282] *Id.* at 31.

[283] Ex. D-2 at 22-24; Ex. H-2 at 2, 11-13.

655.     On July 6, 2006, Robson communicated with Doe: "for info i need a high lmth set today - i will be setting something ridiclous like 28 or 29 for info."  That day, Rabobank's one-month Yen-LIBOR submission was 0.29, an increase of two basis points, making Rabobank's submission the highest submission on the Contributor Panel.  Likewise, Lloyds' one-month Yen-LIBOR submission also increased by two basis points.

656.     On occasions when Robson or Doe were unable to, or failed to, accommodate the other's Yen-LIBOR-based derivatives positions, an effort was sometimes made to explain the attendant circumstances and to preserve their agreement.  For example, on March 28, 2008, Robson preemptively contacted Doe to explain that their submissions would be at odds that day: "morning skip - [Takayuki Yagami] has asked me to set high libors today - gave me levels of lm 82, 3m 94....6m 1.02."  Doe replied: "sry mate cant oblige today...i need em lower!!!"  Robson then explained: "yes was told by [a third party]...just thought i'd let you know why mine will be higher...and you don't get cross with me."

657.     Similarly, on January 5, 2007, Doe explained how he had mistakenly failed to accommodate a request for a false Yen-LIBOR submission from Robson: "just b4 you beat me up....I was in meeting so didn't do me libors today...thk they put .52 for 1s . . . ."  Robson answered: "hahah no thats fine - thats what i set too cheers skip."

658.     Robson and Doe's agreement was also used to manipulate Yen-LIBOR to benefit other traders at both Rabobank and Lloyds.  For example, on May 10, 2006, Robson made a manipulation request of Doe on behalf of Rabobank's Yen trader, Paul Thompson, for a low six-month submission: "re our conversation yesterday about libors...for info i've been asked by my Singapore man to help him out with a silly low 6m fixing today.. ...just for your info."  Doe responded: "Tell him I'll do same if he gets me a job!!!!"

659.     When Robson testified during the Allen/Conti criminal trial, he explained how his submission on May 10, 2006 impacted the six-month Yen-LIBOR fix.  Robson testified that by lowering his Yen-LIBOR submission for Paul Thompson, Rabobank dropped out of the Yen-LIBOR fix for that date and affected the Yen-LIBOR averaging process by pushing another low Yen-LIBOR submission into the calculation:

> Government [Slipperly]: Because you favored lower you said you had to go to 26 for [Paul Thompson] Thommo.  Can you explain what actually happened on that day?
>
> Rabobank [Robson]: So on the left-hand side it shows what I should have sent, which is .3.  Right-hand side shows what I actually set, which is .26, at the request of Paul Thompson.  By setting .26 I have dropped into the dropout zone at the bottom.  However, if I had actually set .30, like I was supposed to have, I would not have been in the dropout zone.  My number would have been taken into consideration in the LIBOR calculation.  However, as I have posted .26 and into the dropout zone, I have then nudged another bank that should have been discarded into the calculation itself; therefore, affecting the actual averaging process.[284]

660.     On July 27, 2006, Robson contacted Doe on behalf of Takayuki Yagami to request a high one-month submission consistent with Rabobank's submission: "[Takayuki Yagami] wants a high lm fix from me today....am going to set .37."  Doe agreed: "that suits mate," "so happy to ablige."  Lloyds' submission jumped from 0.35 to 0.37 between July 26, 2006, and July 27, 2006, a move that took Lloyds' submission from being tied as the lowest Yen-LIBOR submission to being tied for the second highest.

661.     The following day, July 28, 2006, Robson and Yagami conferred internally regarding their mutual desires for another high fixing.  Robson stated to Yagami: "setting a high lm again today - I need it!" to which Yagami responded: "yes pls mate...I need a higher lm libor

---

[284] *United States v. Allen,* No. 14-cr-272, Testimony of Trial at 349 (Oct. 19, 2015).

too."  Within approximately 20 minutes, Robson contacted Doe at Lloyds and stated: "morning

skipper will be setting an obscenely high lm again today...poss 38 just fyi."  Doe responded,

"(K)...oh dear..my poor customers....hehehe!! manual input libors again today then!!!!"  Both

banks' submissions on July 28, 2006, moved up one basis point, from 0.37 to 0.38, a move

which again placed their submissions as the second-highest submissions on the Contributor Panel

that day.

663.    As discussed *supra* at ¶ 419, on March 19, 2008, Robson and Doe agreed to

manipulate Rabobank's and Lloyds' six-month Yen-LIBOR submissions higher.  On that date,

Doe submitted a six-month Yen-LIBOR of 1.15, while Rabobank's submission went from being

tied as the tenth-highest submission on the Contributor Panel on the previous day to being the

second highest submission on the Contributor Panel.

663.    Likewise, Doe had a July 19, 2007 telephone conversation with another trader at

Lloyds ("Trader-C"), in which Trader-C made a manipulation request of Doe for three-month

Yen-LIBOR and Doe offered to extend Trader-C's manipulation request to Robson:

> Lloyds [Trader-C]: I need a little favor today for what it's worth. I don't know
> what you've been doing in 3 months, but we've got like a fixing of 83 billion on
> Monday, [unintelligible] Low threes, [unintelligible]

> Lloyds [Doe]: What you want to do, what you want me to put low libor in, is that
> what you are saying?

> Lloyds [Trader-C]: Yeah, low libor in the threes.

> Lloyds [Doe]: Yeah, 'course I can, mate. No worries at all.

> Lloyds [Trader-C]: That would be nice.

> Lloyds [Doe]: I'll have a word with [Robson] as well, he'll drop it down for  you
> as well I'm sure, [unintelligible] It needs more than one, mate, trust me.
> [unintelligible] Where do you want it? And I'll just pitch it wherever you want,
> [unintelligible]

Lloyds [Trader-C]: Um...roughly where it was yesterday, that's fine. That makes us ten under...well, just under ten under [unintelligible] we've been funding lately.

Lloyds [Doe]: [unintelligible] Yeah, sure.

664.    A short time later, Doe followed through and contacted Robson with Trader-C's manipulation request: "mrng beautiful if u can would love a low fixing in 3s libor today...." Paul Robson then asked: "ok skip - what u need?" to which Doe answered: ".77 if poss but just no higher than yest!!" Robson agreed, stating: "no prob."  On that day, both Rabobank and Lloyds submitted 0.77 for the three-month Yen-LIBOR, placing both banks' submissions in a tie for the second-lowest submission on the Contributor Panel.

665.    Both Robson's criminal guilty plea allocution and his testimony at the Allen/Conti Trial confirm this standing relationship between Robson and Doe.  When Robson pled guilty in this District to conspiracy to commit wire fraud and bank fraud, he admitted that when he received requests from Paul Thompson, Tetsuya Motomura, and Takayuki Yagami, he "conveyed some of these requests [for favorable submissions] to a submitter at another bank and requested that he match the way in which I made my submissions and I in turn reciprocated these actions with him."[285]  The "submitter at another bank" that Robson referred to is Lloyds' Andy Doe.

666.    Further, during the Allen/Conti Trial, Robson discussed how he made an arrangement with Doe to align their Yen-LIBOR submissions to benefit Lloyds' and Rabobank's Yen-LIBOR-based derivatives positions:

> Government [Slipperly]: What was one of the reasons you would interact with [Andy Doe] in connection to LIBOR?
>
> Rabobank [Robson]: We came to an arrangement where we would discuss our LIBOR settings, trying to align with each other, alert each other if we were going

---

[285] *United States v. Robson*, No. 14-cr-272, ECF 21, 12 16:19 (Aug. 18, 2014).

to be setting anything extreme, and a few occasions we made requests of each other as well.[286]

### 4.  Deutsche Bank Regularly Colluded with Contributor Bank Defendants

667.    As shown above, from at least mid-2008 through mid-2010, Deutsche Bank "Trader-11," Guillaume Adolph, regularly conspired with UBS Senior Yen Trader Tom Hayes to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  *See* 567-574, *supra*. Adolph and Hayes aligned their Yen-LIBOR-based derivatives poisons, sharing commercially-sensitive proprietary information about Deutsche Bank's and UBS' trading books, so that both banks would mutually benefit from their manipulative conduct.  Adolph was Deutsche Bank's Yen-LIBOR submitter during 2008 and 2009 and directly manipulated Deutsche Bank's Yen-LIBOR submissions to accommodate requests for false submissions from Hayes and other Contributor Bank Defendants.  For example, Deutsche Bank admitted that it colluded with several other Contributor Bank Defendants besides UBS.[287]  Direct evidence of Deutsche Bank's collusion with Citibank is shown below.  *See* ¶¶ 700-702, *infra*.  Plaintiffs reasonably believe that evidence of Deutsche Banks' collusive misconduct with the other Contributor Bank Defendants will be revealed given an opportunity for discovery.

### 5.  HSBC Joined the Conspiracy.

668.    During the Class Period, UBS and HSBC routinely conspired to manipulate Yen-LIBOR.  *See, e.g.*, Part IV.7.B, *infra* (alternating lower Yen-LIBOR submissions with UBS during Operation 6M).

---

[286] *Id.* at 350 (Oct. 19, 2015).

[287] Ex. I-5 at 8.

669.     The Hayes Trial and Broker Trial, as well as R.P. Martin's settlement cooperation, provide numerous examples of HSBC conspiring with UBS to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  UBS and HSBC conspired to manipulate through direct communication and through other co-conspirators, such as R.P. Martin broker Terry Farr.  Plaintiffs' independent economic analysis, based on discovery produced to date, including money market data reflecting "Yen" interbank offered rates, identifies hundreds of instances consistent with false reporting manipulation by HSBC during the Class Period.

670.     For example, on June 28, 2007, Hayes conspired with his stepbrother Peter O'Leary, a trader at HSBC, to set "6m" Yen-LIBOR "high":

> **June 28, 2007**:
>
> UBS [Hayes]: pls ask ur mate for high 6m mate…wd be really really grateful
>
> HSBC [O'Leary]: will do, for the record he's deff not my 'mate'!...but I'll bbg [Bloomberg] him
>
> UBS [Hayes]: Cheers[288]

671.     O'Leary sent a Bloomberg message to HSBC's Yen-LIBOR submitter, Chris Porter, seeking a "high 6m yen libor" informing HSBC's Yen-LIBOR request was coming directly from O'Leary's "brother":

> **June 28, 2007**:
>
> HSBC [O'Leary]: high 6m yen libor would be gd according to my brother!
>
> HSBC [Porter]: WILL DO MY BEST[289]

672.     O'Leary confirmed to Hayes that his manipulative request for a high six-month Yen-LIBOR had been sent successfully to HSBC's Yen-LIBOR submitter:

---

[288] Ex. A-1 at 27.

[289] *Id*. at 28.

**June 28, 2007**:

HSBC [O'Leary]: Sent darcy a mail so we'll see!

UBS [Hayes]: thx mate

673.    UBS also conspired with HSBC through R.P. Martin's Farr.  Farr was good friends with HSBC's Yen-LIBOR submitter Luke Madden.  Many of these manipulative requests were made through unrecorded means, including personal cell phones and in-person meetings. This allowed their knowingly unlawful manipulative conduct to be concealed.  Examples of manipulative requests between UBS and HSBC's Madden through R.P. Martin appear below in ¶¶ 674-692.

674.    On May 12, 2008, UBS' Hayes and HSBC's Madden conspired through R.P. Martin's Farr in getting "yen LIBORs lower."  HSBC lowered its one-month, three-month, and six-month Yen-LIBOR submissions by two basis points or more on May 12, 2008.

675.    In September 2008, UBS' Hayes and HSBC's Madden conspired through R.P. Martin's Farr, to lower their three-month Yen-LIBOR submissions to manipulate Yen-LIBOR-based derivatives prices:

**September 9, 2008**

UBS [Hayes]:  DUDE, great libors, keep it up, I owe you. ***hsbc, lloyds both 90 in 3m*** … ***maybe we can broke em down to 89?*** And mizuho

R.P. Martin [Farr]: yeah think will be mate there aint any bids really now 1, 3s so this will help the cause....

676.    In furtherance of the conspiracy, HSBC lowered its one-month and three-month Yen-LIBOR submissions on September 10, 2008.  HSBC lowered its one-month Yen-LIBOR from .65 to .63 and HSBC lowered its three-month Yen-LIBOR submission by two basis points,

from .90 to .88 on September 10, 2008.  The one-month and three-month Yen-LIBOR fix

decreased.

677. 

690

678.

679.

_____

290 ▮



682. ███████████████████████████████████████
████████████████████████████████████████████
████████████████

683. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

684. ████████████████████████████████████████████
████████████████

██████████

██████████████████████████████

█████████████████████████████████████████████
███████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████[294]

685. ███████████████████████████████████████
████████████████████████████████████████████
████████████████

686. ████████████████████████████████████████████

██████████████████████████████████

---



687.

688.

689.



690.

691.

692.

295

693. ██████████████████████████████

██████████████████████

694. ██████████████████████████████

██████████████████████████████

████████████████████████████████

████████████████████████████

██████████████████████████████

████████████████████████

████████

██████████████████████

█████████████████[296]

695. ██████████████████████

████████████████████████████████

██████████████████████

696. ██████████████████████

████████████████████████████████

██████████████████████████

██████████████████████████████

██████████████████████████████

██████████████

█████████████████████[297]



─────────────────────

[296] ████████

[297] ██████████

[REDACTED]<sup>298</sup>

|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
| ██ | ███ | ██ | ██ | ██ | ███ | ██ |
| ██ | █ | ███ | ██ | ██ | ██ | ██ |

6.   Citibank Joined the Conspiracy to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives

697.   During the Class Period, Citibank acted in furtherance of the conspiracy to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  In December 2009, Citibank hired UBS trader Tom Hayes, offering him a $3.5 million "special cash award" to come trade Yen-LIBOR-based derivatives for Citibank.  Hayes was fired by Citibank ten months later following an internal investigation by the bank. That investigation was triggered by a complaint from a Citibank Yen-LIBOR submitter who had received a request from Hayes for a false Yen-LIBOR submission.

698.   During the time of his employment at Citibank, Hayes made attempts to influence both Citibank's Yen-LIBOR submissions, and the submissions of other Contributor Bank Defendants.

699.   Such interbank or external requests for false reports by Hayes took place with many of the same traders, submitters, and brokers that Hayes colluded with during the time of his employment at UBS.

700.   [REDACTED]

[REDACTED]

---

<sup>298</sup> [REDACTED]



701.



702.

703.

704. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

        ██████████████

        ████████████████████████████████

        ██

        ████████████████████████████

        ████████████████████████

        ████████████████

        ███████████████████████

        ██████████████████████████████

        ██████████████████████████

        ████████████████████

        ███████████████ [302]

705. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

706. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

_____

[302] █████████████████████████



707.

708.

303

304



709.

710.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

### 7. Currently Known Long-Term Campaigns to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives

711.   Defendants also planned and agreed to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives for extended periods of time by coordinating their manipulative conduct for months if not longer.  Based on information revealed in Defendants' government settlements, at the Hayes Trial, the Broker Trial, and documents produced by R.P. Martin, Plaintiffs have identified at least three long-term manipulation campaigns: (1) coordinated manipulation of three-month Yen LIBOR from January to May 2007; (2) the "Turn Campaign," the coordinated manipulation of six-month Yen-LIBOR artificially higher through the end of June 2009; and (3) "Operation 6M," the coordinated manipulation of six-month Yen-LIBOR from July to September 2009.  During each of these campaigns, Defendants conspired with each other and used multiple means of manipulation to rig Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

### a.   The January to May 2007 Campaign: Defendants Coordinated the Manipulation of Three-Month Yen-LIBOR

712.   Throughout 2007, Hayes made more than 450 documented requests to manipulate Yen-LIBOR. However, Hayes had particularly large trading positions tied to three month Yen-LIBOR that matured in January and February 2007 and in April and May 2007.  As a result he embarked on a coordinated campaign to manipulate three-month Yen-LIBOR for the benefit of his Yen-LIBOR-based derivatives positions.  For this purpose, Hayes made manipulative requests to UBS's Yen-LIBOR submitters, brokers and other Yen-LIBOR Contributor Banks.

Hayes reciprocated the requests to other Yen-LIBOR Contributor Banks by offering to adjust

UBS's Yen-LIBOR submissions to suit their Yen-LIBOR-based derivatives positions.

### i.   **Phase One**

713.    Between January 17 and February 5, 2007, in the first phase of his campaign,

Hayes made at least 18 manipulative requests for false three-month Yen-LIBOR submissions to

UBS' Yen-LIBOR submitters.  He also made at least six requests for false one-month Yen-

LIBOR submissions and at least 10 requests for false six-month Yen-LIBOR submissions.

714.     For example on January 24, 2007, Hayes contacted UBS manager Roger Darin,

who supervised and provided input to the UBS Trader-Submitter making UBS' Yen-LIBOR

submissions and issued a "standing order" to keep three-month and six-month Yen-LIBOR

higher:

> **January 24, 2007:**
>
> UBS [Hayes]:  try to keep 6m and 3m libors up.
>
> UBS [Darin]: standing order, sir.
>
> UBS [Hayes]: thx roger[307]

715.    The same day, Trader-Submitter A, complained to Darin that Hayes and Trader B

wanted conflicting submissions. Trader-Submitter A complained:

> **January 24, 2007:**
>
> UBS [Trader-Submitter A]: As I said to you, I got to say this is majorly frustrating
> that those guys can give us shit as much as they like...One guy [Hayes] wants us
> to do one thing and [UBS Trader B] wants us to do another....

716.    On February 5, 2007, Hayes contacted Roger Darin and Trader-Submitter A

together in an electronic chat:

---

[307] Ex. A-3 at 2.

**February 5, 2007**

> UBS [Hayes]: last 3m fix if you cld keep high (6m wd prefer high but not urgent) and if we cld keep 1m low wd be appreciated, **if doesn't suit let me know and maybe we can offset our fixes thx any help much appreciated.**

717.    Hayes' offer to "offset our fixes" was an express recognition that his requests may conflict with the trading positions of Darin.  In order to safeguard against his requests from being rejected, Hayes offered trades to Darin to align their interests and "offset" any losses that Darin may incur by carrying out Hayes' request.

718.    Throughout this period, UBS's submissions were consistently in the top quartile of Contributor Panel Banks for three-month Yen-LIBOR except on one occasion when it fell into the middle of the pack for one day on January 24, 2007.

719.    As part of the same campaign, on at least four occasions in January 2007, Hayes made requests to JPMorgan traders to persuade them to cause their bank's submitters to increase their three-month Yen-LIBOR submissions.  In return, Hayes offered to ask UBS's Trader-Submitters to make Yen-LIBOR submissions to suit the positions of the JPMorgan traders:

> **January 19, 2007:**
>
> UBS [Hayes]:
>
> To: Stewart Wiley [JPMorgan]
>
> Hi stuart, bit cheeky but if you know who sets your libors and you aren't the other way  I have some absolutely massive 3m fixes the next few days and would really appreciate a high 3m fix, chase were one of the lowest y/day at .51. Anytimes I can return the favour let me know as the guys here are pretty accommodating to me.
>
> Cheers tom[308]

---

[308] Ex. A-2 at 18.

720.     Phase one was successful as Hayes explained to RBS trader Will Hall in an

electronic chat that UBS and JPMorgan had manipulated three-month Yen-LIBOR artificially

higher by February 2007:

> **February 2, 2007**:
>
> UBS [Hayes]:  3m libor is too high cause I have kept it artificially high.
>
> RBS [Hall]: how?
>
> UBS [Hayes]: being mates with the cash desks, [Chase] and i always help each
> other out too
>
> RBS [Hall]: ok that's useful to know so I assume come 1s4s it will be soft
>
> UBS [Hayes]:  well I am long libor in 1v4m so will try to keep high them but
> basically is 1bp too high right now and come may I'll get it 1bp too low net net a
> 2bp swing in the fix[309]

### ii.     Phase Two: lower three-month Yen-LIBOR during April 2007 and May 2007

721.     Between the end of March 2007 and the middle of May 2007, as part of the

second phase of the 2007 campaign, Hayes made at least twenty-seven requests for low three-

month Yen-LIBOR submissions.  In all but one instance (when the request went unanswered),

UBS' Trader-Submitters agreed to the requests.  Over this period, Hayes also made at least

twenty-three manipulative requests for false six-month Yen-LIBOR submissions.  In addition,

UBS manager Roger Darin solicited requests from Hayes on at least one occasion.

722.     For example, on March 29, 2007, Hayes made a request for an artificially lower

three-month Yen-LIBOR submission to UBS manager Roger Darin:

> **March 29, 2007**
>
> UBS [Hayes]: …What are we going to set?

---

[309] *Id.* at 19.

UBS [Darin]: too early to say yet ... prob[ably] .69 would be our unbiased contribution.

UBS [Hayes]: ok wd really help if we could keep 3m low pls

UBS [Darin]: as i said before - i dun mind helping on your fixings, but i'm not setting libor 7bp away from the truth i'll get ubs banned if i do that, no interest in that.

UBS [Hayes]: Ok obviously no int in that happening either, not asking for it to be 7bp from reality…anyway, any help appreciated.[310]

723.     Darin complied with Hayes' request on March 29, 2007, making an artificially lower three-month Yen-LIBOR submission of 0.67.

724.     In recognition that his request might conflict with Darin's own trading positions, on April 17, 2007, Hayes offered to trade a "fra" *i.e.*, forward rate agreement, in order to eliminate any conflict between their respective positions:

**April 17, 2007:**

UBS [Hayes]:  ... really need low libors today in everything, but esp 6m, let me know if that suits or if not can we do a fra? Thx.

UBS [Darin]: I've got nothing today, will keep 'em low.[311]

725.     On April 17, 2007, UBS' one month submission fell 1.5 basis points to 0.625. The three-month Yen-LIBOR submission remained unchanged from the previous day at 0.65. UBS' six-month Yen-LIBOR submission fell two basis points to 0.68.

726.     Darin and UBS' Yen-LIBOR submitters followed almost every request Hayes made during the Contributor Bank Defendants' campaign to manipulate three-month Yen-LIBOR artificially lower between March 2007 and May 2007.  For example, of the twenty-seven requests for false three-month Yen-LIBOR submissions Hayes made, twenty-six were

---

[310] Ex. A-1 at 11.

[311] Ex. A-3 at 16.

affirmatively agreed to by UBS Trader-Submitters.  As a result, thirty-four of the thirty-six three-month Yen-LIBOR submissions UBS made during this period were lower than the published rate, consistent with Hayes' requests.

727.    In the second phase of the 2007 campaign, Hayes made at least six requests to traders and submitters at other banks, including on April 20, 2007, to RBS trader Will Hall:

> **April 20, 2007**:
>
> UBS [Hayes]: mate did you manage to spk to your cash boys?
>
> RBS [Hall]: yes u owe me they are going 65 and 71
>
> RBS [Hall]: thx mate yes I do . . . in fact I owe you big time!
>
> UBS [Hayes]: Mate they set 64! . . . that's beyond the call of duty![312]

728.    Hayes also requested false Yen-LIBOR submissions from HSBC, contacting his stepbrother Peter O'Leary to request a low three-month Yen-LIBOR submission the same day:

> **April 20, 2007**:
>
> UBS [Hayes]: if you can go have a word with the guy…
>
> HSBC [O'Leary]: Yeah I need to go down and see those guys and say hello so I will do
>
> UBS [Hayes]: Well when you do just say to them "oh do you fancy setting a low Yen three month LIBOR?" Well no, just say "if you can set a low Yen three month LIBOR you really help my brother out

729.    ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████

---

[312] *Id.*

276



730.

### b.  Summer 2009: The "Turn Campaign" and "Operation 6M"

731.     Throughout his tenure at UBS, Hayes routinely employed each of his means of manipulation—internal requests, collusion with other panel banks, and coordination with brokers.  At times, he used all three means simultaneously for a longer period to achieve his objective.  This is illustrated by two long-term efforts from June 2009 through August 2009, which were dubbed the "turn campaign" and "operation 6m."

732.     By June 2009, Hayes had amassed significant positions in Yen interest rate swaps that were priced, benchmarked, and/or settled based on one-month, three-month, and six-month Yen-LIBOR.  Hayes' positions became so large at various points that he was close to exceeding internal risk limits imposed by UBS.  The largest positions were tied to six-month Yen-LIBOR. Rather than entering into legitimate hedging positions that would offset his risk, however, Hayes made two coordinated and sustained pushes, to manipulate six-month Yen-LIBOR in ways that would benefit his massive positions.

---

313

314

### i.     The Turn Campaign

733.     The Turn Campaign commenced in early June 2009.  Hayes' derivatives positions tied to six-month Yen-LIBOR were due to reset or mature on June 29, 2009, and would benefit from a high six-month Yen-LIBOR.  A single basis point move in Yen-LIBOR was worth approximately $2 million to UBS.

734.     Hayes coordinated with the UBS Yen-LIBOR submitter Rolf Keiser, Deutsche Bank Yen-LIBOR submitter Guillaume Adolph, and brokers at ICAP, R.P. Martin, and Tullett Prebon to try to keep six-month Yen-LIBOR artificially high.  For example, Hayes explained to Tullett Prebon's Noel Cryan how they should accomplish his objective in late May 2009:

> **May 28, 2009:**
>
> UBS [Hayes]: At the end of June, the six-month fix will be in July and it will go over the year-end turn
>
> Tullett Prebon [Cryan]: Yeah that's right
>
> UBS [Hayes]: Now it's vital for me that that goes up a lot when that happens
>
> Tullett Prebon [Cryan]: Right, gotcha
>
> UBS [Hayes]: Last year it went up about three basis points and I need the same to happen again this year
>
> Tullett Prebon [Cryan]: So basically talk the turn up
>
> UBS [Hayes]: Yeah, so basically start talking – from the middle of – like when you start getting towards the end of June, start talking it up, put it in people's minds, make sure they're aware that sixes is going over the turn so on the day it happens, they actually move it. Because if they don't move it then, it aint going to move
>
> Tullett Prebon [Cryan]: No, gotcha absolutely gotcha
>
> UBS [Hayes]: make some efforts on the LIBORs particularly when it goes up the turn, right.
>
> Tullett Prebon [Cryan]: Yeah.

