# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FUND LIQUIDATION HOLDINGS LLC, as assignee and successor-in-interest to Sonterra Capital Master Fund, Ltd., HAYMAN CAPITAL MASTER FUND, L.P., JAPAN MACRO OPPORTUNITIES MASTER FUND, L.P., and CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

UBS AG, UBS SECURITIES JAPAN CO. LTD., SOCIÉTÉ GÉNÉRALE S.A., NATWEST GROUP PLC, NATWEST MARKETS PLC, NATWEST MARKETS SECURITIES JAPAN LTD., NATWEST MARKETS SECURITIES, INC., BARCLAYS BANK PLC, BARCLAYS PLC, COÖPERATIEVE RABOBANK U.A., LLOYDS BANKING GROUP PLC, LLOYDS BANK PLC, NEX INTERNATIONAL LIMITED, ICAP EUROPE LIMITED, TP ICAP PLC, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., MERRILL LYNCH INTERNATIONAL, AND JOHN DOE NOS. 1-50,

Defendants.

Docket No. 15-cv-5844-GBD

Hon. George B. Daniels

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION ..............................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..........................................................3

ARGUMENT.......................................................................................................................5

I.   THIS COURT HAS, AND HAS ALWAYS HAD, SUBJECT MATTER JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS.................................................................................................5

   A.   This Court Has Subject Matter Jurisdiction Over CalSTRS' Claims.................7

   B.   This Court Has, and Has Always Had, Subject Matter Jurisdiction Over the Hayman Funds' Claims Despite the Fact that the Initial Complaint Was Filed in the Name of Their Investment Advisor............................................................8

   C.   The History of FLH's Pleading in the Name of Sonterra................................11

   D.   Sonterra's Dissolution Has No Impact on the Court's Subject Matter Jurisdiction. .....................................................................................................12

II.  ALL OF PLAINTIFFS' CLAIMS ARE TIMELY ........................................................17

   A.   This Action Was Initiated Within the Relevant Limitations Period for Each Claim. ..............................................................................................................17

   B.   Each Plaintiff's Claims Are Timely. ...............................................................20

   C.   The SAC Adequately Pleads Fraudulent Concealment as to All Claims. .......24

   D.   Plaintiffs' Sherman Act Claims Were Also Tolled Under 15 U.S.C. § 16(i)...26

III. PLAINTIFFS PLEAD A PLAUSIBLE PRICE-FIXING CLAIM BASED ON U.S. TRANSACTIONS IN YEN-LIBOR-BASED DERIVATIVES ...............................28

   A.   Defendants' Disregard of the Applicable Standard of Review Compels Denial of their Rule 12(b)(6) Motion to Dismiss Plaintiffs' Antitrust Claim.. ...............28

   B.   Plaintiffs Sufficiently Plead Antitrust Standing. ..................................................28

   C.   Plaintiffs Plead A Plausible Price Fixing Conspiracy..........................................33

   D.   Plaintiffs Plead Circumstantial Evidence Sufficient to Support a Plausible Inference of Conspiracy.......................................................................................37

   E.   The FTAIA Does Not Bar Plaintiffs' Sherman Act Claims.............................41

IV.     PLAINTIFFS SUFFICIENTLY PLEAD PLAUSIBLE RICO CLAIMS BASED ON
        U.S. TRANSACTIONS IN YEN-LIBOR-BASED DERIVATIVES. .......................43

        A.      Plaintiffs Sufficiently Plead RICO Standing. ....................................................43

        B.      Plaintiffs Properly Plead Each Element of a RICO Claim. .............................44

        C.      Plaintiffs' RICO Claims Are Not Impermissibly Extraterritorial. ..................48

V.      PLAINTIFFS STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD
        FAITH AND FAIR DEALING. .............................................................................49

VI.     PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT. ...............................52

CONCLUSION ....................................................................................................................54

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ABN AMRO Bank, N.V. v. MBIA Inc.,*
    952 N.E.2d 463 (N.Y. 2011) ..................................................................................49

*Alaska Elec. Pension Fund v. Bank of Am. Corp.,*
    175 F. Supp. 3d 44 (S.D.N.Y. 2016) ...............................................................29, 32

*Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.,*
    463 F. Supp. 3d 409 (S.D.N.Y. 2020) .....................................................................39

*American Tobacco Co. v. U.S.,*
    328 U.S. 781 (1946) .................................................................................................28

*Amberger v. Legacy Capital Corp.,*
    No. 17-532, 2017 WL 4863093 (S.D.N.Y. Oct. 16, 2017) .....................................18

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012) ....................................................................................40

*Angermeir v. Cohen,*
    14 F. Supp. 3d 134 (S.D.N.Y. 2014) ................................................................46, 48

*Apex Oil Co. v. DiMauro,*
    822 F.2d 246 (2d Cir. 1987) ..............................................................................36, 39

*Apple Inc. v. Pepper,*
    139 S. Ct. 1514 (2019) ............................................................................................30

*Arandell Corp. v. Centerpoint Energy Servs. Inc.,*
    900 F.3d 623 (9th Cir. 2018) ...................................................................................31

*Baisch v. Gallina,*
    346 F.3d 366 (2d Cir. 2003) ....................................................................................47

*Bankers Trust Co. v. Rhoades,*
    859 F.2d 1096 (2d Cir. 1988) ..................................................................................18

*Bascuñán v. Elsaca,*
    927 F.3d 108 (2d Cir. 2019) ....................................................................................48

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................34

*BPP Ill., LLC v. Royal Bank of Scot. Group PLC,*
    603 F. App'x. 57 (2d Cir. 2015) ......................................................................26

*Brewer v. Hashim,*
    738 F. App'x 34 (2d Cir. 2018) ......................................................................17

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ......................................................................................13

*Carozza v. Boxley,*
    203 F. 673 (4th Cir. 1913) ...............................................................................9

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) .........................................................35

*China Agritech, Inc. v. Resh,*
    138 S. Ct. 1800 (2018) ....................................................................................22

*ChinaCast Educ. Corp. v. Chen Zhou Gou,*
    No. 15-0547, 2016 WL 10653269 (C.D. Cal. Jan. 8, 2016) ..........................14

*City of Philadelphia v. Bank of Am. Corp.,*
    No. 19-1608, 2020 WL 6430307 (S.D.N.Y. Nov. 2, 2020) ............................25

*Clarksons v. Doddridge,*
    55 Va. 42 (1857) ..............................................................................................9

*In re Commodity Exch., Inc. Gold Futures and Options Trading Litig.,*
    213 F. Supp. 3d 631 (S.D.N.Y. 2016) ................................... 29, 31, 32, 39

*Concord Assocs., L.P. v. Entm't Props. Tr.,*
    No. 12-1667, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016) .... 36, 37

*Conolly v. Taylor,*
    27 U.S. 556 (1829) ..........................................................................................10

*Contant v. Bank of Am. Corp.,*
    No. 17-cv-3139, 2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018) ......................39

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962) ..................................................................................28, 33

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984) ........................................................................................31

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.,*
    790 F.3d 411 (2d Cir. 2015) ...........................................................................21

*In re Crude Oil Commodity Futures Litig.,*
   913 F. Supp. 2d 41 (S.D.N.Y. 2012) ...................................................................17

*Dalton v. Educ. Testing Serv.,*
   87 N.Y.2d 384 (1995) .........................................................................................49

*In re DDAVP Indirect Purchaser Antitrust Litig.,*
   903 F. Supp. 2d 198 (S.D.N.Y. 2012) .................................................................53

*Dennis v. JPMorgan Chase & Co.,*
   343 F. Supp. 3d 122 (S.D.N.Y. 2018) ..........................................................*passim*

*Dennis v. JPMorgan Chase & Co.,*
   439 F. Supp. 3d 256 (S.D.N.Y. 2020) .................................................................53

*Digizip.com, Inc. v. Verizon Servs. Corp.,*
   139 F. Supp. 3d 670 (S.D.N.Y. 2015) .................................................................10

*DNAML Pty, Ltd. v. Apple Inc.,*
   No. 13-6516, 2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015) ...............................15

*E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.,*
   160 F.3d 925 (2d Cir. 1998) ................................................................................12

*Eastman Kodak Co. v. Camarata,*
   No. 05-6384, 2006 WL 3538944 (W.D.N.Y. Dec. 6, 2006) ................................53

*Eastman Kodak Co. v. Henry Bath LLC,*
   936 F.3d 86 (2d. Cir. 2019) ...........................................................................28, 30

*Elsevier Inc. v. W.H.P.R. Inc.,*
   692 F. Supp. 2d 297 (S.D.N.Y. 2010) .................................................................48

*Esposito v. United States,*
   368 F.3d 1271 (10th Cir. 2004) ...........................................................................13

*European Cmty. v. RJR Nabisco,*
   764 F.3d 129 (2d Cir. 2014) ................................................................................48

*In re European Gov't Bonds Antitrust Litig.,*
   No. 19-2601, 2020 WL 4273811 (S.D.N.Y. July 23, 2020) ...............19, 25, 31, 36

*FD Prop. Holding, Inc. v. U.S. Traffic Corp.,*
   206 F. Supp. 2d 362 (E.D.N.Y. 2002) .................................................................48

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
   No. 13-7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ..........................*passim*

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ................................................................. 41, 42

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018) ................................................................. 38, 45

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) ................................................................................*passim*

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.*,
   67 F.3d 463 (2d Cir. 1995) ................................................................................47

*Goldblatt v. NCUA*,
   502 F. App'x 53 (2d Cir. 2012) ................................................................................23

*Grupo Dataflux v. Atlas Global Grp., L.P.*,
   541 U.S. 567 (2004) ................................................................................10

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019) ................................................................. 18, 36

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989) ................................................................................47

*Hecht v. Commerce Clearing House Inc.*,
   897 F.2d 21 (2d Cir. 1990) ................................................................. 47, 48

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
   700 F. Supp. 2d 378 (S.D.N.Y. 2010) ................................................................................35

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
   885 F. Supp. 2d 617 (S.D.N.Y. 2012) ................................................................. 17, 27

*House v. Mitra QSR KNE LLC*,
   796 F. App'x 783 (4th Cir. 2019) ................................................................................13

*In re Interest Rate Swaps Antitrust Litig*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) ................................................................................37

*Indovino v. Tassinari*,
   No. 05-4167, 2006 WL 2505232 (E.D.N.Y. Aug. 28, 2006) ................................................26

*Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   340 F. Supp. 3d 285 (S.D.N.Y. 2018) ................................................................. 18, 36, 37

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
   924 F.3d 57 (2d Cir. 2019) ................................................................................30

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) .................................................................................................24

*Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*,
   906 F.3d 215 (2d Cir. 2018).....................................................................................21

*Korwek v. Hunt*,
   649 F. Supp. 1547 (S.D.N.Y. 1986).........................................................................22

*Korwek v. Hunt*,
   827 F.2d 874 (2d Cir. 1987).....................................................................................22

*Krupski v. Costa Crociere S.p.A.*,
   560 U.S. 538 (2010) .................................................................................................21

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12-03419, 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) ................................18

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
   744 F. App'x 710 (2d Cir. 2018) .............................................................................12

*Lerman v. Joyce Int'l, Inc.*,
   10 F.3d 106 (3d Cir. 1993).......................................................................................15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .................................................................................................31

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   962 F. Supp. 2d 606 (S.D.N.Y. 2013) .........................................................49, 50, 53

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   27 F. Supp. 3d 447 (S.D.N.Y 2014) ............................................................50, 51, 52

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   No. 11 MDL 2262, 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ....................51, 54

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   No. 11 MDL 2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015)...........................18

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
   213 F. Supp. 3d 530 (S.D.N.Y. 2016) ..............................................................*passim*

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
   332 F. Supp. 3d 885 (S.D.N.Y. 2018) .....................................................................19

*Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*,
   381 U.S. 311 (1965) .................................................................................................27

*Minn-Chem, Inc. v. Agrium Inc.,*
   683 F.3d 845 (7th Cir. 2012) ................................................................42

*In re Nasdaq Market-Makers Antitrust Litig.,*
   894 F. Supp. 703 (S.D.N.Y. 1995) .......................................................35

*Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs., Inc.,*
   420 F. Supp. 2d 253 (S.D.N.Y. 2006) ..................................................48

*New York v. Hendrickson Bros., Inc.,*
   840 F.2d 1065 (2d Cir. 1988) .........................................................24, 25

*Pappas v. Tzolis,*
   982 N.E.2d 576 (N.Y. 2012) .................................................................53

*Pasquantino v. U.S.,*
   544 U.S. 349 (2005) ..............................................................................48

*Paul v. Bank of America Corp.,*
   No. 09-1932, 2011 WL 684083 (E.D.N.Y. Feb. 16, 2011) ...................51

*Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.,*
   No. 08-0042, 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) ................35

*QS Holdco Inc. v. Bank of America Corp.,*
   No. 18-824, 2019 WL 3716443 (S.D.N.Y. Aug. 6, 2019) ................. 9, 10

*Richardson Greenshields Sec., Inc. v. Lau,*
   825 F.2d 647 (2d Cir. 1987) ..................................................................23

*RJR Nabisco, Inc. v. European Cmty.,*
   136 S. Ct. 2090 (2016) ...........................................................................48

*Ross v. Am. Exp. Co.,*
   35 F. Supp. 3d 407 (S.D.N.Y. 2014) ....................................................36

*In re Sadia, S.A. Sec. Litig.,*
   269 F.R.D. 298 (S.D.N.Y. 2010) ..........................................................39

*S.E.C. v. Wyly,*
   788 F. Supp. 2d 92 (S.D.N.Y. 2011) ....................................................24

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y,*
   769 F.3d 807 (2d Cir. 2014) ..................................................................50

*Sedima, S.P.R.L. v. Imrex Co.,*
   473 U.S. 479 (1985) ..............................................................................44

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) ............................................................................25

*Slayton v. Am. Exp. Co.*,
   460 F.3d 215 (2d Cir. 2006) ...........................................................................18

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp.*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017) .....................................................*passim*

*Sonterra Capital Master Fund Ltd. v. UBS AG*,
   954 F.3d 529 (2d Cir. 2020) ..................................................................... 4, 29

*Sonterra Capital Master Fund, Ltd. v. UBS AG*,
   2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017) .................................................4

*Spool v. World Child Intern. Adoption Agency*,
   520 F.3d 178 (2d Cir. 2008) ...........................................................................47

*In re SSA Bonds Antitrust Litig.*,
   420 F. Supp. 3d 219 (S.D.N.Y. 2019) ...........................................................35

*In re SSA Bonds Antitrust Litig.*,
   No. 16-3711, 2020 WL 1445783 (S.D.N.Y. Mar. 25, 2020) ..........................37

*Starr v. Sony BMG Music Entm't.*,
   592 F.3d 314 (2d Cir. 2010) ...........................................................................40

*Sullivan v. Barclays PLC*
   No. 13-CV-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ...........*passim*

*Thyroff v. Nationwide Mut. Ins. Co.*,
   460 F.3d 400 (2d Cir. 2006) ...........................................................................50

*TI Inv. Servs., LLC v. Microsoft Corp.*,
   23 F. Supp. 3d 451 (D.N.J. 2014) ..................................................................35

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) .........................................................................38

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010) ...................................................................40

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ...........................................................................28

*United States ex rel. Rubar v. Hayner Hoyt Corp.*,
   306 F. Supp. 3d 478 (N.D.N.Y. 2018) ...........................................................22

*United States v. Autuori,*
   212 F.3d 105 (2d Cir. 2000).................................................................................44, 49

*United States v. Hayes,*
   99 F. Supp. 3d 409 (S.D.N.Y. 2015) ....................................................................49

*United States v. Hayes,*
   118 F. Supp. 3d 620 (S.D.N.Y. 2015) ..................................................................49

*United States v. Kim,*
   246 F.3d 186 (2d Cir. 2001)...................................................................................48

*Walker v. Life Ins. Co. of Sw.,*
   No. 10-09198, 2018 WL 3816716 (C.D. Cal. July 31, 2018),
   *aff'd sub nom.,* 953 F.3d 624 (9th Cir. 2020) ......................................................22

*Waterman v. Canal- Louisiana  Bank & Trust Co.,*
   215 U.S. 33 (1909) .................................................................................................14

*Williams v. Affinion Grp., LLC,*
   889 F.3d 116 (2d Cir. 2018)...................................................................................44

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
   401 U.S. 321 (1971) ...............................................................................................27

**Statutes**

15 U.S.C. § 6a ..............................................................................................................42

15 U.S.C. § 15b ...........................................................................................................17

15 U.S.C. § 16(i) ......................................................................................................... 27

18 U.S.C. § 1962(c) .....................................................................................................44

18 U.S.C. § 1341 ..........................................................................................................44

18 U.S.C. § 1343 ..........................................................................................................44

Cal. Corp. Code § 2010(a)...........................................................................................13

N.Y. Bus. Corp. Law § 1006(a)....................................................................................13

**Rules**

Fed. R. Civ. P. 9 ..........................................................................................................12

Fed. R. Civ. P. 17(a)(3) .........................................................................................20, 21

**Other Authorities**

6A Wright & Miller Fed. Prac. & Proc. Civ. §1559 (3d ed. 2020). ...........................................................12

6 Sunderland, COMMON LAW PLEADING (Callaghan & Co., 1914). .........................................................9

ANTITRUST SECTION OF THE AMERICAN BAR ASS'N, PROVING ANTITRUST DAMAGES: LEGAL AND
ECONOMIC ISSUES (2d ed. 2010). ..........................................................................................................30

Plaintiffs respectfully submit this memorandum in opposition to Defendants' motion to dismiss the Second Amended Class Action Complaint ("SAC" or "¶") for lack of subject matter jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6) ("Defs.' Br.," ECF No. 525).

