# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUND LIQUIDATION HOLDINGS LLC as assignee and successor-in-interest to Sonterra Capital Master Fund, Ltd., HAYMAN CAPITAL MASTER FUND, L.P., JAPAN MACRO OPPORTUNITIES MASTER FUND, L.P., and CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBS AG, UBS SECURITIES JAPAN CO. LTD., SOCIÉTÉ GÉNÉRALE S.A., NATWEST GROUP PLC, NATWEST MARKETS PLC, NATWEST MARKETS SECURITIES JAPAN LTD., NATWEST MARKETS SECURITIES, INC., BARCLAYS BANK PLC, BARCLAYS PLC, COÖPERATIEVE RABOBANK U.A., LLOYDS BANKING GROUP PLC, LLOYDS BANK PLC, NEX INTERNATIONAL LIMITED, ICAP EUROPE LIMITED, TP ICAP PLC, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., MERRILL LYNCH INTERNATIONAL, AND JOHN DOE NOS. 1-50,<br><br>Defendants. | DOCKET NO. 15-cv-05844-GBD<br><br>Hon. George B. Daniels<br><br><u>ORAL ARGUMENT REQUESTED</u> |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT FOR LACK OF <u>SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.   THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS
     CASE. ......................................................................................................... 2

     A.   The Court Has Always Lacked Subject Matter Jurisdiction. ................................. 2

     B.   CalSTRS' Later-Added Claims Are Irrelevant to the Analysis. ............................ 5

     C.   Hayman Funds' Substitution Did Not Create Jurisdiction. ................................. 6

     D.   Plaintiffs Admit That Sonterra Could Not Prosecute This Action. ....................... 8

     E.   FLH Additionally Lacks Standing Because Sonterra Did Not Assign Its
          Right to Initiate Claims. ..................................................................... 10

II.  PLAINTIFFS' CLAIMS ARE TIME-BARRED. ......................................................... 13

     A.   Plaintiffs Filed this Action Outside the Relevant Limitations Period for
          Each Claim. ................................................................................... 13

     B.   Named Plaintiffs' Claims Were Untimely When They Attempted to Join
          This Case. ...................................................................................... 17

     C.   Plaintiffs Admit Their Claims Against UBS Are Untimely. ............................... 18

     D.   Plaintiffs' Claims Against Merrill Lynch International Are Time-Barred. ........... 18

III. PLAINTIFFS' SHERMAN ACT CLAIM SHOULD BE DISMISSED
     (COUNT I). ................................................................................................ 19

     A.   Plaintiffs Lack Antitrust Standing. ......................................................... 19

     B.   Plaintiffs Have Not Plausibly Alleged an Overarching Antitrust
          Conspiracy. ................................................................................... 23

     C.   The FTAIA Bars Plaintiffs' Claims. ........................................................ 28

IV.  PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED (COUNTS II-
     III). ......................................................................................................... 29

     A.   Plaintiffs Lack RICO Standing. ............................................................. 29

     B.   Plaintiffs' RICO Claims Are Impermissibly Extraterritorial. ........................... 31

      C.     Plaintiffs Fail to Plead a RICO Enterprise or a Pattern of Racketeering. ............. 34

      D.     Plaintiffs Fail to Plead a RICO Conspiracy. ......................................... 38

**V.     PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED (COUNT IV).** ....................................................... 39

**VI.    PLAINTIFFS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND DEALING SHOULD BE DISMISSED (COUNT V).** ....................................................................................... 41

**CONCLUSION** ......................................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*7 West 57th Street Realty Co. v. Citigroup, Inc.*,
771 F. App'x 498 (2d Cir. 2019) ...........................................................................21

*AmBase Corp. v. 111 W. 57th Sponsor LLC*,
785 F. App'x 886 (2d Cir. 2019) ...........................................................................36

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987)...................................................................................24

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019)............................................................................................21

*Aramony v. United Way of America*,
254 F.3d 403 (2d Cir. 2001)...................................................................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................38

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)...................................................................................26

*Banakus v. United Aircraft Corp.*,
290 F. Supp. 259 (S.D.N.Y. 1968) ..........................................................................9

*Bascuñán v. Elsaca*,
927 F.3d 108 (2d Cir. 2019)...................................................................................32

*Billino v. Citibank, N.A.*,
123 F.3d 723 (2d Cir. 1997)..............................................................................9, 44

*Boritzer v. Calloway*,
2013 WL 311013 (S.D.N.Y. Jan. 24, 2013) .........................................................34

*Boyle v. United States*,
556 U.S. 938 (2009)................................................................................................38

*Carney v. Adams*,
__ S. Ct. __, 2020 WL 7250101 (Dec. 10, 2020) ...................................................5

*CH Acquisitions 2, LLC v. Aquila Aviation L.P.*,
2018 WL 2081860 (S.D.N.Y. Mar. 30, 2018) ......................................................11

*Chicago Title & Tr. Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.*,
   302 U.S. 120 (1937)....................................................................................................9

*Conolly v. Taylor*,
   27 U.S. 556 (1829)......................................................................................................7

*Contant v. Bank of America Corp.*,
   2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018) ..........................................................13

*Copperweld Corp. v. Independent Tube Corp.*,
   467 U.S. 752 (1984)..................................................................................................22

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*,
   790 F.3d 411 (2d Cir. 2015)........................................................................................9

*Cortlandt Street Recovery Corp. v. Deutsche Bank AG, London Branch*,
   2013 WL 3762882 (S.D.N.Y. July 18, 2013) ...........................................................11

*Dennis v. JPMorgan Chase & Co.*,
   343 F. Supp. 3d 122 (S.D.N.Y. Dec. 20, 2018) ........................................................30

*Digizip.com, Inc. v. Verizon Service. Corp.*,
   139 F. Supp. 3d 670 (S.D.N.Y. 2015).........................................................................7

*Disability Advocates, Inc., v. New York Coal. for Quality Assisted Living, Inc.*,
   675 F.3d 149 (2d Cir. 2012)........................................................................................6

*DNAML Pty, Ltd. v. Apple Inc.*,
   2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015) ....................................................12, 21

*EEOC v. Port Authority of N.Y. & N.J.*,
   768 F.3d 247 (2d Cir. 2014)......................................................................................25

*Elsevier, Inc.* v. *W.H.P.R., Inc.*,
   692 F. Supp. 2d 297 (S.D.N.Y. 2010)........................................................................39

*Empire Merchants, LLC v. Reliable Churchill LLP*,
   902 F.3d 132 (2d Cir. 2018)................................................................................29, 30

*Esposito v. United States*,
   368 F.3d 1271 (10th Cir. 2004) ..............................................................................8, 9

*European Cmty. v. RJR Nabisco*,
   764 F.3d 129 (2d Cir. 2014)......................................................................................32

*Fire & Police Pension Ass'n of Col. v. Bank of Montreal*,
   368 F. Supp. 3d 681 (S.D.N.Y. 2019).......................................................................33

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*,
  2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016).................................................27, 29

*Frontpoint European v. Barclays Bank Plc, et al.*,
  No. 16-cv-464 (S.D.N.Y.)...........................................................................6

*Gamm v. Sanderson Farms, Inc.*,
  944 F.3d 455 (2d Cir. 2019)......................................................................27

*Gelboim v. Bank of America Corp.*,
  823 F.3d 759 (2d Cir. 2016)..........................................................20, 21, 23

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.*,
  67 F.3d 463 (2d Cir. 1995).........................................................................36

*Grace v. Int'l Assembly of God v. Festa*,
  797 F. App'x 603 (2d Cir. 2019) ..............................................................34

*Grupo Dataflux v. Atlas Glob. Grp., L.P.*,
  541 U.S. 567 (2004)...................................................................................7

*Harry v. Total Gas & Power N. Am., Inc.*,
  889 F.3d 104 (2d Cir. 2018).....................................................................20

*Hecht v. Commerce Clearing House, Inc.*,
  897 F.2d 21 (2d Cir. 1990)........................................................................38

*Hemi Grp., LLC v. City of N.Y.*,
  559 U.S. 1 (2010)...............................................................................29, 30

*Hinds County v. Wachovia Bank N.A.*,
  700 F. Supp. 2d 378 (S.D.N.Y. 2010)..................................................17, 25

*Holmes v. Sec. Inv. Protection Corp.*,
  503 U.S. 258 (1992)...........................................................................29, 30

*House v. Mitra QSR KNE LLC*,
  796 F. App'x 783 (4th Cir. 2019) ...........................................................8, 9

*Hyland v. HomeServices of Am., Inc.*,
  771 F.3d 310 (6th Cir. 2014) ...................................................................26

*Illinois Brick Co. v. Illinois*,
  97 S. Ct. 2061 (1977)...............................................................................21

*Johnson v. Nyack Hosp.*,
  86 F.3d 8 (2d Cir. 1996)...........................................................................15

*Kinra v. Chicago Bridge & Iron Co.*,
 2018 WL 2371030 (S.D.N.Y. May 24, 2018) ........................................................6

*Klehr v. A.O. Smith Corp.*,
 521 U.S. 179 (1997) ..............................................................................................15

*Koch v. Christie's Int'l. PLC*,
 699 F.3d 141 (2d Cir. 2012) ..................................................................................15

*Korwek v. Hunt*,
 649 F. Supp. 1547 (S.D.N.Y. 1986) .......................................................................16

*Kotteakos v. United States*,
 328 U.S. 750 (1946) ..............................................................................................24

*Krumme v. WestPoint Stevens Inc.*,
 238 F.3d 133 (2d Cir. 2000) ..................................................................................13

*Laydon v. Mizuho Bank, Ltd.*,
 2014 WL 1280464 (S.D.N.Y. 2014) .......................................................................40

*Laydon v. Mizuho Bank, Ltd.*,
 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) ............................................. *passim*

*Laydon v. Mizuho Bank, Ltd.*,
 2020 WL 5077186 (S.D.N.Y. Aug. 27, 2020) .......................................................29

*Laydon v. Mizuho Bank, Ltd.*,
 No. 12-cv-3419, ECF No. 491, slip op. (S.D.N.Y. July 24, 2015) .........................32

*Leder v. Am. Traffic Sols., Inc.*,
 81 F. Supp. 3d 211 (E.D.N.Y. 2015) ......................................................................40

*In re Lehman Bros. Inc.*,
 533 B.R. 362 (S.D.N.Y. 2015) ...............................................................................13

*Lerman v. Joyce Intern., Inc.*,
 10 F.3d 106 (3d Cir. 1993) ....................................................................................12

*Levy v. BASF Metals Ltd.*,
 917 F.3d 106 (2d Cir. 2019) ..................................................................................15

*Levy v. BASF Metals Ltd, et al.*,
 No. 17-cv-3823, *Summary Order* (2d Cir. Feb. 28, 2019) ...................................15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ..........................................21, 22, 37

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ....................................................22

*In re LIBOR-Based Fin. Instruments*,
  No. 17-1569 (2d Cir.) ......................................................................................20

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018) ..........................................................20, 21

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
  753 F.3d 395 (2d Cir. 2014) ............................................................................28

*Mandala v. NTT Data, Inc.*,
  975 F.3d 202 (2d Cir. 2020) ............................................................................28

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ........................................................................26, 28

*Mkt. Force Inc. v. Wauwatosa Realty Co.*,
  906 F.2d 1167 (7th Cir. 1990) ........................................................................27

*Pappas v. Tzolis*,
  20 N.Y.3d 228 (N.Y. 2012) ..............................................................................40

*Pasquantino v. United States*,
  544 U.S. 349 (2005) ........................................................................................32

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*,
  572 F. App'x 60 (2d Cir. 2014) ........................................................................31

*In re Platinum and Palladium Antitrust Litig.*,
  2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ..................................................21

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007) ............................................................................20

*Klein ex rel. Qlik Technologies, Inc. v. Qlik Technologies, Inc.*,
  906 F.3d 215 (2d Cir. 2018) ............................................................................17

*QS Holdco Inc. v. Bank of America Corp.*,
  2019 WL 3716443 (S.D.N.Y. Aug. 6, 2019) ..............................................7, 8, 44

*United States ex rel. Rubar v. Hayner Hoyt Corp.*,
  306 F. Supp. 3d 478 (N.D.N.Y. 2018) ..............................................................16

*Shak v. JPMorgan Chase & Co.*,
  156 F. Supp. 3d 462 (S.D.N.Y. 2016) ..............................................................14

*Singh v. NYCTL 2009-A Trust*,
    2016 WL 3962009 (S.D.N.Y. July 20, 2016) .........................................................................37

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
    366 F. Supp. 3d 516 (S.D.N.Y. 2018) ........................................................................... *passim*

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank Plc, et al.*,
    No. 15-cv-3538 (S.D.N.Y.) .........................................................................................................6

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
    409 F. Supp. 3d 261 (S.D.N.Y. 2019) .......................................................................... *passim*

*Sonterra Capital Master Fund Ltd. v. UBS AG*,
    2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017) .......................................................................39

*Sonterra Capital Master Fund Ltd. v. UBS AG*,
    954 F.3d 529 (2d. Cir. 2020) ..................................................................................................20

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008) ...................................................................................................36

*In re SSA Bonds Antitrust Litigation*,
    420 F. Supp. 3d 219 (S.D.N.Y. 2019) ...................................................................................24

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v.
    Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) ............................................................................................25, 39

*Sullivan v. Barclays PLC*,
    2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ................................................................ *passim*

*Thyroff v. Nationwide Mut. Ins. Co.*,
    460 F.3d 400 (2d Cir. 2006) ...................................................................................................42

