

August 13, 2021

**VIA ECF**
The Honorable George B. Daniels
Daniel Patrick Moynihan United States Courthouse
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *Sonterra Capital Master Fund Ltd. et al. v. UBS AG et al.*, No. 15-cv-5844 (GBD) (SLC)

Dear Judge Daniels:

  We write in response to Defendants' August 3, 2021 letter, ECF No. 565 ("Defs.' Ltr."), submitting the Second Circuit's Summary Order in *Alaska Dep't of Revenue, Treasury Div. v. Manku*, No. 20-1759-cv, 2021 WL 3027170 (2d Cir. July 19, 2021) ("*SSA Bonds*") as supplemental authority. Because the theory advanced by the *SSA Bonds* plaintiffs (*i.e.,* requiring the defendants to collude and agree on a price every time a customer sought to trade) is not remotely comparable to Plaintiffs' allegations here (*i.e.,* only requiring Defendants' manipulation to impact a benchmark used to price instruments throughout the market), *SSA Bonds* does not support dismissal of the Second Amended Class Action Complaint, ECF No. 489 ("SAC" or "¶").

  As a preliminary matter, *SSA Bonds* is an unpublished summary order that lacks "precedential effect" and is not binding on this Court. *See* Second Cir. L.R. 32.1.1; *see also Aguas Lenders Recovery Group v. Suez, S.A.*, 585 F.3d 696, 702 n.4 (2d Cir. 2009). The rationale underlying this rule is that summary orders "frequently do not set out the factual background of the case in enough detail to disclose whether its facts are sufficiently similar to those of a subsequent unrelated case to make our summary ruling applicable to the new case." *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011). Further, courts are cautioned that the "abbreviated explanations in summary orders might result in distortions of case law." *Burgio v. Prudential Life Ins. Co. of Am.*, 253 F.R.D. 219, 230 (E.D.N.Y. 2008). Defendants' failure to address the material differences in the quality of Plaintiffs' allegations here from those in *SSA Bonds* underscores the weaknesses in their position.

**SSA Bonds**

  Far from announcing a new rule of law that changes the pleading standard in antitrust cases, the panel in *SSA Bonds* made clear that its decision was focused on the nature of the alleged conspiracy at issue in that case. *See SSA Bonds*, 2021 WL 3027170, at *4 (concluding that "plaintiffs have cast a net so wide that the claimed antitrust conspiracy is implausible as alleged."). There, the "net" cast by the plaintiffs involved an alleged conspiracy to restrain the entire "decentralized, opaque, and frenetic" market for supranational, sovereign, sub-sovereign, and agency bonds ("SSA bonds"). *Id.* at *1. Alleged issuers of SSA bonds included an unspecified number of entities from

www.lowey.com

44 South Broadway, Suite 1100, White Plains, NY 10601-4459 (p) 914-997-0500 (f) 914-997-0035
One Tower Bridge, 100 Front Street, Suite 520, West Conshohocken, PA 19428 (p) 215-399-4770 (f) 610-862-9777



around the world, ranging from Canadian provincial governments to agencies of the Spanish federal government to the African Development Bank. *Id.* at *2-4; Second Consol. Am. Class Action Compl., ECF No. 506, ¶¶ 116-18, *In re SSA Bonds Antitrust Litig.*, No. 1:16-cv-03711-ER (S.D.N.Y. Nov. 13, 2018) ("SSA Bonds Compl.").

SSA bonds were **not** alleged to be priced by reference to any benchmark, nor were they alleged to include any common component of price. Rather, the plaintiffs alleged that the bonds were priced by individual dealers in bilateral communications each time a customer called to express interest in making a trade. *See SSA Bonds,* 2021 WL 3027170, at *2. These "quotes" expired "quickly," typically within a few minutes *See id.* at *4; SSA Bonds Compl. ¶ 130. The plaintiffs alleged that all defendants colluded in this minutes-long "gap between quote requests and order executions," SSA Bonds Compl. ¶ 130, "every day, nearly all day" to fix the prices of every individual customer trade. *See SSA Bonds*, 2021 WL 3027170, at *4. The panel found that the plaintiffs failed to adequately "explain how the conspirators were able to wield such control over the secondary market" to make the alleged conspiracy plausible. *Id.*

**Gelboim v. Bank of America Corp., 823 F.3d 759 (2d Cir. 2016)**

A conspiracy to manipulate a benchmark rate, like the alleged conspiracy at issue here, is fundamentally different. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765 (2d Cir. 2016).[1] In *Gelboim,* the Second Circuit held that a conspiracy to manipulate the U.S. Dollar LIBOR rate—the U.S. dollar equivalent of the Yen LIBOR benchmark at issue in this case—among 16 banks over the course of several years was plausible. *See id.* at 781-82 ("Close cases abound on this issue, but this is not one of them; appellants' complaints contain numerous factual allegations that clear the bar of plausibility."). The alleged conspiracy was a *per se* violation of the antitrust laws because the alleged manipulation of U.S. dollar LIBOR "warp[ed] . . . market factors affecting the prices for LIBOR-based financial instruments." *Id.* at 776. Accordingly, "no further showing of actual adverse effect in the marketplace [was] necessary." *Id.* Having found that the conspiracy was plausible and "exerted some influence on price," the "extent of that influence and the identity of persons who can sue, among other things, are matters reserved for later." *Id.* at 782-83.

