**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FUND LIQUIDATION HOLDINGS LLC as assignee
and successor-in-interest to Sonterra Capital Master
Fund, Ltd., HAYMAN CAPITAL MASTER FUND,
L.P., JAPAN MACRO OPPORTUNITIES MASTER
FUND, L.P., and CALIFORNIA STATE TEACHERS'
RETIREMENT SYSTEM, on behalf of themselves and
all others similarly situated,

                     Plaintiff,

      -against-

UBS AG, UBS SECURITIES JAPAN CO. LTD.,
SOCIÉTÉ GÉNÉRALE SA, NATWEST GROUP PLC,
NATWEST MARKETS PLC, NATWEST MARKETS
SECURITIES, INC., BARCLAYS BANK PLC,
BARCLAYS PLC, COÖPERATIEVE CENTRALE
RAIFFEISEN-BOERENLEENBANK B.A., LLOYDS
BANKING GROUP PLC, LLOYDS BANK PLC, NEX
INTERNATIONAL LIMITED, ICAP EUROPE
LIMITED, TP ICAP PLC, BANK OF AMERICA
CORPORATION, BANK OF AMERICA, N.A.,
MERRILL LYNCH INTERNATIONAL, and JOHN
DOES NOS. 1-50.,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                               <u>MEMORANDUM DECISION</u>
                                   <u>AND ORDER</u>

                                  15 Civ. 5844 (GBD)

GEORGE B. DANIELS, United States District Judge:

      Defendants (1) Bank of America Corporation, (2) Bank of America, N.A.; (3) Barclays

plc; (4) Barclays Bank plc ("Barclays"); (5) Cooperatieve Rabobank U.A. (f/k/a Cooperatieve

Centrale Raiffeisen-Boerenleenbank B.A.); (6) Lloyds Banking Group plc; (7) Lloyds Bank plc;

(8) Merrill Lynch International ("MLI"), (9) NatWest Markets plc (f/k/a The Royal Bank of

Scotland plc) ("RBS"), (10) NatWest Group plc (f/k/a The Royal Bank of Scotland Group plc),

(11) NatWest Markets Securities Japan Ltd. (f/k/a RBS Securities Japan Limited), (12) Société

Générale, (13) UBS AG ("UBS"), (14) UBS Securities Japan Co. Ltd., (15) NEX International Limited, (16) ICAP Europe Ltd., and (17) TP ICAP plc (collectively, "Defendants") move to dismiss Plaintiffs'[1] Second Amended Class Action Complaint ("Second Amended Complaint" or "SAC") (ECF No. 489) for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(1), for lack of personal jurisdiction pursuant to FRCP 12(b)(2), and for failure to state a claim pursuant to FRCP 12(b)(6).  (Not. Of Defs.' Mots. to Dismiss the SAC, (ECF No. 505).)[2]

Plaintiffs allege that from January 1, 2006 to June 30, 2011, Defendants conspired to fix prices and restrain trade in Yen LIBOR (the London Interbank Offered Rate for the Japanese Yen), and prices of Yen-LIBOR-based derivatives.  (SAC ¶ 1.) Plaintiffs bring claims under the Sherman Act, 15 U.S.C. § 1, et seq., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and state law. *Id.*

Defendants' motion to dismiss Plaintiff Sonterra Capital Master Fund, Ltd. and Plaintiff Fund Liquidation Holding LLC ("FLH") for lack of subject matter jurisdiction is GRANTED. Defendants' motion to dismiss Plaintiffs Hayman Capital Master Fund, L.P., Japan Macro Opportunities Master Fund, L.P. (together, the "Hayman Funds") and California State Teachers' Retirement System ("CalSTRS"), for lack of subject matter jurisdiction is DENIED.

Defendants' motion to dismiss count one of the SAC for failure to state a claim is GRANTED as to all Defendants except RBS, Société Générale, UBS. Defendants motion to

---

[1] As detailed in the SAC, "Plaintiffs" include (1) Fund Liquidation Holdings LLC ("FLH") as assignee and successor-in-interest to Sonterra Capital Master Fund, Ltd., (2) Hayman Capital Master Fund, L.P. ("HCMF"), (3) Japan Macro Opportunities Master Fund, L.P. ("JMOF"), and (4) California State Teachers' Retirement System ("CalSTRS").

[2] Given the lengthy procedural history and factual background, the Court assumes familiarity and only repeats the most salient aspects thereof to the instant motion.

dismiss counts two and three of the SAC against all Defendants is GRANTED.

Defendants' motion to dismiss for lack of personal jurisdiction over RBS is GRANTED. This Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims as to all Defendants except those claims by Plaintiff CalSTRS against Société Générale and UBS.

## I.   LEGAL STANDARDS

### A. Rule 12(b)(1) Lack of Subject Matter Jurisdiction.

The proper procedural route to challenge standing is a motion under Rule 12(b)(1). *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006). "[O]nce the Defendants' motion to dismiss for lack of jurisdiction under [Rule] 12(b)(1) put[s] the Plaintiffs' Article III standing in issue, the District Court has leeway as to the procedure it wishes to follow." *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87–88 (2d Cir. 2006) (*citing Gibbs v. Buck*, 307 U.S. 66, 71–72 (1939)).

In deciding a motion to dismiss "pursuant to Rule 12(b)(1), . . . the Court must accept as true all material factual allegations in the complaint, but should refrain from drawing any inferences in favor of the party asserting jurisdiction." *People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 283 (S.D.N.Y. 2000) (citing *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)). "[U]nder Rule 12(b)(1), [a court is] permitted to rely on non-conclusory, non-hearsay statements outside the pleadings . . . ." *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013). The party invoking the benefit of federal jurisdiction bears the burden of establishing the existence of that jurisdiction. *Sharkey v. Quarantillo*, 541 F.3d 75, 82-83 (2d Cir. 2008) (internal citation omitted). Accordingly, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the

pleadings inferences favorable to the party asserting it." *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (quoting *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (internal quotation marks omitted)).

Whether a plaintiff has standing relates to whether he is entitled to have a court decide the merits of a dispute. *See Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 84 (2d Cir. 2014). To have Article III standing, a plaintiff must show that (1) he has suffered an actual or imminent injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and the defendant's actions; and (3) it is likely that a favorable decision in the case will redress the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

### B. Rule 12(b)(2) Lack of Personal Jurisdiction.

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff has the burden of making a *prima facie* showing that personal jurisdiction over the defendant exists. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012); *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349 (S.D.N.Y. 2014) (plaintiff bears the burden of establishing personal jurisdiction on a motion to dismiss for lack of personal jurisdiction). In assessing personal jurisdiction on a Rule 12(b)(2) motion, the court is neither required to "draw argumentative inferences in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (citation omitted), nor must it "accept as true a legal conclusion couched as a factual allegation." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (citation omitted).