UBS [Hayes]: If you get that up, when it crosses the turn, if you get that up, I will fucking reward you

Tullett Prebon [Cryan]: Right, no worries, I'll go and speak to him again

UBS [Hayes]: Between you and me I've got two and a half million bucks pointing at it, so if it goes up, I'm marking it at one a half points then, if it goes up three points then obviously I make an extra $4 million or something so

Tullett Prebon [Cryan]: You're going to hear nothing about the six-month libor going up over the turn then for the next-

UBS [Hayes]: Yeah yeah

Tullett Prebon [Cryan]: weeks

UBS [Hayes]: Yeah, it's not really so much from now, but the next month it has to be one of those things

Tullett Prebon [Cryan]: Yeah

UBS [Hayes]: Any favours they can call in whatever, you know, take basically you take the guys out for like a strip club or whatever the night before

Tullett Prebon [Cryan]: Yeah, done. I'll go and make sure we're sorted

735.    Hayes quantified and emphasized the potential impact on UBS' derivatives trading positions for his co-conspirators.  He encouraged the brokers to push submitters at other panel banks for high six-month Yen-LIBOR submissions. At times, some of the brokers agreed to enforce the plan by confronting other banks that acted against his interests.

736.





**June 12, 2009**:

UBS [Hayes]: i have such big positions on **monday i have 1.5m usd a bp 6m fix** will ask [Guillaume Adolph] for a one day favour we will move up for one day too

ICAP [Read]: i know mate, i'm trying to keep on top of it, if it moves out of line for 10 sees you know i'll see it and pull it back.[316]

**June 16, 2009**:

ICAP [Read]: Good morning mate…**the "turn campaign" beings today**. Will put an email together at lunch time to [Colin Goodman]

UBS [Hayes]: thx[317]



[318]

---

[316] Ex. A-2 at 30.

[317] *Id.*

[318] ████████████

**June 24, 2009**:

UBS [Hayes]: 6m is huge for me on monday …

ICAP [Read]: i have been putting arbi pressure on [Colin Goodman] and [Danny Wilkinson] ... would help your cause to also speak to [Danny] on friday regarding the turn squeeze and its importance ... i will remind you.

UBS [Hayes]: …thanks i will get [Terry Farr] on the case too remind me to get in touch with [Guillaume at Deutsche Bank].

ICAP [Read]: **yeah need to pull out the big guns for this one**, don't let [Adolph] forget either. :-)es[319]

**June 25, 2009**:

UBS [Hayes]: can you put 6m up on monday when we go through the turn just for a week or so? ... you did say you'd try to help me out!"

Deutsche Bank [Adolph]: yes have eno fixing untill 06/07 so i can

UBS [Hayes]: thanks mate[320]

**June 26, 2009**:

UBS [Hayes]: i need you to move 6m up for 2 weeks mate ... but please move 6m up on monday.

Deutsche Bank [Adolph]: understood

UBS [Hayes]: thx **i need you in the panel on Monday**

Deutsche Bank [Adolph]: ok enough[321]

737.    On the day of the fixing, June 29, 2009, Hayes made one final push to manipulate higher the six-month Yen-LIBOR fixing.  He confirmed his expectations of a high submission with Deutsche Bank's Yen-LIBOR submitter Guillaume Adolph and UBS' trader-submitter Rolf

---

[319] Ex. A-2 at 30-31.

[320] *Id.* at 31.

[321] *Id.*

Keiser, emphasizing that UBS stood to make "2m usda bp fix," *i.e.*, $2 million per basis point

that six-month Yen-LIBOR was manipulated:

> **June 29, 2009**:
>
> UBS [Hayes]: hi .... 6m cash crosses the year end today we have huge fixings
>
> UBS [Keiser]: indeed
>
> UBS [Hayes]: can we set 6m libor high pls? ...
>
> UBS [Keiser]: we dont have any fix at mom
>
> UBS [Hayes]: can we go 74 or 75? **we have 2m usda bp** fix for the next week i think a lot of people are going to move it up today well i hope
>
> UBS [Keiser]: yes sure will. i go with 0. 75 for you.[322]
>
> **June 29, 2009**:
>
> UBS [Hayes]: pls remember 6m today ...
>
> Deutsche Bank [Adolph]: yah no worries ... 6m libor today good contrib?
>
> UBS [Hayes]: **high pls as high as you can manage we are going 75 anyway whatever you can do** thx.
>
> Deutsche Bank [Adolph]: sure np[323]

738.    

---

[322] *Id.* at 31-32.

[323] *Id.* at 32.





739.    The Turn Campaign was successful.  On June 29, 2009, UBS increased its six-month Yen-LIBOR submission three basis points from 0.72 to 0.75 and Deutsche Bank increased its submission by six basis points, from 0.65 to 0.71.  In addition, five other Contributor Bank Defendants and co-conspirators, all of which Hayes and Terry Farr discussed in the conversation above also increased their six month Yen-LIBOR submissions:

285

| Comparison of Six-Month Yen-LIBOR Submissions | | | |
|---|---|---|---|
| ████ | | ████ | ████ |
| ████ | | | |
| ███ | | | |
| ██ | | ████ | ████ |
| | | | |

740.    As a result of Defendants' and co-conspirators' concerted manipulation, six-month Yen-LIBOR increased by three quarters of a basis point on June 29, 2009.  By Hayes' own calculation, UBS made $1.75 million in profit as a result of Defendants' and co-conspirators' manipulative conduct on this day.

### ii.    Operation 6M

741.    During the Turn Campaign, Hayes began his second effort to push six month Yen-LIBOR high after June 2009, in an effort he dubbed, "Operation 6M." Operation 6M was Hayes' campaign to manipulate the six-month Yen-LIBOR fixing upward over several weeks through July, and then to cause the six-month Yen-LIBOR fixing to drop dramatically in mid-August.

742.    The motivation for this effort was clear.  If Hayes was successful in causing an increase to the six-month Yen-LIBOR between the end of July and then a drop in the fixing in mid-August, the UBS Yen Desk stood to gain hundreds of millions of dollars.

743.    As with the Turn Campaign, Hayes' key contacts at certain brokerages and his friend, Deutsche Bank Yen-LIBOR submitter Guillaume Adolph, were critical to his plan. Hayes emphasized that he was trying to benefit his Yen-LIBOR-based derivatives positions while simultaneously managing the massive amount of risk created by his positions, something UBS was very concerned about.

744.    The following are examples of the communications surrounding the beginning of Operation 6m in late June and July.

**June 24, 2009**: (Emphasis added.)

ICAP [Read]:  Morning [Tom], Rbs must have had some fixings, not helping

UBS [Hayes]: he on drugs for once i just want them static and they are falling! ... pls try to keep ly low on screen mate yeah i just need thgis 6m gap for 2weeks

ICAP [Read]: will do my best mate

UBS [Hayes]: then they can all go down hopefully tibor will stay high **operation 6m**.

ICAP [Read]: ;-)[326]

**June 26, 2009**:

UBS [Hayes]: basically I will help you in 2 weeks time…I am the same way

Deutsche Bank [Adolph]: Perfect

UBS [Hayes]: But for the next 2weeks i really really need you to put 6m higher

Deutsche Bank [Adolph]: what is the date just that i know?

UBS [Hayes]: july 14

Deutsche Bank [Adolph]: Ok having a look

UBS [Hayes]:  after that i need 6m to crash off like you.

Deutsche Bank [Adolph]: that is no problem for me, i do nothing with the cash guys until then

UBS [Hayes]: I need you to move 6m up for 2 weeks mate

Deutsche Bank [Adolph]: But after urs please

***

UBS [Hayes]: i will then get our 6m way down after july 18th it is

---

[326] Ex. C-1 at 31.

<u>Deutsche Bank [Adolph]</u>: ok

<u>UBS [Hayes]</u>: and will try to get everyone else down too

<u>Deutsche Bank [Adolph]</u>: when is the lest fixing date? ... the last july fixing date??"

<u>UBS [Hayes]</u>: 18th ... then i a need low low low ... sry 17th ... i happy for all libors off after that date ... only reason ion bid is i have huge huge position that way so am happy for to come lower after the 17th"

<u>Deutsche Bank [Adolph]</u>: ok enough enough [327]

**<u>July 1, 2009</u>**:

<u>UBS [Hayes]</u>:  hi . . . . are we planning on moving libors or just going unch?

<u>UBS [Keiser]</u>: i would have gone slightly lower in 6s but if you wish i can leave it unchanged

<u>UBS [Hayes]</u>: thx really need it unch for next 2wk then low as you want

<u>UBS [Keiser]</u>: ok 0.71 unc

<u>UBS [Hayes]</u>: ta.[328]



<hr>

[327] Ex. I-2 at 28.

[328] Ex. A-2 at 34.

████████████████████████████████

████████████████████████████████████ [329]

**July 15, 2009**:

Tullett Prebon [Cryan]:  ha ha ok mate **i can see you as captain chaos** cash still looking a touch easier but nothing much going on arbi are starting to produce bids so hopefully the offers may go back

UBS [Hayes]: ok i only need 6m high this month then you MUST get it lower a lot lower pls keep 3m and 1m unch."

Tullett Prebon [Cryan]: ok[330]

745.  **Avoiding Conflict with Guillaume Adolph's Interests**.  During Operation 6m (and at other times), Hayes offered to enter into trades with Deutsche Bank's Yen-LIBOR submitter Guillaume Adolph to ensure that their respective interests aligned and Adolph would not have a conflict that prevented him from helping Hayes with manipulating Yen-LIBOR. Hayes offered similar offsetting trades to UBS Trader-Submitters when their positions stood to be negatively impacted by a manipulation that favored Hayes.  *See* ¶¶ 716-717, *supra*.  For example, in the chat below, Hayes urged Adolph: "tell me what you need to see.  i have a vested interest in making sure our fixings match."

**June 26, 2009:**

Deutsche Bank [Adolph]: **on my fra switch it is your best?**

UBS [Hayes]: **tell me what you need to see i have a vested interest in making sure our fixings match** just don't rip me off too much i had those round mid i got to go soon

Deutsche Bank [Adolph]: ok -1.5 and -1 ami asking too much?

---

[329] ████████

[330] Ex. A-2 at 34.

UBS [Hayes]: thats fine[331]

746.    As he was so concerned that Deutsche Bank not make a competing submission,

Hayes offered such trades even at prices that were not beneficial to him to entice Adolph, and the

latter often accepted.  For example on July 21, 2009, Hayes outlined his plan, the size of his

positions, the need to reduce his risk and how Adolph could benefit from an attractive trade:

**July 21, 2009**

UBS [Hayes]: i been asked to reduce risk a bit

Deutsche Bank [Adolph]: ok

UBS [Hayes]: i still going for lower 6m next month but position is huge if you
want to do some 1y 1/t 1 wid help me on risk limits obviously i am still very
much paid and need a low 6m from next week

Deutsche Bank [Adolph]: me paying 1 in 1 y?

UBS [Hayes]: y i don't want to do it but risk are going nuts position is v v big i
told them already 6m will be lower next month problem is all my 6m fixes this
month rolled and i am left too 1 way completely up to you if not i'll give some 3m
1/t.

Deutsche Bank [Adolph]: does not suit me taht much today need high 6m libor
today

UBS [Hayes]: same **how about we do Ov6 spot as well? so no fix today i just
need to keep the risk guys at bay 200b ly will bring me in limit i will pay you
.665 for Ov6 today in same amount to knock the fix out if you need** I think it
does nothing today the fix that is wid be a massive favour ... if you do 200b 1y
then what net fix are you left with? i will hedge the balance so you are neutral

Deutsche Bank [Adolph]: **can i do 200 and lower my 6m quote? oor we cross
fra up to you mate"**

UBS [Hayes]: rahter just cross the fra pls

Deutsche Bank [Adolph]: that is fair ok we done

---

[331] Ex. I-2 at 28.

UBS [Hayes]: thanks[332]

747.    **The Last Phase of Operation 6M**.  As Operation 6M moved from the end of July 2009, Hayes shifted his efforts from increasing the six-month Yen-LIBOR higher, to ensuring that the fixing would be lower, financially benefiting his Yen-LIBOR-based derivatives positions that were due to reset in mid-August 2009.  Hayes coordinated artificially lower six-month Yen-LIBOR submissions at least two weeks in advance with UBS, Deutsche Bank, and HSBC, as indicated in the message to Deutsche Bank Yen-LIBOR submitter Guillaume Adolph below:

> **July 14, 2009**:
>
> UBS [Hayes]: just fyg [for your guide] after eom [end of month] will get 6m down a lot.  we will move from top to bottom and so will [HSBC][333]

748.    ICAP's Darrell Read advised Hayes to be careful with his efforts and to avoid changes in the rate that were too obvious.  Hayes assured Read not to worry, and explained that he would stagger false submissions with HSBC and Deutsche Bank to avoid detection:

> **July 22, 2009**
>
> UBS [Hayes]: 11th aug is the big date i still have lots of 6m fixings till the l0th
>
> ICAP [Read]: christ keeps getting extended started off as 14th of this month :-)
>
> UBS [Hayes]: i know
>
> ICAP [Read]: **if you drop your 6m dramatically on the 11th mate, it will look v fishy**, especially if HSBC and Deutsche Bank go with **you I'd be v careful how you play it,** there might be cause for a drop as you cross into a new month but a couple of weeks in might get people questioning you
>
> UBS [Hayes]: don't worry **will stagger the drops ie 5bp then 5bp**

---

[332] Ex. A-2 at 35.

[333] *Id.* at 34.

ICAP [Read]: ok mate, don't want you getting into sh it

UBS [Hayes]: **us then [Deutsche Bank] then [HSBC] then us then [Deutsche Bank] then [HSBC]**

ICAP [Read]: **great the plan is hatched** and sounds sensible[334]

749.     Hayes discussed the same plan to stagger drops in six-month Yen-LIBOR submissions with with Tullett Prebon broker Noel Cryan:

**July 27, 2009**

UBS [Hayes] speaking to Tullett Prebon [Cryan]: just trying on their August 11th. All right, I really need a big push. I don't want threes and ones to move. I just want sixes. On the, August 11th I need to start going down. What will help is we'll move, HSBC will move, West LB will move a big push

750.     In July 2009, the Yen-LIBOR submissions of UBS and Deutsche Bank both moved higher consistent with Operation 6M.  When Hayes and Adolph were not in the office, they communicated with their BlackBerry mobile phones to coordinate Operation 6M.  In the following electronic chat, Hayes and Adolph ensured that Operation 6M would continue when Hayes was out of UBS's Tokyo office for the month of August:

**July 23, 2009:**

UBS [Hayes]: ok we need to coordinate the 6m drop when do you need it falling?

Deutsche Bank [Adolph]: whenever

UBS [Hayes]: ok we need aug 11th you are back by then? if you need earlier let me know i am going to be away the whole of august almost if you need anything i am in london and zurich offices oon blackberry _____@ubs.com will be pushinh lower 6m from aug 11th

Deutsche Bank [Adolph]: back on the 10th in ldn[335]

UBS [Hayes]: ok well lets sort 6m out from 11th will make a massive push

---

[334] *Id.* at 36.

[335] Ex. I-2 at 29.

751.    Adolph followed through on his promise to Hayes, lowering Deutsche Bank's six-month Yen-LIBOR submissions drastically.  He also informed other co-conspirators, telling Trader K-2 from Firm K that "between u and me 6m libor is going to go very low in sep" and "[Hayes] will drop and teh others when back from holiday."

752.    In August 2009, the submissions of all three banks, UBS, Deutsche Bank, and HSBC all moved lower consistent with the plan.  By August 11, 2009, the day of Hayes' desired drop in the fixing, the submissions of all three banks dropped, such that HSBC and Deutsche Bank were in the bottom quartile of the submitting banks while UBS was included in the fix calculation. Specifically, from late July 2009 through mid-August 2009, UBS' submission fell l2 basis points, HSBC's and Deutsche Bank's submissions fell by 14 and 15 basis points, respectively.  In contrast, the largest change in any other submitting bank's submission during this time was a drop of eight basis points and the average change among the other thirteen banks was a decrease of about four basis points.

  8.  Société Générale

753.    ████████████████████████████████████

██████████████████████████████

754.    ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██ [336]



---

[336] ████████████████████████████

755. 

756.

337

338

9.  Bank of America

757.

337

338

758. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

J.   The Contributor Bank and Broker Defendants Knew That Other Contributor Bank Defendants Were Manipulating Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives.

759.    As early as February 2, 2007, RBS "Trader-3," Will Hall, knew that Tom Hayes communicated with another Contributor Panel "Bank-A," JPMorgan, as part of Hayes' efforts to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  As a result of UBS' collusion with unidentified JPMorgan, RBS also knew that UBS had kept three-month Yen-LIBOR "artificially high."  This provided RBS "useful" insight into the artificial direction of the manipulation and thus a key informational advantage, *i.e.*, knowing the "artificial[]" trend in the three-month Yen-LIBOR, over other Yen-LIBOR-based derivatives market participants.

760.    RBS Yen traders also knew that they were engaging in wrongful conduct and that Yen-LIBOR was being manipulated to benefit Yen-LIBOR-based derivative positions throughout the market.  As the Senior Yen Trader Jimmy Tan, Yen Manager, and other Yen traders coordinated their requests for beneficial Yen-LIBOR submissions with the Primary Submitter Paul White, they discussed at times how the Yen-LIBOR panel was a "cartel" in which rates were being "manipulated."  RBS traders, including Tan, also discussed how Hayes was manipulating Yen-LIBOR, including by coordinating with the "cash guys" at other Contributor Bank Defendants.  Examples of such communications include the following:

**August 20, 2007**:

Yen Manager: it seems to be [UBS] is pushing for these [Yen] libors partnering up with number of cash guys as well [ ... ]

Yen Trader 2: yeah [UBS Yen Trader] all over it

**August 20, 2007**:

RBS [Tan]: this libor setting is getting nutss [ ... ]

Bank A Trader: im puzzled as to why 3m libor fixing not coming off after the FED action [ ... ]

Bank B Trader: [UBS] is lending dolls through my currencies in 3 month do usee him doing the same in urs [ ... ]

RBS [Tan]: yes[,] he always led usd in my mkt[,] **the Yen-LIBOR is a cartel now** [ ... ]

RBS [Tan]: **its just amazing how libor fixing can make you that much money** [ ... ]

RBS [Tan]: [ ... ] its a cartel now in london[.] they smack all the 1yr irs .. and fix it very high or low [.] they smack all the 1yr irs .. and fix it very high or low

761.   Former Rabobank traders and submitters also recognized that Yen-LIBOR was "definite[ly] manipulate[ed]" throughout the market.  For example, on July 7, 2009, Rabobank "Trader-5," Takayuki Yagami, shared his impressions with "Submitter-4," Paul Robson, that "some ppl are talking with each other" to artificially lower the three-month Yen-LIBOR.  Not surprised by Yagami's impressions, Robson commented that Yen-LIBOR was manipulated, and in fact "always" is manipulated.  Robson continued to explain that he too "always used to ask if anyone needed a favour and vise versa," recognizing that although this was "unethical" it "always helpd to have fireind [friend] in [the] mrkt."

762.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



**K. As Sophisticated Market Participants, the Contributor Bank and Broker Defendants Knew Their Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives Would Have (And Did Have) Adverse Financial Consequences on Other Yen-LIBOR-based derivatives Market Participants**

763. Defendants were far from naïve in Yen-LIBOR-based derivatives trading and were well aware of the basic features of Yen-LIBOR-based derivatives, including Yen-LIBOR based interest rate swaps and foreign exchange forwards. *See e.g.*, ¶ 267, *supra* (CFTC finding that RBS and Rabobank traders knew interest rate swaps and foreign exchange forwards were priced based on Yen-LIBOR and traded those Yen-LIBOR-based derivatives for profit).

_____

339 ▮▮▮▮▮

Accordingly, Defendants understood that to the extent they increased their profits or decreased their losses in certain transactions from their manipulation of Yen-LIBOR, other market participants would suffer corresponding losses.

764.    For example, from as early as May 2006 and continuing at least through October 2008, Rabobank Yen-LIBOR submitter Paul Robson and Lloyds trader Andy Doe had an agreement that they would, upon request, contribute Yen-LIBOR submissions to benefit each other's Yen-LIBOR-based derivatives positions, or the Yen-LIBOR-based derivatives positions of other traders.  *See* ¶¶ 653-666, *supra*.  Communications between Doe and Robson demonstrate that they knew their manipulative conduct, which financially benefited Rabobank and Lloyds Yen-LIBOR-based derivatives positions, was harming their "poor customers" who suffered a corresponding monetary loss.  *See* ¶ 661, *supra*.

765.    Robson and Rabobank trader Takayuki Yagami further admitted that they understood that American financial institutions would be negatively impacted by their Yen-LIBOR manipulation.[340]  For example, during his plea allocution, where he admitted to conspiracy to commit wire fraud and bank fraud charges, Robson explained:

> I tailored the yen LIBOR submissions I made on behalf of Rabobank in order to profit the bank's position . . . I understood the parties taking opposite trading positions could be negatively affected and I knew that some of these parties that could be affected were American financial institution…When I made these submissions designed to favor the bank's trading positions, I knew that it was wrong to do so.[341]

766.    Similarly, at Deutsche Bank, despite knowing what they were doing was illegal, its employees continued to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based

---

[340] *United States v. Robson*, No. 14-cr-272, ECF No. 21 (Sept. 2, 2014); *United States v. Yagami,* No. 14-cr-272, ECF No. 16 (Jul. 1, 2014).

[341] *United States v. Robson*, No. 14-cr-272, ECF No. 21 at 12-13 (Sept. 2, 2014).

derivatives.  In a 2008 phone call, Adolph told an unknown caller ("UC") that Hayes and UBS were manipulating Yen-LIBOR lower, along with the help of at least eight other banks.  Because Hayes was coming up on a large reset date for his Yen-LIBOR-based derivatives positions, he told Adolph that each decrease in a basis point would be worth approximately 75 million Yen (roughly $750,000) for his trading book.  Upon telling the UC this information, Adolph confirmed that these actions were illegal, stating:

> Deutsche Bank [Adolph]: Um…it was not…not that big movement in the cash and [UBS] is manipulating it at the moment to get it very low.

> UC: You are telling me that the [UBS] is manipulating right?

> Deutsche Bank [Adolph]: Yeah. I mean yesterday [Hayes] came to me, ok, and said "hello mate," "hello," "I've got a big reset, that was yesterday, and about 750, uh…75 million yen dv01,[342] can you put it low?"

> ***

> Deutsche Bank [Adolph]: And [Hayes] said, 'can you put it low?' I said, 'yeah, ok.' At the end…at the end of the day, [laughter] it went down [unintelligible] bps when I think cash is better bid.

> UC: Fucking hell.

> Deutsche Bank [Adolph]: And he's doing that with the 16 banks [laughter].

> UC: That means [UBS] is asking 16 banks to…to…to ask you guys to put it high.

> Deutsche Bank [Adolph]: Maybe not…not 16 banks, but you know, if he knows eight banks, that's enough.

> ***

> Deutsche Bank [Adolph]: Yeah this is why the LIBOR came off yesterday. For no other reason.

---

[342] This refers to Hayes' "delta," or the impact on Hayes' portfolio resulting from a one basis point change in Yen-LIBOR.

\*\*\*

Deutsche Bank [Adolph]: Yeah, yeah, I know, but…because it was manipulated by Hayes

UC: Fucking hell, manipulating, Wow!

\*\*\*

UC: Is that...is that legal or illegal?

Deutsche Bank [Adolph]: No, that's illegal. No, that's illegal….

767.    Again, in a September 30, 2008 electronic chat, Adolph acknowledged that manipulating Yen-LIBOR was wrong.  Adolph told Deutsche Bank Submitter-8 that ten days prior Hayes, "call[ed] [Adolph] directly to beg [him] to put a low 6m libor."  Submitter-8 replied, "you're kidding me??????" and stated "that's not very kosher . . . ."  Adolph replied, "no, not really."  Despite knowing that manipulating Yen-LIBOR was illegal, Adolph continued to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives products through at least 2010.

L.    Defendants Concocted False Stories They Could Give in the Event Someone Questioned Their Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives.

1.    RBS

768.    The Senior RBS Yen Trader Jimmy Tan and other RBS Yen traders knew that they could impact the fixing of the daily Yen-LIBOR and were aware that RBS' Yen-LIBOR submissions could be questioned by the BBA.  In the following example, Tan boasted about how RBS succeeded in moving six-month Yen-LIBOR and then discussed what false story they could tell to the BBA to justify the low submission if necessary:

**April 2, 2008**:

RBS [Tan]: nice [Yen] libor[.] our 6m fixing move the entire fixing[.] hahahah

300

RBS [Danziger]: the BBA called to ask me about that today

RBS [Tan]: really?

RBS [Danziger]: yes –

RBS [Tan]: they complain?

RBS [Danziger]: asked to speak to me about the low 6m rate

RBS [Danziger]: no[,] just to make sure i was happy with it [ ... ]

RBS [Tan]: i think some banks must have complain

RBS [Danziger]: he called b4 any of the other banks saw our data[,] at about 11.15[,] to check it was ok

RBS [Tan]: oh then its fine

RBS [Danziger]: before publishing

RBS [Tan]: i am sure some HF [hedge fund] will complain tomorrow .. tough

RBS [Danziger]: tough

RBS [Tan]: we will say we lower every tenor .. 1m 3m 6m .. we feel rbs name has very good credit .. no problem getting money in

RBS [Tan]: good way to boost share price!

RBS [Tan]: our 3m libor is at top end ... 6m at bottom end ... just the ideal level!

   2.   Deutsche Bank

769.    To conceal its wrongdoing, Deutsche Bank repeatedly lied to the FCA during its probe into Deutsche Bank's LIBOR-related misconduct.  The FCA's Final Notice against Deutsche Bank details how the bank attempted to hide the Federal Financial Supervisory Authority for Germany's ("BaFin") findings from their LIBOR probe.  In 2012, BaFin reviewed Deutsche Bank's LIBOR misconduct, producing a report ("The Report") to the bank in August of 2013.[343]  Deutsche Bank was unhappy with The Report, which heavily criticized the bank.[344]

---

[343] Ex. I-3 at 26.

[344] *Id* at 27.

770.     In the course of its investigation, the FCA requested that Deutsche Bank provide

it a copy of The Report.[345]  Deutsche Bank's Senior Management, concerned about disclosing

both The Report and BaFin's findings, sought the advice of counsel.[346]  Deutsche Bank's lawyers

informed them that a failure to disclose The Report would constitute a breach of FCA Principle

11, which broadly covers providing false, misleading or inaccurate information to the FCA,

including during an investigation.[347]

771.     Disregarding this advice, Deutsche Bank went on a campaign to suppress The

Report.  In September 2013, Deutsche Bank's Senior Manager F met with BaFin and expressed

concern regarding disclosure of The Report.  The BaFin took no position, meaning Deutsche

Bank was free to provide the report to FCA.