## INTRODUCTION

Defendants' long-standing conspiracy to fix the prices of Yen-LIBOR-based derivatives is well documented. Following criminal and civil investigations by regulators on three continents, ten Defendant banks and brokers have agreed to pay over *$7 billion* in criminal fines and civil penalties, including to the U.S. government, and five of Defendants' individual traders were convicted for their roles in the conspiracy. SAC ¶¶ 7-8, 36-41, 839, 843, 850. Plaintiffs' extensive allegations describe in great detail Defendants' agreement to fix the prices of Yen-LIBOR-based derivatives (summarized in ¶¶ 270-75), causing Plaintiffs to be overcharged and underpaid in their transactions in Yen-LIBOR-based derivatives. ¶¶ 910-54. As the United States Department of Justice put it, "[t]his was the ultimate inside job. [T]raders illegally influenced the very interest rate on which their trades were based, using fraud to gain an unfair advantage." ¶ 4.

Nevertheless, after years of litigation, several rounds of class action settlements, and their loss in the Second Circuit, a subset of Defendants remain and still seek to avoid discovery, which would surely lay bare the full extent of their misconduct. Less than half of Defendants' brief addresses the substance of Plaintiffs' claims—unsurprising, given that Defendants have already admitted to engaging in much of the misconduct alleged in the pleading. Instead, Defendants focus their energy on a hyper-technical theory of standing and what can only be a willful misunderstanding of Rule 17's relation back principles. Their efforts fail.

When they do get to the merits of Plaintiffs' legal and factual allegations, Defendants rely on stale law and improperly advance their own counterfactual version of events. For example, Defendants' argument that Plaintiffs that traded Yen-LIBOR-based derivatives directly with Defendants lack antitrust standing has been widely rejected by courts in this District. And contrary to Defendants' arguments, the Complaint's detailed factual allegations (taken from Defendants' own government settlements) easily pass the low bar to allege a plausible conspiracy.

Plaintiffs also state plausible RICO claims based on a pattern of predicate acts of *domestic* wire fraud. The Complaint explains how the Defendants used domestic wires to achieve the unlawful objective of their scheme in the United States—collecting supracompetitive profits on trades with unsuspecting investors in U.S. financial markets. These domestic predicate acts are an inseparable part of the alleged conspiracy in this case and directly caused Plaintiffs' injuries. No more is required to plausibly allege a domestic civil RICO claim.

Finally, Plaintiffs sufficiently plead claims for unjust enrichment and for breach of the implied covenant of good faith and fair dealing. Defendants claim that Plaintiffs have no basis for their unjust enrichment claim apart from their conspiracy allegations—in other words, apart from over four hundred pages of detailed descriptions of how Defendants worked together unlawfully to benefit themselves at Plaintiffs' expense. And while some of their transactions may have been governed generally by contracts, those contracts certainly did not encompass Defendants' unlawful manipulation of Yen-LIBOR. By contrast, the parties' contracts did entitle Plaintiffs to expect returns on their investments on the terms agreed to, not returns distorted by a surreptitiously manipulated Yen-LIBOR.

Defendants' attempt to escape liability on procedural grounds fare no better. *First*, this action is not and never has been a "legal nullity." The so-called "revelation" of Sonterra's dissolution (of which Defendants have been aware for years) has no relevance at all to CalSTRS' unquestionably valid

claims, or to those of the Hayman Funds that substituted into this action for their investment advisor

with Defendants' and this Court's consent. Nor does Sonterra's dissolution have any bearing on FLH's

ability to carry on this action that FLH initially filed in Sonterra's name in its own name instead.

*Second*, most of the Hayman Funds' and CalSTRS' claims are independently timely, filed within

the relevant limitations periods starting from the inquiry notice date that this Court has already

determined without even needing to relate back to this complaint's original filing. Further, any relevant

limitations periods were tolled as to CalSTRS by its September 2014 motion to intervene in the *Laydon*

action.

Defendants' motion should be denied in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

Having had this case on its docket since 2015, and the parallel *Laydon* action since 2012, this

Court is no doubt familiar with the basic workings of Defendants' conspiracy to manipulate Yen-

LIBOR in order to unlawfully profit from Yen-LIBOR-based derivatives transactions. A timeline of

the procedural history of the two actions follows:

| Date | Event |
|---|---|
| April 30, 2012 | Jeffrey Laydon filed a class action on April 30, 2012, alleging that Defendants' scheme injured him by impacting the value of his positions in exchange-traded Euroyen futures contracts. *Laydon v. Mizuho Bank, Ltd. et al.*, No. 1:12-cv-03419 (S.D.N.Y.) ("*Laydon Docket*"), ECF No. 1. |
| September 22, 2014 | Plaintiff California State Teachers' Retirement System ("CalSTRS") requested an opportunity to intervene in the *Laydon* action in order to assert claims concerning its transactions in Yen foreign exchange forwards priced based on Yen-LIBOR. *Laydon Docket*, ECF No. 387 at 1 n.2. |
| July 24, 2015 | Fund Liquidation Holdings LLC ("FLH") and Hayman Capital Management L.P. ("Hayman Capital") filed this action. FLH filed its claims in the name of the claims' original owner, Sonterra Capital Master Fund, Ltd. ("Sonterra"), an investment fund that assigned its claims to FLH |

| | |
|---|---|
| | four months prior to its dissolution in 2012. SAC ¶ 57. Hayman Capital Management L.P. filed the claims of two investment funds it operates, Plaintiffs Hayman Capital Master Fund, L.P. and Japan Macro Opportunities Master Fund, L.P. (collectively, "the Hayman Funds"), in its own name. SAC ¶ 52. |
| October 8, 2015 | The Court denied CalSTRS' application and recommended that CalSTRS file its claims in a separate action. *Laydon Docket*, ECF No. 529 at 5:18-20. CalSTRS then executed an agreement with Defendants tolling its claims against them until December 18, 2015. Defs.' Br. at 23. |
| December 18, 2015 | FLH (in the name of Sonterra), Hayman Capital, and CalSTRS filed the First Amended Complaint ("FAC"). ECF No. 121. |
| March 29, 2016 | The Court granted Plaintiffs' unopposed motion to substitute the Hayman Funds into the action as the real party in interest as to the claims initially filed in the name of Hayman Capital. ECF No. 217. |
| March 10, 2017 | The Court granted Defendants' motion to dismiss the FAC, holding that Plaintiffs failed to allege Article III standing to assert any claims. *Sonterra Capital Master Fund, Ltd. v. UBS AG*, 2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017). |
| April 1, 2020 | The Second Circuit reversed, holding that Plaintiffs sufficiently alleged that their interest rate swap, swaption, and foreign exchange forward transactions were impacted by Defendants' alleged manipulation of Yen-LIBOR, and remanding to this Court for further proceedings. *Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529 (2d Cir. 2020) ("*Sonterra Yen-LIBOR I*"). |
| August 24, 2020 | Plaintiffs filed the SAC. The SAC's allegations clarified FLH's role as the real party in interest underlying the claims initially filed in Sonterra's name and substituted FLH into the action as the proper Plaintiff as to those claims. SAC ¶¶ 55-60. |
| October 9, 2020 | Defendants moved to dismiss the SAC under for lack of subject matter jurisdiction, failure to state a claim, and lack of personal jurisdiction. ECF Nos. 505-27. |

## ARGUMENT

### I.   THIS COURT HAS, AND HAS ALWAYS HAD, SUBJECT MATTER JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS.

The SAC has three plaintiffs: CalSTRS, the Hayman Funds, and FLH. Defendants assert that this Court lacks subject matter jurisdiction over *any* of the three plaintiffs' claims, based solely on a pleading error by FLH in the original complaint that had nothing to do with CalSTRS or the Hayman Funds. Defendants are wrong.

CalSTRS—the world's largest educator-only pension fund—was injured when it transacted in Yen-LIBOR-based derivatives directly with Defendants. Its Sherman Act, RICO, and pendent state law claims are plainly within this Court's subject matter jurisdiction. It asserted those claims within all relevant statutes of limitations via its 2014 motion to intervene in *Laydon* and subsequent tolling agreement with Defendants. Indeed, this Court *invited* CalSTRS to file its own action upon denying its motion to intervene in *Laydon*. CalSTRS did just that. Now, Defendants complain there is no subject matter jurisdiction over CalSTRS' claims solely because CalSTRS joined an amended complaint in this action, rather than filing its own stand-alone complaint. But there is no reason whatsoever that the meaningless distinction between an amended complaint and a new one would change this Court's authority to hear CalSTRS' claims.

The Hayman Funds, too, were injured by transacting in Yen-LIBOR-based derivatives with Defendants. Their investment manager, Hayman Capital, initially brought this action on their behalf. Plaintiffs later sought to substitute the Hayman Funds themselves as plaintiffs in place of Hayman Capital under Rule 17. Defendants did not oppose this motion and the Court granted it. By the express text of Rule 17, following substitution, "the action proceed[ed] as if it were originally commenced by the real party in interest [the Hayman Funds]." None of that has anything to do with Sonterra or FLH. The Hayman Funds do not need any other plaintiff alongside them in the caption for this Court to have subject matter jurisdiction over their claims.

As for FLH, it has been a plaintiff in this action all along. FLH made the technical error of initiating this action in the name of Sonterra rather than in its own name. Sonterra was an investment fund that was injured when transacting in Yen-LIBOR-based derivatives. It assigned its claims arising out of those transactions to FLH, and subsequently dissolved. As the SAC describes, FLH realized that because it is the owner of Sonterra's claims (the "real party in interest" per Rule 17), it should bring this action in its own name rather than in Sonterra's name, and it has now done so. The question of whether FLH may substitute as plaintiff for its assignor, Sonterra, is now squarely before the Second Circuit and has been fully briefed and argued. In *Fund Liquidation Holdings LLC v. Bank of America Corp.*, No. 19-2719 (2d Cir.) ("*SIBOR*"), Defendants contend (just as they do here) that the fact of Sonterra's dissolution and/or its assignment of claims to FLH makes the action a "legal nullity" from its inception.[1] The metaphysical, formalistic "legal nullity" theory posits that where named plaintiffs lack "standing," no other plaintiff can be joined to the case via substitution or amendment, because no case ever actually "existed" in the first instance, and thus there is nothing to join. FLH's briefing in *SIBOR* explains in exhaustive detail that there is no "legal nullity" doctrine in this Circuit and that neither Sonterra's dissolution nor its assignment of claims make substitution of FLH impossible or inappropriate. Plaintiffs respond to Defendants' arguments here as well for the Court's convenience. More importantly, though, Plaintiffs here show how illogical it would be to connect any possible deficiencies in FLH's claims with those of CalSTRS and the Hayman Funds, as Defendants urge this Court to do.

---

[1] Notably, the other district court cases on this topic on which Defendants heavily rely (*CHF LIBOR* and *GBP LIBOR*,) are also on appeal at the Second Circuit and are held in abeyance pending the outcome of *SIBOR*.

**A.  This Court Has Subject Matter Jurisdiction Over CalSTRS' Claims.**

Defendants tack their throwaway argument about CalSTRS to the end of this portion of their briefing. They say little more than "see our arguments above regarding Sonterra/FLH," because there is nothing else to say. They have no independent argument as to why this Court would lack subject matter jurisdiction over CalSTRS' claims. As described above, no one disputes that this Court would have subject matter jurisdiction over CalSTRS' claims had CalSTRS raised those claims in its own stand-alone complaint. Similarly, if the Court had denied CalSTRS' motion to intervene in *Laydon* prior to July 2015, CalSTRS would have been on the original complaint in this action. No one disputes that the Court would have subject matter jurisdiction over CalSTRS' claims in that instance, either.[2] Even if this Court considered both FLH's and the Hayman Funds' claims to be "nullities" (which, of course, it should not), dismissing *CalSTRS'* claims simply because CalSTRS joined an amended complaint rather than opening a new docket number would be the height of pointless formalism. It cannot be that this Court's constitutional authority to hear CalSTRS' claims turns on the random happenstance of when the Court chose to rule on CalSTRS' motion to intervene, or on whether CalSTRS purchased its own docket number to commence a separate action rather than joining this one. If the law were truly as arbitrary as Defendants contend, plaintiffs would always elect to file their own stand-alone lawsuits (however duplicative and inefficient that choice might be) rather than to join an existing lawsuit, for fear that subject matter jurisdiction for the earlier plaintiffs' claims might be found wanting and their own claims vitiated as a result. Defendants' mantra "parties cannot create subject matter jurisdiction where it does not exist" is exactly backwards. Plaintiffs do not claim that CalSTRS' joinder somehow "created" subject matter jurisdiction for any party other than itself. Our point is simply that even if, contrary to reality, subject matter jurisdiction over FLH's and the Hayman Funds' claims were

---

[2] Indeed, in that scenario Defendants would be unable to make their "legal nullity" arguments as to *any* of the three plaintiffs, demonstrating how very arbitrary the "legal nullity" theory is.

lacking, the mere fact of CalSTRS' joinder does not *take away* this Court's subject matter jurisdiction over CalSTRS' claims.

### B. This Court Has, and Has Always Had, Subject Matter Jurisdiction Over the Hayman Funds' Claims Despite the Fact that the Initial Complaint Was Filed in the Name of Their Investment Advisor.

Defendants know perfectly well how Rule 17 works. They demonstrated as much when they consented to the substitution of the Hayman Funds for Hayman Capital. The original complaint was brought in the name of Hayman Capital, an investment advisor to the Hayman Funds that transacted in Yen-LIBOR-based derivatives pursuant to their ISDA Master Agreements with certain Defendants. *See* ECF No. 1, ¶ 53 (Hayman Capital is "an investment advisor incorporated in Delaware with its principal place of business in Dallas, Texas, brings claims on behalf of the investment funds it advises.") The funds themselves, the real parties in interest (who made the relevant transactions and were injured as a result) sought to substitute for the advisor that had brought the action on their behalf. Nothing else changed in the action—not the facts, not the claims, just the names on the caption. *See* ECF No. 217. Defendants accepted the substitution without raising any jurisdictional objections, as a perfectly straightforward procedural matter of correcting a minor pleading error that had no impact on them one way or the other.

Now, in a spectacular display of chutzpah, Defendants claim that they only consented to that substitution because they believed that Sonterra was a proper plaintiff. Following the "revelation" of Sonterra's pre-suit dissolution, they realized that neither initial plaintiff had "standing" and concluded that the suit was incurably jurisdictionally defective. In other words, Defendants' position is that Rule 17 may only constitutionally be used to substitute when there happens to be a second, non-defective plaintiff in the case alongside the non-real-party-in-interest. The trouble is that Rule 17 says no such thing.

The history of common law pleading practice sheds light on the development of Rule 17. At common law, plaintiffs regularly pled cases in the name of the originally injured party rather than the current owner of the claim, often without even disclosing that they were doing so. *See, e.g.*, Sunderland, COMMON LAW PLEADING 731 n.77 (Callaghan & Co., 1914) ("*Record need not disclose real plaintiff.*"); *Carozza v. Boxley*, 203 F. 673, 677 (4th Cir. 1913) ("[S]uit may be brought in one of three ways—in the name of the original obligee or payee, in his name for the use of the assignee, or in the name of the assignee alone."); *Clarksons v. Doddridge*, 55 Va. 42, 46 (1857) ("It is usual, when an action is brought in the name of one person for the use of another, to state the fact . . . . And it is useful and convenient to do so . . . . But this is not necessary. The statement is no material part of the pleadings. *The cause of action is complete without it.*") (emphasis added). All that mattered for Article III purposes was whether the court had jurisdiction over the *claim* itself, not the name on the caption or who ultimately received any money that might be recovered.