*United States v. Cambindo Valencia*,
    609 F.2d 603 (2d Cir. 1979) ...................................................................................................24

*United States v. Guadagna*,
    183 F.3d 122 (2d Cir. 1999) ...................................................................................................37

*United States v. Hayes*,
    99 F. Supp. 3d 409 (S.D.N.Y. 2015) .....................................................................................32

*United States v. Kim*,
    246 F.3d 186 (2d Cir. 2001) ...................................................................................................32

*United States v. Turkette*,
    452 U.S. 576 (1981) ...............................................................................................................38

*Vidurek v. Koskinen,*
    789 F. App'x 889 (2d Cir. 2019) ........................................................37

*In re Vitamin C Antitrust Litig.,*
    279 F.R.D. 90 (E.D.N.Y. 2012) ........................................................21

*Waterman v. Canal-Louisiana Bank & Trust Co.,*
    215 U.S. 33 (1909) ........................................................9

**Statutes**

15 U.S.C. § 1 ........................................................ *passim*

15 U.S.C. § 16(i) ........................................................17

18 U.S.C. §§ 1961-68 ........................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 8 ........................................................38

Fed. R. Civ. P. 12 ........................................................4, 7, 20, 28

Fed. R. Civ. P. 15 ........................................................3, 6, 17

Fed. R. Civ. P. 17 ........................................................6, 7, 8, 9, 17

# PRELIMINARY STATEMENT[1]

Plaintiffs do not dispute that Sonterra, a dissolved Cayman entity, could not prosecute its claims at the time this action was commenced.  The claims of the other original plaintiff, Hayman Capital, were dismissed with prejudice because it too lacked constitutional standing.  Subject matter jurisdiction was lacking from the moment this action was filed.  The only remaining question is whether the subsequent addition of new or replacement plaintiffs to an action that was *void ab initio* can create subject matter jurisdiction (even assuming those new plaintiffs possess the claims at issue, which Plaintiff FLH does not).  Controlling law is clear that the answer is "no," as several judges presiding over other LIBOR-related cases in this District have recognized.

Even if there were some basis in the law to retroactively create subject matter jurisdiction by amendment or substitution, the addition of new Plaintiffs Hayman Funds, CalSTRS[2], and, now, FLH could not have revived this action because none had timely claims when it joined or sought to join the action.  Plaintiffs cannot avail themselves of the relation back doctrine to fix this problem because the complaint to which they seek to relate back is a legal nullity, nor do they allege any basis for the tolling of their claims.

Each of these defects alone is dispositive, and the Court need not reach the sufficiency of Plaintiffs' allegations.  But the SAC should also be dismissed because each of the claims is insufficiently pled.  *First*, Plaintiffs fail to allege statutory standing under either the Sherman Act or RICO because—as this Court has already held—the alleged connection between their purported

---

[1] Unless otherwise indicated, capitalized terms herein have the same meaning ascribed in Defendants' opening memorandum ("Mem.") (ECF No. 525) and all internal citations and quotation marks are omitted.  As referenced herein, "Opposition" or "Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the SAC for Lack of Subject Matter Jurisdiction and Failure to State a Claim (ECF No. 542).

[2] Plaintiffs do not dispute that CalSTRS released its claims in this action against Barclays PLC, Barclays Bank PLC, UBS AG, and UBS Japan pursuant to settlements relating to LIBOR between those entities and more than forty state Attorneys General.  *See* Mem. 4 n. 4.

injuries and Defendants' alleged conduct is too indirect. If Plaintiffs' attenuated, entirely hypothetical chain of causation could support statutory standing, any party on the losing side of a Yen-related derivative could sue, creating near limitless potential liability. That is not the law. *Second*, Plaintiffs fail to allege sufficient conduct based in or aimed at the United States to support a claim within the territorial reach of the Sherman Act or RICO claim. *Third*, Plaintiffs' amendments cannot transform their piecemeal allegations of episodic, one-off chats and requests for favorable LIBOR submissions by a handful of traders (many not even relating to Yen LIBOR) into a sweeping, multi-year conspiracy involving more than forty bank and broker entities to manipulate the prices of all Yen LIBOR-related derivatives. As Plaintiffs' Opposition makes clear, their supposition that such a conspiracy existed is entirely speculative and conclusory and thus insufficient to state a claim.

Finally, Plaintiffs' state law claims fail because the underlying conduct allegations suffer from the same defects discussed above and because Plaintiffs fail to plead additional prerequisites for those claims, including, *inter alia*, a relationship with each Defendant or any causal link between Defendants' purported misconduct and losses on specific contracts.

For the reasons described herein and in Defendants' opening brief, the SAC should be dismissed in its entirety.

## ARGUMENT

### I.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS CASE.

#### A.    The Court Has Always Lacked Subject Matter Jurisdiction.

Plaintiffs' Opposition confirms that the Court should dismiss the SAC for lack of subject matter jurisdiction. Plaintiffs admit that Sonterra, which dissolved three years before this action was commenced, "cannot properly prosecute this lawsuit in its own name." Opp. 14. Plaintiffs similarly do not dispute that Hayman Capital never had standing to pursue claims (*id.* at 5), because

it never owned the derivatives on which it was purporting to sue or suffered any injury. Accordingly, neither original named plaintiff had standing.  This ends the analysis.

Nevertheless, unable to contest these dispositive facts, Plaintiffs pivot to arguments focused on whether there is standing for plaintiffs newly added by substitution or amendment: CalSTRS, Hayman Funds, and FLH.  *See* Opp. 5   All of those arguments fail.

*First*, Plaintiffs advance the specious argument that CalSTRS' ability to have filed a separate action when it joined this one is curative.  CalSTRS' claims were not timely asserted.  *See infra* Section II.B.  But even if they had been, CalSTRS' contention that it *would have had* constitutional standing to file a different *hypothetical* lawsuit is irrelevant.  CalSTRS *did not* "file its own action" (*see* Opp. 5); it joined this one.  That matters, and is far from a "meaningless distinction" (*id.*) for the purposes of Article III.  As Judge Stein recently recognized, adding CalSTRS through subsequent amendment under Rule 15 cannot create subject matter jurisdiction where, as here, it did not previously exist.  *See* Mem. 15-16; *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG* ("*CHF LIBOR*"), 409 F. Supp. 3d 261, 270 (S.D.N.Y. 2019).

*Second*, Plaintiffs wrongly contend that the jurisdictional defect at the outset of this action is a non-issue because Defendants consented to the order substituting Hayman Funds.  As an initial matter, Defendants' consent cannot create subject matter jurisdiction where subject matter jurisdiction does not already exist.  *See* Mem. 15.  In any event, this argument ignores that both Defendants and the Court wrongly believed that Sonterra was a proper plaintiff because *Plaintiffs* misrepresented—whether intentionally or negligently—Sonterra's existence.  We now know Sonterra was dissolved when Plaintiffs filed suit.  *See* Opp. 3-4.  It would be perverse for Plaintiffs to benefit from having obtained Defendants' consent, where the critical facts were both missing and within Plaintiffs' control.  Plaintiffs also ignore that the impetus for Hayman Funds'

substitution was Defendants' motion to dismiss Hayman Capital for lack of standing—in other words, where Defendants did possess such critical facts, they promptly challenged the existence of subject matter jurisdiction. Regardless, like amendment, substitution cannot cure a complaint that was void *ab initio*. *See* Mem. 1, 15-16.

*Third*, Plaintiffs invite this Court to ignore the consequence of Sonterra's pre-suit dissolution and buy into the fiction that FLH—which waited five years into the litigation to surface—somehow has "been a plaintiff in this action all along." Opp. 6. Talk about *chutzpah*. *See id*. at 8. At all times, Sonterra has been the named plaintiff in this case. Counsel did not proactively disclose the supposed role or even the existence of FLH, which counsel now represent has been their client throughout; Defendants discovered it for themselves. *Id.* at 6. Counsel attempt to excuse these omissions by contending that they corrected the relevant allegation in a *different* case and wrongly suggest that they could not have notified this Court or the Second Circuit of the truth while the case was on appeal. *Id.* at 11. The record shows that Plaintiffs sought to substitute FLH for Sonterra only *after* Defendants alerted Plaintiffs of their intention to make a Rule 12(b)(1) challenge. *See* Mem. 7 n.6; Defs. Nov. 2, 2020 Ltr (ECF No. 535) (recounting that "prior to the submission of the proposed briefing schedule to the Court, Defendants communicated to Plaintiffs, in writing and on multiple occasions, their intended argument that subject matter jurisdiction was lacking from the outset of this case").

In any event, as four judges in this District have correctly recognized in rejecting similar, untimely attempts to replace Sonterra and/or other dissolved entities with FLH (Mem. 14-15), Plaintiffs' proposed substitution by amendment cannot retroactively create subject matter jurisdiction, even if accompanied by allegations of a good faith mistake of law.[3] That reasoning

---

[3] Plaintiffs contend for the first time that neither FLH nor Plaintiffs' counsel was aware of Sonterra's dissolution at

is not "formalistic" (Opp. 6); rather, it rests on the foundational principle that where no plaintiff

has Article III standing from the outset of a case, the action suffers from a jurisdictional defect that

cannot be remedied by amendment or substitution. *See, e.g.*, *CHF LIBOR*, 409 F. Supp. 3d at 270

(Stein, J.) ("[B]ecause Sonterra wound up and dissolved—and was not in existence—when it

brought this action in 2015, this suit was, and remains, a legal nullity.  No amendment or

substitution can cure this threshold jurisdictional defect, and thus dismissal is mandatory."); *see

generally Carney v. Adams*, __ S. Ct. __, 2020 WL 7250101, at *4 (Dec. 10, 2020) ("standing is

assessed at the time the action commences").

> **B.      CalSTRS' Later-Added Claims Are Irrelevant to the Analysis.**

Plaintiffs' central argument is that the Court necessarily must have jurisdiction over

CalSTRS' claims because the Court would have had jurisdiction if CalSTRS had chosen to assert

them in a separate (and timely) action or joined this case at the outset.  Opp. 7.  Tellingly, Plaintiffs

cite no authority for this incorrect assertion.   Plaintiffs emphasize that CalSTRS moved to

intervene in *another* lawsuit (*Laydon*), and that the timing of CalSTRS' decision to join this case

was supposedly a function of when the Court chose to reject that proposed intervention, but there

is no logical reason why that would create jurisdiction in *this* case.  Plaintiffs even suggest that

CalSTRS' claims cure the jurisdictional defects in this action because the Court supposedly

"greenlit" their claims here (Opp. 23; *see also id.* at 5), but of course, the Court did no such thing.[4]

CalSTRS always could have become one of the original plaintiffs in *Sonterra* if it wanted—after

all, Plaintiffs' counsel is the same in both actions.  The critical—and fatal—point is that CalSTRS

---

the commencement of this action.  Opp. 11.  If true, this represents a striking lack of pre-suit investigation by FLH
and its counsel.  Regardless, it does nothing to change that Sonterra had in fact dissolved and that, until the SAC was
filed, Sonterra was the named plaintiff or that the operative pleading misleadingly alleged that Sonterra was a going
concern.  Mem. 9.

[4] To the contrary, the Court directed Plaintiff to file its own, separate action, if it so chose.  It neither addressed the
merits of any putative claims, nor invited CalSTRS to join *this* case.

was not an original plaintiff in this litigation.

Plaintiffs also fail to grapple with the many authorities that make clear that a procedural rule, including an amendment under Rule 15, cannot retroactively create jurisdiction. Mem. 12-15; *see also Kinra v. Chicago Bridge & Iron Co.*, 2018 WL 2371030, at *4 (S.D.N.Y. May 24, 2018) (citing *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 110 (2d Cir. 2013)). That principle applies equally here.[5]

### C.    Hayman Funds' Substitution Did Not Create Jurisdiction.

Because Hayman Capital indisputably lacked Article III standing to assert claims as the investment advisor to Hayman Funds (Mem. 9; Opp. 8), Plaintiffs argue that Hayman Funds are the real parties in interest and that Rule 17 substitution therefore retroactively conferred jurisdiction on this Court. This argument fails because, as with CalSTRS, substitution, like amendment, does not "breathe life into a non-existent law suit," like the one brought by Sonterra and Hayman Capital. *Disability Advocates, Inc.*, *v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 161 (2d Cir. 2012); *Kinra*, 2018 WL 2371030, at *3 (dismissing complaint for lack of subject matter jurisdiction, and concluding that "Plaintiffs cannot cure the initial named Plaintiff's lack of Article III standing via Rule 17 substitution"); *see also* Mem. 12-13, 15.

Plaintiffs' detour into the annals of pleading history does not assist them. By their own admission, those centuries-old cases involved pleadings in the name of the originally injured party, rather than the current owner of the claim. Opp. 9. Here, however, Hayman Capital never alleged that it owned the derivatives at issue or held legal title to any of its clients' claims. *See* Defs.'

---

[5] Plaintiffs' argument that a subject matter jurisdiction dismissal here would promote inefficiencies in class actions is irrelevant to the question of this Court's subject matter jurisdiction. It is also speculative, as plaintiffs (including plaintiffs represented by Plaintiffs' counsel here) routinely file individual suits, competing class action complaints (such as *Laydon* and *Sonterra*), and protective actions. *Compare, e.g.*, *Sonterra Capital Master Fund, Ltd. v. Barclays Bank Plc, et al.*, No. 15-cv-3538 (S.D.N.Y.) (alleging manipulation of Sterling LIBOR), *with Frontpoint European v. Barclays Bank Plc, et al.*, No. 16-cv-464 (S.D.N.Y.) (separate follow on lawsuit also alleging manipulation of Sterling LIBOR later consolidated with earlier *Sonterra* action).