Like the conspiracy alleged in *Gelboim* (*i.e.,* manipulation of a benchmark that forms a price component of financial products traded by the plaintiffs) and unlike the alleged conspiracy in *SSA Bonds* (*i.e.*, collusion on every individual customer trade), the price-fixing theory alleged by Plaintiffs here is "rather straightforward." *Gelboim*, 823 F.3d at 765. This case involves the alleged

---

[1] To the extent the Court identifies any tension between *Gelboim* and *SSA Bonds*, *Gelboim* is a precedential decision that remains binding authority. *See Alvarez v. City of New York*, No. 11-CV-5464 (JPO), 2017 WL 6033425, at *3 (S.D.N.Y. Dec. 5, 2017); *accord United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015), *aff'd*, 854 F.3d 197 (2d Cir. 2017) (holding that courts in the Second Circuit are "bound to follow [a precedential Second Circuit] decision 'unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'").

Case 1:15-cv-05844-GBD-HBP   Document 566   Filed 08/13/21   Page 3 of 4



manipulation of a benchmark rate set once per day, by a panel consisting of Contributor Bank Defendants, that served as a component of price for Yen-LIBOR-based derivatives traded market-wide. ¶¶ 256-69. Like the market for U.S. dollar LIBOR-based financial instruments in *Gelboim*, and unlike the "decentralized" pricing in the SSA bonds market which required collusion on every trade to successfully carry out the conspiracy, *see SSA Bonds*, 2021 WL 3027170, at *4, the price of every single product in this market directly incorporated the Yen LIBOR rate set daily by Defendants. ¶¶ 1, 249-69 (alleging that Yen LIBOR forms a component of price for Yen LIBOR-based derivatives). Indeed, Contributor Bank Defendants' control over a price component is precisely what made their scheme far easier to execute than the one alleged by the *SSA Bonds* plaintiffs; manipulation of a pricing benchmark obviated any need to "collud[e] on specific trades." 2021 WL 3027170, at *4. *See also* ¶ 990 (the DOJ's Deutsche Bank AG Criminal Information explained that Defendants colluded "to fix the price of Yen LIBOR-based derivative products *by fixing* Yen-LIBOR, a key component of the price thereof…") (emphasis added); ¶ 199 (the Statement of Facts attached to Société Générale's Deferred Prosecution Agreement with the DOJ recognized the "broad impact" of Yen-LIBOR manipulation, resulting in "significant damage to the global financial markets").

**The Factual Allegations Alleged Here Plausibly Support the Alleged Conspiracy**

The quality of the factual allegations here further distinguishes this case from *SSA Bonds*. This Court has already found that the facts underlying this case constitute "overwhelming factual content from which this Court could infer manipulative intent, particularly based on direct evidence from certain Defendants' communications." *See Laydon v. Mizuho Bank, Ltd.*, No. 12-CV-3419 GBD, 2014 WL 1280464, at *6 (S.D.N.Y. Mar. 28, 2014). Moreover, these facts "giv[e] rise to an inference that Defendants knew of the other Defendants' unlawful and manipulative conduct and assisted each other in the furtherance of the violation." *Id.* at *6. The SAC is replete with admissions and direct evidence that Defendants coordinated with one another to falsify Yen-LIBOR and did so with the goal of fixing the prices of Yen LIBOR-based derivatives. *See* Pls.' Merits Opp'n Br., ECF No. 542, at 28-40. *See also, e.g.*, ¶ 5 (UBS reported its involvement in "criminal cartel activity to the DOJ pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act"); ¶¶ 9-15 (factual findings accompanying DOJ's non-prosecution and deferred prosecution agreements include admissions of collusion among Defendants by UBS, RBS, Rabobank, Barclays, Deutsche Bank, and Lloyds); ¶ 521 (quoting December 1, 2010 chat in which a Rabobank trader agreed with an ICAP broker to lower Yen-LIBOR); ¶ 590 (February 9, 2009 chat in which a UBS trader conspired with a Tullett Prebon broker to lower Yen-LIBOR); ¶ 753 (June 29, 2009 telephone call in which a Société Générale trader agreed with an RP Martin broker to inflate Yen-LIBOR). These allegations, and many others like them,[2] are more than sufficient to plausibly allege that the Defendants formed a conspiracy to fix prices in the Yen LIBOR-based derivatives market by manipulating Yen LIBOR. *See Gelboim*, 823 F.3d at 766, 781-82 (concluding that conspiracy among U.S. dollar LIBOR panel banks to manipulate U.S. dollar LIBOR "to increase profits in individual transactions" was plausible

---

[2] *See* Pls.' Merits Opp'n Br., ECF No. 542, at 28-40.



<div style="text-align:right">
The Honorable George B. Daniels
August 13, 2021
Page 4 of 4
</div>

based on economic analysis, internal communications, and a common motive of "increased profits").

     For the foregoing reasons and those provided in Plaintiffs' briefing, the Court should deny Defendants' motion to dismiss.

Respectfully,

/s/ Vincent Briganti
Vincent Briganti