### C. Rule 12(b)(6) Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co.*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

## II.   DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION IS GRANTED IN PART

### A. Sonterra Lack Subject Matter Jurisdiction Because FLH is not a Real Party in Interest

Defendants first contend that, at the time the complaint was filed in this action, Sonterra "lacked Article III standing" because it was a dissolved entity. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Second Am. Class Action Compl. for Lack of Subject Matter Jurisdiction and Failure to State a Claim ("Defs.' Br."), ECF No. 525, at 9–11.) Since the case was a legal nullity, Defendants argue, Plaintiffs cannot create subject matter jurisdiction by substituting FLH as plaintiff. (*Id.* at 13–14.)

In *Fund Liquidation Holdings LLC v. Bank of Am. Corp.* ("*SIBOR*"), the Second Circuit addressed whether Sonterra, also an original named plaintiff in that case, lacked Article III standing

because of its pre-suit dissolution. 991 F.3d 370 (2d Cir. 2021). The Court held that, since Sonterra "did not legally exist" pursuant to Cayman Island law, it "lacked standing to sue" at the time it filed suit. *SIBOR*, 991 F.3d at 384. The same holding applies here. However, that alone does not warrant dismissal.

The *SIBOR* court held that Sonterra's defect in Article III standing could easily be resolved "so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed." *Id.* at 386. The court explained that if FLH "(the real party in interest) is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time." *Id.* It is only when "the real party in interest either fails to materialize or lacks standing itself should the case be dismissed for want of subject-matter jurisdiction." *Id.* at 386.[3] If Sonterra effectively assigned its claims to FLH, there would be no Article III standing issue in this case.

Here, in the Asset Purchase Agreement dated August 3, 2021 ("APA"), Sonterra assigned, to Fund Liquidation Holdings, LLC, "all of [its] right, title and interest in all of the Assets," which are defined, in relevant part, as "all of [Sonterra's] right, title and interest in and to any and all Recovery Rights. . . ." (Exhibit A, ECF No. 527-1, Art. I § 1.1, Art. II.) "Recovery Rights" are defined as "all monetary, legal and other rights held by or accruing to [Sonterra] in respect of [any] Claim." (*Id.* Art. II.) As relevant here, one subdivision of "Claims" is "Future Claims," which is defined as:

> any and all claims of [Sonterra] . . . related to the ownership of, or any transaction in, any Traded Securities . . . as to which no Case has been filed as of the date hereof, including, without limitation, any and all of the following: (i) any future class action lawsuit . . .

---

[3] Defendants also contend that Sonterra lacked standing because it assigned its claims prior to suit. (*Id.* at 11.) The Second Circuit, similarly, rejected this argument, reasoning that Sonterra's pre-suit assignment of its claims to FLH "does not pose a constitutional roadblock" to Article III standing. *SIBOR*, 991 F.3d at 382.

or other lawsuits . . . (ii) any other future claims. . . .

First, Defendants contend that the APA did not effectively convey the "right to initiate or prosecute this lawsuit," because such a right must be express and the APA only transferred "the right to recover proceeds in connection with certain claims pre-dating the transfer or brought by other parties." (Defs.' Br. at 16; Reply Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Second Am. Class Action Compl. ("Defs.' Reply"), ECF No. 547, at 10–11.)  The APA, however, is not so limited.  It assigns all of Sonterra's right, title and interest in all claims relating to its "ownership of, or any transaction in, any Traded Securities," necessarily including the right to initiate or prosecute those claims.  The cases Defendants rely upon are inapposite.  *See, e.g., Cortlandt St. Recovery Corp. v. Deutsche Bank AG, London Branch*, No. 12 Civ. 9351 (JPO), 2013 WL 3762882, at \*2 (S.D.N.Y. July 18, 2013) (finding assignment insufficient where it did not indicate "what was assigned" or that "legal title to the claims at issue" was conveyed).  Accordingly, Sonterra effectively assigned the right to initiate and prosecute a lawsuit pertaining to the claims conveyed.

Second, Defendants argue that the APA fails to assign Sonterra's antitrust and RICO claims because the APA does not contain a specific or unambiguous general assignment. (Defs.' Br. at 17–18.)  "To effect a transfer of the right to bring an antitrust [or RICO] claim, the transferee must expressly assign the right to bring that cause of action, either by making specific reference to the [] claim or by making an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust [or RICO] claim." *DNAML Pty, Ltd. v. Apple Inc.*, No. 13 Civ. 6516 (DLC), 2015 WL 9077075, at \*3 (S.D.N.Y. Dec. 16, 2015).  Here, the APA makes a general unambiguous assignment of Sonterra's antitrust and RICO claims.  Indeed, Sonterra assigned "any and all claims . . . related to the ownership of, or any transaction in, any Traded Securities,"

including claims that can be brought in "any future class action lawsuit." The cases Defendants cite support rather than conflict with this conclusion. *See Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993) (finding assignment sufficient to convey RICO claim where it referred to "legal causes of action or claims" by expressly assigning entity's "causes of action, [] claims and demands of whatsoever nature"); *DNAML*, 2015 WL 9077075, at *5 (finding assignment insufficient to convey antitrust claims where it only assigned entity's "business and assets" but made no reference to "claims of any kind"). The APA, like the assignment in *Lerman* and unlike that in *DNAML*, refers to legal claims.

Defendants' reliance on *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC* ("*GBP LIBOR*") and *Fund Liquidation Holdings LLC v. Citibank, N.A.* ("*SIBOR I*"), is misplaced. In each case, the court held that a conveyance of claims relating to future "securities class action lawsuit[s]" was insufficient to convey antitrust claims because such language evidenced an intention to convey causes of action "arising out of the securities laws" and could not be understood to "encompass antitrust claims." *GBP LIBOR*, 403 F. Supp. 3d 257, 265 (S.D.N.Y. 2019); *SIBOR I*, 399 F. Supp. 3d 94, 103 (S.D.N.Y. 2019), *vacated and remanded sub nom. Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370 (2d Cir. 2021). Contrastingly, the APA in the present case conveys claims relating to "any future class action lawsuit" which can be understood as encompassing antitrust claims.[4]

Finally, Defendants contend that, even if the APA conveyed Sonterra's antitrust and RICO claims, it did not convey such claims relating to FX derivatives. (Defs. Br. at 18.) On this point, Defendants are correct. The APA limits the claims assigned to only those relating to Sonterra's "ownership of, or any transaction in, any Traded Securities." (APA, at 3.) The APA defines

---

[4] Defendants also cite *GBP LIBOR* and *SIBOR I* in support of their contention that the APA does not convey RICO claims. (Defs.' Br. at 18 n.19.) For the reasons explained, these cases are inapposite.