772.     After the BaFin meeting, on September 6, 2013, Senior Manager F talked to

Senior Manager G via telephone.  Together, Senior Managers F and G scripted a fabricated

response, which they agreed to follow if the FCA asked Deutsche Bank to produce The Report in

the future.  The script read as follows:

> . . . the BaFin has explicitly stated to DB that it would not approve
> of DB sharing either copies or details of the contents of the
> aforementioned documents [including the report] with foreign
> regulators at this stage.[348]

773.     To provide further cover for Deutsche Bank's actions and support the scripted

response above, Senior Manager F met with Legal Manager A later that same day to draft an

"attendance note" about the BaFin meeting.  The note was intentionally ambiguous and written

so that it could be interpreted to state that the BaFin expressly prohibited Deutsche Bank from

---

[345] Id.

[346] *Id.* at 26.

[347] *Id*. at 27.

[348] *Id.* (alteration in original).

disclosing The Report to the FCA.  Conveniently, this ambiguous document was the only record of the September BaFin meeting.

774.    All the while, Deutsche Bank's management knew that disclosing The Report was not prohibited by BaFin.  For example, in a September 10 email, a Deutsche Bank Legal Team member wrote that "subject to the [Management] Board agreeing, we would likely inform the other regulators about receipt of the [Report and the other materials] but only be prepared to share the [Report]."[349]  This statement was also reflected in papers sent to the management board during a meeting which stated that disclosure of The Report "may be acceptable for the BaFin."

775.    Despite being told by its legal department to disclose The Report to the FCA, Deutsche Bank's management deliberately chose to conceal BaFin's criticisms against the bank. On September 13, 2013, Deutsche Bank conveyed the previously-scripted statement to the FCA's Enforcement and Financial Crime Division.  On September 16, Senior Manager E told the FCA's Supervision Department the same message during a phone call.  Deutsche Bank also followed-up via email on September 16, stating to the FCA:

> DB received several documents from the BaFin in August 2013 including [the Report]… **The BaFin has indicated to DB that it would not approve of DB sharing either copies or details of the contents of the documents referred to above with foreign regulators at this stage.** In these circumstances, the Bank feels that it has no option but to defer to the BaFin's wishes. As discussed, if you would like further information, we would therefore ask that you speak directly with your contacts at the BaFin.[350]

776.    Collectively, the information Deutsche Bank told the FCA was inaccurate, misleading, and intentionally crafted to keep the FCA from discovering the criticisms of the bank, including The Report, that senior management considered unflattering.

---

[349] *Id.* at 28 (alterations in original).

[350] *Id.* (emphasis added).

777.    On January 30, 2014, the FCA began to investigate Deutsche Bank for its failure to disclose The Report.  Deutsche Bank continued to make misrepresentations to the FCA to cover-up its LIBOR-related misconduct.  Deutsche Bank Senior Manager H represented to the FCA that the attendance note of the September meeting with BaFin substantiated the bank's position that their non-disclosure was reliable and appropriate.  Senior Manager H later determined that the attendance note was misleading, but did not contact the FCA to correct his misleading statement.  The FCA determined that the attendance note was drafted by Legal Manager A two days after the September meeting, at which he was not present.[351]

778.    To further conceal its LIBOR-related misconduct, members of Deutsche Bank's compliance department repeatedly refused to conduct internal audits of its LIBOR submission process.  For example, on October 25, 2010, a Deutsche Bank Compliance Supervisor asked Compliance Officer A to look into the bank's LIBOR-related systems and control to formally review the banks' practices in multiple currencies.[352]  Upon information and belief, "Compliance Officer A" is Andrew Sowter, Deutsche Bank's Head of Compliance Asia Pacific and the Global Head of Global Banking Compliance.[353]  Compliance Officer A ignored this request and did not conduct the review because it would negatively impact Deutsche Bank's highly profitable LIBOR-based derivatives business, explaining to another Deutsche Bank employee that he thought the Compliance Supervisor's idea of reviewing the LIBOR submission process was

---

[351] *Id.* at 29.

[352] Ex. I-3 at 23.

[353] Plaintiff believes this to be true from comparing Ex. I-3 at 30 and the Ex. I-6 at 14.  According to Ex. I-3, "Compliance Officer A" prepared an attestation for the FCA pertaining to Deutsche Bank's systems and controls in place for its LIBOR submissions process after a request from the FCA on February 4, 2011.  Similarly, Ex. I-6 states that on February 4, 2011, the FCA requested a confirmation of Deutsche Bank's LIBOR systems and controls, to which Mr. Andrew Sowter issued an incorrect written confirmation.

"crazy" and that "the business is going to go completely mental" if any kind of audit ever takes place.[354]

779.    Later that same year, Compliance Officer A struck again, this time in response to a December 2010 request from the BBA that Deutsche Bank conduct an internal audit of its LIBOR submission process.  Rather than simply conduct the review, Compliance Officer A signed and submitted a confirmation to the BBA on January 12, 2011, stating that Deutsche Bank's LIBOR submissions had already been audited.  This was a lie.  Deutsche Bank's compliance did not audit the systems and controls in place for LIBOR.  Compliance Officer A further dismissed the BBA's request and his fraudulent statement in an email, stating that the signed confirmation form was nothing more than "an arse-covering exercise [by the BBA]."

780.    Following the BBA's request, on February 4, 2011, the FCA requested that Deutsche Bank attest to the systems and controls in place to ensure the integrity of Deutsche Bank's LIBOR submission process.  Once again, the task of completing this review fell on Compliance Officer A, who conducted only a minimal investigation into Deutsche Bank's LIBOR submission process.  Compliance Officer A found that there were **no LIBOR-specific systems and controls** in place to ensure the integrity of the benchmark.  He also found that Deutsche Bank's communication monitoring system would not detect any LIBOR-related "buzz words" indicative of manipulative conduct and/or inter-bank coordination.[355]

781.    Despite these findings, on March 18, 2011, Compliance Officer A provided an attestation to Senior Manager I, who signed and returned the following statement to the FCA:

> DB monitors all email and instant messaging communications of all front office staff.  The focus of this surveillance is DB's market conduct, such that key words and phrases within the monitoring tool

---

[354] Ex. I-3 at 23.

[355] *Id.* at 30.

> are designed to flag potential market conduct issues.  Any potential
> issues can be escalated and investigated as necessary.  In light of the
> above, I consider, together with the senior management [names of
> Senior Manager B and Senior Manager C provided] . . . that DB
> currently has adequate systems and controls in place for the
> determination and submission of DB's LIBOR fixings.[356]

782.    This statement was blatantly false in three respects, as Compliance Officer A

knew that Deutsche Bank: (1) did not have any specific procedure in place governing LIBOR

submissions; (2) did not conduct spot checks; and (3) did not monitor communications for

LIBOR-specific terms.  The FCA found that Deutsche Bank's senior management failed to

oversee Compliance Officer A or verify any information contained within the attestation.[357]

783.    In yet another failure to comply with a government regulator's request, Deutsche

Bank destroyed possibly-relevant evidence after receiving a formal request from the FCA to

preserve it.  In May 2011, the FCA ordered that Deutsche Bank retain all LIBOR-related data

and information, including telephone recordings, dated back through 2006.  Hermann-Josef

Lamberti, a member of Deutsche Bank's management board and Chief Operating Officer

responsible for overseeing IT, did not properly warn his subordinates of the FCA order. As a

result, in July 2012, Deutsche Bank destroyed audio recording of telephone calls relevant to the

LIBOR investigation dating from 2008 to 2009.

### 3.   Rabobank

784.    To cover up its failure to implement internal LIBOR-related systems and controls,

Rabobank filed a false attestation with the FCA.  On February 2, 2011, the FCA asked Rabobank

to "provide an attestation as to the adequacy of the systems and controls arrangements currently

---

[356] *Id.* at 30-31.

[357] *Id.* at 31.

in place for the determination and agreement of . . . LIBOR submissions."[358]  At that time, Rabobank had drafted a LIBOR policy, but did not implement it.

785.    Despite not having any LIBOR-related systems and controls in place, Rabobank signed and returned an attestation to the FCA on March 18, 2011, stating: "As per your letter of 2nd February 2011, we can confirm that the arrangements in place for Rabobank International's LIBOR submissions are adequate and fit for purpose."  This statement was false in three aspects, as Rabobank: (i) did not implement, disseminate, or even train its employees on any LIBOR-related systems and controls; (ii) continued to allow submitters to trade derivatives that were based on the very rate they were responsible for submitting; and (iii) failed to implement a system to maintain records of who was making LIBOR submissions and on what those submissions were based.[359]

786.    After lying to the FCA, Rabobank put its flawed LIBOR policy in place on March 30, 2011, but given the policy's shortfalls, Rabobank's traders and submitters continued to manipulate LIBOR.  It was not until over a year later, in August 2012, that Rabobank finally addressed the problem by putting systems and controls in place that prohibited LIBOR submitters from trading LIBOR-based derivatives products.[360]

787.    Rabobank's failure to implement internal controls to address benchmark interest rate submissions, allowance of inappropriate communications between traders and Rabobank's submitters, and financial incentive to manipulate the rates amplified the pattern of misconduct, which continued for a number of years.

---

[358] Ex. D-3 at 16.

[359] *Id*.

[360] *Id*.

788.     During the Allen/Conti Trial, it was revealed for the first time that Rabobank's employees also lied when interviewed by the FCA about their manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  Paul Robson testified that when the FCA interviewed him, he feared the possible criminal ramifications of his actions, so he lied to the authority to protect his interests:

> Government [Slipperly]: Mr. Robson, you were asked quite a bit about your state of mind during cross-examination. Can you tell the jury about your state of mind when you were giving -- when you were interviewed by the FCA?
>
> Rabobank [Robson]:  I didn't really treat it with the gravity it deserved.  I thought that if I could create enough bluster and ambiguity around it, the whole affair then it would go away, so that's what I did."[361]

789.     Robson also testified that his objective in lying to the FCA was "trying to create some doubt and confusion about what [they] were doing."[362]  Because Defendants told self-serving lies to government regulators to keep them from discovering the extent of their wrongdoing, Plaintiffs and the Class continue to learn new information about the means of Defendants' manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, and the details of their conspiracy.

### M.  Defendants Used Code Words to Conceal Their Manipulation of Yen-LIBOR and the Prices of Yen-LIBOR-based derivatives

#### 1.  ICAP Yen Brokers Used Code Words and Personal Cell Phones To Try and Conceal Their Yen-LIBOR Services

790.     In late 2007 and early 2008, ICAP's Yen Desk Head Danny Wilkinson, Derivatives Broker 1 Darrell Read and Cash Broker 1 Colin Goodman became concerned that

---

[361] *United States v. Allen*, No. 14-cr-272, Testimony of Trial at 614 (Oct. 22, 2015).

[362] *Id.* at 626-27.

ICAP compliance might discover that they were aiding Hayes' manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  To conceal their unlawful activities, Read began communicating by personal mobile telephones and text messages with Goodman.  Read also alerted Hayes about the need to be careful in their communications when explaining their "views":

> **November 1, 2007**:
>
> ICAP [READ]: HI MATE, JUST HAD [Danny Wilkinson] BACK ON RE-LIBORS, HAD A LOT OF COMPLIANCE PRESSURE RECENTLY DUE TO CREDIT PROBLEMS, WE BOTH NEED TO BE A LITTLE MORE SUBTLE IN OUR "VIEWS"…IE' I THINK THE FWDS ARE SUGGESTING THIS 6MOS LIBOR SHOULD BE LOWER…ETC.  MY E-MAILS ETC. NEED TO BE WORDED MORE CAREFULLY

791.   In an effort to ensure that Hayes' requests escaped detection from review by ICAP's compliance staff, Read and Hayes started using code words to mask their discussions about manipulating LIBOR.  Read and Hayes used the words "political correctness," "arbitrage," "arb" or "arbi" to denote requests and efforts to push Yen-LIBOR in a particular direction on Hayes' behalf.  For example:

> **November 13, 2007**:
>
> ICAP [Read]: [to Colin Goodman] in these days of "political correctness" is it true that there is a fair bit of pressure holding 6 mos libor down today?  I think this will probably suit.
>
> **January 28, 2008**:
>
> ICAP [Read]: [Colin] libors..sees 1m and 3m coming in unchanged ... 6m down 1/4bp....arbi has made him sent them out a bit higher,but not confident he'll get them up
>
> **February 21, 2008**:
>
> UBS [Hayes]: cu know what ineed arbitrage wise?  you
>
> ICAP [Read]: high 3m low 6m  [Colin] reckons 1m could come off 1/2bp today (looks 1bp too high to him at the mom)....3m -1/8th.....6m -1/8th
>
> UBS [Hayes]: ok lets hope the arby works!

ICAP [Read]: well he has sent the same as yesterday,but just warning us . .. when does your big 1m roll out?

2. R.P. Martin Brokers and Hayes Attempted to Conceal Their Improper Conduct Surrounding the Wash Trades

792. Hayes and R.P. Martin broker Terry Farr were well aware of the improper nature of their conduct.   First, they made an effort to avoid any written communications confirming the wash trades, choosing primarily to communicate via telephone.  For example, Hayes warned Farr not to put anything on chat:

**December 3, 2008**:

UBS [Hayes]: What I'm doing mate, don't fucking put it on chat.

R.P. Martin [Farr]: All right. Okay.

UBS [Hayes]: All right. Okay. 90 and three-eighths

R.P. Martin [Farr]: Oh, thank you very much, mate. I love you.

UBS [Hayes]:  I just want it but don't put it on fucking chat, all right.

793.



████████████████████████████

N. After the Contributor Bank Defendants Were Placed on Notice of Government Investigations into the Manipulation of U.S. Dollar LIBOR, Defendants Continued to Manipulate Yen-LIBOR and the Prices of Yen-LIBOR-based Derivatives

794.     Defendants continued their unlawful conduct long after authorities had launched investigations into false reporting and manipulation of U.S. Dollar LIBOR.  By way of example, RBS traders and submitters acknowledged internally by at least September 2010 that regulators were investigating false reporting of U.S. Dollar LIBOR, but nonetheless agreed that they were going to continue to manipulate Yen-LIBOR.  RBS traders and submitters, however, recognized that they should be more careful to cover their tracks to avoid detection, including avoiding openly discussing in writing their manipulation of Yen-LIBOR while regulators were snooping around in U.S. Dollar LIBOR.

795.     For example, in one exchange on September 24, 2010, Jimmy Tan contacted Neil Danziger and told him to ask Paul White "to push 6m [Yen] Libor up 2 bps to 44."  Danziger responded: "ha . . . i will mention it ... no emails anymore . . . ."   In another exchange, on November 22, 2010, Danziger and Jimmy Tan acknowledged that "at the moment the FED are all over us about USD libors," but because they didn't "think anyone cares [about] JPY libor," at least "not yet," they acknowledged they had the green light to continue with their Yen-LIBOR manipulation.

796.     In another exchange on November 24, 2010, Paul White, RBS' primary submitter, warned Jimmy Tan to no longer put in writing his manipulative requests.  The warning first appeared in writing when the submitter diverted an instant message request from Jimmy Tan for an artificial Yen-LIBOR rate by responding spontaneously with the off-topic-question of: "how you doing with all the volatilities these days?" *i.e.,* code to change the subject.  Tan responded,

"ok no prob….wouldn't want to cause any problem….thanks mate."  Shortly after the instant

message exchange, in a follow-up telephone conversation, Paul White was more blunt in his

warning, saying "we're just not . . . allowed to have those conversations on [instant messages] . .

. because of the BBA thing."  After they had a good laugh about it, White confirmed he was still

on board with the manipulation, *i.e.,* submitting false Yen-LIBOR rates that financially

benefitted Tan's Yen-LIBOR-based derivatives positions, saying: "So yeah, leave it with me,

and uh, it won't be a problem."  Jimmy Tan responded, "Ok, great."

797.    The collusive manipulation in the Yen-LIBOR-based derivatives market had

become so widespread that in Jimmy Tan's words, the banks setting Yen-LIBOR had become a

"cartel."

798.    UBS continued to engage in all of the manipulative conduct long after it was on

notice that the CFTC was investigating UBS in connection with its U.S. Dollar LIBOR practices.

UBS received a demand for documents and information from the CFTC's Division of

Enforcement in October 2008, yet the conduct of the traders and submitters in relation to Yen

(and other currencies), including collusive conduct, occurred well into 2010.  The rampant

misconduct across Yen-LIBOR and other rates at UBS only came to light as a result of the

CFTC's subsequent request in April 2010 that UBS conduct an internal investigation relating to

its U.S. Dollar LIBOR practices.  *See* Ex. A-2, p. 13.

O. **Defendants Obstructed Government Investigations and Lied to Their Attorneys during Their Own Internal Investigations of LIBOR Manipulation.**

799.    Defendants also sought to obstruct investigations into the manipulation of

LIBOR.  For example, in December 2010, a UBS derivatives desk manager instructed a UBS

LIBOR Submitter to lie when interviewed by UBS attorneys during the investigation into

LIBOR manipulation. Among other things, the UBS derivatives desk manager instructed the

UBS Submitter to:

- falsely claim that the UBS Yen trading desks did not have any derivative positions with exposure to Yen-LIBOR;

- avoid mentioning Hayes;

- falsely indicate that the Yen-LIBOR submission process did not take into account trading positions;

- falsely claim that they never moved the Yen-LIBOR submissions to benefit the Yen trading desks;

- falsely claim that when contributing Yen-LIBOR submissions, UBS tried to be "as close to the market as possible."

P.  Legal Findings and Implications of Defendants' Manipulative and Collusive Conduct

1.  The CFTC Determined Yen-LIBOR is a Commodity in Interstate Commerce.

800.    On a daily basis, Defendants, through the transmission of an electronic

spreadsheet to Thomson Reuters, which calculates their official fixings, knowingly delivered or

caused to be delivered its Yen-LIBOR submissions through the mails or interstate commerce.

Defendants' submissions were also caused to be delivered through the mails or interstate

commerce through the daily dissemination and publication globally, including into the United

States, of the panel banks' submissions as well as the daily official benchmark interest rates by at

least Thomson Reuters on behalf of the BBA, and other third party vendors.  The panel banks'

submissions are, and were used during the Class Period, used to determine the official published

rates for Yen-LIBOR, which are calculated based on a trimmed average of the submissions.

Defendants' daily Yen-LIBOR submissions contained market information concerning the costs

of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and

stress in the money markets, and Defendants' ability to borrow Yen.  Such market information

affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which Yen-LIBOR is fixed.

801.    The Broker Defendants also knowingly caused to be delivered through the mails or interstate commerce false or misleading or knowingly inaccurate reports concerning Yen bank borrowing rates, through the form of Suggested LIBORs, which is market information that affects or tends to affect the fixing or pricing of Yen-LIBOR, a commodity in interstate commerce. Each business day, Yen-LIBOR panel banks, through the transmission of electronic spreadsheets to Thomson Reuters, made Yen-LIBOR submissions in contribution to the daily fixing of Yen-LIBOR for various tenors through the mails or interstate commerce. Yen-LIBOR panel banks' submissions were delivered through the mails or interstate commerce by the daily dissemination and publication globally, including into the United States, of the panel banks' submissions as well as the daily official Yen-LIBOR fixing by Thomson Reuters on behalf of the BBA and by other third-party vendors. The panel banks' submissions are used to determine the official published rates for Yen-LIBOR, which are calculated based on a trimmed average of the submissions. The Yen-LIBOR panel banks' submissions contain market information concerning the costs of borrowing unsecured funds in Yen in particular tenors, the liquidity conditions and stress in the money markets, and the panel banks' ability to borrow Yen in the London interbank market. Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which Yen-LIBOR is fixed.

802.    ICAP brokers provided oral or written Yen-LIBOR predictions, *i.e.*, the "Suggested LIBORs." However, to benefit certain ICAP clients, in particular the UBS Senior Yen Trader Tom Hayes, and to assist their efforts to manipulate the fixing of Yen-LIBOR on their behalf, ICAP Yen brokers often knowingly disseminated false, misleading and knowingly

inaccurate market information to the Yen Panel banks through two primary means: (1) Cash Broker 1 and/or others brokers provided skewed Suggested LIBORs, through the daily Yen-LIBOR run thru emails or oral communications with submitters or traders at the Yen-LIBOR panel banks; and (2) ICAP brokers directly pressured Yen-LIBOR submitters and traders at panel banks to submit certain rates, that were skewed to reflect rates beneficial to the Senior Yen Trader and at times other traders.  At times, certain Yen panel banks used ICAP's skewed Suggested LIBORs in determining and making their Yen-LIBOR submissions to the BBA, in violation of BBA rules.  As a result, those Yen-LIBOR submissions were false, misleading or knowingly inaccurate because the panel banks' submissions purported to reflect the panel banks' perceived costs of borrowing Yen in the inter-bank market, but in reality, reflected in whole or in part the rates that benefited the trading positions of ICAP's clients.

803.     Similarly, to benefit certain R.P. Martin clients, specifically the UBS Senior Yen Trader and the RBS Yen Trader, and to assist their efforts to attempt to manipulate the fixing of Yen-LIBOR on their behalf, R.P. Martin Yen brokers often knowingly disseminated false, misleading and knowingly inaccurate market information to the Yen Panel banks through three primary means: (1) Terry Farr or others provided skewed Suggested LIBORs through oral communications with submitters or traders at the Yen-LIBOR panel banks; and (2) RP Martin brokers directly pressured Yen-LIBOR submitters and traders at panel banks to submit certain rates that were skewed to reflect rates beneficial to the Senior Yen Trader and at times other traders. At times, certain Yen-LIBOR Contributor Banks used R.P. Martin's skewed Suggested LIBORs in determining and making their Yen-LIBOR submissions to the BBA in violation of BBA rules.  As a result, those Yen-LIBOR submissions were false, misleading or knowingly inaccurate because the panel banks' submissions purported to reflect the panel banks' perceived

costs of borrowing Yen in the interbank market but in reality, reflected in whole or in part the rates that benefited the Yen-LIBOR-based derivative positions of R.P. Martin's clients.

804.    Accordingly, the Broker Defendants' actions, designed and intended to benefit clients and themselves, knowingly caused the panel banks to deliver through the mails or interstate commerce false or misleading or knowingly inaccurate market information that affects or tends to affect a commodity in interstate commerce, including Yen-LIBOR and violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2006).

> 2.    As Part of its Non-Prosecution Agreement with the DOJ, UBS Admits That False and Misleading Yen-LIBOR Contributions Affected Financial Instruments Traded in the United States.

805.    As part of its Non-Prosecution Agreement with the DOJ, UBS admitted that when the requests of derivatives traders for favorable Yen-LIBOR submissions were taken into account by the UBS rate submitters, UBS' rate submissions were false and misleading.

> 3.    Defendants and their Co-conspirators Admit They Successfully Manipulated Yen-LIBOR

806.    For example, as part of its Non-Prosecution Agreement with the DOJ, UBS admitted that when UBS derivatives traders influenced the submissions of other Contributor Panel Banks by: (1) seeking and receiving accommodations from their counterparts at such banks, or (2) influencing the submissions from other banks with assistance from cash brokers who disseminated misinformation in the marketplace.  The manipulation of those submissions affected Yen-LIBOR on various occasions.  Similarly, as part of their Deferred Prosecution Agreements with the DOJ, Defendants RBS and Rabobank admitted that when its Yen-LIBOR derivatives traders made requests of RBS' Yen-LIBOR rate submitters in order to influence RBS' Yen-LIBOR submissions, and when the submitters accommodated those requests, the manipulation of the submissions affected the resulting Yen-LIBOR fix on various occasions.  In

addition, when traders, former traders, and/or submitters, including some at RBS, agreed to

coordinate requests for favorable Yen-LIBOR submissions, and when Yen-LIBOR submitters

accommodated those requests, the manipulation of submissions affected the Yen-LIBOR fixing

on various occasions.

> 4. The CFTC Has Determined That Contributor Bank Defendants and Co-
> conspirators UBS, RBS, Rabobank, Deutsche Bank, Barclays, Lloyds, and
> Société Générale Successfully Manipulated Yen-LIBOR.

807.    The CFTC has determined that, *inter alia*, Contributor Bank Defendants and Co-

conspirators UBS, RBS, Rabobank, Lloyds, Deutsche Bank, Barclays, and Société Générale's

submissions for Yen-LIBOR were false, misleading, or knowingly inaccurate because they were

based in whole or in part on impermissible and illegitimate factors, including the Yen-LIBOR-

based derivatives positions of their traders.  By using these impermissible and illegitimate factors

in making its Yen-LIBOR submissions, Defendants conveyed false, misleading, and/or

knowingly inaccurate information while representing that the rates they submitted were truthful

and reliable quotes based solely on the cost of borrowing unsecured funds in the relevant

markets.  Certain of Defendants' managers, traders and submitters at the very least knew that

certain of their Yen-LIBOR submissions contained false, misleading, and knowingly inaccurate

information concerning the submitted rates.

> 5. The CFTC Has Determined that Broker Defendant ICAP and Co-Conspirator
> R.P. Martin Successfully Manipulated Yen-LIBOR and the Prices of Yen-
> LIBOR-based Derivatives.

808.    The CFTC has determined that, *inter alia*, Broker Defendant ICAP and co-

conspirator R.P. Martin communicated on a daily basis with banks that participated on the Yen-

LIBOR panel and made submissions that purported to reflect their assessments of their

respective banks' costs of borrowing unsecured funds in the London interbank market for Yen

across tenors. The official LIBOR fixings are calculated using a trimmed average methodology applied to the rates submitted by the panel banks.  By virtue of this methodology, panel banks had the ability to influence or affect the rate that would become the official Yen-LIBOR fixing for any tenor. Accordingly, if the Broker Defendants could influence the rates submitted by the panel banks, then the Broker Defendants had the ability to influence or affect the rate at which Yen-LIBOR would be fixed.  As alleged herein, Yen-LIBOR panel banks (in violation of BBA rules) relied upon the market information about Yen borrowing rates and Suggested LIBORs provided by the Broker Defendants, and, at times, at least certain panel banks used the rates suggested by the Broker Defendants in determining and making their submissions.  As a result, at times, certain Yen-LIBOR panel banks made false or misleading Yen-LIBOR submissions.

6.   The CFTC Has Determined that Contributor Bank Defendants and Co-Conspirators UBS, RBS, Rabobank, Deutsche Bank and Lloyds Aided and Abetted the Manipulation of Yen-LIBOR.