The same is true now. The modern Rule 17 was enacted simply to standardize pleadings and prevent duplicative lawsuits, not to declare the earlier practice unconstitutional. In *QS Holdco Inc. v. Bank of America Corp.*, No. 18-824, 2019 WL 3716443 (S.D.N.Y. Aug. 6, 2019), the defendants moved to dismiss a suit brought in the name of an assignor for lack of subject matter jurisdiction on the same basis as Defendants here, *i.e.* that "because Plaintiff 'does not own' the claims alleged in the Complaint, it lacks standing to assert them." *Id.* at *2. The assignor was the sole plaintiff and was therefore unable to rely on subject matter jurisdiction provided by another. *See id.* Nonetheless, Judge Sullivan decisively rejected the defendants' theory. He explained that "[t]he real party in interest principle codified in Rule 17 … is actually about *prudential* standing, which does not implicate federal jurisdiction under Article III, but rather ensures that an assignor and assignee are not both bringing the same action." *Id.* at *3 (emphasis added). Directly contradicting Defendants' argument here, Judge Sullivan continued: "Article III standing is not implicated when 'the only real concern with respect to standing is whether

the plaintiff was the proper owner of [the] claims at the time it brought this suit.'" *Id.* (quoting *Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 679 (S.D.N.Y. 2015)) (alterations omitted). This is plain on the face of Rule 17 itself. Not only is a pleading in the name of a non-real party in interest not a "nullity," it is so minor a defect that the district court does not even have the *discretion* to dismiss a case on that ground without providing an opportunity to substitute, and relating the cured pleading back in time to the original one.

The idea that a change in parties can cure a complaint facially defective in subject matter jurisdiction is far from new. In *Conolly v. Taylor*, 27 U.S. 556 (1829), the Supreme Court held that a diversity suit that included a non-diverse party could be cured, retroactively, by dropping that party long after the suit had been filed. Notably, the Court *conceded* that there had been no diversity jurisdiction at the outset, and that "jurisdiction depends on the state of the parties at the commencement of the suit." *Id.* at 565. But the Court held that rule applicable only "[w]here there is no *change of party*," *id.* (emphasis added)—an approach to the time-of-filing rule for assessing jurisdiction that the Court has recently reinforced. *See Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 572–75 (2004). *Conolly* thus permitted a retroactive change of the named parties on the same claims to save a suit that was outside the court's subject matter jurisdiction at inception. Defendants' citations to cases about intervention are irrelevant. An intervention involves the addition of a new plaintiff *with its own, separate claim.* A substitution of the real party in interest, by contrast, changes the party name on the *same* claim. Regardless of whether the caption says Hayman Capital Management or Hayman Capital Master Fund, the claim here is and always has been for injury sustained by Hayman Capital Master Fund when it transacted in Yen-LIBOR-based derivatives. This Court unquestionably has subject matter jurisdiction over that claim. The notion that Defendants can now disavow their consent to the Hayman substitution and label the entire action a "nullity" simply because the complaint now mentions Sonterra's dissolution borders on the frivolous. Even if FLH could not substitute for

Sonterra, that would have no impact on the Hayman Funds' claims. The very purpose of Rule 17 is to permit the substitution of a party that does own the claim for an initial plaintiff that does not, regardless of whether other plaintiffs are in the case.

### C. The History of FLH's Pleading in the Name of Sonterra.

Before turning to the substance of why FLH owns Sonterra's claim and may substitute for Sonterra as plaintiff, it is worth clarifying the factual record of how the initial pleading in Sonterra's name came to be. Defendants (with no factual support) accuse Plaintiffs of fabricating their allegation in the SAC that FLH initially commenced this action in Sonterra's name believing that to be the proper course of action, and subsequently realized that had been an error. *See* Defs.' Br. at 13; SAC ¶ 60. But they do not even attempt to speculate as to what possible advantage Plaintiffs could have gained by doing such a thing. There is none.

FLH purchased Sonterra's assets (including its claims) via an Asset Purchase Agreement ("APA") in August 2012. At that time, Sonterra was still a going concern. Several years later, FLH retained Lowey Dannenberg to file these claims. The APA, in addition to conveying full ownership of Sonterra's claims to FLH, also contained a power of attorney enabling FLH to act in Sonterra's "name, place and stead." So FLH directed its counsel to do just that, and to file these claims in Sonterra's name—the proper course of action for the holder of a power of attorney under Cayman law. Neither FLH nor its counsel was aware at this time of Sonterra's dissolution. Sonterra's corporate status was (and is) immaterial to FLH, the actual client and the owner of the claims. In 2017, FLH's counsel learned of Sonterra's dissolution. Contrary to Defendants' implication, it was FLH's own counsel— not Defendants—who first brought the dissolution to light by changing the relevant allegation when the time came to amend their complaint in another case that FLH had filed in Sonterra's name against many of the Defendants here. By that point, this Court had already dismissed this action on other grounds, such that there was no amended complaint or other notice to file in this case. Defendants,

however, were aware of Sonterra's dissolution and expressly referred to it in their briefing on Plaintiffs'

appeal of this Court's dismissal.

In short, there was nothing clandestine or strategic underlying the changes in FLH's pleadings.

There were two simple mistakes: one regarding Sonterra's corporate status, and one regarding the

propriety of FLH's bringing the action in Sonterra's name rather than its own. Plaintiffs sought to

cure both mistakes as soon as they became aware of them. Defendants complain that the SAC does

not contain more detailed allegations recounting this history. *See* Defs.' Br. at 13. The reason is simply

that it is totally irrelevant. Plaintiffs recount it here only to clarify matters for the Court and to respond

to Defendants' unwarranted accusation of dishonesty.

### D. Sonterra's Dissolution Has No Impact on the Court's Subject Matter Jurisdiction.

Defendants' unsupported statement that "a dissolved corporation has no stake in a litigation

and, thus, lacks the standing necessary to invoke Article III" (Defs.' Br. at 10) is simply wrong.

Whether a dissolved corporation has the *capacity* to sue is a question of the applicable state law, as

Defendants themselves implicitly concede by citing Cayman law on this point.[3] Many states—New

York, for example—do indeed permit suits by dissolved corporations. And they can do this without

running afoul of the Constitution because capacity is not an Article III question. *See LBBW Luxemburg*

*S.A. v. Wells Fargo Sec. LLC*, 744 F. App'x 710, 714 n.3 (2d Cir. 2018) (summary order) ("Capacity to

sue is . . . conceptually distinct from the question of standing" and is "not a jurisdictional issue.")

(internal quotation marks omitted). Lack of capacity to sue is just an affirmative defense, one that can

be (and often is) waived with no impact on subject matter jurisdiction. *See* Fed. R. Civ. P. 9; *E.R.*

*Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 936 (2d Cir. 1998); 6A Wright & Miller

Fed. Prac. & Proc. Civ. §1559 (3d ed. 2020).

---

[3] Sonterra was incorporated under Cayman law. SAC ¶ 55.

Realizing this, Defendants attempt to manufacture a distinction between a corporation that lacks capacity to sue for some other reason, and one that lacks capacity specifically because it has dissolved and no longer "exists," citing an unpublished Fourth Circuit decision denying substitution for a deceased natural person. *See* Defs.' Merit Br. at 10 (citing *House v. Mitra QSR KNE LLC*, 796 F. App'x 783 (4th Cir. 2019)). First of all, *House* is wrong on its own terms. The Tenth Circuit has reached the opposite, and more reasonable, conclusion in *Esposito v. United States*, 368 F.3d 1271, 1276-77 (10th Cir. 2004) (permitting substitution for deceased plaintiff and rejecting "legal nullity" doctrine on grounds that "Rule 17(a) is designed to prevent forfeitures, and as such must be given broad application."). But it is not even necessary to consider the *House* scenario of a case filed in the name of a dead person, because we are dealing here with a corporation. The idea that corporations have some kind of "life" or "existence" that is different from capacity makes no sense. Corporations do not "exist" at all apart from their officers and owners and the "capacity" in which the law allows those human beings to use the corporate form. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706–07 (2014) ("Corporations, separate and apart from the human beings who own, run, and are employed by them, cannot do anything at all."). Corporations can even "exist" for some "purposes"—*i.e.* in some *capacities*—and not others. For example, California law provides that "[a] corporation which is dissolved nevertheless continues to exist for the purpose of … prosecuting and defending actions by or against it," Cal. Corp. Code § 2010(a). Meanwhile, New York describes the exact same issue of corporate capacity in terms that do not imply "life" or "existence." *See* N.Y. Bus. Corp. Law § 1006(a) ("A dissolved corporation . . . may continue to function for the purpose of winding up" and thus "may sue or be sued[.]"). There is simply no basis to differentiate dissolution/"non-existence" from other types of corporate capacity deficiencies. All of them center on what a given state law will or will not allow its corporations to do. None of them implicate Article III federal subject matter jurisdiction. Nor could they; a district court's constitutional power cannot be altered by the laws of a state or

another country.[4] Defendants are quite right that Sonterra, as a dissolved Cayman corporation, cannot properly prosecute this lawsuit in its own name.[5] But it does not follow from there that FLH cannot be substituted in its place because of some fundamental jurisdictional defect.

### i.  The APA Conveyed Sonterra's Claims in this Action to FLH.

Each of Defendants' three arguments concerning the APA is incorrect. The APA conveyed from Sonterra to FLH the right to commence lawsuits generally; the right to commence antitrust lawsuits; and the right to commence lawsuits relating to Sonterra's FX transactions. FLH owns all the claims it asserts here arising out of Sonterra's injuries.

### ii.  The APA Conveyed the Right to Commence Lawsuits, Not Just to Collect Proceeds.

Defendants' argument on this point is an exercise in selective quotation. It is true that the APA conveyed "Assets," and that "Assets" is defined as "all of [Sonterra's] right, title and interest in and to any and all Recovery Rights and any and all amounts payable in connection with any of the Existing Claims and Future Claims." But Defendants conveniently skip over the definition of "Recovery Rights": "***all monetary, legal and other rights*** held by or accruing to [Sonterra] ***in respect of such Claim, including, without limitation***, the aggregate amount which [Sonterra] is, or may become, entitled to receive pursuant to any Settlement and/or Judgment in connection with such Claim." APA at 3 (emphasis added). "All rights" (paired with the broad "including, without limitation" language) in respect of the Claims could hardly be clearer. It is an outright grant of

---

[4] *See Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33, 43 (1909) ("The general rule…is that, inasmuch as the jurisdiction of the courts of the United States is derived from the Federal Constitution and statutes . . . the jurisdiction may be exercised, and is not subject to limitations or restraint by state legislation establishing courts of probate, and giving them jurisdiction over similar matters.").

[5] The *ChinaCast* case Defendants cite (Defs.' Br. at 10) is relevant only to this point. The court there was evaluating whether the "non-existent" corporate plaintiff could maintain the action itself, and did not even touch on the question of substitution.  *See ChinaCast Educ. Corp. v. Chen Zhou Gou*, No. 15-0547, 2016 WL 10653269 (C.D. Cal. Jan. 8, 2016).

ownership, necessarily including the right to initiate Claims in the first instance. Nor are "Claims" limited to "certain claims pre-dating the transfer or brought by other parties," as Defendants contend. *See* Defs.' Br. at 17. On the contrary, "Claims" includes both "Existing Claims" *and* "Future Claims," and the definition makes no mention whatsoever of any requirement that these claims be brought by someone other than Sonterra. *See* APA at 3. Further, "Assets" in the APA has two parts: "any and all amounts payable in connection with any of the Existing Claims and the Future Claims" on the one hand, and Recovery Rights on the other. *See* APA at 2. If "Recovery Rights" means nothing more than the right to recover money from claims, then there is no purpose to also mentioning "amounts payable in connection with" claims.

### iii. The APA Conveyed the Right to Commence All Types of Lawsuits, Including Antitrust and RICO Claims.

Once again, Defendants would like very clear words such as "any" and "all" to mean something far more limited. "Future Claims," in relevant part, means "***any and all claims*** . . . to Recovery Rights related to the ownership of, or any transaction in, any Traded Securities, in each case, as to which no Case has been filed as of the date hereof***, including, without limitation…any future class action lawsuit*** or any Judgment thereon or other lawsuits, to the extent related to [Sonterra's] ownership of, or any transaction in, any Traded Securities." APA at 3. The proposition that "[g]eneral assignments do not suffice" to convey antitrust or RICO claims (Defs.' Br. at 17) applies only to general assignments of *assets* that do not refer to legal claims at all, as Defendants' own cited cases make clear. In *Lerman v. Joyce Int'l, Inc.*, for instance, an assignment of "all . . . causes of action, … claims and demands" was considered sufficiently "express" to transfer a RICO claim. 10 F.3d 106, 112 (3d Cir. 1993); *DNAML Pty, Ltd. v. Apple Inc.*, No. 13-6516, 2015 WL 9077075, at *5 (S.D.N.Y. Dec. 16, 2015) ("The Agreement contains no express assignment of Old DNAML's antitrust claims, ***and no general assignment of all claims***. While the Agreement transfers all of Old DNAML's 'Business and Assets' to New DNAML***, neither the term 'Assets' nor 'Business' is defined in the***

15

*Agreement to include claims of any kind*. As explained above, a transfer of assets does not effect an assignment of antitrust claims.") Here, "any future class action lawsuit" certainly encompasses both antitrust and RICO claims.

      **iv.**   **The APA Conveyed the Right to Commence Lawsuits Related to Sonterra's "Ownership of, or Any Transaction in, Any Traded Securities."**

Defendants' attempt to exclude the FX derivatives at issue in this case from the scope of "Traded Securities" falls flat. Upon the execution of the APA, Sonterra provided FLH with a complete list of "Trade Data," defined in the APA as "all of the relevant information to be provided by [Sonterra] to [FLH] pursuant hereto and relating to purchases, sales, ownership and other transactions in all Traded Securities by [Sonterra] during the Trade Period." APA at 4. Sonterra's Yen-LIBOR-based derivatives transactions between 2009 and 2011 are listed in the Trade Data, as are thousands of other FX forward transactions. SAC ¶ 57. Yet Defendants still contend that Sonterra did not intend to convey claims related to those transactions based on the fact that FX derivatives are not specifically listed in the APA's definition of "Securities" and "do not fall within the common definition of securities." Defs.' Br. at 18. As to the latter, it matters not at all what falls within "the common definition of securities"; it matters only what Sonterra and FLH intended to include within their own definition of "Traded Securities." And while the APA's definition of "Securities" does not specifically mention FX forwards, it does refer broadly to "securities of ***any kind, type, or nature, including, without limitation***, stocks, bonds, options, puts calls, ***swaps and similar instruments or rights***." APA at 4 (emphasis added). Plainly, the parties intended to encompass the widest variety of financial products possible. Being that the term "Securities" is expressly defined to include "swaps and similar instruments or rights," the term necessarily includes FX forwards, which are derivatives similar to swaps.  SAC ¶ 266.

In addition to the parties' unambiguous language, the parties' actions confirm accuracy of this interpretation. It would make no sense at all that the parties would intend to definitionally exclude FX forwards, which are derivatives similar to swaps, but actually include thousands of FX forwards transactions in the list of Trade Data accompanying the APA.

## II.   ALL OF PLAINTIFFS' CLAIMS ARE TIMELY.

The statute of limitations is an affirmative defense that Defendants bear the burden of proving. *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 58 (S.D.N.Y. 2012). Dismissal of a complaint on statute of limitations grounds at the pleading stage, then, is almost *never* appropriate. It happens only in exceptional cases where a plaintiff's complaint, on its face, pleads itself out of court. *See Brewer v. Hashim*, 738 F. App'x 34, 34-35 (2d Cir. 2018) (citation omitted) (statute of limitations dismissal at pleading stage only appropriate where a complaint "clearly shows the claim is out of time"). This case is not an exception to the rule.