Mem. of Law in Support of Mot. to Dismiss the Am. Compl. for Lack of Subject Matter Jurisdiction & Failure to State a Claim (ECF No. 148) at 12-13.

Plaintiffs' reliance on *QS Holdco Inc. v. Bank of America Corp.*, 2019 WL 3716443 (S.D.N.Y. Aug. 6, 2019) is similarly unavailing.  There, plaintiff QS Holdco assigned its interest in the asserted antitrust claims to EquiLend prior to the lawsuit.  *Id.* at *2.  Judge Sullivan considered whether to analyze defendants' motion to dismiss under Rule 12(b)(1) or Rule 17.  *Id.* He observed that the defendants did not seriously challenge Article III standing because the complaint fairly alleged that QS Holdco suffered lost profits, goodwill, and prospective business relations.  *Id.* at *3.  He also observed that the assignment implicated the real party in interest principle codified in Rule 17, which ensures that an assignor and assignee are not both bringing the same action.  *Id.*

Those circumstances are readily distinguishable.  Here, Hayman Capital never alleged that it (i) held any legal right to any of the financial instruments at issue, (ii) possessed any legal right to assert claims on behalf of its clients, or (iii) suffered any injury that could support Article III standing.  Moreover, Defendants expressly challenged Hayman Capital's Article III standing.[6] The issue then is not one of assignment, but rather whether the original named plaintiff, Hayman Capital, vested the Court with jurisdiction to hear the dispute.  It did not, and Hayman Capital's claims were appropriately dismissed with prejudice.

Thus, Defendants are not seeking to have this action dismissed on the "same basis" as the defendants in *QS Holdco.*  Opp. 9.  Indeed, faced with the same argument Plaintiffs make here

---

[6] *Digizip.com, Inc. v. Verizon Service. Corp.*, 139 F. Supp. 3d 670, 678 (S.D.N.Y. 2015), which Plaintiffs also cite is distinguishable for the same reasons.  Likewise, in *Conolly v. Taylor*, 27 U.S. 556, 565 (1829), contrary to Plaintiffs' contention, the court *had* subject matter jurisdiction from the outset, because two of the originally named plaintiffs were non-U.S. citizens.  *Id.* (the "court ha[d] original jurisdiction").  And in *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 575 n.5 (2004) the Court recognized that it has not allowed "postfiling changes in the party line-up . . . [to] *perfect* previously defective statutory subject matter jurisdiction").  Here, there *was* a post-filing change in the party line-up (Hayman Capital to Hayman Funds).

(and the same plaintiffs), Judge Stein recognized "an important distinction":  In *QS Holdco*, the question of assignment "impacted the plaintiff's capacity alone, [while] the court's subject matter jurisdiction was never in doubt."  *CHF LIBOR*, 409 F. Supp. 3d at 267-68.  By contrast here, as in *CHF LIBOR*, there was no originally named plaintiff with Article III standing, so the Court's subject matter jurisdiction *is* in doubt—and, indeed, did not exist—and therefore *QS Holdco* "does not alter th[e] analysis."  409 F. Supp. 3d at 267.

### D.    Plaintiffs Admit That Sonterra Could Not Prosecute This Action.

Plaintiffs do not dispute that a dissolved Cayman Islands corporation has no stake in a litigation.  Mem. 9-10.  Plaintiffs nevertheless argue that a corporation's dissolution has no bearing on constitutional standing.  Opp. 12-14.  The Fourth Circuit recently explained why that argument is wrong.  Suits filed by non-existent parties not only fail to satisfy the requirements for substitution under Rule 17 but also pose an independent, insurmountable Article III problem:  the absence of any plaintiff with a cognizable interest in the litigation.  *See House v. Mitra QSR KNE LLC*, 796 F. App'x 783, 785-88 (4th Cir. 2019) ("Absent a plaintiff with legal existence, there can be no Article III case or controversy.").

Plaintiffs attempt to brush aside *House* by arguing that the Tenth Circuit reached the "opposite" result in *Esposito v. United States*, 368 F.3d 1271, 1277 (10th Cir. 2004).  Opp. 13.  But *Esposito* did not address Article III standing.  In *Esposito*, the question was whether the wife of a decedent could be substituted as the real party in interest in a wrongful death claim brought in the decedent's name.  To the extent the Tenth Circuit addressed whether the case was a "nullity" because it was brought in the name of a decedent, it held merely that the decedent's lack of capacity did not prevent the substitution from relating back to the commencement of the suit for statute of

limitations purposes.[7]  *See House,* 796 F. App'x at 789 (distinguishing *Esposito*).  Indeed, *Esposito*

explained that the issue before it was unlike the issue in *Banakus v. United Aircraft Corp.*, 290 F.

Supp. 259 (S.D.N.Y. 1968), where a court held that a case brought in the name of a decedent—

similar to the situation here—*was* a nullity that could not be cured by substitution.

In any event, the Second Circuit has endorsed the soundness of the principle recognized by

*House*.  In *Billino v. Citibank, N.A.*, 123 F.3d 723 (2d Cir. 1997), the court held that "a deceased

plaintiff simply no longer has a cognizable interest in the outcome of litigation," and dismissed for

lack of jurisdiction.  *Id.* at 725; *see also Cortlandt St. Recovery Corp. v. Hellas Telecomms.,*

*S.A.R.L.*, 790 F.3d 411, 423 (2d Cir. 2015) ("[I]n the absence of a plaintiff with standing, this

lawsuit was a nullity, and there was therefore no lawsuit pending for the real party in interest to

'ratify, join, or be substituted into' under Rule 17(a)(3) or otherwise.").

Plaintiffs also argue that because different states' laws treat corporations differently (and

because, according to them, New York permits suits by dissolved corporations), a suit by a

dissolved corporation does not implicate Article III concerns.[8]  However, the U.S. Supreme Court

has long held that

> [t]he decisions of this court are all to the effect that a private corporation in this
> country can exist only under the express law of the state or sovereignty by which it
> was created. Its dissolution puts an end to its existence, the result of which may be
> likened to the death of a natural person.  There must be some statutory authority for
> the prolongation of its life, even for litigation purposes.

*Chicago Title & Tr. Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.*, 302 U.S. 120, 124-25 (1937).

---

[7] Although they are mistaken, if Plaintiffs' proposed application of *Esposito* were credited, then that decision would undercut Plaintiffs' argument that "Sonterra's corporate status was (and is) immaterial to FLH, the actual client and the owner of the claims" (Opp. 11).  *See* 368 F.3d at 1273 (The "real party in interest" principle requires that an action "be brought in the name of the party who possesses the substantive right being asserted under the applicable law.").

[8] *Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33, 43 (1909), lends Plaintiffs no support for this proposition, as it merely finds that state legislation giving *probate* courts' jurisdiction over matters which have been under the jurisdiction of federal courts, and does not limit federal courts' jurisdiction over these matters.

Plaintiffs have not pointed to any "statutory . . . prolongation of" the life of Sonterra, a Cayman corporation, which undisputedly had no ability to "take any lawful action" at the time of filing. Declaration of John Michael Harris, dated October 8, 2020, at ¶ 21. To the contrary, Plaintiffs concede that "Defendants are quite right that Sonterra, as a dissolved Cayman corporation, cannot properly prosecute this lawsuit in its own name." Opp. 14.

Plaintiffs also concede a second jurisdictional defect. By Plaintiffs' own admission, four months prior to its dissolution and three years before Plaintiffs initiated this case, Sonterra purported to fully assign its claims to FLH. Opp. 3-4. In doing so, Sonterra voluntarily disavowed any interest in this case before the suit commenced, which forecloses Plaintiffs' argument that Sonterra had Article III standing. Plaintiffs address neither this fatal problem, nor the applicable Second Circuit authority Defendants cited. *See* Mem. 10-11 (citing *Valdin Invs. Corp. v. Oxbridge Capital Mgmt., LLC*, 651 F. App'x 5, 7 (2d Cir. 2016)).

### E.   FLH Additionally Lacks Standing Because Sonterra Did Not Assign Its Right to Initiate Claims.

In the alternative, the Court should dismiss the claims asserted by FLH on the ground that the APA with Sonterra did not validly assign FLH the right to bring this lawsuit.

#### 1.   The APA Did Not Convey the Right for FLH to Initiate the Claims.

Plaintiffs fail to cite to any operative covenant in the APA that purportedly assigned to FLH the right to commence lawsuits, not just collect proceeds. Instead, Plaintiffs misconstrue the APA's definitions of the assets FLH purchased—namely, the "Recovery Rights" and the amounts payable in connection with "Existing Claims" and "Future Claims." *See* Sonterra-FLH APA at Art. II (definition of "Assets").[9] But a grant of ownership to the Recovery Rights and amounts

---

[9] FLH purchased "all of the Sellers' right, title and interest in and to any and all Recovery Rights and any and all amounts payable in connection with any of the Existing Claims and the Future Claims, excluding the Initial Payments."

payable has no bearing on FLH's ability to initiate lawsuits.  *See Cortlandt Street Recovery Corp. v. Deutsche Bank AG, London Branch*, 2013 WL 3762882, at *2 (S.D.N.Y. July 18, 2013) (assignment of "full rights to collect . . . and to pursue all remedies" on any claims arising from a set of Notes did not convey standing, which requires "*ownership of* or *title to*" [those] claims").

Plaintiffs' focus on the definition of "Claims" is a red herring, as it makes no mention of who has standing to bring those claims.  And the APA explicitly addresses that point elsewhere—in its definition of "Case."  *See* Sonterra-FLH APA, at Art. II (defining "case" as "any lawsuit, reclamation, refund, credit or any other right ***now or hereafter filed or pursued in connection with such Claim***") (emphasis added).[10]  The APA makes explicit that the term "Case" must be read in light of the term "Claim" and that it purports to convey only Recovery Rights to Claims, *i.e.*, the right to recover proceeds in connection with certain Claims, *not* the right to initiate or prosecute Claims (or Cases).  Thus, Plaintiffs' contention that the APA grants FLH standing to initiate these lawsuits is incorrect, especially where, as here, it is clear that the drafters of the APA knew how to assign that right, but intentionally omitted such language from the definitions of "Claims" and "Recovery Rights."  *See CH Acquisitions 2, LLC v. Aquila Aviation L.P.*, 2018 WL 2081860, at *10 (S.D.N.Y. Mar. 30, 2018) (the maxim *expressio unius est exclusio alterius* supports the conclusion that "if parties to a contract omit terms . . . the parties intended the omission").

---

Sonterra-FLH APA, at Art. II (definition of "Assets").  Plaintiffs concede, by defining "Assets" and then focusing solely on the definition of "Recovery Rights," that the only possible grant of the right and title to bring lawsuits must be included as one of the "Recovery Rights."  *See* Mem. 14-15.

[10] And while the APA uses the filing of lawsuits (using the word "Case") as a way to distinguish "Existing" from "Future" claims, the APA uses the term only to delineate whether a lawsuit already exists, not whether a lawsuit could be filed.  *See* Sonterra-FLH APA at Art. II ("Existing Claims means all claims to Recovery Rights . . . for which a Case has been filed as of the date hereof"); *id.* ("Future Claims means any and all claims . . .  in each case, as to which no Case has been filed as of the date hereof").  No other reference to a "Case," or any discussion of the initiation of a lawsuit, is included in the "Assets" transferred by the agreement.

## 2.     The APA Did Not Authorize FLH to Bring Antitrust or RICO Claims.

The assignment of a federal antitrust or RICO claim must be express: a general assignment does not suffice.[11]  Mem. 16-18.  The APA has, at best, a general assignment, which ends the inquiry.  Nevertheless, Plaintiffs contend that the APA sufficiently assigned antitrust and RICO claims based on the assignment of "future class action lawsuit[s]" as one type of "Future Claim" permitted to be sought as a "Recovery Right."  Opp. 16.  Again, Plaintiffs mischaracterize the APA.  It does not convey the right to *bring* future class action lawsuits.  *Supra* Section I.E.1.  Further, even if it did, a grant of authority to bring "any future class action lawsuit" would not constitute the requisite "unambiguous assignment . . . in a manner that would *clearly* encompass the antitrust [or RICO] claim."  *DNAML Pty, Ltd. v. Apple Inc.*, 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015).

## 3.     The APA Did Not Assign FX Derivative Claims.

Even if the APA granted FLH the authority to pursue certain claims, FLH would still lack standing to pursue certain other claims because the APA did not assign claims related to the FX derivatives at issue in this case.  Plaintiffs do not dispute that FX forwards, which Sonterra allegedly traded, and FX derivatives more generally, are excluded from the exhaustive list of "Securities" that were conveyed under the APA.  Opp. 16.  Rather, Plaintiffs wrongly contend that FX derivatives fall within the assignment clause of the APA because the APA purportedly sets forth a non-exclusive list of instruments assigned.  *Id*.  This argument misconstrues the APA,

---

[11] Plaintiffs assert that general assignments are insufficient to convey antitrust or RICO claims only when they convey assets that do not refer to legal claims at all.  Opp. 15.  But they have no support for that proposition.  In *DNAML Pty, Ltd. v. Apple Inc.*, 2015 WL 9077075, *5 (S.D.N.Y. Dec. 16, 2015), the parties *had* transferred certain legal rights related to an enumerated list of contractual agreements.  The court concluded that the parties "were aware of how to transfer legal claims, [that they] chose to transfer specific rights that they delineated, . . . [that they] did not intend a general transfer of all legal claims" and, therefore, did not assign antitrust claims.