"Traded Securities" as all "Securities," which "means any debt and/or equity securities of any kind, type or nature, including, without limitation, stock, bonds, options, puts, calls, swaps and similar instruments or rights." (*Id.* at 4.) While "Securities" is explicitly defined in the APA, the lower case "securities" is not and signifies that the parties intended this term to be interpreted using its plain meaning, which does not include FX derivatives. *See Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139 (LGS), 2018 WL 5292126, at *9 (S.D.N.Y. Oct. 25, 2018) ("[A]lthough FX instruments are analogous to securities in some respects, Plaintiffs do not have recourse under federal securities . . . laws."). Thus, the APA only assigns those claims relating to Sonterra's ownership or transaction in securities. While Plaintiff is correct, the definition of "Securities" encompasses a wide variety of financial instruments, it encompasses securities and securities-adjacent instruments.

Plaintiffs further contend that the plain meaning of "securities" does not matter because the parties included FX transactions in the "Trade Data" provided by Sonterra, which evidences the parties' clear intent to include FX transactions in the definition of "Traded Securities." (Pls.' Opp'n at 16.) As Plaintiffs admit, however, the language of the APA is unambiguous and, thus, does not present a circumstance that would require this Court to look beyond the four corners of the agreement. The term "Traded Securities," as defined by the APA, makes clear that Sonterra only assigned its claims relating to its ownership or transaction in securities or securities adjacent instruments. Indeed, the definitions of "Traded Securities" and "Securities" make no reference or provide any other indication that either of terms should be interpreted with reference to any "Trade Data." On the other hand, the APA defines "Trade Data" as all "relevant information . . . relating to" transactions in securities and securities-adjacent instruments. (APA, Art. II.) This definition further confirms the parties' intent to convey claims relating to securities. The Notices of

9

Assignment attached as exhibits to the APA also confirm such an intent. It states that Sonterra assigned its rights in "any claims related to . . . securities of any kind, type or nature." (*Id.* at Ex. B.) Accordingly, the APA did not assign the claims at issue here to FLH.[5] Thus, FLH is not a real party in interest and Rule 17 does not permit its joinder in this action.

Thus, Defendants motion to dismiss Sonterra and FLH for lack of subject matter jurisdiction is granted.

**B. Hayman Funds' Substitution Stands.**

Defendants contend that because the original named Plaintiffs, Sonterra and Hayman Capital, did not have Article III standing, "this Court always lacked subject matter jurisdiction" and the Hayman Funds' substitution cannot "confer subject matter jurisdiction." (Defs.' Br. at 15.) The Hayman Funds, the real parties in interest existing at the time this suit was filed, sought to be substituted into this action filed by Hayman Capital, the investment advisor that brought this action on the funds' behalf. In accordance with *SIBOR*, Hayman Funds' substitution avoids dismissal of this case even though the original plaintiffs lacked Article III standing. Indeed, as the Second Circuit explained, "if we can alter the party in whose name a case must be prosecuted without offending Article III, it stands to reason that failing to initially name the correct party is

---

[5] Contrary to Plaintiffs' contention, *SIBOR* does not "fully support[]" FLH's substitution for Sonterra. (Letter, dated March 23, 2021, ECF No. 555.) In *Sibor*, the Second Circuit referenced the district court's preliminary determination regarding Sonterra's assignment to FLH. SIBOR, 991 F.3d at 392 (citing *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.* ("*SIBOR I*"), No. 16 Civ. 5263 (AKH), 2018 WL 4830087, at *11–12 (S.D.N.Y. Oct. 4, 2018) (granting leave to amend the complaint after concluding that "[t]he documents 'appear' to show a full assignment")). The district court, however, did not fully address whether the APA effectively assigned the claims there because it dismissed Sonterra after finding it was not an efficient enforcer. *Fund Liquidation Holdings LLC v. Citibank, N.A.*, 399 F. Supp. 3d 94, 99 (S.D.N.Y. 2019), *vacated and remanded sub nom. Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370 (2d Cir. 2021) (explaining that in *SIBOR I*, the court granted leave to amend and instructed Plaintiffs to "show how they got their assignment" and give an "interpretation"); *see also id.* at 104 (declining to address whether the effectivity of Sonterra's assignment because the court dismissed Sonterra's claims).

not itself a constitutional problem." *SIBOR*, 991 F.3d at 388. Accordingly, the Hayman Funds were properly substituted under Rule 17 and their "joinder . . . relates back to the 'original[ ] commence[ment]' of the suit," which is "consistent with the directive that standing must exist at the case's inception." *Id.* at 389.[6] Therefore, Defendants' motion to dismiss for lack of subject matter jurisdiction over Hayman Funds' claims is denied.[7]

## III.   DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' ANTITRUST CLAIM IS GRANTED IN PART

The SAC asserts that the Defendants conspired with each other to make false Yen LIBOR submissions in violation of Section 1 of the Sherman Act. Defendants argue that this claim should be dismissed because (i) Plaintiffs lack antitrust standing because they are not efficient enforcers, (ii) the claim is barred by the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a, and (iii) Plaintiffs fail to plausibly allege an antirust conspiracy. (Defs.' Br. at 28.)

### A. Antitrust Standing.

To have standing to sue for an antitrust violation, a plaintiff must be an efficient enforcer which requires courts to consider: (1) the "directness or indirectness of the asserted injury," through evaluation of the "chain of causation" linking [plaintiff's] asserted injury and the Banks' alleged price-fixing; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which [plaintiff's] damages claim is "highly speculative"; and (4) the importance of avoiding "either the risk of duplicate recoveries on the one hand, or the danger of complex

---

[6] Defendants' contention that relation back is inapplicable because the present antitrust claim does not arise out of the conduct, transaction or occurrence of the original pleading is rejected. (Defs.' Br. at 23 n.26.)

[7] Given the Second Circuit's decision in *SIBOR*, this Court's reasoning regarding the Hayman Funds applies with equal weight to Plaintiff CalSTRS. Accordingly, Defendants' motion to dismiss CalSTRS for lack of subject matter jurisdiction is denied.

apportionment of damages on the other." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778 (2d Cir. 2016) (quoting *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 540–45, 103 S. Ct. 897 (1983)). "The efficient enforcer factors reflect a 'concern about whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement.'" *Gelboim*, 823 F.3d at 780. "This test is not mechanical, and 'the weight to be given the various factors will necessarily vary with the circumstances of particular cases.'" *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG* ("*CHF LIBOR*"), 277 F. Supp. 3d 521, 558 (S.D.N.Y. 2017) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005). Additionally, "[i]t is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), No. 11 MDL 2262 (NRB), 2016 WL 7378980, at *15 (S.D.N.Y. Dec. 20, 2016) (citation omitted).