809.   The CFTC has determined that, inter alia, Contributor Bank Defendants and co-conspirators UBS, RBS, Rabobank, Deutsche Bank, and Lloyds also aided and abetted traders at other banks to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  As evidenced by the extensive communications, Defendants' traders and submitters and traders at other panel banks coordinated about Yen-LIBOR rates that would benefit their banks' or their co-conspirators' respective derivatives trading positions.  Also, the traders at the other panel banks or brokers on behalf of traders at other banks asked Defendants' traders to submit a certain rate, or submit a rate in a direction higher or lower, that would benefit the cash and derivatives trading positions of the traders at the other panel banks.  Defendants' derivatives traders agreed and made the requests of their Yen-LIBOR submitters, who in turn made their Yen-LIBOR submissions based on the derivatives traders' or brokers' requests.  In addition, at least one RBS

Yen trader knowingly assisted the UBS Yen Trader to manipulate Yen-LIBOR by agreeing to act

as counterparty to wash trades opposite UBS to provide extra brokerage commissions to the

inter-dealer brokers as payment for their assistance in manipulating Yen-LIBOR.

> 7.  The CFTC Has Determined that Broker Defendant ICAP and Co-Conspirator
>     R.P. Martin Aided and Abetted the Manipulation of Yen-LIBOR.

810.    The CFTC has determined that, *inter alia*, Broker Defendant ICAP and Co-

Conspirator R.P. Martin aided and abetted and often coordinated with and assisted Yen-LIBOR-

based derivatives traders at Yen-LIBOR panel banks, primarily the UBS Senior Yen Trader, to

manipulate the official Yen-LIBOR fixings for certain tenors by at times causing panel banks to

make Yen-LIBOR submissions at rates or levels that that would benefit the derivatives traders'

trading positions.  The Broker Defendants knew that the UBS Senior Yen Trader and other

traders were trying to manipulate Yen-LIBOR to benefit their derivatives trading positions.

> 8.  The CFTC Has Determined Contributor Bank Defendants and Co-Conspirators
>     UBS, RBS, Rabobank, Lloyds, ICAP, R.P. Martin, Deutsche Bank, Barclays, and
>     Société Générale Are Vicariously Liable for the Acts of their Employees in the
>     Manipulation of Yen-LIBOR.

811.    The CFTC has determined that Contributor Bank Defendants and co-conspirators

UBS, UBS Japan, RBS, RBS Japan, Rabobank, Lloyds, Deutsche Bank, Barclays, and Société

Générale, as well as Broker Defendant ICAP and co-conspirator R.P. Martin are liable for the

acts, omissions, and failures of the managers, traders, submitters, and/or brokers who acted as

their employees and/or agents and in violation of Sections 6(c), 6(d) and 9(a)(2) of the CEA, 7

U.S.C. §§ 9, 13b and 13(a)(2).

9.   Contributor Bank Defendants and Co-Contributors UBS, RBS, Rabobank, Lloyds, Deutsche Bank, Barclays, and Société Générale Acknowledge Same in their Non-Prosecution and Deferred Prosecution Agreements with the DOJ.

812.   As part of their Deferred and Non-Prosecution Agreements with the DOJ, Defendants and co-conspirators UBS, RBS, Rabobank, Lloyds, Deutsche Bank, and Barclays each acknowledged that the wrongful acts described in the DOJ Statement of Facts taken by the participating employees in furtherance of the misconduct were within the scope of their employment at their respective financial institution.  UBS, RBS, Rabobank, Barclays, and Société Générale also each acknowledged that the participating employees intended, at least in part, to benefit UBS, RBS, Rabobank, Lloyds, and Barclays through the actions described in the DOJ SOF.

10.   Contributor Bank Defendants and Co-Conspirators UBS, RBS, Rabobank, Deutsche Bank, Barclays, and Société Générale Admit They Engaged in a Deceptive Course of Conduct When They Submitted or Caused to Be Submitted False and Misleading Yen-LIBOR Submissions Designed to Derive Illicit Profits at the Expense of Their Counterparties and other Yen-LIBOR-based Derivatives Participants.

813.   As part of its Non-Prosecution Agreement with the DOJ, UBS admitted that its derivatives traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.  As part of that effort: (1) derivatives traders and submitters submitted and caused the submission of materially false and misleading Yen-LIBOR contributions; and (2) derivatives traders, after initiating and continuing their effort to manipulate Yen-LIBOR, negotiated and entered into derivative transactions with counterparties that did not know UBS employees were often attempting to manipulate the reference interest rate.

814.   As part of their Deferred Prosecution Agreements with the DOJ, Defendants RBS, and Rabobank, and co-conspirator Deutsche Bank admitted that when the requests of derivatives

traders for favorable Yen-LIBOR submissions influenced the RBS, Rabobank, and Deutsche Bank rate submitters' contributions, RBS', Rabobank's, and Deutsche Bank's Yen-LIBOR rate submissions were false and misleading.  In making and in accommodating these requests, the derivatives traders and submitters (and RBS, Rabobank, and Deutsche Bank) were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.  As part of that effort: (1) RBS, Rabobank, and Deutsche Bank derivatives traders and submitters submitted, and caused the submission of, materially false and misleading Yen-LIBOR contributions; and (2) RBS, Rabobank, and Deutsche Bank derivatives traders, after initiating and while continuing their effort to manipulate Yen-LIBOR contributions, negotiated and entered into derivatives transactions with counterparties knowing that that those counterparties were unaware of the efforts by RBS', Rabobank's, and Deutsche Bank's employees to manipulate the relevant Yen-LIBOR rate.

815.    As part of its Deferred Prosecution Agreements with the DOJ, Defendant Lloyds admitted that when its submitters made Yen-LIBOR submissions that took trading positions into account, Lloyds' Yen-LIBOR submissions were false and misleading.  In making and accommodating the requests, the traders and submitters involved in the making of these false and misleading submissions (including those at Rabobank) were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties. As part of that effort: (1) traders and submitters submitted and caused the submission of materially false and misleading Yen-LIBOR contributions; and (2) traders and submitters, both before and after initiating and continuing their effort to manipulate Yen-LIBOR contributions, negotiated and entered into transactions with counterparties that did not know that Lloyds employees were manipulating Yen-LIBOR.

816.    When the request of Barclays' swaps traders for favorable LIBOR submissions were taken into account by the rate submitters, Barclays' rate submissions were false and misleading.  In making and in accommodating the requests, the swaps traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.  As part of that effort: (1) swaps traders and submitters submitted and caused the submission of materially false and misleading LIBOR contributions; and (2) swaps traders, after initiating and continuing their effort to manipulate LIBOR, negotiated and entered into derivatives transactions with counterparties that did not know that Barclays employees were intending to manipulate LIBOR.

817.    As part of its Deferred Prosecution Agreement with the DOJ, Defendant Société Générale admitted that when its submitters made Yen-LIBOR submissions that took trading positions into account, Société Générale's Yen-LIBOR submissions were false and misleading.

11.  Defendants Admit They Were Competitors.

818.    For example, as part of its Deferred Prosecution Agreement with the DOJ, RBS admitted that traders, former traders, and/or submitters at competing financial institutions, including RBS, agreed to coordinate and in fact coordinated with regard to Yen-LIBOR submissions, causing the manipulation of Yen-LIBOR on certain occasions.  Because Yen-LIBOR was a pricing component of Yen-LIBOR-based derivatives contracts held by their respective financial institutions, the traders benefited from this agreement by affecting the profitability of these transactions.

Q.  Defendants Plead Guilty or Agree to Waive Indictment to Criminal Charges of Wire Fraud in Connection with Their Manipulation of the Prices of Yen-LIBOR-based Derivatives.

819.    In connection with their unlawful manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, Defendants UBS Japan and RBS Japan agreed to waive indictment and plead guilty to a one-count criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section, and the Antitrust Division of the DOJ charging each with wire fraud, in violation of 18 U.S.C. § 1343.  As part of its Deferred Prosecution Agreement with the DOJ, RBS Japan's corporate parent Natwest Markets plc f/k/a/ The Royal Bank of Scotland plc  ("RBS") was also charged with wire fraud and price-fixing in violation of Section 1 of the Sherman Act.  Defendant Rabobank also waived indictment to wire fraud as part of its own Deferred Prosecution Agreement with the DOJ.  *See* Exs. A-4, B-3 and D-4.

1.  UBS Japan.

820.    Between approximately 2006 and at least 2009, in the District of Connecticut and elsewhere, UBS Japan, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant devised and engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about February 25, 2009, the defendant transmitted or caused the transmission of electronic communications, specifically: (1) an electronic chat between a derivatives trader

employed by the defendant and a broker employed at an inter-dealer brokerage firm, (2) a subsequent Yen LIBOR submission from a bank to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate through international and interstate wires, at least one of which passed through, among other locations and facilities, servers located in Stamford, Connecticut.

2.   RBS Japan.

821.   Between approximately 2006 and at least 2010, in the District of Connecticut and elsewhere, RBS Japan, the defendant, through its employees, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant, through its employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about October 5, 2009, the defendant transmitted or caused the transmission of electronic communications, specifically: (1) an electronic chat between a derivatives trader employed by the defendant and a derivatives trader employed by the defendant's parent company, (2) a subsequent Yen-LIBOR submission from a bank to Thomson Reuters, and (3) a subsequent publication of a Yen-LIBOR rate—through international and interstate wires, at least one of which passed through, among other locations and facilities, servers located in Stamford, Connecticut.

3.   Rabobank.

822.   Between approximately 2005 and at least 2010, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., the defendant, through its employees, unlawfully, willfully, and

knowingly, having devised and intending to devise a scheme and artifice to defraud and for

obtaining money and property by means of false and fraudulent pretenses, representations, and

promises, did transmit and cause to be transmitted by means of wire, radio, and television

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing such scheme and artifice, to wit, the defendant, through its

employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades

executed on its behalf by secretly manipulating benchmark interest rates to which the

profitability of those trades was tied, and in furtherance of that scheme, on or about April 17,

2008, the defendant transmitted or caused the transmission of electronic communications,

specifically: (1) an electronic chat between a derivatives trader and a money market trader, (2) a

subsequent Yen-LIBOR submission from the defendant to Thomson Reuters, and (3) a

subsequent publication of a Yen-LIBOR rate through international and interstate wires.

4. Deutsche Bank

823.   From at least as early as 2008 through at least 2010, the defendant, Deutsche

Bank AG, through its employees, and its co-conspirators, engaged in a combination and

conspiracy in unreasonable restraint of interstate and foreign commerce.  The aforesaid

combination and conspiracy consisted of an agreement, understanding and concert of action

among the defendant and its co-conspirators, the substantial terms of which were to fix the price

of Yen LIBOR-based derivative products by fixing Yen-LIBOR, a key component of the price

hereof, on certain occasions.

5. UBS Waived Indictment and Pled Guilty After the DOJ Revoked a Non-
   Prosecution Agreement Based on UBS' Continued Market Manipulation and
   Serial Criminal Conduct

824.   On December 18, 2012, the DOJ Criminal Division, Fraud Section, and UBS

entered into a Non-Prosecution Agreement ("NPA") relating to UBS' submissions of LIBOR

325

(including Yen-LIBOR), Euribor and Euroyen TIBOR ("IBOR Benchmarks") and manipulation of IBOR Benchmarks prior to 2011.

825.    In the NPA, UBS agreed to "commit no United States crime" whatsoever for a period of two years from the execution date of the NPA and represented that it had, among other things, "strengthened its compliance and internal control standards and procedures" and "sought to effectively remediate any problems it [had] discovered."

826.    Under the NPA, UBS paid a penalty of $500 million and committed to real reformation of its operating practices in exchange for the Criminal Division's agreement not to prosecute UBS "for any crimes related to UBS's submissions of benchmark interest rates . . . ."

827.    Rather than adhering to the terms of the NPA, UBS continued to manipulate commodity markets, this time in foreign exchange spot and precious metals markets.  After the execution of the NPA, certain UBS employees engaged in "(i) fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange ("FX") market transactions with customers via telephone, email, and/or electronic chat to the detriment of UBS' customers and (ii) collusion with other participants in certain FX markets."

828.    UBS, pursuant to the terms of the NPA, reported its continued manipulation to the DOJ, Criminal Division.  The Criminal Division determined that UBS' conduct breached the NPA.  In making its determination, the Criminal Division cited that UBS was a serial offender, having entered into multiple civil and regulatory settlements for violations.

829.    Further, UBS' FX manipulation was the fourth U.S. criminal matter to come before the DOJ in the past six years.  In addition to the IBOR Benchmark and the FX manipulation, in February 2009, UBS entered into a Deferred Prosecution Agreement with the DOJ Tax Division for conspiring to defraud the United States of tax revenue through secret bank

accounts for U.S. taxpayers.  In May 2011, UBS entered into a separate Non-Prosecution

Agreement with the Antitrust Division relating to its involvement in bid-rigging in the municipal

bond derivatives market.

830.     Subsequent to the Criminal Division's declaration of a breach of the NPA, UBS

entered into a plea agreement on May 20, 2015 ("May 2015 Agreement").  In the May 2015

Agreement, UBS waived indictment and agreed to plead guilty to one count of a wire fraud in

furtherance of a scheme to defraud counterparties to interest rate derivatives transactions by

manipulating Yen-LIBOR.  UBS admitted that the factual allegations of the charging

information were true and reflected UBS' conduct in connection with IBOR Benchmarks,

including Yen-LIBOR.

831.     In addition to an obligation to cooperate with the Criminal Division and other

undertakings, UBS also agreed to pay an additional criminal fine of $203 million, and was to

enter into a separate Cooperation and Non-Prosecution Agreement with the DOJ Antitrust

Division relating to foreign exchange antitrust offenses.

> 6.  Société Générale Pled Guilty and Settled with the CFTF for Manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

832.     As described by the CFTC Order dated June 4, 2018 (the "CFTC SG Order"),

Société Générale pled guilty and paid $475 million to settle claims brought by the CFTC, which

alleged that from at least July 2006 through at least August 2007, Société Générale made false

Yen-LIBOR submissions to manipulate Yen-LIBOR to benefit its Yen-LIBOR-based derivatives

positions.

833.     The CFTC SG Order established that Société Générale's false and misleading

Yen-LIBOR submissions were made through transmission of the submissions to the BBA's

service provider, Thompson Reuters, and through daily dissemination and global publication of

327

the submissions, which indicated that Société Générale delivered or caused to be delivered its

Yen-LIBOR submissions through the mails or interstate commerce.

834.     In furtherance of its scheme to manipulate Yen-LIBOR to benefit its Yen-LIBOR-

based derivative positions, on or about June 8, 2007, Société Générale transmitted or caused the

transmission of electronic communications, specifically: (1) an electronic chat between a Yen

derivatives trader and a Yen-LIBOR submitter, (2) a subsequent Yen-LIBOR submission from

Société Générale to Thomson Reuters, and (3) a subsequent publication of a Yen-LIBOR rate

through international and interstate wires.

R.  Defendants Former Traders and Brokers Have Been Criminally Charged with an
    Antitrust Violation, Wire Fraud and Conspiracy to Defraud Charges in the U.S. and
    U.K.

1.  Former UBS and Citibank Yen Trader Thomas Hayes and Former UBS Yen
    Trader Roger Darin

835.     Hayes and another former UBS Trader, Roger Darin, have been charged by the

DOJ with conspiracy to commit wire fraud, wire fraud and antitrust violations in connection with

the manipulation of Yen-LIBOR.  *See* Ex. A-6, Complaint filed in *U.S. v. Hayes et al.*, 12 MAG

3229 (S.D.N.Y. Dec. 12, 2012) (the "Hayes/Darin Criminal Complaint").

836.     The Hayes/Darin Criminal Complaint includes numerous communications

evidencing blatant market manipulation and illicit conspiratorial conduct between UBS and RBS,

among others, while Hayes was employed at Defendant UBS.  The Hayes/Darin Criminal

Complaint also includes communications evidencing manipulative and conspiratorial conduct by

Thomas Hayes after he left Defendant UBS to join co-conspirator Citigroup.

837.     On October 2, 2014, Darin moved to dismiss the Hayes/Darin Criminal

Complaint. ECF No. 6. On March 20, 2015, Judge James C. Francis IV denied Darin's motion to

dismiss, finding that the exercise of jurisdiction over Darin did not constitute a violation of due process. ECF No. 28, at 31.

838.   In June 2013, the U.K. SFO also charged former UBS and Citibank trader Hayes with eight counts of conspiracy to defraud, directly implicating Defendants and co-conspirators (i) UBS AG; (ii) Citigroup Global Markets Japan Limited, (iii) Deutsche Bank AG, (iv) UBS Japan, (v) JP Morgan Chase & Co., (vi) The Royal Bank of Scotland plc, (vii) HSBC and (viii) Rabobank, as well as Broker Defendants and co-conspirators (i) ICAP plc, (ii) R.P. Martin Holdings Limited and (iii) Tullett Prebon plc.  Specifically the U.K. SFO alleges:

a.      Between December 1, 2009, and September 7, 2010, at within the jurisdiction of Central Criminal Court conspired together with other employees of Citigroup Global Markets Japan Limited and associated entities to defraud in dishonestly seeking to manipulate Yen London Interbank Offered Rates and other interbank offered rates, by procuring or making the submission of rates by Citigroup as a contributing Panel Bank to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

b.      Between December 1, 2009, and September 7, 2010, at within the jurisdiction of Central Criminal Court conspired together with employees of UBS AG, Deutsche Bank AG and others to defraud in dishonestly seeking to manipulate Yen London Interbank Offered Rates and other interbank offered rates, by procuring or making the submission of rates by contributing Panel Banks to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

c.      Between December 1, 2009, and September 7, 2010, at within the jurisdiction of Central Criminal Court conspired together with employees of ICAP plc and others to defraud in

dishonestly seeking to manipulate Yen London Interbank Offered Rates and other interbank offered rates, by procuring or making the submission of rates by contributing Panel Banks to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

      d.     Between December 1, 2009, and September 7, 2010, at within the jurisdiction of Central Criminal Court conspired together with employees of ICAP plc and others to defraud in dishonestly seeking to manipulate Yen London Interbank Offered Rates and other interbank offered rates, by procuring or making the submission of rates by contributing Panel Banks to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

      e.     Between August 8, 2006, and December 3, 2009, at within the jurisdiction of Central Criminal Court conspired together with other employees of UBS Japan and associated entities (together "UBS") to defraud in dishonestly seeking to manipulate Yen London Interbank Offered Rates and other interbank offered rates, by procuring or making the submission of rates by UBS as a contributing Panel Bank to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

      f.     Between August 8, 2006 and December 3, 2009 at within the jurisdiction of Central Criminal Court conspired together with employees of JP Morgan Chase & Co, The Royal Bank of Scotland Group plc, Deutsche Bank AG and others to defraud in dishonestly seeking to manipulate Yen London Interbank Offered Rates and other interbank offered rates, by procuring or making the submission of rates by contributing Panel Banks to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

g.      Between August 8, 2006, and December 3, 2009, at within the jurisdiction of

Central Criminal Court conspired together with employees of UBS AG, ICAP plc and others to

defraud in dishonestly seeking to manipulate Yen London Interbank Offered Rates and other

interbank offered rates, by procuring or making the submission of rates by contributing Panel

Banks to Thomson Reuters, with the intention that the economic interests of others would be

prejudiced and/or to make personal gain for themselves or another.

h.      Between August 8, 2006, and December 3, 2009, at within the jurisdiction of

Central Criminal Court conspired together with employees of UBS AG, R.P. Martin Holdings

Limited, Tullett Prebon plc, Rabobank, HSBC and others to defraud in dishonestly seeking to

manipulate Yen London Interbank Offered Rates and other interbank offered rates, by procuring

or making the submission of rates by contributing Panel Banks to Thomson Reuters, with the

intention that the economic interests of others would be prejudiced and/or to make personal gain

for themselves or another.

839.    On August 3, 2015, Hayes was convicted of all eight counts of conspiracy to

defraud listed above and sentenced to fourteen years in U.K. prison.

840.    Following his sentencing, Hayes filed an appeal. Although the appeal led to a

reduction to a total sentence of 11 years in U.K. prison, Hayes' appeal against conviction was

dismissed.

2.   Former ICAP Brokers.

841.    Three former ICAP brokers, Darrell Read, Daniel Wilkinson, and Colin

Goodman, have been charged by the DOJ with conspiracy to commit wire fraud and wire fraud

in connection with the manipulation of Yen-LIBOR.  *See* Ex. C-3.  The DOJ alleges the three

former ICAP brokers conspired with former UBS trader Hayes from July 2006 through

September 2009.  The same ICAP brokers were also charged by the U.K. SFO with conspiracy

331

to defraud charges for their manipulation of Yen-LIBOR from August 8, 2006 through September 7, 2010.

### 3.   Former R.P. Martin Brokers Terry John Farr and James Andrew Gilmour.

842.   In July 2013, the U.K. SFO also charged former R.P. Martin broker Terry Farr and James Gilmour with conspiracy to defraud charges.  Between August 8, 2006, and December 3, 2009, both Farr and Gilmour are alleged to have conspired to manipulate Yen-LIBOR and other interbank offered rates with, among others, former UBS trader Tom Hayes and fellow R.P. Martin broker James Gilmour, as well as other yet-to-be named traders and brokers at Defendants UBS, Tullett Prebon, Rabobank, and co-conspirator HSBC.  Farr is also alleged to have conspired with Hayes to manipulate Yen-LIBOR between January 12, 2009, and July 9, 2010, when Hayes was employed by Citi Group Global Markets.

### 4.   Former Rabobank Traders.

843.   Seven former Rabobank traders, Paul Robson, Paul Thompson, Tetsuya Motomura, Takayuki Yagami, Lee Stewart, Anthony Allen, and Anthony Conti were charged by the DOJ with allegations including conspiracy to commit wire fraud, conspiracy to commit bank fraud, and wire fraud in connection with the manipulation of Yen-LIBOR from May 2006 through early 2011.  *See* Ex. D-5.  Robson, Thompson, Yagami, and Stewart each pleaded guilty to conspiracy to commit wire and conspiracy to commit bank fraud for their role in the conspiracy to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

### V.   Defendants' and their Co-conspirators' Unlawful Conduct Has Also Led to Investigations, Issuance Of Findings of Misconduct and Administrative Sanctions With Governmental Authorities in the U.S. and Abroad

844.   Defendants' unlawful conduct has led to numerous government investigations, both domestically and abroad, including by the DOJ, CFTC, SEC, FSA, the Japanese Securities and Exchange Surveillance Commission, the Canadian Competition Bureau, the Swiss

Competition Commission, Swiss financial market supervisory authority FINMA, the Monetary

Authority for Singapore, BaFin, and the NYSDFS.

A.  JFSA Investigation

845.    On April 12, 2013, the JFSA, based upon April 5, 2013 Recommendations for

Administrative Actions by the JSESC, took administrative action against Defendant RBS Japan

for a violation of the Financial Instruments and Exchange Act relating to RBS' submission of

false Yen-LIBOR rates during the period from around middle 2006 to early 2010.

846.    The JFSA Administrative Actions against RBS Japan provides as follows:

**1. <u>Descriptions of the Recommendation</u>**

(1) <u>Inappropriate conduct[] related to Yen LIBOR</u>

From around middle of 2006 to early 2010, one trader at the Department of Short
Term Market (at the time; hereinafter referred to as "Trader A") and his colleagues at
RBS Securities continuously approached Yen LIBOR submitters of Royal Bank of
Scotland plc (hereinafter referred to as "RBS plc") including through RBS plc's
traders and made requests to change Yen LIBOR submissions in order to affect Yen
LIBOR in favor of the derivative transactions by Trader A and his colleagues.

The above conducts of Trader A and his colleagues could undermine the market
integrity, considering that Yen LIBOR is a significantly important financial index that
serves as a benchmark interest rate for various financial transactions. Therefore, the
conducts are acknowledged to be seriously unjust and malicious and have a serious
problem from the viewpoints of the public interest and protection of investors.

Furthermore, in light of the fact that RBS Securities has failed to identify these
misconducts for a long period of time and has not taken any appropriate measures, it is
acknowledged that its internal control system has serious deficiencies.

****

The conducts mentioned above in (1) are acknowledged to be unjust and malicious
and have a serious problem from the viewpoints of the public interest and the investor
protection, since (i) these conducts are recognized to be made in the course of RBS
Securities' business operation and (ii) such conducts could undermine the market
integrity. Furthermore, it is acknowledged that its internal control system has
significant deficiencies. Therefore, it is acknowledged that the situation of RBS
Securities' business operation is a case where administrative action is "necessary and
appropriate for the public interest or protection of investors, with regard to a Financial

333

Instruments Business Operator's business operation" as stipulated under Article 51 of the "FIEA".

B.  Swiss Competition Commission Investigation

847.    On February 3, 2012, the *Wall Street Journal* reported that UBS AG, Credit Suisse Group AG, Bank of Tokyo-Mitsubishi UFJ, Ltd., Citigroup Inc., Deutsche Bank AG, HSBC Holdings Plc, J.P. Morgan Chase & Co., Mizuho Financial Group Inc., Rabobank International, Royal Bank of Scotland Group Plc, Société Générale S.A., and Sumitomo Mitsui Banking Corp., among others, were under investigation by COMCO, the Swiss competition regulatory body, for colluding with one another to manipulate Yen-LIBOR rates and the prices of derivatives benchmarked to these rates.

848.    COMCO's investigation, like other government investigations, was prompted by information and documents provided by a leniency applicant, believed to be UBS, pursuant to COMCO's antitrust leniency program.

849.    According to a February 3, 2012 press release, COMCO reported that:

COMCO has received information regarding potential unlawful agreements among banks.  Specifically, collusion between derivative traders might have influenced the reference rates LIBOR and TIBOR.  Furthermore, market conditions regarding derivative products based upon these reference rates might have been manipulated too.  Hence, COMCO has opened an investigation against UBS and Credit Suisse, as well as against more than ten foreign financial institutions and other companies.

The Secretariat of COMCO ("Secretariat") received an application for its leniency program, which indicated that derivatives traders of various banks might have influenced the reference rates LIBOR and fixed with respect to certain currencies.  The London Interbank Offered Rate (LIBOR) and the Tokyo Interbank Offered Rate (TIBOR) are reference rates which are aimed at reflecting the interest level in the interbank deposit market.  The British Bankers' Association (for LIBOR) and the Japanese Bankers' Association (for TIBOR) calculate these rates on a daily basis, for a range of currencies, based on submissions by respective panel banks.  Derivative traders working for a number of financial institutions might have manipulated these submissions by coordinating their behaviour, thereby influencing these reference rates in their favour. Moreover, derivative traders might have colluded to manipulate the difference between the ask price and the bid price (spread) of derivatives based on these reference rates to the detriment of their clients.