### A.   This action was initiated within the relevant limitations period for each claim.

Plaintiffs' claim under Section 1 of the Sherman Act has a four-year limitations period. 15 U.S.C. § 15b. For a price-fixing claim, the four years begin to run only when a plaintiff is put on notice that it has been harmed by the defendants' conspiracy. *See Hinds Cty., Miss. v. Wachovia Bank N.A.*, 885 F. Supp. 2d 617, 627 (S.D.N.Y. 2012) ("*Hinds III*").[6] Plaintiffs' RICO claims similarly have a four-year

---

[6] Defendants fail to explain their contention that Plaintiffs' pending antitrust claim does not arise out of the same conduct as the antitrust claims asserted on July 24, 2015. Defs.' Br. at 8 n.8; 23 n.26. In fact, these claims are self-evidently the same. Each of Plaintiffs' pleadings alleges that Defendants violated the Sherman Act by conspiring to, *inter alia*, report false Yen-LIBOR rates (*compare* ECF No. 1 ("Compl.") at ¶¶ 134-37 *with* ECF No. 121 ("FAC") at ¶¶ 202-05 *and with* SAC ¶¶ 270-73) and engage in manipulative trading of derivatives priced based on Yen-LIBOR (*compare* Compl. ¶¶ 138-39 *with* FAC ¶¶ 206-07 *and with* SAC ¶¶ 274-75). Plaintiffs' decision to title the claim as a "conspiracy to fix the prices of Yen-LIBOR-based derivatives" (¶ 1001) does not change any of the substance of the claim or the allegations supporting it. In fact, Plaintiffs' prior pleadings used similar language to describe the anticompetitive scheme. *See* Compl. ¶ 1 & FAC ¶ 1 (alleging that Defendants conspired to fix "the prices of Euroyen-based derivatives"); Compl. ¶ 123 & FAC ¶ 191 (defining "Euroyen-based derivatives" as financial instruments priced in reference to Yen-LIBOR or a related benchmark

period that accrues only upon a plaintiff's discovery of its injury. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988). Finally, this Court has already held in *Laydon* that Plaintiffs' common law claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing have a six-year limitations period. *See Laydon v. Mizuho Bank, Ltd.*, No. 12-03419, 2015 WL 1515487, at *5 (S.D.N.Y. Mar. 31, 2015) ("*Laydon II*") (applying New York's six-year period to a nonresident plaintiff's unjust enrichment and covenant breach claims).[7] Plaintiffs allege that Defendants' scheme continued until June 30, 2011 (¶ 1), which is less than six years prior to the filing of this action on July 24, 2015, such that the "continuing violation" doctrine renders Plaintiffs' state law claims timely. *See Amberger v. Legacy Capital Corp.*, No. 17-532, 2017 WL 4863093, at *8 (S.D.N.Y. Oct. 16, 2017) (explaining that the continuing violation doctrine applies to a claim founded on a defendant's "pattern of ongoing, wrongful acts" that continued until within the limitations period).

The first notice of *any* Defendants' misconduct arrived on July 26, 2011, when Defendant UBS filed a Form 6-K revealing that it had received leniency from the DOJ for antitrust violations concerning false Yen-LIBOR submissions. SAC ¶¶ 967-68. This Court has already concluded that July 26, 2011 was the earliest possible date on which investors had inquiry notice of a scheme to fix the prices of Yen-LIBOR-based derivatives. *See Laydon II*, 2015 WL 1515487, at *3.[8] This action was filed

---

called Euroyen TIBOR). *See also Slayton v. Am. Exp. Co.*, 460 F.3d 215, 229 (2d Cir. 2006), *as amended* (Oct. 3, 2006) (holding that an amended complaint alleging the same facts as an initial complaint, but "amplified, or stated in a slightly different way," related back to the filing date of the initial complaint).

[7] Defendants incorrectly suggest that the Court should apply a three-year limitations period to the unjust enrichment claims. Defs.' Br. at 21. Because Plaintiffs seek restitution as a remedy for Defendants' unjust enrichment (¶¶ 1053-54 & Prayer for Relief ¶ F), a six-year period applies. *See Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 333 (S.D.N.Y. 2018) (holding that a six-year period is appropriate when "the plaintiff seeks an equitable remedy"). *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"), relied on by Defendants, confirms that the three-year period applies only to "unjust enrichment claim[s] sounding in tort for monetary relief." *LIBOR IV*, 2015 WL 6243526, at *163 n.186 (S.D.N.Y. Oct. 20, 2015).

[8] Defendants' off-hand suggestion that the public availability of Yen-LIBOR submission data itself sufficed to put Plaintiffs on notice of Defendants' conspiracy to manipulate the rate has been repeatedly rejected by courts in this District. *See, e.g., In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d

on July 25, 2015—within the four-year statute of limitations for Sherman Act and RICO claims, and very comfortably within the six-year statute of limitations for the common law claims.

As to the rest of the Defendants, Plaintiffs' claims are even more obviously timely. *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 122, 195-96 (S.D.N.Y. 2018) ("*BBSW I*") (notice of a single defendant's benchmark-fixing misconduct insufficient to put plaintiffs on notice of other defendants' involvement in the "widespread conspiracy"). Plaintiffs first learned that Citigroup, Deutsche Bank, HSBC, JPMorgan, RBS, ICAP, and R.P. Martin were implicated in the conspiracy through a February 17, 2012 report in the *Wall Street Journal*. A June 20, 2013 finding by the U.K. Senior Fraud Office identified Tullett Prebon for the first time as an additional conspirator. SAC ¶¶ 969-70. And Plaintiffs could not have known that Defendant MLI—neither a member of the BBA Yen-LIBOR panel nor a broker—had conspired with UBS and R.P. Martin to enter manipulative wash trades until the Hayes trial publicly revealed its role on May 26, 2015. ¶¶ 534-35, 573-75.

Defendants' suggested inquiry notice date, March 15, 2011, ignores this Court's holding that July 26, 2011 was the earliest possible date for inquiry notice, and is unsupported by the facts. The UBS annual report published on March 15, 2011 made general reference to regulatory investigations related to LIBOR and "similar matters," but did not mention Yen-LIBOR at all. SAC ¶¶ 965-66. This "generic" information did not apprise Plaintiffs of the material details of their claims against Defendants. *See In re London Silver Fixing, Ltd. Antitrust Litig.*, 332 F. Supp. 3d 885, 913-14 (S.D.N.Y. 2018) (government press release "investigating complaints of misconduct in the silver market" lacking

---

354, 367-68 (S.D.N.Y. 2019) ("[R]equiring potential plaintiffs to conduct exhaustive statistical analysis of millions of transactions, just on the off chance that it would reveal some suspicious behavior, would be absurd."); *In re European Gov't Bonds Antitrust Litig.*, No. 19-2601, 2020 WL 4273811, at *12 (S.D.N.Y. July 23, 2020) ("*EGB*") ("Defendants themselves claim that these statistical trends could be innocent rather than nefarious"); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp.*, ("*CHF LIBOR*") 277 F. Supp. 3d 521, 568 (S.D.N.Y. 2017) (criticizing defendants for relying on this same "breathtaking inconsistency").

enough specific information about the affected products, time period, and market did not constitute inquiry notice of plaintiffs' silver price-fixing claims). This Court has already drawn the same conclusion. Defendants admit, as they must, that this Court was aware of the March 15, 2011 annual report when it held that July 26, 2011 was the earliest possible date for inquiry notice of a price-fixing conspiracy pertaining to Yen-LIBOR-based derivatives. Defs.' Br. at 20 n.23 (citing *Laydon II,* 2015 WL 1515487, at *3 & *6). In short, this action was timely filed as to all claims.

## B.  Each Plaintiff's claims are timely.

Defendants' next line of attack is to argue that, regardless of the initial filing date of this action, the individual Plaintiffs named in the now-operative SAC did not timely assert their claims. This argument fails, because: (i) the claims of FLH and the Hayman Funds relate back to the date of the initial Complaint; (ii) the relevant limitations periods were tolled as to CalSTRS by its September 2014 motion to intervene in the *Laydon* action; and (iii) the Hayman Funds and CalSTRS became Plaintiffs within 6 years of inquiry notice as to all Defendants and within 4 years of inquiry notice as to several Defendants.

### i.  All claims filed by FLH And the Hayman Funds relate back to July 26, 2015.

The Court granted Plaintiffs' Rule 17(a)(3) motion to substitute the Hayman Funds into the action on March 29, 2016, ECF No. 217, accepting Plaintiffs' representation that the Hayman Funds are the "real part[ies] in interest" as to the claims initially filed in the name of Hayman Capital Management L.P. *See* Fed. R. Civ. P. 17(a)(3). FLH, too enters this action by way of Rule 17(a)(3). The SAC pleads that FLH has owned the Sonterra claims from the outset (¶¶ 57-59), and that FLH has been in control of prosecuting the Sonterra claims as "the real party in interest." ¶ 60.[9] Following these substitutions, "the action proceeds as if it had been originally commenced by the real party in interest."

---

[9] If the Court prefers, Plaintiffs can formalize the Rule 17(a)(3) substitution request as to FLH in a separate motion.

Fed R. Civ. P. 17(a)(3). Therefore, the claims of the real party in interest date back to the date of the incorrect party's initial filing. *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 421 (2d Cir. 2015).

Defendants incorrectly assert that a Rule 17(a)(3) substitution does not relate back to the filing of the initial pleading unless there was a "mistake concerning the proper party's identity." Defs.' Br. at 22. In reality, "a plaintiff's honest mistake is not a precondition" for Rule 17(a)(3) substitution. *Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 227 (2d Cir. 2018). Rather, a real party in interest's claim relates back so long as its substitution "does not reflect bad faith from the plaintiffs or unfairness to the defendants." *Id.* at 218. As described above, Defendants do not point to a shred of evidence that Plaintiffs acted in bad faith or as some kind of a tactical scheme. They attempt to sidestep the relevant law on Rule 17(a)(3) substitution by referring instead to the requirements for relation back in the context of Rule 15(c)(1)(C) amendment. Although the Advisory Committee Notes to Rule 15 identify Rule 17(a) as "relevant" to relation back of amended pleadings under Rule 15(c), this vague comparison does not overcome the Second Circuit's clear instruction that no "mistake" requirement applies to Rule 17(a)(3) substitution. And even if it did not, both the Hayman Funds' understanding of their trading documentation to suggest that Hayman L.P. was the proper plaintiff and FLH's understanding of its contractual rights and Cayman law are textbook examples of mistakes. *See Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 549 (2010) (holding that when a plaintiff is aware of the correct party's identity but names an incorrect party based on a misunderstanding of that party's role, "[t]hat kind of *deliberate but mistaken choice* does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied.") (emphasis added). And of course, Defendants' additional argument, that relation back is unavailable because the initial filing was a "legal nullity," fails for the reasons presented above. *See supra* at 8-19.

Finally, the Supreme Court's prohibition of untimely "follow-on class action[s]," *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1808 (2018), has no bearing on Plaintiffs' claims, which have been asserted in amendments within the *same ongoing action*, not a separate "follow-on" action following dismissal of the first.  *See id.* at 1815 (Sotomayor, J., concurring) (recognizing that the Court's holding allows district courts to "liberally permit amendment of the pleadings or intervention of new plaintiffs and counsel"); *Walker v. Life Ins. Co. of Sw.*, No. 10-09198, 2018 WL 3816716, at *5 (C.D. Cal. July 31, 2018), *aff'd sub nom.*, 953 F.3d 624 (9th Cir. 2020) (rejecting defendant's argument that *China Agritech* may bar "the assertion of revived claims in the same action in which they were originally brought").

> ii.   **CalSTRS' motion to intervene in the *Laydon* action tolled the statutes of limitations as to its claims.**

On September 22, 2014, CalSTRS sought to intervene as a named plaintiff in *Laydon*. *See* Defs.' Br. at 27 n.23. This filing tolled all applicable statutes of limitations, well within both the four- and six-year periods. *See United States ex rel. Rubar v. Hayner Hoyt Corp.*, 306 F. Supp. 3d 478, 491 (N.D.N.Y. 2018) (holding that a party's motion to intervene, filed within the limitations period, preserves its claims, reasoning that "[a]lthough the statute of limitations has now lapsed, it would be unjust to penalize proposed intervenor for a factor beyond their control, such as a court's deliberate consideration of their timely-filed motion and proposed complaint.").

Defendants cite two cases for the proposition that a denied motion to amend or intervene cannot render a plaintiff's claims timely. *See* Defs.' Br. at 23 n. 27. But both decisions are limited to denials on the *merits* of the proposed intervenor's claim. In *Korwek v. Hunt*, 649 F. Supp. 1547, 1548 (S.D.N.Y. 1986), plaintiffs originally sought unsuccessfully to intervene in an action and thereby dramatically expand the class definition in a way the court had already considered and rejected, only to file a new, untimely suit again proposing the same rejected class definition. *See Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir. 1987) ("While appellants are correct in noting that appellees were apprised fully of the pending adverse claims, this fact alone is insufficient to justify filing a class action of a nature

already determined to be unmanageable."). *Goldblatt v. NCUA* is an even more extreme example of a meritless first attempt to toll the statute of limitations. There, the plaintiffs sought to add a new defendant that the court determined *was actually the sole owner of the claims plaintiffs were attempting to assert. See* 502 F. App'x 53, 55 & n.1 (2d Cir. 2012).

Here, in contrast, the Court never even reached the merits of CalSTRS' claims in considering its motion to intervene in *Laydon,* let alone found them wanting. On the contrary, the Court expressly invited CalSTRS to file its claims against Defendants in a new case. *See* Transcript at 5:18-20, *Laydon v. Mizuho Bank, Ltd.*, No. 12-03419, ECF No. 529 ("With regard to the CalSTRS application to intervene, I'm going to deny that application. If there is a claim to be made against defendants, **that case should be brought.**"). That the Court greenlit these claims on October 8, 2015, after many limitations periods had lapsed, does not change the fact that Defendants were placed on notice of the claims at the time the motion to intervene was filed over a year earlier, within all relevant periods. *See Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 652-53 (2d Cir. 1987)[10]

### iii. The Hayman Funds and CalSTRS joined the action within several relevant limitation periods.

Further, most of the Hayman Funds and CalSTRS' claims would still be timely even if they did not relate back to the filing date of the original complaint. Defendants acknowledge they received notice of CalSTRS' claims no later than their October 16, 2015 tolling agreement. Defs.' Br. at 23. This date occurred within four years of Plaintiffs' inquiry notice of their claims against every Defendant except UBS (*see supra* at 21-22), and within six years of Plaintiffs' inquiry notice of their claims against any Defendant. *See supra* at 21. Similarly, the Hayman Funds provided notice of their claims no later than Plaintiffs' March 18, 2016 motion to substitute, within four years of Plaintiffs'

---

[10] Defendants acknowledge that the period between October 16, 2015 and the filing of the FAC on December 18, 2015 was subject to a tolling agreement between them and CalSTRS. Defs.' Br. at 23.

inquiry notice as to Tullett Prebon and MLI, and within six years of Plaintiffs' inquiry notice as to each Defendant.

### C.  The SAC adequately pleads fraudulent concealment as to all claims.

Fraudulent concealment tolls the statutes of limitations for antitrust and RICO claims when (1) the defendant concealed the existence of the violation; (2) plaintiff remained in ignorance of the violation; and (3) plaintiff's continuing ignorance was not the result of lack of diligence. *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (antitrust); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195-96 (1997) (RICO). The Second Circuit's standard for concealment—the first prong of the *Hendrickson* test is a lenient one. Plaintiffs need only plead either (i) that defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy, or (ii) that the conspiracy was inherently self-concealing. *See Hendrickson*, 840 F. 2d at 1083. Here, Plaintiffs do both, easily satisfying the standard.

Plaintiffs plead that Defendants took affirmative steps to cover up their conspiracy by, *inter alia*, submitting false attestations to regulators (¶¶ 779-82, 784-85), failing to enact internal LIBOR-related systems and controls (¶¶ 280, 283, 291, 295, 301-02, 306, 317-18, 324, 337-38), failing to conduct audits that would uncover their employees' LIBOR manipulation (¶¶ 325-26), circulating illusory guidelines that did not ensure compliance (¶¶ 339-40), using code words and taking their requests "offline" to evade detection (¶¶ 303-04, 790-93), destroying evidence (¶ 783), and lying to their attorneys and government regulators (¶¶ 788-89, 799). *See also* ¶¶ 984-85 (summarizing these acts of affirmative concealment). Each action concealed Defendants' antitrust and RICO violations from Plaintiffs and the Class, preventing them from discovering Defendants' wrongdoing.[11]

---

[11] There is no bar to pleading the same acts in support of both the substance of Plaintiffs' claim and Defendants' fraudulent concealment of that claim. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-7789, 2016 WL 5108131, at *16 (S.D.N.Y. Sept. 20, 2016) ("*FOREX*") ("The same secret communications that plead conspiracy also plead the three elements of fraudulent concealment.). *Accord S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 108 (S.D.N.Y. 2011) ("[W]here a plaintiff raises fraud-based

Moreover, at least seven Defendants maintained codes of conduct that publicly represented their employees' compliance with applicable competition and fraud laws. ¶¶ 992-1000. These affirmative misstatements induced Plaintiffs and the Class to rely on the ethical and legal standards of Defendants. *See EGB*, 2020 WL 4273811, at *11 (plaintiffs sufficiently pled fraudulent concealment where they "allege[d] reliance on Defendants' affirmative representations in their codes of conduct, which consistently disavow that Defendants engage in any unfair competitive practices").[12]   In any event, Defendants' scheme, a horizontal price-fixing conspiracy, was quintessentially self-concealing. ¶ 983; *BBSW I*, 343 F. Supp. 3d at 195 (holding that bid-rigging conspiracies are by their nature self-concealing) (citing *Hendrickson*, 840 F. 2d at 1083-84).