Plaintiffs likewise mischaracterize *Lerman v. Joyce Intern., Inc.*, 10 F.3d 106, 112 (3d Cir. 1993), "which holds only that there may be a sufficient assignment of antitrust claims if there is an express assignment of all causes of action."  *DNAML*, 2015 WL 9077075, at *5.

which assigned "only debt and/or equity *securities*" and related derivatives of *those securities*— *e.g.*, options on securities and securities-based swaps. *See* Sonterra-FLH APA, at Art. II. Nothing in the APA indicates an intention to convey derivatives that are not based on "debt and/or equity securities," including non-asset-based derivatives like interest-rate swaps and forwards. *See Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2001) ("[I]it is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'").[12] Plaintiffs' contention that Sonterra and FLH *meant* to include FX forwards in the assignment, and that FX forwards were allegedly added to the data dump of transactions comprising the "Trade Data," concedes that those instruments were literally not included in the APA. Moreover, evidence of intent is irrelevant in light of the unambiguous terms of the APA. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) ("When interpreting an unambiguous contract, words and phrases are given their plain meaning.").

## II.   PLAINTIFFS' CLAIMS ARE TIME-BARRED.

### A.   Plaintiffs Filed this Action Outside the Relevant Limitations Period for Each Claim.

Plaintiffs cannot dispute that they initiated this action more than four years after June 30, 2011, the latest date by which their claims accrued. Instead, they seek to avoid the consequence of their delay by asserting that: (i) their state law claims are governed by New York's six-year statute of limitations instead of Texas' and California's shorter limitations periods; (ii) they lacked notice of their alleged injuries until after Defendants' purported misconduct had ended; and (iii)

---

[12] Plaintiffs also offer no response to the fact that FX forwards are not referred to as "securities" in the original or amended pleadings, nor that they fail to allege that Sonterra purchased or contracted in securities. *See generally* ECF Nos. 1, 121. This omission is telling, as FX derivatives are fundamentally different from securities. *See Contant v. Bank of America Corp.*, 2018 WL 5292126, at *9 (S.D.N.Y. Oct. 25, 2018) ("[A]lthough FX instruments are analogous to securities in some respects, Plaintiffs do not have recourse under federal securities or antitrust laws."); *In re Lehman Bros. Inc.*, 533 B.R. 362, 378 (S.D.N.Y. 2015) (entering into FX forward contracts does not equate to purchasing securities).

their claims were tolled. *See* Opp. 17-27. Each of these arguments should be rejected.

*First*, Plaintiffs cannot rely upon this Court's application of New York's six-year limitations period for state law claims in *Laydon* (Opp. 18).[13] Hayman Funds and CalSTRS do not dispute that their claims accrued in Texas and California, respectively. Even if their contracts contain New York choice-of-law clauses, New York's borrowing statute would apply Texas' and California's shorter statutes of limitations. Mem. 21 & n.8.

As for Sonterra's unjust enrichment claim—which FLH seeks to assert—Plaintiffs incorrectly suggest that New York's six-year limitations period applies because they purportedly seek an equitable remedy rather than monetary relief, for which Plaintiffs do not dispute a three-year limitations period applies. Opp. 18 & n.7. In determining the applicable limitations period, New York courts look beyond the form of the relief requested and to the substance of the remedy sought. *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 479 (S.D.N.Y. 2016). Here, as in *Shak*, "Plaintiffs may not overcome the fundamentally monetary nature of the recovery they seek by recasting it as a bid for restitution." *Id.*; *see also* SAC ¶¶ 1053-54 (seeking monetary restitution). Therefore, the shorter limitations period applies, and Plaintiffs' state law claims, like their federal claims, are facially untimely.

*Second*, Plaintiffs argue that the claims filed on July 24, 2015 are timely because they first became aware of Defendants' alleged misconduct on July 26, 2011. Opp. 18-19.[14] However, as

---

[13] *See* Defs.' Opp. to Pls. Mot. to Amend, *Laydon v. Mizuho Bank Ltd.*, No. 12-cv-3419, ECF No. 361, at 31 (S.D.N.Y. Aug. 15, 2014). While the *Laydon* defendants noted that New York's borrowing statute would apply Oklahoma's shorter statute of limitations if the claims accrued there, *id.* at 33 n.19, the Court did not need to reach that question because the claims were untimely under either state's law.

[14] Plaintiffs' contention that "[t]his Court has already concluded that July 26, 2011 was the *earliest possible* date on which investors had inquiry notice of a scheme to fix the prices of Yen-LIBOR-based derivatives" (Opp. 18) (emphasis added) misconstrues the Court's holding in *Laydon*. This Court found that the proposed plaintiff was "put on notice of his claims *no later* than July 26, 2011." *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515487, at *3 (S.D.N.Y. Mar. 31, 2015) (emphasis added). Because the proposed plaintiff's CEA claims in *Laydon* were not brought within the applicable two-year limitations period from this later date, this Court did not need to, and did not, address whether the

described in Defendants' opening brief, Plaintiffs were on inquiry notice by March 15, 2011 at the latest.  Mem. 19-20. [15]   Inquiry notice is triggered when a plaintiff is alerted to his potential injury—not the precise means by which that injury was precipitated.  *Koch v. Christie's Int'l. PLC*, 699 F.3d 141, 148 (2d Cir. 2012).  Here, Plaintiffs were on inquiry notice when "circumstances would have suggested to a person of ordinary intelligence the probability that the LIBOR fixes which affected the prices of plaintiffs' [] contracts had been manipulated."  *LIBOR I*, 935 F. Supp. 2d 666, 699 (S.D.N.Y. 2013).  Plaintiffs assert claims from as early as January 1, 2006, alleging that their investments were affected by fluctuations in the published Yen LIBOR benchmark.  SAC ¶ 955.  The data on which Plaintiffs rely to support their claims has always been publicly available, as the LIBOR rates and Defendants' submissions were published every day.  *See* SAC ¶¶ 892-909.  Further, the SAC reveals that Plaintiffs were on inquiry notice of their alleged injuries since at least March 15, 2011, when UBS publicly disclosed that it had received subpoenas from various government regulators investigating, among other things, "whether there were improper attempts by UBS, *either acting on its own or together with others, to manipulate LIBOR rates at certain times*."  SAC ¶ 965 (emphasis added); *see LIBOR III*, 27 F. Supp. 3d 447, 484-85 (S.D.N.Y. 2014) ("[I]nquiry notice is not a defendant-specific determination. . . .  The specificity required to trigger inquiry notice is not necessarily specificity with regard to [each] defendant, but rather specificity that notifies a plaintiff that he has been injured.");  *see also Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir. 2019) ("The relevant inquiry . . . is not whether [plaintiff] had discovered the

---

proposed plaintiff was on notice of his claims before that time.

[15] Plaintiffs wrongly contend that their antitrust claim is subject to a notice requirement.  Opp. 17.  The U.S. Supreme Court and Second Circuit have been unequivocal that the limitations period for a Sherman Act claim begins to run at the time of plaintiffs' alleged injury—not discovery of the injury.  *See* Mem. at 19; *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997); *Levy v. BASF Metals Ltd, et al.*, No. 17-cv-3823, *Summary Order* at 2 (2d Cir. Feb. 28, 2019); *Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996) ("An antitrust action accrues as soon as there is injury to competition.").  As with Plaintiffs' antitrust claim, the limitations period for Plaintiffs' state law claims began to run when their alleged injury occurred, not when it was discovered.  *See LIBOR IV*, 2015 WL 4634541, at *115.

identity of the defendants or whether she had discovered the manipulation scheme she alleges in her complaint.").

*Third*, Plaintiffs' untimely filing cannot be excused by any of the tolling doctrines they now seek to invoke.  This Court rejected Plaintiffs' fraudulent concealment theory based on the same allegations in *Laydon*—a holding Plaintiffs do not address.  *Laydon II*, 2015 WL 1515487, at *6.  Similarly, equitable tolling is inappropriate because, as Plaintiffs acknowledge, that doctrine is available only to "a plaintiff who is *unaware* of his cause of action" (Opp. 26 (emphasis added)), and Plaintiffs were decidedly on notice of Defendants' alleged misconduct during the limitations period, *supra* pp. 15-16.[16]  Moreover, CalSTRS' denied motion to intervene in *Laydon* did not toll the *Sonterra* complaint.  *See, e.g., Korwek v. Hunt*, 649 F. Supp. 1547, 1548 (S.D.N.Y. 1986) (denied motion to intervene does not toll limitations for later-filed action).[17]

*Finally*, Plaintiffs' Sherman Act claim is not entitled to government-proceeding antitrust tolling because the alleged wide-ranging conspiracy among numerous Yen LIBOR panel banks and interbank brokers to fix prices and restrain trade in markets for multiple Yen LIBOR-based derivatives bears no relation to the specific conspiracies alleged in criminal proceedings against the employees of two Defendants.  *Zenith Radio Corporation v. Hazeltine Research, Inc.*, on which Plaintiffs rely, establishes that a criminal proceeding may toll civil antitrust claims against unnamed conspirators only if they are "participants in a conspiracy *which is the object of a*

---

[16] Further, even if the statutes of limitations for Plaintiffs' state law claims were equitably tolled until July 26, 2011— *i.e.*, the date on which Plaintiffs *concede* actual awareness of their alleged injuries (Opp. 25)—Plaintiffs nonetheless failed to bring their unjust enrichment claims within the two- and three-year limitations periods applicable to those claims.  *See* Mem. 21; *supra* p. 14.

[17] The single case Plaintiffs cite in arguing that a motion to intervene triggers tolling of a separate, later-filed action is inapposite.  There, the court found that it would be unjust to penalize a proposed intervenor whose claims lapsed during the pendency of *that court's consideration* of whether to grant the proposed intervenor's motion for intervention *in the same case*.  *See United States ex rel. Rubar v. Hayner Hoyt Corp.*, 306 F. Supp. 3d 478, 491 (N.D.N.Y. 2018).  The court did not hold that the motion tolled the proposed intervenor's claims in *another* case.

*Government suit.*"  401 U.S. 321, 336 (1971) (emphasis added).  Likewise, in *Hinds County., Miss.*

*v. Wachovia Bank N.A.* ("*Hinds III*"), the court held that government-proceeding antitrust tolling

was appropriate because the "two [complaints] alleged substantially the same conspiracy."  885 F.

Supp. 2d 617, 628 (S.D.N.Y. 2012).  No government proceeding has asserted, or even insinuated,

the implausible multi-year, multi-market price-fixing conspiracy that Plaintiffs allege here.[18]

### B.   Named Plaintiffs' Claims Were Untimely When They Attempted to Join This Case.

As discussed *supra* Sections I.A-D, where subject matter jurisdiction is lacking at the outset

of a case, the relation back doctrine under Rule 15 is unavailable because the litigation should have

been dismissed as a legal nullity.  *See, e.g.*, *CHF LIBOR*, 409 F. Supp. 3d at 270 (citing *SIBOR*

*III*, 399 F. Supp. 3d at 104 (a complaint brought by FLH "would be a new filing, not capable of

relating back in time to FrontPoint's and Sonterra's filing")).  Plaintiffs' contention that the claims

asserted by FLH and the Hayman Funds relate back to the filing date of the initial complaint (Opp.

20) ignores this recent line of cases from this District.[19]  Moreover, even assuming FLH's and the

Hayman Funds' claims do relate back, their claims remain untimely because each of the claims of

Sonterra and Hayman Capital, respectively, were time-barred when this action was initially filed.

*See supra* Section II.A.  Finally, as discussed *supra* p. 16, CalSTRS cannot rely on its motion to

intervene in *Laydon* to toll a subsequently filed action, and thus its claims were time-barred when

it sought to join this case.

---

[18] The government never even charged Bank of America and Merrill Lynch International with any alleged wrongdoing at all.  Moreover, the DOJ filed the Information against Deutsche Bank on April 23, 2015, after the applicable statute of limitations had run.  Therefore, tolling under 15 U.S.C. § 16(i) for that proceeding cannot resurrect Plaintiffs' untimely antitrust claims.

[19] Further, Plaintiffs' discussion of *Klein ex rel. Qlik Technologies, Inc. v. Qlik Technologies, Inc.*, 906 F.3d 215, 227 (2d Cir. 2018) is misplaced.  Opp. 21.  Unlike in *Klein*, or the earlier substitution of the Hayman Funds in this case, Plaintiffs attempt to add FLH through amendment, rather than substitution under Rule 17(a)(3).  Thus, as Defendants showed in their opening brief, the relation back principles of Rule 15(c) apply to FLH's claims.  Mem. 22 (amendments to add new plaintiffs under Rule 15(c) relate back to the date of the original pleading only if there was a mistake concerning the proper party's identity).