### i.   Directness of Causation of the Injury

"The first factor addresses the 'directness or indirectness of the asserted injury,' which 'requires evaluation of the chain of causation linking [plaintiff's] asserted injury and the [defendants'] alleged price-fixing.'" *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC* ("*GBP LIBOR*"), 366 F. Supp. 3d 516, 532–33 (S.D.N.Y. 2018) (quoting *Gelboim*, 823 F.3d at 778). Defendants are correct that there is an attenuated chain of causation between Defendants' conduct and Plaintiffs' injuries. (Defs.' Br. at 29–30.) Consequently, this factor weighs against a finding of efficient enforcer status for Plaintiffs. Further, this factor weights heavily against CalSTR's umbrella standing for its transactions with non-defendants.[8]

---

[8] Defendants' reliance on *Laydon* is misplaced. There, the chain of causation was further attenuated by plaintiff's failure to "point to any direct, clearly traceable means by which Defendants' alleged manipulation of one benchmark led to a loss to him on contracts linked to an entirely separate benchmark." *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2014 WL 1280464, at *9 (S.D.N.Y. Mar. 28, 2014).

In *Gelboim* expressed concern over 'umbrella standing' which is asserted when "a plaintiff is injured by dealing with a non-defendant by virtue of a defendant's raising of prices in the market as a whole." *GBP LIBOR*, 366 F. Supp. 3d at 533 (citing *Gelboim*, 823 F.3d at 778). Such plaintiffs vastly extend the scope of antitrust liability. *Sullivan*, 2017 WL 685570, at *16. This concern is present here if plaintiffs are permitted to proceed on transactions entered with non-defendants. *Gelboim*, 823 F.3d at 779. Thus, while a plaintiff's status as a direct purchaser is not a requirement for antitrust standing, "'whether [p]laintiffs dealt directly or indirectly with [d]efendants, as well as the scope of the relevant market, are both relevant to the issue of causation.'" *GBP LIBOR*, 366 F. Supp. 3d at 533 (citing *Gelboim*, 823 F.3d at 778). In line with courts in this district, this Court draws "a line between plaintiffs who transacted directly with defendants and those who did not" because the "'independent decision' of contracting parties to incorporate [Yen] LIBOR 'breaks the chain of causation between defendants' actions and a plaintiff's injury.'" *Id.* at 533 (quoting *Sullivan*, 2017 WL 685570, at *17).

Plaintiffs contend that *Apple Inc. v. Pepper* forecloses "the invocation of the *Illinois Brick* 'indirect purchaser' doctrine." (Pls.' Br. at 30.); 139 S. Ct. 1514, 1520 (2019). Plaintiffs misread that case. There, the Supreme Court upheld the *Illinois Brick* bright line rule and held that plaintiffs, as direct purchasers of Apple, were permitted to proceed with their antitrust claim. *Id.* Here, CalSTRS's transaction with Barclays Capital Inc., a non-defendant, presents the same concerns outlined above regarding umbrella standing. It is not a direct purchaser of a Defendant. Plaintiff's attempt to employ the "single enterprise" liability discussed in *Copperweld Corp. v.*

---

Likewise, *7 W. 57th Street Realty Co. v. Citigroup, Inc.* is inapposite because the bonds at issue there "were not actually tied to LIBOR" whereas here, Plaintiffs have alleged that Yen LIBOR is incorporated implicitly into their transactions through a complex formula involving a number of other causal factors. 771 F. App'x 498 (2d Cir. 2019). While these vaguely defined links present a hurdle for Plaintiffs to overcome regarding causation, this hurdle presents more of an issue for umbrella standing than for those claims against Defendants that Plaintiffs directly transacted with.

*Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) fails.   Under *Copperweld*, coordinated activity of related entities permits viewing the entities as a single enterprise.   *Id.*   Plaintiffs' complaint, however, is devoid of any allegation of coordinated activity.   *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2019 WL 1331830, at *38 (S.D.N.Y. Mar. 25, 2019) ("The independent decision of Panel Banks' subsidiaries and affiliates to sell LIBOR-based financial instruments did not further the plausibly pled conspiracy, the main objective of which was achieved when Panel Banks submitted allegedly suppressed LIBOR submissions.").

This factor weighs against antitrust standing for CalSTRS's claim pertaining to its transactions with non-defendants.   Moreover, this factor weighs less strongly against Plaintiffs' standing to pursue its claims pertaining to transactions with Defendants.

### ii.   Existence of More Direct Victims

Under this second factor, whether Plaintiff is a consumer or competitor is not dispositive. "Like the plaintiffs in *Gelboium*, 'one peculiar feature of this case is that remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers of the Banks.'" *GBP LIBOR*, 366 F. Supp. 3d at 546 (quoting *Gelboim*, 823 F.3d at 779).   Thus, in this efficient enforcer analysis, this factor is given diminished weight.

### iii.   Speculative Damages

"'[H]ighly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement.'" *GBP LIBOR*, 366 F. Supp. 3d at 546 (quoting *Gelboim*, 823 F.3d at 779).   "While 'some degree of uncertainty stems from the nature of antitrust law' and is permitted, plaintiffs must be able to allege that they could arrive at a just and reasonable estimate of damages." *Id.* (citation omitted).   As Judge Broderick explained in *GBP LIBOR*, "'[a]s with most antitrust cases,

14

to establish damages, [p]laintiffs will have to offer a reliable 'but-for' world. At a minimum, that 'but-for' world will require [p]laintiffs to establish (1) what an alternative Fix Price would have been absent collusion, and (2) the behavior of [Defendants] absent a Fix Price affected by collusion.'" *GBP LIBOR*, 366 F. Supp. 3d at 546 (citation omitted).  In evaluating whether damages are unduly speculative in price-fixing cases, considerations include (1) the extent to which the damages claim is conclusory in nature; (2) whether the injury is "so far down the chain of causation from defendants' actions that it would be impossible to untangle the impact of the fixed price from the impact of intervening market decisions," which relates to the causation factor; (3) whether external market factors affected the "relationship between the fixed price and the price that the plaintiffs ultimately paid;" and (4) whether "the non-fixed components of a transaction were heavily negotiated between the parties in relation to the fixed component." *GBP LIBOR*, 366 F. Supp. 3d at 546 (quoting *LIBOR VI*, 2016 WL 7378980, at *17–18).