334

Beside the two major Swiss Banks, UBS and Credit Suisse, ten foreign banks (Bank of Tokyo Mitsubishi UFJ, Citigroup Inc., Deutsche Bank AG, HSBC Holdings plc, JP Morgan Chase & Co., Mizuho Financial Group Inc., Coöperative Centrale Raiffeisen-Boerenleenbank B.A., Royal Bank of Scotland Group plc, Société Générale S.A., Sumitomo Mitsui Banking Corporation) and other financial intermediaries are subject to this investigation led by the Secretariat.

850.    On December 5, 2016, COMCO reached settlements with four banks totaling CHF 14.4 million. COMCO settled claims relating to its Yen-LIBOR investigation with Deutsche Bank (CHF 5.027 million), RBS (CHF 3.926 million) Citigroup (CHF 3.779 million), and JPMorgan (CHF 1.703 million).

851.    COMCO's Yen-LIBOR investigations regarding HSBC, Lloyds, Rabobank and UBS, and against the Interdealer/Cash Brokers ICAP, RP Martin and Tullett Prebon, are ongoing.

C.    Dozens of Defendants' and their Co-conspirators' Employees Are Under Investigation and/or Have Resigned, or Been Suspended, or Fired or Arrested

852.    According to public reports, dozens of traders employed by the Contributor Bank and Broker Defendants have been fired or suspended or put under investigation by worldwide regulators for their alleged involvement in the manipulation of benchmark rates.  Such firings, terminations, and/or announced investigations of individuals employed or affiliated with the Defendants include, but are not limited, to the following:

1.    RBS

853.    According to public reports, Defendant RBS fired at least four employees in connection with their manipulation of Yen-LIBOR:  Paul White, Andrew Hamilton, Neil Danziger, and Tan Chi Min.

854.    Paul White was RBS' principal rate-setter for Yen-LIBOR.  According to *Reuters*, Mr. White was fired by RBS in late 2011 in connection with his involvement in RBS'

335

alleged manipulation of Yen-LIBOR. On December 4, 2016, the Financial Conduct Authority banned Mr. White from performing any function in relation to any regulated financial activity and publicly censured him due to his involvement in RBS's alleged manipulation of Yen-LIBOR. The Financial Conduct Authority noted that were it not for Mr. White's serious financial hardship, he would have been fined £250,000.

855.    Andrew Hamilton was an investment advisor for RBS in its London office. According to *Bloomberg*, Mr. Hamilton was fired by RBS on October 21, 2011.

856.    Neil Danziger was a foreign-exchange trader for RBS in its London office. According to *Bloomberg*, Mr. Danziger was fired by RBS on October 21, 2011. On August 1, 2018, the Financial Conduct Authority fined Mr. Danizger £250,000 and prohibited him from performing any function in relation to any regulated financial activity due to his involvement in RBS' alleged manipulation of Yen-LIBOR.

857.    Tan Chi Min ("Jimmy Tan") was the head of short-term interest rate trading for Yen at RBS and the head of Delta One trading in Singapore.  Tan was fired in November 2011.

858.    In addition, other RBS traders have been implicated in the manipulation of Yen-LIBOR.  According to CCB Officer Brian Elliott's May 18, 2011 affidavit, Brent Davies, an RBS trader, was one of the traders believed to be involved in the manipulation of Yen-LIBOR. According to the affidavit, Trader A explained to Mr. Davies who his collusive contacts were and how he had and was going to manipulate Yen-LIBOR.  Trader A also communicated his trading positions, his desire for certain movement in Yen-LIBOR and gave instructions for Mr. Davies to get RBS to make Yen-LIBOR submissions consistent with Trader A's wishes.  Mr. Davies acknowledged these communications and confirmed that he would follow through.

Trader A and Mr. Davies also entered into transactions that aligned their trading interest in regards to Yen-LIBOR.

859.    In addition, Will Hall, a derivatives trader at RBS in London, was named in Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen-LIBOR.  According to the affidavit, Trader A communicated to Mr. Hall his trading positions, his desire for a certain movement in Yen-LIBOR and instructions to get RBS to make Yen-LIBOR submissions consistent with his wishes, and Mr. Hall agreed to do this.

860.    Todd Morakis was RBS' Singapore-based head of trading for emerging markets. According to documents filed in the Singapore litigation, Mr. Morakis "orally confirmed to [Tan] around October [2011] that 'the practice of requesting to change the rate Libor is common in every rate setting environment in the banking industry.'"

861.    Further, Jezri Mohideen, RBS head of rates trading and yen products, was suspended as a result of his involvement in the manipulation of Yen-LIBOR.

### 2.  Citibank/Citigroup

862.    The *Financial Times* reported that Hayes "allegedly worked with …other traders to push submissions up or down for a benchmark interest rate called yen Libor."  Hayes was fired by Citibank in 2010.

863.    Brian McAppin was Citigroup's brokerage head in Japan.  The Japanese investigation found that McAppin "overlooked" attempts by two traders to influence interest rates despite "recognizing these actions."

864.    Citigroup Inc.'s head of Japan banking, Darren Buckley, resigned as chief executive officer of Citibank Japan Ltd., and Citigroup was forced to write off $50 million dollars in losses when it unwound positions it held in Yen-LIBOR-based derivatives and reported the rate setting misconduct to regulators.

865. Tom Hayes was fired by Citigroup less than a year after the bank hired him after an internal investigation revealed that Hayes had manipulated Yen-LIBOR.

### 3.  UBS

866. Two former UBS traders, Tom Hayes and Roger Darin, have been criminally indicted by the DOJ.

867. On August 8, 2012, the *Wall Street Journal* reported that UBS had fired or suspended approximately 20 traders and managers following UBS' involvement in the manipulation of Yen-LIBOR.  The *Financial Times* also reported that Yvan Ducrot, co-head of UBS' rates business, and Holger Seger, the global head of short-term interest rates trading at UBS, were both suspended by UBS.

868. On January 9, 2013, *Bloomberg* reported that UBS had "dismissed, penalized or reprimanded" over 40 people.  About 18 people had lost their jobs and UBS had "taken action" against 40 people.

869. Two former UBS traders in Singapore, Mukesh Kumar Chhaganlal (UBS' former co-head of macro-trading for emerging markets in Asia) and Prashant Mirpuri (a former UBS executive director) each claimed in separate lawsuits against UBS that they were fired by UBS in an effort to cover up its role in the manipulation of Yen-LIBOR.

### 4.  JPMorgan Chase

870. Paul Glands was a derivatives trader with JPMorgan Chase in London.  He was named in CCB Officer Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen-LIBOR.  According to the affidavit, Trader A communicated to Mr. Glands his trading positions, his desire for a certain movement in Yen-

LIBOR, and instructions to get JPMorgan Chase to make Yen-LIBOR submissions consistent with his wishes, and Mr. Glands agreed to do so.

871.    Stewart Wiley was a derivatives trader with JPMorgan Chase in London.  He was named in CCB Officer Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen-LIBOR.  According to the affidavit, Trader A communicated to Mr. Wiley his trading positions, his desire for a certain movement in Yen-LIBOR, and instructions to get JPMorgan Chase to make Yen-LIBOR submissions consistent with his wishes, and Mr. Wiley agreed to do so.  According to CCB Officer Brian Elliott's May 18, 2011 affidavit, the Cooperating Party's Trader A also asked if Paul Glands or Stewart Wiley required certain Yen-LIBOR submissions to aid their trading positions.

5.    Deutsche Bank

872.    Guillaume Adolph was a Deutsche Bank derivatives trader who was named in CCB Officer Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen-LIBOR.  According to the affidavit, Trader A communicated to Adolph his trading positions, his desire for a certain movement in Yen-LIBOR and instructions to get Deutsche to make Yen-LIBOR submissions consistent with his wishes, and Adolph agreed to do so.  Further, according to the affidavit, Adolph shared his trading positions with Trader A. Trader A also aligned his trading positions with Adolph to align their interests in respect of Yen-LIBOR.   Adolph was fired by Deutsche in December 2011 for conspiring with former UBS Trader Tom Hayes to manipulate Yen-LIBOR.

873.    In January 2013, Deutsche Bank announced that it fired at least two traders in connection with LIBOR-rigging.

874.    On November 28, 2012, *The Wall Street Journal* reported that Deutsche had admitted to the German Parliament that it failed to uphold interest rate reporting standards.

339

6.   HSBC

875.    Peter O'Leary was an HSBC derivatives trader who was named in CCB Officer Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen-LIBOR.  According to the affidavit, O'Leary was instructed by Trader A at UBS "to get HSBC to make Yen-LIBOR submissions consistent with his wishes."

7.   Barclays

876.    Following the announcement of the Barclays Settlement, Chairman Marcus Agius, Chief Executive Officer Robert Diamond, and Chief Operating Officer Jerry Del Missier resigned.  On November 28, 2012, *The Wall Street Journal* reported that Defendant Barclays had disciplined 13 members of its staff for their involvement in LIBOR rate-fixing.

8.   Bank of Tokyo-Mitsubishi UFJ/Mitsubishi UFJ Financial Group

877.    Christian Schluep was suspended by co-conspirator Bank of Tokyo-Mitsubishi UFJ.  Schluep joined Bank of Tokyo-Mitsubishi UFJ after serving as a derivatives trader at Rabobank from December 2003 until October 2008.

878.    Paul Robson was suspended by co-conspirator Bank of Tokyo-Mitsubishi UFJ for his alleged involvement in the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  Robson was a former derivatives trader at Defendant Rabobank for eight years (from approximately 2001 through August 2009).  As alleged above, Robson was criminally charged with conspiracy to commit wire fraud and bank fraud, as well as wire fraud, by the DOJ in connection with the manipulation of Yen-LIBOR from May 2006 through early 2011.

879.    In August 2012, co-conspirator Mitsubishi UFJ Financial Group Inc. suspended a third London-based banker who was in charge of submitting co-conspirator Mitsubishi UFJ Financial Group Inc.'s LIBOR rates.

9.   Rabobank

880.    On July 27, 2012, *Reuters* reported that Defendant Rabobank fired four of its LIBOR submitters between 2008 and 2011 for their involvement in rate manipulation.  Seven former Rabobank traders, Paul Robson, Paul Thompson, Tetsuya Motomura, Takayuki Yagami, Lee Stewart, Anthony Allen, and Anthony Conti were charged by the DOJ with allegations including conspiracy to commit wire fraud, conspiracy to commit bank fraud, and wire fraud in connection with the manipulation of Yen-LIBOR from May 2006 through early 2011.  *See* Ex. D-5.  Robson, Thompson, Yagami, and Stewart each plead guilty to conspiracy to commit wire fraud and conspiracy to commit bank fraud for their role in the conspiracy to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  Allen and Conti were found guilty of conspiracy to commit wire fraud, conspiracy to commit bank fraud, and wire fraud in connection with the manipulation of Yen-LIBOR.

10. R.P. Martin

881.    Terry Farr and James Gilmour, two former employees of inter-dealer broker R.P. Martin Holdings Ltd., have been arrested by the U.K. Serious Fraud Office and City of London police "in connection with the investigation into the manipulation of LIBOR."

11. ICAP

882.    As alleged above, three former ICAP brokers, Darrell Read, Daniel Wilkinson and Colin Goodman have been criminally charged by the DOJ with conspiracy to commit wire fraud and wire fraud in connection with the manipulation of Yen-LIBOR.

12. Tullett Prebon

883.    Noel Cryan was dismissed in September 2013 following Tullett Prebon's internal disciplinary hearings for gross misconduct and the manipulation of Yen-LIBOR.  Cryan admitted

"he had arranged [the trades]" with UBS.  According to Cryan, managers at Tullett Prebon were aware of and encouraged the manipulation.

884.    Cryan said that Tullett senior managers encouraged him to enter wash trades to generate illicit revenue for Tullett after Tullett saw commissions at a rival broker reach £100,000.  One allegedly told him to "get involved."

885.    Cryan also said that some of the wash trades were conducted after conversations by another Tullett Prebon broker with an RBS trader.

D.  The BBA's Re-Evaluation of Rate-Setting Process

886.    The rate-setting manipulation has prompted the BBA to re-evaluate the Yen-LIBOR rate-setting process.

887.    Remarking on an August 2012 review of allegations of LIBOR-rigging by the FSA, the managing director of the FSA, Martin Wheatley, said that maintaining the current system for setting LIBOR "was not a viable option."

888.    On September 24, 2012, CFTC Chairman Gary Gensler told a hearing of the European Parliament's Economic and Monetary Affairs Committee that the current rate setting process, in which there was no supervision or overview by regulators, left LIBOR "open to manipulation."

889.    On September 25, 2012, it was announced that the BBA's governing council voted on September 13 to give up its role in setting LIBOR, reportedly opening the door for government involvement in the rate-setting process.

890.    On February 25, 2013, the BBA formally voted to relinquish its role in the setting of LIBOR.

891.     On February 1, 2014, the administration of LIBOR was transferred from the BBA to the Intercontinental Exchange Group ("ICE") to address the need for a new administrator of LIBOR highlighted by the Wheatley review.

## VI.     Independent Analyses Demonstrate that Yen-LIBOR Was Artificial During the Class Period

892.     Plaintiffs' analyses demonstrate that Yen-LIBOR was artificial throughout the Class Period.

### A.   Yen-LIBOR Diverged Dramatically From its Historical Relationship with the Euroyen Deposit Rate

893.     Throughout the Class Period, Yen-LIBOR diverged dramatically from its historical relationship with the Euroyen Deposit Rate (the "EYDR").

894.     The EYDR is comprised of quotes for bids and asks of financial institutions seeking to transact in the three-month Euroyen market.  The EYDR is calculated on a daily basis by Bloomberg.  Bloomberg collects actual transactions in three-month Euroyen by a group of financial institutions, including banks and brokerages.  Throughout the Class Period, Bloomberg published on a daily basis the lowest composite EYDR ask rate offered by active, contributing banks as well as a composite EYDR bid rate which is the highest bid rate offered by active, contributing banks.  Bloomberg also published the mid-point between the composite ask and composite bid rates.

895.     The EYDR is similar to Yen-LIBOR except that the set of participating financial institutions is larger than the number of banks participating on the Yen-LIBOR panel.  Important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors facing the contributing banks should (absent manipulation) be reflected similarly in Yen-LIBOR and the EYDR, and therefore not cause the historical relationship between these rates to diverge.  Significant de-linkages in the historical

relationship between Yen-LIBOR and the EYDR (as demonstrated in Figures 1 and 2 below)
during the Class Period strongly indicate that Yen-LIBOR was artificial.

896.     The historical spread relationship between Yen-LIBOR and the EYDR broke
down during the Class Period.  Figures 1 and 2 below show the relationship, including spread
relationship, between Yen-LIBOR and the EYDR for the period of January 2003 through June
2012.[363]

897.     As demonstrated therein, from January 2003 through December 2005, Yen-
LIBOR and the EYDR moved closely together with Yen-LIBOR remaining consistently and
slightly higher than the EYDR, causing the Yen-LIBOR/EYDR spread to be slightly positive.
The average spread of Yen-LIBOR with respect to the EYDR ask rate for the 36 months prior to
the Class Period (January 3, 2003 to December 31, 2005) was a positive 0.0480.  During this pre-
Class Period, there were 698 days of Yen-LIBOR submissions with EYDR ask quotes available.
On only 22 days out of 698 days (or 3.2%) did a slightly negative spread between Yen-LIBOR
and EYDR exist.

898.     As demonstrated in Figures 1 and 2 below, by the start of the Class Period, the
historical relationship between Yen-LIBOR and the EYDR began to change.  Further into the
Class Period, the relationship became further materially de-linked, providing strong evidence of
artificiality.  For example, on December 11, 2007 the Yen-LIBOR/EYDR spread was -0.081; on
October 2, 2008 it was -0.968; on July 14, 2009 it was -0.216, and on June 1, 2010 it was -0.108,
or more than 100 basis points negative (and far from the historical slightly positive Yen-

---

[363] In Figure 2, the spread is calculated as follows: the spread equals the 3 Month Yen-LIBOR minus the 3 Month EYDR.

LIBOR/EYDR average spread of 0.0480 that existed during the 36 months preceding the Class Period).

## **FIGURE 1**



**3 Month Yen LIBOR and 3 Month EuroYen Deposit Rate Ask Price**
January 2003 -- June 2012

Data Source: Bloomberg. The ask price for the EuroYen Deposit Rate is provided by Bloomberg. All figures are in percent.

**FIGURE 2**



3 Month Yen LIBOR and 3 Month EuroYen Deposit Rate (ask) Spread
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The spread is calculated as 3 Month Yen LIBOR minus ask price of the 3 Month EuroYen Deposit Rate. The ask price of the EuroYen Deposit Rate is provided by Bloomberg.  Spreads larger than 3.25 in magnitude occured on 6 days and were excluded from this representation. All figures are in percent.

B.  Analyses of the Defendant Banks' and Co-conspirators Yen-LIBOR Quotes
    Submitted During the Class Period, as Compared to the then Prevailing EYDR,
    Further Demonstrate Artificiality.

899.    Figure 3 below presents examples of quotes submitted by Contibutor Bank

Defendants and Co-conspirators that were significantly lower than the prevailing EYDR, often

by 75 basis points, and on certain instances more than 100 basis points (or a full percentage

point) below the the-then prevailing EYDR, further supporting Yen-LIBOR artificiality during

the Class Period.

900.    For example, as illustrated in Figure 3 below, on October 8, 2008, co-conspirators

Bank of Tokyo-Mitsubishi, Sumitomo Mitsui Banking Corp. and Norinchukin Bank submitted

Yen-LIBOR quotes of 0.98, 0.99, and 0.97, which were respectively lower than the prevailing

EYDR of 2.00 by -1.02, -1.01, and -1.03.  On November 17, 2008, co-conspirators JPMorgan

Chase and Deutsche Bank, and Defendant UBS all submitted a Yen-LIBOR quote of 0.85, lower

than the prevailing EYDR of 1.80 by -0.95.  Deutsche Bank has since admitted to colluding with

346

UBS trader Hayes to manipulate Yen-LIBOR.  Each of the foregoing rate submissions resulted in negative spreads which diverged materially from the historical, pre-Class Period average positive spread of 0.0480 between Yen-LIBOR and the EYDR.

## FIGURE 3

3 Month Yen LIBOR Quotes, EuroYen Deposit Rate (ask) and Associated Spread for Each Bank on Selected Days

| | | 10/8/2008 | | | 10/9/2008 | | | 10/10/2008 | | | 10/14/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Bank of America | Bank of America | 0.98 | 2.00 | -1.02 | 0.98 | 2.00 | -1.02 | 1.00 | 1.90 | -0.90 | 1.03 | 1.80 | -0.77 |

| | | 10/8/2008 | | | 10/10/2008 | | | 10/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Bank of Tokyo-Mitsubishi | Bank of Tokyo-Mitsubishi | 0.98 | 2.00 | -1.02 | 1.02 | 1.90 | -0.88 | 1.02 | 1.80 | -0.78 | 0.88 | 1.80 | -0.92 |

| | | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Barclays | Barclays | 1.25 | 1.90 | -0.65 | 1.35 | 1.80 | -0.45 | 1.14 | 1.80 | -0.66 | 1.16 | 1.80 | -0.64 |

| | | 10/10/2008 | | | 11/11/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Citibank | Citibank | 1.15 | 1.90 | -0.75 | 0.88 | 1.80 | -0.92 | 0.89 | 1.80 | -0.91 | 0.90 | 1.80 | -0.90 |

| | | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Deutsche Bank | Deutsche Bank | 1.03 | 1.90 | -0.87 | 1.00 | 1.80 | -0.80 | 0.85 | 1.80 | -0.95 | 0.85 | 1.80 | -0.95 |

| | | 10/10/2008 | | | 10/14/2008 | | | 10/15/2008 | | | 10/16/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| HSBC | HSBC | 1.14 | 1.90 | -0.76 | 1.13 | 1.80 | -0.67 | 1.12 | 1.80 | -0.68 | 1.10 | 1.70 | -0.60 |

| | | 11/12/2008 | | | 11/13/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| JP Morgan Chase | JP Morgan Chase | 0.86 | 1.80 | -0.94 | 0.86 | 1.70 | -0.84 | 0.85 | 1.80 | -0.95 | 0.85 | 1.80 | -0.95 |

| | | 11/12/2008 | | | 11/13/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Lloyds | Lloyds Banking Group | 0.90 | 1.80 | -0.90 | 0.90 | 1.70 | -0.80 | 0.91 | 1.80 | -0.89 | 0.90 | 1.80 | -0.90 |

| | | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Mizuho Corporate Bank | Mizuho Corporate Bank | 1.07 | 1.90 | -0.83 | 1.07 | 1.80 | -0.73 | 0.88 | 1.80 | -0.92 | 0.88 | 1.80 | -0.92 |

| | | 10/8/2008 | | | 10/10/2008 | | | 10/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Norinchukin Bank | Norinchukin Bank | 0.97 | 2.00 | -1.03 | 0.99 | 1.90 | -0.91 | 0.99 | 1.80 | -0.81 | 0.87 | 1.80 | -0.93 |

| | | 10/10/2008 | | | 10/14/2008 | | | 10/16/2008 | | | 10/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Rabobank | Rabobank | 0.80 | 1.90 | -1.10 | 0.80 | 1.80 | -1.00 | 0.80 | 1.70 | -0.90 | 0.80 | 1.70 | -0.90 |

| | | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Royal Bank of Scotland | Royal Bank of Scotland | 1.08 | 1.90 | -0.82 | 1.06 | 1.80 | -0.74 | 0.86 | 1.80 | -0.94 | 0.86 | 1.80 | -0.94 |

| | | 10/8/2008 | | | 10/9/2008 | | | 10/14/2008 | | | 10/15/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Societe Generale | Societe Generale | 1.25 | 2.00 | -0.75 | 1.25 | 2.00 | -0.75 | 1.20 | 1.80 | -0.60 | 1.20 | 1.80 | -0.60 |

| | | 10/8/2008 | | | 10/9/2008 | | | 10/10/2008 | | | 10/14/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| Mitsui Sumitomo Banking Corp | Sumitomo Mitsui Banking Corp | 0.99 | 2.00 | -1.01 | 0.99 | 2.00 | -1.01 | 1.02 | 1.90 | -0.88 | 1.02 | 1.80 | -0.78 |

| | | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| UBS AG | UBS AG | 1.03 | 1.90 | -0.87 | 1.03 | 1.80 | -0.77 | 0.85 | 1.80 | -0.95 | 0.85 | 1.80 | -0.95 |

Data Source: Bloomberg.

Note: "LIBOR" denotes the bank's 3 month Yen LIBOR quote for that day, and "EY(ask)" denotes the 3 month Yen EuroYen Deposit Rate ask. The spread is calculated as 3 Month Yen LIBOR quote minus ask price of the 3 Month EuroYen Deposit Rate. The ask price of the EuroYen Deposit Rate is provided by Bloomberg. All figures are in percentage points.

901.    Figures 4 through 19 below measure the spread between the EYDR and each Yen-LIBOR panel bank's submitted Yen-LIBOR quote to the BBA during the period from January 2003 through June 2012.

348

**FIGURE 4**

# Average Spreads of Banks' Yen LIBOR Quotes to the EuroYen Deposit Rate (Ask Quote)

| | 1/3/2003 -- 12/31/2005 | 1/1/2006 -- 4/30/2009 | 5/1/2009 -- 6/30/2011 |
|---|---|---|---|
| **Bank of America** | 0.0403 | -0.0288 | -0.0009 |
| **Bank of Tokyo-Mitsubishi** | 0.0556 | -0.0502 | -0.0047 |
| **Barclays** | 0.0427 | -0.0014 | -0.0124 |
| **Citibank** | 0.0487 | -0.0345 | -0.0092 |
| **Deutsche Bank** | 0.0482 | -0.0526 | -0.0366 |
| **HSBC** | 0.0546 | -0.0254 | -0.0117 |
| **JP Morgan Chase** | 0.0370 | -0.0428 | -0.0152 |
| **Lloyds Banking Group** | 0.0158 | -0.0284 | -0.0083 |
| **Mizuho Corporate Bank** | 0.0655 | -0.0349 | -0.0036 |
| **Norinchukin Bank** | 0.0732 | -0.0422 | -0.0058 |
| **Rabobank** | 0.0365 | -0.0378 | -0.0311 |
| **Royal Bank of Scotland** | -0.0046 | -0.0504 | -0.0182 |
| **Societe Generale** | 0.0384 | -0.0053 | -0.0156 |
| **Sumitomo Mitsui Banking Corp** | 0.0642 | -0.0416 | -0.0036 |
| **UBS AG** | 0.0429 | -0.0514 | -0.0196 |

**FIGURE 5**



**3 Month EuroYen Deposit Rate Ask Price and
Bank of Tokyo Mitsubishi UFJ 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg. All figures are in percent.

**FIGURE 6**



**3 Month EuroYen Deposit Rate Ask Price and
Deutsche Bank 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg. All figures are in percent.

## FIGURE 7



**3 Month EuroYen Deposit Rate Ask Price and
Sumitomo Mitsui Banking Corp 3 Month Yen LIBOR Quotes**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

## FIGURE 8



**3 Month EuroYen Deposit Rate Ask Price and
Barclays 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 9**



**3 Month EuroYen Deposit Rate Ask Price and
Royal Bank of Scotland 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 10**



**3 Month EuroYen Deposit Rate Ask Price and
Societe Generale 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 11**



**3 Month EuroYen Deposit Rate Ask Price and
Citibank 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 12**



**3 Month EuroYen Deposit Rate Ask Price and
Norinchukin 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

## FIGURE 13

**3 Month EuroYen Deposit Rate Ask Price and
Rabobank 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012



Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

## FIGURE 14

**3 Month EuroYen Deposit Rate Ask Price and
Mizuho Corporate Bank 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012



Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 15**



**3 Month EuroYen Deposit Rate Ask Price and
UBS 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 16**



**3 Month EuroYen Deposit Rate Ask Price and
HSBC 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 17**



**3 Month EuroYen Deposit Rate Ask Price and
JP Morgan Chase 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 18**



**3 Month EuroYen Deposit Rate Ask Price and
Lloyds Banking Group 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The ask price for the EuroYen Deposit Rate is provided by Bloomberg.  All figures are in percent.

**FIGURE 19**



**C.  The Difference Between Defendants' Reported Yen-LIBOR Quotes and their CDS Spreads Strongly Supports Yen-LIBOR Artificiality**

902.    Another economic indicator that Yen-LIBOR was artificial during the Class Period is the difference between the Yen-LIBOR Defendant panel banks' reported daily Yen-LIBOR quotes and the contemporaneous cost of buying default insurance, known as the "spread," on credit-default swaps ("CDS") that Yen-LIBOR Defendant panel banks issued during the Class Period.