The SAC also easily satisfies the second and third prongs of the *Hendrickson* test. For the reasons explained above, Plaintiffs remained unaware of their claims against *any* Defendants until at least July 26, 2011, and unaware of their claims against most Defendants until considerably later. *See supra* at 21-22. The SAC also sufficiently pleads that Plaintiffs exercised appropriate due diligence; it alleges that "Plaintiffs actively monitor their investments to ensure that there is no evidence of fraud or irregularities in their trading positions and did so in connection with their Yen-LIBOR-based derivatives during the Class Period." ¶ 971. At this stage, it is "premature" to require a plaintiff to make any further showing of diligence. *City of Philadelphia v. Bank of Am. Corp.*, No. 19-1608, 2020 WL

---

claims, the allegations supporting the merits of those claims are often very similar to the allegations that support fraudulent concealment. This similarity does not prevent a plaintiff from pleading equitable tolling.").

[12] *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), is inapposite. That decision concerned the plausibility that generic language in a company's code of conduct would suffice to induce an investor to *purchase shares of the company*. *Id.* at 62 (explaining that the decision applied the test for ascertaining securities fraud). *Singh* has never been applied in a fraudulent concealment analysis, and Defendants provide no support for the proposition that the materiality threshold for inducing a person to actively spend her money and purchase securities is the same as the threshold for inducing a person *not* to take the burdensome step of filing a lawsuit.

6430307, at *13 (S.D.N.Y. Nov. 2, 2020) (quoting *BPP Ill., LLC v. Royal Bank of Scot. Group PLC*, 603

F. App'x. 57, 59 (2d Cir. 2015)).

Additionally, Defendants' acts of concealment equitably tolled Plaintiffs' unjust enrichment

and implied covenant claims. Under the doctrine of equitable tolling, the "statute of limitations does

not run against a plaintiff who is unaware of his cause of action" because of his blameless ignorance

or where "there was culpable action by the defendant that concealed plaintiff's claim." *Indovino v.*

*Tassinari*, No. 05-4167, 2006 WL 2505232, at *4 (E.D.N.Y. Aug. 28, 2006) (citations and quotations

omitted). Once the statute of limitations is tolled, it remains tolled until "the plaintiff either acquires

actual knowledge of the facts that comprise his action or should have acquired such knowledge

through the exercise of reasonable diligence after being apprised of sufficient facts to put him on

notice." *Id.*  For the same reasons, and during the same time, that Defendants' fraudulent concealment

tolled Plaintiffs' federal claims, the New York common law claims were equitably tolled. [13]

### D.  Plaintiffs' Sherman Act claims were also tolled under 15 U.S.C. § 16(i).

Plaintiffs' antitrust claims were also tolled by the U.S. Government's criminal antitrust

proceedings against UBS' Tom Hayes and Roger Darin and against Deutsche Bank. ¶¶ 986-91.

Pursuant to 15 U.S.C. § 16(i), "any civil or criminal proceeding [] instituted by the United States to

---

[13] Because Plaintiffs lacked notice of MLI's role in the conspiracy until May 26, 2015, *see supra* at 22, the claims against MLI are timely under both the four- and six-year limitations periods. 244 days passed from May 26, 2015 to January 25, 2016, the date on which Plaintiffs' tolling agreement with MLI entered into effect. Defs.' Br. at 27. Between the agreement's expiration on January 25, 2019, *id.* and the filing of the SAC on August 24, 2020, an additional 577 days passed. This equals a total of 821 days, or 2 years and 3 months. And as Defendants note, even if the Court were to regard Plaintiffs as on notice of their MLI claims as of April 30, 2012, the date on which Plaintiffs first filed the *Laydon* action against other Defendants, only 4 years, 9 months and 23 days have passed, leaving the common law claims as timely under their applicable 6-year periods. Nor can MLI escape its tolling agreement on the grounds that FLH lacked capacity to enter into the agreement using Sonterra's name. The SAC alleges that FLH acquired an "irrevocable power of attorney coupled with an interest, giving FLH the right to take any steps it deemed reasonable and necessary to maximize the value of the assets FLH acquired from Sonterra" (¶ 59), including entering into tolling agreements to preserve avenues for relief against potential Defendants.

prevent, restrain, or punish violations of any of the antitrust laws" tolls the running of the statute of limitations for private rights of action during the pendency of the government action and for one year thereafter. 15 U.S.C. § 16(i). The statute applies to "a private party who brings suit for a conspiracy against which the Government has already brought suit." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 335-36 (1971). Once the Government sues, the statute of limitations remains tolled "regardless of whether a final judgment or decree is ultimately entered." *Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 316 (1965).

Defendants do not dispute that the DOJ actions against Hayes, Darin, and Deutsche Bank constitute "criminal proceeding[s] . . . instituted by the United States to prevent, restrain, or punish violations of [an] antitrust laws" under § 16(i). The only remaining inquiry is whether the claims in the Complaint are "based in whole or in part on any matter complained of in" the DOJ's proceedings. 15 U.S.C. § 16(i). On their faces, the DOJ's criminal complaints allege acts identical to those that give rise to Plaintiffs' claim—Yen-LIBOR panel banks made false submissions to the BBA and used inter-dealer brokers to manipulate Yen-LIBOR in favor of their Yen-LIBOR-based derivatives products. *See* SAC Exs. A-6; I-7. Defendants argue that the DOJ cases do not concern "a multi-year price-fixing conspiracy as Plaintiffs allege here," and point out that many Defendants were not charged by the DOJ. Defs.' Br. at 26. The Supreme Court expressly rejected this argument in *Zenith*, as did Judge Marrero in the very case Defendants themselves cite. *See Zenith*, 401 U.S. at 335-36 (§ 16(i) applies "even if the defendant named in the private suit was named neither as a defendant nor as a coconspirator by the Government."). *See also Hinds III*, 885 F. Supp. 2d at 628-29 (rejecting defendants' argument that § 16(i) should not apply because defendants' co-conspirators were not indicted, cited in Defs' Br. at 26).

### III.   PLAINTIFFS PLEAD A PLAUSIBLE PRICE-FIXING CLAIM BASED ON U.S. TRANSACTIONS IN YEN-LIBOR-BASED DERIVATIVES.

#### A.   Defendants' Disregard of the Applicable Standard of Review Compels Denial of their Rule 12(b)(6) Motion to Dismiss Plaintiffs' Antitrust Claim.

All Rule 12(b)(6) motions require the court to accept the truth of the facts as pled in the complaint, and to draw all reasonable inferences in favor of the plaintiffs. *E.g. Eastman Kodak Co. v. Henry Bath LLC ("Aluminum")*, 936 F.3d 86, 93 (2d. Cir. 2019). A plaintiff's claim for relief need only be *plausible*, not certain. *In re London Silver Fixing, Ltd. Antitrust Litig. ("Silver")*, 213 F. Supp. 3d 530, 548 (S.D.N.Y. 2016). And where the facts alleged in a complaint give rise to multiple plausible explanations, it is not the court's task on a Rule 12(b)(6) motion to choose among them. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). In the context of antitrust cases, "[t]o survive dismissal, 'the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action.'" *Id.* The plaintiff's allegations of a conspiracy are to be viewed holistically, keeping in mind that individually innocent acts may still form a part of an unlawful conspiracy. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 809-10 (1946). Owing to the difficulty in obtaining direct evidence of a conspiracy at the pleading stage, "'in antitrust cases in particular, the Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.).

#### B.   Plaintiffs Sufficiently Plead Antitrust Standing.

To allege antitrust standing, Plaintiffs must plead: (i) Plaintiffs suffered "antitrust injury," and (ii) Plaintiffs are "efficient enforcers" of the antitrust laws. *Gelboim*, 823 F.3d at 772. Here, Defendants do not even dispute that Plaintiffs suffered antitrust injury. They argue only that Plaintiffs are not efficient enforcers, pointing to what they call "an attenuated chain of causation" between their own

unlawful acts and Plaintiffs' injury, and relying on this Court's 2014 decision in *Laydon*. Defs.' Br. at 29. But the law has evolved substantially in the past six years. Most critically, the Second Circuit has already held *in this case* that "Plaintiffs plausibly alleged that Defendants' conduct caused them to suffer economic injury." *Sonterra Yen-LIBOR I*, 954 F.3d at 532. Curiously, Defendants appear almost to concede that Plaintiffs who transacted in interest rate swaps and swaptions directly with Defendants are efficient enforcers. *See* Defs.' Merit Br. at 30. They argue instead that "Plaintiffs' alleged damages from FX instruments [are] far more attenuated." *Id.* But the Second Circuit held just the opposite, noting Plaintiffs' specific allegations that Sonterra and CalSTRS paid "higher prices" for Yen FX forwards "as a result of Defendants' market manipulation." *Sonterra Yen-LIBOR I*, 954 F.3d at 532. It made clear that the Court must accept Plaintiffs' allegations that Yen-LIBOR impacted the prices of Yen FX forwards, interest rate swaps and swaptions alike—bringing us straight to the final step of Defendants' "attenuated chain." *See id.* at 534-35.[14]

Additionally, when deciding *Laydon* in 2014, this Court did not have the benefit of the wealth of cases in this District recognizing the direct connection between the manipulation of a financial benchmark and the injury to investors in products linked to that benchmark.[15] These cases all built off

---

[14] Defendants' citation to *7 W. 57th Street*, where the court found that "any diminution in value was necessarily directly caused by" others than the Defendants, is thus inapposite. *See* Defs.' Br. at 30.

[15] *See, e.g., CHF LIBOR*, 277 F. Supp. 3d at 546-47, 572-73 (crediting plaintiffs' allegation of an industry standard price formula for Swiss franc futures and forwards that incorporates Swiss franc LIBOR); *Sullivan v. Barclays PLC* ("*Euribor*"), No. 13-CV-2811 (PKC), 2017 WL 685570, at *9–10 (S.D.N.Y. Feb. 21, 2017) (crediting as true plaintiffs' allegation of the identical pricing formula linking CME Euro futures with Euribor); *FOREX*, 2016 WL 5108131, at *5 (crediting plaintiffs' allegation that "FX spot market prices, including benchmark rates, directly impact the prices of exchange-traded instruments"); *Alaska Elec. Pension Fund v. Bank of Am. Corp.* ("*ISDAfix*"), 175 F. Supp. 3d 44, 61 (S.D.N.Y. 2016) (plaintiffs were efficient enforcers where they alleged, *inter alia*, that "they were directly harmed by Defendants' anticompetitive conduct by having to pay higher prices (or earning lower profits) from instruments tied to [interest rate benchmark] ISDAfix"); *In re Commodity Exch., Inc. Gold Futures and Options Trading Litig.* ("*Gold*"), 213 F. Supp. 3d 631, 656 (S.D.N.Y. 2016) (accepting as true plaintiffs' allegations that defendants' suppression of the "Fix Price" had a direct impact on

the Second Circuit's 2016 opinion in *Gelboim*, which established that manipulation of LIBOR gives rise to antitrust injury by corrupting market conditions, even if other factors might also impact the prices of LIBOR-based derivatives. *See Gelboim*, 823 F.3d at 773-74; *see also IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 64 (2d Cir. 2019) (antitrust laws guarantee the "right to do business in a market undistorted by unlawful anticompetitive conduct"); *Aluminum*, 936 F.3d at 93 (plaintiffs that were not direct purchasers were proximately injured by defendants' antitrust conspiracy to fix component of price).[16] Plaintiffs respectfully submit that in light of these intervening developments in the law, this Court's earlier ruling in *Laydon* should not control the outcome of this case.[17]

Defendants' next line of attack zeroes in on those Plaintiffs who did not transact directly with a named Defendant. This precise issue—whether a plaintiff who transacted in a LIBOR-based derivative with a non-defendant has antitrust standing—is currently before the Second Circuit and should be decided imminently. *See* Joint Brief of Plaintiff-Appellants at 6-39, *In re LIBOR-Based Fin. Instruments*, No. 17-1569 (2d Cir.), ECF No. 344. And once again, Defendants brush over key developments in the law that have already taken place. Their invocation of the *Illinois Brick* "indirect purchaser" doctrine is foreclosed by the Supreme Court's recent decision in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019). As in *Apple*, "[t]his is not a case where multiple parties at different levels of a distribution chain are trying to all recover the same passed-through overcharge initially levied by the manufacturer at the top of the chain." 139 S. Ct. at 1524. Numerous courts in this District have held

---

market participants, finding plaintiffs demonstrated a sufficiently direct injury); *Silver*, 213 F. Supp. 3d at 555 (same).

[16] Further, econometric and regression analyses are widely used in antitrust cases to isolate impacts on price unrelated to the alleged violations. *E.g.* ANTITRUST SECTION OF THE AMERICAN BAR ASS'N, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 125 (2d ed. 2010) ("Econometric and regression analyses are particularly useful in separating the impact of an alleged anticompetitive act on market incomes (such as pricing) from the impact of other influences.")

[17] Additionally, that ruling is also on appeal before the Second Circuit.

*Illinois Brick* inapplicable in benchmark manipulation cases like this one. *BBSW I*, 343 F. Supp. 3d at 165-66 (*Illinois Brick* did not bar claims by plaintiffs who alleged that defendants "fixed BBSW, which then was incorporated into various derivatives" because "[t]he indirect purchaser doctrine [did] not present the same concerns" in such a case); *Silver*, 213 F. Supp. 3d at 553-54 (*Illinois Brick* not implicated where plaintiffs alleged "that Defendants suppressed the Fix Price, which had a direct (and negative) impact on the value of their silver investments"); *Gold,* 213 F. Supp. 3d at 655 (*Illinois Brick* not implicated where plaintiffs alleged "Defendants suppressed the Fix Price, which had a direct (and negative) impact on the value of their Gold Investments.").

Even if *Illinois Brick* did apply, CalSTRS' transactions "with affiliates or subsidiaries of certain Defendants" would fall within the "direct purchaser" category. *Contra* Defs.' Br. at 31. Antitrust law treats corporate affiliates as a "single enterprise" as a matter of law when they exhibit a "complete unity of interest." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984).  Under this "single enterprise" rule, corporate affiliates cannot conspire with each other as a matter of antitrust law and are liable for each other's antitrust violations. *Arandell Corp. v. Centerpoint Energy Servs. Inc.*, 900 F.3d 623, 631 (9th Cir. 2018) (emphasis in original) (holding gas seller liable for anticompetitive scheme when it sold gas at prices fixed by its parent); *see also EGB*, 2020 WL 4273811, at *14 (holding that plaintiffs' transactions with a defendant's affiliate-agents were sufficiently direct to render plaintiffs efficient enforcers as to that defendant).

Defendants' final argument against Plaintiffs' efficient enforcer status is that Plaintiffs' damages are unduly speculative and difficult to apportion. But "potential difficulty in ascertaining and apportioning damages is not an independent basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects…." *Gold*, 213 F. Supp. 3d at 658 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014)). Antitrust cases—particularly large, global benchmark manipulation cases—

involve a certain degree of uncertainty as to damages by their nature. Knowing this, courts in this District have repeatedly rebuffed defendants' arguments about speculative damages at the pleading stage.[18] This Court should follow suit.

Finally, while Defendants claim that Plaintiffs who did not transact directly with them present a particular problem,[19] there is no categorical rule that excludes "umbrella purchasers" from being efficient enforcers of the antitrust laws, particularly in a benchmark manipulation case. *See Gelboim*, 823 F.3d 779 (there is "no difference in the injury alleged" by those who transacted directly with the defendants and those who did not). In any event, the specific question of whether a plaintiff who did not transact directly with a defendant may be an efficient enforcer will be decided imminently by the Second Circuit. *See* Joint Brief of Plaintiff-Appellants at 6-39, *In re LIBOR-Based Fin. Instruments,* No. 17-1569 (2d Cir.), ECF No. 344.