### C.      Plaintiffs Admit Their Claims Against UBS Are Untimely.

Plaintiffs admit that their RICO and antitrust claims against UBS are untimely unless those claims relate back to the filing of the original complaint.  *See* Opp. 23 (arguing that claims are timely "against every Defendant except UBS").  As Plaintiffs explain, that is because (i) Plaintiffs were on inquiry notice of their claims, *at minimum*, against UBS by at least July 26, 2011 (*see id.* at 18-19; SAC ¶¶ 963-965, 968), and (ii) CalSTRS and Hayman, at the earliest, gave notice of their claims on October 16, 2015, and March 18, 2016, respectively, while FLH now asserts such claims in the SAC (*see* Opp. 23).  As explained *supra* Section II.B, Plaintiffs' claims do *not* relate back to July 24, 2015, or any other earlier date.  Accordingly, Plaintiffs' antitrust and RICO claims against UBS must be dismissed, including the claims of CalSTRS and Hayman even if such claims were deemed to date back to when CalSTRS and Hayman first raised them.  In any event, the limitations periods for Plaintiffs' antitrust and state law claims began to run no later than June 30, 2011, when the causes of action accrued, so those claims are time-barred regardless when Plaintiffs were concededly on inquiry notice for their RICO claims with respect to UBS.  *See supra* pp. 13-15 & n.15.

### D.      Plaintiffs' Claims Against Merrill Lynch International Are Time-Barred.

All of Plaintiffs' claims against Merrill Lynch ("MLI") are time-barred.  *See* Mem. 27-28.  Plaintiffs argue that their claims against MLI did not accrue until May 26, 2015, because Plaintiffs only then purportedly became aware of MLI's involvement in the alleged conspiracy.  *See* Opp. 19.  But inquiry notice is not a defendant-specific determination.  *See supra* pp. 15-16.  Rather, the question is when plaintiff discovered her *injury*, *id.*—as Plaintiffs acknowledge elsewhere in their opposition, *see* Opp. 17-18.  Accordingly, because Plaintiffs plainly were on notice of their alleged *injuries* at the very latest when Plaintiffs' counsel filed their related complaint in *Laydon* on

April 30, 2012, all of Plaintiffs' claims against MLI are time-barred.[20]

Moreover, even if Plaintiffs' claims against MLI accrued on May 26, 2015 (which they did not), Sonterra's claims against MLI are still time-barred because Sonterra voluntarily dismissed those claims on January 26, 2016, more than four years before the August 24, 2020 filing of the SAC that attempted to reinstate them.  Plaintiffs' only argument to the contrary is based on the Tolling Agreement between Sonterra and MLI, but as Plaintiffs do not dispute, New York law (which governs the Tolling Agreement) makes clear that a contract with a non-existent entity such as Sonterra is "void from its inception" as to that entity.  Mem. 28.[21]  Because the Tolling Agreement was between MLI and a non-existent entity, Sonterra—and not with FLH—it was void from its inception.

## III.   PLAINTIFFS' SHERMAN ACT CLAIM SHOULD BE DISMISSED (COUNT I).

### A.   Plaintiffs Lack Antitrust Standing.

Nothing in the Opposition demonstrates that Plaintiffs are efficient enforcers.

<u>Plaintiffs' alleged injuries are indirect</u>.  Plaintiffs do not attempt to distinguish *Laydon*, instead urging the Court to retreat from its prior conclusion concerning the attenuated nature of the harm Plaintiffs allege.  *See* Opp. 30.  But Plaintiffs offer no valid reason for the Court to do so. Plaintiffs assert that the law has evolved since *Laydon* and note, "most critically," the Second Circuit's holding that they plausibly alleged "that Defendants' conduct caused them to suffer economic injury."  *Id.* at 29 (quoting *Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529

---

[20] Contrary to Plaintiffs' erroneous contention (*see* Opp. 26 n.13), all claims against MLI (under the Sherman Act and RICO, and for breach of the implied covenant of good faith and fair dealing) carry statutes of limitations of four years or fewer, as explained *supra* Section II.A.

[21] In response, Plaintiffs resort to rhetorical sleight of hand by asking whether FLH could "enter[ ] into tolling agreements to preserve avenues for relief against potential Defendants." Opp. 26 n.13.  But whether FLH could contract with MLI is irrelevant because the Tolling Agreement makes no reference at all to FLH, and indeed (as Plaintiffs do not dispute) MLI was not even aware of FLH's existence at the time of the contract.

(2d. Cir. 2020)).  But that holding concerns *Article III* standing, not *antitrust* standing.  Antitrust standing is, of course, "distinct from constitutional standing, in which a mere showing of harm in fact will establish the necessary injury."  *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007); *Harry v. Total Gas & Power N. Am., Inc*., 889 F.3d 104, 111 (2d Cir. 2018) (holding that Article III injury was "within the realm of possibility" but that "Plaintiffs fail[ed] to establish antitrust standing").  Indeed, the *Sonterra* panel expressly declined to decide the Rule 12(b)(6) issues here, including Plaintiffs' status as efficient enforcers.  954 F.3d at 533 n.4.

Meanwhile, the Second Circuit decisions that *do* address efficient enforcer issues do not help Plaintiffs.  Plaintiffs cite *Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016), which, according to Plaintiffs, "established that manipulation of LIBOR gives rise to *antitrust injury* by corrupting market conditions."  Opp. 30 (emphasis added).  But nothing in *Gelboim* supports Plaintiffs' claim to be *efficient enforcers*.  To the contrary, *Gelboim* expresses grave doubts about conferring efficient enforcer status (as Plaintiffs ask this Court to do) on "every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap," since doing so would "not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated."  823 F.3d at 779.  In particular, *Gelboim* makes clear that granting efficient enforcer status to "umbrella" purchasers that did not transact directly with a defendant risks "damages disproportionate to wrongdoing" that would be inappropriate under antitrust law.  *Id.* at 779.  Given the Second Circuit's prior warning in *Gelboim*, the Court need not wait for a decision in *In re LIBOR-Based Fin. Instruments* ("*LIBOR VI*"), No. 17-1569 (2d Cir.), to dismiss Plaintiffs' claims.

Moreover, since *Gelboim*, courts have repeatedly reaffirmed the principle that antitrust standing is absent where a plaintiffs' claims are insufficiently direct.  The Second Circuit itself did so in *7 West 57th Street Realty Co. v. Citigroup, Inc.*, 771 F. App'x 498 (2d Cir.), *cert. denied*, 140 S. Ct. 71 (2019), holding that plaintiffs lack antitrust standing to assert claims based on instruments that do not reference USD LIBOR, such as the FX forwards and options at issue here.[22]  Plaintiffs have no answer to that case other than to declare in a footnote, without explanation, that it is "inapposite."  Opp. 29 n.14.  And multiple judges in this District, following *Gelboim*, have dismissed antitrust claims asserted by "umbrella" purchasers.[23]

Applicable precedent similarly forecloses any attempt by Plaintiffs to recover based on transactions with affiliates of the Yen LIBOR panel banks.  Accusing Defendants of "brushing over" key developments in the law, Plaintiffs point to *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019).  But *Apple* (cited in Defendants' opening brief, *see* Mem. 33) affirmed the "bright-line rule" of *Illinois Brick Co. v. Illinois*, 97 S. Ct. 2061 (1977), that "indirect" purchasers may not recover on an antitrust theory.  *Apple,* 139 S. Ct. at 1521.  Plaintiffs in *Apple* were permitted to proceed precisely because they purchased directly from the defendant in that case.  *Id.* at 1519.  As explained in Defendants' opening brief (*see* Mem. 33), Plaintiffs do not allege that they transacted with any affiliate of a panel bank that was its wholly-owned subsidiary, let alone allege "functional or economic unity" among a panel bank and its subsidiary; thus, no exception to *Illinois Brick* applies.  *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 101-02 (E.D.N.Y. 2012).  Importantly,

---

[22] Any injury suffered by Plaintiffs who transacted exclusively in FX forwards and options is prohibitively attenuated for the additional reason that parties to an FX instrument must make independent decisions on how to price instruments and to use Yen LIBOR to benchmark their transactions.  Mem. 30; *see 7 W. 57th St.*, 771 F. App'x at 502; *Laydon II*, 2015 WL 1515487, at *10.

[23] *See, e.g.*, *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 544-56 (S.D.N.Y. 2018); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 905 (S.D.N.Y. 2018); *Sullivan v. Barclays PLC*, 2017 WL 685570, at *17 (S.D.N.Y. Feb. 21, 2017); *In re Platinum and Palladium Antitrust Litig.*, 2017 WL 1169626, at *22 (S.D.N.Y. Mar. 28, 2017); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), 2016 WL 7378980 at *15 (S.D.N.Y. Dec. 20, 2016).

*Copperweld Corp. v. Independent Tube Corp.*, 467 U.S. 752 (1984), concerned a parent company's antitrust liability for its wholly-owned subsidiary and thus does not apply. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VIII*"), 2019 WL 1331830, at *39 (S.D.N.Y. Mar. 25, 2019).

Plaintiffs also point to cases in which they contend courts have recognized a "direct connection between the manipulation of a financial benchmark and the injury to investors in products linked to that benchmark." Opp. 29 & n.15. But those decisions do not stand for the proposition that such a "connection" automatically confers efficient enforcer status. For example, Judge Stein, in *CHF LIBOR*, noted *Gelboim*'s "strong hint that the efficient-enforcer analysis would pose a tall hurdle" and held that none of the plaintiffs in that case was an efficient enforcer against any defendant. 277 F. Supp. 3d at 521. And, in several cases, courts held that only plaintiffs who transacted directly with defendants were efficient enforcers. *See, e.g.*, *Sullivan v. Barclays PLC*, 2017 WL 685570, at *15.

<u>Plaintiffs' damages are speculative, and apportionment would be prohibitively complex.</u> The attenuated nature of Plaintiffs' alleged chain of causation is only one reason why Plaintiffs are not efficient enforcers. Another is the highly speculative nature of their alleged damages. As explained in Defendants' opening brief (*see* Mem. 31-32), the negotiated transactions in which Plaintiffs claim to have engaged involved multiple features capable of absorbing, or neutralizing, the effect of any alleged Yen LIBOR manipulation. Judge Buchwald commented that such "absorption" may render antitrust claims based on the effect of alleged USD LIBOR manipulation on interest rate swaps unduly speculative. *See LIBOR VI*, 2016 WL 7378980, at *20. Judge Broderick rejected antitrust claims based on the effect of alleged GBP LIBOR manipulation on FX forwards, *i.e.*, "the sort of highly negotiated contracts that incorporate numerous considerations

as to make the effect of . . . LIBOR manipulation highly speculative." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 547 (S.D.N.Y. 2018).  Relatedly, even if Plaintiffs could recover, it would be prohibitively complicated to apportion their damages.  *See, e.g.*, *Gelboim*, 823 F.3d at 780; *Sullivan*, 2017 WL 685570, at *19.  Plaintiffs' only response to these points is to argue that they do not constitute an "independent" basis to dismiss at the pleading stage.  Opp. 31-32 & n.18.  However, each strongly supports that result.

### B.    Plaintiffs Have Not Plausibly Alleged an Overarching Antitrust Conspiracy.

Rather than show how the SAC plausibly alleges that *all* Defendants engaged in a nearly six-year conspiracy of "staggering" breadth (SAC ¶ 4), Plaintiffs' opposition crystallizes the SAC's failure to do so.

<u>Plaintiffs fail to plead direct evidence of an overarching antitrust conspiracy</u>.  Plaintiffs accuse Defendants of attempting to "deconstruct Plaintiffs' complaint into a patchwork of individual, parallel manipulations" (Opp. 33), but no "deconstruction" is required to demonstrate the implausibility of Plaintiffs' claims.  The allegations Plaintiffs highlight in their opposition expose the deficiencies in their pleading.  Plaintiffs tout "numerous examples of collusion" (*id.*), but then cite allegations concerning Defendants' ISDA master agreements and *internal* structure (*see* SAC ¶¶ 229-294), *internal* communications (*see id.* ¶ 373), and ambiguous communications between some banks and brokers (*see id.* ¶¶ 469, 790).  Attempting to leverage disclosures made in the criminal trial of a single former trader, Plaintiffs point to allegedly improper communications among only a few bank employees.  *See, e.g.*, *id.* ¶¶ 602-03, 628.  Plaintiffs similarly allege that one bank employee, in one chat, used the word "cartel" twice.  *Id.* ¶ 628.  But these allegations do not come close to showing that all Defendants participated in the sweeping, multi-year conspiracy to manipulate Yen LIBOR that Plaintiffs allege.  Such a complex and far-reaching conspiracy

would presumably require numerous communications to plan, coordinate, and enforce.  *See Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) ("long-term" conspiracies involving "complex relationships among competitors" are more susceptible to direct proof than conspiracies that are "short term and relatively simple in operation").  Yet Plaintiffs are unable to allege more than a few isolated and sporadic communications in a failed attempt to demonstrate Defendants engaged in a *six-year* conspiracy involving *more than forty* bank and broker entities.