As noted by other courts in this district, highly negotiated interest rate swaps likely absorb the effects of Yen LIBOR suppression and the negotiated components of FX forwards render the effect of Yen LIBOR manipulation speculative. *See GBP LIBOR*, 366 F. Supp. 3d at 547; *LIBOR VI*, 2016 WL 7378980, at *18. This factor weighs against antitrust standing for CalSTRS's claim pertaining to its transactions with non-defendants.  It weighs less strongly against Plaintiffs' standing to pursue its claims pertaining to transactions with Defendants.

### iv.   Duplicative Recovery and Complex Apportionment

"The final factor 'reflects a strong interest in keeping the scope of complex antitrust trials within judicially manageable limits.'" *GBP LIBOR*, 366 F. Supp. 3d at 548 (quoting *LIBOR VI*, 2016 WL 7378980, at *23).  "It traditionally concerns the prospect of different groups of plaintiffs attempting to recover for the same exact injury." *Id.* (citation omitted).  The conduct at issue here

was the subject of numerous government and regulatory investigations and proceedings many of which appear to be ongoing. There is nothing before this Court demonstrating that any of the Plaintiffs have received payments as a result of those proceedings and there are various ways to protect against duplicate recoveries or apportionment issues in this action.

Thus, the Hayman Funds and CalSTRS are efficient enforcers and have antitrust standing to pursue an antitrust claim against those Defendants with whom they have transacted. CalSTRS lacks standing to pursue its antitrust claim involving transactions with non-defendants. Thus, that claim is dismissed.

### B. Antitrust Conspiracy.[9]

The Plaintiffs plausibly allege antitrust claims against RBS, UBS, and Société Générale. "'In order to establish a conspiracy in violation of § 1 . . . proof of joint or concerted action is required; proof of unilateral action does not suffice.'" *CHF LIBOR*, 277 F. Supp. 3d at 552 (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012)). "'Price-fixing conspiracies concentrate the power to set prices among the conspirators, including the power to control the market and to fix arbitrary and unreasonable prices.'" *GBP LIBOR*, 366 F. Supp. 3d at 549–50 (quoting *Sullivan*, 2017 WL 685570, at *23). "To allege a conspiracy sufficient to survive a motion to dismiss, a plaintiff must 'allege enough facts to support the inference that a conspiracy actually existed,' which can be done in two ways." *CHF LIBOR*, 277 F. Supp. 3d at 552 (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).

"'First, a plaintiff may, of course, assert direct evidence that the defendants entered into an

---

[9] In light of this Court's findings above regarding antitrust standing, this Court only examines whether Plaintiffs have sufficiently pleaded an antitrust conspiracy with regard to the following Defendants: RBS Plc, Société Générale, UBS AG, Merrill Lynch International, and Barclays Bank Plc.

agreement in violation of the antitrust laws.' But because 'this type of 'smoking gun' can be hard to come by, especially at the pleading stage,' a complaint may instead 'present circumstantial facts supporting the inference that a conspiracy existed.'" *CHF LIBOR*, 277 F. Supp. 3d at 552 (citation omitted). "The line separating conspiracy from parallelism is indistinct, but may be crossed with allegations of interdependent conduct, accompanied by circumstantial evidence and plus factors. These plus factors include: (1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications." *GBP LIBOR*, 277 F. Supp. 3d at 552 (quoting *Gelboim*, 823 F.3d at 781). "'Collusion within a bank will not support a claim pursuant to section 1 of the Sherman Act." *CHF LIBOR*, 277 F. Supp. 3d at 552 (quoting *LIBOR IV*, 2015 WL 4634541, at *39).

Moreover, "'the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial.'" *CHF LIBOR*, 277 F. Supp. 3d at 553 (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)). "Instead, '[b]ecause plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible,' and the 'choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.'" *CHF LIBOR*, 277 F. Supp. 3d at 553 (quoting *Anderson News, L.L.C.*, 680 F.3d at 184–85).

Plaintiffs plausibly allege an antitrust conspiracy to manipulate Yen LIBOR submissions and rates against Defendants RBS, UBS, and Société Générale. [10] Plaintiffs allege, in the form of

---

[10] It is worth noting that the antitrust conspiracy as alleged—a sweeping, long running conspiracy to "make false submissions to the BBA designed to artificially suppress, inflate, maintain, or otherwise alter Yen-

regulatory findings, settlements. and communications, that on multiple occasions these three Defendants participated in the manipulation of Yen LIBOR and inter-defendant collusion. (*See, e.g.*, Exhibit B-4, ECF No. 488-12, at 13 n.15 (CFTC finding regarding UBS and RBS's collusion to "manipulate[ Yen LIBOR] rate"); SAC ¶ 5 (allegation that UBS self-reported manipulation of Yen-LIBOR-based derivative prices to the DOJ); *id.* ¶ 16 (alleging that Société Générale admitted in a CFTC settlement to Yen LIBOR manipulation); SAC ¶¶ 5, 13, 276, 524, 530–31, 605–06, 753-56, 762, 794–97, 847, 969.)

Defendants contend that Plaintiffs' conspiracy allegations fail because they are nothing more than actions by a discrete set of individuals that do not plausibly allege a "conspiracy spanning six years and involving 18 Defendants." (Defs.' Br. at 34.) Plaintiffs' allegations, however, sufficiently plead allegations demonstrating the conspiracy extended beyond "a discrete set of individuals." Even so, as explained, at this stage of the proceeding, it is not necessary to choose "between two plausible inferences that may be drawn from factual allegations." *CHF LIBOR*, 277 F. Supp. 3d at 553 (quoting *Anderson News, L.L.C.*, 680 F.3d at 184–85). Moreover, issues regarding the conspiracy's scope can be raised at a later stage. Accordingly, Defendants'