903.    A CDS is a contract which transfers credit risk from a credit protection buyer to a credit protection seller.  This agreement occurs when one party, the protection buyer, seeks financial protection in event of a default on an underlying credit instrument, such as a bond or a loan.  Generally, a CDS buyer makes a series of payments (known as the CDS "fee" or "spread") to the CDS seller in exchange for a payment if the underlying credit instrument experiences an adverse credit event.

357

904.    The spread serves as a measure of the perceived risk of default by the entity issuing the underlying bond or receiving the loan.  Typically, the greater the risk of default the underlying bond or loan bears, the higher the CDS spread.  In the case of a CDS for which the underlying instrument consists of an interbank loan where a Yen-LIBOR panel bank is the borrower, the greater the perceived risk the panel bank will default on the loan, the higher the applicable CDS spread, as this higher spread represents the cost of insuring against the increased risk of a default on the underlying loan.

905.    It is expected that an individual Yen-LIBOR bank's daily quote and its CDS spreads should move in relative lockstep, meaning that when an individual bank has a CDS spread that is one of the lowest when compared to all other banks in the group, it should also have one of the lowest LIBOR quotes in the group.  Plaintiffs' economic analyses indicate that this was not the case during the Class Period, and in particular from September 12, 2008 through January 19, 2009, when banks with the highest CDS spreads in the Yen-LIBOR panel very often (nearly 100% of the time) submitted the lowest Yen-LIBOR quotes.

906.    Plaintiffs analyzed available CDS spread data for select Yen-LIBOR panel banks.

907.    In Figures 20 and 21, below, Plaintiffs conducted an intraday rank ordering whereby on each given day, Yen-LIBOR quotes submitted by Yen-LIBOR panel bank Defendants were ranked (ordered) from highest to lowest.  The quotes were then classified into two groups: above or equal, and below the median Yen-LIBOR quote for that day, among the same group of banks.  Similar rank ordering was performed for CDS spreads for the same group of banks, and the CDS spreads were classified into two groups:, above or equal, and below the median CDS spread on that day, within the same group of banks.  For each bank, results were organized into the three following groups: (i) Yen-LIBOR Quote Below Median & CDS Above

or Equal Median (Black); (ii) Yen-LIBOR Quote Above or Equal Median & CDS Above or

Equal Median together with Yen-LIBOR Quote Below Median & CDS Below Median (Dotted);

and (iii) Yen-LIBOR Quote Above or Equal Median & CDS Below Median (Gray).

908.    Among other findings, Figure 20 shows that from September 12, 2008 through

January 19, 2009, Defendant UBS' Yen-LIBOR quotes were below its CDS spread almost 100%

of the time, and that the Yen-LIBOR quotes submitted by co-conspirators Deutsche Bank and

Mizuho Corporate Bank, and Defendant Rabobank were below their respective CDS spreads

50% (or nearly 50%) of the time.

**FIGURE 20**



Intraday Rank Ordering:  3 Month Yen LIBOR Quotes and Credit Default Swaps
9/12/2008 – 1/19/2009

909.     Figure 21 below illustrates additional examples of when Yen-LIBOR Defendant and co-conspirator banks submitted Yen-LIBOR quotes well below their then-prevailing CDS spreads.  For example, on October 15, 2008, Deutsche Bank submitted the lowest Yen-LIBOR quote, yet its CDS spread was the 9th lowest amongst 12 CDS spreads for that day.  This means that Deutsche Bank had one of the highest CDS spreads among the Yen-LIBOR panel banks on that day, while having the lowest Yen-LIBOR quote.  UBS is one of the banks with the largest difference between its CDS spreads and Yen-LIBOR quotes.  For example, on September 16, 25, 26 and 29 of 2008, UBS submitted the lowest Yen-LIBOR quote yet it had the highest CDS spread among 12 CDS spreads for that day.

## FIGURE 21

### Intraday Rank Ordering of LIBOR Quotes and Credit Default Swaps

| | 10/15/2008 | | 10/22/2008 | | 10/23/2008 | | 10/24/2008 | |
|---|---|---|---|---|---|---|---|---|
| | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank |
| Deutsche Bank | 1 | 9 | 2 | 11 | 2 | 11 | 2 | 11 |

| | 10/8/2008 | | 10/15/2008 | | 10/28/2008 | | 11/4/2008 | |
|---|---|---|---|---|---|---|---|---|
| | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank |
| Mizuho Corporate Bank | 3 | 10 | 5 | 11 | 1 | 8 | 4 | 10 |

| | 10/10/2008 | | 10/13/2008 | | 10/14/2008 | | 12/16/2008 | |
|---|---|---|---|---|---|---|---|---|
| | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank |
| Rabobank | 1 | 8 | 1 | 9 | 1 | 9 | 2 | 10 |

| | 9/16/2008 | | 9/25/2008 | | 9/26/2008 | | 9/29/2008 | |
|---|---|---|---|---|---|---|---|---|
| | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank | LIBOR Rank | CDS Rank |
| UBS AG | 1 | 12 | 1 | 12 | 1 | 12 | 1 | 12 |

Data Source: Bloomberg; CDS data from CMA.

Note: The rank is from lowest to highest, *i.e.*, a rank of 1 for LIBOR means that the bank had the lowest quote submitted that day. Similarly, a rank of 9 for CDS means that the bank had the ninth lowest CDS submitted that day.  On each given day there were an average of 12 to 13 banks contributing to the LIBOR panel for which CDS data were available.

**VII.**    **During the Class Period, Plaintiffs Transacted in Yen-LIBOR-based derivatives at Artificial Prices Proximately Resulting From Defendants' Manipulation and False Reporting of Yen-LIBOR**

A. FLH as Assignee and Successor to Sonterra

910.    Prior to entereing into the APA with Plaintiff FLH, Sonterra entered into U.S.-based transactions for Yen-LIBOR-based derivatives during the Class Period, including Yen foreign exchange forwards, at artificial prices proximately caused by Defendants' manipulative conduct and suffered legal injury.  For example, on May 20, 2010, Sonterra entered into a Yen foreign exchange forward, agreeing to buy $2,111,434.86 for ¥190,000,000.00 on May 28, 2010.

911.    Communications released as part of RBS' settlement with the CFTC demonstrates that Defendants were involved in manipulating six-month Yen-LIBOR on May 20, 2010:

> **May 20, 2010**:
>
> RBS [Tan]:  [Danziger/Yen Trader 6] can ask [Paul White] to bump up 6m JPY libor by 1bp
>
> RBS [Danziger]: sure
>
> RBS [Tan]: tx
>
> [RBS] Yen Trader 6: yes[364]

912.    As explained in ¶ 267, *supra*, the CFTC has found in its settlements with both RBS[365] and Rabobank[366] that Yen foreign exchange forwards are one of several Yen-LIBOR-based derivatives priced based on Yen-LIBOR and therefore were affected by Defendants' manipulation of Yen-LIBOR during the Class Period.

---

[364] Ex. B-4 at 9.

[365] *Id.* at 6 (explaining Yen foreign exchange forwards are "priced based on" Yen-LIBOR).

[366] Ex. D-2 at 6 (explaining Yen foreign exchange forwards are "priced off of" Yen-LIBOR).

913.    Defendants' upward manipulation of Yen-LIBOR on May 20, 2010, artificially increased the cost for Sonterra to purchase Yen foreign exchange forwards on that date.  As a result, Sonterra was injured when it entered into a Yen foreign exchange forward at an artificially higher price on May 20, 2010.

B.  The Hayman Plaintiffs

1.  Plaintiff JMOF

914.    Plaintiff JMOF entered into dozens of U.S.-based transactions for Yen-LIBOR-based derivatives, including Yen-LIBOR-based interest rate swaps and swaptions and foreign exchange options, directly with Defendant Merrill Lynch and co-conspirators JPMorgan Chase Bank, N.A. and Deutsche Bank AG during the Class Period between July 11, 2010 and June 23, 2011. Each of these transactions directly incorporated Yen-LIBOR as a price component.

915.    JMOF was injured as a direct result of Defendants' conspiracy to manipulate Yen-LIBOR. As alleged herein, Defendants Barclays, RBS, UBS, Rabobank, Lloyds, and Societe Generale have each admitted to manipulating Yen-LIBOR to benefit their derivatives positions during this period when Plaintiff JMOF transacted Yen-LIBOR-based interest rate swaps, swaptions and foreign exchange options with Defendants. The CFTC, FCA, and NYDFS have also found that Defendants ICAP and R.P. Martin manipulated Yen-LIBOR during the same period. Defendants' and their co-conspirators' coordinated manipulation of Yen-LIBOR during this period caused JMOF to suffer monetary losses including, for example, in the following transactions:

          a.  On September 29, 2010 JMOF purchased a Yen-LIBOR-based swaption from JPMorgan Chase Bank, N.A. This swaption gave JMOF the right, but not the obligation, to enter into an interest rate swap with JPMorgan Chase Bank, N.A. on October 2, 2013 in which JMOF would pay 2.5% per year on ¥4,123,860,000 in

exchange for receiving floating rate payments tied to Yen-LIBOR. JMOF was overcharged when it paid a $225,000.00 premium for this swaption, which is more than it otherwise would have paid absent Defendants' unlawful conduct.

    b.  On June 17, 2011, JMOF sold a foreign exchange option to Merrill Lynch, giving JMOF the right to sell Yen against USD with a strike price of 102.25. JMOF was underpaid when it received a $316,540.00 premium from Merrill Lynch for this option, which is less than it otherwise would have absent Defendants' unlawful conduct.

    2.  Plaintiff HCMF

916.    Plaintiff HCMF entered into dozens of Yen-LIBOR-based derivatives transactions from within the United States during the Class Period, including Yen-LIBOR-based interest rate swaps and swaptions and foreign exchange options, with Defendants Barclays Bank PLC and Merrill Lynch International and co-conspirators JPMorgan Chase Bank, N.A. and Deutsche Bank AG between July 15, 2009 and June 15, 2011. Each of these transactions directly incorporated Yen-LIBOR as a price component.

917.    HCMF was injured as a direct result of Defendants' conspiracy to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives. As alleged herein, Defendants and co-conspirators Barclays, RBS, UBS, Rabobank, Lloyds, SocGen, and Deutsche Bank have each admitted to manipulating Yen-LIBOR during the Class Period, when Plaintiff HCMF transacted Yen-LIBOR-based swaptions and foreign exchange options with Defendants. The CFTC, FCA, and NYDFS have also found that Defendants ICAP and R.P. Martin participated in the conspiracy to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives during the same period. Defendants' manipulation of Yen-LIBOR during this period caused HCMF to suffer monetary losses by artificially increasing the amount HCMF paid to purchase these swaptions and foreign exchange options from Defendants, and artificially reduced the amount received when it sold these derivatives to Defendants. Likewise, Defendants' manipulation of

Yen-LIBOR increased the cost for HCMF to enter and exit Yen-LIBOR-based swap transactions entered with the Defendants during the same period, causing HCMF to suffer monetary loss.

918.    For example, on July 15, 2009, HCMF entered into a Yen-LIBOR-based interest rate swap with Merrill Lynch International, agreeing to pay 1.515% interest per year on ¥2,500,000,000, in exchange for receiving floating rate payments based on Yen-LIBOR.

919.    Communications released as part of Defendant UBS' settlements with the CFTC and FCA demonstrate that Defendants were engaged in manipulating six-month Yen-LIBOR at the time of this transaction. For example:

**June 26, 2009**:

UBS [Hayes]: basically I will help you in 2 weeks time…I am the same way

Deutsche Bank [Adolph]: Perfect

UBS [Hayes]: But for the next 2weeks i really really need you to put 6m higher

Deutsche Bank [Adolph]: what is the date just that i know?

UBS [Hayes]: july 14

Deutsche Bank [Adolph]: Ok having a look

UBS [Hayes]:  after that i need 6m to crash off like you.

Deutsche Bank [Adolph]: that is no problem for me, i do nothing with the cash guys until then

UBS [Hayes]: I need you to move 6m up for 2 weeks mate

Deutsche Bank [Adolph]: But after urs please

***

UBS [Hayes]: i will then get our 6m way down after july 18th it is

Deutsche Bank [Adolph]: ok

UBS [Hayes]: and will try to get everyone else down too

> Deutsche Bank [Adolph]: when is the lest fixing date? ... the last july fixing date??"

> UBS [Hayes]: 18th ... then i a need low low low ... sry 17th ... i happy for all libors off after that date ... only reason ion bid is i have huge huge position that way so am happy for to come lower after the 17th"

> Deutsche Bank [Adolph]: ok enough enough [367]

920.    Defendants' manipulation of six-month Yen LIBOR artificially higher leading up to and during Operation 6M artificially increased the amount of interest HCMF was required to pay Merrill Lynch in the interest rate swap it purchased on July 15, 2009. As a result, HCMF was overcharged and suffered monetary losses because the interest rate swap it purchased from Merrill Lynch provided a lower return and was worth less than it would have been absent Defendants' conspiracy.

921.    In another example, on August 6, 2009, HCMF sold a foreign exchange option to JPMorgan, giving JPMorgan the right to purchase $125,000,000.00 in exchange for Yen at a strike price of 102.5 yen/dollar. JPMorgan paid HCMF $4,587,500.00 for this option.

922.    Communications released as part of Defendant Deutsche Bank's settlement with the DOJ, Defendant UBS' settlement with the CFTC, and Broker Defendant ICAP's settlement with the CFTC demonstrate that these transactions occurred while Defendants were engaged in a concerted effort to manipulate three-month and six-month Yen-LIBOR lower during August and September 2009 as part of Operation 6M. For example, in the chats below, UBS trader Tom Hayes discusses lowering six-month Yen-LIBOR lower between July 15, 2009 and August 11, 2009.

**July 14, 2009**:

---

[367] Ex. I-2 at 28.

UBS [Hayes]: just fyg [for your guide] after eom [end of month] will get 6m down a lot.  we will move from top to bottom and so will [HSBC][368]

**July 22, 2009**

UBS [Hayes]: 11th aug is the big date i still have lots of 6m fixings till the l0th

ICAP [Read]: christ keeps getting extended started off as 14th of this month :-)

UBS [Hayes]: i know

ICAP [Read]: **if you drop your 6m dramatically on the 11th mate, it will look v fishy**, especially if HSBC and Deutsche Bank go with **you I'd be v careful how you play it,** there might be cause for a drop as you cross into a new month but a couple of weeks in might get people questioning you

UBS [Hayes]: don't worry **will stagger the drops ie 5bp then 5bp**

ICAP [Read]: ok mate, don't want you getting into sh it

UBS [Hayes]:  **us then [Deutsche Bank] then [HSBC] then us then [Deutsche Bank] then [HSBC]**

ICAP [Read]:  **great the plan is hatched** and sounds sensible[369]

**July 27, 2009**

UBS [Hayes] speaking to Tullett Prebon [Cryan]: just trying on their August 11th. All right, I really need a big push. I don't want threes and ones to move. I just want sixes. On the, August 11th I need to start going down. What will help is we'll move, HSBC will move, West LB will move a big push

**July 23, 2009:**

UBS [Hayes]: ok we need to coordinate the 6m drop when do you need it falling?

Deutsche Bank [Adolph]: whenever

UBS [Hayes]: ok we need aug 11th you are back by then? if you need earlier let me know i am going to be away the whole of august almost if you need anything i am in london and zurich offices oon blackberry _____@ubs.com will be pushinh lower 6m from aug 11th

---

[368] *Id.* at 34.

[369] *Id.* at 36.

> Deutsche Bank [Adolph]: back on the 10th in ldn[370]

> UBS [Hayes]: ok well lets sort 6m out from 11th will make a massive push

923.    Consistent with these conversations, six-month Yen-LIBOR decreased significantly during July and August 2009, from 0.66375 on July 17, 2009 to 0.6325 on August 11, 2009.

924.    Defendants' manipulation of six-month Yen LIBOR artificially lower between July 18 and August 11, 2009 artificially reduced the amount of Yen HCMF would receive per U.S. Dollar in the foreign exchange option it sold to JPMorgan on August 6, 2009. As a result, HCMF was underpaid and suffered monetary losses because it received less than it would have absent Defendants' manipulation in exchange for the foreign exchange option it sold to JPMorgan on August 6, 2009.

925.    Similarly, on September 7, 2009, HCMF entered into two Yen-LIBOR-based interest rate swaps: (1) with JPMorgan, in which HCMF agreed to pay 1.60875% on ¥4,400,000,000 in exchange for receiving floating rate payments based on Yen-LIBOR; and (2) with Defendant Merrill Lynch International, in which HCMF agreed to pay 1.59875% on ¥4,400,000,000, in exchange for receiving floating rate payments based on Yen-LIBOR.

926.    Communications show that Defendants' and their co-conspirators' downward manipulation of six-month Yen-LIBOR as part of Operation 6M continued into September 2009. For example:

> **August 11, 2009**:

> Deutsche Bank [Adolph]: between u and me 6m libor is going to go very low in sep

---

[370] Ex. I-2 at 29.

<u>Deutsche Bank [Adolph]</u>: [UBS trader Tom Hayes] will drop and teh others when back from holiday[371]

**<u>September 10, 2009</u>:**
<u>ICAP [Read]</u>: Happy friday mate … libors still heading in the right direction.

<u>UBS [Alykulov]</u>: good mng Monday is the d-day

<u>ICAP [Read]</u>: big fix?

<u>UBS [Alykulov]</u>: Yeah both 3s and 6s

<u>ICAP [Read]</u>: low in both?

<u>UBS [Alykulov]</u>: ye

<u>ICAP [Read]</u>: ok will call [Cash Broker 1 [Colin Goodman]] on the train into work   [Mirhat Alykulov], you realise that you have the ability to influence the 3m fix, you are currently sitting at the upper end of the range. The 6m will have to come down to others as you are already v low.

<u>UBS Yen Trader 1</u>: yep

<u>ICAP [Read]</u>: ill remind you to chase your cash boys as well:-)

<u>UBS Yen Trader 1</u>: cool:-) on Monday

<u>ICAP [Read]</u>: yes[372]

927.    As described in the conversations above, six-month Yen-LIBOR artificially decreased from 0.6325 on August 11, 2009 to 0.58125 on September 7, 2009.

928.    Defendants' continued manipulation of six-month Yen-LIBOR through September 7, 2009 artificially decreased the rate of interest HCMF received in the interest rate swaps it purchased from JPMorgan and Merrill Lynch International, respectively. As a result, HCMF was overcharged and suffered monetary losses because the interest rate swaps it

---

[371] Ex. I-1 at 57.

[372] Ex. C-1 at 34.

purchased from Merrill Lynch International and J.P. Morgan Chase Bank, N.A. provided a lower

return and were worth less than they would have been absent Defendants' unlawful conduct.

929.    On March 4, 2010, HCMF subsequently closed the Yen-LIBOR-based interest

rate swap it entered with Merrill Lynch International on September 7, 2009. In connection with

this transaction, HCMF paid Merrill Lynch International ¥ 505,643.00.

930.    Communications released as part of Defendant RBS' settlements with the DOJ,

CFTC, and FSA, in addition to Broker Defendant ICAP's settlement with the CFTC demonstrate

that Defendants engaged in a concerted effort to, (and in fact successfully did) manipulate three-

month Yen-LIBOR artificially lower on March 4, 2010.

931.    Beginning on March 3, 2010, former UBS trader Tom Hayes, who was now at

Citibank, messaged ICAP broker Brent Davies to request an artificially lower three-month Yen-

LIBOR:

> **March 3, 2010**:
>
> <u>Citibank [Hayes]</u>: I really need a low 3m jpy libor into the imm any favours you
> can get with the due at rbs would be much appreciated even if he on;ly move 3m
> down 1bp from 25 to 24
>
> <u>ICAP [Davies]</u>: I'll give him a nudge later, see what he can do
>
> <u>Citibank [Hayes]</u>: thanks mate really really would appreciate that
>
> <u>ICAP [Davies]</u>: haven't seen him since I left so might buy him a steak to catch up
>
> <u>Citibank [Hayes]</u>: yeah…I have a huge fix on the imm so if he moves 1bp now
> and leaves it that would be great

932.    ICAP broker Brent Davies subsequently passed on this request to RBS Yen

Submitter Paul White hours later, after the Yen-LIBOR panel banks had already made their Yen-

LIBOR submissions on March 3, 2010 but before they did so March 4, 2010:

> **March 3, 2010**:

369

ICAP [Davies]: can I pick ur brain?

RBS [White]: Yeah

ICAP [Davies]: u see 3m jpy libor going anywhere btween now and imm?

RBS [White]: looks fairly statis to be honest, poss more pressure on upside, but not a lot

ICAP [Davies]: oh we have a mutual friend who'd ove to see it go down, no chance at all?
RBS [White]: haha [Senior Yen Trader [Tom Hayes]] by chance

ICAP [Davies]: shhh

RBS [White]: hehehe, mne should remain flat , always suits me if anything to go lower as I rcve funds

ICAP [Davies]: gotcha, thanks, and, if u cud see ur way to a small drop there might be a steak in it for ya, haha

RBS [White]: noted ;-)

ICAP [Davies]: 8-)

933.    As requested in the communications above, RBS artificially lowered its three-month Yen LIBOR submission from 0.25 on March 3, 2010 to 0.24 on March 4, 2010. Defendants' manipulation of Yen-LIBOR on March 4, 2010, caused three-month Yen-LIBOR to artificially decrease to 0.25063 from 0.2525 on March 3, 2010.

934.    Indeed, on March 4, 2010 RBS confirmed that it had helped manipulate three-month Yen LIBOR artificially lower:

**March 4, 2010**:

RBS [White]: Libor lower ;-)

ICAP [Davies]: good work!!!!

935.    Defendants' manipulation of three-month Yen LIBOR artificially lower on March 4, 2010 artificially reduced the amount of interest HCMF would receive under the Yen-LIBOR-

based interest rate swap it purchased from Merrill Lynch on September 7, 2009, thereby decreasing its value. As a result, HCMF was overcharged and suffered monetary losses because Defendants' manipulation of three-month Yen-LIBOR artificially lower on March 4, 2010 artificially increased HCMF's cost to close that position.

C.   Plaintiff CalSTRS

936.    Plaintiff CalSTRS engaged in U.S.-based transactions for Yen-LIBOR-based derivatives during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was damaged and suffered legal injury when it was overcharged and/or underpaid in those transactions.

937.    CalSTRS purchased and sold tens of thousands of Yen-LIBOR-based derivatives within the United States during the Class Period, including directly from/to the Contributor Bank Defendants.  For example, CalSTRS engaged in transactions for hundreds of Yen foreign exchange forwards with Defendant UBS between March 27, 2006 and June 24, 2011; hundreds of Yen foreign exchange forwards with co-conspirator Citibank between February 14, 2006 and June 29, 2011; hundreds of Yen foreign exchange forwards with co-conspirator Deutsche Bank between January 11, 2006 and June 30, 2011; hundreds of Yen foreign exchange forwards with Defendant RBS between January 14, 2006 and May 20, 2011; hundreds of foreign exchange forwards with Bank of America between January 13, 2006 and June 21, 2011; dozens of Yen foreign exchange forwards with co-conspirator HSBC Bank between February 22, 2006 and June 23, 2011; hundreds of Yen foreign exchange forwards with co-conspirator JPMorgan between January 20, 2006 and June 30, 2011; dozens of Yen foreign exchange forwards with Defendant

Société Générale between March 2, 2006 and February 18, 2011; and dozens of Yen foreign exchange forwards with Defendant Barclays between January 11, 2006 and June 27, 2011.

938.     Yen foreign exchange forwards are Yen-LIBOR-based derivatives that are priced based on Yen-LIBOR.  *See* Part I.B., above.  As a result, Defendants' manipulation of Yen-LIBOR, caused the prices of Yen foreign exchange forwards to be artificial during the Class Period.  CalSTRS was injured as a direct and proximate result of Defendants' manipulative conduct when it paid more for, or received less than it otherwise should have in its transactions with the Contributor Bank Defendants.

939.     For example, on December 2, 2010, CalSTRS entered into a Yen foreign exchange forward with Defendant Barclays, agreeing to purchase ¥806,103,420.00 from Barclays on December 14, 2010, for $9,649,888.31.  CalSTRS also entered into two Yen foreign exchange forwards with co-conspirator Deutsche on December 2, 2010, agreeing to purchase ¥4,324,477.00 from Deutsche on December 16, 2010, for $51,274.33 and ¥5,242,826.00 from Deutsche on December 17, 2010, for $62,248.53.

940.     Communications released as part of ICAP and Rabobank's settlements with the CFTC demonstrate that Defendants plotted to manipulate three-month Yen-LIBOR artificially lower to 0.18 on December 2, 2010:

> **December 1, 2010**:
>
> Rabobank [Yagami]: hope this will push libors down
>
> ICAP [Goodman]: ok we need lower libors tomorrow yes?
>
> Rabobank [Yagami]: Yeah…
>
> ICAP [Goodman]: ok ill work some magic for tomorrow :-)
>
> Rabobank [Yagami]: I want 3. And 6m libor a lot lower…? How?

ICAP [Goodman]: we wait and see, tomorrow lower Friday a bit more but ill do my best

Rabobank [Yagami]: Yeah…I think yen libors shud be lower but ppl tend to keep them higher whereas usd libors ppl look like manipulately put them higher

ICAP [Goodman]: ill work some magic tomorrow hopefully, 3m 19, 6m 35

Rabobank [Yagami]: Mate… 3mth is already below 19

ICAP [Goodman]: **mistype 18**

Rabobank [Yagami]: **That will be nice**

ICAP [Goodman]: **ok i am on the case for u**

Rabobank [Yagami]: Thank u mate[373]

941.     As Rabobank discussed with ICAP broker Colin Goodman, Defendants manipulated three-month Yen-LIBOR artificially lower to 0.18 on December 2, 2010.  This downward manipulation of Yen-LIBOR artificially increased the cost for CalSTRS to purchase Yen foreign exchange forwards from Barclays on December 14, 2010, and Deutsche on December 16 and 17, 2010.  As a result, CalSTRS was injured when it was overcharged by Barclays and Deutsche Bank for these Yen foreign exchange forwards.

942.     On March 12, 2008, CalSTRS entered into two foreign exchange forwards with co-conspirator JPMorgan agreeing to sell a total of ¥1,711,844,943.00 to JPMorgan on June 4, 2008, for $16,296,301.04.  Two days later, on March 14, 2008, CalSTRS entered into an additional Yen currency forward agreement with JPMorgan agreeing to sell ¥915,479,120.00 to JPMorgan on June 4, 2008 for $8,715,113.71.

---

[373] *Id.* at 37.