---

[18] *See, e.g., ISDAFix,* 175 F. Supp. 3d at 61 (rejecting argument that damages were too speculative for antitrust standing where plaintiffs "alleged that they were directly harmed by Defendants' anticompetitive conduct by having to pay higher prices (or earning lower profits) from instruments tied to ISDAfix [benchmark]"); *FOREX*, 2016 WL 5108131 at *8 (rejecting defendants' argument that damages were unduly speculative where "the defendants engaged in a price-fixing conspiracy spanning more than a decade and involving innumerable combinations of currency pairs for almost every country in the world"); *Silver*, 213 F. Supp. 3d at 557 ("issues regarding the speculative nature of Plaintiffs' injuries and damages can best be resolved at a later stage"); *Gold*, 213 F. Supp. 3d at 658 ("because … the PM Fixing was a price altering event, because exogenous factors affect price movements in most antitrust cases, and because the existence of such factors does not alone defeat standing, questions regarding the extent of Plaintiffs' injuries can best be resolved at a later stage"); *BBSW I,* 343 F. Supp. 3d at 167 (rejecting defendants' arguments that plaintiffs' injuries resulting from manipulation of the "BBSW" benchmark rate were too speculative, finding "it would be entirely premature to foreclose this claim at this most preliminary stage."). Even in *CHF LIBOR,* on which Defendants heavily rely, Judge Stein acknowledged that "district courts assessing similar LIBOR antitrust claims have disagreed as to whether these difficulties deprive plaintiffs of efficient enforcer status." *CHF LIBOR*, 277 F. Supp. 3d at 564.

[19] Defendants rely on *Euribor*, 2017 WL 685570, at *20 (Defs. Br. at 32). In that case, however, the court placed great weight on the "vast size" of the umbrella claims since four out of the six plaintiffs lacked direct dealings with the Defendants. This concern is not present here, where only one Plaintiff lacks direct dealings with Defendants. *Euribor*, at *21.

### C.  Plaintiffs Plead A Plausible Price Fixing Conspiracy.

The SAC overflows with specific allegations of both direct and circumstantial evidence supporting Plaintiffs' claims that Defendants engaged in a *per se* illegal conspiracy to manipulate Yen-LIBOR submissions and rates, with the purpose and effect of fixing prices of Yen-LIBOR-based derivatives in the United States during the Class Period. *E.g.* SAC ¶¶1, 25, 524, 601-676, 969, 1003, 1005. Defendants attempt to deconstruct Plaintiffs' complaint into a patchwork of individual, parallel manipulations, notwithstanding. Not only does this effort violate settled Supreme Court law requiring courts to evaluate an alleged conspiracy as a whole (*see Continental Ore,* 370 U.S. at 699), it directly contradicts Defendants' own admissions of collusion. *See* SAC ¶ 5 (UBS), ¶ 11 (RBS), ¶ 12 (Rabobank), ¶ 13 (Barclays), ¶ 15 (Lloyds). Both the direct and the circumstantial evidence presented in the SAC more than adequately support Plaintiffs' allegations of a price-fixing conspiracy.

### 1. Plaintiffs Allege Direct Evidence of Conspiracy.

Defendants' argument that Plaintiffs plead no direct evidence of conspiracy (Defs.' Br. at 34) is simply wrong. The SAC cites numerous examples of collusion between UBS, HSBC, Rabobank, Lloyds, Deutsche Bank, Société Générale, and others. *E.g.* SAC ¶¶ 229-294. Defendants conspired through instant messages, emails, and telephone calls to manipulate Yen-LIBOR in order to benefit their trading positions in Yen-LIBOR-based derivatives. *See, e.g.,* SAC ¶¶ 373, 469, 790. Defendants' argument that intrabank collusion does not support a conspiracy claim (Defs.' Br. at 35) ignores all of the *inter*-bank communications the SAC alleges. For example, UBS trader Tom Hayes was well known for communicating with derivatives traders employed by at least RBS, JPMorgan, and Deutsche Bank for the manipulative purpose of benefitting their Yen-LIBOR-based derivatives trading positions. SAC ¶¶ 25; 602-603, 1022. Hayes' managers even questioned "the legal risk of UBS asking others to move their fixing." SAC ¶ 347. Similarly, RBS Senior Yen Trader, Jimmy Tan, openly chatted with traders at other banks about how Yen-LIBOR submitters at the various banks had become a cartel.

SAC ¶ 628. As yet another example, when an anonymous Lloyds trader asked Lloyd's submitter to submit a lower Yen-LIBOR rate, the submitter offered to ask the Rabobank submitter to submit a lower rate as well. SAC ¶ 663. The SAC is also replete with communications among brokers and traders at different institutions sharing proprietary information. *See, e.g.*, ¶¶ 521, 523, 524, 578-584, 590-600. And these are just the communications that have been revealed to date, prior to discovery. They unquestionably raise the "reasonable expectation that discovery will reveal [additional] evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 545 (2007).

Moreover, these exchanges were not, as Defendants contend, isolated actions by "a discrete set of individuals." Defs.' 12(b)(6) Mot. at 31. That the banks acted in concert to manipulate Yen-LIBOR, including through inter-Defendant communications, is further demonstrated by global investigations and findings of misconduct in connection with Defendants' conduct in the Yen-LIBOR market (*see, e.g.,* SAC ¶¶ 844-847); warnings among Defendants' employees to stop coordinating through chats and emails once government investigations came to light (SAC ¶¶ 794-798); and the arrest, suspension, termination, or resignation of dozens of Defendants' employees as a result of government investigations (SAC ¶¶ 852-891). Defendants' traders' words make clear that they understood themselves to be acting as part of an agreement among the banks. For example, RBS trader Tan described the banks manipulating Yen-LIBOR as a "cartel." SAC ¶¶ 25, 628. Similarly, RBS London trader Hall described "pure manipulation going on" in the Yen-LIBOR fixing. SAC ¶ 629.

These allegations plausibly plead a conspiracy, not just parallel conduct. In *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, for example, plaintiffs' complaint "adequately alleged a Section 1 conspiracy among Defendants in the FX market based on, among other things, **the sharing of market-sensitive, nonpublic information in chat rooms and instant messages, and a series of penalties and fines imposed against a number of Defendants by regulators worldwide**." *FOREX*, 2016 WL 5108131, at *3 (emphasis added). Likewise, in *In re Nasdaq Market-Makers Antitrust*

*Litig.*, the complaint's conspiracy allegations were sufficient where they provided "a number of specifics with regard to the conspiracy," including the nature of the agreement and "*some* defendant-specific examples . . . reported in the press." 894 F. Supp. 703, 712 (S.D.N.Y. 1995) (emphasis added). Such cases are far more comparable to the situation here than those Defendants cite. For instance, Defendants rely on *TI Inv. Servs., LLC v. Microsoft Corp.*—where the complaint was totally devoid of *any* allegations of inter-defendant communications or of government investigations, let alone guilty pleas and settlements, and where the plaintiffs themselves alleged that Microsoft's actions likely emboldened others to engage in the same conduct independently (as opposed to entering into an agreement). *See* 23 F. Supp. 3d 451, 471 (D.N.J. 2014).[20]

Defendants chiefly argue that Plaintiffs' claims should be dismissed because the SAC does not include an individual example of an inter-bank communication for each and every one of the Defendants. But the law has no such requirement. *See Hinds Cty., Miss. v. Wachovia Bank N.A.,* 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (no requirement that a complaint "be detailed with overt acts by each defendant"); *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. 08-0042, 2013 WL 6481195, at *33 (E.D.N.Y. Sept. 20, 2013) ("although the specific examples of certain defendants' communication with their affiliates regarding the conspiracies" were helpful "these examples [were] not required as to every defendant."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (courts "do not require plaintiffs in complex, multinational, antitrust cases

---

[20] *In re SSA Bonds Antitrust Litig.,* is similarly off point. There, Plaintiffs alleged that Defendants sold and traded SSA bonds, government-issued debt securities, at artificial prices. 420 F. Supp. 3d 219, 226 (S.D.N.Y. 2019).  The court highlighted the fact that SSA bond prices are quoted on an individual and not systemic basis, i.e., they do not have a benchmark rate. *Id.* In this context, the Court held that traders' group chats demonstrated individual acts of manipulation rather than an overarching conspiracy. *Id.* Here, the gravamen of Plaintiffs' SAC is that Defendants colluded to manipulate the Yen LIBOR benchmark rate. *See, e.g.* SAC ¶ 1. Plaintiffs' allegations detail chats not about individual sales and trades, but rather specifically requesting and agreeing to make false Yen LIBOR submissions, *inter alia. See, e.g.* SAC ¶¶ 26, 607-623.

to plead detailed, defendant-by-defendant allegations").[21] "'[O]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it.'" *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 438 (S.D.N.Y. 2014) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257 (2d Cir. 1987)). "Questions as to each Defendant's participation in the conspiracy and the conspiracy's scope may be raised later in litigation, but do not merit dismissal at this phase." *FOREX*, 2016 WL 5108131, at *4. Nor must Plaintiffs allege that each Defendant participated in the conspiracy through identical means. *EGB*, 2020 WL 4273811, at *17. Indeed, inter-Defendant communications are only one of Plaintiffs' many allegations that raise a plausible inference of conspiracy. Accordingly, Plaintiffs' claims should be sustained as against each Defendant.

Moreover, each Defendant has more than ample notice of its alleged role in the conspiracy. The chart attached hereto details specific examples of the SAC's allegations as to each Defendant's unlawful acts and the regulatory actions in which they were named.[22] In such cases, "it is not impermissible group pleading to refer to their collective actions in furtherance of the conspiracy using a more general phrase such as 'the Prime Broker Defendants.'" *Iowa Pub. Emps.*, 340 F. Supp. 3d at 317 (holding defendants were on sufficient notice of claims against them where plaintiffs' complaint included particular allegations about certain defendants and alleged that each defendant joined the conspiracy).[23] That the SAC at times refers to Defendants by their corporate family names does not

---

[21] Even if this Court were to require a specific example of inter-bank collusion for each Defendant, at a bare minimum the motion to dismiss should be denied as to those Defendants as to whom Plaintiffs do plead a specific example, and granted without prejudice and with leave to replead as to the rest. *See GSE Bonds*, 396 F. Supp. 3d at 363 (sustaining allegations against "Chatroom Defendants" because chat logs were "direct evidence of a conspiracy to fix prices").

[22] The lone exception is holding corporation Bank of America Corporation. The SAC explains the corporate structure by which Bank of America Corporation owns the subsidiaries that Plaintiff alleges participated directly in the conspiracy. *See* ¶¶ 61 (Bank of America Corporation owns Bank of America and Merrill Lynch and receives and recognizes their revenues).

[23] In reaching its conclusion, the *Iowa Pub. Employees* court distinguished *Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12-1667, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016), cited by Defendants. Defs.' Br. at 34. Unlike in *Iowa* (and here), *Concord Associates* held that

negate this fact. The SAC alleges many specific examples of employees identified by name taking specific actions to further the interests of the conspiracy. *Iowa Pub. Employees*, 340 F. Supp. at 317 (plaintiffs did not impermissibly rely on group pleading where "the Amended Complaint identifie[d] specific employees by name who held themselves out as representing the interests of their employers."). Courts routinely allow this type of pleading at the corporate family level. *See In re Interest Rate Swaps Antitrust Litig*, 261 F. Supp. 3d 430, 478 (S.D.N.Y. 2017) (noting that the complaint often groups the eleven defendants "each a corporate family" together).

### D. Plaintiffs Plead Circumstantial Evidence Sufficient to Support a Plausible Inference of Conspiracy.

On top of the ample direct evidence the SAC presents, the SAC also sets forth vast circumstantial evidence, in the form of parallel conduct and plus factors,[24] equally sufficient to support the existence of a conspiracy.

**Parallel Unlawful Acts of Repeated Manipulations**. Each Defendant acted repeatedly in the same way to manipulate Yen-LIBOR; ***nine*** Defendants have expressly admitted to doing so. *See, e.g.,* SAC ¶¶ 270-275.

**The Yen-LIBOR Market Offered Conditions Conducive to Collusion and a Common Motive to Conspire.** The Yen-LIBOR submission process created inherent conflicts of interest that

---

"group pleading is 'insufficient to withstand review on a motion to dismiss ... [where there are] **no factual allegations** in the **complaint to connect each, or any**, of the group defendants, directly to the conspiracy[.]" *Iowa Pub. Emps.*, 340 F. Supp. at 317 (quoting *Concord Assocs.*, 2014 WL 1396524, at *24) (emphasis added). Similarly, in *In re SSA Bonds Antitrust Litig.*, No. 16-3711, 2020 WL 1445783, at *4 (S.D.N.Y. Mar. 25, 2020), also cited by Defendants (Defs.' Br. at 34), the court found that plaintiffs did not sufficiently plead an antitrust conspiracy where plaintiffs did not make *any* specific factual allegations about *any* of the defendants at issue. *SSA Bonds*, 2020 WL 1445783, at *6.

[24] A plaintiff may establish a conspiracy through parallel conduct, i.e., "interdependent conduct" that is "accompanied by circumstantial evidence and plus factors," such as "a common motive to conspire," "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators," and "evidence of a high level of interfirm communications." *Gelboim*, 823 F.3d at 781 (internal citations and quotations omitted). These examples are not "exhaustive" but merely "illustrative." *Id.*

promoted manipulation and facilitated collusion. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) (reversing dismissal where complaint "allege[d] a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion"). Because of the high notional value of Yen-LIBOR-based derivatives, even very small movements in Yen-LIBOR would and did have a significant positive impact on Defendants' positions. SAC ¶ 279. Defendants' traders' compensation was based in part on the profit and loss calculation of their trading books. *Id.* Thus, Defendants' traders were motivated to do all they could to manipulate Yen-LIBOR in their favor. Those same traders whose salary depended on Yen-LIBOR also served as Yen-LIBOR submitters, with the perfect opportunity to carry out the manipulations they needed. *See, e.g.*, SAC ¶¶ 286, 315. Broker Defendants likewise profited, and in some cases received kickbacks and bribes for assisting traders with manipulating Yen-LIBOR. *See, e.g.*, SAC ¶¶ 23, 515, 545, 984. Additionally, Defendants lacked internal controls that would have prevented traders and brokers from engaging in collusive communications to manipulate Yen-LIBOR. SAC ¶¶ 322-344.

Defendants attempt to discredit these allegations by pointing out that each Defendant operated differently and that, on occasion, Defendants tried to manipulate and profit from transactions with one another. Defs.' Br. at 36. But "it is not necessary for defendants' interests to be aligned at all times to share a common motive." *BBSW I*, 343 F. Supp. 3d. at 170, n.208 (citing cases and finding plaintiffs' allegations created "a plausible claim that defendants conspired to rig the process of setting the BBSW rate such that, over time, each would benefit by realizing profits on their respective derivative positions."); *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, ("*SIBOR*"), No. 16-5263, 2018 WL 4830087, at *4 (S.D.N.Y. Oct. 4, 2018) ("While the derivative positions of Panel Members may differ on a given day, a subset of the Panel may benefit from a given manipulation, and the remainder may wait for their winning day to come, being privy to the knowledge of where the rates are heading.").

**Frequent Communications Between Bank and Broker Employees.** Defendants' employees frequently communicated among banks through chats, emails, and telephone conversations. *See, e.g.,* SAC ¶¶ 89, 124, 298, 346. Such a high volume of interfirm communications itself supports the inference of a conspiracy. *Apex Oil*, 822 F.2d at 254 (recognizing "a high level of interfirm communications" supports inference of a conspiracy); *Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 430 (S.D.N.Y. 2020) ("[E]ven if these conversations themselves did not set spreads or fixes, the sharing of information between competitors constitutes circumstantial evidence of an antitrust conspiracy and is sufficient at the pleading stage.").