Judge Ramos recently rejected similar allegations in *In re SSA Bonds Antitrust Litigation*, 420 F. Supp. 3d 219 (S.D.N.Y. 2019).  Plaintiffs there alleged "sporadic discussions concerning individual bonds, from numerous distinct issuers, trading at different times and in disparate circumstances."  *Id.* at 238.  Defendants argued that "such 'fragmented communications' do not suggest any overarching conspiracy."  *Id.*  Judge Ramos agreed and found that plaintiffs failed to plausibly allege a conspiracy:  "The group chats here merely show opportunistic attempts at collusion by individual traders and are not evidence of an overarching conspiracy committed by the Foreign Dealer Defendants.  Put differently, the chats do not signal a widespread, multi-bank conspiracy."  *Id.* at 239.  The same conclusion is warranted here.  At most, Plaintiffs allege discrete agreements between low-level traders "who were sometimes joined, sometimes in competition, but never fused into a single enterprise."  *United States v. Cambindo Valencia*, 609 F.2d 603, 626 (2d Cir. 1979); *see also Kotteakos v. United States*, 328 U.S. 750, 769 (1946) (differentiating "numerous separate adventures of like character" from a "single enterprise").  Indeed, for several Defendants, including Bank of America, Barclays, and Société Générale, Plaintiffs fail to allege even a single improper interbank communication.  The opposition does not contend otherwise (*see* Opp. 33), but instead argues, citing *Hinds County v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378 (S.D.N.Y. 2010), that Plaintiffs need not plead "overt acts" by each Defendant.  Regardless of

whether plaintiffs must plead "overt acts," *Hinds County* holds that an antitrust plaintiff "must adequately allege the plausible involvement of *each defendant* and put defendants on notice of the claims against them." *Id.* at 394 (emphasis added). The SAC fails entirely to do so.[24]

Finally, in an attempt to excuse their failure to plead facts plausibly showing that all Defendants conspired, Plaintiffs contend that "these are just the communications that have been revealed to date, prior to discovery" and speculate that "discovery will reveal [additional] evidence of illegal agreement." Opp. 34. This contention rings hollow. In addition to the extensive information and documents Plaintiffs have received as a result of enforcement activity related to Yen LIBOR, they appear also to have received voluminous discovery from the many defendants that have settled this case. Plaintiffs offer no reasonable basis to infer that the allegations in the SAC, presumably asserted with the benefit of settlement discovery from *twenty-five* alleged co-conspirators[25] involved with Yen LIBOR, are merely the "tip of the iceberg."[26]

<u>Plaintiffs fail to plead circumstantial evidence of an overarching antitrust conspiracy.</u> Plaintiffs similarly fail to plead an overarching conspiracy through circumstantial evidence. They do not allege parallel conduct or plus factors sufficient to support a plausible inference that Defendants engaged in a six-year conspiracy involving more than forty bank and broker entities.

As the Second Circuit has explained, "merely observing parallel conduct among

---

[24] For example, Plaintiffs offer no response to the argument in Defendants' opening brief that the SAC does not plausibly allege any conspiratorial conduct by Bank of America. *See* Mem. 35 n.33.

[25] Plaintiffs in their Opposition misleadingly lump all of the broker defendants together, when in reality, most of the allegations and communications cited in the SAC relate to settling defendant R.P. Martin rather than to other broker defendants.

[26] *See Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 723 (2d Cir. 2013) ("[I]mprecise pleading is particularly inappropriate . . . where the plaintiffs necessarily have access, without discovery, to plan documents . . . that provide[d] specific information from which to fashion a suitable complaint."); *EEOC v. Port Authority of N.Y. & N.J.*, 768 F.3d 247, 258 (2d Cir. 2014) (affirming dismissal where plaintiff's "pleadings [could not] be said to contain 'enough fact[s] to raise a *reasonable* expectation that discovery will reveal evidence of illegal[ity]'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

competitors does not necessarily explain its cause." *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Rather, the alleged parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 137 (internal quotation marks omitted).  That means alleging, *e.g.*, "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* (internal quotation marks omitted).  As an initial matter, there is not even "parallel conduct" here—nor is it even clear what that would be in the context of Yen LIBOR, which is set based on individual bank contributions that varied widely on a day-to-day basis over the purported six-year period of misconduct.  In any event, the SAC offers no basis to conclude that the misconduct it describes—not an overarching conspiracy, but a series of episodic, self-interested misdeeds—"would probably not result from . . . mere interdependence unaided by an advance understanding." *Id.*

Nor do Plaintiffs adequately allege any "plus factors."  In their opposition, Plaintiffs contend that they have established a "common motive to conspire" by pleading that bank employees were compensated "based in part on the profit and loss calculation of their trading books" and thus were "motivated to do all they could to manipulate Yen-LIBOR in their favor." Opp. 38.  But a profit motive is not a "motive to conspire." *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134-135 (3d Cir. 1999) ("Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act."); *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 321 (6th Cir. 2014) (affirming district court's finding that "[i]f this Court were to find that Defendants' motive to maximize profits supported an inference of an illegal conspiracy, then all businesses

would be subject to anti-trust liability").

At most, Plaintiffs suggest that some individual employees possibly were motivated to manipulate Yen LIBOR unilaterally to suit their own trading positions. Indeed, and as explained in Defendants' opening brief (Mem. 36), Plaintiffs' First Amended Complaint alleged that certain Defendants and their alleged co-conspirators attempted to profit *at one another's expense*—the exact opposite of a "common scheme" (or even parallel conduct). *See* FAC ¶¶ 172, 280, 405-08, 704. Plaintiffs invite the Court to speculate that some Defendants were prepared to accept losses on some transactions in order to profit on other transactions, all as part of a common scheme (*see* Opp. 38)—but Plaintiffs cannot point to any such allegations in the SAC. It is also simply implausible that such a scheme would make economic sense, or even be practicable, given the vast number of ever-changing economic interests at issue over six years, and Plaintiffs allege no facts meriting that conclusion.

Plaintiffs contend further that frequent communications between Defendants constitute a plus factor supporting an inference of conspiracy. *See* Opp. 39. But "the law is clear that the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 466 (2d Cir. 2019); *see also Mkt. Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1173 (7th Cir. 1990) ("[E]vidence of informal communications among several parties does not unambiguously support an inference of a conspiracy."). Nor can Plaintiffs rely on *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("*FOREX*"), where Judge Schofield upheld conspiracy allegations based in part on a substantial volume of multilateral group chats in which each defendant was a participant on at least one occasion. Here, Plaintiffs rely merely on a handful of bilateral requests for favorable LIBOR submissions to support a panel-wide conspiracy,

none of which involved three Defendants.  Such "isolated discussions . . . simply are not enough plausibly to allege a high level of interfirm communications."  *Citigroup*, 709 F.3d at 140.

Plaintiffs also argue that their own "independent" economic analysis supports the existence of a conspiracy.  Opp. 39.  But the Court need not merely accept Plaintiffs' economic analysis at face value, even on this Rule 12(b)(6) motion; rather, the Court must consider whether Plaintiffs' analysis is supported by facts plausibly supporting the inference sought.  As the Second Circuit recently explained, such "statistics are pliable" and "must be consulted cautiously."  *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 205, 210 (2d Cir. 2020).  Indeed, Plaintiffs fail to plead facts showing why purported historical correlations between Yen LIBOR and other benchmarks they retrospectively cherry-picked should have remained unchanged amid a global financial crisis.

Finally, Plaintiffs argue that the existence of government investigations supports a plausible inference of the massive interbank conspiracy they allege.  But despite Plaintiffs' claim of an "admitted conspiracy" (PJ Opp. 1), none of the cited investigations and their following enforcement actions and settlements reflects the sweeping, six-year conspiracy Plaintiffs allege.  Those investigations therefore undercut, rather than support, Plaintiffs' requested inference.

### C.   The FTAIA Bars Plaintiffs' Claims.

Plaintiffs' antitrust claim is impermissibly extraterritorial under the FTAIA.  Plaintiffs contend, in their opposition, that the FTAIA does not bar their claim because the putative class is limited to parties that engaged in U.S.-based transactions (Opp. 41) but fail to articulate a "reasonably proximate causal nexus" between those transactions and Yen LIBOR submissions abroad.  *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 411 (2d Cir. 2014).  As explained above, Plaintiffs' claim relies upon an attenuated chain of causation that does not plausibly establish the requisite causal nexus.  Indeed, the U.S. was essentially irrelevant to the

purported conspiracy. *See supra* pp. 20-22. As a result, even if the alleged injury is properly described as domestic, that does not save Plaintiffs' antitrust claim from dismissal as impermissibly extraterritorial. Nor do Plaintiffs reconcile their theory of liability based on the FTAIA's "import commerce" exception with this Court's ruling in *Laydon*[27] that the same "alleged wrongful conduct . . . is almost entirely foreign, rendering it impermissibly extraterritorial." *Laydon v. Mizuho Bank, Ltd.*, 2020 WL 5077186, at *2 (S.D.N.Y. Aug. 27, 2020).

## IV. PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED (COUNTS II-III).

Plaintiffs' opposition fails to demonstrate that they have RICO standing, that their claims are sufficiently domestic, and that they have adequately pled the elements of a RICO claim. Plaintiffs also fail to plead a RICO conspiracy claim.

### A. Plaintiffs Lack RICO Standing.

Plaintiffs concede that they must plead a "direct relation" between their injuries and the injurious conduct alleged. *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992); *see id.* at 269-70; *see also* Opp. 43; Mem. 40-41. Courts regularly dismiss civil RICO claims where, as here, causation "is 'too remote,' 'purely contingent,' or 'indirec[t].'" *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515487, at *9 (S.D.N.Y. Mar. 31, 2015) ("*Laydon II*") (quoting *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9-10, 12 (2010)). Indeed, proximate causation for civil RICO claims is more stringent than for common law claims. *See, e.g.*, *Hemi*, 559 U.S. at *12 (injuries may be "indirect" for purposes of RICO even if they are "foreseeable" and thus otherwise plead causation). In evaluating a civil RICO claim, courts "rarely 'go beyond the first step' when assessing causation." *Empire Merchants, LLC v. Reliable Churchill LLP*, 902 F.3d 132, 141 (2d Cir. 2018).

---

[27] The "import commerce" exception does not apply to Barclays PLC, LBG, Lloyds Bank, Rabobank, RBS Group, RBS Japan, RBS Securities Inc., UBS Japan, NEX International Limited, ICAP Europe Limited, or TP ICAP plc for the additional reason that none of those Defendants is alleged to have transacted directly with any Plaintiff. *See FOREX*, 2016 WL 5108131, at *13 (applying the "import commerce" exception to plaintiffs based and operating in the United States who transacted directly with defendants).

As Defendants have explained, Plaintiffs rely on an attenuated chain of causation that includes at least five discrete links, all of which must have occurred on dates relevant to Plaintiffs' transactions to have caused them harm.  *See* Mem. 29-30.  That chain is especially attenuated for those who transacted exclusively in FX forwards and options, such as CalSTRS, Japan Macro Opportunities Master Fund, and FLH's purported predecessor, Sonterra (Mem. 30), because the parties to an FX instrument would also have had to make independent decisions to price instruments and to use Yen LIBOR as a consideration in their transactions.  *See id.*; *see also Laydon II*, 2015 WL 1515487, at *10.  Plaintiffs have thus failed to "show a sufficiently direct connection between the alleged misconduct and the injury."  2015 WL 1515487, at *10.[28]

The cases cited by Plaintiffs cannot bear the weight they place on them.  In *BBSW I*, for example, Judge Kaplan applied a "foreseeability" standard to civil RICO, finding that plaintiffs had standing because he believed it was "entirely foreseeable that systematic efforts to manipulate BBSW would in turn injure parties on the wrong end of the affected BBSW-Based Derivatives."  *Dennis v. JPMorgan Chase & Co.*, ("*BBSW I*"), 343 F. Supp. 3d 122, 184 (S.D.N.Y. Dec. 20, 2018), *adhered to on denial of reconsideration*, No. 16-CV-6496 (LAK), 2018 WL 6985207.  But the Supreme Court has explicitly rejected this approach.  *See, e.g.*, *Hemi*, 559 U.S. at 12 ("Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. . . . [They] never even mention the concept of foreseeability.");  *see also Empire Merchants,* 902 F.3d at 145 (2d Cir. 2018) ("[F]oreseeability and intention have little to no import for RICO's proximate cause test.").  As for *CHF LIBOR*, Judge Stein did not,

---

[28] Plaintiffs wrongly claim that Defendants rely on "stale case law" to demonstrate a lack of causation.  Opp. 43.  Cases from the Second Circuit and from this district make clear that Plaintiffs are not efficient enforcers of the antitrust laws, *see* Mem. 28-32; *supra* Section III.A, and proximate cause under civil RICO largely mirrors the applicable analysis under the Sherman Act.  *See Holmes*, 503 U.S. at 268-70; *see also, e.g.*, *Hemi*, 559 U.S. at *11-12.  Furthermore, this Court has recognized that fatal attenuation flaws underlie such claims of injury supposedly caused by Yen LIBOR manipulation.  *See Laydon II*, 2015 WL 1515487, at *10.  Plaintiffs provide no reason to depart from that ruling.

as Plaintiffs claim, broadly hold that all allegations of a global benchmark manipulation conspiracy were "adequate to support" RICO standing.  Opp. 43.  Rather, he concluded that plaintiffs who transacted directly with defendants (*i.e.*, direct counterparties) could assert civil RICO claims against such defendants.  277 F. Supp. 3d at 557-66, 576.  Even if Judge Stein's analysis of standing was correct (which Defendants do not concede), Plaintiffs do not even mention that limiting aspect of his decision in their brief.[29]

### B.   Plaintiffs' RICO Claims Are Impermissibly Extraterritorial.

Recognizing that voluminous case law has now rendered their RICO claim impermissibly extraterritorial, Plaintiffs resort to outdated (and inapposite) case law that does nothing to remedy their lack of "extensive factual allegations" of domestic wire fraud, *Laydon II*, 2015 WL 1515487, at \*9, or the fact that they have alleged only "that *some* domestic conduct occurred" in support of their claims, *id.* at \*8-9 (quoting *Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014)); *see* Opp. 48-49.  Indeed, Plaintiffs' allegations are nearly verbatim repetitions of those this Court rejected in *Laydon*—a case Plaintiffs do not try to distinguish.