---

LIBOR" —is simply implausible when viewed as a whole. As Judge Stein explained, and as suggested in *Gelboim*, "it is harder to infer a conspiracy from individual acts of trader-based manipulation because large financial institutions are both buyers and sellers of derivative products, and thus any changes may well offset each other. But assuming that an upward or downward shift would provide a net increase in profit to a particular bank, one would need to further assume that the same shift would benefit each member of the conspiracy. Unless the banks are similarly situated in this respect, there would be no evident common motive to conspire. This particularly undermines the inference of a conspiracy when the simpler explanation is that the banks may have been independently engaging in intra-defendant manipulation by submitting false [Yen] LIBOR quotes through requests from their own traders to those in the same bank who submit the quote to the BBA." *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 555 (S.D.N.Y. 2017) ("*CHF LIBOR*"). The SAC offers no explanation why conspiracy, as alleged, would be plausible. Consequently, Plaintiffs may not "shoehorn each" Defendant into the conspiracy absent Defendant specific allegations of collusion. *Alaska Dep't of Revenue, Treasury Div. v. Manku*, No. 20-1759-CV, 2021 WL 3027170, at *4 (2d Cir. July 19, 2021) ("*SSA Bonds*") (noting Plaintiffs' failure "to link each of the defendants individually to specific acts of anticompetitive conduct in furtherance of the conspiracy.")

motion to dismiss Plaintiffs antitrust claim against UBS, RBS and Société Générale (the "Remaining Defendants") is denied.[11]

Plaintiffs do not plausibly allege that Merrill Lynch International participated in an antitrust conspiracy. Contrary to Plaintiffs' contention, "each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose. Mere generalizations as to any particular defendant—or even defendants as a group—are insufficient." *CHF LIBOR*, 277 F. Supp. 3d at 553 (quoting *In re Zinc Antitrust Litig.*, 155 F.Supp.3d 337, 384 (S.D.N.Y. 2016). Plaintiffs refer this Court to only two paragraphs pertaining to MLI in its over 400-page SAC, neither of which indicate that any individual at MLI participated in any way in the conspiracy. The allegation that a trader agreed to participate in one TIBOR/LIBOR trade does not indicate an involvement in a lengthy conspiracy to manipulate Yen LIBOR. Accordingly, Plaintiffs' antitrust claim against Merrill Lynch is dismissed.

Moreover, Plaintiffs fail to plausibly plead Barclays Bank Plc's involvement in the alleged conspiracy. *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 559 (S.D.N.Y. 2018) ("*GBP LIBOR*") (citing *Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12 Civ. 1667(ER), 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014) ("Group pleading, by which allegations are made against families of affiliated entities[,] is simply insufficient to withstand review on a motion to dismiss."); *In re Digital Music Antitrust Litig.*, 812 F.Supp.2d 390, 417 (S.D.N.Y. 2011) (allegations of "direct involvement of the Parent Companies by way of generic

---

[11] Contrary to Defendants' contention, *SSA Bonds* does not lead to a dismissal of Plaintiffs' entire antitrust claim. There, the Second Circuit, affirmed the dismissal of an antitrust claim where plaintiffs alleged a "single, unitary super-desk" conspiracy involving "more than twenty entities . . . conspiring every day, nearly all day" in a "decentralized, opaque, and frenetic" secondary market for U.S. dollar-denominated supranational, sovereign, and agency bonds. While this Court questioned the plausibility of Plaintiffs' conspiracy as to *all* Defendants, unlike plaintiffs in *SSA Bonds*, Plaintiffs have sufficiently alleged collusion on a smaller scale and have not "explicitly refused to plead . . . a narrower antitrust conspiracy." *SSA Bonds*, 2021 WL 3027170, at *2, *4.

references to 'defendants' " were insufficient)).   Consequently, Plaintiffs' antitrust claim against Barclays Bank Plc is likewise dismissed.

### C.   FTAIA.

"The FTAIA 'lays down a general rule placing all (non-import) activity involving foreign commerce outside the Sherman Act's reach.'" *CHF LIBOR*, 277 F. Supp. 3d at 568–69 (quoting *F. Hoffmann–La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004)). "'It then brings such conduct back within the Sherman Act's reach provided that the conduct both (1) sufficiently affects American commerce, *i.e.*, it has a direct, substantial, and reasonably foreseeable effect on American domestic, import, or (certain) export commerce, and (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'give rise to a [Sherman Act] claim.'" *CHF LIBOR*, 277 F. Supp. 3d at 568–69 (quoting *Empagran S.A.*, 542 U.S. at 162).   "'[F]oreign anticompetitive conduct can have a statutorily required 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic or import commerce even if the effect does not follow as an immediate consequence of the defendant's conduct, so long as there is a reasonably proximate causal nexus between the conduct and the effect.'" *Id.* at 569 (quoting *Lotes Co., Ltd. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 398 (2d Cir. 2014) (citation omitted)). "'In adopting the FTAIA, Congress expressly endorsed an extraterritorial application of the Sherman Act.'" *Id.* at 569 (quoting *Sullivan*, 2017 WL 685570, at \*22).

Defendants contend that the FTAIA bars Plaintiffs' antitrust claim because the conduct at issue here is entirely foreign conduct lacking a causal nexus to any domestic effect.   (Defs.' Br. at 37.)   Defendants heavily rely on this Court's decision in Laydon, in which the CEA and RICO claims there were dismissed as impermissibly extraterritorial.   (Defs.' Br. at 38 (citing Laydon v. Mizuho Bank, Ltd., 2020 WL 5077186, at \*2 (S.D.N.Y. Aug. 27, 2020) (*Laydon V*)).)   That

decision regarding the CEA and RICO claims in that case, does not inform the decision this Court must make here regarding the applicability of the FTAIA to Plaintiffs' antitrust claims. Indeed, unlike the claims in that case, the FTAIA does not bar Plaintiffs' antitrust claim here. Defendants' alleged manipulation of Yen LIBOR had a foreseeable effect on the Yen-LIBOR-based derivatives sold in the U.S. Contrary to Defendants' contention, the focus is not the Defendants' conduct but the effect in the U.S. and this Court follows the many decisions that have declined to invoke the FTAIA to bar antitrust claims relating to benchmark manipulation. *CHF LIBOR*, 277 F. Supp. 3d 521, 569 (S.D.N.Y. 2017) (noting the numerous decisions on this issue); *see also id.* ("There can be no serious dispute that the manipulation of a benchmark that is globally disseminated and serves as a pricing component of derivatives sold widely in the United States, as plaintiffs have plausibly alleged, would have a foreseeable effect within the United States."). Accordingly, Plaintiffs' antitrust claim is not barred by the FTAIA.