943.    Communications released as part of UBS' non-prosecution agreement with the DOJ reveal that between March 12, 2008 and March 17, 2008, Defendants were engaged in manipulating three-month Yen-LIBOR artificially higher to benefit their Yen-LIBOR-based derivatives positions in advance of the March 17, 2008, IMM date.  *See* ¶ 375, *supra*.

944.    Defendants' upward manipulation of Yen-LIBOR between March 12 and March 17, 2008, artificially decreased the amount that CalSTRS received from JPMorgan when it sold Yen foreign exchange forwards on March 12 and March 14, 2008.  As a result, CalSTRS was injured when it was underpaid by JPMorgan for these Yen foreign exchange forwards.

945.    On May 12, 2010, CalSTRS entered into a Yen foreign exchange forward with Defendant RBS agreeing to purchase ¥198,000,000.00 from RBS for $2,127,644.15 on June 9, 2010.

946.    Communications released as part of the DOJ criminal complaint against ICAP brokers Darrell Read, Daniel Wilkinson, and Colin Goodman show that on May 12, 2010, RBS agreed to lower its three-month Yen-LIBOR quote to 0.23 to assist with Defendants' downward manipulation of Yen-LIBOR.

> **May 12, 2010**
>
> UBS [Hayes]: You know my mate [Brent Davies], he used to work on the cash desk at RBS?
>
> ICAP [Read]: Yeah, yeah, yeah.
>
> UBS [Hayes]: Well, RBS is going to move its 3-month Yen LIBOR down to 23 today
>
> ICAP [Read]: Ah perfect. Perfect. . . . Okay, well Colin's sending his out as well so that might help. He might get one or two. [Unintelligible] [H]andy man to know, this [Davies][374]

---

[374] Ex. C-3 at 26-27.

947.    On May 12, 2010, RBS did in fact lower its three-month Yen-LIBOR quote to 0.23, manipulating Yen-LIBOR artificially lower.

948.    Defendants' downward manipulation of Yen-LIBOR on May 12, 2010, artificially increased the cost for CalSTRS to purchase Yen foreign exchange forwards from RBS on June 9, 2010.  As a result, CalSTRS was injured by Defendants' manipulative conduct when it was overcharged by RBS for this Yen foreign exchange forward.

949.    On March 3, 2010, CalSTRS entered into a Yen foreign exchange forward with Defendant UBS agreeing to purchase ¥997,066,480.00 from UBS for $11,263,360.71 on March 19, 2010.

950.    Communications released as part of RBS and ICAP's settlements with the CFTC show that beginning on at least March 3, 2010, co-conspirator Citibank (which by then employed Tom Hayes), and Defendants RBS and ICAP engaged in a coordinated downward manipulation of Yen-LIBOR to financially benefit their Yen-LIBOR-based derivatives positions heading into the March 15, 2010, IMM date.  *See* ¶¶ 624-625, *supra*.

951.    Defendants' suppression of Yen-LIBOR between March 3, 2010 and March 15, 2010, artificially increased the cost for CalSTRS to purchase Yen foreign exchange forwards from UBS on March 15, 2010.  As a result, CalSTRS was injured by Defendants' manipulative conduct when it was overcharged by UBS for this Yen foreign exchange forward.

D.  Plaintiffs CalSTRS, Hayman & Sonterra

952.    In addition to transacting at artificial prices on the limited number of days for which Defendants' communications have been released to the public, Plaintiffs also were damaged and suffered legal injury on their Yen-LIBOR-based derivatives positions because Defendants' manipulative conduct rendered Yen LIBOR and the prices of Yen LIBOR-based derivatives artificial throughout the entire Class Period in a direction that favored the Defendants

375

and their co-conspirators while causing corresponding injuries to Defendants' customers,

including the Hayman Plaintiffs, CalSTRS, and the Class.

953.    The persistent nature of Defendants' manipulative conduct is well documented in

their settlements with government regulators.  This is confirmed directly by Hayes, who

explained in his SFO interviews that he and his co-conspirators manipulated Yen-LIBOR to

artificial levels on a daily basis and to keep the rate artificial over long periods of time by staying

consistent in their efforts:

> For a particular length of time that LIBORs would be, you know,
> particularly skewed. And I think you know that it's a semi sensible
> way to do it. Because I think I had in the FSA report I had seven
> campaigns . . . They weren't random, they were very consistent.  I
> mean, in fact the plan was all about consistency.
>
> You know it was all about doing the same thing on a daily basis…

954.    Defendants' relentless efforts to manipulate Yen-LIBOR and the prices of Yen-

LIBOR-based derivatives, rendered the prices of Yen-LIBOR-based derivatives artificial

throughout the entire Class Period.  As a result, Plaintiffs were damaged and suffered legal injury

when they engaged in transactions for Yen-LIBOR-based derivatives at artificial prices

proximately caused by Defendants' manipulative conduct.

## CLASS ACTION ALLEGATIONS

955.    Plaintiffs brings this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on their own behalf and as representatives of the following Class:[375]

> All persons or entities that engaged in a U.S. based transaction of a
> financial instrument priced, benchmarked, settled to or otherwise
> affected by Yen-LIBOR during the period of at least January 1, 2006
> through at least June 30, 2011 (the "Class Period"). A U.S. based
> transaction means a transaction by a U.S. Person, or by a Person

---

[375] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

> from or through a location within the U.S. Excluded from the Class
> are the Defendants and any parent, subsidiary, affiliate, or agent of
> any Defendant.

956.     The Class is so numerous that the individual joinder of all members is
impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time,
Plaintiffs are informed and believe that at least thousands of geographically dispersed Class
members transacted in Yen-LIBOR-based derivatives worth billions of dollars within the United
States during the Class Period.

957.     Plaintiffs' claims are typical of the claims of the other members of the Class.
Plaintiffs and the members of the Class sustained damages arising out of Defendants' common
course of conduct in violation of law as complained of herein.  The injuries and damages of each
member of the Class were directly caused by Defendants' wrongful conduct in violation of the
laws as alleged herein.

958.     Plaintiffs will fairly and adequately protect the interests of the members of the
Class.  Plaintiffs are adequate representatives of the Class and have no interests which are
adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and
experienced in class action litigation, including commodity manipulation and antitrust class
action litigation.

959.     Common questions of law and fact exist as to all members of the Class which
predominate over any questions affecting solely individual members of the Class.  These
common questions of law and facts include, without limitation:

(a)     Whether Defendants' unlawful acts violate Section 1 of the Sherman Act;

(b)     Whether Defendants' unlawful acts violate RICO;

(c)     Whether Defendants engaged in wire fraud;

(d)   Whether Defendants engaged in a pattern of racketeering activity;

(e)    Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiffs and the Class;

(f)   Whether Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class;

(g)   The operative time period and extent of Defendants' foregoing violations; and

(h)   Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

960.   A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

961.   Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## TOLLING AND FRAUDULENT CONCEALMENT

962.   The statute of limitations relating to the claims for relief alleged herein (*see* ¶¶ 1001-1061) were tolled because of fraudulent concealment, including: (1) Defendants' active acts of concealment that were independent of the acts that constituted the underlying conduct

giving rise to their liability; and (2) the inherently self-concealing nature of Defendants'

misconduct.  Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-

concealing manipulative acts and could not have discovered same by the exercise of due

diligence until July 26, 2011 as to Defendant UBS only and until February 2012 as to several

other Contributor Panel Banks and Broker Defendants.

963.    Plaintiffs and the Class' investigation of their claims required time and resources

to identify additional Defendant wrongdoers through, among other things, economic analysis of

public submission data and "reverse engineering" to identify unnamed co-conspirator

Contributor Panel Banks and brokers.  At least one Defendant, Lloyds Bank, represented to

Plaintiffs and the Class' counsel that its internal investigation revealed no instances of

wrongdoing, inducing them to voluntarily dismiss the action and enter into a tolling agreement.

It was not until later disclosures by other co-conspirators revealed to counsel, through additional

"reverse engineering" efforts, and Lloyds's own LIBOR settlement, that the public information

revealed Lloyds' culpability and Plaintiffs and the Class determined that Lloyds misrepresented

the facts.  With each succeeding indictment and government investigation disclosure, more and

more information is revealed and additional Defendants and the scope of Defendants'

wrongdoing becomes clearer.

964.    UBS' July 26, 2011 disclosure is the earliest Plaintiffs could have suspected UBS'

role in the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

Plaintiffs could not have suspected, much less known, of the other Contributor Bank or Broker

Defendants involvement in the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based

derivatives until much later.  Plaintiffs thus assert the tolling of the applicable statute of

limitations affecting the rights of the claims of relief asserted by Plaintiffs.  Defendants are also

equitably estopped from asserting that any otherwise applicable limitations period has run.

A.  Dates of Initial Public Disclosures

965.    On March 15, 2011, UBS disclosed in its 2010 annual report (at page 318 of 430)

that it had received subpoenas from the Commodity Futures Trading Commission, U.S.

Department of Justice, and other U.S. government agencies, as well as an information request

from the Japanese Financial Supervisory Agency, as follows:

> UBS has received subpoenas from the SEC, the US Commodity
> Futures Trading Commission and the US Department of Justice in
> connection with investigations regarding submissions to the British
> Bankers' Association, which sets LIBOR rates. UBS understands
> that the investigations focus on whether there were improper
> attempts by UBS, either acting on its own or together with others, to
> manipulate LIBOR rates at certain times. In addition, UBS has
> received an order to provide information to the Japan Financial
> Supervisory Agency concerning similar matters. UBS is conducting
> an internal review and is cooperating with the investigations.

966.    UBS failed to mention in its 2010 annual report whether the foregoing

investigations related to submissions for Yen-LIBOR (or other rates).

967.    It was not until UBS filed a Form 6-K with the SEC on July 26, 2011 that UBS

disclosed for the first time that it had received conditional leniency from the Antitrust Division

of the U.S. Department of Justice in connection with potential antitrust or competition law

violations related to submissions of Yen-LIBOR.  The July 26, 2011 Form 6-K was the first

public disclosure by UBS of allegations of false reporting by it with respect to Yen-LIBOR.

968.    UBS' July 26, 2011 disclosure is the earliest Plaintiffs could have suspected UBS'

role in the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

Plaintiffs could not have suspected, much less known, of the other Contributor Bank or Broker

Defendants involvement in the manipulation until much later.

969. For example, on February 13, 2012, the Wall Street Journal reported that the Canadian Competition Commission ("CCB") joined U.S., European and Japanese regulators in investigations into reference banks' collusion and resulting manipulation and Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.   Later, on February 17, 2012, The Wall Street Journal reported that "lawyers acting for the cooperating bank had told [the CCB] that traders at six banks on the yen Libor panel—Citigroup Inc., Deutsche Bank AG, HSBC Holdings plc, J.P. Morgan Chase & Co., Royal Bank of Scotland Group PLC and UBS—'entered into agreements to submit artificially high or artificially low' quotes . . . ."   The same report also confirmed that the CCB was investigating whether the traders also "conspired" with individuals at individual inter-dealer broker firms, including Broker Defendant ICAP and co-conspirator R.P. Martin, "to use their influence with yen Libor submitters to affect what rates were submitted by other yen Libor panel banks."   The foregoing reports in February 2012 are the first public disclosures of Broker Defendant ICAP and co-conspirator R.P. Martin involvement in the manipulation of Yen-LIBOR.

970. Additional public disclosures of other Contributor Bank and Broker Defendants' involvement in the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives came even later than February 2012.  For example, the first public disclosure of the involvement of Broker Defendants ICAP Europe Limited and Martin Brokers (UK) Ltd. in the manipulation of Yen-LIBOR did not occur until ICAP Europe Limited settled civil charges with the CFTC and FCA on September 25, 2013 and Martin Brokers (UK) Ltd. settled same with the CFTC and FCA on May 15, 2014.  Similarly, the first public disclosure of Broker Defendant Tullett Prebon's involvement in the manipulation of Yen-LIBOR did not occur until February 2013 when news reports speculated that Tullett Prebon conspired with former UBS and Citibank

Senior Yen Trader Tom Hayes. In response to the public reports, a Tullett Prebon spokesperson commented that "Tullett Prebon has never been informed by the FSA [Financial Services Authority] or any other regulatory authority that Tullett Prebon or any of its brokers are under investigation in relation to LIBOR." Thus, it was not until June 20, 2013 when the U.K. SFO identified Tullett Prebon as an alleged co-conspirator of former UBS and Citibank Senior Yen Trader Tom Hayes in the manipulation of Yen-LIBOR and other interbank offered rates that Plaintiffs had knowledge of Tullett Prebon's involvement in the alleged conspiracy and manipulation.

B. Plaintiffs' Due Diligence Efforts

971. Plaintiffs actively monitor their investments to ensure that there is no evidence of fraud or irregularities in their trading positions and did so in connection with their Yen-LIBOR-based derivatives during the Class Period. This monitoring included having investment professionals analyze market trends and economic data associated with their investments and public information concerning the markets in which they were investing. Prior to the times identified above when public disclosures were made, Plaintiffs, much like their similarly situated class members, had no suspicion of, nor reason to know, that Defendants were engaged in widespread collusion and manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives. Hence, despite Plaintiffs' due diligence, they were unable to discover the fraud alleged herein until public disclosures raised their suspicions as to UBS and then they investigated the culpability of others through their lawyers' investigatory work.

972. **The Structure of the Yen-LIBOR Submission Process Gave Plaintiffs No Reason To Suspect Defendants Were Engaged in Wrongdoing.**

973. In order to ensure that Yen-LIBOR constituted the average competitive market interest rate, the Defendants, through their trade organization, the "BBA," promulgated certain

Instructions that were supposed to govern their participation in the Yen-LIBOR rate-setting

process.  By promulgating these Instructions through their BBA trade organization and then

making daily Yen-LIBOR submissions purportedly pursuant to these Instructions, each

Defendant impliedly but repeatedly represented that its submissions complied with the

Instructions.  By such conduct, each Contributor Panel Bank Defendant and Co-conspirator

represented that its submissions reflected that Defendant's competitive market borrowing rate.

974.  Specifically, each Defendant's conduct was undertaken pursuant to and impliedly

represented that it complied with, among others, the following Instructions promulgated by the

BBA:

> A. **An individual** BBA LIBOR Contributor Panel Bank will contribute **the rate at which it** could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable **market** size just prior to 1100.
>
> B. Rates shall be contributed for currencies, maturities and fixing dates and according to agreed quotation conventions.
>
> C. **Contributor Banks shall input their rate without reference to rates contributed by other Contributor Banks.**
>
> D. Rates shall be for deposits:
>
> - made in the London **market** in **reasonable market** size;
>
> - that are simple and unsecured….
>
> G. …. The Designated Distributor will endeavor to identify and arrange for the correction of manifest errors in rates input by individual Contributor Banks prior to 1130.

**The Designated Distributor will publish the average rate**

**and individual Contributor Banks' rates at or around**

**1130hrs London time.**

Remaining manifest errors may be corrected over the next 30

minutes. The Designated Distributor then will make any

necessary adjustments to the average rate and publish it as the

BBA LIBOR Fixing at 1200hrs."[376]

975.    The foregoing Instructions ensured in at least three ways that Yen-LIBOR

submissions constituted a competitive market rate and that the Yen-LIBOR average was

publishing a competitive average market rate.  First, each individual bank was to make its own

submission relating to the competitive market rate at which it could borrow funds.  *See*

Instruction "A" above.  This borrowing rate was expressly limited to that for loans of

"reasonable market size."  The "reasonable market size" requirement for each bank's estimate of

borrowing costs, most closely captured the competitive market borrowing rate.

976.    Second, each panel bank was prohibited from referring to, or coordinating with

other panel banks in the submissions that such panel bank made.  See Instruction "C" above.

This prohibition of information sharing was reinforced and further ensured by the Instruction

"G" above.  Specifically, Instruction "G" mandated that there would be only a simultaneous

release of all banks' rates.  Such simultaneous release prevented any coordination among the

banks after receipt from the BBA of another bank's rate.  This forced each bank individually to

submit its own competitive rate for borrowing.

---

[376]https://web.archive.org/web/20080930203457/http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=225&a=1413&artpage=all (last viewed July 23, 2015) (emphasis added).

977.     Third, the Yen-LIBOR rate was that applicable to deposits made in the "market" and, even then, only those which were of "reasonable market size."  See Instruction "D" above. These requirements further ensured that Yen-LIBOR reflected a competitive "market" rate. Instruction "D" prohibited the use, for example, as the basis for each bank's submission of any non-market borrowing rates.  It even prohibited market rates for irregular sizes.  Once again, these requirements most closely captured the competitive market rate.

978.     Taken together, the foregoing Instructions, if followed, rendered Yen-LIBOR the average competitive market borrowing rate.  Such Instructions prohibited each bank's Yen-LIBOR submission from reflecting any collusion, coordination, advance notice among the competing banks, or sharing (directly or through brokers) of their intended rate submissions.

979.     Similarly, the Instructions, taken together, prohibited each individual bank from using its self-interest in profits on its derivatives positions as a substitute for its competitive borrowing rate in determining the rate submission the bank would make.

980.     On the contrary, the sole basis for the submission by each bank was limited to "the rate at which it could borrow funds…in reasonable market size just prior to 1100."  See Instruction "A" above.  Defendants, through the BBA, made this requirement even more explicit during 2008 when they stated that the

> basis for a … bank's submissions …was to be the rate at which members of the bank's staff primarily responsible for management of the bank's cash, rather than the bank's derivatives trading book, believed that the bank could borrow unsecured inter-bank funds in the London money market. Further, according to the BBA, a Contributor Panel bank should not have contributed a rate based on the pricing of any derivative financial instrument. In other words, a Contributor Panel bank's LIBOR submissions should not have been influenced by its motive to maximize profit or minimize losses in derivatives transactions tied to LIBOR.[377]

---

[377] *See* Ex. I-1.

981.    By continuing to make their Yen LIBOR submissions, each Defendant impliedly represented that it was submitting its competitive market borrowing rate and was not submitting a non-competitive rate that served its interests in manipulating the markets.  Defendants continued to make these representations long after their re-affirmance in 2008 (quoted above) that their submissions were to reflect their competitive market borrowing rate rather than their self-interest in manipulating prices.

982.    However, these representations were false and fraudulent.  For example, Defendant UBS continued to make false and manipulative submissions from 2005 through 2010. Accordingly, UBS and other Defendants intentionally and carefully limited their communications to secret communications that were either outside of business channels or in private chatrooms, emails, and through traders' personal cellphones.  Thereby, Defendants intentionally, affirmatively and fraudulently concealed the facts that they were conspiring among themselves to make, on virtually a daily basis, manipulated submissions of non-competitive rates that benefited their Yen-LIBOR-based derivatives positions.

983.    **The Manipulative and Collusive Conduct Was Inherently Self-Concealing**. The conduct that gives rise to the violations of law set forth herein are inherently self-concealing. *See, e.g.*, *In re European Gov't Bonds Antitrust Litig.*, No. 19 CIV. 2601 (VM), 2020 WL 4273811, at *10 (S.D.N.Y. July 23, 2020) (holding that defendants' conspiracy to fix European Government Bond prices was inherently self-concealing); *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004) ("[a]mong the principal allegations against Defendants are assertions that they reported false trade data to entities that collect that information for public dissemination, and that they engaged in fraudulent wash trades…Such activities are inherently self-concealing."); *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F.

Supp. 3d 122, 135 (S.D.N.Y. 2016) (recognizing that price-fixing conspiracies in violation of

antitrust law are inherently self-concealing) (citing *In re Nine W. Shoes Antitrust Litig.*, 80 F.

Supp. 2d 181, 193 (S.D.N.Y. 2000)).  Further, as certain of defendants' traders recognized, the

manipulation of Yen-LIBOR required that it remain concealed from the BBA, regulators and the

public in order to ensure its success over an extended period of time.

984.   **Extraordinary Acts of Concealment Independent of the Conduct Underlying**

**their Violations of Law**.  In addition to and separate from the inherently self-concealing

manipulative and acts alleged herein as to Defendants' Yen LIBOR manipulation and collusion,

many Defendants engaged in extraordinary measures to hide their wrongdoing from government

investigators and their victims, including Plaintiffs.  These acts included:

> (1) avoiding discussing the manipulation of Yen-LIBOR in public forums (*see,*
> App. *passim*);
>
> (2) directing their Yen-LIBOR-based derivatives traders and Yen-LIBOR
> submitters to limit their internal written communications discussing the
> manipulation of Yen-LIBOR;
>
> (3) agreeing to stagger the submission of false reports over successive trading
> days and over extended periods of time (*e.g.*, agree that an artificially low rate
> would be submitted by co-conspirator A today, by co-conspirator B tomorrow and
> co-conspirator C the next day, etc.) in order to exert a greater and longer-lasting
> manipulative impact on Yen-LIBOR-based derivative prices and to mask their
> false  reporting from other market players;
>
> (4) concocting false stories they could give in the event someone (*e.g.*, the BBA,
> regulators, or other market participants) questioned their false Yen-LIBOR
> submissions;
>
> (5) lying to their own attorneys during internal investigations of rate
> manipulation, including falsely claiming that their Yen trading desks did not have
> any derivative positions with exposure to Yen-LIBOR and the interest rate
> submission process did not take into account trading positions;
>
> (6) engaging in wash trades and other illicit sham transactions to surreptitiously
> pay the Broker Defendants for their assistance in manipulating Yen-LIBOR;
>
> (7) paying bribes and kickbacks to Broker Defendants for their LIBOR "fixing
> services" to maintain the Broker Defendants cooperation and continue the

387

successful manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives;

(8) spoliating evidence of their wrongdoing by destroying LIBOR-related phone recordings and other documents after being put on notice of government investigations;

(9) lying to regulators and concealing the findings of LIBOR manipulation by one regulator from another regulator;

(10) using electronic chat rooms open only to a select group of traders and brokers (*see,* App. *passim*);

(11) using code words to avoid detection like "arbi" to signal a manipulative request or "curry" to indicate a bribe for advancing the manipulation was coming;

(12) intentionally taking manipulative communications "offline" to continue the manipulative conversations in-person or on personal cellphones or through text messaging to avoid detection;

(13) reorganizing trading desks to facilitate verbal communication, and eliminate written communication, between their Yen-LIBOR-based derivatives traders and Yen LIBOR submitters;

(14) having compliance officers falsely attest to the BBA that they audited their LIBOR submission processes;

(15) refusing to conduct internal audits of Yen-LIBOR submissions processes referring to the audits as nothing more than "an arse-covering exercise [by the BBA]";

(16) maintaining no LIBOR-specific systems and controls that could detect LIBOR-related "buzz words" indicative of manipulation; and

(17) putting in place lax compliance standards they knew would not detect wrongdoing.

985. **Additional Evidence of Extraordinary Efforts to Conceal Wrongdoing Have Been Revealed to Plaintiffs Through Testimony Adduced at Former UBS and Citibank Trader Thomas Hayes' United Kingdom Criminal Trial.**  For example, Hayes explained to ICAP broker Darrell Read in a March 2010 telephone conversation that Citi's Yen-LIBOR submitters were generally not receptive to manipulative requests unless the requests were made "offline."  Hayes stated to Read in words or substance, "You know because they were like pretty

reluctant to do anything on the libors but if you talk to them like you now on a non recorded line. Blah blah blah….”

C.  Government Proceeding Antitrust Tolling

986.    Plaintiffs' claims are also tolled by operation of 15 U.S.C. §16(i).

987.    Section 16(i) provides, in relevant part:

> Suspension of limitations. Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws,…, the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter…

988.    As alleged herein, the United States has filed criminal proceedings, including criminal antitrust indictments against former traders and brokers of the Contributor Bank and Broker Defendants.  This private action seeks antitrust damages arising under the Sherman Act and is based in large part on the matters complained of in the United States' criminal proceedings.  As a result, under Section 16(i) of the Sherman Act, Plaintiffs' claims are currently tolled and have been tolled since the date these criminal proceedings were instituted.

989.    For example, on December 19, 2012, the Criminal Division (Fraud Section) and the Antitrust Division of the U.S. Department of Justice unsealed a criminal complaint previously filed on December 12, 2012 in this District against former UBS and Citibank Trader Tom Alexander William Hayes and former UBS trader and Yen-LIBOR submitter Roger Darin. *See* Ex. A-6, Complaint filed in *United States of America v. Tom Alexander William Hayes, and Roger Darin*, 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012) (the "Hayes/Darin Criminal Complaint"). The Hayes/Darin Criminal Complaint identifies at least four additional, unidentified Yen-LIBOR panel banks as Banks A, B, C and D.  The Hayes/Darin Criminal Complaint also identifies at least two unidentified Brokerage Firms as Brokerage Firm A and Brokerage Firm B.  Both Hayes

and Darin were charged with conspiracy to commit wire fraud. Hayes was also charged with a violation of Section 1 of the Sherman Act due to alleged anticompetitive conduct in relation to Yen-LIBOR from at least September 2006 through September 2009.

990.    On April 23, 2015, the Department of Justice charged Co-conspirator Deutsche Bank AG with a criminal violation of Section 1 of the Sherman Act, by filing a Criminal Information in the U.S. District Court for the District of Connecticut.  (Docket No. 3:15-cr-61 (ENC)).   The price-fixing count of Deutsche Bank's Criminal Information provides:

> From at least as early as 2008 through at least 2010, the defendant, Deutsche Bank AG, through its employees, and its co-conspirators, engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign commerce.  The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among the Defendants and its co-conspirators, the substantial terms of which were to fix the price of Yen LIBOR-based derivative products by fixing Yen-LIBOR, a key component of the price thereof, on certain occasions.

> In violation of Title 15, United States Code, Section 1.[378]

991.    Plaintiffs' claims are in large part based on the same facts and circumstances that underlie the United States criminal complaint against former UBS traders Tom Alexander William Hayes and Roger Darin as well as Deutsche Bank's Criminal Information.  Plaintiffs expressly rely on the United States' criminal complaint against former UBS traders Tom Alexander William Hayes and Roger Darin and the Deutsche Bank criminal indictment in pleading their claims.  *See e.g.*, Ex. A-6, Ex I-7.  The United States' actions against both former UBS traders Tom Alexander William Hayes and Roger Darin remains pending and, as a result, the statutes of limitations on Plaintiffs' claims are currently suspended by operation of 15 U.S.C. §16(i).

---

[378] Ex. I-7.

D.  Defendants Affirmatively Concealed their Unlawful Conduct.

992.   In addition to the other methods that Defendants and their co-conspirators used to prevent discovery of their misconduct, such as falsely claiming to follow BBA rules when making Yen-LIBOR submissions and conspiring via nonpublic means, the Defendants fraudulently concealed their misconduct by representing that they put in place effective compliance measures, did not engage in collusion, and did not tolerate market manipulation by their traders. As described in this Complaint, these statements were false.