**Independent Economic Analysis Demonstrates that the Price of Yen-LIBOR was Artificial During the Class Period, Consistent with Conspiracy.** Plaintiffs allege that over the course of Defendants' manipulation, Yen-LIBOR diverged dramatically from its historical relationship with the Euroyen Deposit Rate, a benchmark comprised of quotes for bids and asks of financial institutions seeking to transact in the three-month Euroyen market. SAC ¶¶ 893-901. Plaintiffs' analysis also demonstrates that Defendant bank quotes diverged from their "CDS spreads" when one would expect the quotes and CDC spreads to move in lockstep. SAC ¶ 905. During the class period, the Defendant banks frequently submitted low Yen-LIBOR rates, even when their CDS spreads were high. SAC ¶¶ 905, 908-909. This anomalous behavior on behalf of multiple Defendants supports an inference of conspiracy.[25]

---

[25] Defendants claim that Plaintiffs' economic analysis merely shows the aggregate impact of deviating Yen LIBOR rates. Defs.' Br. at 36 n. 36. However, courts routinely accept analysis based on averages and market-wide data at the pleading stage. *See, e.g., Contant v. Bank of Am. Corp.*, No. 17-cv-3139, 2018 WL 5292126, at * 6 (S.D.N.Y. Oct. 25, 2018); *Gold*, 213 F. Supp. 3d. at 660 (average bid dispersion and price decline); *Silver*, 213 F. Supp. 3d at 559 (average price decline). Moreover, Defendants' alternative explanations that Plaintiffs' data could result from independent bank activity or "financial dislocations caused by the financial crisis" do not hold water. As set forth herein, Plaintiffs have met their burden to plausibly allege a conspiracy among Defendants, and not mere parallel conduct. Additionally, the financial crisis does nothing to explain Defendants' sharing of information, false Yen-LIBOR submissions, and global investigations and government penalties in connection with the manipulation of Yen-LIBOR, all of which plausibly indicate an orchestrated plan. *Cf. In re Sadia, S.A.*

**Regulatory Settlements Provide Non-Speculative Support for The Existence of A Conspiracy.** Dozens of Defendants, co-conspirators, and their employees are under investigation and have been subject to fines, guilty pleas, government settlements, deferred prosecution agreements, and criminal charges in connection with their manipulation of Yen-LIBOR. *See, e.g.,* SAC ¶¶ 4-24. These include UBS, RBS, Citibank, JPMorgan, Deutsche Bank, HSBC, Barclays, Bank of Tokyo, Rabobank, R.P. Martin, ICAP, and Tullett Prebon. *Id.*

The existence of government investigations is a recognized plus factor supporting the inference of conspiracy. *See Starr v. Sony BMG Music Entm't.*, 592 F.3d 314, 324-25 (2d Cir. 2010). Here, government investigations have led to factual findings and admissions that Defendants colluded to manipulate Yen-LIBOR. SAC ¶¶ 800-891. Indeed, as part of its leniency application to the Department of Justice, UBS admitted to manipulating Yen-LIBOR and to colluding with other Defendants. SAC ¶ 5. RBS, Rabobank, Lloyds, Barclays, and Deutsche Bank[26] also all admitted to colluding with others to manipulate Yen-LIBOR. *See, e.g.,* SAC ¶¶ 10-15; 646-66. The findings and admissions arising out of these government actions alone makes it *plausible* that discovery will reveal evidence of the alleged conspiracy.

---

*Sec. Litig.*, 269 F.R.D. 298, 317 (S.D.N.Y. 2010) (rejecting defendants' "don't blame me, blame the financial crisis" defense). More importantly, "although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that the conduct was culpable is not also plausible" and "it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

[26] Defendants claim that ¶ 812 of the SAC incorrectly states that Société Générale admitted in its deferred prosecution agreement to interbank conduct. Defs.' Brf. at 35 n. 34. Defendants misread ¶ 812, which states simply that Société Générale's deferred prosecution agreement admits that S Société Générale's employees intended to benefit their trading positions. But even if Defendants were correct (they are not), the fact that a Defendant does not make a particular admission in a government proceeding does not mean the Defendant was not a conscious participant in an antitrust conspiracy. *FOREX*, 2016 WL 5108131, at *4 ("[T]he scope and nature of….criminal guilty pleas are not determinative of the plaintiffs' potential claims in a civil antitrust suit.") (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal. 2010)).

### E.  The FTAIA Does Not Bar Plaintiffs' Sherman Act Claims.

It is surprising that Defendants have even attempted to argue that the FTAIA bars Plaintiffs' antitrust claims. This case is no different from all the other LIBOR cases where courts in this District have correctly found that "[t]he FTAIA does not bar plaintiffs' antitrust claim because the Class is limited to 'U.S. based transactions.'" *CHF LIBOR,* 277 F. Supp. 3d at 569 ("[N]one of the numerous decisions in this district addressing LIBOR manipulation have invoked the FTAIA to bar claims based on transactions occurring in the United States."); *see also BBSW I*, 343 F. Supp. 3d at 172 (allegations that defendants "manipulated BBSW on a regular basis in order to impact the prices of and increase profits on BBSW-Based Derivatives" sold in the United States were sufficient to plead "direct, substantial and reasonably foreseeable" effect on domestic commerce); *SIBOR*, 2017 WL 3600425, at *13 (S.D.N.Y. Aug. 18,  2017) (same, as to SIBOR); *Euribor*, 2017 WL 685570, at *22 (same, as to Euribor). Defendants' musings on CEA and RICO extraterritoriality are flawed in their own right,[27] but more to the point for this purpose, totally irrelevant. *See Euribor*, 2017 WL 685570, at *22 ("In adopting the FTAIA, Congress expressly endorsed an extraterritorial application of the Sherman Act…. [T]his puts plaintiffs' antitrust claims on a very different footing than their claims brought under the CEA and RICO."). The law is crystal clear that antitrust claims arising out of U.S. transactions may proceed even where much of defendants' conduct takes place abroad.

### a.  The import commerce exception brings the conspiracy to fix prices of U.S.-based transactions in Yen LIBOR-based derivatives outside the FTAIA's coverage.

The FTAIA specifically carves out "import commerce" from its reach, such that the Sherman Act continues to regulate it. Here, transactions in Yen-LIBOR-based derivatives in the U.S. or with U.S. residents (as Defendants admit that they do, *e.g.*, SAC ¶¶ 5, 10, 11, 13, 15, 16) necessarily "import"

---

[27] Furthermore, Defendants rely heavily on *Laydon's* rulings on this topic, which are currently on appeal at the Second Circuit.

the manipulated derivatives into the U.S.  *See, e.g. FOREX,* 2016 WL 5108131, at *13 ("In a situation where a U.S. entity operating in the United States trades FX with a foreign desk of a Defendant, the FTAIA does not apply and the claim is not barred because of the statute's import commerce exclusion (or exception)."); *accord Minn-Chem, Inc. v. Agrium Inc.,* 683 F.3d 845, 855 (7th Cir. 2012) ("[T]ransactions that are directly between the plaintiff purchasers and the defendant cartel members are the import commerce of the United States in this sector.").

> **b.  The domestic effect exception also brings the conspiracy to fix prices of U.S.-based transactions in Yen LIBOR-based derivatives outside the FTAIA's coverage.**

This domestic commerce exception applies where "(1) the foreign conduct has a 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic, import, or certain export commerce, and (2) that effect "gives rise to a claim under" the Sherman Act.  15 U.S.C. § 6a.  Both requirements are met here. As Judge Stein put it, "[t]here can be no serious dispute that the manipulation of a benchmark that is globally disseminated and serves as a pricing component of derivatives sold widely in the United States, as plaintiffs have plausibly alleged, would have a foreseeable effect within the United States." *CHF LIBOR,* 277 F. Supp. 3d at 569; *see also BBSW I,* 343 F. Supp. 3d at 172; *SIBOR,* 2017 WL 3600425, at *13; *Euribor,* 2017 WL 685570, at *22. Plaintiffs here plead that Yen-LIBOR serves as a pricing component for Yen LIBOR-based derivatives (SAC ¶¶ 1, 256-269), and that Defendants manipulated Yen-LIBOR on a regular basis in order to impact the prices of and increase their own profits on their transactions in those derivatives, *id.* ¶¶ 3, 12, 15, 16, 157, 186, 270, 279. Plaintiffs plead also that Defendants transacted in Yen-LIBOR-based Derivatives the United States. *See e.g., id.* ¶¶ 2, 51, 79, 89, 156, 169, 241. These allegations mirror those of all of the other LIBOR cases that have rejected the same FTAIA arguments and should yield the same result here.

The domestic effect of Defendants' conspiracy gives rise to Plaintiffs' U.S.-based claim. Contrary to Defendants' complaints about a "multi-step causal chain" (Defs.' Br. at 39) the connection

between Defendant's conduct and Plaintiffs' injury is as straightforward as can be. Defendants fixed the prices of Yen-LIBOR-based derivatives traded in the United States. Plaintiffs were overcharged and/or underpaid on their U.S. transactions in those very derivatives. Their Sherman Act claim arises directly from their injury incurred in those transactions. The required causal link for this prong of the FTAIA analysis is between the domestic *effects* of Defendants' conduct (changes in the prices of Yen-LIBOR-based derivatives) and Plaintiffs' injury—not between the conduct itself and the injury. *See Euribor,* 2017 WL 685570, at *22 (rejecting FTAIA challenge where "[d]efendants also point to the Europe–based *conduct* of defendants, even though the FTAIA's express language and the decisions applying it focus on the anti-competitive *effects* within the United States.").

## IV.   PLAINTIFFS SUFFICIENTLY PLEAD PLAUSIBLE RICO CLAIMS BASED ON U.S. TRANSACTIONS IN YEN-LIBOR-BASED DERIVATIVES.

### A. Plaintiffs Sufficiently Plead RICO Standing.

Once again, Defendants rely on stale case law to complain of causation deficiencies that do not exist. All Plaintiffs need to do to plead RICO standing is to allege a "direct relation" between their injury (transacting in price-fixed Yen-LIBOR-based derivatives) and Defendants' RICO violation (a scheme to fix the prices of derivatives by manipulating Yen-LIBOR.) *Accord CHF LIBOR*, 277 F. Supp. 3d at 576. They have clearly done so. *See, e.g.*, SAC ¶¶ 914-51. As Defendants point out, the RICO standing analysis effectively mirrors that for antitrust standing. Defs.' Br. at 40. It is no surprise, then, that the courts that found allegations of a global benchmark manipulation conspiracy adequate to support antitrust standing found the same for RICO. *See CHF LIBOR*, 277 F. Supp. 3d at 576 (defendants' argument that plaintiffs' injuries were too "indirect and speculative" for RICO standing "fails for the reasons given in the antitrust standing analysis above"); *BBSW I*, 343 F. Supp. 3d at 184 (plaintiffs pled RICO standing because "[t]o suggest that the manipulation of a component of the price of a derivative impacts the overall price and therefore the returns on such derivative requires no great leap of logic"). The connection between Defendants' specific RICO predicate acts and Plaintiffs'

injuries is even more obvious. Plaintiffs allege, *inter alia*, that the bank Defendants here used domestic wires to procure illicit trading profits obtained by Yen-LIBOR manipulation from counterparties located in the United States, including CalSTRS and the Hayman Funds. *See, e.g.,* SAC ¶¶ 142-46, 154-56, 1023. Plaintiffs were injured by losing money on their Yen-LIBOR-based derivatives transactions. Defendants violated RICO by (among other things) taking that money from them. It is difficult to imagine any more direct relationship between conduct and injury.

### B.   Plaintiffs Properly Plead Each Element of a RICO Claim.

Plaintiffs adequately allege the RICO elements: Defendants' conduct of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, (1985). Plaintiffs also plead the necessary predicate offense of wire fraud, "(i) a scheme to defraud[28] (ii) to get money or property (iii) furthered by the use of interstate mail or wires." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); *see* 18 U.S.C. §§ 1341, 1343. Additionally, Plaintiffs plausibly allege that Defendants conspired to violate RICO, and thus are liable under 18 U.S.C. § 1962(d).

### 1.   Plaintiffs Plead an "Enterprise."

Just as they do in the context of antitrust, Defendants attempt to disaggregate their countless acts showing a RICO enterprise. Considering each of the "three structural features" necessary to an enterprise (*see* Defs.' Br. at 46) establishes that Plaintiffs here have plausibly pled one.

***Purpose***: The purpose of Defendants' enterprise was to profit from transactions in Yen-LIBOR-based derivatives by manipulating Yen-LIBOR. Multiple courts have found this to be a plausible goal for a conspiracy. *E.g. BBSW I*, 343 F. Supp. 3d at 185 (accepting "common purpose" of RICO enterprise was to manipulate BBSW benchmark to increase profits on BBSW-based

---

[28] A "scheme to defraud" is "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).

derivatives); *SIBOR*, 2018 WL 4830087, at *10 ("the SAC plausibly alleges a trader-based conspiracy [to manipulate SIBOR] having the goal of profiting in the U.S. and elsewhere [on SIBOR-based derivatives transactions]"). As Judge Hellerstein explained, "[w]hile the derivative positions of Panel Members may differ on a given day, a subset of the Panel may benefit from a given manipulation, and the remainder may wait for their winning day to come, being privy to the knowledge of where the rates are heading." *SIBOR,* 2018 WL 4830087, at *4. The motivation of "interdealer brokers who never had any proprietary investments" of their own to "knowingly participate[] in and aid[] [the banks'] six-year-effort" (Defs.' Br. at 47) is even simpler: the banks compensated them for it. SAC ¶¶ 500-31. As far as the "requisite intent to harm" (Defs.' Br. at 47), seeking to unlawfully increase profits on derivatives transactions necessarily entails financial injury to the counterparty. Rabobank trader Paul Robson explained: "I tailored the yen LIBOR submissions I made on behalf of Rabobank in order to profit the bank's position . . . ***I understood the parties taking opposite trading positions could be negatively affected***." SAC ¶ 27 (emphasis added); *see also id.* ¶¶ 51, 71, 78, 89, 141, 145.

*Relationships*. Defendants' characterization of the relationships between the conspiring banks and brokers as "routine business relationships" (Defs.' Br. at 46) is both humorous and telling. Regulators throughout the world have imposed billions of dollars in fines on entities whose "routine business relationships" involved collusion to manipulate Yen-LIBOR in a self-described "cartel" (SAC ¶¶ 25, 628, 760, 797), sharing of proprietary trading information (*see, e.g., id.* ¶¶ 272, 606, 616, 631, 667), and rewarding each other through wash trades and bribes (*id.* ¶¶ 500-531). Any one of these acts could suffice to meet the very low threshold for alleging an association-in-fact. *E.g. BBSW I*, 343 F. Supp. 3d at 184 (accepting allegations that "defendants associated with one another by sharing information . . . ahead of the Fixing Window" as sufficient to establish "relationships among the individuals associated with the enterprise").

*Longevity.* Defendants do not even attempt to contest that Plaintiffs' allegations of a six-year course of conduct constitute "longevity sufficient to permit these associates to pursue the enterprise's purpose." *See* Defs.' Br. at 46. This factor alone lends substantial force to Plaintiffs' allegations that Defendants acted as part of a fraudulent scheme in pursuit of a common purpose. The sheer persistence in the very same behaviors—making, and encouraging each other to make, false Yen-LIBOR submissions, rewarding brokers for facilitating the false submissions, sharing proprietary information—over a period of years makes it very difficult to characterize them as "idiosyncratic." *See* Defs.' Br. at 47.

### 2. Plaintiffs Plead a Pattern of Racketeering with Respect to Each Defendant.

Exhibit A hereto compiles examples of the SAC's specific allegations as to each Defendant's participation in the six-year-long "pattern of racketeering," including many acts of wire fraud. Defendants' assertion that Plaintiffs rely only on generalized group pleading is simply inaccurate. *See* Defs.' Br at 44-45. Plaintiffs have more than satisfied their obligation to provide each Defendant with "fair notice of the claims against them," such that it is not inherently improper for the SAC sometimes to refer to Defendants collectively as well in describing their collective scheme. *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 150 (S.D.N.Y. 2014)). Plaintiffs' complaint, well over 400 pages long not counting exhibits, overflowing with direct quotations of Defendants' fraudulent wire communications, as well as specific details of Plaintiffs' transactions on which Defendants directly collected their ill-gotten gains via wire fraud, provides well more than the required detail.

Defendants claim that their many communications over a period of six years, all directed at manipulating Yen-LIBOR for their benefit in derivatives trading, do not constitute a "pattern" because they involved "mov[ing] Yen LIBOR up or down on certain days." Defs.' Br. at 45. But as set forth above, the plausibility of multi-directional benchmark manipulation conspiracies is now comfortably established in this District. That Defendants moved Yen-LIBOR in different directions depending on

their trading positions at the relevant time does not make their behavior any less of a "pattern." The "pattern" is a consistent effort to shift the Yen-LIBOR benchmark from reflecting actual market fundamentals to reflecting the artificial profit motivations of the conspirators. Over and over for *six years*, they engaged in the same acts directed at the same goal of profiting unlawfully from Yen-LIBOR-based derivative transactions. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (allegations of numerous bribes over a six-year period sufficient to establish pattern of racketeering).[29]

   **i.     Plaintiffs Plead a RICO Conspiracy Claim.**

The test for a RICO conspiracy claim under § 1962(d) is "less demanding" than for substantive violations. *Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003). The singular requirement is to allege some factual basis for finding a conscious agreement among the Defendants. *Hecht v. Commerce Clearing House Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990).