Plaintiffs' principal argument is that RICO does not require that every "actor and activity" be located in the United States.  Opp. 48.  But that misses the point.  Plaintiffs' claims are extraterritorial not because the enterprise was based, or some of the activities occurred, abroad, but because the *core conduct* alleged—manipulation of Yen LIBOR by foreign and international institutions through false submissions to the BBA in London to generate profits worldwide—was not "directed from (or to) the United States."[30]  *Petroleos*, 572 F. App'x at 61.  Instead, "the alleged conspiracy and manipulations occurred almost entirely abroad," *SIBOR II*, at \*10.  Because

---

[29]  In this case, a similar holding would still mean, for example, that FLH could bring *no RICO claims*.

[30]  Plaintiffs have not plausibly alleged that the trading of manipulated Yen LIBOR-based derivatives was directed specifically at the U.S., rather than generally worldwide.  *See SIBOR II*, 2018 WL 4830087, at \*10 (rejecting similar allegation as to Singapore-based reference rates); *see also, e.g.*, SAC ¶¶ 27, 71, 78-79, 89.

the core conduct alleged occurred outside the U.S., any alleged domestic use of wires, such as the transmission of trade confirmations to certain U.S. counterparties, is "merely incidental" to the scheme, *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019); *see, e.g.*, *Sonterra (Sterling)*, 366 F. Supp. 3d at 556 (dismissing claim where alleged domestic wires were "peripheral to the overall scheme" that was hatched abroad).

Plaintiffs rely on *RJR Nabisco*, but the scheme alleged in that case (unlike here) "was allegedly both managed from and directed at the U.S." *Laydon II*, 2015 WL 1515487, at *9. Indeed, this Court in *Laydon* already considered *Nabisco* and found it distinguishable. *See id.* at *8-9. The defendant in *Nabisco*, among other things, allegedly "orchestrated a global money laundering scheme from the United States," communicated on "virtually a daily basis" through U.S. wires, sought to mislead authorities "within the United States," "traveled from and to the United States in furtherance of" schemes, and "repatriated the profits of . . . unlawful activity into the United States" through numerous acts of money laundering and related domestic activity. *See European Cmty. v. RJR Nabisco*, 764 F.3d 129, 141-42 (2d Cir. 2014), *rev'd on other grounds*, 136 S. Ct. 2090 (2016). That case could not be further afield.[31]

Numerous courts in this District have now dismissed similar RICO claims involving "alleged manipulation of foreign market interest rate benchmarks with similar domestic wire fraud

---

[31] Plaintiffs also rely on inapposite criminal wire fraud cases with easily differentiable facts, such as *Pasquantino v. United States*, 544 U.S. 349 (2005), *United States v. Kim*, 246 F.3d 186 (2d Cir. 2001), and *United States v. Hayes*, 99 F. Supp. 409 (S.D.N.Y. 2015), *adopted in part*, 118 F. Supp. 3d 620 (S.D.N.Y. 2015). *See* Opp. 48-49 (citing *Pasquantino*, 544 U.S. at 371 (noting that plaintiffs "executed the [criminal] scheme inside the United States"); *Kim*, 99 F. Supp. 3d at 190 (distinguishing criminal wire fraud cases from civil RICO cases)). Just as *Hayes* indicated civil cases were "not relevant" to the criminal case at issue, Plaintiffs' cited authority in the criminal law context is irrelevant to Plaintiffs' civil RICO claims. 99 F. Supp. 3d at 423 n.4. In fact, both this Court and Judge Stein have refused to apply the abbreviated criminal wire fraud analysis in *Hayes* to sweeping civil RICO claims such as those here. *See Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, ECF No. 491, slip op. at 3 n.3 (S.D.N.Y. July 24, 2015) ("To be 'within the domestic reach of the wire fraud statute,' is not the same as overcoming the presumption against extraterritoriality in the RICO context." (citations omitted)); *CHF LIBOR*, 277 F. Supp. 3d at 581 ("[C]riminal law and civil law serve different purposes and have different sources and constraints").

allegations." *Fire & Police Pension Ass'n of Col. v. Bank of Montreal*, 368 F. Supp. 3d 681, 710 (S.D.N.Y. 2019) ("*CDOR*"); *see* Mem. 42-43 (citing cases).   As those courts have repeatedly explained, "simply alleging that some domestic conduct occurred," as Plaintiffs seek to do here, is insufficient to state a civil RICO claim.   *SIBOR I*, 2017 WL 3600425, at *14; *see, e.g.*, *Laydon II*, 2015 WL 1515487, at *8 (actions were "far too attenuated"); *Sonterra (Sterling)*, 366 F. Supp. 3d at 557 ("[I]t is clear that the scheme was principally foreign in nature and only incidentally touched the United States."); *Sullivan*, 2017 WL 685570, at *34 ("The use of United States wires was, at most, incidental."); *SIBOR II*, 2018 WL 4830087, at *10 ("[T]he alleged conspiracy and manipulations occurred almost entirely abroad.").   Plaintiffs in this case have likewise failed to "allege 'sufficient domestic conduct for the claims involving . . . wire fraud . . . to sustain the application of RICO.'"   *CDOR*, 368 F. Supp. 3d at 709 (quoting *Laydon II*, 2015 WL 1515487, at *8).

The closest Plaintiffs come to addressing this case law is their citation to Judge Stein's observation in *CHF LIBOR* that RICO extraterritoriality became "more complex" in light of "detailed allegations" of collaboration between foreign and domestic defendants.   277 F. Supp. 3d at 582; *see id.* at 597.   But Judge Stein never reached the issue because the plaintiffs in that case elected not to argue that those allegations were even sufficient to make out a civil RICO claim. *See* Opp. 49; *CHF LIBOR*, 277 F. Supp. 3d at 582-83.   And this case contains no similar allegations.   Plaintiffs point to a single email that a Connecticut-based trader employed by an affiliate of one Defendant *received* from an employee of a different affiliate of the same bank. Opp. 49.[32]   This ambiguous, interbank email does not remotely support Plaintiffs' claim of wide-

---

[32] That Barclays "employed traders in New York [and London] who transacted in interest rate swaps tied to Yen LIBOR" (Opp. at 49 (citing SAC ¶ 178)) says nothing about whether any individuals in the U.S. were involved in alleged LIBOR manipulation.   Indeed, the documents referenced in the SAC refer either to manipulation of a *different*

ranging inter-bank conspiracy among more than thirty alleged "co-conspirators."

In any event, the core conduct alleged is a massive "hub and spoke conspiracy" between and among more than thirty foreign entities, organized under a foreign trade association, who communicated with one another abroad to purportedly make false representations concerning a foreign benchmark rate to the BBA in London.  *See, e.g.*, *Sullivan*, 2017 WL 685570, at *33. Plaintiffs' allegations that "some domestic conduct" occurred from time to time in the U.S. fall far short of demonstrating that the relevant acts of wire fraud "were domestic in nature," as required. *Sonterra (Sterling)*, 366 F. Supp. 3d at 556-57 (RICO claim dismissed where defendants allegedly employed traders who transacted or manipulated LIBOR in the U.S.); *SIBOR II*, 2018 WL 4830087, at *9-10 (alleged trader-based conspiracy to profit in the U.S. "was not based in the U.S.").

## C.    Plaintiffs Fail to Plead a RICO Enterprise or a Pattern of Racketeering.

On the merits, Plaintiffs fail to meet the applicable pleading standard.  Plaintiffs do not dispute that "RICO claims premised on mail or wire fraud in particular must be closely scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."  *Grace v. Int'l Assembly of God v. Festa*, 797 F. App'x 603, 605 (2d Cir. 2019) (quotation marks omitted).  Such claims must also, at minimum, provide "a detailed description of the underlying scheme and the connection therewith" to each wire communication.  *Boritzer v. Calloway*, 2013 WL 311013, at *9 (S.D.N.Y. Jan. 24, 2013).

Plaintiffs insist that they have provided "more than the required detail" to allow the Court to find a "pattern" of predicate acts committed by each Defendant, but they fail to cite a single paragraph of the SAC as support.  *See* Opp. 46.  Instead, Plaintiffs refer to a chart appended to

---

benchmark, or to claims of Yen LIBOR manipulation that are silent as to where traders were located.  *See* SAC Ex. G-1 at 5-6, 9.

their brief (rather than enumerate each Defendant's supposed predicate acts) that appears to simply catalogue certain instances in which each Defendant is mentioned in the SAC in connection with supposed "participation" in racketeering, leaving the Court and the parties to sort out whether, when, and how each Defendant is supposed to have engaged in predicate acts.  Opp. 46; *see id.* at Ex. A.

Upon scrutiny, Plaintiffs' chart is deeply flawed.  Indeed, Plaintiffs concede that Bank of America Corp. is not alleged to have participated in relevant wire communications (Opp. 36 n.22), and no particularized allegations appear for other Defendants such as RBS Group and Lloyds Banking Group plc.  Plaintiffs also have cited paragraphs that do not even reference the applicable Defendant in their chart, *see, e.g.*, SAC ¶¶ 809, 1050 (no Barclays PLC); several defendants are listed solely because they have been the subject of regulatory actions or settlements; and the chart illustrates Plaintiffs' impermissible group pleading by, for example, ambiguously attributing conduct of trader Hayes to UBS Securities Japan and UBS AG.  *Compare, e.g.*, SAC ¶ 161 (both entities), *with, e.g.*, SAC ¶¶ 563-565, 607, 610 (UBS AG); *see* SAC ¶ 156.

In addition, many cited paragraphs include conclusory assertions,[33] others cannot plausibly indicate particularized instances of wire fraud by the indicated Defendant,[34] and still others allege communications that are not domestic in nature.[35]  In numerous instances, the chart simply denotes when "a Defendant is referred to" *generally* "as part of a defined sub-group, such as Contributor Bank Defendants," without indicating any particularized allegation as to any Defendant, Opp., Ex.

---

[33] *See, e.g.*, SAC ¶¶ 25, 193, 255, 271, 272, 278, 382, 485, 519, 544, 604, 941, 1050.

[34] *See, e.g.*, SAC ¶ 191 (general trading patterns over four years), ¶ 348 (alleged inaction), ¶¶ 469-470 (ordinary communications) ¶ 476 (circulation of daily LIBOR), ¶¶ 478-481 (no particularized communications), ¶¶ 563-65, 753-56 (SocGen), ¶¶ 605, 647 (discussion about rates), ¶ 708 (UBS, Lloyds, RBS, SocGen), ¶ 525 (general allegations), ¶ 652 (ICAP), ¶ 762 (Barclays inquiring about LIBOR rates), ¶ 847 (investigation), ¶ 885 (RBS), ¶ 598 (Barclays).

[35] *See, e.g.*, SAC ¶¶ 255, 353, 387, 478-83, 563-65, 606-24, 649-52, 739, 758.

A. at 2 n.*  Such generalizations do not "inform each defendant of the nature of his alleged participation in the fraud," as required to survive dismissal. *CHF LIBOR*, 277 F. Supp. 3d at 578 (quotation marks omitted).[36]

Even if Plaintiffs had adequately alleged that each Defendant engaged in wire fraud (and they have not), they would still fail to allege that each Defendant engaged in a *pattern* of racketeering by committing at least two predicate acts that were both related to and amounted to continuing criminal activity. *See* Mem. 45; *see also, e.g.*, *Sullivan*, 2017 WL 685570, at *35. Plaintiffs conclusorily claim that all Defendants engaged in "multi-directional benchmark manipulation . . . [o]ver and over for *six years*" (Opp. 46-47), but they do not attempt (in their chart or otherwise) to specify how *any* particular Defendant engaged in continuous and related conduct, as opposed to "isolated" or "sporadic" communications about meeting interim trading goals during the alleged six-year period. *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (2d Cir. 1995); *see AmBase Corp. v. 111 W. 57th Sponsor LLC*, 785 F. App'x 886, 888-89 (2d Cir. 2019). Indeed, the very nature of the conduct alleged—*ad hoc* efforts by (at most) a few traders at a time to move Yen LIBOR up or down—is the opposite of the persistent, continuous, years-long scheme required to plead a RICO claim for each Defendant. *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184-86 (2d Cir. 2008).

Finally, even if Plaintiffs had adequately alleged a pattern of racketeering (and they have not), they still have failed to allege that any Defendant engaged in such a pattern through a common "*enterprise*" of more than 30 corporate entities that Plaintiffs claim continuously worked within a unitary "six-year course of conduct" to "profit from transactions in Yen-LIBOR-based derivatives." Opp. 44-46; *see, e.g.*, SAC ¶ 1018; *see also* Mem. 45-48.

---

[36] In addition, although Plaintiffs purport to "indicate instances where a Defendant is referred to as part of a defined sub-group," the chart fails to do so with respect to Rabobank. *See* Opp. Ex. A. at 2.

Plaintiffs claim that Defendants banded together in order to profit from trading positions on Yen-LIBOR-based derivatives, including others' transactions. *See* Opp. 44-45. But it is simply implausible that numerous global financial institutions purposely aligned and coordinated their constantly changing positions and massive Yen-LIBOR exposures worldwide over a continuous six-year period in order to accommodate the profit motives of a small handful of traders, especially when the market for derivatives and other financial products related to Yen LIBOR is one of the largest and most active such markets in the world. *See, e.g.*, SAC ¶ 79; *Sonterra (CHF)*, 277 F. Supp. 3d at 553-57, 577 (complaint failed to explain why "each defendant" would profit from manipulation in the same direction at the same time); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *2-3 (S.D.N.Y. Dec. 20, 2016). Moreover, none of the paragraphs cited by Plaintiffs even comes close to suggesting that any Defendant deliberately targeted a Plaintiff throughout the course of that alleged scheme. *See United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999).