## IV.   DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' RICO CLAIMS IS GRANTED

Defendants contend that Plaintiffs' RICO claims predicated on wire fraud seek an impermissible "extraterritorial application of the RICO statute." (Defs.' Br. at 41.) "The Supreme Court in *RJR Nabisco, Inc. v. European Community*, established that private claims under RICO must overcome a presumption against extraterritoriality." *GBP LIBOR*, 366 F. Supp. 3d at 555 (citing *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 136 S.Ct. 2090, 2100–02, 195 L.Ed.2d 476 (2016)). "A private plaintiff seeking extraterritorial application of RICO is subject to considerations that do not apply to criminal prosecutions under the statute,[12] and must specifically

---

[12] Accordingly, Plaintiffs' reliance on various criminal cases to contend that their claims are not extraterritorial is misplaced, as this Court previously held in *Laydon*. *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), ECF No. 491, at 3 n.3 (S.D.N.Y. July 24, 2015) ("To be within the domestic reach of the wire fraud statute, is not the same as overcoming the presumption against extraterritoriality in the RICO context.") (internal quotation marks omitted).

allege a domestic injury." *GBP LIBOR*, 366 F. Supp. 3d at 555 (citing *RJR*, 136 S. Ct. at 2106). "[T]he wire fraud statute does not have extraterritorial application and may not serve as a predicate act for a RICO claim premised on foreign-based activities." *Sullivan v. Barclays PLC*, No. 13 Civ. 2811 (PKC), 2017 WL 685570, at *33 (S.D.N.Y. Feb. 21, 2017). Accordingly, Plaintiffs must allege that the wire fraud was domestic in nature.

Here, Plaintiffs rely on (1) the use of "U.S. wires to send fraudulent trade confirmations . . . to U.S. counterparties," (2) receipt of funds from Plaintiffs through U.S. wires and employment of traders in the U.S. who traded in Yen-LIBOR-based derivatives in the U.S., (3) sending communications through the U.S., and (4) the activities of Thompson Reuters in connection with its services to publish the LIBOR fixes. (Pl.'s Op'n at 48–49.) Yet, those contacts have consistently been rejected as providing only a "minimal nexus to the United States. . . ." *CHF LIBOR*, 277 F. Supp. 3d at 581 (collecting cases). Plaintiffs' allegations regarding domestic conduct are almost entirely similar to those rejected in *Laydon*. As in *Laydon*, Plaintiffs' RICO claim is "based on the alleged actions of foreign and international institutions that submitted false information to the BBA." *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1515487, at *9 (S.D.N.Y. Mar. 31, 2015). As Judge Stein explained:

> [D]efendants are based abroad, their allegedly manipulated quotes were submitted from abroad to a banking association located abroad, and the [Yen] LIBOR rate at issue is the [Yen] LIBOR rate for a foreign currency. That the alleged goal of the conspiracy was to increase worldwide profits, including profits generated in the United States, cannot render "domestic" a scheme that was otherwise centered abroad. Nor can the fact that the [Yen] LIBOR fixes were distributed worldwide, including into the United States, or that defendants carried out their manipulation from abroad through servers that happened to route their communications in the United States. The Supreme Court doggedly underscored this point when it wrote that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case."

*CHF LIBOR*, 277 F. Supp. 3d at 582 (citing *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 266 (2010)).  Accordingly, Plaintiffs' RICO claims are dismissed.[13]

## V.  DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS DENIED

As an initial matter, in light of this Court dismissal of Plaintiffs' federal claims against all Defendants other than RBS Plc, Société Générale, and UBS AG (the "Dismissed Defendants"), this Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims against the Dismissed Defendants.

As explained above, Plaintiffs have adequately pleaded the involvement of the Remaining Defendants in the alleged conspiracy.  Defendants' contend that Plaintiff CalSTRS's unjust enrichment claim against the Remaining Defendants can only be raised in the absence of an actual agreement. (Defs.' Br. at 49–50.)  "A plaintiff may proceed on the 'quasi-contract theory of unjust enrichment' only 'where the contract does not cover the dispute in issue.'"  *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 193–94 (S.D.N.Y. 2018), adhered to on denial of reconsideration, No. 16 Civ. 6496 (LAK), 2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018).  The SAC does not allege any information regarding the terms of CALSTRS's contracts with the Remaining Defendants.  Plaintiff, however, contends that Defendants' "misconduct extended well beyond the terms of any underlying agreement." (Pls.' Opp'n at 52.)  Since neither party has provided this Court with the relevant contractual terms, this Court cannot resolve this issue at this stage. Defendants' motion to dismiss Plaintiff CalSTRS's unjust enrichment claim against the Remaining Defendants is denied.

---

[13] Consequently, this Court need not address Defendants remaining arguments regarding these claims.

## VI.   DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM IS GRANTED IN PART

This Court declines to exercise supplemental jurisdiction over Plaintiffs' implied covenant of good faith and fair dealing claim against Bank of America, Merrill Lynch, and Barclays. Thus, Defendants' motion to dismiss is granted.

Plaintiff CalSTRS asserts a claim for breach of the implied covenant of good faith and fair dealing against the Remaining Defendants.[14] "To state a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *LIBOR IV*, 2015 WL 4634541, at *67 (citing *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir.2004)). "'A covenant of good faith and fair dealing in the course of contract performance' is '[i]mplicit in all contracts,' and thus a breach of this implied covenant constitutes a breach of the contract." *LIBOR IV*, 2015 WL 4634541, at *67 (citations omitted). "Specifically, implied in every contract is a promise that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *LIBOR IV*, 2015 WL 4634541, at *67 (citation omitted). CalSTRS has plausibly alleged that in allegedly manipulating Yen LIBOR, the Remaining Defendants interfered with its rights to enjoy maximum returns permitted "by market forces." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 192 (S.D.N.Y. 2018). Defendants' remaining arguments are rejected for the reasons discussed above. Accordingly, Defendants' motion to dismiss CalSTRS's claim is denied.

---

[14] The SAC does not allege which law governs CalSTRS's contracts with these Defendants but both parties cite New York law in their briefs.

## VII.   DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION IS GRANTED IN PART

Defendants move to dismiss for lack of personal jurisdiction.  In light of the conclusions reached above, this Court will only determine whether the SAC adequately alleges personal jurisdiction over the Remaining Defendants.

"To make out a prima facie case of personal jurisdiction ... plaintiffs must establish a statutory basis for personal jurisdiction and that the exercise of personal jurisdiction [ ] comport[s] with constitutional due process principles." *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, No. 18 Civ. 10364 (LGS) (SA), 2021 WL 3192814, at *2 (S.D.N.Y. July 28, 2021).

Since Plaintiffs' claim arises under the Sherman Act, the "appropriate forum to consider for purposes of the minimum contacts analysis is the entire United States." *Id.* "'[S]everal courts in this district addressing federal claims with national service of process—including claims based on alleged LIBOR manipulation—have applied the 'national contacts' test.'" *GBP LIBOR*, 366 F. Supp. 3d at 562 (collecting cases).