993.   Bank of America's public Code of Ethics stated during the Class Period that its employees and those of all of its subsidiaries are expected to "deal fairly with [its] customers, competitors, vendors and teammates" and to not take "unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of facts or any other unfair-dealing practice." Further, Bank of America highlighted the importance of these values, calling the code "more than just words on a page," and "the basic guidelines of business practice."

994.   Similarly, RBS's Code of Conduct governing its own employees and those of its subsidiaries stressed "honest and ethical conduct" and "compliance with applicable laws, rules and regulations." The Code of Conduct affirms that "personal conduct, business integrity, and the Group's security are crucial."

995.   UBS's public Code of Conduct, which it held out to customers during the Class Period, professes that its "most valuable" asset is "its established and unquestioned reputation for integrity." UBS reported that it required "continuing alertness" from its employees to "high ethical standards," and requires them to "comply with all applicable laws, rules and regulations."

996.   Barclays' Statement on Corporate Conduct and Ethics, which it published during the Class Period, represented that employees "conduct themselves according to consistently high

391

professional and ethical standards" and that they "meet local laws and regulations." Barclays claimed to "compete vigorously to uphold the principle of a free market and abide by relevant laws, regulations, industry standards and internationally accepted best practice. [We] avoid unfair or unethical competitive practices."

997.    During the Class Period, Rabobank's Code of Conduct stated that it holds its employees to "set high standards for the way it deals with customers" by being "fair, honest, conscientious and trustworthy." Rabobank also claimed to put a "special focus on compliance."

998.    Lloyds' Code of Business Conduct, which it published during the Class Period, claimed that the bank "demand[s] honesty and integrity in everything we do," and that "high ethical standards are of crucial importance." Further, Lloyds claimed to "commit itself to obey[ing] the laws, rules and regulations, of every country in which [it] operate[s]."

999.    Societe General reported that its "Risk management governance, control, and organizational principles" included "strong managerial involvement, throughout the entire organisation, from the Board of Directors down to operational teams" and "a tight framework of internal procedures and guidelines."

1000.   These public representations were designed to assure customers, including Plaintiffs and the Class, that Defendants would not unlawfully take advantage of their customers, let alone engage in the years-long, far-reaching, and criminal misconduct described in this Complaint. As reflected in numerous guilty pleas and government findings, the Defendants failed to implement effective compliance measures to detect and deter the misconduct described in this Complaint. *See* Part IV.A., above. Accordingly, these false public statements by the Defendants constitute affirmative acts of concealment.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act**

**Conspiracy to Fix the Prices of Yen-LIBOR-based Derivatives Traded in the United States**

**Against all Defendants**

1001.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

1002.   Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

1003.   During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, by conspiring to, *inter alia*, make false submissions to the BBA designed to artificially suppress, inflate, maintain, or otherwise alter Yen-LIBOR.

1004.   This conspiracy to manipulate and fix the prices of Yen-LIBOR caused injury to both Plaintiffs and members of the Class because they were deprived of the benefit of a legitimate and accurate Yen-LIBOR that reflected actual market conditions.  Plaintiffs and members of the Class also were deprived of the ability to accurately price Yen-LIBOR-based derivatives entered into during the Class Period and to accurately determine the settlement value of Yen-LIBOR interest rate swaps, Yen foreign exchange forwards and other Yen-LIBOR-based derivatives by reference to an accurate Yen-LIBOR.  Plaintiffs and members of the Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts taken in furtherance thereof.

1005.   The conspiracy is a *per se* violation of § 1 of the Sherman Act. The goal of Defendants' and their co-conspirators' unlawful conduct was to fix the prices of Yen-LIBOR-based derivatives. Thus, by trading Yen-LIBOR-based derivatives in the United States while fixing the prices of these products, the Defendants and their co-conspirators restrained the domestic market for Yen-LIBOR-based derivatives.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the Yen-LIBOR-based derivatives market.  There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof.  Any ostensible pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

1006.   As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

1007.   Plaintiffs and members of the Class seek treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

1008.   Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

**(For Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO))**
**18 U.S.C. §§ 1961 *et seq.***
**Against All Defendants**

1009.   Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

## Defendants Engaged In Conduct Actionable Under RICO

1010.   18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

1011.   18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

1012.   Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

1013.   18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

1014.   18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

1015.   18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals,

pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

1016.   At all relevant times, an association-in-fact consisting of Defendants, Defendants' employees and agents, who conducted Defendants' affairs through illegal acts including the transmission of false Yen-LIBOR submissions or directing other employees and agents to intentionally manipulate Yen-LIBOR rates by wire communications, and the BBA were an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

1017.   At all relevant times, Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

## Defendants Conducted the Affairs of A RICO Enterprise

1018.   Defendants' association-in-fact, through their frequent and routine communications with each other, their organization of a hub-and-spoke conspiracy through inter-dealer brokers, association with the BBA, and participation together as members in the Yen-LIBOR panel, constitutes a RICO enterprise.  Defendants conducted the affairs of the enterprise through a pattern of racketeering activity by transmitting or causing to be transmitted by use of wires false and artificial Yen-LIBOR submissions throughout the Class Period.  Within the United States, Defendants would on a regular basis communicate through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce.  Further, on a daily basis, Defendants caused the enterprise to transmit an electronic spreadsheet to Thomson Reuters.  Through their collusive activities in reporting Yen-LIBOR submissions and the daily transmission by use of wires of an electronic spreadsheet setting forth those submissions,

Defendants conducted the affairs of the enterprise through a pattern of racketeering activity, knowingly transmitting or causing to be transmitted false Yen-LIBOR submissions.

1019.   As part of its global settlement with regulators for its manipulation of financial benchmarks, Defendant Rabobank agreed to waive indictment to a one-count criminal information filed in the District of Connecticut by the Criminal Division (Fraud Section) and Antitrust Division of the DOJ charging Rabobank with wire fraud, in violation of 18 U.S.C. § 1343, in connection with, *inter alia*, Rabobank's false reporting of Yen-LIBOR.  The one-count criminal information provides that "[b]etween approximately 2005 and at least 2010, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., the defendant, through its employees, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant, through its employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about April 17, 2008, the defendant transmitted or caused the transmission of electronic communications - specifically, (1) an electronic chat between a derivatives trader and a money market trader, (2) a subsequent Yen LIBOR submission from the defendant to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate through international and interstate wires."  The Rabobank Criminal Information is attached as Ex. D-4.

1020.   As part of its global settlement with regulators for its manipulation of financial benchmarks, Defendant RBS Japan pled guilty and agreed to waive indictment to a one-count criminal information filed in the District of Connecticut by the Criminal Division (Fraud Section) and Antitrust Division of the DOJ charging RBS Japan with felony wire fraud, in violation of 18 U.S.C. § 1343, in connection with, *inter alia*, RBS Japan's false reporting of Yen-LIBOR.  The one-count criminal information provides that "[b]etween approximately 2006 and at least 2010, in the District of Connecticut and elsewhere, RBS SECURITIES JAPAN LIMITED, the defendant, through its employees, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant, through its employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of  those trades was tied, and in furtherance of that scheme, on or about October 5, 2009, the defendant transmitted or caused the transmission of electronic communications -- specifically, (1) an electronic chat between a derivatives trader employed by the defendant and a derivatives trader employed by the defendant's parent company, (2) a subsequent Yen LIBOR submission from a bank to Thomson Reuters, and (3) a subsequent publication of a Yen-LIBOR rate—through international and interstate wires, at least one of which passed through, among other locations and facilities, servers located in Stamford, Connecticut."  The RBS Criminal Information is attached as Ex. B-3.

1021.   As part of its global settlement with regulators for its manipulation of financial benchmarks, Defendant UBS Japan pled guilty and agreed to waive indictment to a one-count criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section and Antitrust Division of the DOJ charging UBS with felony wire fraud, in violation of 18 U.S.C. §§ 1342-3, in connection with, *inter alia*, UBS' false reporting of Yen-LIBOR.  The one-count criminal information provides that "[b]etween approximately 2006 and at least 2009, in the District of Connecticut and elsewhere, UBS SECURITIES JAPAN CO., LTD., the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant devised and engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about February 25, 2009, the defendant transmitted or caused the transmission of electronic communications—specifically, (1) an electronic chat between a derivatives trader employed by the defendant and a broker employed at an inter-dealer brokerage firm, (2) a subsequent Yen LIBOR submission from a bank to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate through international and interstate wires, at least one of which passed through, among other locations and facilities, servers located in Stamford, Connecticut."  *See* Ex. A-4.

1022.   As part of its global settlement with regulators for its manipulation of financial benchmarks, Defendant UBS AG pled guilty and agreed to waive indictment to a one-count criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section and Antitrust Division of the DOJ charging UBS with felony wire fraud, in violation of 18 U.S.C. §§ 1343 & 2, in connection with, *inter alia*, UBS' false reporting of Yen-LIBOR.  The one-count criminal information provides that "Between approximately 2001 and in or about 2010, in the District of Connecticut and elsewhere, the defendant, UBS AG, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, which violation affected a financial institution, to wit: the defendant, UBS AG, devised and engaged in a scheme to defraud counterparties to interest rate derivatives transactions by secretly manipulating benchmark interest rates to which the profitability of those transactions was tied, and in furtherance of that scheme, on or about June 29, 2009, the defendant, UBS AG, transmitted or caused the transmission of electronic communications in interstate and foreign commerce, specifically: (1) an electronic chat between a senior derivatives trader employed by a subsidiary of the defendant, UBS AG ("Trader-1"), and a London-based inter-dealer derivatives broker ("Broker-1"), in which Trader-1 requested assistance from the broker in requesting that other banks sitting on the London Interbank Offered Rate ("LIBOR") Yen panel submit an increased Yen LIBOR rate favorable to Trader-1's trading positions; (2) a telephone call placed by Broker-1 at Trader-1's request to a Yen LIBOR submitter at another Yen panel bank, in which Broker-l requested that

the submitter increase the panel bank's Yen LIBOR submission that day; (3) an electronic chat between Trader-l and a junior derivatives trader employed by the defendant, UBS AG, who also served as a Yen LIBOR submitter for the defendant ("UBS Submitter"), in which Trader-l requested that the UBS Submitter increase UBS AG's Yen LIBOR submission to a rate favorable to Trader-1's trading positions; (4) a subsequent Yen LIBOR submission from the defendant, UBS AG, to Thomson Reuters reflecting an accommodation of Trader-1's request to the UBS Submitter; and (5) a subsequent publication of a Yen LIBOR rate -through international and interstate wires, at least one of which passed through, among other locations and facilities, servers located in Stamford, Connecticut."

1023.   Defendants conducted the affairs of the enterprise through a pattern of racketeering activity, including by: (i) transmitting or causing to be transmitted false and artificial Yen-LIBOR quotes in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (ii) transmitting or causing to be transmitted false and artificial Yen-LIBOR quotes that were relied on by Thomson Reuters and the BBA in collecting, calculating, publishing and/or disseminating the daily Yen-LIBOR submissions of each Defendant and the daily Yen-LIBOR fix that were transmitted, published and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; (iii) coordinating their daily Yen-LIBOR submissions and their Yen-LIBOR-based derivatives trading positions in electronic chats routed through electronic servers located in the United States; (iv) sending trade confirmations based on manipulated Yen-LIBOR rates to counterparties in the United States; (v) executing sham transactions, including wash trades, through inter-dealer brokers; and (iv) collecting ill-gotten proceeds from customer accounts located in the United States as a result of Defendants' unlawful conduct, including Plaintiffs

401

HCMF, JMOF, and CalSTRS.  In total, this conduct constituted thousands of predicate acts of wire fraud.

1024.   It is clear that even though the BBA may be a foreign entity, the elements of the wire fraud were completed in the United States. This is evidenced by many phone conversations, electronic chats, electronic mail made from the Defendants in the United States and false wire submissions to Thomson Reuters in New York.  In addition to phone conversations, Defendants would routinely communicate using Bloomberg chat terminals and in internal electronic messaging systems to discuss and receive preferential Yen-LIBOR requests and their Yen-LIBOR-based derivatives trading positions.  Defendants also used electronic Bloomberg chats to communicate information regarding their trading positions and to coordinate their false Yen-LIBOR submissions during the Class Period.

1025.   For example, at least some of the electronic chats between Defendants' traders and brokers below were transmitted through servers located in the United States.  As part of its factual basis for its Plea Agreement with the DOJ, Defendant UBS Japan admitted as "true and accurate" that "on or about February 25, 2009, a derivatives trader employed by UBSSJ [UBS Japan] (referred to as 'Trader-1') engaged in an electronic chat with an employee of an inter-dealer broker (referred to as 'Broker-B').  During the chat, Trader-1 asked Broker-B to help influence Yen-LIBOR submitters at other banks to contribute submissions that would benefit Trader-1's trading positions.  In response, Broker-B indicated that he would do so.  The chat was transmitted through, among other locations and facilities, a UBS server located in Stamford, Connecticut.  Following the chat, Broker-B spoke by telephone with a Yen-LIBOR submitter at a bank other than UBS (referred to as Submitter-F at Bank-F).  During that call, Broker-B asked Submitter-F to alter the submitter's contribution for Yen-LIBOR for a particular maturity (or

"tenor") in a manner that was consistent with Trader-1's request to Broker-B. Submitter-F acceded to Broker-B's request by changing the Yen-LIBOR contribution from Bank-F in that tenor. Bank-F's LIBOR submissions were then transmitted to Thomson Reuters, which calculated and published the daily LIBOR rates and transmitted those rates electronically to locations around the world. As a result of the change in Bank F's submission that occurred because of these events, a published Yen LIBOR was affected."

1026.   The common purpose of the enterprise was simple: profiteering. By engaging in the predicate acts alleged including, but not limited to, transmitting or causing false and artificial Yen-LIBOR submissions to be transmitted to Thomson Reuters as agent for the BBA, and by exchanging Yen-LIBOR-based derivatives positions and prices, Defendants affected the prices of Yen-LIBOR-based derivatives, rendering them artificial. This directly resulted in Defendants reaping hundreds of millions, if not billions, in illicit trading profits on their Yen-LIBOR-based derivative positions that Defendants collected from customer accounts located in the United States.

1027.   Defendants acknowledged the profitability of this scheme on multiple occasions. For example, in an electronic chat on August 20, 2007, an RBS Senior Yen Trader commented "its just amazing how libor fixing can make you that much money." Moreover, while traders benefited through increased commissions, Broker Defendants were paid handsomely in the form of bribes and other illicit and illegitimate compensation by UBS traders which sometimes included regular bonuses and bigger salary packages. In one exchange on September 18, 2008, a UBS Trader wrote to a broker employed by Broker Co-conspirator R.P. Martin that "if you keep 6s [six-month Yen-LIBOR] unchanged today. . . .**I will f\*\*\*ing do one humungous deal with you….Like a 50,000 buck deal, whatever….I need you to keep it as low as**

403

possible....if you do that....I'll pay you, you know, 50,000 dollars, 100,000

dollars....whatever you want. All right."

### Defendants Have Conducted the Affairs of an Enterprise Through a Pattern of Racketeering Activity

1028.   Defendants each committed far more than two predicate acts of wire fraud.  As

alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

1. The transmission of false Yen-LIBOR Rates to Thomson Reuters in the United States, for further dissemination;

2. Causing the transmission and dissemination in the United States of false Yen-LIBOR "Fix" by Thomson Reuters as agent for the BBA;

3. Causing the transmission and dissemination in the United States of false Yen-LIBOR Individual Bank Quotes by Thomson Reuters;

4. Electronic communications and instant messages that emanated from within the United States or were routed through United States electronic servers with manipulative requests, broker false run thrus and suggested LIBORs; and

5. Sending trade confirmations (e-mail, message, telephonic, facsimile) based on manipulated and false Yen-LIBOR rates to counterparties in the United States; and

6. Collecting overcharges from customers to Yen-LIBOR-based derivatives from accounts located in the United States as a direct result of Defendants' unlawful conduct.

1029.   The conduct of every party involved in the scheme is not an isolated occurrence.

The pattern of racketeering activity herein alleged involved not isolated occurrences but

constituted related acts which amounted to a threat of continued criminal activity throughout the

Class Period.  Each Defendant shared a common purpose in increasing their profits from trading

financial instruments priced, benchmarked, settled to or otherwise affected by Yen-LIBOR, and

also had a common method of conducting the affairs of the enterprise through a pattern of

racketeering activity through use of the wires in transmitting false Yen-LIBOR reports and

placing trades in conformity therewith, and collecting proceeds from this misconduct from customer accounts.

1030.   Defendants acted in a uniform way to conduct the affairs of the enterprise through daily submission and electronic communication of their collusive and artificial Yen-LIBOR submissions to the BBA and Thomson Reuters following uniform procedures used in virtually an identical way every day. As alleged herein, the predicate acts had a closed-ended continuity involving a closed period of repeated conduct in colluding to set Yen- LIBOR, reporting false Yen-LIBOR, and trading to benefit therefrom, throughout the Class Period.

## The Pattern of Racketeering Activity Was Directed to, and Did Affect, Interstate Commerce

1031.   Through the racketeering scheme described above, Defendants conducted the affairs of the enterprise through a pattern of activity to illegally increase their profits to the detriment of investors in Yen-LIBOR-based derivatives residing throughout the United States, and/or transacting in Yen-LIBOR-based derivatives within the United States.

1032.   Plaintiffs' allegations herein arise out of, and are based on, Defendants' use of the Internet and/or the wires across state lines as well as agreements between entities in different states to manipulate Yen-LIBOR and the price of Yen-LIBOR-based derivatives. Using those interstate channels to coordinate the scheme and transmit fraudulent statements to Plaintiffs and collect ill-gotten payments from Plaintiffs across state lines satisfies RICO's requirement of an effect on interstate commerce. Defendants' racketeering acts had a direct effect on interstate commerce.

1033.   The primary purpose of Defendants' racketeering activity was to benefit the Defendants' derivatives trading positions, including the positions that the Defendants established in the United States regularly throughout the Class Period.

1034.   In addition, as part of its Plea Agreement, UBS Japan admitted as "true and accurate" that it "entered into interest rate derivatives transactions tied to Yen LIBOR - such as derivatives, forward rate agreements, and futures - with counterparties to those transactions. Many of those counterparties were located in the United States.  Those United States counterparties included, among others, asset management corporations, mortgage and loan corporations, and insurance companies.  Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States."

1035.   During the Class Period, numerous instant message chats and emails between UBS Senior Yen Trader Hayes and the Broker Defendants wherein Hayes requested the Broker help influence Yen-LIBOR Submitters to benefit the Trader's trading positions were transmitted through servers located in Stamford, Connecticut or New York, New York.[379]

1036.   Therefore, Plaintiffs' allegations satisfy RICO's "interstate commerce" element because the racketeering claims alleged herein arise out of, and are based on, Defendants' use of the internet or the wires across state lines as well as agreements between entities in different states to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.  Using those interstate channels to coordinate the scheme and transmit fraudulent statements to Plaintiffs across state lines satisfies RICO's requirement of an effect on interstate commerce.

**Plaintiffs Suffered Injury Proximately Caused By the Pattern of Racketeering Activity**

1037.   As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct.  Plaintiffs and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed depriving

---

[379] *See, e.g.*, Ex. A-4.

Plaintiffs and the Class of their money relative to their Yen-LIBOR-based derivatives contracts was the very purpose of the Defendants' scheme.

1038.   Plaintiffs and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

1039.   As a direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## THIRD CLAIM FOR RELIEF

**For Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act (RICO)**

**18 U.S.C. §§ 1961 *et seq.***

**Against All Defendants**

1040.   Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

1041.   In addition to conducting the affairs of the enterprise through a pattern of racketeering activity, Defendants conspired to violate RICO in violation of 18 U.S.C. § 1962(d).

1042.   Defendants organized and implemented the scheme alleged herein, which required their agreement to report their borrowing rates falsely and to benefit their trading positions, and ensured that it continued uninterrupted, by concealing their violations and the prices of Yen-LIBOR-based derivatives from Plaintiffs and the Class.

1043.   Defendants knew and intended that their racketeering acts would injure participants in the Yen-LIBOR-based derivatives market, yet each Defendant remained a participant despite the racketeering nature of their conduct.  At any point while the scheme had been in place, any of the participants could have ended the scheme by abandoning the conspiracy

and notifying the public and law enforcement authorities of its existence.  Rather than stopping

the scheme, however, the Defendants chose to continue it, to the direct detriment of participants

in the U.S. Yen-LIBOR-based derivatives market, such as Plaintiffs and members of the Class.

1044.   As alleged herein, Plaintiffs and members of the Class are direct victims of

Defendants' wrongful and unlawful conduct.  Plaintiffs' and the Class' injuries to their property

were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy;

indeed, such effects were precisely the reason why the scheme was concocted.

1045.   Plaintiffs and members of the Class are entitled to recover treble the damages they

have sustained, according to proof, as well as restitution and costs of suit and reasonable

attorneys' fees in accordance with 18 U.S.C. § 1964(c).

1046.   As a direct and proximate result of the racketeering activities alleged herein,

Plaintiffs and members of the Class are entitled to an Order, in accordance with 18 U.S.C. §

1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## FOURTH CLAIM FOR RELIEF

### For Unjust Enrichment

### Against Contributor Bank Defendants

1047.   Plaintiffs incorporate by reference and re-allege the preceding allegations, as

though fully set forth herein.

1048.   To the extent required, this claim is pled in the alternative to Plaintiffs' Seventh

Claim for Relief under FED. R. CIV. P. 8(d).

1049.   The Contributor Bank Defendants, individually, and/or through their subsidiaries

or affiliates traded Yen-LIBOR-based derivatives at a time the Contributor Bank Defendants

were actively and systematically manipulating Yen-LIBOR and the prices of Yen-LIBOR-based

derivatives to artificial and anticompetitive levels for their own illicit financial benefit to the detriment of Plaintiffs and Class Members.

1050.   The Contributor Bank Defendants, and/or one or more their subsidiaries and/or affiliates, financially benefited from the unlawful manipulation.  As alleged herein, Contributor Bank Defendants, among other things, intentionally and systematically manipulated Yen-LIBOR to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) in ill-gotten trading profits on Yen-LIBOR-based derivative contracts held by them and other colluding banks, the prices of which (and thus illicit profits) were benchmarked, traded, settled, and priced to such Yen-LIBOR rates.  In this regard, for example, Yen-LIBOR submitters at the Contributor Bank Defendants, among other things, regularly and improperly coordinated and changed their Yen-LIBOR submissions with one another at the request of Contributor Bank Defendants' interest rate derivatives traders employed by them or their subsidiaries or affiliates. These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact in Yen-LIBOR-based derivatives at artificial and manipulated prices.

1051.   Plaintiff HCMF transacted Yen-LIBOR-based derivatives during the Class Period directly with Contributor Bank Defendants, including Defendants Barclays and Merrill Lynch. *See* Part VII.B, *supra*.

1052.   Plaintiff CalSTRS transacted Yen-LIBOR-based derivatives with Defendants UBS, RBS, Barclays, Bank of America, and Société Générale.  *See* Part VII.C, *supra*.

1053.   It is unjust and inequitable for Contributor Bank Defendants (and/or their subsidiaries or affiliates) to have enriched themselves in this manner at the expense of Plaintiffs Hayman Capital, CalSTRS and similarly situated members of the Class, and the circumstances

are such that equity and good conscience require the Contributor Bank Defendants to make restitution.

1054.   Each Contributor Bank Defendant should pay restitution or its own unjust enrichment to Plaintiffs HCMF, JMOF, CalSTRS, and similarly situated members of the Class.

## FIFTH CLAIM FOR RELIEF

### For Breach of The Implied Covenant of Good Faith and Fair Dealing

### Against Defendants Barclays, Bank of America, Merrill Lynch, UBS, RBS, and Société Générale

1055.   Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

1056.   To the extent required, this claim is pled in the alternative to Plaintiffs' Sixth Claim for Relief under FED. R. CIV. P. 8(d).

1057.   Plaintiffs JMOF and HCMF entered into binding and enforceable contracts with Defendants Barclays and Merrill Lynch in connection with Yen-LIBOR-based derivatives, for example, Yen-LIBOR-based interest rate swaps and options.  *See* Part VII.B, *supra*.

1058.   Plaintiff CalSTRS entered into binding and enforceable contracts with Defendants UBS, RBS, Barclays, Bank of America, and Société Générale, for example, Yen foreign exchange forwards.  *See* Part VII.C, *supra*.

1059.   Each of the contracts includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

1060.   Defendants Barclays, Merrill Lynch, Bank of America, UBS, RBS, and Société Générale breached this duty and, without reasonable basis and with improper motive, acted in

bad faith by, among other things, (i) intentionally submitting false and artificial Yen-LIBOR submissions to the BBA for the express purpose of obtaining ill-gotten profits from their Yen-LIBOR-based derivatives positions; and/or (ii) colluding directly with employees at other Contributor Panel Banks, either directly or through brokers, in order to manipulate Yen-LIBOR and the prices of Yen-LIBOR-based derivatives.

1061.   As a direct and proximate cause of these breaches of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purposes of these contracts, Plaintiffs HCMF, JMOF, CalSTRS, and similarly situated members of the Class, have been damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs demand relief as follows:

A.      For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives, and their counsel be appointed as Class counsel;

B.      For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

C.      For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful enterprise in violation of RICO;

D.      For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, to be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

411

E.      For a judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the federal antitrust laws and RICO, in an amount to be trebled in accordance with such laws;

F.      For a judgment awarding Plaintiffs and the Class restitution of any and all sums received by the Contributor Bank Defendants' unjust enrichment;

G.      For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

H.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: August 24, 2020
White Plains, New York

LOWEY DANNENBERG, P.C.

By: */s/Vincent Briganti*
    Vincent Briganti
    Geoffrey M. Horn
    Peter D. St. Phillip
    Raymond Girnys
    Christian Levis
    Roland R. St. Louis, III
    44 South Broadway, 11th Floor
    White Plains, New York 10601
    Telephone: (914) 997-0500
    vbriganti@lowey.com
    ghorn@lowey.com
    pstphillip@lowey.com
    rgirnys@lowey.com
    clevis@lowey.com
    rstlouis@lowey.com

    *Counsel for Plaintiffs*

    Joseph J. Tabacco, Jr. (JT-1994)
    Todd A. Seaver
    **BERMAN TABACCO**

412

44 Montgomery Street Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6282
jtabacco@bermantabacco.com
tseaver@bermantabacco.com

Patrick T. Egan (PE-6812)
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
pegan@bermantabacco.com

*Additional Counsel for Plaintiffs*