Plaintiffs adequately allege that Defendants conspired to violate section 1961(d) by organizing and implementing their scheme to defraud, which required a conspiracy to profit unlawfully from Yen-LIBOR-based derivative transactions that were artificially priced as a result of their conduct. *See, e.g.*, SAC ¶¶ 33-35, 271, 358, 381, 486-96. These allegations state a plausible claim that Defendants were part of a RICO conspiracy.[30] *See, e.g.*, *BBSW I*, 343 F. Supp. 3d at 188 (allegations of cooperation among defendants to exchange information to help one another manipulate BBSW benchmark and

---

[29] Defendants' citation to cases where the alleged activity took place over much shorter periods of time is thus unavailing. *See* Defs.' Br. at 45, citing *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467-69 (2d Cir. 1995) (no "pattern of racketeering activity" when activities persisted under a year and only a few impacted investors) and *Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) ("some unspecified RICO predicate" occurring for less than a year).

[30] These allegations distinguish the case at hand from those cited by Defendant. *See Hecht*, 897 F.2d 21, 25-26 n.4 (dismissing RICO conspiracy claim for failure to allege *any facts* of a conscious agreement); *Elsevier Inc. v. W.H.P.R. Inc.*, 692 F. Supp. 2d 297, 313 (S.D.N.Y. 2010) (complaint contained only conclusory, bare allegations of an agreement); *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs., Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006) (same); *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002) (same).

Prime Bank Bill transactions were sufficient to establish antitrust conspiracy and RICO conspiracy); *Angermeir*, 14 F. Supp. 3d at 155 (citing cases).

### C.  Plaintiffs' RICO Claims Are Not Impermissibly Extraterritorial.

In *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101-06 (2016), the Supreme Court explained that the "focus" of the RICO extraterritoriality analysis is on whether "liability or guilt could attach to extraterritorial conduct under the relevant RICO predicate," and not the location of the alleged "enterprise" used to carry out the scheme. *See also European Cmty. v. RJR Nabisco,* 764 F.3d 129, 136-38 (2d Cir. 2014); *Bascuñán v. Elsaca*, 927 F.3d 108, 123 (2d Cir. 2019) ("the mail and wire fraud statutes do not give way simply because the alleged fraudster was located outside the United States.").

The Second Circuit has long held that the RICO statute is intended to regulate foreign actors and activity, like Defendants' conduct here, that use the United States wires to perpetuate fraud. *United States v. Kim*, 246 F.3d 186, 189-91 & n.2 (2d Cir. 2001) (defendant's "fraudulent scheme was implemented while he was located in Croatia—but furthered by wire transmissions to and from New York"); *European Cmty.*, 764 F.3d at 142 (although scheme took place abroad, it was designed to "defraud in the United States and [defendants] used the U.S. mails and wires in furtherance of those schemes and with the intent to do so."); *Pasquantino v. U.S.*, 544 U.S. 349, 353, 371 (2005) (use of United States interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue does not constitute extraterritorial application of the wire fraud statute); s*ee also United States v. Hayes*, 99 F. Supp. 3d 409, 420-22 (S.D.N.Y. 2015) (allegations that conspirators published to servers in the U.S. manipulated LIBOR rates and used interstate wires to memorialize trades at artificial prices in furtherance of scheme to defraud established domestic application of wire fraud statute); *United States v. Hayes*, 118 F. Supp. 3d 620, 628-29 (S.D.N.Y. 2015) (same).

Plaintiffs' RICO claims here arise from Defendants' domestic violations of the wire fraud statute, including using U.S. wires to send fraudulent trade confirmations incorporating Yen-LIBOR

to U.S. counterparties in the United States, without disclosing Defendants were manipulating Yen-LIBOR to those customers' detriment; and extracting ill-gotten funds from Plaintiffs and Class members in the United States through U.S. wires. On top of that, Defendants took numerous other actions in the United States in furtherance of their scheme to defraud—all of which form part of their predicate offense of wire fraud. *See Autuori*, 212 F.3d at 115 ("scheme to defraud" first element of wire fraud). Barclays, for example, employed traders in New York who transacted in interest rate swaps tied to Yen LIBOR. SAC ¶ 178. RBS's Stamford-based trader David Pieri not only traded Yen LIBOR-based derivatives in the United States, but also was involved in manipulating Yen-LIBOR. *Id.* ¶¶ 192-93. Judge Stein in *CHF LIBOR* specifically left open the question of whether just such a showing (not present in that case) would defeat defendants' challenge to plaintiffs' RICO claim based on the issue of extraterritoriality. *See* 277 F. Supp. 3d at 582-83.

## V.   PLAINTIFFS STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Under New York law, every contract includes an implied covenant of good faith and fair dealing. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, ("*LIBOR II*"), 962 F. Supp. 2d 606, 631-32 (S.D.N.Y. 2013) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)); *see also ABN AMRO Bank, N.V. v. MBIA Inc.*, 952 N.E.2d 463, 475 (N.Y. 2011). This implied covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the contract." *LIBOR II*, 962 F. Supp. 2d at 632.

Plaintiffs JMOF and HCMF entered into contracts with Defendants Barclays and Merrill Lynch, and Plaintiff CalSTRS entered into contracts with Defendants UBS, RBS, Barclays, Bank of America, and Société Générale, for Yen-LIBOR-based products. SAC ¶¶ 1057-58. Implied in each of these contracts was a promise that Barclays, Merrill Lynch, UBS, RBS, Bank of America, and Société Générale would not manipulate Yen-LIBOR to the detriment of Plaintiffs. *See LIBOR II*, 962 F. Supp.

2d at 631-35 (finding over-the-counter LIBOR-based derivatives "included a promise by defendants not to manipulate LIBOR to their benefit and plaintiffs' detriment."); *Euribor*, 2017 WL 685570, at *36 (same). These Defendants breached the implied covenant of good faith and fair dealing when they manipulated Yen-LIBOR in "reckless disregard of the detriment to plaintiffs" JMOF, HCMF, and CalSTRS, "with whom [these Defendants] were in direct contractual privity." *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, ("*LIBOR III*"), 27 F. Supp. 3d 447, 482-84 (S.D.N.Y 2014).

Contrary to Defendants' contention, it is irrelevant that CalSTRS's FX forward contracts with Defendants "do not refer to or even mention Yen LIBOR" (*see* Defs.' Br. at 51) because the parties understood that the manipulation of Yen-LIBOR would directly impact these FX forward contracts to Plaintiffs' detriment. *See* SAC ¶ 938 ("Yen foreign exchange forwards are Yen-LIBOR-based derivatives that are priced based on Yen-LIBOR."); *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (a party breaches the implied covenant of good faith and fair dealing by committing some act that has "the effect of destroying or injuring the right of the [ ] party to receive the fruits of the contract."); *BBSW I*, 343 F. Supp. 3d at 192 (by manipulating BBSW benchmark, defendants interfered with plaintiff's right to "enjoy the maximum returns permitted by market forces on their . . . transactions."). Simply put, this is not a case where a party is invoking their "general right to act on [their] own interests in a way that *may incidentally lessen* the other party's anticipated fruits from the contract," (*Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 408 (2d Cir. 2006) (emphasis added)), but the intentional, unlawful manipulation a benchmark that directly impacted the proceeds Plaintiffs received under the contract for Defendants' own benefit. *Id.* at 407 (a party violates the implied covenant of good faith and fair dealing when a party "do[es] anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.").[31]

---

[31] Neither *Thyroff* nor *Paul v. Bank of America Corp.*, No. 09-1932, 2011 WL 684083 (E.D.N.Y. Feb. 16, 2011) is to the contrary. *Thyroff* dealt with a disgruntled former employee who brought a purely contractual claim against his former employer, arguing that it was improper that defendant had taken

Similarly, Plaintiffs need not "identify [each] specific [derivative] . . . artificially priced" (*see* Defs.' Br. at 51-52) to establish a claim for breach of the implied covenant of good faith and fair dealing. *See LIBOR III*, 27 F. Supp. 3d at 482 (rejecting argument that plaintiff must "focus on the particular tenors of LIBOR that applied to the parties' contracts" and accepting allegations that "LIBOR was systematically suppressed across all tenors" as a "coherent theory . . . sufficient to meet [plaintiffs'] pleading burden."). Here, Plaintiffs' allegations that Defendants systematically manipulated Yen-LIBOR submissions, which led to Plaintiffs' sustaining a loss or receiving less on these contracts than they otherwise would, constitute a "coherent theory" and are sufficient for purposes of Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. *See, e.g.*, SAC ¶¶ 270; 914-51; *LIBOR III*, 27 F. Supp. 3d at 482.

Defendants incorrectly claim that Plaintiffs have not alleged that Defendants have acted with "intent" or "reckless disregard" of the risk of harm. *See* Defs.' Br. at 51. Manipulation of benchmark rates has been considered "at least in reckless disregard" of counterparties, such as Plaintiffs. *See, e.g.*, *LIBOR III*, 27 F. Supp. 3d at 483; SAC ¶¶ 1057-58. It is of no moment that the panel banks were distinct entities from the contracting Defendants, because Plaintiffs allege that the counterparties participated with the banks in their illicit Yen-LIBOR manipulation. SAC ¶¶ 914-51; *see LIBOR IV*, 2015 WL 4634541, at *65 (S.D.N.Y. Aug. 4, 2015) (a claim for breach of the implied covenant is

---

data plaintiff collected about clients. Plaintiff was only able to point to an agent agreement, containing a non-compete clause, and an office equipment lease agreement, neither of which were even tangentially related to the right of an employer to access information off their own software. Not only were these agreements entirely unrelated to the right to collect information, but nothing prevented plaintiff from receiving the "fruits" under the contract. *Id.* at 407-08. In *Paul v. Bank of America Corp.*, plaintiff sued her credit card company for breach of contract alleging they wrongly provided her personal information to the police, in purported violation of her cardmember agreement. 2011 WL 684083, at *1. The main purpose of the contract was providing credit for transactions, and defendants' use of personal information bore no obvious "connection with the rights or obligations set forth in the terms of the contract." *Id.* at *6.

proper where "plaintiff can allege that the counterparty entity participated somehow in the panel bank's illicit manipulation.").[32]

## VI.   PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT.

Plaintiffs adequately plead a claim for unjust enrichment, which requires allegations that a party received a benefit at the expense of another. *LIBOR III*, 27 F. Supp. 3d at 479. Plaintiffs allege that they transacted with Defendants while Defendants were actively and systematically manipulating Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, resulting in illegal, ill-gotten gains for Contributor Bank Defendants at the expense of Plaintiffs. SAC ¶ 1049. Nothing more is required

Even if this Court were to dismiss Plaintiff's RICO or antitrust claims, Plaintiffs' unjust enrichment claims are still viable (and this Court's exercise of supplemental jurisdiction over them therefore appropriate) because they are based on Defendants' underlying misconduct. Defendants have entered historic settlements with the DOJ, CFTC, FSA, NYSDFS, and EC, resulting in over $7 billion in fines and penalties, relating to their manipulation of Yen-LIBOR and the prices of Yen-LIBOR-based derivatives, directly resulting in unlawful profits at the expense of Plaintiffs and Class members. SAC ¶¶ 8, 276-77. Common sense dictates that it would be unjust for Defendants to retain the benefit of their misconduct, including their unlawful profits, regardless of whether this Court sustains Plaintiffs' RICO and antitrust claims, which have separate legal requirements to state a claim.

Nor are Plaintiffs' unjust enrichment claims barred by contract. Defendants' alleged misconduct extended well "beyond the terms of any underlying agreements," none of which made any mention of whether Defendants were permitted to manipulate Yen-LIBOR. *Euribor,* 2017 WL

---

[32] Lastly, Defendants claim that Plaintiffs Hayman and CalSTRS do not have injury-in-fact, a standing argument, is easily dispelled. *See* Defs.' Br. at 11 (citing *BBSW I*, 343 F. Supp. 3d at 154-55). *BBSW I* concluded that allegations that defendants "manipulated BBSW on days when these plaintiffs transacted in BBSW-Based Derivatives . . . "readily meets the 'low threshold' for injury-in-fact." Plaintiffs here allege the same. SAC ¶¶ 915; 937-38.

685570, at *36 (sustaining unjust enrichment claim on this basis despite presence of contracts); *BBSW I*, 343 F. Supp. 3d at 194 (contracts between the parties "did not 'clearly cover' the manipulation of the benchmark rate underlying the derivatives that were the subject of the contracts.") (internal citation omitted); *LIBOR II*, 962 F. Supp. 2d at 630 (same).[33]

Finally, Defendants are wrong that plaintiffs may not pursue unjust enrichment claims against Defendants with whom they did not have "direct dealings."[34] *See* Defs.' Br. at 50. New York law only requires that a plaintiff's relationship with a defendant not be too attenuated. *See, e.g., In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 233 (S.D.N.Y. 2012) (sustaining plaintiffs' unjust enrichment claims under New York law "despite not having direct dealings (contractual or otherwise)"); *Dennis v. JPMorgan Chase & Co.*, 439 F. Supp. 3d 256, 268 (S.D.N.Y. 2020) ("*BBSW II*") (an unjust enrichment claim can survive by a "'modest' showing that the alleged connection between the parties is not too attenuated.") (internal citation omitted); *Eastman Kodak Co. v. Camarata*, No. 05-6384, 2006 WL 3538944, at *14-15 (W.D.N.Y. Dec. 6, 2006) (sustaining unjust enrichment claims against the non-counterparty defendant where plaintiffs alleged that the non-counterparty defendant knowingly furthered the scheme to defraud, and was enriched thereby). Recently, Judge Kaplan held that "allegations that a defendant's misconduct 'artificially moved market prices in a way that directly harmed [p]laintiffs while benefitting [d]efendants'" is sufficient to meet this standard. *BBSW II,* 439 F. Supp. 3d at 268. Further, with respect to affiliated entities, courts have expressly held that a plaintiff

---

[33] In *Pappas v. Tzolis*, 982 N.E.2d 576, 580 (N.Y. 2012), cited by Defendants (*see* Defs.' Br. at 49) the parties formed an LLC and entered an operating agreement allowing the parties to engage in "business ventures and investments . . . whether or not in competition with the LLC, without obligation of any kind to the LLC or to the other Members." *Id.* at 578. This agreement precluded plaintiff from bringing an unjust enrichment claim when another member purchased all shares and sold the LLC to a third-party because, unlike here, the agreement clearly governed the subject matter. *Id.* at 580.

[34] Contrary to Defendants' contention, (*see* Defs.' Br at 50 n.45) Plaintiff HCMF alleged they entered "Yen-LIBOR-based derivatives transactions from within the United States during the Class Period . . . with . . . Barclays Bank PLC." SAC ¶ 916.

may pursue "unjust enrichment as a remedy for damages caused by a counterparty's affiliate." *LIBOR*

*IV*, 2015 WL 4634541, at *65.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.

Dated: November 30, 2020
White Plains, New York

Respectfully submitted,

By: */s/ Vincent Briganti*
  Vincent Briganti
  Raymond Girnys
  Christian Levis
  Peter A. Barile III
  Margaret MacLean
  Roland R. St. Louis, III
  Noelle Feigenbaum
  **LOWEY DANNENBERG, P.C.**
  44 South Broadway, 11th Floor
  White Plains, New York 10601
  Telephone: (914) 997-0500
  vbriganti@lowey.com
  rgirnys@lowey.com
  clevis@lowey.com
  pbarile@lowey.com
  mmaclean@lowey.com
  rstlouis@lowey.com
  nfeigenbaum@lowey.com

  Charles Z Kopel
  100 Front Street, Suite 520
  West Conshohocken, PA 19428
  Telephone: (215) 399-4770
  ckopel@lowey.com

  *Counsel for Plaintiffs*

  Joseph J. Tabacco, Jr.
  Todd A. Seaver
  Carl Hammarskjold
  **BERMAN TABACCO**
  44 Montgomery Street Suite 650
  San Francisco, CA 94104
  Telephone: (415) 433-3200

Facsimile: (415) 433-6282
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com

Patrick T. Egan
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
pegan@bermantabacco.com

*Additional Counsel for Plaintiffs*