Plaintiffs likewise fail to plead facts suggesting that the "enterprise" formed relationships through which members "work[ed] together" to achieve a nefarious purpose. *Vidurek v. Koskinen*, 789 F. App'x 889, 894 (2d Cir. 2019). Indeed, most Defendants are not even alleged to have had relationships beyond collectively submitting Yen-LIBOR rates to the BBA. "[R]outine business relationships," however, do not suffice to establish a RICO enterprise. *Singh v. NYCTL 2009-A Trust*, 2016 WL 3962009, at *10 (S.D.N.Y. July 20, 2016). At best, Plaintiffs point to infrequent communications by a handful of individuals employed by certain Defendants who were seeking to advance their own interests on discrete occasions—a far cry from the durable corporate relationships that would be required for Plaintiffs to plausibly plead the "enterprise" that is supposedly alleged in their complaint. *See, e.g.*, SAC ¶¶ 502-505, 667, 760, 797.

Nor have Plaintiffs adequately pled that the enterprise worked together with sufficient "longevity" to permit it to pursue the common purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009). Isolated instances of a few individuals coordinating on certain days to meet short-term trading goals is hardly enough to plead that each Defendant could have engaged in its alleged pattern of racketeering activity for six years "through" such an enterprise, as Plaintiffs must plead in their RICO claim. *United States v. Turkette*, 452 U.S. 576, 583 (1981); *see, e.g.*, SAC ¶¶ 502, 624.

**D.       Plaintiffs Fail to Plead a RICO Conspiracy.**

Even assuming that Plaintiffs adequately pled an underlying RICO claim (and they have not), their RICO conspiracy claim fails for the independent reason that they have not adequately alleged a "conscious agreement" among all Defendants to commit a pattern of racketeering through the alleged enterprise to profit from trading positions throughout the class period. *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25-26 & n.4 (2d Cir. 1990).[37]   *See* Mem. 48. Although they have benefitted from settlements and cooperation by various defendants for many years (*see supra* Section III.B), Plaintiffs have still failed to make allegations plausibly supporting the existence of a unitary conspiracy among thirty global and international firms to "methodically and purposefully manipulate[] the prices of Yen-LIBOR-based derivatives" through "systematic submission of false Yen-LIBOR rates to the BBA throughout the [six-year] Class Period," in order to profit from trading by themselves and "their co-conspirators" (SAC ¶ 270). Instead, Plaintiffs have resorted to making conclusory assertions about "regular" collusion by "Contributor Bank

---

[37] Plaintiffs misread *Hecht* as indicating that a plaintiff need only provide "some factual basis" for inferring a conscious agreement. *See* Opp. 46. The Court explained that a factual basis for an agreement is *necessary*, not sufficient, because Rule 8 pleading standards apply. *See Hecht*, 897 F.2d at 26 n.4; *see also, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is *plausible* on its face." (emphasis added) (quotation marks omitted)).

Defendants and Co-Conspirators" generally (SAC ¶¶ 33-35, 271), irrelevant *intra*-bank collusion (*see, e.g.*, *id.* at ¶ 358), and *ad hoc* actions taken by a handful of traders to move Yen LIBOR up or down on particular days to benefit their own idiosyncratic trading positions (*id.* at ¶¶ 486-496).

Sparse allegations such as these do not plead "specific facts tending to show that each of the [nineteen] [D]efendants entered into an agreement" worldwide to manipulate Yen LIBOR for six years. *Elsevier, Inc.* v. *W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 313 (S.D.N.Y. 2010). Indeed, Plaintiffs provide no explanation of how such a conspiracy could even operate among dozens of people across numerous entities submitting daily rates for fifteen tenors, particularly where each entity had different and varying interests relating to the active Yen-LIBOR derivatives market across its numerous divisions.

## V.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED (COUNT IV).[38]

Because Plaintiffs' federal claims fail, the Court should decline to exercise supplemental jurisdiction over their state law claims, as it did previously. *Sonterra Capital Master Fund Ltd. v. UBS AG*, 2017 WL 1091983, at *3 (S.D.N.Y. Mar. 10, 2017), *rev'd on other grounds*, 954 F.3d 529 (2d Cir. 2020).[39] Regardless, Plaintiffs' state law claims also fail on the merits.

*First*, where, as here, the only basis for an unjust enrichment claim is the same defective conspiracy theory that underlies Plaintiffs' antitrust and RICO claims, the unjust enrichment claim fails. *See* Mem. 49-50. Plaintiffs respond only by asserting that it is "[c]ommon sense" that their

---

[38] Defendants assumed for purposes of their Motion to Dismiss that New York law applied to Plaintiffs' common law claims. *See* Mem. at 48 n.42. Plaintiffs do not argue otherwise. Defendants reserve the right, however, to argue for application of different laws should the claims proceed.

[39] Plaintiffs assert that, even if their federal claims fail, it would be "appropriate" for this Court to exercise supplemental jurisdiction over its state-law claims because those claims are purportedly "still viable." Opp. 51. That is not the law. *See Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state law claims.").

unjust enrichment claim should nonetheless survive, but they notably cite no case law to support their position and do not even attempt to rebut any of the cases cited by Defendants. *See* Opp. 52. Because an unjust enrichment claim is not a "catchall cause of action to be used when others fail," it must be dismissed if the claims on which it is premised fail as well. *See, e.g.*, *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 227 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir. 2015).

*Second*, Plaintiffs ignore the principle that "only in the absence of an actual agreement between the parties" may a plaintiff pursue unjust enrichment claims. *See* Mem. 49 (quoting *SIBOR I*, 2017 WL 3600425, at *16)). Because Plaintiffs base their unjust enrichment claim on purported direct transactions between a Plaintiff and a Defendant, those transactions were "controlled by contracts," *Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (N.Y. 2012), and Plaintiffs' claim fails as a matter of law.

*Third*, Plaintiffs contend that they may pursue claims against Defendants with which they did not transact so long as the "plaintiff's relationship with a defendant [is] not [ ] too attenuated." Opp. 53. But Plaintiffs had *no relationship at all* with the Defendants with which they did not transact, which requires dismissal. *See Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *13 (S.D.N.Y. 2014) ("requir[ing] some type of direct dealing or *actual*, *substantive relationship* with a Defendant" to state unjust enrichment claim under New York law) (emphasis added).[40]

---

[40] *See also, e.g.*, *LIBOR IV*, 2015 WL 4634541, at *65, *68 (S.D.N.Y. Aug. 4, 2015) ("[U]njust enrichment claims may only be alleged against a counterparty."). Nor do any of the authorities cited by Plaintiffs support their unjust enrichment claim here against Defendants with which they did not transact. In *In re DDAVP*, the plaintiffs—unlike Plaintiffs here—purchased the defendants' *own products* through an intermediary, which "plausibly conferred some benefit on Defendants." 903 F. Supp. 2d 198, 234 (S.D.N.Y. 2012). And in *BBSW II*, plaintiffs asserted claims against two affiliated defendants who "worked together" to trade directly with plaintiffs. 439 F. Supp. 3d 256, 268 (S.D.N.Y. 2020).

## VI.    PLAINTIFFS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND DEALING SHOULD BE DISMISSED (COUNT V).

Plaintiffs fail to adequately plead a claim for breach of the implied covenant of good faith and fair dealing.  Plaintiffs do not dispute that they cannot tie *any* specific alleged manipulation to *any* specific breach of their alleged contracts.  Mem. 51-52.  Instead, citing *LIBOR III*, they claim that Defendants "systematically manipulated Yen-LIBOR submissions, which led to Plaintiffs' sustaining a loss or receiving less on these contracts than they otherwise would."  Opp. 51.  But *LIBOR III* is inapposite.  There, Judge Buchwald upheld claims premised on the alleged systematic suppression of LIBOR for reputational reasons.  *See* 27 F. Supp. 3d 447, 469, 482 (S.D.N.Y. 2014).  By contrast, Judge Buchwald *rejected* claims that, like those here, were premised on "trader conduct [which] suggested that manipulation was episodic, varying in direction, and targeted to particular positions in the market," and required greater specificity to demonstrate injury.  *Id.* at 482.

Similarly, Plaintiffs have not pleaded that counterparty Defendants engaged in "[m]anipulation of benchmark rates" in "reckless disregard" of their transactions with Plaintiffs, because they allege no facts showing that counterparty Defendants engaged in manipulation at times and in directions that would have impacted Plaintiffs, let alone that any Defendants knew that to be the case.  Opp. 51.  Indeed, Plaintiffs' claims are particularly defective as to non-panel bank counterparties, because Plaintiffs have not plausibly "allege[d] that the counterparty entity participated somehow in the panel bank's [alleged] manipulation," *LIBOR IV*, 2015 WL 4634541, at *65 (S.D.N.Y. Aug. 4, 2015), offering only conclusory allegations, Opp. 51 (citing SAC ¶¶ 914–51).[41]

---

[41] *See also BBSW II*, 439 F. Supp. 3d at 268 (dismissing implied covenant claims against non-panel bank entities).

Finally, Plaintiffs fail to adequately plead an implied covenant claim based on FX forwards, which do not reference Yen LIBOR. The covenant of good faith does not require a party to forgo "act[ing] on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006). Notwithstanding Plaintiffs' vague and non-specific suggestion that the FX forwards were "priced based on Yen-LIBOR" (Opp. 50), Plaintiffs are unable to point to *any* (explicit or implicit) contractual benefit of FX forwards of which they were deprived.[42]

## CONCLUSION

The Court should dismiss the Second Amended Class Action Complaint with prejudice.

---

[42] Indeed, it is unclear what Plaintiffs even mean when they say their FX forwards were breached because they were supposedly "priced based on Yen-LIBOR." To the extent Plaintiffs argue that the alleged manipulation of Yen-LIBOR caused them initially to agree to a lower price for their contract, that is not a "fruit of the contract" and thus not a *breach* of the contract. Opp. 41.

Dated:  December 21, 2020
New York, New York

Respectfully submitted,


| | |
|---|---|
| /s/ David R. Gelfand | /s/ Marc J. Gottridge |
| David R. Gelfand | Marc J. Gottridge |
| Tawfiq S. Rangwala | Lisa J. Fried |
| Stephen P. Morgan | Benjamin A. Fleming |
| MILBANK LLP | HOGAN LOVELLS US LLP |
| 55 Hudson Yards | 390 Madison Avenue |
| New York, New York 10001 | New York, New York 10017 |
| Telephone: (212) 530-5000 | Telephone: (212) 918-3000 |
| dgelfand@milbank.com | marc.gottridge@hoganlovells.com |
| trangwala@milbank.com | lisa.fried@hoganlovells.com |
| smorgan1@milbank.com | benjamin.fleming@hoganlovells.com |

Mark D. Villaverde
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067-3019
Telephone: (424) 386-4000
mvillaverde@milbank.com

*Attorneys for Defendant Coöperatieve
Rabobank U.A.*

*Attorneys for Defendants Lloyds Banking
Group plc and Lloyds Bank plc*


| | |
|---|---|
| /s/ Leigh M. Nathanson | /s/ Steven Wolowitz |
| Leigh M. Nathanson | Steven Wolowitz |
| KING & SPALDING LLP | Henninger S. Bullock |
| 1185 Avenue of the Americas | Andrew J. Calica |
| New York, New York 10001 | Victoria D. Whitney |
| Telephone: (212) 790-5359 | MAYER BROWN LLP |
| lnathanson@kslaw.com | 1221 Avenue of the Americas |
| | New York, New York 10020 |
| *Attorneys for Defendants Barclays PLC and* | Telephone: (212) 506-2500 |
| *Barclays Bank PLC* | swolowitz@mayerbrown.com |
| | hbullock@mayerbrown.com |
| | acalica@mayerbrown.com |
| | vwhitney@mayerbrown.com |

*Attorneys for Defendant Société Générale*

/s/ Fraser L. Hunter

Fraser L. Hunter, Jr.
David S. Lesser
Jamie S. Dycus
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Fax: (212) 230-8888
fraser.hunter@wilmerhale.com
david.lesser@wilmerhale.com
jamie.dycus@wilmerhale.com

*Attorneys for Defendants NatWest Group
plc, NatWest Markets plc, NatWest Markets
Securities Japan Ltd., and NatWest Markets
Securities Inc.*

/s/ Eric J. Stock

Eric J. Stock
Jefferson E. Bell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
estock@gibsondunn.com
jbell@gibsondunn.com

*Attorneys for Defendants UBS AG and UBS
Securities Japan Co. Ltd.*

/s/ Arthur J. Burke

Arthur J. Burke
Paul S. Mishkin
Adam G. Mehes
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
arthur.burke@davispolk.com
paul.mishkin@davispolk.com
adam.mehes@davispolk.com

*Attorneys for Defendants Bank of America
Corporation, Bank of America, N.A., and
Merrill Lynch International*

/s/ Shari A. Brandt

Shari A. Brandt
H. Rowan Gaither
Andrew Podolin
RICHARDS KIBBE & ORBE LLP
200 Liberty Street
New York, New York 10281
Telephone: (212) 530-1800
sbrandt@rkollp.com
rgaither@rkollp.com
apodolin@rkollp.com

*Attorneys for Defendants NEX International
Limited, ICAP Europe Limited, and TP
ICAP plc*