There are two forms of personal jurisdiction, specific and general but only specific jurisdiction is claimed here.  "'[S]pecific jurisdiction exists when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18 Civ. 2830 (JPO), 2020 WL 7046837, at *2 (S.D.N.Y. Nov. 30, 2020) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir. 1996); *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021). "[T]here must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* at 1025 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017)).

A court's authority to exercise specific personal jurisdiction over a defendant "depends on the defendant having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)).   The due process analysis consists of two discrete components; "the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016); *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).

Under the minimum contacts inquiry, the court "must determine whether the defendant has sufficient minimum contacts with the forum . . . to justify the court's exercise of personal jurisdiction." *Id.* (citing *Int'l Shoe*, 326 U.S. at 316).   The defendant "must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" *Ford Motor Co.*, 141 S. Ct. at 1024–25 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Id.* (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).   A foreign defendant may also be subject to specific jurisdiction if "relevant conduct took place entirely outside the forum but that contact had in-forum effects harmful to the plaintiff." *GBP LIBOR*, 366 F. Supp. 3d at 562.   It is not enough that effects be foreseeable. *Id.*

Once the court is satisfied that a defendant has sufficient contacts with the forum to justify the court's exercise of personal jurisdiction, "whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloé*, 616 F.3d at 164 (quoting *Int'l Shoe*, 326 U.S. at 316).   If the court determines that a defendant lacks the requisite contacts, it need not consider the second prong of the due process test. *See Metro. Life Ins. Co. v. Robertson–Ceco*

*Corp.*, 84 F.3d 560, 568–69 (2d Cir. 1996) (quoting *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)). "A plaintiff asserting specific personal jurisdiction 'must establish the court's jurisdiction with respect to *each* claim asserted.'" *GBP LIBOR*, 366 F. Supp. 3d at 562 (Sunward Elecs., Inc. v. McDonald, 362 F.3d 17,24 (2d Cir. 2004)).

## A. RBS is Dismissed for Lack of Personal Jurisdiction.

Defendants contend that Plaintiffs fail to sufficiently allege facts satisfying the venue provision of Section 12. (Mem. of Law in Supp. of the Foreign Bank Defs.' Mot. to Dismiss the Second Am. Class Action Compl. for Lack of Personal Jurisdiction ("Defs.' PJ Br."), ECF No. 513, at 36.) To satisfy the venue provision, the SAC must sufficiently allege that RBS "transact[s] business" in the Southern District of New York. *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 198–99 (S.D.N.Y. 2018) ("transact business" refers "to the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character.") (internal quotation marks omitted). Plaintiffs fail to allege that RBS conducts business in this District of a substantial character. Accordingly, Plaintiff CalSTRS antitrust claim against RBS is dismissed. Likewise, Plaintiff CalSTRS's remaining state law claim against RBS is dismissed as this Court declines to exercise supplemental jurisdiction over that claim.[15]

## B. Plaintiffs Sufficiently Allege Jurisdiction Against UBS and Société Générale.[16]

---

[15] Contrary to Plaintiffs' contention, "jurisdiction lies only in cases in which the venue provision of Section 12, not the general venue statute, is satisfied." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 198 (S.D.N.Y. 2018). Indeed, "the operative language for purposes of personal jurisdiction is found in the second half of the statute – that is, the service provision, which states that 'all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.' The Second Circuit has construed 'in such cases' in accordance with its plain language." Id. (citation omitted). Thus, the general venue statute is inapplicable.

[16] Defendants' contention that Plaintiffs' claims are time barred and thus, warrant dismissal, is rejected. (Defs.' Br. at 19.) The SAC adequately alleges that Plaintiff CalSTRS's claims were tolled by the fraudulent concealment doctrine. Plaintiff demonstrates that Defendants concealed the existence of its cause of action, that Plaintiff remained in ignorance and Plaintiff's ignorance was not attributable to lack of diligence.

UBS and Société Générale are each entities incorporated and headquartered abroad. *See* Decl. of Richard G. McCarty, ECF No. 521 ¶ 8 (RBS headquartered and incorporated in the United Kingdom); Decl. of Dominique Bourrinet, ECF No. 522 ¶ 2 (Société Générale incorporated and headquartered in France); Decl. of John Connors, ECF No. 523 ¶ 3 (UBS incorporated and headquartered in Switzerland). Plaintiff alleges that each Defendant traded with Plaintiff in the allegedly manipulated product and trade the same product with other U.S. parties. (SAC ¶¶ 156–60, 242.) Notably, both Defendants have U.S. trading desks or offices/branches where traders arrange and execute Yen-LIBOR-based derivatives. (SAC ¶¶ 5, 153–154, 197–198.) Each contact has a sufficient nexus to the conspiracy alleged here: conspiracy to manipulate Yen LIBOR in order to unlawfully profit or limit liabilities.

UBS and Société Générale purposefully availed themselves of the forum and have failed to present a compelling case demonstrating that the exercise of jurisdiction here would be unreasonable and not comport with due process.

Finally, even if Defendants are correct that jurisdiction over the state law claims are only proper in California or Texas, this Court will exercise pendent personal jurisdiction since personal jurisdiction has been established regarding the Sherman Act claims. *GBP LIBOR*, 366 F. Supp. 3d at 566 ("Having found that Plaintiffs have made a *prima facie* showing" of personal jurisdiction over the "Sherman Act claims" and "that the Sherman Act claims have a 'nucleus of pertinent facts in common' with the unjust enrichment claim, it is appropriate to exercise pendent personal jurisdiction.").

## VIII. CONCLUSION

Defendants' motion to dismiss all claims by Plaintiffs Sonterra Capital Master Fund, Ltd. and Fund Liquidation Holding LLC for lack of subject matter jurisdiction is GRANTED. Defendants' motion to dismiss Plaintiffs Hayman Funds and CalSTRS for lack of subject matter

jurisdiction is DENIED.

Defendants' motion to dismiss count one of the SAC failure to state a claim is GRANTED as to all Defendants except RBS, Société Générale and UBS. Defendants motion to dismiss counts two and three of the SAC against all Defendants is GRANTED.

Defendants' motion to dismiss for lack of personal jurisdiction over RBS is GRANTED. Defendants' motion to dismiss for lack of personal jurisdiction over Société Générale and UBS is DENIED.

This Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims except those claims by Plaintiff CalSTRS against Société Générale and UBS.

Plaintiffs' request for jurisdictional discovery is DENIED.

The Clerk of Clerk is instructed to close ECF No. 505 accordingly.


Dated:   September 30, 2021
         New York, New York


                                                    SO ORDERED:

                                                    _George B. Daniels_
                                                    GEORGE B. DANIELS
                                                    United States District Judge